IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| CATHOLIC DIOCESE OF WILMINGTON, INC. ) | |
| a Delaware domestic nonprofit religious ) | |
| corporation ) | Case No. 09-13560 (CSS) |
| ) | |
| Debtors. ) | |
| ) | **Hearing Date: October 21, 2009 at 9:30 a.m.** |

**RESPONSE TO DEBTOR'S MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 363 AND 507 AUTHORIZING DEBTOR TO PAY PREPETITION WAGES, TO HONOR CERTAIN EMPLOYEE BENEFITS AND OTHER CONTRACTUAL OBLIGATIONS**

The Unofficial Committee of Survivors of Clergy Sex Abuse (the "Committee") hereby opposes the "Debtor's Motion For Order Under 11 U.S.C. §§ 105, 363 And 507 Authorizing Debtor To Pay Prepetition Wages, To Honor Certain Employee Benefits And Other Contractual Obligations " ("Benefits Motion") on the following grounds:

**Introduction**

1.  In the Benefits Motion, the Debtor presents a primer on Canon Law (irrelevant to the rule of law in an American Court) and argues its sanitized version of the childhood sexual abuse crisis for page after page, including a litany of programs and actions that were meant to address the crisis long after this Diocese's children were horrifically injured. The Diocese carefully planned its bankruptcy and its white-washed story of the decades long contemporary crisis. In addition to the scripted story of the abuse crisis, the Diocese portrays itself as a victim of the survivors search for justice by positing that its social services programs are threatened by the abuse litigation. Ironically, by explaining the bankruptcy as an equitable

18482-001\DOCS_DE:154057.2

means to handle abuse claims, it casts itself as the protector of survivors of abuse which abuse was facilitated by its own policies.

2.  In contrast, the truth compels the conclusion that the Diocese filed this bankruptcy to keep its history of child sexual abuse out of the public eye. If it really was concerned only with a race to the courthouse, it could have allowed yesterday's abuse trial to proceed to verdict and then filed if it was found liable. It did not file to protect the social services provided by the Diocese because more than 65% of its total income and a much higher percentage of its program funding comes from governmental sources. See Exhibit A (The Dialog, March 7, 2009, p.7); Testimony of Anthony Flynn, counsel for the Diocese (Flynn A6315) (Catholic Charities obtains 70-73% of its budget from governmental sources); Testimony of Marci A. Hamilton (Hamilton A6412) ("federal government actually pay[s] 86 to 87 percent into Catholic charities funds."); Testimony of Rev. Thomas Doyle (Doyle A6227) (National figure for governmental support is 80-92%); and http://www.catholiccharitiesusa.org/NetCommunity/Document.Doc?id=1924 ("In 2008 67% of cash income came from government sources[.]").[1]

3.  The Diocese filed this case on the eve of the first of six consecutive priest sex abuse trials involving the criminally convicted Diocesan priest, Father Francis DeLuca, set to begin this past Monday morning in Kent County Superior Court. This filing is the Diocese's

---

[1] This testimony was taken in connection with the enactment of the Delaware Child Victim's Act of 2007 which created a two-year window in the statute of limitations for child sexual abuse. Citations starting with a capital letter followed by numbers are to the legislative record. For more information regarding the legislation, see http://www.childvictimsvoice.com/

last, desperate effort to hide the truth from the public and conceal the thousands of pages of scandalous documents and stunning testimony that would have been exposed to the light of day in <u>open court</u> during the trial. As Vicar General Msgr. Thomas Cini - the longtime second in command of the Diocese - admitted in one highly confidential, internal document, since the 1950s, the Diocese has engaged in 'cover up' of the rape and sexual abuse of young children by its priests. Bankruptcy, a process that dictates transparency, is not a refuge for those who want to keep secrets.

