## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| CATHOLIC DIOCESE OF WILMINGTON, INC., a Delaware Corporation,[1] | ) ) ) ) | Case No. 09-13560 (CSS) |
| Debtor. | ) ) ) ) | **Objection Deadline (proposed): December 1, 2009 at 4:00 p.m. (ET)** **Hearing Date (proposed): December 4, 2009at 9:00 a.m. (ET)** |

## DEBTOR'S MOTION FOR ORDER AUTHORIZING THE DEBTOR (I) TO CONTINUE PROVIDING PENSIONS, SUSTENANCE AND/OR MEDICAL COVERAGE IN THE ORDINARY COURSE TO CERTAIN RETIRED OR REMOVED PRIESTS ACCUSED OF SEXUAL ABUSE; AND (II) TO USE CERTAIN RESTRICTED <u>FUNDS TO PAY PREPETITION PRIEST PENSION OBLIGATIONS</u>

The above-captioned debtor and debtor in possession (the "<u>Debtor</u>") hereby

moves (the "<u>Motion</u>") for entry of an order pursuant to sections 363 and 105(a) of title 11 of the

United States Code (the "<u>Bankruptcy Code</u>") authorizing the Debtor (i) to continue providing

pensions, sustenance and/or medical coverage in the ordinary course to certain priests accused of

sexual abuse of minors; and (ii) to use certain restricted funds for the payment of prepetition

pension obligations and certain housing and health costs for retired priests.  In support of this

Motion, the Debtor relies on the relevant portions of the *Declaration of the Reverend Monsignor*

*J. Thomas Cini in Support of Chapter 11 Petition and First-Day Relief* filed on October 20, 2009

[D.I. 9] (the "<u>Cini Declaration</u>").[2]  In further support of this Motion, the Debtor respectfully

represents as follows:

---

[1]        The last four digits of the Debtor's federal tax identification number are 5439.  The Debtor's mailing address is 1925 Delaware Avenue, P.O. Box 2030, Wilmington, Delaware 19899-2030.

[2]        Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Cini Declaration.

## PRELIMINARY STATEMENT

1.      As a chapter 11 debtor in possession, the Debtor is entitled to continue to operate its business and use property of its bankruptcy estate in the ordinary course, without notice or a hearing.  11 U.S.C. § 363(c)(2), 1107, and 1108.  While the Debtor is required to abide by applicable nonbankruptcy law governing the transfer of property by not-for-profit corporations, 11 U.S.C. § 363(d), the Debtor's cash is unencumbered, thus obviating the provision of adequate protection to any party in connection with the Debtor's use of cash, see 11 U.S.C. § 363(c)(2) & (e).  Because the Debtor is a not-for-profit corporation, its chapter 11 case may not be converted to chapter 7 without its consent.  11 U.S.C. § 1112(c).  Thus, the Bankruptcy Code *plainly contemplates* "business as usual" for the Debtor, subject to the general reporting obligations and typical chapter 11 case deadlines imposed by the Bankruptcy Code and Rules.

2.      Notwithstanding the foregoing, at the outset of this case, the unofficial committee of abuse survivors took the untenable position that the Debtor should *not* be permitted to operate in the ordinary course of business.  In particular, the unofficial committee objected to any use of property of the estate to provide compensation or benefits to priests identified by the Debtor as admitted, substantiated, or credibly accused abusers of children – an objection which, if sustained, would (and no doubt was intended to) set a precedent for future line-item vetos of otherwise ordinary-course transactions.

3.      As the unofficial committee was likely aware, the Debtor has an obligation under Canon Law to care for retired clergy.  Only the Vatican has the power to laicize clergy.  Thus, while several priests have been dismissed from the public ministry and have laicization

DB02:8877240.4

059604.1018

proceedings pending against them, for the time being they remain clergy whom the Debtor supports, and must continue to support.

4.     As the unofficial committee may also have known, since August 2008 the Debtor has provided charity to Francis G. DeLuca, an 80-year old former Diocesan priest who was laicized in July 2008, in the form of a $1,000 per month allowance[3] and coverage under the Debtor's medical plan. The Debtor has terminated Mr. DeLuca's allowance, but does seek to continue providing him medical coverage. This is unremarkable. Corporal works of mercy such as the provision of charity to Mr. DeLuca are fundamental to the Christian faith, and there is no "bad person" exception to Catholic charity. The Debtor did not stop being a Catholic institution when it filed its bankruptcy petition, and no provision of the Bankruptcy Code compels the Debtor to abdicate its faith – or, for that matter, to depart from its fundamental corporate purposes[4] – in matters concerning the use or disposition of property of the estate.

5.     Even though the unofficial committee's position regarding the Debtor's ordinary course operations and support of accused abusers had no basis in the Bankruptcy Code, in order to avoid unnecessary controversy early in this chapter 11 case, the Debtor agreed not to provide any consideration to any person who had been accused of sexual abuse (whether or not such accusations were substantiated or credible) absent further order of the Court. By this Motion, the Debtor seeks such authority, as well as authority to pay prepetition priest pension obligations, and certain housing and health costs for retirees, using restricted funds that were donated to the Debtor specifically for such purpose.

