IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CATHOLIC DIOCESE OF WILMINGTON, INC., | ) | Case No. 09-13560 |
| a Delaware Corporation, | ) | |
| | ) | **Re: Docket No. 137** |
| Debtor. | ) | |
| | ) | |

Objection Deadline: December 15, 2009, 4:00 p.m., Eastern Time
Hearing Date: January 4, 2009, 10:00 a.m., Eastern Time

**[REDACTED][1] OPPOSITION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTOR'S MOTION FOR ORDER AUTHORIZING THE DEBTOR (I) TO CONTINUE PROVIDING PENSIONS, SUSTENANCE AND/OR MEDICAL COVERAGE IN THE ORDINARY COURSE TO CERTAIN RETIRED OR REMOVED PRIESTS ACCUSED OF SEXUAL ABUSE; AND (II) TO USE CERTAIN RESTRICTED FUNDS TO PAY PREPETITION PRIEST PENSION OBLIGATIONS**

The Official Committee of Unsecured Creditors (the "Committee") hereby files

its objection (the "Opposition") to the *Motion for Order Authorizing the Debtor (i) to Continue*

*Providing Pensions, Sustenance and/or Medical Coverage in the Ordinary Course to Certain*

*Retired or Removed Priests Accused of Sexual Abuse; and (ii) to Use Certain Restricted Funds*

*to Pay Prepetition Priest Pension Obligations* (the "Motion") filed by the Catholic Diocese of

Wilmington, Inc. (the "Debtor" or the "Diocese"). Unless otherwise defined herein, capitalized

terms have the meanings ascribed to them in the Motion.

---

[1] An unredacted version of this document is being filed under seal.

# PRELIMINARY STATEMENT[2]

1.      The Motion can be divided into three requests: (1) a request to pay the "pensions" (the "Pension Claims") of three abuser priests, Revs. James E. Richardson, Douglas W. Dempster, and John A. Sarro; (2) a request to pay "sustenance" (the "Sustenance Claim") to three abuser priests, Revs. Joseph A. McGovern, Kenneth J. Martin, and Charles W. Wiggins, and (3) a request to pay the medical premiums of a laicized predator and felon, Francis G. DeLuca. Each request must be denied.

2.      Third Circuit law is clear that claims to pension benefits that vested pre-petition are pre-petition claims that cannot be paid outside of a plan. Besides, Richardson is the only one of the three Pension Claimants who even qualified for retirement. The other two did not qualify for pensions but received them anyway. Dempster did not have enough years of service to qualify for a pension, but was given one to induce him to stop fighting his removal from public ministry and to conceal the fact that he was leaving the ministry because he had sexually abused children. Sarro also was not old enough, nor did he have enough years of service to qualify for a pension.[3] Further, there is no provision in the pension plan to pay the "assisted living" of Sarro. Therefore, even if the Pension Claims were not pre-petition and could be paid, there is no authority under the Diocese's pension plan to be paying these costs in the first place, and the Court should not sanction the Diocese's abuse of its own system.

---

[2] Unless otherwise defined herein, capitalized terms used in this section of the Opposition have the meanings ascribed to them in other sections of the Motion.

[3] The Diocese has refused to produce Sarro's personnel file in time for this Opposition. Therefore, the Committee has not yet discovered why the Diocese gave Sarro a pension, despite the fact that he did not qualify for one. The Committee has moved to compel production of Sarro's personnel file and may have to supplement this Opposition at a later date. In any event, Sarro's claim should not be paid before the Committee's motion to compel is resolved.

3.     With respect to the Severance Claims, McGovern – like Dempster – extracted an agreement from the Diocese pursuant to which McGovern stopped fighting his removal from public ministry in exchange for payments from the Diocese. The Court should not authorize the Debtor to pay McGovern's claim under this pre-petition settlement. Furthermore, McGovern is a highly-educated, relatively young man who does not need sustenance.

4.     The Diocese has withheld the personnel files of the other two Sustenance Claimants and therefore the Committee does not know the facts underlying these claims. However, publicly available information shows that they are relatively young men (60 and 64 years old, respectively) and who do not appear to "need" any sustenance. Further, because the personnel file of McGovern reveals that the Diocese omitted that it had a pre-petition agreement with McGovern, the Court should not trust the Motion's depiction of the facts with respect to Wiggins and Martin.[4]

5.     With respect to DeLuca, a serial pedophile and convicted felon, the medical premiums that the Diocese seeks to continue are a holdover from the Diocese's admitted scheme to cover up DeLuca's crimes. DeLuca was removed from public ministry in 1993 after having abused hundreds of children. The Diocese admits that it told the public that he was "retiring for health reasons" in order to minimize, downplay, and hide his crimes. Although he did not really retire, the Diocese paid the supposedly "restricted" priest pension funds to DeLuca to help cover up his crimes. DeLuca lived in Syracuse under the "guise" of a retired priest and drove a car with the vanity plate "Uncle Frankie Wankie." Because he was not exposed, and

---

[4] The Committee is moving to compel production of the Sarro, Wiggins and Martin personnel files. These claims should not be paid before the motion to compel is resolved.

because the Diocese intentionally helped him from being exposed by financing his cover as a "retired" priest (with the "restricted" funds), DeLuca raped more children in Syracuse. Only then did the Diocese scale back their payments to him. However, the medical premiums that the Debtor asks permission to pay him are a hold-over from the pre-petition scheme to cover-up a lifetime of child rape.

6.       When viewed from the proper perspective the theory of "ordinary course," which the Diocese relies on heavily to justify paying the Pension Claims, the Severance Claims and the DeLuca payments, is inapposite. Ordinary course applies to a debtor's efforts to generate income for the benefit of the estate and to the exercise of the debtor's business judgment in those efforts. Here, business judgment does not apply because the Debtor is not trying to preserve its operations and its reorganizational value for the benefit of creditors. It is simply seeking to further its admitted prepetition cover-up by spending estate resources (on pre-petition claims).

