# Exhibit A

OF

## ANNA V. GRAHAM

I, ANNA V. GRAHAM, of the City of Wilmington, New Castle County and State of Delaware, do make, publish and declare the following as and for my Last Will and Testament, hereby revoking and making void any and all wills by me at any time heretofore made.

FIRST: I order and direct that all of my just debts and funeral expenses be paid as soon after my death as conveniently may be.

SECOND: I give and devise my real estate known as 2202 Grant Avenue, Wilmington, Delaware, together with any and all policies of insurance thereon unto my nephew, PAUL J. TAGGART, in fee simple.

THIRD: I give to my niece, LORETTA HAGGERTY DRISCOLL, of 88 D Buckingham Drive, Lakehurst, New Jersey 08733, my gold diamond solitaire ring which I inherited from my husband. I give to my niece, CATHERINE HAGGERTY FITZGERALD, of 53 Rockaway Avenue, Marblehead, Massachusetts, my silver tea service consisting of five (5) pieces, which was given to me by my sister-in-law, Mathilda P. Graham, and the silver tray given to me by my mother.

I give and bequeath unto my friend, ANN NAULTY, my jade beads she brought to me from Alaska and the sum of Twenty-Five Thousand Dollars ($25,000.00).

the sum of Twenty-Five Thousand Dollars ($25,000.00).

All of my clothing, wearing apparel and jewelry not otherwise disposed of in this my Will, I give and bequeath in equal shares unto my nieces, LORETTA HAGGERTY DRISCOLL and CATHERINE HAGGERTY FITZGERALD, or the survivor of them.

All of my tangible personal property (including household furniture and fixtures and automobiles, but excluding securities, money or obligations for the payment of money) not herein otherwise specifically disposed of in this my Will, together with any and all policies of insurance thereon, I give and bequeath unto my nephew, PAUL J. TAGGART.

FOURTH: I give and bequeath unto the following-named friends of mine the amounts set opposite their respective names:

| | |
|---|---|
| ANNE CRISCONI | -- $1,000.00 |
| MARY O'B. FETTERS | -- $5,000.00 |

FIFTH: I give to each of the following-named persons the sum set opposite their respective names provided the recipient is in my employ at the time of my death:

| | |
|---|---|
| LUCIUS HARRISON | -- $10,000.00 |
| MARTHA SMITH | -- $ 5,000.00 |
| JOSEPHINE SMITH | -- $ 5,000.00 |

SIXTH: I give to the SOCIETY FOR THE PROPAGATION OF THE FAITH OF THE DIOCESE OF WILMINGTON, Fifty Thousand Dollars ($50,000.00), with the request that masses be offered for my intention and the intention of my deceased husband, Henry T. Graham, and I request that my Executors pay this legacy as promptly following my death as possible.

SEVENTH: I give and bequeath unto ST. ANN'S CHURCH, a religious corporation of the State of Delaware, situate at

Delaware, the sum of One Hundred Thousand Dollars ($100,000.00).

I give and bequeath unto the JUNIOR BOARD OF ST. FRANCIS HOSPITAL, INCORPORATED, a corporation of the State of Delaware, in Wilmington, Delaware, the sum of Twenty-Five Thousand Dollars ($25,000.00), and I direct my Executors hereinafter named to pay unto St. Francis Hospital Renewal Fund any amount remaining unpaid on any pledge made by me during my lifetime.

EIGHTH: I give and bequeath unto the ST. FRANCIS HOSPITAL, INCORPORATED, a corporation of the State of Delaware, the sum of Twenty-Five Thousand Dollars ($25,000.00).

I give and bequeath the sum of One Hundred Thousand Dollars ($100,000.00) to THE CATHOLIC DIOCESE FOUNDATION to be used in such manner as may be determined by the Ordinary of the Diocese of Wilmington with the request, however, that it be used so far as possible for the benefit of St. Mark's High School of The Diocese of Wilmington.

NINTH: I give and bequeath as follows:

Two Hundred Thousand Dollars ($200,000.00) unto my nephew, PAUL J. TAGGART.

Two Hundred Thousand Dollars ($200,000.00) unto my niece, CATHERINE HAGGERTY FITZGERALD, if she shall survive me, but if she shall not survive me, then in equal shares per stirpes unto her issue me surviving.

Two Hundred Thousand Dollars ($200,000.00) unto my niece, LORETTA HAGGERTY DRISCOLL, if she shall survive me, but if she shall not survive me, then in equal shares per stirpes unto her issue me surviving.

Twenty-Five Thousand Dollars ($25,000.00) unto ROSEMARY WIEMAN, if she shall survive me.

Twenty-Five Thousand Dollars ($25,000.00) unto JOSEPH O. WIEMAN, Parkview Apartments, 15 Beach Road, Great Neck, New York, if he shall survive me.

if she shall survive me, but if she shall not survive me, then in equal shares per stirpes unto her issue me surviving.

Ten Thousand Dollars ($10,000.00) unto DOROTHY EPPIG, 400 Clinton Avenue, Brooklyn, New York, if she shall survive me.

Ten Thousand Dollars ($10,000.00) unto ELIZABETH VAN BOURGONDIEN, 134 The Crescent, Babylon, New York, if she shall survive me.

Ten Thousand Dollars ($10,000.00) unto my niece, CATHERINE MURPHY, if she shall survive me.

TENTH: I give and bequeath unto THE ACADEMY OF THE VISITATION of Wilmington, Delaware, a corporation of the State of Delaware, the sum of One Hundred Thousand Dollars ($100,000.00).

ELEVENTH: All of the rest, residue and remainder of my estate, real, personal and mixed, to which I may be legally or equitably entitled at the time of my death, I give, devise and bequeath unto THE CATHOLIC DIOCESE FOUNDATION to be used for the education of students for the Priesthood or for additional studies for Priests; in the event such costs are being adequately met from other sources, then The Catholic Diocese Foundation of the Diocese of Wilmington may direct the use of this bequest to the retirement fund for Clergy or for any other purpose which it may deem necessary or desirable. It is my request that the recipients of this my residuary estate will remember my deceased husband, Henry T. Graham, and me in his prayers.

TWELFTH: In the event any of the beneficiaries under this my Will shall be in need of funds during the period of the administration of my estate, I request my Executors to advance to such beneficiary so much of his or her legacy as in the sound discretion of my Executors may be advisable.

