# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : |
| | : |
| **CATHOLIC DIOCESE OF WILMINGTON,** | :    Chapter 11 |
| **INC.**, a Delaware corporation, | : |
| | :    Case No. 09-13560 (CSS) |
| Debtor, | : |

**JOINDER BY THE ABUSE SURVIVORS TO THE SUPPLEMENTAL OPPOSITION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTOR'S MOTION FOR ORDER AUTHORIZING THE DEBTOR (I) TO CONTINUE PROVIDING PENSIONS, SUSTENANCE AND/OR MEDICAL COVERAGE IN THE ORDINARY COURSE TO CERTAIN RETIRED OR REMOVED PRIESTS ACCUSED OF SEXUAL ABUSE; AND (II) TO USE CERTAIN RESTRICTED FUNDS TO PAY PREPETITION PRIEST PENSION OBLIGATIONS, ADDRESSING THE RELIGION CLAUSES OF THE FIRST AMENDMENT**

**THE NEUBERGER FIRM, P.A.**
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
2 E. 7th Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

**JACOBS & CRUMPLAR, P.A.**
**ROBERT JACOBS, ESQ. (#244)**
**THOMAS C. CRUMPLAR, ESQ. (#942)**
2 E. 7th Street, Suite 400
Wilmington, DE 19801
(302) 656-5445
Bob@JCDELaw.com
Tom@JCDELaw.com

Dated: January 27, 2010      Attorneys for the Abuse Survivors

# TABLE OF CONTENTS

I. INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. **THE FIRST AMENDMENT DOES NOT BAR THE APPLICATION OF THE BANKRUPTCY STATUTE IN THIS MATTER.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A. **The Belief/Action Dichotomy.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B. **The Seminal <u>Smith</u> Decision.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C. **The Supreme Court's Treatment of the <u>Smith</u> Concepts.** . . . . . . . . . . . 5

    D. **The <u>Bob Jones</u> Decision.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    E. **The Claimed 'Religious Autonomy Doctrine'.** . . . . . . . . . . . . . . . . . . . . . 7

    F. **Bankruptcy Law Precedent.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

# TABLE OF AUTHORITIES

**Cases**                                                                                                   **Page**

Blackhawk v. Penn., 381 F.3d 202 (3d Cir. 2004)........................................... 4

Bob Jones Univ. v. United States, 461 U.S. 574 (1983)................................. 3, 6

Bowen v. Roy, 476 U.S. 693 (1986)........................................................ 5-6

Braunfeld v. Brown, 366 U.S. 599 (1961).................................................... 5

Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993)............. 4

City of Boerne v. Flores, 521 U.S. 507 (1997).............................................. 4

Employment Div. v. Smith, 494 U.S.872 (1990).......................................... 1, 3-5

General Council on Finance and Administration of the United Methodist
    Church v. Superior Court, 439 U.S. 1355 (1978)..................................... 1, 7-8

In re The Catholic Bishop of Spokane, 329 B.R. 304 (Bankr. E.D.Wash. 2005)............. 8-9

In re Roman Catholic Archbishop of Portland in Oregon, 335 B.R. 815
    (Bankr. D.Ore. 2005)................................................................ 9

In re Roman Catholic Archbishop of Portland in Oregon, 335 B.R. 842
    (Bankr. D.Ore. 2005)................................................................ 9

Jimmy Swaggert Ministries v. Bd. of Equalization of Cal., 493 U.S. 378 (1996)............. 6

Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439 (1988)................... 6

Pagano v. Hadley, 100 F.R.D. 758 (D. Del. 1984)......................................... 1, 8

Rayburn v. General Conference of Seventh-Day Adventists, 772 F.2d 1164
    (4th Cir. 1985).................................................................... 3

Reynolds v. United States, 98 U.S. 145 (1878)......................................... 1, 3, 5

Salvation Army v. Dep't of Community Affairs, 919 F.2d 183 (3d Cir. 1990)............. 1, 4-5

U.S. v. Lee, 455 U.S. 252 (1982).......................................................... 5