## The History Of The Abuse Crisis

4.     Unlike nearly every other case that comes before this Court, the nature of the claims and the Debtor's history in handling those claims is essential to whether the Debtor should be allowed to stay in bankruptcy and how it is allowed to reorganize. The true story of this Diocese's and its priests culpability can only be fully told in an orderly fashion and not in the hurried atmosphere of first day motions. Therefore, Committee requests that the Court conduct a case status conference which should include an opportunity for the Committee and the state court counsel who represent substantially all of the plaintiffs in the abuse litigation to fully explain the facts of the abuse cases. Nonetheless, the following summary of the recent history of abuse in the Diocese is illuminating[2]:

---

[2] This short history is taken from a summary judgment motion filed by certain plaintiffs in a pending Delaware state court action. The factual support for the motion is part of the state court record and parenthetical notations to the State Court discovery is cited. The Committee is not supplying that extensive evidentiary record in recognition of the Court's limited time to review the Benefits Motion; however, it can provide the factual support on request of the Court.

A.  **1966-1985 - Father Gerres Admitted the Policy.**

5.  Father Gerres is a former longtime member of the Diocesan Personnel Committee who has served as a priest since 1966. He testified that from 1966-1985, "if a priest had been found to have abused a child, [ ] he would normally be transferred to another parish after that conclusion was reached." He was not fired, forbidden to be around children or otherwise punished in any way. (Gerres 148, 138, 12-14, A1150, 1148, 1116-17).[3]

B.  **1960 - the Doherty Report.**

6.  John Holmes Doherty was the CYO football coach at St. Ann's in 1958 forward. He testified that the parent of one of his players reported to him inappropriate behavior by Father Carley of a "sexual" nature with his young son. Doherty reported this to Father Eckrich, but the matter was never investigated in any way. (Doherty 6-12, A1107-08). Carley continued to work with children until 1993. (Saltarelli 11/16/06 at 2, A5929).

C.  **1960 - the Agostini Report.**

7.  Mrs. Carrie Agostini and her husband learned in 1960 that Carley had tried to sexually abuse their son. Her husband immediately reported it to Bishop FitzMaurice. The Bishop promised to take care of the matter. However, other than forcing Carley to come to the family home and apologize, nothing was ever done. (Agostini Aff. ¶¶ 14-19, A1103-04; Agostini 22-41, A1095-99). As noted, Carley continued and enjoyed a long career working with children until 1993. (Saltarelli 11/16/06 at 2, A5929).

---

[3] Even though Father Gerres' base of personal knowledge dates back to only 1966, the evidence reveals that this policy predated his employment by the Diocese.

### D.    1962 - the Schulte Report.

8.    Doris Schulte learned in September or October of 1962 that Father DeLuca had abused her young son Michael. The family promptly reported the abuse to the Bishop who sent Father Dempster to the house to investigate. Dempster threatened the family with eternal damnation if they ever spoke of the incident to anyone. (D. Schulte Aff. ¶¶ 11-25, A816-19; D. Schulte 24-43, A796-801). Yet nothing was ever done and DeLuca continued to work with children until 2006. (Saltarelli 11/16/06 at 2, A5929).

### E.    The Anonymous Victim #1 Report.

9.    In late summer 1965, Anonymous Victim #1 also reported DeLuca's abuse to his parents, who immediately reported the abuse to church authorities who assured them DeLuca would be taken care of. Although DeLuca was forced to write a letter of apology he only was transferred to St. Elizabeth's where he continued to work with and sexually abuse young children. (Anonymous Victim #1 Aff. ¶¶ 13-15, A5761; Saltarelli 11/16/06 at 2, A5929).

### F.    1966 - the Dougherty Incident.

10.    Mary Dougherty would testify that during the summer of 1966, Father Mackiewicz tried to rape her on a public beach. She was saved when Father Kempski pulled Mackiewicz off of her. Father Kempski denies seeing an attempted rape, but does admit he was utterly "aghast" at Mackiewicz's "inappropriate" physical conduct with this young girl that should have gotten him "in trouble" for his misconduct with her. (Kempski Nov. 2008 101, 104, 110-111, A1288-91). Yet despite this, Mackiewicz was never punished and worked with children until 1987. (Saltarelli 11/16/06 at 2-3, A5929-30).