---

[3]     Mr. DeLuca does not receive a pension or other sustenance from the Debtor because he is no longer a priest.

[4]     As set forth in the Debtor's certificate of incorporation, the Debtor's primary corporate purpose is to "promote the teachings of Jesus Christ, as taught and set forth by the Roman Catholic Church, throughout the territory of the Diocese of Wilmington."

## JURISDICTION AND VENUE

6.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory predicates for the relief sought herein are sections 363 and 105(a) of the Bankruptcy Code.

## GENERAL BACKGROUND

8.      On October 18, 2009 (the "Petition Date"), the Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtor is authorized to continue to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.      On November 4, 2009, the U.S. Trustee appointed an official committee of unsecured creditors (the "Committee") in this chapter 11 case. As of the date hereof, no request for appointment of a chapter 11 trustee or examiner has been made.

10.      Information regarding the Debtor's history and business operations, its capital structure, and the events leading up to the commencement of this chapter 11 case can be found in the Cini Declaration.

## RELEVANT BACKGROUND

**A.      The Priest Retirement Fund and Pension Plan**

11.      The Debtor maintains a sub-fund in its Pooled Investment Program (#F0100, the "Priest Retirement Fund") for the care of retired Diocesan priests.

12.      The Priest Retirement Fund was established over thirty years ago, in 1978, by a $1,000,000 grant from Catholic Diocese Foundation ("Foundation") f/k/a the Catholic

Foundation of the Diocese of Wilmington, Inc. Foundation had previously received these funds via a bequest from Mrs. Anna V. Graham (the "Graham Bequest"), whose will instructed Foundation to use the funds for the education of priests or, if such costs were adequately met from other sources, to direct the use of the funds "to the retirement fund for Clergy or for any other purpose which it may deem necessary or desirable."[5] At its May 18, 1978 board meeting, Foundation considered a grant request for the establishment of a funded pension plan for Diocesan priests, and resolved to make the Graham Bequest available for this purpose.[6]

13. In addition to the initial grant from Foundation, the Priest Retirement Fund is funded with quarterly distributions (currently approximately $3,819) from PNC Bank, Delaware, as trustee of the Julia M. Kenney Charitable Foundation (the "Kenney Trust"). The Kenney Trust is a charitable foundation established upon Ms. Kenney's death, which has three beneficiaries, including the Debtor. Distributions to the Debtor from the Kenney Trust are "for the purposes of meeting the retirement needs of sick or aged members of such organization."[7]

14. Consistent with the purposes of the gifts from the Foundation and the Kenney Trust, the Debtor has used the Priest Retirement Funds to pay monthly pensions and to provide housing and residential nursing care for retired priests. As of September 30, 2009, the value of the assets in the Priest Retirement Fund was approximately $3.6 million.

15. The specifications for the Debtor's clergy pension plan (the "Priest Pension Plan") are attached hereto as Exhibit D. These plan specifications set forth eligibility criteria for participation in the Priest Pension Plan and also provide a description of benefits

---

[5] A copy of Mrs. Graham's will is attached hereto as Exhibit B.

[6] Minutes from this board meeting have been produced to the Committee and the U.S. Trustee.

[7] A copy of the January 5, 2001, letter to the Debtor from PNC Bank regarding the Kenney Trust is attached hereto as Exhibit C. The letter has been redacted to remove potentially non-public financial information regarding the Kenney Trust. An unredacted copy of the letter has been produced to the U.S. Trustee and the Committee.

payable under the plan. Presently, 29 retired Diocesan priests receive pensions under the Priest

Pension Plan, at a cost of approximately $55,000 per month. Benefits are payable the last day of

the month, in arrears. Pension benefits are paid from the Priest Retirement Fund by The Bank of

New York Mellon, successor by operation of law to Mellon Bank, N.A. (the "<u>Custodian</u>"), the

custodian of the Pooled Investment Account, on a fee-for-service basis. Due to the freeze on the

Pooled Investment Account, which is the subject of a pending motion to be heard November 20,

2009, the Custodian has not made any payments to priest pensioners. For the month of October,

the Debtor will direct the Custodian to make a prorated pension payment and to withhold the

amount accruing between October 1 and the Petition Date (approximately $31,900) pending

further order of the Court.[8]

16.     In addition to these pension benefits, the Debtor pays approximately

$4,000 per month for housing for Rev. John A. Sarro, as discussed below, and $2,000 per month

for 24-hour nursing care for Rev. Thomas E. Hanley,[9] all from the Priest Retirement Fund. ***To
be clear, Fr. Hanley is not an Accused Abuser (as hereinafter defined).***

17.     Retired priests ineligible for the Priest Pension Plan are provided

"sustenance" in accordance with Canon Law. Sustenance payments are paid from the Debtor's

general operating funds.

**B.      The Accused Abusers**

18.     The Debtor made a commitment on the record at the first-day hearing not

to provide any payments or benefits to any individual that had been accused of sexual abuse.