7.       Further, the Debtor states that it can pay the Pension Claims because it intends to use funds that are held in trust and otherwise restricted for the benefit of retired priests. There is no evidence that the fund is held in trust. The Catholic Diocese Foundation, which transferred the seed money (a $1 million bequest from Mrs. Anna V. Graham) for the priest pension fund, did not send the money "in trust." Her will states that the money could be used for "any purpose." When the money was transferred for the pension fund, the Diocese had not decided to create a trust.

8.     In addition, there is no evidence that the funds are restricted. Mrs. Graham, who bequeathed the $1 million that was ultimately used to create the retirement fund, did not restrict how the Diocese could use those funds. While the Kenney Foundation did restrict the use of funds to the "aged and sick" members of the Diocese, the Diocese has not honored that restriction. Neither DeLuca nor Dempster was aged or sick when the Diocese used the priest fund to finance their faux retirement. Sarro, moreover, was too young to even qualify for a pension when they gave it to him – let alone was he "aged and sick."

9.     Accordingly, the Court should deny the Motion in its entirety.

## FACTS

### A.     The Pension Plan

10.     The terms of the Debtor's pension plan ("Pension Plan") is attached to the Motion as Exhibit D. According to that Exhibit, a priest can qualify for either the "normal retirement" or the "early retirement." To receive a "normal retirement," a priest "needs 25 years of service" and must be 70 years old. If a priest is 70 years old with less than 25 years of service a "per month proportionate deduction shall be calculated." To receive an "early retirement," a priest must be 65 years old, there must be a "serious reason" for the early retirement, the priest must have "25 years of service to the diocese," *and* there must be "approval of the Diocesan Bishop." (Emphasis added). The "normal retirement benefit" is $925 per month, as of "April 1, 1990." While the Diocese may have increased this amount, it has failed to produce any evidence of such increase. Therefore, even if the Pension Claims could be paid – which they cannot be, since they are prepetition claims – there is no way to test the amount of the Pension Claims that

the Debtor proposes to pay. The pension plan also provides that the Diocese will pay the medical insurance of retired priests on an annual basis. The pension plan also provides for a "disability benefit." "Should a priest for medical reasons be required to withdraw permanently from the active ministry, full benefits will be granted. . . . Certification by a physician is required." Exhibit D to the Motion.

11.     Exhibit D to the Motion also states "there is a Trustee of the Pension Fund separate from the diocese. All plan assets are held in a trust and are managed by the Delaware Trust Company." However, as the Court is aware from other filings in this case, the pension plan assets are held by BNY Mellon as "custodian" in Subfund F#10100 of the Pooled Investment Program. There is no Trustee and the Delaware Trust Company plays no role at all. No evidence regarding the Delaware Trust Company has been produced.

**B.     The Pension Fund**

12.     Based on previously filed pleadings with the Court, the priest pension fund from which the Debtor proposes to pay the Pension Claims has two sources of funds. The first is $1 million from the Catholic Diocese Foundation, which in turn received the money from Mrs. Anna V. Graham pursuant to her will. The second is a relatively small (less than $4,000) quarterly payment that is received from the Julia M. Kenney Charitable Foundation (the "Kenney Foundation").

13.     In her will, attached hereto as **Exhibit A,**[5] Mrs. Graham bequeathed the residue of her estate to the Catholic Diocese Foundation "to be used for the education of students

---

[5] The copy attached to the Motion is illegible. Therefore, the Committee is attaching a clean copy for the Court's reference.

for the Priesthood or for additional studies for Priests; in the event such costs are being

adequately met from other sources, then The Catholic Diocese Foundation of the Diocese of

Wilmington may direct the use of this bequest to the retirement fund for Clergy or for any other

purpose which it may deem necessary or desirable." In September 1978, minutes of a meeting of

the Catholic Diocese Foundation reveal a discussion regarding the intent of this bequeath. The

minutes state, "Based on the wording of the bequest of Mrs. Anna V. Graham, it would seem that

funds from her bequest could be used for the general purposes of the Foundation." The minutes

are attached hereto as **Exhibit B**.

        14.     Earlier in May 1978, the Board of Directors of the Catholic Diocese

Foundation discussed a request from the "Senate of Priests" for "a grant establishing a funded

pension plan for Diocesan priests." The minutes are attached hereto as **Exhibit C**. The Catholic

Diocese Foundation's minutes stated:

> Monsignor Taggart moved that the Foundation make available [to
> the Diocese] up to one million dollars, the best possible plan of
> investing it for the priests' pensions. This motion was seconded by
> Monsignor Foltz and with Justice Duffy abstaining, all approved.
> Justice Duffy wished the reasons for his abstention be recorded;
> namely, insufficient information as to the terms of the plan,
> calculations of the one million not clearly shown, and it was not
> clearly stated who would handle the one million and on what basis
> (trust fund type or in secured funds, or what.

*See* **Exhibit C**, attached hereto.

        15.     The Motion states that the Kenney Foundation provides approximately

$4,000 a month to the Diocesan's priest pension fund and that distributions to the Debtor are "for

the purposes of meeting the retirement needs of sick or aged members of such organization."

## C. The Abuser Priests Subject to the Motion

16. The Debtor has refused to give files prior to the deadline for filing the Opposition. Therefore, the Committee will only outline publicly available information that is relevant to these Claimants.[6]

### (1) DeLuca -- Felon[7]

17. DeLuca admits that ███████████████████████████ over the course of fifty years. (DeLuca 2008 at 213-14, A54-55).[8] In the Senate debates before the unanimous enactment of the Delaware Child Victim's Act of 2007, which led to this chapter 11 case, Senator McBride specifically referred to DeLuca by saying, "there is in my opinion no better example of why we want to pass this Bill." (McBride A6223). Even though DeLuca admits that he abused so many boys that he cannot possibly remember all of them, he does not think his abuse is "any real big deal." (Lemon Nov. 2008 at 113, A1330). The boys "liked it." (DeLuca 2009 ex. 4 p.2, A272; DeLuca 2009 at 233, A234; Mulvee ex. 3 p.2, A3250). They were ███████████████████████ (DeLuca 2008 at 315, A164). Besides, he did not know that sexually abusing 11-year olds was a crime. (DeLuca 2008 at 64, A17; DeLuca 2009 at 44-45, A187).