TRUST COMPANY, a corporation of the State of Delaware, my nephew, PAUL J. TAGGART, and my friend, WILLIAM S. POTTER, of Wilmington, Delaware, Executors of this my Last Will and Testament, and I direct that my individual Executors shall not be required to give bond with surety before receiving letters testamentary.

I authorize my said Executors, in their sole discretion:

(a) To retain any and all stocks, bonds, notes, securities, or other property constituting my estate immediately after my death, without liability for any decrease in value thereof.

(b) To sell at public or private sale, exchange for like or unlike property, convey, lease for terms longer or shorter than the trust, and otherwise dispose of any and all property, real or personal, held in the estate by them administered, for such price and upon such terms and credits as may be deemed proper.

(c) To hold uninvested any money available for investment or to invest the proceeds of any sale or sales, and any other money available for investment, in such stocks, bonds, notes, securities or other income-producing property as may be deemed appropriate, irrespective of the rules of investment set forth in any present or future laws of the State of Delaware or elsewhere.

(d) To vote directly or by proxy at any election or stockholders' meeting any shares of stock held in the estate by them administered.

for protecting or enforcing any right, obligation or interest arising from any stock, bond, note, or security held in the estate by them administered, or for reorganizing, consolidating, merging or adjusting the finances of any corporation issuing the same, to accept in lieu thereof any new or substituted stocks, bonds, notes or securities, whether of the same or a different kind or class, or with different priorities, rights or privileges, to pay any assessment or any expense incident thereto, and to do any other act or thing that may be deemed necessary or advisable in connection therewith.

(f)   To pay any legacy and to make any division or distribution of the estate by them administered in cash or in kind, or partly in cash and partly in kind, and to value and apportion the property to be so divided or distributed, which valuation and apportionment shall be final and conclusive upon all persons and corporations interested therein.

(g)   To borrow money for such periods of time and upon such terms or conditions as they shall deem advisable for the purpose of paying any taxes chargeable to the estate by them administered, or for the purpose of taking up subscription rights accruing upon any stock or security held therein, or for the protection, preservation or improvement of the estate by them administered, and they may mortgage or pledge such part or the whole of such estate as may be required to secure such loan or loans.

(h)   To rely upon such information with respect to heirship, relationship, survivorship, identity or any other fact relative to determining to whom any property held in the estate by them administered or the income therefrom shall be paid or distributed as they shall have no reason to believe is incorrect, without any liability for so doing.

with respect to any property or any interest in property, legal or equitable, which is included as part of my gross estate for the purpose of any such tax, shall be paid by my Executors out of my residuary estate and shall not be prorated or apportioned among or charged against the respective interest of any devisee, legatee, beneficiary, transferee or other recipient nor charged against any property passing or which may have passed to any of them, and my Executors shall not be entitled to contribution or reimbursement for any portion of any such tax from any such person, any statute or rule of law to the contrary notwithstanding.

LASTLY: For all purposes of this my Will, I direct that an adopted person shall not be deemed to be a child or an issue of the adopting person or the issue of the ascendants of the adopting person. The terms issue, heirs, parents and children as used in this my Will shall refer solely and exclusively to persons of the blood and not an adopted person.

IN WITNESS WHEREOF, I, ANNA V. GRAHAM, have to this my Will, written on seven (7) sheets of paper, set my hand and seal this _15th_ day of _November_ , A.D. 1975.

_Anna V. Graham_ (SEAL)

Signed, sealed, published, and declared by the above named Testatrix, ANNA V. GRAHAM, as and for her Last Will and Testament, in the presence of us, who, at her request and in her presence and in the presence of each other, have hereunto subscribed our names as witnesses the day and year last aforesaid.

_David 7 Anderson_

_Daniel F. Lindley_

Before me, the subscriber, on this day personally appeared ANNA V. GRAHAM, DAVID F. ANDERSON, DANIEL F. LINDLEY and _____, known to me to be the Testatrix and the Witnesses, respectively, whose names are signed to the attached or foregoing instrument and, all of these persons being by me first duly sworn, ANNA V. GRAHAM, the Testatrix, declared to me and to the Witnesses in my presence that the instrument is her Last Will and that she had willingly signed or directed another to sign for her, and that she executed it as her free and voluntary act for the purposes therein expressed; and each of the witnesses stated to me, in the presence and hearing of the Testatrix, that such person signed the Will as witness and that to the best of such person's knowledge the Testatrix was eighteen years of age or over, of sound mind and under no constraint or undue influence.

_____
Testatrix

_____
Witness

_____
Witness

_____
Witness

Subscribed, sworn and acknowledged before me by ANNA V. GRAHAM, the Testatrix, subscribed and sworn before me by DAVID F. ANDERSON, DANIEL F. LINDLEY and _____, Witnesses, this 18th day of November, A.D. 1975.

_____
Notary Public

# **Exhibit B**

*CDF Minutes*
*9/21/78*
*Daugherty Trust Ref.*

ax payments and for the supplemental grant made to Saint
beth Ann Seton Parish. The first request considered was
from St. Paul's Parish for $23,000 to supplement the income
e parish for maintaining St. Paul's School. The Foundation
has been giving this supplemental support since St. Mary's/St.
Patrick's School closed, and the members feel that it is still
a worthwhile project. Bishop Mardaga reported the development
of "adopt-a-student program" that will help both St. Peter's
and St. Paul's Schools operations. Upon motion by Msgr. Taggart,
seconded by Father Clark, all approved a grant of up to $23,000
to St. Paul's School.

The board members next considered the request from St. Peter's
Cathedral. Bishop Mardaga gave some background information con-
cerning the Cathedral Parish; i.e., the question of whether or
not to continue St. Peter's as the Cathedral, the potential inner-
city development in the vicinity of the Cathedral that might re-
new the neighborhood and build up the parish population. There
was discussion about the per pupil cost and the need to reassess
the educational system in the face of ever-rising inflation. The
Board members felt that the request of St. Peter's can become a
repeated request as is St. Paul's. At the conclusion of the dis-
cussion, upon a motion by Msgr. Taggart, seconded by Father Clark,
all approved the requested grant of $20,000.

The third request had been received from the Old Bohemia Historical
Society. Bishop Mardaga reviewed the history of this shrine for
members of the Board and the rebuilding and maintenance of it by
the Historical Society. He put this question to the board: does
the Foundation wish to put into monuments money that may be needed
more in missionary endeavors, realizing all the while that it would
not be good to let this particular shrine deteriorate. After dis-
cussion, upon motion by Msgr. Foltz, seconded by Msgr. Taggart,
all approved a grant of $15,000. Msgr. Taggart reported that the
Maryland Historical Society has money for such projects, and he
urged that the Old Bohemia Historical Society should contact that
group, and all the Board members agreed.