**Constitutions**

U.S. Const., Amd. I.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

**Other Authority**

Hamilton, "The Waterloo For the So-Called Church Autonomy Theory: Widespread Clergy Abuse and Institutional Cover-Up," 29 Cardozo Law Review 225 (2007). . . . . . . . . . . . .  8

# I. INTRODUCTION

The State Court Abuse Survivors ("Abuse Survivors"), through counsel, join in the Supplemental Opposition of the Official Committee of Unsecured Creditors to Debtor's Motion for Order Authorizing the Debtor (i) to Continue Providing Pensions, Sustenance and/or Medical Coverage in the Ordinary Course to Certain Retired or Removed Priests Accused of Sexual Abuse; and (ii) to Use Certain Restricted Funds to Pay Prepetition Priest Pension Obligations.

In addition, the Abuse Survivors add the following. There is a continuing chorus in this case, as in ancient Greek theater, urging this Court to react to the repeated incantation of the "First Amendment," as if it is a magic talisman which will save the Debtor from the harsh reality of the uniform application of the bankruptcy statute. In the words of Debtor's counsel at the January 12, 2010 oral argument -

> It's the Debtor's position that because Canon Law requires it, we have to be in a position to be able to do it ... That puts [the Debtor] in a very difficult position here with Your Honor and it creates a First Amendment issue about free exercise of religion.

(D.I. 270 at 29-30; see, e.g. D.I. 236 at 13-15; D.I. 137 at 2-3, 12-13). This chant unsuccessfully occurred throughout the underlying state court sexual abuse litigation, and so in this new forum the refrain is subtly being auditioned for a new audience, this Bankruptcy Court.

The Abuse Survivors submit this joinder in an effort to identify the fundamentals of governing First Amendment religion clause jurisprudence. Those principles are found in a handful of decisions: Employment Division v. Smith, 494 U.S. 872, 879 (1990); Reynolds v. U.S., 98 U.S. 145, 164 (1878); General Council on Finance and Administration of the United Methodist Church v. Superior Court, 439 U.S. 1355, 1372-73 (1978); Salvation Army v. Dept. of Community Affairs, 919 F.2d 183, 196 n.8 (3rd Cir. 1990); Pagano v. Hadley, 100 F.R.D. 758, 761 (D. Del. 1984).

1

The "belief/action dichotomy" is the simple analytical principle which will determine all of the Debtor's assertions in this pension proceeding and throughout this Chapter 11 bankruptcy. The Debtor is free to "believe" whatever it wants about giving away its assets to convicted or admitted child rapists. But when it enters the world of actions, its actions are governed by neutral laws of general applicability, such as the bankruptcy statute, which apply to all citizens, be they corporate entities, religious believers or atheists. Applying the belief/action dichotomy found in the religion clause case law of the First Amendment leads to the self evident conclusion that these esteemed constitutional provisions were never designed to protect rapists of children or those who conspired with them, aided or abetted them or covered up their evil actions, in other words, the Debtor herein.

The defense of the religion clauses fails under both pre and post 1990 religion clause jurisprudence. The debtor claims that it is obligated by religious belief or internal church doctrine to charitably give its assets to defrocked priest Francis DeLuca (and others), a convicted child molester and rapist of dozens of children who filed at least 21 separate lawsuits against the Debtor in the federal and state systems. But this assertion fails because the bankruptcy statute sets forth fundamental national public policy and is uniformly applied. Its application herein violates no legally protectable interest of the Debtor. It remains free to believe whatever it wants in the area of giving assets to convicted child molesters and rapists, instead of to the survivors of their actions, or to widows or orphans, for that matter. It also can speak and advocate whatever it wants about those beliefs and even pray about them. Moreover, it always can conduct its core religious services however it wishes. But, once the Debtor moved from belief into the realm of action found in this bankruptcy court, the interest of the state became significant enough for state regulation to impact upon its conduct, even in the face of the religion clauses, or its alleged

internal church doctrines or alleged canonical obligations.  The belief/action dichotomy permits the application of the bankruptcy statute despite these red herring objections because it is a valid and neutral law of general applicability.  See Reynolds v. U.S., 98 U.S. 145, 164 (1878); Employment Div. v. Smith, 494 U.S. 872, 879 (1990); Bob Jones Univ. v. U.S., 461 U.S. 574, 603-04 and id. at n.30 (1983).