### G. The Pastor Leinheiser Report.

11. On May 14, 1967, Father Leinheiser, Mackiewicz's pastor at Holy Rosary parish, reported to Bishop Hyle that Mackiewicz was taking children up to his rectory bedroom and refused to stop doing so. Pastor Leinheiser begged the Bishop for help. (CDOW_LJM_83, A5951). The Bishop only responded by transferring Mackiewicz to St. Thomas later that fall and he continued to work with young children until 1987. (Saltarelli 11/16/06 at 2-3, A5929-30).

### H. 1968 - the Turcol Report.

12. Rosemary Turcol testified that in 1968 she reported Father Clarahan's sexual abuse of a classmate to Father Mullen who responded, "We were afraid this would happen" and "What are you going to do? You're 17 years old. Do you think anybody is going to believe you?" (Turcol Aff. ¶¶ 11-21, A5803-04). Clarahan still worked with kids until 1993. (Saltarelli 11/16/06 at 2, A5929).

### I. 1977 - the Aigner Report.

13. An angry parent reported to Father Clark in 1977 that then Deacon Dudzinski was pressuring her to take her young son on overnight trips. Father Aigner investigated, documented his concerns in writing in a "disturbing," "red flag" internal Diocesan memo and concluded that Dudzinski was taking overnight trips with young boys and warned of "scandalous" repercussions if nothing was done. Kempski testified he informed the Bishop of the matter, but Dudzinski was hired anyway. (Kempski Ex. 2, A2027; Kempski Dec. 2008 192-193, 200, 209-210, A2019, 2021, 2023). Dudzinksi continued to work with children until 1985. (Saltarelli 11/16/06 at 2, A5929).

**J.     1979 - the John Doe #12 Report.**

14.    John Doe #12 reported Father DeLuca's abuse to his parents in 1979. His parents immediately reported the abuse to Father Turley. Other than a forced apology, no action was ever taken against DeLuca and he worked with children for many more years. (John Doe #12 Aff. ¶ 13, 15-16, A5765).

**K.     1984 - the John Doe #8 Report.**

15.    John Doe #8 reported to Sister Grace in 1984 that "I did not feel comfortable seeing DeLuca." Instead of investigating or otherwise inquiring further, she simply told him the story about the boy who cried wolf, and nothing was ever done. (John Doe #8 aff. ¶ 19, A6500).

**L.     1958-2004 - Msgr. Cini Admitted the Policy –**

16.    In 2004, Msgr. Cini created a highly confidential, internal Diocesan memo in which *Cini admitted the existence of the policy, pattern and practice at issue* - that the defendants had engaged in a "cover up" of DeLuca's abuse since the 1950's and admitted that whenever DeLuca was transferred, "diocesan officials at that time probably were <u>aware of the abuse, but that is the way it was handled</u>." (Mulvee depo. Ex. 19 at 2, A3351) (emphasis added).

**M.     The Legislative History Leading to the Landmark Child Victim's Act.**

17.    In response to disclosures of clergy sex abuse in dioceses and religious orders around the country and in Delaware in particular, the public in Delaware demanded accountability for these offenses and the Delaware General Assembly and the Governor acted to

protect child victims of sexual abuse. The following is a summary of those disclosures and the legislative process that led to the enactment of the Delaware Child Victim's Act: legislation unanimously passed by the General Assembly.

      a.    **The Boston Scandal.**

18.    In January 2002, the Boston Globe published the first in a series of groundbreaking investigative articles and exposes which dramatically catapulted the cover-up of priest sexual abuse of children into the forefront of public consciousness. (A5961-86)

      a.    **The Delaware Scandal.**

19.    Closer to home, a similar scandal soon emerged. (A5987-6199). Articles began to show up in the Delaware media roughly as follows: initially in 2002 (A5987-88); in January 2004 with the filing of the first priest sex abuse lawsuit against the Diocese (A5909-6000); in February 2005 with the public announcement that the Diocese had settled with Father Carley victim John F. Dougherty (A6001-03); in November 2005 with the filing of the second priest sex abuse lawsuit against the Diocese (A6004-11); continuing in November 2005 with a comprehensive series of investigative reports by the News Journal revealing a widespread cover up of child sex abuse by priests in the Diocese of Wilmington (A6012-81); continuing in November 2005 and for the next year with a series of investigative news articles specifically focusing upon defendant DeLuca and his sexual abuse of plaintiff Schulte and plaintiff Dingle (A6012-28, 6036-47, 6089-98); in January 2006 with grass roots efforts to change the statute of limitations in child abuse cases (A6082-84); starting in May 2006 documenting an ultimately failed legislative effort to change the statute of limitations in child sex abuse cases (A6085-88);