---

[8]       Also, to be clear, no pension payment will be made to any Accused Abuser (as hereinafter defined) pending
the resolution of this Motion.

[9]       Fr. Hanley reimburses the Debtor $1,000 per month for this expense.

The individuals falling within this category (the "<u>Accused Abusers</u>") who otherwise would have received payment or benefits from the Debtor in the ordinary course are identified below.

### 1. Priest Pensioners

19. Three of the Accused Abusers receive benefits under the Priest Pension Plan, namely: Rev. James E. Richardson, Rev. John A. Sarro, and Rev. Douglas W. Dempster. The Debtor covers these and other priest pensioners under its health insurance plan, the costs of which are paid from the Debtor's general operating funds, but reimbursed in part by special assessment against Parish Corporations and Non-Debtor Catholic Entities based upon the number of active priests they employ. In the fiscal year ended June 30, 2009, this "head tax" against non-debtor entities underwrote approximately 57% of pensioners' insurance premiums paid by the Debtor.

20. Fr. Richardson was accused of sexual abuse in a lawsuit filed anonymously by "John Yoe #1" in June 2009.[10] In accordance with the *Charter for the Protection of Children and Young People* promulgated by the United States Conference of Catholic Bishops in 2002 (the "*Charter*"), Bishop Malooly temporarily suspended Fr. Richardson's authority to function as a priest, pending an investigation into the accusation by the Diocesan Review Board.[11] Retired Superior Court Judge Vincent A. Bifferato, Sr., Chair of the Review Board, commissioned former Chief Deputy Attorney General Ferris Wharton to investigate the complaint of John Yoe #1. Mr. Wharton concluded that the allegations against

---

[10]  The complaint of John Yoe #1 alleges abuse in 1968, and was filed under the Delaware Child Victim's Act. This is the only case under the CVA involving alleged abuse by a priest of the Diocese of Wilmington who still is in ministry. Fr. Richardson is retired, and has no parish or other assignment, but he occasionally celebrates Mass and administers the sacraments, including at Holy Child Parish.

[11]  The Diocesan Review Board was established in 2002, in accordance with the *Charter*. The Review Board is a confidential consultative body that advises the Bishop in assessing allegations of sexual abuse of minors, and in determining a priest's suitability for ministry. The Review Board comprises nine members, includes both Catholics and a non-Catholic, and one priest.

DB02:8877240.4                                                                                              059604.1018

Fr. Richardson are not credible. The Review Board considered Mr. Wharton's conclusions, unanimously found that Fr. Richardson was suitable for ministry, and recommended to Bishop Malooly that he restore Fr. Richardson's ministerial faculties. Bishop Malooly accepted the recommendation of the Review Board and has restored Fr. Richardson's authority to function as a priest. Fr. Richardson receives pension benefits of approximately $2,208 per month.

21. Fr. Sarro was accused in 1998 of abuse relating to a time he was serving overseas, and he was removed from the public ministry in that year. Fr. Sarro was identified by Bishop Saltarelli on November 16, 2006, as one of 18 Diocesan priests against whom there were admitted, corroborated or otherwise substantiated allegations of abuse of minors. Laicization proceedings are currently pending against Fr. Sarro before the Vatican in Rome. The Debtor pays approximately $134 per day from the Priest Retirement Fund to house Fr. Sarro at an assisted-living facility in Childs, Maryland operated by the Oblates of St. Francis de Sales, a Catholic religious order. Fr. Sarro receives pension benefits of approximately $1,767 per month. He contributes $1,950 per month (i.e., all of his pension, plus some of his own money) toward his housing costs. No suit has been filed against Fr. Sarro or the Debtor relating to the allegations of abuse lodged against him in 1998.

22. Fr. Dempster was removed from public ministry in 1993, and was identified by Bishop Saltarelli on November 16, 2006, as another of the 18 Diocesan priests against whom there were admitted, corroborated or otherwise substantiated allegations of abuse of minors. Laicization proceedings are currently pending against Fr. Dempster before the Vatican in Rome. Fr. Dempster receives pension benefits of approximately $1,767 per month. Fr. Dempster is not accused of abuse in any of the lawsuits currently pending against the Debtor, but the Debtor settled a claim regarding Fr. Dempster, by "John Goe #1," in 1993. Despite

8

executing a general release of his claims against Fr. Dempster, the Debtor, and any Parish Corporations, John Goe #1 has sued Fr. Dempster and three Parish Corporations in a case to which the Debtor is not a party.

### 2. Non-Pensioner Retired Priests

23. Three of the Accused Abusers have historically received sustenance from the Debtor in the form of cash payments and medical coverage, namely: Rev. Joseph A. McGovern, Rev. Charles W. Wiggins, and Rev. Kenneth J. Martin. Sustenance payments and medical costs for these priests are paid from the Debtor's general operating funds. For the time being, the Debtor has suspended cash sustenance payments to these priests pending the receipt of financial disclosures demonstrating their financial need, including tax returns, bank statements, sources of income and statements of assets and liabilities.[12] However, the Debtor intends to continue to provide medical coverage to these priests.