18. The Diocese admits that it engaged in a "cover up"[9] of DeLuca's crimes by transferring DeLuca from parish to parish (approximately seven) and lying about the reasons

---

[6] The Committee is moving to compel the production of these files and to extend the Opposition deadline so that the Committee may review them. The Committee believes that no amount should be paid to Sarro, Wiggins, or Martin before the Committee has reviewed their files.

[7] In this section of the Opposition, the Committee will to source documents, which are deposition transcripts. The Committee will submit an appendix of the deposition excerpts separately.

[8] All citations with a name and numbers afterward are to deposition transcripts with the name of the deponent listed first.

[9] (████ 192-96, 205, A4175-76, 4179).

for the transfers. (Mulvee ex. 19, A3350). According to the Diocese, from 1966-85, "if a priest had been found to have abused a child, [ ] he would normally be transferred to another parish after that conclusion was reached." (Gerres 12-14, 135-36, 141-42, 148, A1116-17, 1147-50). He did not lose his faculties and he was not punished in any way. (Gerres 12-14, 135-36, 141-42, 148, A1116-17, 1147-50). This Diocesan policy was referred to by Senator McBride as "taking out the trash or spreading the garbage." (McBride A6248). The excuse for this policy was the grave shortage of priests. (Lemon Oct. 2008 at 91-93, A913; Lemon Oct. 2008 ex. 3 p.2, A974).

19.     In the Diocese's judgment, a pedophile priest was better than no priest.

20.     DeLuca, for his part, brags that he never had to "sneak" young boys into the rectory and never had to "hide" the fact of his abuse from any of the priests there. (DeLuca 2009 at 158, A216). He molested altar boys in the rectory after morning mass. (███ 198-201, A4321). He molested boys in the music room, nurse's room and teacher's lounge of the parish elementary schools. (███ 92-95, 97-122, 244-55, 257, 267-70, A4150-58, 4188-95; F. ███ Inter. at 12-14, A5391-93; ███ Aff. ¶ 4-8, A5753; ███ 211, 213-16, 218-221, 230-33, 236-43, A4324-26, 4329-32; ███ Inter. at 9-11, 19-20, A5485-87, A5495-96). He molested boys on overnight trips to ███████████████████. Blackwood seminary in New Jersey, Wildwood, New Jersey, and New York City. (DeLuca 2008 ex. 12, A138; DeLuca 2009 at 136, 186, A210, 223; DeLuca 2009 at 185, A222; DeLuca 2009 at 187, A223; DeLuca 2009 at 189, A223).

21.     According to DeLuca, he would "basically hump[] [the child], mount on him and gyrate back and forth until [he] had an ejection." (DeLuca 2008 at 201-204, 215, 322, A51-52, 55, 166; DeLuca 2009 at 72, 83-84, 142-45, 147, 164-68, 202, 194, 197, 212-13, 217-18, 227). Survivors remember DeLuca removing their clothes, humping until he ejaculated, being French kissed, being forced to masturbate DeLuca and being masturbated by DeLuca, oral sex, anal sex, and penetration of the child's anus with his fingers. (M. Schulte 82-98, 220-23, A4455-59, 4489-90; M. Schulte Inter. at 9, A5592; ███████ 112-14, 249, 251-52, 255, A4155-56, 4190-91; ██████ Inter. At 9-11, A5388-90; ██████ Aff. ¶ 7, A5753; ██████ 192-93, 209-10, 216-18, A4319, 4323-26; ███ Inter. at 7-10, A5483-86; Vai 134-37, 147, 149-50, 197-99, A4619-23, 4635; Vai Inter. at 8-9, A5673-74). One boy remembers not being able to breathe as he lay on his stomach trying to fight off DeLuca as DeLuca anally raped him. (M. Schulte 82-98, 220-23, A4455-59, 4489-90; M. Schulte Inter. at 9, A5592). An episode of sexual abuse could take from ten minutes to two hours. (Sowden Inter. at 8, A5634; Sowden 126-27, 299-300, 318-19, 324-25, A4531, 4574, 4579, 4580-81).

22.     In 1993, the Diocese and Bishop publicly announced that "for reasons of health," DeLuca was being retired and transferred to inactive ministry and was moving to Syracuse, New York. (DeLuca 2008 Ex.1 p.2, A59; DeLuca 2008 ex. 5 p.2, A39; DeLuca 2009 at 14, 546, 552-53, A180, 437-38; DeLuca 2009 ex. 54-56, A547-50; Mulvee 410-14, A3296-97; Mulvee ex. 12, 21-22, A3341, 3354-56; Rebman 334-35, A3505-06; Rebman ex. 10-11, A3665-66; Lemon Nov. 2008 at 148, 151, A1339-40; Maria Dingle 116, A4700; Connell 88, A4088). Bishop Mulvee admits that this "cover story" was not true and he was being removed because of

sexual abuse of a child. (Mulvee 368-69, 410-14, A3286, 3296-97). This was a "face-saving gesture" for the Diocese. (Lemon Nov. 2008 at 148, A1339).[10]

     23.     Bishop Mulvee admits that not reporting DeLuca to the authorities in 1993 violated the Diocese's sex abuse reporting policy (Mulvee 206-07, A3222). This also violated the state child abuse reporting statute. *See* 16 Del.C. § 903.32.

     24.     Although DeLuca did not really retire, the Diocese financed his guise as a retired priest by paying him a full pension, plus medical insurance. (DeLuca 2008 at 11, A64; DeLuca 2009 at 14, 550-51, A180, 438; DeLuca 2009 ex. 55, A549; Mulvee 382-83, A3289; Lemon Nov. 2008 at 159-60, A1342; Cini Nov. 2008 at 147, A1219).