Bishop Mardaga then made a request to the Board members on behalf
of Urban Ministry, a request that had not crystalized in time to
submit in writing to the board members prior to the meeting. Bishop
Mardaga told the Board how he had asked Bishop James C. Burke to
come to the Diocese to take the responsibility for a formal Urban
Ministry. The request covers the budget for the current fiscal
year, and the budget for next year will be included in the Ordinary
fiscal operation of the Diocese. The figure needed for this fiscal
year, including the purchase of an automobile for Bishop Burke,
comes to $20,300. Upon motion by Mr. Hillis, seconded by Father
Clark, all approved the grant of $20,300 to the Diocese of Wilmington.


Redacted

CONFIDENTIAL



The Board members next considered the disposition of the balance
of the bequest from Mrs. Graham.  In the May meeting, a grant of
$1,000,000 was made to the Diocese to set up a funded pension plan
for the retirement of Diocesan priests.  This plan has now been
officially established as of July 1, 1978, and will provide pensions
for all priests retiring since that date.  There still remains from
the bequest a balance of approximately $700,000.  The language of
the will of Mrs. Graham was again reviewed, and after discussion
of the needs mentioned, that is, pension fund, education of priests,
it was decided to postpone any further disposition.

There was another bequest of $100,000 in General Motors stock that
was left with the suggestion that if at all possible it be used for



Real Estate  Msgr. Taggart distributed a report on Diocesan prop-
erties together with a memorandum dated September 18 addressed to
all members of the Board from Msgr. Taggart.  There was a discussion
of the policy for retaining and disposing of real estate.  Mr. Burton
was of the opinion that land is a good investment and it should be
sold as a need to buy other properties for Diocesan purposes arises.
Because of inflation, land is a better investment than other forms
of investments.  Msgr. Taggart mentioned that that has been the
policy of the real estate committee.  Justice Duffy said that there
is a question of balance.  In view of the number of properties held,
it must be determined what is in the best interests of the Foundation.
At the conclusion of the discussion, Justice Duffy moved that the

CDOW_BKY_03170

one-fifth of the total amount to be charged against the Foundation as an expense for legal services and the other four-fifths paid by the Foundation as a grant to the Diocese.



Redacted

At the May 12, 1983 meeting, Msgr. Taggart inquired if the residue of the funds from the Dougherty and Graham bequests could be released for general purposes. At that time, it was suggested that the Wills of both Mrs. Graham and Miss Dougherty be examined to determine this.



Bishop Mardaga was presented with copies of the appropriate section of both bequests which he read to the Board. Based on the wording of the bequest of Mrs. Anna V. Graham, it would seem that funds from her bequest could be used for the general purposes of the Foundation. However, in the case of the Dougherty bequest, there seems to be a little more difficulty.



Redacted

Finally, there was some question as to whether any work had been done related to Mr. Prendergast's suggestion that the Diocese outline for the Foundation a hierarchy of Diocesan needs and priorities. Msgr. Foltz and Father Cini had been asked to prepare the information, however, with Monsignor's illness and with other difficulties, that has not been accomplished to date. Father Cini and Monsignor had met on two occasions and began outlining the priorities. It will be readied

CONFIDENTIAL

CDOW_BKY_03171

# **Exhibit C**

MINUTES OF MEETING OF
BOARD OF DIRECTORS
CATHOLIC DIOCESE FOUNDATION

Date:              Thursday, May 18, 1978

Place:             Bishop's Office, 1925 Delaware Avenue
                   Wilmington, Delaware

Present:           Most Rev. Thomas J. Mardaga, D.D.
                   Rev. Msgr. Henri I. Foltz
                   Rev. Msgr. Paul J. Taggart
                   Rev. Howard T. Clark
                   Mr. I. G. Burton
                   Hon. William Duffy
                   Mr. Alton Hillis

Also Present:      Vy. Rev. J. Thomas Cini
                   Mr. Joseph A. Horgan

Bishop Mardaga opened the meeting with prayer at 2:35 p.m.

Minutes of meeting of February 16, 1978, had been mailed to members of
the Board. Justice Duffy thought that the Board had resolved to take
a 4-1/2% total return for two years and then take a look at it. Although
it will be the policy to review regularly the percentage of total return,
no resolution was taken.

At this point in the meeting, Mr. Walter J. Laird, Jr., Chairman of
Diocesan Investment Committee, introduced Messrs. Hugh C. Wallace,
Daniel F. Mahoney, Jr., and W. Mott Hupfel, Jr., from Wilmington
Capital Management, Inc., who had been invited to the meeting so
that members of the Board might review their management of funds in
the Master Custody Account held by Wilmington Trust. WCM, who was
hired October 1, 1977, had provided the members of the Board with a
brochure that included a review of the economy, the level of the
stock market, a review of the portfolio, and a general investment
policy memorandum. Mr. Wallace expressed the opinion that the economy
would go through a slowing down activity without a recession. With
regard to the security market, Mr. Mahoney, using a chart in the
brochure, pointed out the continual rise of both earnings and dividends
along with consumer price index, even though security prices had re-
mained on a level plane since 1965. The breakdown of the portfolio of
the Catholic Diocese was explained, again referring to a chart on page
of the brochure. At present, the portfolio shows a ratio of 67%
equities to 33% in fixed income or cash equivalents, and Justice
Duffy questioned whether this was in line. Mr. Wallace said that it
appropriate; that anywhere between 50% and 75% in equities was to
found in other similar funds. Mr. Mahoney also pointed out that
bonds have a higher cash yield, when the dividend yield plus
is considered, stocks are better investments, especially in
face of constantly rising inflation. At the conclusion of the
discussion, Mr. Laird and members of WCM left the meeting.

50

-2-

Financial Statements. Monsignor Foltz reported the market value of
the various funds as of Wednesday, May 17, 1978, reflecting the surge
in the equity market since the middle of April.