**II.     THE FIRST AMENDMENT DOES NOT BAR THE APPLICATION OF THE BANKRUPTCY STATUTE IN THIS MATTER.**

**A. The Belief/Action Dichotomy.**   "Churches are not - and should not be - above the law."  Rayburn v. General Conf. of Seventh-Day Adventists, 772 F.2d 1164, 1171 (4th Cir. 1985).  The belief/action dichotomy is well established in constitutional jurisprudence.  As the Supreme Court stated over 125 years ago, by the enactment of the free exercise clause -

> Congress was deprived of all legislative power over mere opinion, but was left free to reach actions which were in violation of social duties or subversive of good order.

Reynolds v. U.S., 98 U.S. 145, 164 (1878).  In upholding the polygamy conviction of a Morman, despite such actions being a central tenet of his religious faith, the Reynolds Court held that religious beliefs cannot serve as a defense to illegal actions.  "Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices."  Id. at 166.  Religious practices can be forbidden lest "the professed doctrines of religious belief" be made "superior to the law of the land." Id. at 167.  In our present case, the practice of making allegedly charitable payments to DeLuca and other priests is not "superior to the law of the land" found in the bankruptcy statute.

**B. The Seminal Smith Decision.**  The seminal modern day free exercise decision is Employment Div. v. Smith, 494 U.S. 872 (1990).  There, a Native American's sincerely held religious beliefs mandated the sacramental use of hallucinogenic drugs.  As a result of those

3

actions, unemployment compensation benefits were denied. The Supreme Court observed that "mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities." Id. at 879. Reiterating the belief/action dichotomy, the Court indicated that free exercise "means, first and foremost, the right to believe and profess whatever religious doctrine one desires." Id. at 877. Discussing Reynolds, the Smith Court stated that while laws "cannot interfere with mere religious belief and opinions, they may with practices...." Id. at 879. Smith's landmark holding is that

> the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).

Id. at 879; accord Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993)("[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."); City of Boerne v. Flores, 521 U.S. 507, 514 (1997) ("Smith held that neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest"); see Blackhawk v. Penn., 381 F.3d 202, 206-09 (3d Cir. 2004) (surveying the state of free exercise jurisprudence since Smith).[1]

In Circuit Judge Stapleton's decision in Salvation Army v. Dept. of Community Affairs, 919 F.2d 183 (3rd Cir. 1990), the state successfully sought to enforce a generally applicable statute which as applied extensively regulated rehabilitation centers, or homes, for disadvantaged homeless men operated by and forming a fundamental part of a particular religion. Both religion clauses were the basis for the failed constitutional challenge to this intrusion into the operation of

---

[1] Smith applies equally in both the criminal and civil contexts. Salvation Army v. Dept. of Community Affairs, 919 F.2d 183, 195-96 (3d Cir. 1990).

4

core religious values. Id. at 185. Among other rulings, the Court noted the continuing viability of the belief/action dichotomy in Supreme Court jurisprudence which had just been reaffirmed in Smith. Id. at 196 n.8.

> Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself.

Id. (quoting Reynolds, 98 U.S. at 166-67 and Smith, 494 U.S. at 879). An entanglement claim under the establishment clause also failed because the Supreme Court has repeatedly upheld extensive regulatory interactions with religious organizations. Id. at 202.

**C. The Supreme Court's Treatment of the Smith Concepts.** Both prior to and after the actual Smith decision, the Supreme Court had repeated occasion to apply its free exercise concepts, which constantly outweighed any even-handed substantial religious burdens. The intrusions upon religious practices in all these cases were much greater than the alleged interference herein regarding the payment of about $10,000 per month to the child molesters in question. Indeed, they often substantially impacted core religious practices.

For example, in Braunfeld v. Brown, 366 U.S. 599, 603 (1961), Orthodox Jewish retailers were required to abide by Sunday closing laws. The Court observed that "the freedom to act, even when the action is in accord with one's religious convictions, is not totally free from legislative restrictions." Id. at 604. Similarly in U.S. v. Lee, 455 U.S. 252 (1982), the Old Order Amish were required to pay Social Security taxes. Appealing to Reynolds, the Court noted that the "state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest." Id. at 257. Accommodating the Amish practice would "radically restrict the operating latitude of the legislature." Id. at 259.