in November 2006 with another comprehensive series of investigative reports following defendant DeLuca's arrest and ultimate conviction for sexually abusing plaintiff Dingle and the Diocese's announcement and public identification of 20 of its priests as child sex abusers which the Bishop admitted occurred because of DeLuca's highly publicized arrest (A6099-6122); in December 2006 with Judge Scott's traumatic amnesia decision in the Eden matter (A6123-27); continuing in December 2006 with a renewed public outcry by Delaware victims to legislatively change the statute of limitations (A6128-31); still in December 2006 with the filing of the third abuse lawsuit (A6132-38); and finally in January and continuing through July 2007 with the final legislative push which ultimately resulted in enactment of Senate Bill 29 which became the historic Delaware Child Victim's Act of 2007. (A6139-97).

        **a.    Taking Delaware Children Out of State to Abuse Them.**

20.    Numerous newspaper articles also discussed these priests' regular pattern of taking children from their Delaware parishes across state lines to abuse them in neighboring states. Articles about Father Carley detailed his pattern of sexually abusing young boys while on: camping, boating and beach trips in Maryland; ski trips in Pennsylvania; trips to the New York Athletic Club in New York City and trips to see Carley's parents in Long Island, New York; beach trips to Key West, Florida; the Von Trapp Family Lodge in Vermont; vacation trips to Montreal, Canada; and Acapulco, Mexico.(A6036). Articles and editorials detailing Father Dudzinski explained that Dudzinski had taken his victim across state lines, away from his parents and abused him during trips to Busch Gardens, in Williamsburg, Virginia. (A6012, 6015). Similarly, articles and editorials about DeLuca also discussed how he took his victims

out of state to sexually abuse him in Philadelphia, Pennsylvania, New York City, and Richmond, Virginia. (A6015, 6099, 6118).

### a. The Widespread Nature of the Abuse Problem in Delaware.

21. In his testimony before the legislature considering the bill that eventually became the Delaware Child Victim's Act, Dr. James Walsh explained that 1 out of every 5 people were sexually abused as children. (Walsh 172; A6345). Similarly, Representative Deborah Hudson also discussed these figures, that 1 in 5 children are sexually abused, from 1 in 6 boys to 1 in 4 girls. (Hudson 4; A6397).[5] Senator Simpson explained that the sexual abuse of children "is pervasive in [our] society." (Simpson 27; A6229). Senator McDowell was "very disturbed" by the widespread abuse of Delaware citizens. (McDowell 99; A6247). "[C]hild sex abuse is a very serious problem in Delaware." (Hudson A6271). Addressing this widespread problem is a responsibility "which we take very seriously." (DeLuca 28, A6229). Accordingly, in Representative Valihura's words, this "is one of the most important Bills we will see this year." (Valihura 3; A6303).

---

[5] The widespread nature of the problem also was demonstrated by Senator Still who, despite thoroughly grilling many witnesses who testified in favor of the legislation, opened up and revealed that he also had been sexually abused as a six year old. (Still 96-97; A6246).

### a. Widespread Public Support For Legislative Changes The Statute of Limitations.

22. In 2007, massive community support for legislative change to the statute of limitations led to the passage of the Delaware Child Victim's Act. The Delaware General Assembly unanimously passed the legislation and the Governor, declaring the legislation to be "vitally important" then signed it into law on July 10, 2007.

### The Court Should Limit The Relief Sought In The Benefits Motion

23. The Court should deny the relief sought in the Benefits Motion or limit the relief sought therein on the following grounds:

A. Due to the short notice afforded the Committee, the Benefits Motion potentially has enormous consequences to the legal issue of whether Parishes, religious orders and other parties related to the Diocese are part of the Debtor and whether their real and personal property is property of the estate the Court should not make any findings of fact or conclusions of law regarding the relationships between the Diocese, the Parishes and the Non-Debtor Catholic Entities.