24. Fr. McGovern was removed from the public ministry in 1986, and was identified by Bishop Saltarelli on November 16, 2006, as one of 18 priests against whom there were admitted, corroborated or otherwise substantiated allegations of abuse of minors. Laicization proceedings are currently pending against Fr. McGovern before the Vatican in Rome. In September 2009, the Debtor paid cash sustenance of $496 to Fr. McGovern and paid $548 in health insurance premiums on his behalf to cover him under the Debtor's health insurance plan. The Debtor also pays for periodic psychological evaluations for Fr. McGovern. Fr. McGovern is accused of abuse in one lawsuit that is currently pending against the Debtor.

25. Fr. Wiggins was removed from the public ministry in 2003, and was identified by Bishop Saltarelli on November 16, 2006, as one of 18 priest against whom there

---

[12] A list of the information requested is attached hereto as Exhibit E. Based upon this information, the Debtor will determine the level of sustenance it is required to provide pursuant to Canon Law.

were admitted, corroborated or otherwise substantiated allegations of abuse of minors. Laicization proceedings are currently pending against Fr. Wiggins before the Vatican in Rome. In September 2009, the Debtor paid $2,100 to Fr. Wiggins for sustenance and paid $548 in health insurance premiums on his behalf to cover him under the Debtor's health insurance plan. The Debtor also pays for monthly counseling sessions for Fr. Wiggins. Fr. Wiggins is accused of abuse in one lawsuit that is currently pending against the Debtor.

26.     Fr. Martin was identified by Bishop Saltarelli on November 16, 2006, as one of 18 priests against whom there were admitted, corroborated or otherwise substantiated allegations of abuse of minors, albeit prior to his becoming a Diocesan priest. Fr. Martin was dismissed from the public ministry in 2008, but has appealed this dismissal to the Congregation for the Clergy, the body within the Vatican that is responsible for overseeing matters regarding priests and deacons not belonging to religious orders.

27.     The Debtor does not provide cash sustenance payments to Fr. Martin, based upon his refusal to provide financial disclosures demonstrating a need. However, the Debtor does cover Fr. Martin under its health insurance plan. Fr. Martin has petitioned the Vatican to compel the Debtor to provide cash sustenance payments, which the Debtor has opposed. The matter is currently pending before the Vatican in Rome. A ruling in favor of Fr. Martin may require the Debtor to make sustenance payments to Fr. Martin as a matter of Canon Law, irrespective of his failure to provide financial disclosures. Fr. Martin is not accused of abuse in any of the lawsuits currently pending against the Debtor.

**3.      Francis G. DeLuca**

28.     The last of the Accused Abusers, Francis G. DeLuca, receives charity from the Debtor in the form of coverage under the Debtor's health insurance plan. As discussed

in the Cini Declaration, Mr. DeLuca is a former Diocesan priest who was dismissed from the public ministry in 1993, and identified by Bishop Saltarelli on November 16, 2006, as one of 18 priests against whom there were admitted, corroborated or otherwise substantiated allegations of abuse of minors. Mr. DeLuca was laicized by Pope Benedict XVI in July 2008. Mr. DeLuca is accused of abuse in 20 of the lawsuits currently pending against the Debtor, including the eight cases that were originally scheduled for trial immediately following the Petition Date. The Debtor believes Mr. DeLuca, who is 80, is destitute and without the means to support himself. He lives with his sister, who is also elderly, and he reportedly receives about $400 per month in social security. Since August 2008, the Debtor has provided Mr. DeLuca $1,000 per month in charity, and has covered him under its health insurance plan, at a cost of approximately $548 per month. The Debtor has discontinued cash charity payments but intends to continue to cover Mr. DeLuca under its health insurance plan.

## RELIEF REQUESTED

29.     At the interim hearing on this Motion, the Debtor will seek entry of an order substantially in the form attached hereto as Exhibit A authorizing the Debtor (i) to pay prepetition pension obligations and certain housing and health costs for retired priests (including, but not limited to, Frs. Richardson, Sarro, and Dempster) out of the Priest Retirement Fund; (ii) to continue providing medical coverage in the ordinary course to Frs. Wiggins, McGovern, and Martin, and to provide such sustenance payments as the Debtor, in its sole discretion, determines are required to be made pursuant to Canon Law; and (iii) to continue providing medical coverage to Mr. DeLuca in the ordinary course.