     25.     In a note to Rev. Lemon from Syracuse, where DeLuca was pretending to be a retired priest, DeLuca commented on the delightfully large number of altar boys in his Syracuse church, noting "23 lads a Sunday," "no gals here." (DeLuca 2009 at 624-25, A456; DeLuca 2009 ex. 71 at p.3, A568; Lemon March 2009 at 303-04, A6489). He began driving a car with a vanity plate that said, "Uncle Frankie Wankie." (Dillingham 129-30, A2852-53; DeLuca 2009 at 596, 599, A449-50; Michael Dingle 84-85, A4659-60). DeLuca also continued to abuse children in Syracuse and was finally convicted of child abuse.[11]

     26.     In 2008, the Diocese finally laicized DeLuca. According to the Motion, the Diocese cut off the full pension that they had used to finance the cover up, but now seek

---

[10] The Diocese regularly lied to the public in stating that priests were retiring for health reasons when in reality, they were being retired for sexually abusing innocent young children. (Lemon Nov. 2008 at 152-53, A1340; Cini Nov. 2008 at 47, A1194).

[11] The records of DeLuca's arrest and conviction are part of the public record.

permission to continue paying the medical premiums that they had agreed to pay him as part of the cover up.

(2)     McGovern – Sustenance Claimant

27.     McGovern has a Masters Degree of Liberal Arts in Ancient and Near Eastern Religions from Johns Hopkins University, and a Masters of Art in History from Fordham University. (**Exhibit D**). He may also have a third Masters Degree from Temple University, and a J.D. from an undisclosed university. (**Exhibit E**). (A search of publicly available records has not found a Joseph A. McGovern admitted to the bar of either Pennsylvania or Delaware.)

28.     In January, McGovern will be only 61 years old. (**Exhibit D –** McGovern's birthday is January 29, 1949). He has been living on his own for almost 20 years[12] and supports himself by teaching part-time. (**Exhibit F**). While he did get fired from a teaching job after his child abuse became public in 2005, (**Exhibit F**). there is no evidence that he is incapable of getting a more appropriate job or that he is otherwise a "charity case."

29.     In 1980 or 1981, McGovern offered multiple times to show his penis to a boy while the boy was showering during a retreat. (**Exhibit G**). McGovern said he wanted to show the boy his uncircumcised penis so that the boy could compare it to his circumcised one. McGovern was walking around in bikini underwear. (**Exhibit G**). The boy's father complained to the Diocese. (**Exhibit G; Exhibit H**). However, Bishop Mulvee apparently did not learn of this incident until 1986, at which point the Diocese sent McGovern to St. Luke's where he stayed from March 1986 to October 1986. (**Exhibit H**).

---

[12] As set forth below, McGovern was removed from the public ministry in 1990.

30.     McGovern admits that he also accosted two other children. The Diocese believes there may be more victims and that he remains a threat to children. (**Exhibit I**).

31.     In 1986, the Vice Chancellor of the Wilmington Diocese wrote a letter to the Vice Chancellor of the Archdiocese of Philadelphia asking the Archdiocese if it would take McGovern. (**Exhibit H**) With respect to McGovern's offering to expose himself to the child in the shower, the Wilmington Vice Chancellor said, it "never involved any civil or criminal action. There was, rather than a formal complaint, *the perception of a possible problem. . . .*" (**Exhibit H**).

32.     The letter added that if the Archdiocese of Philadelphia would accept McGovern, McGovern would "concentrate on his studies [graduate studies at Temple University], seek the hospitality of a rectory *and provide such priestly service as would be appropriate and needed.*" It also referred to McGovern "exercise[ing] his priestly ministry outside of the diocese of Wilmington." (**Exhibit H**).

33.     After an initial refusal, the Archdiocese accepted McGovern and assigned him to Holy Angels Church in Philadelphia, effective March 16, 1987, where he began acting like any other priest, saying mass and associating with the parishioners. (**Exhibit J**).

34.     In late 1989, some questions arose regarding McGovern functioning as a priest in the Archdiocese. (**Exhibit K**). In response, Rev. John Jagodzinski stated in a memo dated October 18, 1989, "Nowhere in any of the communications on this matter was it ever stated in writing that Father McGovern was to refrain from ministry in this Archdiocese." (**Exhibit J; Exhibit K**).

35.     Not until December 20, 1989 is there any evidence that McGovern was actually told "that the Bishop wanted him to stop functioning publicly as a priest," even though Bishop Mulvee was maintaining that he had intended that McGovern be removed from the public ministry back in 1986. **(Exhibit L)**. When McGovern was finally told of the Bishop's intent, McGovern responded like a lawyer. He wanted to know "the canonical reason for such action" and "wanted time to think about this." **(Exhibit L)**.

36.     Notes in the file in the June 1990 time frame refer to multiple phone calls and discussions with McGovern regarding his removal from public ministry. The notes reference "the legal reasons for the request" to remove McGovern from public ministry and that McGovern wanted to know if the Diocese would "be able to help him with the rent." **(Exhibit M)**. The Notes further disclose discussions with McGovern to pay him $5,902 a year for two years and $1,362 "for start up." One note adds "negotiate." **(Exhibit M)**.

37.     The negotiations were successful. A note in the file dated June 19, 1990 states that McGovern will not celebrate mass at Holy Angels Church "from here on out." **(Exhibit N)**. Notes in the same time frame show that the Diocese would pay McGovern "start-up expenses of $1,500 and a monthly commitment of $454. This arrangement will be re-evaluated at the first of the year." **(Exhibit O)**.

38.     In 2002, after twelve years of payments pursuant to this "commitment," the Diocese for the first time asked McGovern to provide financial disclosures. McGovern's lawyer responded, "As we understand, the Diocese has been paying Father McGovern his stipend since approximately 1990, *which was a bargained for exchange* in return for Father

McGovern not pursuing any dispute he had with your Diocese through Canon Law. Insofar as

this arrangement existed for in excess of the last decade, it is unlawful to change the terms of this

agreement unilaterally." (Emphasis added.) (**Exhibit P**).

      39.    The Diocese "flinched" (its own words) and continued making the

payments. (**Exhibit F**). It appears, however, that some in the Diocese were not happy with the

arrangement. An undated note says, "I'd cut [McGovern] off as we have the others and let him

fight with Rome (no more support from us) . . . I'd shut off support." (**Exhibit Q**).

Nonetheless, the Diocese continued to pay McGovern. (**Exhibit R**).