Monsignor Foltz also reported on the status of the grants that had
been made in the previous three meetings within this fiscal year.
Of the grant of $35,000 to St. Mary/St. Patrick for the refur-
bishing of the convent for a residence for elderly people, $30,000
has been paid out to date. The work is almost finished, and when
everything is approved, the final $5,000 will be paid. The $6,100
for the Migrant Ministry was intended for an automobile for a nun
That will be coming in the summer. The grant for the Dialog in
the amount of $23,000 is for fiscal 1979. Nothing has been requested
against the grant given to the High School Principals group for a
Cooperative Teacher-Education project. The entire amount of $40,000
has been paid to the Mother of Hope project, and it is understood
that the work is progressing and will be completed soon. Against
the grant of $9,000 for the Emmaus Program, only $800 has been
requested.

Members next considered the requests for grants as follows, keeping
in mind that approximately $122,000 was available:

Father Carley had submitted a request for $5,030 for ground work
around the Tubman Chapel in Meekins Neck, Maryland. Bishop Mardaga
explainedkthe historical background of this chapel, which was built
in 1769 by Richard Tubman and donated together with one-fifth an
acre of land for the use of the Roman Catholic community of lower
Dorchester County. Mrs. Jacob C. France, whose grandfather gave
the land and built the first St. Mary's Church in that area con-
tributed to the restoration of the chapel, which is owned by the
parish in Cambridge. After discussion, Justice Duffy moved, and
Mr. Hillis seconded that the grant of $5,030 by given. All approved.

A request on behalf of St. Mark's High School was considered. This
covered a number of repairs, car, tractor, etc. Even with this
grant of $38,880, there will still be a deficit budget for fiscal 1979.
Members of the Board, who have approved grants in the past, are in
favor of supporting the high school, and upon motion by Father Clark,
seconded by Justice Duffy, all approved a grant of $38,880.

A request came from Monsignor Dewson, pastor of the Church of the
Good Shepherd in Perryville, for a special spiritual program called
Genesis 2, and the cost is $2,500. There was a discussion whether
or not this could be considered a pilot program, whether or not
the material could be used by other parishes. At the end of the
discussion, Justice Duffy moved that a grant of $1,000 be made, an
explanation be given to the parish that the parish project should
be encouraged, but that it should be encouraged as a pilot project,
that might be offered to other parishes. The motion was seconded
by Father Clark and all approved.

CONFIDENTIAL

CDOW_BKY_04965

A request from Family Life Bureau was considered. They would like an addressograph machine which uses cards, for an ever-expanding list of mailings on a weekly, monthly, and bi-monthly basis. The cost is $1,055. There was discussion whether or not this sort of work should not be done on the computer. It was suggested that before taking action, the use of computer be studied. At a later point in the meeting, Monsignor Taggart suggested that the matter not be left unsettled. He moved, and Mr. Hillis seconded, that an amount up to $1,055 be granted to get the job done, if not feasible on the computer, then on the addressograph. All approved.

A request from the office of the Permanent Diaconate was considered. At the February and May meetings of 1977, a request for a grant for a total of $30,000 over a four-year period was considered to initiate the Permanent Diaconate program in the Diocese. At the May meeting of 1977, a grant of $10,200 was given. To date, almost $7,200 has been expended against that grant. They are now asking for a grant for the second fiscal year of the program in the amount of $10,000. Upon motion by Mr. Hillis, seconded by Monsignor Foltz, all approved a grant of up to $10,000 for the second year of the program.

The Senate of Priests requested a grant for establishing a funded pension plan for Diocesan priests. The plan calls for a past service funding base in the amount of $781,900, plus a normal cost of $33,800 for the year for the priests presently serving the Diocese. It was recommended that the past-service funding be paid over a period of twenty years with an annual contribution of $66,631, and this together with the $33,800 would make approximately $100,000 a year. The request is for a million dollars to provide for the past-service plan and a reduction in the normal costs of starting up the plan. The plan calls for an insurance setup with Banker's Life through John J. Pearce & Co. There was much discussion about this plan, and a question was raised whether or not the amount of $500 per month pension would be set without any possibility of adjustment due to inflation. Rather than a straight insurance setup, could a similar program to the lay pension plan be established? After the discussion, Monsignor Taggart moved that the Foundation make available up to one million dollars, the best possible plan of investing it for the priests' pensions. The motion was seconded by Monsignor Foltz and with Justice Duffy abstaining, all approved. Justice Duffy wished the reasons for his abstention be recorded; namely, insufficient information on the terms of the plan, calculations of the one million clearly shown, and it was not clearly stated who would handle the million and on what basis (trust fund type or in secured notes or what).

Mr. Verdaga then brought up a request that had not been in time to be mailed to the members of the Board, as it was a recent development. A new parish is to be established on Route 7 near Route 40, which will need initial money. The Foundation will make ready twenty acres for the parish that will take families from both Our Lady of

Fatima and St. John-Holy Angels and Holy Family. There is no building on the property, and the new pastor will be in need of a new residence. It is proposed to buy one of the homes that a contractor is building in that vicinity, and to start saying Mass in the Pleasantville School in July. To purchase the home and provide start-up money, the request is for a grant of $50,000. Upon motion by Monsignor Foltz, seconded by Mr. Hillis, all approved a grant of up to $50,000.

At this point in the meeting, Bishop Mardaga excused himself to keep another commitment.

Real Estate Report. In response to a request on the part of Justice Duffy at the last meeting, Monsignor Taggart had a printed review of the properties held by CDF, when and why they were acquired, and what the Real Estate Committee thinks about each property at the present time, indicating those properties that the Committee think should be sold, and those that must still be held.

Justice Duffy pointed out that while CDF is a source and conduit for obtaining and passing on to the Diocese properties for parishes and other purposes, the Board has a responsibility to be prepared to defend their position in real estate. The Diocese owes it to the Foundation to state that they have a real present or antici- pated use for each property. There should be a policy established. Real estate may be a good investment business; rather the Board should be concerned about obtaining as much income as possible. Justice Duffy suggested that the Foundation ask the Diocese to inform CDF about the use of the properties over the next ten to fifteen years. Mr. Hillis thought that the report was a good first step, but a running record should be maintained and kept up to date. Mr. Burton asked if the Foundation ever bought property for speculation, to which Monsignor Taggart replied no. As far as he could tell from the records, the Foundation has never bought property except with some anticipated use in mind. There was further discussion on just how to go about selling property, especially the timing of sales.