Then in Bowen v. Roy, 476 U.S. 693 (1986), in rejecting another Native American

5

religious claim, citing Reynolds, the Court noted that "[n]ot all burdens on religion are unconstitutional" and also relied upon Lee's concern not to restrict "the operating latitude of the legislature." 476 U.S. at 702. Next in Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439 (1988), the Native American religious faith was again overridden as a paved road was permitted to be constructed through ancient burial sites considered sacred and essential for spiritual activities. Id. at 442. Despite the "devastating effects" such construction would have "on traditional Indian religious practices" id. at 451, this burden was found insufficient as actual beliefs were not being coerced. Id. at 447, 449. Finally, in Jimmy Swaggert Ministries v. Bd. of Equalization of Cal., 493 U.S. 378 (1996), the Court unanimously upheld the imposition of a neutral and generally applicable sales and use tax on the distribution of religious materials by a religious organization, despite claims that the religion clauses reign supreme over legislative interests.

**D. The Bob Jones Decision.** Even putting aside Smith, Bob Jones Univ. v. U.S., 461 U.S. 574 (1983), is illustrative and would govern the outcome of our present case. There, for sincerely held religious reasons, a pervasively religious university forbade interracial dating and marriage while a similarly situated private religious high school forbade non-Caucasian applicants. Id. at 580, 583. In other words, their religious beliefs mandated the action of race discrimination.

As a result, the IRS denied both entities tax exempt status. In rejecting a vigorous religion clause defense, the Supreme Court looked to our "fundamental national public policy" opposed to race discrimination in education. Id. at 593-94. In light of this "fundamental, overriding interest in eradicating racial discrimination in education," this "governmental interest substantially outweighs whatever burden denial of tax benefits places on petitioner's exercise of their religious

6

beliefs." Id. at 604.  In other words, fundamental, national public policy as enacted by Congress substantially outweighed the religiously mandated actions of race discrimination by pervasively religious schools.  A similar result under the bankruptcy statute is appropriate herein.

**E.  The Claimed 'Religious Autonomy Doctrine**.'  The claimed 'religious autonomy doctrine' is an alternate religion clause argument arising from various inapplicable internal church property dispute cases.  Sitting as Circuit Justice, Chief Justice Rehnquist in General Council on Finance and Administration of the United Methodist Church v. Superior Court, 439 U.S. 1355 (1978), in effect addressed the frequently asserted claim of the Debtor that any examination of its internal rules and regulations, a/k/a canon law, is forbidden by the religion clauses because somehow this involves the Court in resolving disputes over religious doctrine, such as how many angels might reside on the head of a pin.  Therein a United Methodist Church hierarchical religious entity had been sued under an "alter ego" or corporate veil piercing legal theory in a contract and securities law class action.   439 U.S. 1355, 1369.  The courts had accepted one of the parties proof as to the role the entity played "in the structure of the Methodist Church and reject[ed] contrary testimony of church officials and experts and statements set forth in [its] Book of Discipline, which contains the constitution and bylaws of the Methodist Church." Id. at 1370.  So one expert's opinions on matters of religious organization or operating procedures had been accepted over another's, which lead to a religion clause claim that this examination of doctrine was improper.  Id.

Chief Justice Rehnquist easily disposed of the false and misplaced assertion that the courts are without the power even to look into such factual disputes and instead explained that the precedent for such a false claim is misread and was intended only for internal church doctrinal disputes, and not for legal disputes outside church structures and involving third parties, such as

7

our survivors herein.