B. The Court should deny the Benefits Motion to the extent that it seeks to make any direct or indirect payments or providing any form of consideration (i.e. room and/or board or housing/food allowances) to any person who has been identified by the Diocese as an admitted, substantiated or credibly accused abuser. In November 2006, the late Bishop Saltarelli published a list of 20 such Diocesan priests in The Dialog, the Diocese's newspaper. Notably, he did not publish a list of admitted, substantiated or credibly accused Religious Order abuser priests. The Diocese, as a pre-condition to any relief on

the Benefits Motion, should be required to update and publish the list of admitted, substantiated or credibly accused Diocesan and Religious Order priests as well as any non-clergy in the employment of the Diocese. To the extent that any parish (incorporated or unincorporated), religious order or other affiliated entity ("Non-Debtor Catholic Entities") utilizes the benefits processing services of the Diocese, the Diocese should be barred from providing those services unless such Parishes Related Catholic Entity file an affidavit that they do not provide any direct or indirect payments or providing any form of consideration (i.e. room and/or board or housing/food allowances) to an admitted, substantiated or credibly accused abuser.[4]

C.  The Committee was not afforded an opportunity to review the Benefits Motion or the supporting declarations prior to the commencement of the case although the Committee made that request on October 17. The U.S. Trustee has not formed an official creditors committee of creditors. If the Court grants the relief, it should explicitly state that it is doing so solely on the Debtor's bare representations and that its order is without prejudice to reconsideration upon an opportunity for an official committee to conduct due diligence on the relief sought.

---

[4] The Diocese's ability to provide an accurate list of admitted, substantiated or credibly accused abusers is cast in doubt because since 2006 it no longer allows for an independent auditor to review its compliance with mandated child protection measures; rather, it engages in a self-audit with outside oversight.

D.  The benefits system includes transfers from Parishes and Non-Debtor Catholic Entities to the Debtor and the Debtor's payment of certain expenses on behalf of them. The description of the system gives rise to an inquiry as to whether the Debtor makes up any shortfall if a Parish a Non-Debtor Catholic Entity fails to pay its share of these expenses, which are depicted as pass-throughs. The system also gives rise to a question as to whether the Parishes or Non-Debtor Catholic Entities, if even really separate entities, are paying an appropriate share of expenses related to benefit expenses. An order granting relief sought in the Benefits Motion should be conditioned on every such entity having paid all prepetition obligations related to benefits processing.

*[Remainder of Page Intentionally Left Blank]*

Dated: October __, 2009

THE NEUBERGER FIRM, P.A.

/s/ Thomas S. Neuberger
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
RAEANN WARNER, ESQ. (#4931)
2 E. 7th Street, Suite 302
Wilmington, DE 19801
Telephone: (302) 655-0582
    TSN@NeubergerLaw.com
    SJN@NeubergerLaw.com
    RW@NeubergerLaw.com


JACOBS & CRUMPLAR, P.A.

/s/ Thomas C. Crumplar
THOMAS C. CRUMPLAR, ESQ. (#942)
ROBERT JACOBS, ESQ. (#244)
LOUIS F. D'ONOFRIO, ESQ. (#5158)
2 E. 7th Street, Suite 400
Wilmington, DE 19801
(302) 656-5445
    Tom@JCDELaw.com
    Bob@JCDELaw.com
    Lou@JCDELaw.com


PACHULSKI STANG ZIEHL & JONES LLP

/s/ Curtis A. Hehn
James I. Stang (CA Bar 94435)
Hamid R. Rafatjoo (CA Bar 181564)
Laura Davis Jones (Bar No. 2436)
Curtis A. Hehn (Bar No. 4264)
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
    jstang@pszjlaw.com
    hrafatjoo@pszjlaw.com
    ljones@pszjlaw.com
    chehn@pszjlaw.com