DB02:8877240.4

059604.1018

# BASIS FOR RELIEF REQUESTED

## A. Payments to Accused Abusers are Permitted by Section 363 of the Bankruptcy Code

30. Section 363(c)(1) of the Bankruptcy Code expressly authorizes the Debtor to use property of the estate in the ordinary course of business without notice or a hearing, unless otherwise ordered by the Court. 11 U.S.C. §§ 363(c)(1), 1107 & 1108. To determine whether a particular transaction is in the ordinary course of a debtor's business for § 363 purposes, the Third Circuit applies a two-part inquiry that looks to the "vertical dimension" and "horizontal dimension" of the proposed transaction. In re Roth Am., Inc., 975 F.2d 949, 952 (3d Cir. 1992). The "vertical" inquiry asks whether, from the vantage point of a hypothetical creditor, the transaction "subjects [the] creditor to economic risk of a nature different from those he accepted when he decided to extend credit." Id. Under this "creditor's expectation test," the touchstone of "ordinariness" is the hypothetical creditor's reasonable expectations as to what transactions the debtor is likely to enter into in the conduct of its business. Id. While the primary focus is on the debtor's prepetition business practices and conduct, a court must also consider the changing circumstances inherent in the hypothetical creditor's expectations. Id. The horizontal inquiry asks "whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry." Id.

31. As discussed below, the provision of pension and health benefits to Frs. Richardson, Sarro, and Dempster, the provision of sustenance to Frs. Wiggins, McGovern, and Martin, and the provision of charity to Mr. DeLuca, all fall squarely within the ordinary course of the Debtor's business. Accordingly, the Debtor should be granted authority to continue these payments.[13]

---

[13] There are also potential constitutional and other implications regarding the continued care of retired clergy and the provision of charity to Mr. DeLuca. The Debtor does not waive and, hereby expressly reserves all of the

### 1.    Priest Pension Obligations and Sustenance

32.    The Debtor has an affirmative obligation under Canon Law to care for its retired clergy, and has been doing so via the Priest Pension Plan for over thirty years.  For priests ineligible for the Priest Pension Plan, the Debtor has historically provided sustenance.  The continuation of these practices are entirely consistent with Debtor's prepetition business practices and conduct.  It is also consistent with the reasonable expectations of Debtor's creditors, insofar as any creditor familiar with the Debtor's operations and finances would have been aware of the Debtor's obligation to support its retired clergy.  The continuation of this support does not subject creditors to unreasonable risks.  Indeed, with respect to payments made from the Priest Retirement Fund (i.e., pension obligations and Fr. Sarro's housing costs) it does not subject creditors to any risk at all, because, as discussed further below, the Priest Retirement Fund is restricted and unavailable to satisfy the claims of general creditors.  Thus, the "vertical" dimension of ordinariness under section 363(c)(1) is plainly satisfied.

33.    The same reasoning applies perforce with respect to the "horizontal" dimension of ordinariness, insofar as all other entities within the Debtor's industry (i.e., Catholic dioceses) are bound by the same Canon Law to care for their retired clergy.  Accordingly, there is no basis in the Bankruptcy Code to deny the Debtor the authority to continue providing benefits in the ordinary course to Frs. Richardson, Sarro, Dempster,[14] McGovern, Wiggins, and Martin.

---

rights, claims and arguments under the Free Exercise and Establishment Clauses of the First Amendment, the federal Religious Freedom and Restoration Act of 1994, and all other applicable state and federal laws.

[14]    The lone arguable exception would be the payment of the *pro rata* portion of the October pension payment due to Frs. Richardson, Sarro, and Dempster.  However, for the reasons discussed below this can be paid from the Priest Retirement Fund.

DB02:8877240.4                                                                     059604.1018

## 2.    Continued Medical Coverage for Mr. DeLuca

34.    In the Catholic faith, there are certain "works of mercy" which are considered expectations to be fulfilled by believers, insofar as they are able.  Works of mercy are "corporal," which serve bodily and material needs, or "spiritual."  Corporal works of mercy are those that attend to bodily needs, namely: feeding the hungry, giving drink to the thirsty, clothing the naked, sheltering the homeless, visiting the sick, visiting the imprisoned, and burying the dead.  Spiritual works of mercy include instructing the ignorant, counseling the doubtful, admonishing the sinner, bearing wrongs patiently, forgiving offences willingly, comforting the afflicted, and praying for the living and the dead.[15]  The performance of the works of mercy is more than an expression of humanitarianism – it is a mandate of natural law, reflective of the supernatural order, based upon the principle that we are to do to others as we would have them to us.

35.    The provision of charity to Mr. DeLuca in the form of medical insurance coverage is a corporal work of mercy, and the continuation of this coverage is entirely consistent with the Debtor's prepetition business practices and conduct.  It is also consistent with the reasonable expectations of Debtor's creditors, insofar as any creditor familiar with the Debtor's operations and finances would have been aware of the Debtor's provision of charity to Mr. DeLuca.  The continuation of this charity in the form of medical coverage – at a cost of $548 per month – does not subject creditors to unreasonable risks.  Thus, the "vertical" dimension of ordinariness under section 363(c)(1) is plainly satisfied.

---

[15]    An example of a spiritual work of mercy the Debtor performs in the ordinary course is the provision of counseling services (or, alternatively, reimbursement for third-party counseling services) to victims of clergy sexual abuse, irrespective of whether they have valid legal claims against the Debtor (e.g., non-time-barred) or have filed suit against the Debtor.