      40.    In the summer of 2007, the Diocese again tried to condition its payments

to McGovern on financial need. According to a memo dated August 2007, Fr. Cini asked

McGovern for information relating to his financial status as a condition to receiving further

payments from the Diocese. According to the memo, McGovern's "response was that we tried

to do this a couple of years ago and that I had received a very pointed letter from his attorney. I

told him I remembered that but that this time we were not going to flinch." (**Exhibit F**).

      41.    As of July 23, 2007, Mr. Corsini reported to Fr. Cini, that the Diocese was

paying McGovern "$5950 in salary, $6000 in living allowance, and $3600 as a business

expense." The Diocese also paid McGovern's health insurance through the "lay health insurance

plan." (**Exhibit S**). The memo stated that the Diocese was withholding payment to McGovern

pending receipt of additional unspecified information from him. However, it appears that the

Diocese continued to pay McGovern. As of June 2009, the Diocese's records show that they

were still paying McGovern the same amount. (**Exhibit T**).

42.     According to the Motion, the Diocese is paying McGovern $496 a month ($5,952 a year), plus $548 a month ($6,576) on behalf of McGovern in medical premiums. There is no evidence in the file, or in the Motion, that this 61 year old college professor with a law degree cannot support himself.

### (3)     Dempster – Pension Claimant[13]

43.     Dempster was removed from the public ministry for abusing children in 1993 when he was only 55 or 56 years old. Therefore, he did not qualify for either "normal retirement" or "early retirement" within the terms of the Debtor's Pension Plan. The Diocese, however, granted Dempster a pension as part of a negotiated settlement with Dempster pursuant to which he agreed to tender his resignation and leave public ministry, and the Diocese agreed to give him a full pension and tell the world that he retired for "reasons of health."[14]  (**Exhibit U**).

44.     The negotiations with Dempster began after someone delivered to the Diocese a tape recording in which Dempster admitted that he sexually abused at least one boy. CDOW DWD 00921, 00924, 00926 and 00763.  In notes discussing the tape recording, dated March 22, 1993, the Diocese states, "at this time we know of two cases of abuse. The current allegation is true. . . ." CDOW DWD 0090.

45.     In response to the tape and its knowledge of Dempster's crimes, the Diocese sought to negotiate and "develop a financial package" and a "satisfactory package" for Dempster.  (**Exhibit V**).  No doubt to enhance the terms of that package, Dempster hired a

---

[13] In this section some documents will be attached to the Opposition. However, because other documents may be confidential, they will only be referred by Bates Stamp number pending resolution of that issue. They will subsequently be presented to the Court under seal.

[14] The same subterfuge was used with DeLuca that same year.

lawyer who promptly told the Diocese "[n]o letter of resignation will be forthcoming." (**Exhibit W**). However, by December 20, 2009 the "satisfactory package" for Dempster had been negotiated. Dempster pretended to tender his resignation "for reasons of health" which the Diocese then pretended to accept. (**Exhibit X**).[15]

46. Dempster was a serial abuser who spent some years with DeLuca in a rectory that can only fairly be described as an "animal house." Starting in the fall of 1962 and continuing until 1966, on at least a weekly basis, Father Dempster regularly took a young altar boy up to his second floor rectory bedroom to sexually abuse him. This was openly done in the presence of Father Sheehy, DeLuca, the rectory housekeepers and other priests who lived there, many of whom greeted this young altar boy as he entered Dempster's room. ( ▮ Aff. ¶¶ 8-23, A5778-80).

47. Dempster begrudgingly admits that he "may have [also] seen" DeLuca bringing children in and out of DeLuca's bedroom "from time to time." (Dempster 121-24, A2273-74).[16] He remembers that DeLuca "may have had them overnight" in his room. (Dempster 123, A2274). He also admits seeing a large number of young children going in and out of Father

---

[15] As with DeLuca, the Diocese did not call the police and did not tell the public the truth.

[16] Father Dempster extensively asserted his Fifth Amendment right not to incriminate himself as a basis to refuse to answer questions about his sexual abuse of a certain young boy and numerous other young children. (Dempster 63-74, 188-91, 194, 202, 206-07, 210-11, 231-32, 244, 246, 249, 255, 282-83, 287, A2259-62, 2290-92, 2294-96, 2301, 2304-05, 2307, 2314-15). Unlike in the criminal context, asserting the privilege in the civil context is not "costless." *S.E.C. v. Graystone Nash, Inc.*, 25 F.3d 187, 190 (3d Cir. 1994); accord U.S. v. Certain Real Property, 55 F.3d 78, (2d Cir. 1995). "Unlike the rule in criminal cases, however, reliance on the Fifth Amendment in civil cases may give rise to an adverse inference against the party claiming its benefits." *Graystone*, 25 F.3d at 190. It "may, therefore, carry some disadvantages for the party who seeks its protection." *Id.* The law surrounding privilege against self incrimination under the Delaware Constitution is "essentially the same" as the federal privilege. *W.S.F.S. v. Tucker*, 1986 WL 3136, *2 (Del.Ch. March 13, 1986); *accord State v. Wiggins*, 2004 WL 440449, *1 (Del. Super. Feb. 24, 2004).

DeLuca's bedroom alone. (Dempster 125, A2274). Rather than report DeLuca, Dempster, as set forth above, pursued his own interests and tried to protect DeLuca.

48.    In the early 1960's, when one family complained about DeLuca, Dempster went to the boy's family and threatened the boy's mother and father with eternal damnation if they ever spoke of the abuse to anyone again. (D. Schulte Aff. ¶¶ 20, 22-23, A818-19; D. Schulte 35-42, 77-79, A799-801; M. Schulte 142, A4470; M. Schulte Inter. at 12, A5593). Dempster then took the child into the family bomb shelter (it was in the early 1960's around the time of the Cuban Missile crisis), and demanded with a "threatening demeanor," "how fucking far is this going to go." (M. Schulte 141-42, A4470; M. Schulte Inter. at 12, A5593). Dempster told the boy that he was "forbidden to tell anybody anything about what happened with Father DeLuca," it would be a "mor[t]al sin and that there would be serious ramifications" if he continued complaining. The child was afraid that he would be expelled from school. (M. Schulte 144, A4470; M. Schulte Inter. at 12, A5593). Mulvee described Dempster's conduct as "abominable." (Mulvee 150, A3208).