Justice Duffy moved that the Diocese be requested to indicate to the Foundation in writing that it has a possible use for whatever land is held, looking forward to about fifteen years; and to indi- cate further, land which the Diocese does not anticipate using, and would be available for sale at the discretion of the Real Estate Committee. This motion was seconded by Monsignor Foltz, and all voted in favor of the motion.

There being no further business, the meeting adjourned at 5:17.

_____
Assistant Secretary

Members of the Board are reminded that the next meeting of the Board is scheduled for Thursday, September 21, at 2:30 p.m. in the Bishop's Office.

# Exhibit D

McGOVERN, JOSEPH A.

| | |
|---|---|
| Date of Birth: | January 29, 1949                Soc. Sec. No. 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 |
| Place of Birth: | Queens, New York |
| Education: | Our Lady of the Snows Elementary, North Floral Park, NY;  9/59-6/63 |
| | Cathedral Prep. Secondary, Elmhurst, NY; 6/67 |
| | Fordham University, New York; 9/71-6/73; M.A., History-6/73 |
| | Cathedral College, New York; 9/67-6/71; B.A. - 6/71 |
| | St. Mary's Seminary, Baltimore, MD; 9/76-12/77, M. Div. - 12/78 |
| | Immaculate Conception, Huntington, New York; 9/73-6/75 |

Date of Deacon Ordination:  June 10, 1978, at 10:30 a.m.

Place of Deacon Ordination: St. Peter's Cathedral, Wilmington

Deacon Ordaining Prelate:  Most Rev. Thomas J. Mardaga, D.D.

Date of Ordination:  February 3, 1979

Place of Ordination: St. Peter's Cathedral

Ordaining Prelate:  Most Rev. Thomas J. Mardaga, D.D.

Appointments:  1)  6/24/78 - Deacon, St. Francis de Sales, Salisbury,

2)  1/30/79 - Associate Pastor, St. Francis de Sales, Salisbury,

3) June 13, 1979 - Associate Pastor, St. Mary Refuge of Sinners, Cambridge, Maryland

4) November 19, 1980 - Associate Pastor, St. Catherine of Siena, Wilmington

5) June 22, 1983 - Associate Pastor, St. John's-Holy Angels Parish, Newark Delaware

6) June, 1983 - Masters Degree of Liberal Arts in Ancient and Near Eastern Religions from Johns Hopkins University, Baltimore, MD

7) March 10, 1986 - Sick/Leave - St. Luke's Institute

AD 005491

CDOW_JAM_00238

# Exhibit E

7-5-95   Joe McGovern called: he's moving
candidate → he's a Ph.D. + ORIGINS OF CHRISTIANITY +
— Dissertation — 2 years — 1997 —

NEW ADDRESS →   1600 GARRETT Rd.   # C-307
                Upper Darby, Pa.
                              19082

            · 610 - 39# - 9617 ·


        ⟹ moving Expenses ⟹ $200.₀₀ - 300.₀₀ ←

CDOW_JAM_00137



## ARCHDIOCESE OF PHILADELPHIA

222 North Seventeenth Street • Philadelphia, Pennsylvania 19103-1299 • (215) 587-3550
4532

May 16, 1990

THE SECRETARIAT FOR CLERGY

Very Reverend Clement R. Lemon, E.V.C.
Director of Office for Clergy
1925 Delaware Avenue
Ste. 3A, Box 2030
Wilmington, DE 19899

Dear Clem:

This letter is in regard to the residence of a priest from your Diocese, Reverend Joseph J. McGovern, at Holy Angels Parish. My understanding of Father's original grant of hospitality at Holy Angels Church was that within a year of his arrival there he would seek either residence in another diocese or live on his own while he studied at Temple University. Apparently, this program has not been followed.

Several months ago it was announced at Holy Angels Parish that Father McGovern would be leaving the parish. Up until now, he has not. More recently, because of changes at an administrative level, we have need of all the living space in the rectory for Archdiocesan purposes.

Therefore, I kindly ask you to meet with Father McGovern to see if you can work out another residence situation that is agreeable to your Diocese and to Father McGovern's needs.

Thanking you in your kind attention in this matter, I remain

Sincerely yours in Christ,

*Dick McAndrews*

Richard J. McAndrews
Assistant, Secretary For Clergy

CC: Reverend Joseph J. McGovern

jcf

**Joni Lawruk**

| | |
|---|---|
| From: | Msgr. John Barres [jbarres@cdow.org] |
| Sent: | Monday, October 09, 2006 1:13 PM |
| To: | 'Patricia Bossi'; 'Joni Lawruk' |
| Subject: | FW: |

-----Original Message-----
From: Fr. James Oliver [mailto:FRJOLIVER@adphila.org]
Sent: Tuesday, October 03, 2006 2:05 PM
To: Msgr. John Barres
Subject: Re:

John,

I hope that your audit went well.

I apologize for not returning your e-mail. I have been away from the e-mail for a while after surgery on my knee. I had a ligament replaced.

I am not aware that we know anything more about the priest whom you reference.

I hope to see you at the gathering.

Jim
>>> "Msgr. John Barres" <jbarres@cdow.org> 9/12/2006 1:14 PM >>>
Dear Fr. Oliver:

I hope you have had a good summer. I'm looking forward to seeing you at Regional Chancellors in October.

The Diocese is having a Gavin on-site Audit Sept. 25-28, 2006. In preparation for the audit, I wanted to touch base about Fr. Joseph McGovern, a priest from the Diocese of Wilmington who had been doing graduate work in Philadelphia and living in an Archdiocese of Philadelphia rectory. He was featured prominently in the Philadelphia Inquirer pieces.

The latest update from our end is that with his own initiative he recently went down to acted - Medical Red—————————Redacted - Medical Records————————————We have also heard that he has completed law school and is studying for the bar exam [He is 58 years old]. The Diocese of Wilmington has never actually submitted his case to Rome for any type of removal from the clerical state or attempt at voluntary laicization.

As we come closer to the Audit, I just wanted to double-check to see if you had any additional information from your end that would be helpful to us. Thanks for your assistance Jim.