> In my view, applicant **plainly is wrong** when it asserts that the First and Fourteenth Amendments prevent a civil court from independently examining, and making the ultimate decision regarding, the structure and actual operation of a hierarchical church and its constituent units in an action such as this. There are constitutional limitations on the extent to which a civil court may inquire into and determine matters of ecclesiastical cognizance and polity in **adjudicating intrachurch disputes.** *See Serbian Eastern Orthodox Diocese v. Milivojevich*. But this Court never has suggested that those constraints similarly apply outside the context of such **intraorganization disputes**. Thus, *Serbian Eastern Orthodox Diocese* and the other cases cited by applicant are not in point. Those are premised on a perceived danger that in resolving **intrachurch disputes** the State will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrinal beliefs. *426 U.S., at 709-710.* Such considerations are not applicable to **purely secular disputes** between third parties and a particular defendant, albeit a religious affiliated organization, in which fraud, breach of contract and statutory violations are alleged.

439 U.S. at 1372-73 (emphasis supplied). Consequently, the courts can always look into questions of religious doctrine to resolve disputes, as long as they are not intra-church disputes.

District Judge Stapleton rejected religious autonomy and followed this precedent in another action involving the Debtor herein. In Pagano v. Hadley, 100 F.R.D. 758, 761 (D. Del. 1984), the Debtor herein unsuccessfully sought to quash a civil subpoena for the personnel files of one of its priests, asserting the religion clauses as a defense. As did Chief Justice Rehnquist, the District of Delaware found that the legal authority submitted by the Debtor "plainly is wrong." Id. at 761. Relying upon the belief/action dichotomy, the Court also noted that "producing ... the personnel file will not interfere with the Bishop's right to believe as he chooses and to engage in the religious observances of his faith." Id. Nor would it entangle the court in the affairs of the Church. Id.[2]

**F. Bankruptcy Law Precedent.** These principles have been followed by the bankruptcy

---

[2] For a thorough analysis of the defects of the religious autonomy doctrine see Hamilton, "The Waterloo For the So-Called Church Autonomy Theory: Widespread Clergy Abuse and Institutional Cover-Up," 29 Cardozo Law Review 225 (2007).

courts in diocesan bankruptcy litigation across the country. In re The Catholic Bishop of Spokane, 329 B.R. 304, 322-25 (Bankr. E.D.Wash. 2005), rejected religious autonomy claims in adjudicating the ownership of parish assets and noted the case law distinction between inter-church disputes and those with outside third parties on which Chief Justice Rehnquist relied. The primacy of uniform laws of general applicability, like the bankruptcy statute, over religious claims regarding the ownership of assets also was reiterated in a lengthy and detailed analysis.

> Application of commonly understood and commonly applied statutes and common law regulating property interests, rather than application of ecclesiastical law, **does not interfere with the free exercise of religion**. Application of section 541 to this debtor on the same basis as its application to all other bankruptcy debtors does not interfere with the free exercise of religion.

Id. at 325 (emphasis supplied); accord In re Roman Catholic Archbishop of Portland in Oregon, 335 B.R. 842, 851-55 (Bankr. D.Ore. 2005). Similarly, in In re Roman Catholic Archbishop of Portland in Oregon, 335 B.R. 815, 824-25, 831 (Bankr. D.Ore. 2005), discovery about internal church governance also was upheld over a religion clause challenge, relying upon the inter-church and outside third parties distinction which was discussed by Chief Justice Rehnquist.

### III. CONCLUSION

As can be seen from the case law, the Supreme Court has repeatedly rejected assertions that claims of religion trump neutral laws of general applicability, even when such laws place substantial burdens on religious practice. Consequently, for the reasons stated above, the religion clauses are no bar to denying the application of the Debtor. The argument of the Debtor is incorrect as a matter of law that the First Amendment precludes inquiry into matters of internal church operations, including the Debtor's canonical obligations to provide for its removed and retired clergy. (D.I. 270 at 29-30; D.I. 236 at 13-15; D.I. 137 at 2-3, 12-13).

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
2 E. 7th Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

**JACOBS & CRUMPLAR, P.A.**

/s/ Robert Jacobs
**ROBERT JACOBS, ESQ. (#244)**
**THOMAS C. CRUMPLAR, ESQ. (#942)**
2 E. 7th Street, Suite 400
Wilmington, DE 19801
(302) 656-5445
Bob@JCDELaw.com
Tom@JCDELaw.com

Dated: January 27, 2010        Attorneys for the Abuse Survivors