*Attorneys for the Unofficial Committee of Abuse Survivors*

# **<u>EXHIBIT A</u>**

# Annual Stewardship Report of The Diocese of Wilmington

arch 7, 2009                                                                                                                                         The Dialog  7

|  | FY08 | FY07 |
|---|---|---|
| vernment Funding | 9,544,545 | 10,565,276 |
| nual Catholic Appeal | 1,171,462 | 1,233,454 |
| ogram Service Fees | 725,350 | 615,408 |
| ntributions | 1,737,484 | 1,666,636 |
| ecial Events | 161,459 | 116,049 |
| estments/Reserves/Other | 288,470 | 347,579 |
| tal | 14,271,458 | 15,230,769 |

### CATHOLIC YOUTH MINISTRY

he Office for Catholic Youth Ministry serves the parishes, hools, and institutions within the Diocese of Wilmington, well as the community at large, by providing services ese organizations are not able to provide for themselves. M leads the way in training young people as leaders, in oviding a healthy physical outlet through CYM Athletics, erving as an advocate for our young Church, and by ing diocesan wide events that allow our youth to expece the universal church. Moreover, CYM's work with e adults called to guide young people in ministry is essen-. CYM supports a collaborative network of adult leaders, ovides constant communication using the latest technol-y, and trains the adults in ministry so that all are pre-red to share in this important work of the Church. In serv-g the youth and the adults called to guide them, CYM sures that proper catechesis, appropriate pastoral care, angelization, effective prayer and worship, and mean-gful justice and service are among the qualities that will ide young people throughout their lives.

|  | FY08 | FY07 |
|---|---|---|
| penses |  |  |
| ogram Services | 507,617 | 385,708 |
| pporting Services | 151,736 | 182,855 |
| tal | 659,353 | 568,563 |
| nding |  |  |
| ntributions | 1,162 | 1,157 |
| vernment Grants | 25,000 | 25,000 |
| ited Way | 32,071 | 38,097 |
| nual Catholic Appeal | 125,067 | 161,248 |
| ogram Fees | 281,300 | 223,655 |
| ecial Events | 150,486 | 91,908 |
| ndraising | 53,059 | 45,043 |
| serve/Investment/Other income | -8,792 | -17,545 |
| tal | 659,353 | 568,563 |

### FY 2008 EXPENSES

| EXPENSES | FY08 | FY07 |
|---|---|---|
| Administration | 8,954,525 | 5,442,887 |
| Catholic Youth Ministry | 659,353 | 568,563 |
| Catholic Cemeteries, Inc. | 3,571,355 | 3,011,714 |
| Catholic Education Department | 1,191,118 | 1,318,400 |
| Catholic Ministry to the Elderly, Inc. | 758,596 | 682,567 |
| Communications Department | 121,023 | 135,963 |
| Special Collections and Receipts for National and International Needs | 823,594 | 884,299 |
| Annual Catholic Appeal High School Allocations & Rebates to Parishes | 783,851 | 767,849 |
| Catholic Charities, Inc. | 14,271,458 | 15,230,769 |
| Group Homes | 1,603,238 | 1,405,730 |
| Pastoral Services Department | 1,752,585 | 1,586,237 |
| DOW Schools, Inc. | 23,173,181 | 22,404,174 |
| TOTAL | 57,663,877 | 53,439,152 |

### FY 2008 FUNDING

| FUNDING | FY08 | FY07 |
|---|---|---|
| Tuition, Program Fee, Sales, etc. | 22,550,619 | 20,677,858 |
| Government Programs | 12,834,451 | 13,712,444 |
| Investments & Reserves | 9,932,458 | 6,847,785 |
| Parish Assessments | 3,810,000 | 3,679,625 |
| Annual Catholic Appeal | 3,856,502 | 3,822,305 |
| Special Collections | 846,568 | 900,950 |
| United Ways | 676,854 | 727,575 |
| Contributions | 2,565,795 | 2,562,127 |
| Fundraising | 590,630 | 508,483 |
| TOTAL | 57,663,877 | 53,439,152 |

### DIOCESE OF WILMINGTON SCHOOLS, INC.

This corporation has five operating segments: School transportation/nurse administration, St. Mark's High School, St. Thomas More Preparatory, Christ the Teacher Elementary School and Most Blessed Sacrament Elementary School.