36.     The same reasoning applies perforce with respect to the "horizontal"

dimension of ordinariness, insofar as all other entities within the Debtor's industry (i.e., Catholic

dioceses) are bound by the same principles of faith and precepts of natural law to perform

corporal works of mercy.  Accordingly, there is no basis in the Bankruptcy Code to deny the

Debtor the authority to continue providing medical coverage in the ordinary course to Mr.

DeLuca.

**B.      Payment of Prepetition Amounts from the Priest Retirement Fund is Permitted under Sections 363 and 541 of the Bankruptcy Code**

37.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor in

possession "after notice and a hearing, may use, sell, or lease, other than in the ordinary course

of business, property of the estate."  11 U.S.C. § 363(b)(1).  Use of property of the estate outside

the ordinary course of business is appropriate if (i) there is an articulated business justification,

(ii) there was adequate notice to all creditors, and (iii) a hearing is held on the use.  See, e.g, In re

Abotts Dairies of Pa., Inc., 788 F. 2d 143 (3d Cir. 1986); In re Delaware and Hudson Ry. Co.,

124 B.R. 169, 176 (D. Del. 1991).

38.     Section 541(a)(1) of the Bankruptcy Code provides that the bankruptcy

estate is composed of "all legal or equitable interests of the debtor in property as of the

commencement of the case."  11 U.S.C. § 541(a)(1).  "Any power that the debtor may exercise

solely for the benefit of an entity other than the debtor," however, is excluded from the

bankruptcy estate.  11 U.S.C. § 541(b)(1).  Moreover, property over which the bankrupt holds

"only legal title and not an equitable interest . . . becomes property of the estate . . . only to the

extent of the debtor's legal title to such property, but not to the extent of any equitable interest in

such property that the debtor does not hold."  11 U.S.C. § 541(d).  Thus, funds held by a debtor

in trust for third parties are not part of the debtor's bankruptcy estate.  See Begier v. Internal

DB02:8877240.4                                                                                          059604.1018

Revenue Service, 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'"); United States v. Whiting Pools, Inc., 462 U.S. 198, 205 n.10 (1983) (noting that "Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition" from the bankruptcy estate); Vess Oil Corp. v. SemCrude, L.P. (In re Semcrude, L.P.), Case No. 08-11525(BLS), 2009 Bankr. LEXIS 3085, *20-21 (Bankr. D. Del. Oct. 5, 2009) (finding that property held by debtors in resulting trust for others was not property of the bankruptcy estate).

39.     The Debtor submits that the Priest Retirement Fund is held by the Debtor in trust for the benefit of retired clergy, either as a result of a charitable trust or a resulting trust under Delaware law.  Accordingly, the Priest Retirement Fund is not property of the Debtor's bankruptcy estate, and may be used to satisfy prepetition amounts relating to pension obligations, housing costs for Fr. Sarro, and prepetition nursing care to Fr. Hanley.[16]

40.     Alternatively, and at a minimum, the Debtor submits that the Priest Retirement Fund is a charitable gift subject to donor-imposed restrictions limiting the use of the funds to the care of retired clergy, which restrictions are enforceable under Delaware law.  Given the Priest Retirement Fund is not available to satisfy the claims of general creditors, the Debtor should be authorized, pursuant to section 363(b)(1) of the Bankruptcy Code, to use the Priest Retirement Fund to satisfy prepetition amounts.

**1.     The Priest Retirement Fund is Held in Trust by the Debtor**

41.     As a general rule, a legal owner of property is entitled to the beneficial use and enjoyment of the property.  Bodley v. Jones, 32 A.2d 436, 440 (Del. 1943).  However, where

---

[16]     In addition, to the extent the Priest Pension Fund is not property of the estate, there is no basis in the Bankruptcy Code to prohibit the Debtor from making payments to Frs. Richardson, Sarro, and Dempster from this fund, irrespective of whether such payments would constitute "ordinary course" payments as discussed above.

a trust has been created, the legal owner holds the property for the benefit, use and enjoyment of another.  Id.  In evaluating whether an express trust exists, Delaware courts adhere to the following general principles:

> In order to create an express trust the intention so to do must be evidenced by definite, explicit and unequivocal words, or by circumstances so revealing and compelling as to manifest the intention with all reasonable certainty.  It follows, necessarily, that the words or the circumstances must admit of but one interpretation, and no [express] trust is created if the transaction is as consistent with another form of undertaking as with that of a[n] [express] trust.

Levin v. Smith, 513 A.2d 1292, 1297 (Del. 1986) (quoting Bodley, 32 A.2d at 440).  Generally, express trusts are created through written instruments.  See Bodley, 32 A.2d at 440.  However, in certain circumstances, Delaware courts have recognized oral express trusts.  Levin, 513 A.2d at 1296 (stating that, "under [Delaware] law . . . , oral trusts in land are recognized"); Taylor v. Jones, C.A. No. 1498-K, 2006 Del. Ch. LEXIS 100, *20 n.20 (Del. Ch. May 25, 2006) (noting that Delaware's statute of frauds limiting the creation of oral trusts, 12 Del. C. § 3545, only applies to oral trusts created after January 1, 2001).  The Debtor submits that the Priest Retirement Fund is held in trust by the Debtor, either as a charitable trust or a resulting trust.  As such, the Priest Retirement Fund is not property of the Debtor's bankruptcy estate, and the Bankruptcy Code's limitations on the use of property of the bankruptcy estate do not apply.