(4)    Sarro – Pension Claimant

49.    The Debtor has refused to produce Sarro's file on the ground that it has to build the file "from scratch." Therefore, the Committee cannot fully and fairly respond at this time to the Debtor's request to pay Sarro's Pension Claim at this time.

50.    The Committee has, however, been able to piece together that Sarro did not qualify for a pension and did not even retire. He was removed from the public ministry in 1998 for abusing children after having served only 19 years -- less than the 25 years that is

required for either "normal retirement" or "early retirement," when he was only 57 years old, less than 65 years that qualifies for "early retirement." The Committee suspects – but cannot confirm until it receives Sarro's file – that Sarro was given a "satisfactory financial package," like Dempster and DeLuca, in exchange for a ruse retirement.

51.     As part of his "pension benefit," the Diocese also pays $134 a day, or approximately $4,000 per month, for Sarro's "assisted living." The Diocese offsets this $4,000 payment against Sarro's pension payment (which, as set forth above, he should not be receiving). There is no provision in the pension plan for the payment of "assisted living," or for payments in excess of the "normal retirement benefit," which according to the plan specifications attached as Exhibit D to the Motion barely exceed $900 a month. (It may be that the benefit has increased since 1990, the date referenced in the pension plan. But, those updates have not been provided to the Committee.)

52.     The Diocese has produced no evidence regarding this "assisted living," and why Sarro lives there. A newspaper article in 2006 describes Sarro's residence as a "monitored religious retirement community in Maryland."

(5)     Richardson – Pension Claimant

53.     Richardson is the only priest identified in the Motion who actually retired and was both old enough and had sufficient years of service to qualify for a bona fide pension benefit. However, as set forth below, the Pension Claims are pre-petition and cannot be paid outside of a plan.

54.     To prevent the production of his personnel file, Wiggins has moved for a protective order in the adversary proceeding relating to the temporary restraining order that the Debtor requested in Adversary Proceeding No. 09-52275. According to publicly available records, Wiggins was removed from the public ministry in 2003. However, as in the case of McGovern, he may have been removed from the public ministry on a different date. Further, as in the case of McGovern, there may be additional material facts that the Diocese has not disclosed.

55.     Wiggins is only 53 years old. He therefore appears too young to need "sustenance."

(7)     Martin – Sustenance Claimant

56.     The Diocese has refused to produce Martin's personnel file to the Committee in time for the hearing. He was removed from the public ministry, according to publicly available records, in 2001. As in the case of McGovern, he may have been removed from the public ministry on a different date, and there may be other material, undisclosed facts.

57.     Martin is only 65 years old. He therefore appears too young to need "sustenance."

**ARGUMENT**

**A.     The Debtor Cannot Pay the Pension Claims Outside of a Plan**

58.     In the Motion, the Debtor requests permission to continue paying pension benefits to three abuser priests, Sarro, Dempster, and Richardson. The Debtor's request to pay

the Pension Claims should be denied. Pension benefits that vest pre-petition pursuant to a pre-petition plan constitute pre-petition claims that cannot be paid outside of a plan. Additionally, the Debtor's request to pay the Pension Claims of Sarro and Dempster should be denied for the additional reason that Sarro and Dempster do not meet the plan requirements for a pension. They did not "serve" the Diocese for the requisite 25 years. Finally, in the case of Dempster, the retirement was just a ruse to extract Dempster's agreement to leave the public ministry after being caught on tape admitting to abusing children.

        (1)    Under Clear Third Circuit Law, the Pension Claims are Pre-Petition Claims

59.     In the Third Circuit, pension claims arising under a pre-petition pension plan are pre-petition claims if the claimant became entitled to the payments before the petition date, even though the payments were due post-petition. For example, in *Belcufine v. Aloe (In re Shenango Group, Inc.)*, 186 B.R. 623 (W.D. Penn. 1995), a set of employees sued the debtor's officers under a state law that holds officers liable for the corporation's failure to pay retirement benefits. The retirement payments were required pursuant to a set of pre-petition agreements between the employees and the debtor. After the petition date, the debtor stopped making the payments. The employees sued the debtor's officers for the debtor's failure to make the post-petition payments.

60.     Even though the payments were not due until after the petition date, the lower court held that "Plaintiffs' claims constitute prepetition claims because the obligations arose prior to filing." *Id.*, at 627. The court also held that, "[o]nce a bankruptcy petition is filed, the debtor in a Chapter 11 is barred from paying prepetition claims by any method other than

plan payments or order of court. . . . " *Id.,* at 627. Because the debtor was barred from making

these payments, the court refused to hold the officers personally liable.[17] The Third Circuit

affirmed this decision in *Belcufine v. Aloe,* 112 F.3d 633 (3rd Cir. 1997). The Third Circuit

agreed that the Debtor was not allowed to pay pension benefit claims that were "earned in the

prepetition period, but that became due only in the post-petition period." *Id.* at 634.

      61.    Other cases within the Third Circuit bolster the point that pension claims

arising from a pre-petition obligation, but coming due post-petition, are pre-petition claims that

cannot be paid outside of a plan without a Court order. In *In re Morin,* 2006 WL 2085224

(Bankr. D. N.J. 2006), a pension and disability plan mistakenly paid disability payments to a

party. The party then filed bankruptcy. Post-petition, the debtor became entitled to pension

payments from the plan pursuant to a pre-petition agreement. The plan sought to offset the

pension payment obligation against its claim for the mistakenly paid disability payments. The

debtor argued that offset should not be allowed because mutuality was lacking. The debtor

claimed that the pension payment claim arose post-petition because payment did not come due

until after the petition date and the disability payment claims arose pre-petition because the

payments were made pre-petition.