                                        Msgr. John Barres

Chancellor,
Diocese of Wilmington


JMOend

1

CDOW_JAM_00098

# **Exhibit F**

# INTEROFFICE MEMORANDUM

| | |
|---|---|
| **To:** | **Bishop Saltarelli** |
| **From:** | **Msgr. J. Thomas Cini** |
| **Subject:** | **Fr. Joseph McGovern** |
| **Date:** | **August 2, 2007** |

RECEIV

AUG 3 2007

BISHOP'S OFF

---

*As you know, back in mid May I wrote to both Father Joseph McGovern and also to* [_____] *asking for information related to their financial status. I am attaching for your information a copy of the letter I sent to Fr. McGovern.*

Redacted - Nonresponsive

*In the case of Fr. McGovern, however, we did not receive a response, and so I did not have a check issued to him for July. He called. My information is that he called the Finance Office as well as the Human Resources Office and was eventually referred to me. On July 31 I had a conversation with him. I mentioned the fact that we had sent him the letter and he seemed to have ignored it. His response was that we tried to do this a couple of years ago and that I had received a very pointed letter from his attorney. I told him I remembered that but that this time we were not going to flinch. We would not issue a check unless we had verifiable information about his financial status. He went on to assert that we had a contract with him. I told him I was unaware of such a document and he then responded saying there was no document but by virtue of a practice of sending him a check each month over these many years, it was tantamount to a contract. He then quoted some legal phrase to me. (I found out later that he has studied law.) I told Father that regardless of a contract if he wanted his attorney to give us a telephone call or write to us that is fine, we still would not release a check until we had further information as was requested in the attached letter. Father then went on to say to me – I have lost two jobs because of you people. I then asked him to please explain. He told me that in September or October of 2005 he was let go by Temple University after the Grand Jury investigation in Philadelphia was made public. He went on to describe to me the conditions of his dismissal. He also had a job with LaSalle University. In both places he was an adjunct professor. That means he had no tenure and that the Universities could act as they wanted to. Temple asked him to resign. He refused and so they let him continue for the semester, but since he*

CDOW_JAM_00347

had no tenure, at the end of the semester he was cut. That would have probably been December of 2005 or January of 2006.

Having had that experience at Temple he then approached the Dean of his department at LaSalle, asking if they intended to do the same thing and the Dean said no. However, later in the year the Dean retired and a new person who came in that was not that disposed to Father. So when the University was alerted to the fact that a number of newspapers were carrying the story about the Diocese of Wilmington releasing names, he was brought in to the Provost and confronted. They told him he could not teach anymore and that they would pay him for the rest of the semester. That means that he was receiving income up until May of this year.

In response to my question he said he is not working now, but that he is applying for jobs as a teacher at a number of colleges. He has not heard yet but hopes to hear. I advised him that we would want to know his status at some point. (I have no doubt that I will have to call him.) Once Joe got over his irritation that we had cut off the check and we got into a conversation, he was quite free with the conversation. I asked where he taught, what he taught, what degrees he has, and what efforts he is making to secure a job, and he responded quite freely without reservation and without any attitude.

Since he does not have any income at this point I have authorized a small sustenance check. However, Bishop, I need your confirmation and endorsement of that decision. May I recommend that we continue sustenance and that we check back with him at the end of September to ascertain if in fact he has secured a job. In that case, I would ask him to please disclose his income to us and we can reevaluate the situation.

Enclosure

CDOW_JAM_003

## INTEROFFICE MEMORANDUM

**To:**  **Bishop Malooly**

**From:**  **Msgr. J. Thomas Cini**

**Subject:**  **Fr. Joseph McGovern**

**Date:**  **July 15, 2009**

*As you know, Fr. McGovern is one of the couple of priests [ ⌐ ‾ ‾ ‾ ‾ ] being the other) for whom we provide some type of sustenance despite their having been removed permanently from ministry. As I described to you in the past our policy has been to be in touch every six months if possible – but certainly every year – with each of these priests to ascertain their employment status and their income which in turn will assist us to evaluate the need to continue sustenance to them. I wrote to both Fr. McGovern and [ ‾ ‾ ‾ ‾ ‾ ] I have had a telephone conversation with McGovern.*

Redacted - Nonresponsive

*Joe McGovern did in fact call me both in response to my letter and my call to him. As usual Joe was pleasant. I must say this is a change from years ago when anytime I was in contact with him one could feel the heat coming through the telephone. He has most grateful, however, for our assistance, especially in recent years since after the publication of the names by our own Bishop in November of 2006 and then the publication if priests accused who were living in or part of the Archdiocese of Philadelphia resulted in his loss of jobs.*

Redacted - Financial Records
Redacted - Financial Records *He is an Adjunct Professor in a Community College teaching English at a very basic level, despite his own personal, good mind and credentials. He spoke of having great hopes that he would soon advance to a full time position in this Community College. He spoke of the politics in the area of academia, etc. I was rather startled to hear his* Redacted - Financial Records *I asked him if he had an automobile; he said yes, but it has been unusable for a number of months. Any place he goes he travels by public transportation.* Redacted - Financial Records.
Redacted - Financial Records

CDOW_JAM_00249

*I also explained to him, as he knows, the need for us to verify his statements with the submission of his income tax returns.*

*At this point the tone of the conversation changed. Joe got a bit defensive. He thought that our requesting this information was too intrusive. He indicated quite frankly that he did not want to and did not expect to cooperate. He then spoke of some type of agreement made between him and diocesan officials (I am presuming it was Msgr. Lemon) that this type of intrusion would not be part of the deal – I doubt very much that this agreement was reached. He also spoke about an attorney providing him assistance. He has thrown that smokescreen at us in the past, although not in recent years. I told Joe that I would relay the information to you, however, we have rules and he has to abide by them.*

*I did not tell him at that point that his case was being sent on to Rome.*

*I await your advice.*

e/Malooly-mcgovern

CDOW_JAM_00250

# **Exhibit G**

**Final Testimony of [░░░░░░░░] on June 11, 2009 regarding Fr. Joseph McGovern and my son [░░░]**

Let me begin by saying that at first I thought that all this was in the past until I recently saw the then Fr. McGovern's picture and write up in the papers, causing me to once again recall the situation which took place between Fr. McGovern and my son [░░] in 1980—1982. More accurately we, [░░] my wife and I, believe that the incident took place in 1980 or 1981 when [░░] was either 13 or 14 years of age. His birthday being Feb 22, 1967, [░░] was delayed from starting school for 1 year. He therefore could have been 13 or 14 depending on what month the incident occurred.

[░░] and [░░] have always been devout and dedicated altar servers during grade school, [░░] continuing to serve through his entire senior year at St. Mark's high school. Fr. McGovern was assigned the responsibility of the altar servers and he decided to have a weekend retreat for them away from the parish. At that time there was no reason for anyone to question such a retreat or even doubt the integrity or proper behavior of any priest. We therefore encouraged [░░] to attend the retreat. I believe that it was Friday and Saturday overnight.