*TRANSPORTATION AND NURSING:*
Via this corporation, the subsidies from the State of Delaware for school transportation and nursing services are administered and allocated.

|  | FY08 | FY07 |
|---|---|---|
| Expenses |  |  |
| Parent Transportation Reimbursement | 1,194,379 | 1,205,088 |

|  | FY08 | FY07 |
|---|---|---|
| Student Activities | 332,674 | 282,730 |
| General & Administrative Development | 515,045 | 515,045 |
|  | 22,390 | 42,587 |
| Total | 2,356,327 | 2,000,575 |
| Funding |  |  |
| Diocesan Contributions | 427,454 | 573,809 |
| Other Contributions | 148,777 | 114,136 |
| Tuition & Fees | 1,390,742 | 1,014,985 |
| Student Activities | 377,483 | 315,246 |
| Other Revenue | 20,935 | 39,407 |
| Reserves | (9,064) | (57,008) |
| Total | 2,356,327 | 2,000,575 |

**SETON VILLA, SIENA HALL, CHILDREN'S HOME**

Under the management of Catholic Charities, Seton Villa provides 24-hour a-day residential care and treatment for dependent, neglected, abused, and emotionally disturbed youth. Services include family counseling and reunification, programs to enhance educational achievement, parenting skills, and independent living. Programming at Siena Hall and Children's Home has been discontinued, but reserves are used to fund children's services within Catholic Charities.

### SETON VILLA:

|  | FY08 | FY07 |
|---|---|---|
| **Expenses** | | |
| Program Services | 680,712 | 697,574 |
| Supporting Services | 93,936 | 86,695 |
|  | **774,648** | **784,269** |
| **Funding** | | |
| Program Fees/Govt. Contracts | 701,664 | 688,318 |
| Contributions | 20,249 | 11,694 |
| United Way | 2,095 | 3,111 |
| Investments/Reserves/Other | 50,640 | 81,146 |
|  | **774,648** | **784,269** |
| Support to Children's Services at Catholic Charities | 163,332 | 157,002 |

### SIENA HALL:

|  | FY08 | FY07 |
|---|---|---|
| **Expenses** | | |
| Program Services | 56,367 | 24,279 |
| Supporting Services | 0 | 615 |
|  | **56,367** | **24,894** |
| **Funding** | | |
| Investments/Reserves/Other | 56,367 | 24,894 |
|  |  |  |
| Support to Children's Services at Catholic Charities | 310,375 | 150,905 |

### CHILDREN'S HOME:

|  | FY08 | FY07 |
|---|---|---|
| **Expenses** | | |
| Program Services | 96,996 | 96,046 |
| Supporting Services | 2,904 | 2,544 |
|  | **99,900** | **98,590** |
| **Funding** | | |
| Contributions & Bequests | 682 |  |
| Investments/Reserves/Other | 99,900 | 97,908 |
|  | **99,900** | **98,590** |
| Support to Children's Services at Catholic Charities | 198,616 | 190,070 |

---

| | FY08 | FY07 |
|---|---|---|
| School Bus Contracts & DART | 417,655 | 441,211 |
| Nursing Services | 317,550 | 374,131 |
| Professional Fees | 20,926 | 16,035 |
| **Total** | **1,950,510** | **2,036,465** |
| **Funding** | | |
| State Transportation Subsidy | 1,309,363 | 1,324,805 |
| Parent Bus Payments | 302,671 | 322,736 |
| State Nurse Subsidy | 432,800 | 276,333 |
| Other | 94,324 | 112,591 |
| **Total** | **1,950,510** | **2,036,465** |

### ST. MARK'S HIGH SCHOOL:

Saint Mark's High School is a diocesan Catholic high school dedicated to the development of young men and women who live the message of the Gospel in their daily lives, who are open to growth, and who are committed to doing justice. Saint Mark's enrolls approximately 1,542 students from New Castle County and the surrounding areas and offers a full range of academic and co-curricular programs which meet a variety of student interests and needs.