### a.    Charitable Trust

42.    Under Delaware Law, a charitable trust is created if all of the following are present: (i) an intent to create a trust; (ii) a gift, donation, or gratuity, or in the nature thereof, to a charity or for charitable purposes; and (iii) a description of an identifiable, but indefinite group of the public as beneficiaries.  Del. Land Dev. Co. v. First & Cent. Presbyterian Church of Wilmington, 147 A. 165, 171-72 (Del. 1929);  Monaghan v. Joyce, 103 A. 582, 584 (Del. Ch. 1918); see generally Ross v. Freeman, 180 A. 527, 532 (Del. Ch. 1935) (collecting cases

defining and dealing with charitable trusts).  The Priest Retirement Fund meets all three requirements.

43.     With respect to the first element, it is well settled that the grantor's intent to create a trust may be derived from the language, no matter how informal, of the operative document, but must show that the person "intended to impose a definite and binding obligation . . . to use and expend the [gift] in some particular fashion."  Del. Trust Co. v. Fitzmaurice, 31 A.2d 383, 388 (Del. 1943).  Here, the "grantors" of the Priest Retirement Fund are Foundation (with respect to the initial $1 million grant) and the Kenney Trust (with respect to its quarterly distributions to the Debtor), both of which clearly delimited the Debtor's use of the funds to the care of retired clergy.  Accordingly, the first element of a charitable trust is satisfied.

44.     The second element requires that the gift or donation be made to a charity or for a charitable purpose.  Generally, gifts to religious, educational, or philanthropic organizations are considered gifts for charitable purposes.  Trustees of New Castle Common v. Megginson, 77 A. 565, 570 (Del. 1910).  This element too is satisfied, as the Debtor is a religious not-for-profit institution.

45.     The third element of a charitable trust is satisfied where the gift is "for the benefit of the public or of some portion thereof."  Del. Trust Co., 31 A.2d at 388 (quoting Del. Land Dev. Co. v. First & Cent. Presbyterian Church of Wilmington, 147 A. 165, 171 (Del. 1929)), and is indefinite, i.e., "not for any particular person, or set of persons fixed by any artificial or arbitrary selections."  Trustees of New Castle Common v. Megginson, 77 A. 565, 570 (Del. 1910).  The description of "the public or a portion thereof" may be general or specific – such as indigent retired teachers associated with the Wilmington Teachers Association.  Craven v. Wilmington Teachers Ass'n, 47 A.2d 580, 584 (Del. 1946).  Here, Foundation's and the

Kenney Trust's grants to the Debtor were for the benefit of a portion of the public: the Debtor's retired priests.  It is a specific description of a select class to whom the benefit of the gift inures.

46.     In light of the foregoing, the Debtor asserts that the Priest Retirement Fund is a charitable trust fund that is being administered by the Debtor for the benefit of its retired clergy.  The Debtor's estate has taken the Priest Retirement Fund subject to all limitations and conditions that existed on the fund pre-petition.  See In re Schauer, 62 B.R. 526, 529-30 (Bankr. D. Minn. 1986), aff'd 835 F.2d 1222 (8th Cir. 1987); see also 11 U.S.C. § 363(d) (requiring not-for-profit debtor to use property of the estate consistent with applicable state law governing transfers of property by a not-for-profit).  These limitations and conditions require that the Debtor use the Fund to care for retired priests.

47.     In the event that the specific purpose for which the Priest Retirement Fund was established were frustrated, either one of two things happen: (i) the charitable trust would fail and revert to the donors (or pass to any remainderman or contingent beneficiary the donor may have designated), or (ii) the court could elect to apply the doctrine of *cy pres*,[17] and devote the fund to a charitable purpose that is similar to that the donor sought to benefit.  Murphy v. McBride, 130 A. 283, 286 (Del. 1925).  In either event, the Fund is not available for general creditors.

### b.     Resulting Trust

48.     A "resulting trust" is one form of an implied trust under Delaware law. E. Lake Methodist Episcopal Church, Inc. v. Trustees of the Peninsula-Del. Annual Conference of the United Methodist Church, Inc., 731 A.2d 790, 809 (Del. 1999).  The Supreme Court of

---

[17]     Under Delaware law, the doctrine of *cy pres* can be invoked when (i) a donor has evinced a general charitable intention; (ii) that the particular purpose designated in the original gift has become impossible or impractical of fulfillment; and (iii) that the proposed alternative use must approximate as nearly as possible the donor's general charitable intention.  In re Estate of du Pont, 663 A.2d 470, 478 ( Del. Ch. 1994).