      62.    The court held that even though the pension payments came due post-

petition, the debtor had a pre-petition claim for those payments because the debtor "met the

---

[17] The court stated that the statute exists to deter corporate officers from gambling with employees' salaries and other benefits in order to try to salvage the company. Thus, if the corporation decided to make a last-ditch investment instead of paying its employees, and the investment failed, the officers would be personally liable to the employees for those salaries and benefits. Those considerations do not apply in the bankruptcy setting where the corporation failed to make the payments because it was prohibited from doing so by the Bankruptcy Code. *Belcufine,* 112 F.2d at 639.

requirement for a vested retirement benefit pre-petition." *Id.*, at *6. Accordingly, "[b]oth [the debtor] and [the plan] stand in the same capacity and hold claims against one another that arose pre-petition." *Id.* at * 6. *See also Exide Technologies, Inc.,* 378 B.R. 762 (Bankr. D. Del. 2007) (after finding that a retirement agreement was not executory because the debtor had already retired as of the petition date and owed no further duties to the debtor, court held that the party's pension claim was a general unsecured claim).

63.    Finally, Judge Carey recently considered a claim to retirement benefits in the context of section 1114 of the Bankruptcy Code. In *In re Arclin U.S. Holding, Inc.,* 416 B.R. 117 (Bankr. D. Del. Oct. 9, 2009), an employee entered into an early retirement package with the debtor pursuant to which the debtor agreed to make periodic payments, provide a car allowance, and pay medical benefits. After the debtor filed bankruptcy, it stopped making any of these payments.

64.    When the employee moved to compel the payments, the Debtor argued that the agreement was a severance agreement – not a retirement plan. The court disagreed and without discussion treated the entire package as an "early retirement" package. *Arclin*, 416 B.R. at 119. The court then ordered the debtor to resume paying the health insurance premiums because they qualified as the type of "benefits" covered by section 1114. Without discussion, the court rejected the employees' request to require the debtor to resume making the other payments under the early retirement package. It appears that the court did not consider it necessary to explain why the other payments were not required by section 1114 because it is clear that section 1114 only covers medical benefits. The real question, therefore, was whether

the premiums under the early retirement package were 'medical benefits' within the meaning of section 1114. Despite its lack of discussion, *Arclin* bolsters the point that a Debtor is not entitled or required to pay pension claims that arise under a pre-petition pension plan or agreement, unless they fall within the specific medical benefits covered by section 1114 of the Bankruptcy Code.

65.     Pre-petition claims can only be paid in exceptional circumstances under the doctrine of necessity. *See e.g., Capital Factors, Inc. v. Kmart Corp.*, 291 B.R. 818, 823 (N.D. Ill. 2003, aff'd, 359 F.3d 866 (7th Cir. 2004) ("[I]t is clear that however useful and practical these [pre-petition] payments may appear to bankruptcy courts, they simply are not authorized by the Bankruptcy Code."); *Official Committee of Equity Sec. Holders v. Mabey,* 832 F.2d 299, 302 (4th Cir. 1987) ("Bankruptcy Code does not permit a distribution to unsecured creditors in a chapter 11 proceeding except under and pursuant to a plan of reorganization that has been properly presented and approved."); *In re Wexler Knitting Mills,* 44 B.R. 1019, 1020 (Bankr. E.D. Pa. 1984) (court denied debtor's application to pay prepetition debt owed for contributions to its employee benefit plan since "the debtor's averment that is anticipated plan of reorganization will provide a one hundred percent (100%) payment is purely speculative.").

66.     Accordingly, the Diocese should not be allowed to pay the Pension Claims.

      (2)     <u>The Diocese Violated its Pension Plan Terms by Paying
Retirement to Dempster and Sarro; Such Payments Were
Part of the Admitted Diocesan Cover-Up of Abuse.</u>

67.     Dempster's Pension Claim should not be paid for the additional reason that his "retirement" was a subterfuge designed to keep the public from learning that he had abused many children under the Diocese's watch.

68.     Sarro's Pension Claim should not be paid for the additional reason that Sarro, like Dempster, did not retire. He was removed from the ministry for abusing children. Moreover, Sarro did not qualify for a pension because he only served the Diocese 19 years – less than the 25 years required for either a "normal retirement" or an "early retirement."[18] Therefore, he is not qualified to receive a full pension or early retirement, let alone have it continued on an administrative basis and paid ahead of the pre-petition claims of the survivors of his abuse.

69.     In addition, the Diocese's pension plan does not provide for the payment of "assisted living" and the Debtor has not provided any evidence of what this "assisted living" is. Accordingly, the Court should not authorize the Debtor to continue making these payments.

      (3)     <u>Richardson</u>

70.     Richardson is the only priest mentioned in the Motion who actually qualifies for a pension. However, as set forth above, pension claims are pre-petition claims that cannot be elevated above the pre-petition claims of other creditors. Accordingly, the Pension Claims of Richardson should also be denied.

---

[18] He was ordained in 1979 and was removed from the ministry in 1998.

**B.**     **The Sustenance Claimants**

             (1)     McGovern

71.     The Motion reads as if McGovern is some decrepit old sinner recently turned out onto the streets and in need of Catholic "sustenance." However, McGovern is a highly educated 61 year old who been "inactive" since he was 41 years old. He is also a hard nosed negotiator who extracted a great deal from the Diocese. That deal, and his tenacity, have enabled McGovern to live the past couple of decades on the Diocesan dole and have afforded him the luxury of pursuing his various intellectual interests.

72.     While that life is certainly preferable to working full-time, McGovern, like every other creditor of this Debtor, will have to wait for a plan to be confirmed before he can receive further payments on his pre-petition claim.

73.     The Motion also reads as if the Diocese removed McGovern from public ministry in 1986, immediately after the Bishop learned that he was abusing children. In fact, the Diocese did not remove him from public ministry after learning of his abuse. It transferred him to another parish because of the "perception of a problem." When the Diocese finally got around to removing him from the public ministry, McGovern put up a fight and extracted the deal that the Diocese is now calling "sustenance."

74.     The Court cannot authorize the Diocese to continue making payments pursuant to this pre-petition agreement with McGovern that the Diocese failed to disclose to the Court.