Fr. McGovern dropped [░░] off at our house after the retreat and there was no reason to suspect anything was wrong until [░░] came into the house and Fr. McGovern had left. [░░] has always been truthful and upright with both [░░] and me even to this day. [░░] said shortly after entering the house, "Dad I have something I want to discuss with you." He immediately told us what took place during the retreat. My recollection of what he said is still clear.

"While I was on retreat I slept in the same room as Fr. McGovern and on two occasions Father watched me take a shower. Father observed that my penis was different because I was circumcised. Father was walking around in bikini underwear and asked me if I would like to see his penis so that I could see what the difference was. I told him no and I closed the shower curtain. He tried this both times I showered but both times I said no. I knew that this was not right and I was uncomfortable until the end of the retreat." 

I asked [░░] if Father had ever touched him and he said no. I have no reason to believe anything to the contrary. I explained to [░░] that he did the right thing confiding in us and assured him that there was nothing that he did that was wrong. I also asked him if he knew that any other altar servers were similarly approached and he thought that there was one other boy, [░░░░░░], who also appeared to be in Father's presence quite often, but [░░] did not know if anything ever happened.

CDOW_JAM_0038

I wanted to call [ ] father to find out but I could not because of some serious allocations his father was making against [ ], our pastor, because of situation in what I will refer to as a dysfunctional parish "Mens Club". To this day I don't know if [ ] was ever approached by Fr. McGovern in any unbecoming way.

Naturally [ ] and I were very upset and I assured [ ] that the next day I would approach Fr. McGovern. I asked [ ] if there was anything else he could add and he said no. I thank God for giving [ ] the courage to first of all say no to Father McGovern and then to have the courage to speak to us about the situation.

The next day, I first went to Fr. Ralph Martin and told him the story. I also told Father Martin that I felt I had an obligation to first say something to Fr. McGovern (there could always be two sides to a story, although I trusted entirely in my son's integrity), and then my need to report this to the Bishop. Fr. Martin concurred and told me that after I met with him Fr. Martin would also speak to Fr. McGovern.

I set up the meeting by phone and when I met with Fr. McGovern in the rectory I made sure that Fr. Martin was upstairs and that I was not alone in the rectory. Without hesitation I got right to the point and told Fr. McGovern what [ ] had told me. To my surprise and dismay, Fr. McGovern did not repudiate, apologize, admit or show any remorse for what he had done. When I was finished there seemed to be what I felt to be a long pause and then I finally said that I intended on reporting the incident to the Bishop and that I had already reported this to Fr. Martin. I told Fr. McGovern that I was disappointed in him and dismayed that he was not even showing any sign of remorse by saying I am sorry. I then left after advising Fr. Martin that I was finished.

What transpired between Fr. Martin and Fr. McGovern, I don't know because I respected that confidentiality. Fr. Martin encouraged me to contact the priests council, and I believe the person I contacted was Msgr. Lemon but I am not sure of that. Within the week I was called to meet with three priests at the chancery office. I gave my above statements, answered their questions, and then I was asked to meet with the then Bishop Mulvee. The priests and the bishop all thanked me for having the courage to present this information to them and I was assured that Fr. McGovern would be called in and that I would be advised of whatever action would then follow. I was also asked by the priests and the bishop if I thought that [ ] would need counseling. I did not think so at that time, but in hind sight I believe that it was improper to ask me that question simply because one experiencing the abuse or the parents of the abused are not in a disposition to make a prudent decision in that matter. I believe that it would have been more beneficial for encouragement to be given to me to have [ ] come in privately and in session with [ ] and I to assure [ ] he did the right thing and that this should not shaken his faith in any way, etc.

Until Fr. McGovern left St. Catherine's I told [redacted] not to have any contact with him and to advise me if Fr. McGovern tried to contact him. [redacted] told me that he did not want [redacted] or our daughter [redacted] to know about it and to this day, from what [redacted] tells us, neither of them know.

As far as I know, there were no drugs or alcohol involved in the incident and there was no physical or sexual abuse. But there was certainly mental anguish over this or otherwise [redacted] would not have volunteered to come forth with the information.

In retrospect I cannot help but wonder about what long term affect this has had on [redacted]. It was not until years later after [redacted] had left home for a job in PA that he confided in us that he had not been to church since high school and that he only went to church with us when visiting us or we with him because he did not want to hurt our feelings. After many lengthy discussions about his faith or lack thereof, we still do not know what it was that ultimately turned [redacted] away from his Catholic roots. He is now married to a wonderful girl in CA who is not Catholic, who was married before, and they have two wonderful children, who both unfortunately have never been baptized. Strangely enough, [redacted] still goes to Mass with us when we visit with him, especially at Christmas and Easter, still sings the hymns, makes the sign of the cross, says meal prayers with us, but at least on the surface does nothing more. He is totally absorbed in his position with a computer firm as a consultant and analyst and gives none of his time to any community or church affiliation.

[redacted] does not want to speak about the incident any longer and has told us the last time we mentioned the subject that he would never testify regarding the incident. [redacted] and I can't help but believe that there is a connection between this incident and his refraining from practicing any faith. His wife is of a mixed background, her father being a respected figure in the Masons and she herself first being of some protestant denomination and then converting to Judaism for the sake of her previous spouse. I have tried to encourage his wife, [redacted] to seek an annulment prior to them being married but she would have no part of it. [redacted] attitude to this at the time was, why should we. We don't plan on being Catholics or raising our children Catholic.

At one point Fr. McGovern called me and asked my permission to be able to celebrate Mass for his dying father. This took me completely by surprise but I didn't hesitate to say to him that I did not think it appropriate for a priest removed from his priestly duties to put on and take off and put back on again even for a short time the role of priest. I regretted to tell him no because of his father but I felt it was the right thing to do. I relayed this to someone in the chancery office who assured me I did the proper thing.

CDOW_JAM_0038

If you will notice, I still refer to Fr. McGovern as Father despite all of this. I still believe that ordination is "forever according to the order of Melchisedech". By the same token one cannot erase Baptism or the seal of Confirmation. Somehow, Fr. McGovern will hopefully work through all this through counseling, contrition, and reconciliation with God and those he has offended. While [redacted] and I have found forgiveness for Fr. McGovern, we cannot excuse what he has done.