|  | FY08 | FY07 |
|---|---|---|
| **Expenses** | | |
| Academic Programs | 9,511,426 | 9,736,346 |
| Auxiliary Programs | 400,687 | 351,116 |
| Student Activities | 1,782,287 | 1,694,303 |
| General and Administration | 2,170,160 | 2,041,305 |
| Fundraising | 418,973 | 494,552 |
| Other | 3,375 | 5,050 |
| **Total** | **14,698,703** | **14,779,448** |
| **Funding** | | |
| Tuition and Fees | 11,663,958 | 11,147,553 |
| Auxiliary Programs | 452,115 | 461,215 |
| Contributions | 658,123 | 719,056 |
| Annual Catholic Appeal | 188,000 | 188,000 |
| Other Diocesan Contributions | 1,219,126 | 1,370,513 |
| Student Activities | 548,110 | 645,443 |
| State & Federal Funding | 37,292 | 73,139 |
| Investments/Reserves/Other | (68,021) | 174,529 |
| **Total** | **14,698,703** | **14,779,448** |

### ST. THOMAS MORE PREPARATORY:

St. Thomas More Preparatory, located in Magnolia, continues to expand its services, facilities, and enrollment. By balancing religion, outstanding academics, arts, athletics and community service, the Prep prepares each student for the college that best suits his or her unique gifts. Challenging moral, academic and co-curricular programs assist each graduate to become a faith-filled, discerning, loving and active citizen.

|  | FY08 | FY07 |
|---|---|---|
| **Expenses** | | |
| Academic Programs | 1,186,177 | 1,044,340 |
| Auxiliary Programs | 300,041 | 164,480 |

---

### CHRIST THE TEACHER CATHOLIC SCHOOL:

Opening in 2002, Christ the Teacher School enrolls more than 600 students in an educational setting that embraces the whole child. Programs carry both a strong academic and religious focus, nurturing a generation of bright and moral leaders for tomorrow.

|  | FY08 | FY07 |
|---|---|---|
| **Expenses** | | |
| Academic Programs | 1,233,334 | 1,180,114 |
| Auxiliary Programs/ Student Activities | 378,606 | 380,431 |
| Maintenance | 287,154 | 319,716 |
| General & Administration | 323,808 | 327,448 |
| Fixed Charges | 349,389 | 340,866 |
| Capital Expenditures | 123,520 | 121,527 |
| Other |  |  |
| **Total** | **2,695,811** | **2,670,102** |
| **Funding** | | |
| Tuition & Fees | 2,137,246 | 2,131,056 |
| Auxiliary Programs/ Student Activities | 536,139 | 335,253 |
| Development & Fundraising | 68,565 | 301,015 |
| Parish Support | 160,000 | 159,980 |
| Other/Reserves | (206,139) | (257,202) |
| **Total** | **2,695,811** | **2,670,102** |

### MOST BLESSED SACRAMENT CATHOLIC SCHOOL:

Most Blessed Sacrament School offers a learning environment grounded in the Catholic Christian faith and supported by gospel values. The intellectual, spiritual, and physical development of every child is emphasized.

|  | FY08 | FY07 |
|---|---|---|
| **Expenses** | | |
| Academic Programs | 698,092 | 693,563 |
| Auxiliary Programs/ Student Activities | 63,030 | 90,219 |
| General and Administration | 101,085 | 76,131 |
| Fundraising | 104,734 | 85,580 |
| Maintenance | 283,227 | 257,111 |
| Fixed Charges | 206,662 | 197,833 |
| Capital Expenses | 15,000 | 33,773 |
| **Total** | **1,471,830** | **434,210** |
| **Funding** | | |
| Tuition and Fees | 723,699 | 756,907 |
| Auxiliary Programs/Student Activities | 62,872 | 53,618 |
| Development and Fundraising | 157,061 | 187,940 |
| Parish Support | 201,873 | 193,240 |
| Diocese Support | 294,300 | 234,500 |
| Other | 32,025 | 8,005 |
| **Total** | **1,471,830** | **1,434,210** |