Delaware has described the circumstances under which a court may impose a resulting trust as follows:

> A resulting trust arises where a person conveys property under circumstances that raise an inference that the person does not intend the person taking or holding the property to have the beneficial interest in the property. The presumed intention of the parties guides the resulting trust.

Id. Under these circumstances, Delaware law recognizes that "a trust 'results' in favor of the person from whom the equitable interest is thus assumed to have been intended, and whom equity deems to be the real owner." Adams v. Jankouskas, 452 A.2d 148, 154 n.4 (Del. 1982); see Hudak v. Procek, 806 A.2d 140, 146 (Del. 2002) (stating that the purpose of a resulting trust is "to ensure that legal formalities do not frustrate the original intent of the transacting parties").

49. The intent of the transacting parties must be derived from evidence found in the transfer documents, corporate charters, church documents, state statutes, and other secular documents or provisions. E. Lake, 731 A.2d at 809. In fact, all relevant evidence of an intent to create a trust may be considered even though the evidence "does not relate exclusively to or contain the language of traditional property and trust law." Id. (quoting Bishop & Diocese of Colo. v. Mote, 716 P.2d 85 (Colo. 1986)).

50. When Foundation's board approved the initial $1 million grant to the Debtor, it did not intend for the Debtor to have any beneficial interest in that money – it intended the money would be used to establish a funded pension plan for the benefit of retired priests. Similarly, the Kenney Trust's donations to the Debtor "for the purposes of meeting the retirement needs of sick or aged members of said organization" does not evidence an intent that the Debtor would have a beneficial interest in the funds. Although the legal formalities may not have risen to the level necessary to create an express trust, that should not frustrate the intent of

Foundation and Ms. Kenney that the Debtor would hold the funds donated in trust for the benefit of retired clergy.

### 2. At a Minimum, the Priest Retirement Fund Constitutes a Charitable Gift Subject to Restrictions under Delaware Law

51.     Where an operative document does not clearly evidence an intent to create a trust and the recipient is a charitable corporation, Delaware courts characterize the transfer as a charitable gift.  Craven v. Wilmington Teachers Ass'n, 47 A.2d 580, 584 (Del. 1946).  The donor of the charitable gift may impose certain conditions associated with use of the gift.  It is well settled that Delaware courts recognize these types of gifts as gifts "subject to conditions." Hanover St. Presbyterian Church, 210 A.2d at 192 (citing Denckla v. Independence Found., 193 A.2d 538, 538-39 (Del. 1963)).  Each condition will be derived from the donor's intent and may include restricting the use of the principal.  The Executive Council of the Protestant Episcopal Church in the Diocese of Del., Inc. v. Moss, 231 A.2d 463, 386 (Del. Ch. 1967) (applying New York law, but recognizing that New York and Delaware courts enforce the "purpose" provisions of gifts to charitable corporations); see also St. Joseph's Hospital v. Bennett, 22 N.E.2d 305, 307 (N.Y. 1939) (stating that "[t]he gift and the statement of its purpose cannot be separated, one from the other . . . ," and holding that the entity could not receive a gift for one purpose and use it for another).

52.     Even if Foundation's and the Kenney Trust's donations to the Debtor do not rise to the level of charitable or resulting trusts, they constitute charitable gifts subject to the conditions that the funds (now the Priest Retirement Fund) be used to provide benefits to retired clergy.  It is simply not possible to glean a contrary intent from the operative documents or the circumstances of the transactions.  Because the restrictions on the use of the Priest Retirement Fund are enforceable under Delaware law, they must be observed by the Debtor in this chapter

DB02:8877240.4                                    059604.1018

11 case.  See 11 U.S.C. § 363(d).  Accordingly, the Priest Retirement Fund will only be available to satisfy pension claims of retired clergy in this chapter 11 case, and will not be available to satisfy the claims of general creditors.  Under these circumstances, it makes abundant business sense for the Debtor to use the Priest Retirement Fund to bring current any outstanding pension obligations, which will result in a reduction of the claims against the Debtor's bankruptcy estate and, more importantly, will alleviate the financial burden of this bankruptcy proceeding on the Debtor's retired clergy, many of whom assist in the Debtor's pastoral ministry, and all of whom the Debtor is affirmatively obligated to support under Canon Law.

### **NOTICE**

53.     Notice of this Motion will be provided to:  (i) the Office of the U.S. Trustee; (ii) proposed counsel to the Committee; (iii) the Attorney General for the State of Delaware; and (iv) all parties that have requested notice pursuant to Local Rule 2002-1(b).  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

DB02:8877240.4

059604.1018

## CONCLUSION

WHEREFORE, the Debtor respectfully requests this Court to enter an order substantially in the form attached hereto as <u>Exhibit A</u> granting the relief requested in this Motion and awarding the Debtor such other and further relief as is just and proper.

Dated: Wilmington, Delaware
       November 19, 2009

YOUNG CONAWAY STARGATT & TAYLOR, LLP

James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Maris J. Finnegan (No. 5294)
Patrick A. Jackson (No. 4976)
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Proposed Counsel for the Debtor and
Debtor in Possession*

DB02:8877240.4

059604.1018