(2)   Wiggins and Martin

75.     Wiggins was only 46 years old, and Martin was only 56 years old when they were removed from the public ministry in 2003 for abusing children.[19]  Because the Diocese has refused to produce their personnel files, the Committee does not know the circumstances of this removal.  However, because the motion has omitted material facts with respect to McGovern, the Court should not trust that it has all the facts regarding Wiggins and Martin.

76.     While the Diocese suggests that Wiggins and Martin need "sustenance" because they are sick and infirm, no evidence has been produced to suggest that Wiggins, who is now only 53 years old, or Martin, who is now only 65 years old, are incapable of supporting themselves.

(3)   There Is No Obligation to Pay Sustenance

77.     The Diocese argues that under Canon Law, it is obligated to pay sustenance to the Sustenance Claimants.  First, Bankruptcy law – not Canon law – determines when and what in priority claims can be paid.  Moreover, the former Archbishop of New York, Edward M. Egan, who is a canon law scholar, was recently quoted in a NY Times article, dated December 3, 2009 as saying that that there is no such obligation.  The article recounts that a priest was sent to a treatment center after abusing children.  The priest checked himself out after ten days and refused to return the Diocese.  Although the priest continued to receive a stipend, Archbishop Egan stated, "We are not obligated to do that, except that it is a practice that has a

---

[19] The Committee does not have Wiggins' or Martin's file.  Given that the Motion backdates McGovern's removal from public ministry, it may be that Wiggins and Martin were removed from public ministry at different dates.  The Court should not allow the Diocese to pay Wiggins or Martin at least until the Committee has had an opportunity to review the Wiggins and Martin personnel files.

certain moral implication." Archbishop Egan's deposition transcript can be found at

http://documents.nytimes.com/edward-m-egan-s-depositions#p=1.

## C.    <u>DeLuca's Claim</u>

78.     The Diocese admits that it gave DeLuca a pension in order to cover up and

minimize his sexual abuse of hundred of children over the course of decades. While the Diocese

can be applauded for partially ending the ruse and cutting off his pension, it should be required to

go all the way – and end the pre-petition deal that the Diocese struck with DeLuca as part of its

cover-up.

79.     Accordingly, the Court should not authorize the Debtor to pay DeLuca's

medical insurance.

## D.    <u>Ordinary Course is Inapposite</u>

80.     Ordinary course is inapposite because it assumes that a debtor is

exercising its business judgment in order to make money that benefits the estate. Here, the

Debtor is not making judgment calls on how to generate revenue for the benefit of the estate. It

is looking for ways to give money away. In this context, the Court can order the Debtor to stop

giving money away, even if "ordinarily" that is how the Diocese operates.

## E.    The Debtor Is Not Allowed to Argue that the <br> First Amendment and RFRA Support the Motion

81.     The Debtor drops in a footnote that it reserves all rights to argue that the

First Amendment and the Religious Freedom and Restoration Act of 1994 may allow the

Diocese to pay the Pension Claims, the Sustenance Claims, and the medical premiums on behalf of DeLuca. However, the Debtor does not make a single argument that these provisions apply.

82.     The Debtor should not be allowed to ambush the Committee either in a reply or at oral argument with respect to these arguments. Accordingly, the Committee requests that the Court ignore any such arguments.

## F.     The Stub Period Is Inapposite

83.     The Debtor requests permission to pay the Pension Claims, and presumably the Sustenance Claims, for the "stub period," October 1st through October 17th. However, that request assumes that the Pension Claims and the Sustenance Claims are post-petition claims that can be paid in the ordinary course. As set forth above, that it is not the case. No part of a pre-petition claim should be allowed in light of the record before the Court.

## G.     The SubFund is Not Held In Trust

84.     The Debtor claims that it is entitled to pay the Pension Claims and perhaps DeLuca (the Motion is not clear) because it intends to use money from its priest pension fund, which it claims is held in trust. The Court should reject this proposition. First, the property of the estate issue cannot be decided in this contested matter, but must be decided in the adversary proceeding that will shortly be commenced on this issue. Second, when the Catholic Diocese Foundation transferred $1 million to the Diocese for the benefit of retired priests, there was no agreement that it would be subject to a trust. In fact, "it was not clearly stated who would handle the one million and on what basis (trust fund type or in secured funds, or what)." Furthermore, Mrs. Graham, whose estate apparently funded the $1 million transfer to the pension fund, clearly

stated that the money could be used "for any purpose." Therefore, there is no evidence of any sort of a trust and the Court should reject that proposition.

85.     Alternatively, the Debtor states that using the pension fund money to pay the Pension Claims (and perhaps DeLuca's medical premiums) should be allowed because the funds are restricted and will never be made available to the Pension Claimants' and DeLuca's survivors. In support of this argument, the Debtor refers to the Kenney Foundation which provides about $4,000 a quarter "for the sick or aged."

86.     The Debtor's newfound "realization" that the priest pension fund is reserved for the "sick or aged," should not be acknowledged. The Debtor used those funds to cover up Dempster's and DeLuca's crimes, and to pay Sarro when he was only 57 years old. The Debtor has not treated the funds as restricted to the "sick or aged" before and it should not be allowed to suddenly resurrect that straw man limitation now.

## CONCLUSION

WHEREFORE, the Committee requests that the Court deny the Motion in its

entirety.

Dated: December 15, 2009    PACHULSKI STANG ZIEHL & JONES LLP


/s/ Curtis A. Hehn
Laura Davis Jones (DE Bar No. 2436)
James I. Stang (CA Bar 94435)
Hamid R. Rafatjoo (CA Bar 181564)
Curtis A. Hehn (DE Bar No. 4264)
Pamela Egan Singer (CA Bar 224758)
10100 Santa Monica Blvd.
11th Floor
Los Angeles, California 90067-4100
Telephone: 310/277-6910
Facsimile: 310/201-0760
E-mail:jstang@pszjlaw.com
  hrafatjoo@pszjlaw.com
  psinger@pszjlaw.com
  ljones@pszjlaw.com
  chehn@pszjlaw.com

Counsel for Official Committee of Unsecured Creditors