Did [redacted] ever reveal any of this to [redacted]? I don't know but the two of them have been very close as brothers over the years. [redacted] has likewise for the same reasons as [redacted] stopped going to church except occasionally out of respect for his parents. [redacted] is exceptionally talented mentally but sometimes I believe his rationalization especially about issues of faith becomes clouded and misguided. [redacted] now claims due to his own research that he leans more to the faith of the Quakers and Buddhists than the Catholic faith. I officiated at the wedding of [redacted] and [redacted] along with Fr. Ralph Martin as the presider. They are now divorced, [redacted] now claiming that they never married for the right intentions, [redacted] marrying because she felt nobody else would marry her, and [redacted] because she was the only girl who ever cared about him. They had one son [redacted] who was baptized and is now 5. [redacted] has remarried outside the church to a girl who believes in Scientology as the basis of her beliefs. Neither she nor [redacted] or [redacted] ever go to church, yet ironically [redacted] says table prayers with us, occasionally goes to church with us, and loves to sing the hymns when he goes with us to church.

It is troublesome to both [redacted] and I that both of our sons and their wives and children are not faithful to the Catholic faith or any faith. We do believe though that a good foundation was laid for both our sons through St. Catherine's and St. Marks. [redacted] once said to me, "Dad I respect your position and consistency within your vocation to the Deaconate, but don't expect me to believe what you believe." Despite our disappointments in that regard with both [redacted] and [redacted] regardless from where this stems, as with St. Monica and her son Augustine, we never cease praying for our sons to return to the faith in which they were baptized and confirmed.

A final note to all of this. Despite all the sexual problems that now plague the priesthood Marie and I remain strong in our faith and confident in our Bishops and Priests who are honestly trying to shepherd us in the right direction. However, it is not easy to look at a newly ordained priest and not have thoughts of wondering if he too will be guilty of sexual harassment someday. Because [redacted] and [redacted] resided at St. Catherine's for awhile, when the news papers broadcasted their situations, each time we hear things like this the thoughts of our own son's story comes back to us.

Last night [_____] called me asking to be removed as Eucharistic Ministers because of their relative, [_____] also accused of sexual misconduct. I assured them this was not their fault nor should they feel embarrassment because of him. They have agreed to continue as Eucharistic Ministers but only at a different time than they usually served, only because of being confronted by others asking pointed questions at the Mass they were attending. Hopefully this will satisfy them and put them at ease but they assured me they would come back to me if they were still having problems. Since then both of them have resigned as Eucharistic Ministers mainly for health reasons.

In my work with the Advocate program I witness cases involving sexual, physical and mental abuse. I can in a small way relate to their situations and I hopefully have been instrumental in giving them the proper advise for professional counseling and spiritual direction.

I don't expect the issue will ever go away entirely, but certainly our sons returning to the faith would help. In retrospect, as I mentioned before, from the beginning, it should not have been left up to me and [_____] to decide if we "wanted" counseling or if [_____] needed counseling. Because of the seriousness of the nature of sexual abuse, parents need to be encouraged to enter into counseling and not asked if they want it. Hopefully this practice will be implemented in future situations such as this if they do occur.

*Joh O. Barres*

Bishop-elect John O. Barres
Chancellor


PATRICIA SLEPESKY-BOSSI
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires Sept. 24, 2009

# Exhibit H



**DIOCESE OF WILMINGTON**

**CONFIDENTIAL**

October 27, 1986

CONFIDENTIAL

Rev. John W. Graf, Vice Chancellor
Archdiocese of Philadelphia
222 North Seventeenth Street
Philadelphia, Pennsylvania 19103

Dear Father Graf:

Thank you for your letter of October 21, 1986 which you wrote in response to mine of October 10 concerning Father Joseph McGovern.

To assist with the consideration of Father McGovern's request to reside in a rectory in the Archdiocese I will in this letter give you some additional background and I also enclose copies of six letters and a copy of Father McGovern's Aftercare Contract. I know you are aware of the sensitivity of these materials and yet I believe it is absolutely essential that you have them for your presentation to His Eminence Cardinal Krol.

First, I should make it clear that the incident which led to Father McGovern's going to St. Luke's happened some years prior to Bishop Mulvee's arrival in Wilmington and never involved any civil or criminal action. There was, rather than a formal complaint, the perception of a possible problem and when Bishop Mulvee was made aware of it he insisted that Father McGovern receive evaluation at St. Luke's. That evaluation suggested a treatment program which, as you can see from the attached correspondence, led to Father McGovern's entering St. Luke's on March 10, 1986 and being dismissed on October 16, 1986.

Redacted - Medical Records            Redacted - Medical Records

one might ask why Bishop Mulvee prefers that Father McGovern exercise his priestly ministry outside of the Diocese of Wilmington. The essential reason is the small size of the Diocese and the fact that some of the priests seem to be aware of the reason why Father McGovern was away. It seems impossible for a person to go to St. Luke's and not have it become public knowledge and certain conclusions made. The situation is also complicated by the fact that there was a perception of a possible problem related to a boy who is the son of                So, in spite of the positive report from St. Luke's the Bishop feels that it is not in the interests of the Church that Father McGovern return to work in the Diocese in the foreseeable future, even though we continue to support him financially.

AD 005483

Bishop Mulvee does not want to give a problem to the Archdiocese of Philadelphia. At the same time he endorses Father McGovern's request to live in the Archdiocese since it appears to present less difficulties for the Church and would probably be of psychological and spiritual benefit to Father McGovern. For some years, on his own time and at his own expense, Father McGovern has been pursuing graduate work in Near Eastern studies at Temple University. His present plan would place him in a city where he would have easy access to[ Redacted - Medical Records ] He would concentrate on his studies, seek the hospitality of a rectory and provide such priestly service as would be appropriate and needed. It is felt that the host Pastor should be aware of Father McGovern's health situation. This plan might prove of benefit to the parish where he would live and to Father McGovern, while avoiding the harm that might come to the Church if he were present again in this small (and talkative) community.

On behalf of Bishop Mulvee I extend sincere gratitude to you and to Cardinal Krol for your consideration of Father McGovern's request. The Bishop has indicated that he would be ready to meet with Cardinal Krol to discuss this situation.

All good wishes.

Fraternally yours,

Rev. Joseph R. McMahon
Vice Chancellor
Secretary, Clergy Personnel Committee

JRM/w

Enclosures

AD 005484

CDOW_JAM_00233