# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CATHOLIC DIOCESE OF WILMINGTON, INC., a Delaware Corporation,[1] | ) | Case No. 09-13560 (CSS) |
|  | ) |  |
| Debtor. | ) | **Ref. Docket Nos. 137, 188, 189, [___], 290** |
|  | ) |  |

## DEBTOR'S OMNIBUS REPLY TO CERTAIN OBJECTIONS TO THE DEBTOR'S MOTION FOR ORDER AUTHORIZING THE DEBTOR (I) TO CONTINUE PROVIDING PENSIONS, SUSTENANCE AND/OR MEDICAL COVERAGE IN THE ORDINARY COURSE TO CERTAIN RETIRED OR REMOVED PRIESTS ACCUSED OF SEXUAL ABUSE; AND (II) TO USE CERTAIN RESTRICTED FUNDS TO PAY PREPETITION PRIEST PENSION OBLIGATIONS

The above-captioned debtor and debtor in possession (the "Debtor") hereby replies (the "Reply") to certain objections filed by (i) the Official Committee of Unsecured Creditors (the "Committee") [D.I. 190 & ___] (the "Committee Objections")[2] and (ii) certain "State Court Abuse Survivors" represented by The Neuberger Firm, P.A., and Jacobs & Crumplar, P.A. [D.I. 290] (the "Survivor Objection" and, collectively with the Committee Objections, the "Objections") to the *Debtor's Motion for Order Authorizing Debtor (I) to Continue Providing Pensions, Sustenance and/or Medical Coverage in the Ordinary Course to Certain Retired or Removed Priests Accused of Sexual Abuse, and (II) to Use Certain Restricted*

---

[1]      The last four digits of the Debtor's federal tax identification number are 5439. The Debtor's mailing address is 1925 Delaware Avenue, P.O. Box 2030, Wilmington, Delaware 19899-2030.

[2]      As of the filing of this Reply, the latter of the Committee Objections had been served upon the Debtor but not filed with the Court. The Debtor understands the Committee intends to file this objection under seal.

*Assets to Pay Prepetition Priest Pension Obligations* [D.I. 137] (the "Motion").[3]  In support of

this Reply, the Debtor respectfully represents as follows:

## ARGUMENT

### I.   The Proposed Payments and Other Benefits to Retired and Removed Clergy Meet the Vertical and Horizontal Dimensions of "Ordinariness" for Purposes of § 363(c)(1) under Applicable Third Circuit Law

As stated in the Motion, the provision of benefits to retired and removed clergy is

consistent with the Debtor's prepetition practices and does not subject creditors to economic

risks different from the risks they assumed prepetition when extending credit to the Debtor.[4]  In

addition, the provision of benefits to retired and removed clergy is consistent with the practices

of other Catholic dioceses.  Accordingly, the proposed payments meet the vertical and horizontal

dimensions of "ordinariness" for purposes of § 363(c)(1) of the Bankruptcy Code.  See In re

Roth Am., Inc., 975 F.2d 949, 952 (3d Cir. 1992).

As a threshold matter, the Committee argues that § 363(c)(1) is "inapposite"

because "viewed from the proper perspective" it applies only to efforts to generate income or to

preserve operations or reorganizational value for the benefit of creditors.  (Comm. Obj. ¶ 6.)  The

Committee goes on to argue that the Court should enjoin the proposed payments even if they are

otherwise in the ordinary course (Comm. Obj. ¶ 80).  The Committee offers no citations or legal

analysis in support of engrafting an additional "estate-maximization" requirement onto the

established § 363(c)(1) standard, and this proposition is unsupported by the language of the

---

[3]     Jacobs & Crumplar, P.A. and The Neuberger Firm, P.A. filed a joinder [D.I. 188] to the first of the Committee Objections.  Even assuming *arguendo* these firms are parties in interest with standing to file pleadings in this chapter 11 case, the joinder is impertinent and defamatory and does not merit a response.

[4]     With respect to involuntary creditors such as abuse victims, of course, there was no intentional extension of credit or assumption of credit risk on the part of the creditors.  The Debtor does not mean to suggest otherwise.  Rather, the Debtor understands the Third Circuit's "creditor's expectations" test for the vertical dimension of ordinariness to focus on the expectations of *voluntary* creditors.  Cf. In re Owens Corning, 419 F.3d 195, n.21 (3d Cir. 2007) (holding that the creditors' reliance prong of substantive consolidation analysis excludes tort claimants "who, as involuntary creditors, by definition did not rely on anything in becoming creditors").

DB02:9202622.2                                                      068902.1001

Bankruptcy Code or sound bankruptcy policy, particularly when viewed *in pari materia* with the Bankruptcy Code's provisions dealing with non-profit corporations. At most, the Debtor bears a "light evidentiary burden" of establishing that the transactions at issue "involve[] a business judgment made in good faith upon a reasonable basis and within the scope of [the Debtor's] authority under the Bankruptcy Code." In re Nellson Nutraceutical, Inc., 369 B.R. 787, 799 (Bankr. D. Del. 2007) (Sontchi, J.) (citing In re Curlew Valley Assocs., 14 B.R. 506, 513 (Bankr. D. Utah 1981) (Mabey, J.)). The Debtor will meet this burden at trial.

The only portions of the Objections responsive to the Third Circuit's § 363(c)(1) standard are the following assertions by the Committee (the "Ordinariness Arguments"):

(i)    that the Debtor has produced no evidence of past comparable payments or the standards for making them (Comm. Supp. Obj. ¶¶ 11, 51), which appears to be directed at the "vertical" inquiry under the Roth American test;

(ii)   that Canon Law does not require the Debtor to provide sustenance to Frs. McGovern and Wiggins (Comm. Obj. ¶ 77), which appears to be directed at the "horizontal" inquiry under the Roth American test (i.e., custom and practice of Catholic dioceses); and

(iii)  that the Debtor does not routinely provide charity to anyone (Comm. Supp. Obj. ¶ 13), and that Catholic charity "need not extend" to Mr. DeLuca (id. ¶ 16), which appear to be directed at both the "vertical" inquiry (as regards the Debtor's charitable practices) and the "horizontal" inquiry (as regards Catholic charity generally) under the Roth American test.

With respect to the Ordinariness Arguments directed at the vertical inquiry, the Debtor has produced documents responsive to the Committee's requests for production which establish the payment history for each of the individuals at issue in the Motion. In addition, the Debtor will make its witnesses available for deposition prior to trial in accordance with the pretrial scheduling order [D.I. 302]. The Committee will have had an ample opportunity to conduct discovery on the Motion and should not be heard to complain otherwise at trial. With respect to

the Ordinariness Arguments directed at the horizontal inquiry, as discussed below, the Debtor

will provide expert testimony at trial establishing the existence and nature of the Debtor's

obligations under Canon Law to support clergy (including, in some instances, former clergy).

Accordingly, the Debtor will establish both the "vertical" and "horizontal" dimensions of

ordinariness for purposes of § 363(c)(1).

### A. There is no "Estate Maximization" Requirement in § 363(c)(1); It is Enough for the Debtor to Articulate a Rational, Good-Faith Basis for the Proposed Use of Estate Property

Under sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor, as debtor

in possession, is authorized to operate its business. Nellson Neutraceutical, 369 B.R. at 796.

Section 363(c)(1) of the Bankruptcy Code provides that, unless the Court orders otherwise, the

debtor in possession may enter into transactions, including the use of estate property in the

ordinary course of business, without notice or a hearing. Id. The framework of § 363 is

designed to allow a debtor in possession "flexibility to engage in ordinary transactions without

unnecessary creditor and bankruptcy court oversight, while protecting creditors by giving them

an opportunity to be heard when transactions are not ordinary." Roth Am., 975 F.2d at 252.

Neither the Bankruptcy Code nor its legislative history provide a framework for analyzing

whether particular transactions are in the ordinary course of a debtor's business. Id.

Accordingly, most courts, including the Third Circuit, have adopted a two-step inquiry analyzing

the "vertical" and "horizontal" dimensions of ordinariness. Id.

This Court has noted that the discretion for a debtor in possession to act with

regard to ordinary business matters without prior court approval is "at the heart" of the powers of

the debtor in possession. Nellson Neutraceutical, 369 B.R. at 796. Accordingly, "if the Court

determines that a transaction is in the ordinary course of a debtor's business, the Court will not

entertain an objection to the transaction, provided that the conduct involves a business judgment

made in good faith upon a reasonable basis and within the scope of authority under the

Bankruptcy Code." Id. (citing Curlew, 14 B.R. at 513). In Curlew, Judge Mabey noted several

policy reasons which militate in favor of this deferential standard:

> First, . . . reorganization involves the turbulent rivalry of many interests. The trustee's business decisions will affect these interests. If parties, in their own right, or as putative representatives of the estate, question these decisions, the court may be deluged with motions. This would impede the expeditious administration of the estates.

> Second, the reorganization process is not basically an adversary process. The reorganization process is one of controlled negotiation, much like labor negotiations are conducted between labor and management. These negotiations are conducted by trustees, creditor committees, debtors, and their professional representatives [who] are equipped, through experience, expertise, and powers under the Code to shepherd the estate toward reorganization. Judicial involvement blunts the give and take which is necessary to this process and ultimately derails the objective of private control in Chapter 11.

> Third, disagreements over business policy are not amenable to judicial resolution. The courtroom is not a boardroom. The judge is not a business consultant. While a court may pass upon the legal effect of a business decision, (for example, whether it violates the antitrust laws), this involves a process and the application of criteria fundamentally different from those which produce the decision in the first instance. In short, the decision calls for business not legal judgment.

> Fourth, and most important, a major goal of the bankruptcy reform movement was to divorce the court from ministerial duties and to confine it to adjudicative functions. Sound reasons underly this goal. The quintessential predicate for administering justice is a neutral arbiter. A court which appoints a trustee and confers with him regularly and ex parte for the purpose of managing a business may find it difficult to rule impartially if those decisions in which it has participated are challenged. Impartiality is not improved by inviting input from others and transferring the decisionmaking from a private to a public forum. The court is nevertheless cast as a "super-trustee" and overseer of the estate, asked now to determine company policy and later to reconcile the effects of that policy on competing interests.

14 B.R. at 511-13 (internal quotations, citations omitted). Each of the Curlew considerations

applies in this case. Indeed, to call this case a "turbulent rivalry of interests" is an

understatement—the Debtor and the Committee have been at odds over even the most routine

aspects of this chapter 11 case (e.g., cash management, attendance at the 341 meeting, professional retentions), and the Debtor believes that the Court's willingness to second-guess the Debtor on ordinary course uses of property would invite further costly litigation and further delay the resolution of this case.

Nothing in the Bankruptcy Code, its legislative history, or the <u>Roth American</u> opinion supports a departure from the deferential standard outlined in <u>Nellson Neutraceutical</u> or acknowledgement of an "estate maximization" dimension to the ordinariness inquiry. While application of such a criterion might (arguably) make sense in a commercial chapter 11 case driven primarily by asset-side considerations (e.g., preservation of operations and going concern value), it makes little sense in a nonprofit chapter 11 case driven primarily by liability-side considerations (e.g., establishing a rational process for liquidating tort claims). Indeed, where the Debtor, by its very nature, did not seek a profit prepetition, how can the "ordinary course" of business postpetition require the Debtor to seek a profit? The answer is, it cannot. Congress plainly contemplated nonprofit corporations would utilize chapter 11, and it afforded them broader leeway than commercial entities when it comes to restructuring their affairs free of outside interference. For instance, a nonprofit corporation may not be involuntarily petitioned into bankruptcy, 11 U.S.C. § 303(a), nor may its chapter 11 case be converted to chapter 7 without its consent, 11 U.S.C. § 1112(c). It would make little sense for Congress to have afforded a nonprofit chapter 11 debtor immunity from conversion to chapter 7 only to shut off its access to estate property while a debtor in possession. <u>Cf.</u> Opinion, <u>In re Catholic Bishop of Northern Alaska</u>, Case No. F08-00110-DMD D.I. 126 at 14 (Bankr. D. Alaska Apr. 18, 2008)

DB02:9202622.2

068902.1001

("Fairbanks") (rejecting committee's contention that diocesan debtor's estate should be frozen in place until tort claims are dealt with).[5]

Were the Court to recognize an "estate maximization" criterion for the use of property in the ordinary course, the Debtor notes that other, non-controversial uses of estate property might also be at risk. For instance, since 2002 the Debtor has implemented the *Charter for the Protection of Children and Young People* (the "*Charter*"), a comprehensive program developed by the United States Conference of Catholic Bishops (an ecclesial authority, not a secular legal authority). Pursuant to the *Charter*, the Debtor provides therapy to abuse victims— regardless of whether they have commenced a formal lawsuit or have time-barred claims— usually by reimbursement for third-party providers selected by the victims. The Debtor provides this assistance as long as necessary, in some cases settling with victims by paying in lump sum expected medical expenses into the future, or by paying a lump sum for past expenses, with a continuing obligation to pay for future treatment. Because this does not generate "income" for the Debtor, this conduct would be at risk under the Committee's reading of § 363(c)(1) (though, as a practical matter, it is difficult to imagine the Committee would choose to challenge this use of estate property).[6]

## B. The Debtor has Rational, Good-Faith Bases for Providing Benefits to Retired and Removed Priests

There are several rational bases for providing benefits to retired and removed priests. As stated in the Motion, the Debtor's primary corporate purpose, as set forth in its Certificate of Incorporation, is to "promote the teachings of Jesus Christ, as taught and set forth

---

[5] A copy of the Fairbanks opinion is attached hereto as Exhibit A.

[6] The Debtor notes that the interpretation of § 363(c)(1) selectively to permit acceptable forms of religious conduct (e.g., support for abuse victims) while forbidding unpopular forms of religious conduct (e.g., support for Accused Abusers) would raise obvious concerns under the First Amendment. See, e.g., Employment Div. v. Smith, 494 U.S 872, 877 (1990) (noting Free Exercise Clause prohibits a court from "lend[ing] its power to one or the other side in controversies over religious authority or dogma").

by the Roman Catholic Church, throughout the territory of the Diocese of Wilmington." On the most fundamental level, then, the proposed payments advance the Debtor's corporate purposes because the provision of support to the Accused Abusers is affirmatively required by the law and teachings of the Roman Catholic Church (as discussed below).

For Fr. Richardson, whose priestly faculties were restored following an independent investigation that found allegations of sexual abuse not to be credible, the provision of pension and health benefits also will facilitate Fr. Richardson's participation in the public ministry within the Diocese. Retired priests such as Fr. Richardson play an integral part in the Diocese's pastoral ministry, often filling vacancies at parishes resulting, e.g., from active priests' vacations or sick leave.

With respect to Frs. Sarro, Dempster, McGovern, and Wiggins, who have been dismissed from active ministry based upon admitted, corroborated or otherwise substantiated allegations of sexual abuse of minors, the provision of financial support[7] and medical coverage will ensure they have the means available to obtain necessary treatment for any psychological conditions.[8]

Finally, with respect to Mr. DeLuca, the Debtor believes that it would be morally wrong to terminate medical insurance coverage for an 80-year old man. While the Debtor recognizes that the decision to continue providing support to Mr. DeLuca was not a popular one,

---

[7] As stated in the Motion and discussed further below, financial support for Frs. McGovern and Wiggins has been suspended pending receipt of financial disclosures from which the Debtor can determine the scope of its sustenance obligation under Canon Law. If and when financial support resumes, a byproduct of such support would obviously be to provide Frs. McGovern and Wiggins the wherewithal to obtain continuing psychological treatment.

[8] Due to health care privacy laws, the Debtor is not privy to treatment these men may be receiving, to the extent such treatment is covered by the Debtor's medical plan. As stated in the Motion, the Debtor historically paid a portion of the cost of periodic psychological evaluations for Fr. McGovern and for monthly counseling sessions for Fr. Wiggins, neither of which were fully covered by insurance.

and is unpalatable even for many Catholics, the Debtor believes strongly that it must adhere to the principles of its faith, even (indeed, *especially*) in the face of intense public criticism.

### C. Evidence Regarding Canon Law and Catholic Theology Will More than Sufficiently Establish the Horizontal Dimension of Ordinariness Under § 363(c)(1)

The horizontal inquiry for ordinary course under § 363(c)(1) evaluates whether a proposed transaction is of the sort commonly undertaken by companies in the debtor's industry. Roth Am., 975 F.2d at 952. Here, the Debtor's "industry" is the Roman Catholic faith, and the Debtor's peers within this industry are the other Catholic dioceses. Under these circumstances, the internal regulations, custom and practice of the Roman Catholic Church applicable to all dioceses is directly relevant to the § 363(c)(1) inquiry. It is for this purpose the Debtor cited Canon Law in the Motion—namely, as evidence of the custom and practice within the Debtor's industry. While it is true the Debtor reserved rights to address potential free exercise issues relating to the relief requested in the Motion (Motion ¶ 31 n.13, discussed further below), the Debtor did *not* argue that Canon Law governs the priority of distributions from the bankruptcy estate, as the Committee suggests (see Comm. Obj. ¶ 77).

To be clear, the Debtor's position on the interplay of Canon Law and secular law throughout this chapter 11 case has been principled and consistent,[9] and may be summarized as follows. First, where application of a secular legal standard requires factual inquiry into the customs, practices, or state of mind of the Debtor or other Catholic person or entity, Canon Law may provide relevant evidence of the particular fact at issue. Second, as discussed more fully

---

[9] The Committee's position on the interplay of Canon Law and secular law, on the other hand, has been mercurial, and may be summarized as follows: Canon Law does not govern, except when the Committee wants it to. For example, for purposes of the Motion, the Committee asks the Court to ignore the Debtor's application of Canon Law, while for purposes of its alter ego/substantive consolidation complaint, the Committee asks the Court to embrace the Committee's flawed application of Canon Law as a basis to tear down secular legal distinctions between the Debtor and the various non-debtor defendants.

below, where application of a federal law prevents the Debtor from complying with Canon Law, then pursuant to the Religious Freedom Restoration Act of 1994 (as amended, "RFRA"), the Court must consider whether the federal law "substantially burdens" the exercise of the Debtor's religion and, if it does, whether the federal law is in furtherance of a "compelling governmental interest" and, if so, is "the least restrictive means" of furthering such interest. 42 U.S.C. § 2000bb-1.[10] The latter application of Canon Law arises only where a conflict (or alleged conflict) between Canon Law and federal law requires an additional layer of inquiry. As a general matter, the Debtor believes it is possible (and desirable) to harmonize Canon Law and federal law to avoid conflicts that would lead to the additional layer of inquiry under RFRA.

The Debtor will provide expert testimony at trial establishing the Debtor's canonical obligation to provide sustenance to all retired and removed priests,[11] and to provide charity to Mr. DeLuca, irrespective of their conduct. The testimony will show that this obligation is a universal obligation shared by all Catholic dioceses and, as such, that the provision of such sustenance and/or charity to retired, removed, and even laicized priests meets the "horizontal" dimension for ordinariness under § 363(c)(1).

## II. The Prepetition Claim Exception to § 363(c)(1) is Inapposite

The bulk of the legal argument in the Committee Objections is devoted to establishing the non-controversial propositions that (i) pension claims arising under prepetition plans are prepetition claims, and pensioners cannot compel their payment postpetition (Comm.

---

[10] Conflicts between *state* law and Canon Law are governed solely by the Free Exercise Clause of the First Amendment, which, as a general proposition, permits incidental burdens upon the exercise of religion by "neutral laws of general applicability." Employment Div. v. Smith, 494 U.S. 872, 879 (1990). As this bankruptcy proceeding is governed primarily by federal law, the Debtor believes its free exercise rights will be governed primarily by RFRA (except to the extent the federal law at issue is not a "neutral law of general applicability," in which case *both* the Free Exercise Clause *and* RFRA would be implicated, strictly speaking).

[11] To clarify, "sustenance" refers generally to the canonical obligation to support retired clergy. The Priest Pension Plan is one mechanism by which the Debtor provides sustenance to retired clergy (i.e., who are eligible). For retired clergy not eligible for the Priest Pension Plan, the Debtor provides sustenance on a case-by-case basis.

DB02:9202622.2

068902.1001

Obj. ¶¶ 59-64) and (ii) as a general rule, prepetition claims may only be paid pursuant to a chapter 11 plan (id. ¶ 65). Based on these propositions, the Committee argues that payments to pensioners Frs. Richardson, Sarro, and Dempster, and payment of the prepetition stub amount of October's pension payments (the "Stub Pension Amounts")[12] to all other pensioners, is impermissible under the Bankruptcy Code. The Committee goes on to argue that each of the non-pensioner Accused Abusers likewise has a prepetition "claim" against the Debtor, and that the Motion is a disguised vehicle to pay these "claims" outside the context of a chapter 11 plan.

As a threshold matter, the Debtor notes that the Motion assumed *arguendo* that the Stub Pension Amounts represented prepetition "claims" whose payment would be governed by § 363(b)(1) of the Bankruptcy Code (relating to non-ordinary course transactions) rather than § 363(c)(1). (Motion ¶ 33 n.14 & ¶¶ 37-52.) Under a § 363(b)(1) analysis, the Debtor argued that payment of the claims from the restricted Priest Pension Fund made abundant business sense because, as discussed further below, such funds are not otherwise available to satisfy the claims of general creditors.

The Debtor acknowledges the general rule that prepetition claims may not be paid outside of a chapter 11 plan,[13] and does not contest the general proposition that claims under a prepetition pension plan accrue prepetition. In this case, however, pension amounts falling due post-petition have a dual status as prepetition claims under secular law (insofar as they flow from a prepetition contract with the Debtor) and post-petition obligations under Canon Law (insofar as they are a form of sustenance for retired clergy, which the Debtor would be required to provide independent of any contractual relationship). In the latter capacity, the Debtor believes the

---

[12] Pensions are paid monthly in arrears. Accordingly, the *pro rata* portion of the October 2009 pension representing the prepetition portion of the month is clearly a prepetition claim.

[13] The Debtor also acknowledges, of course, that bankruptcy courts frequently permit the payment of prepetition claims outside a plan, under the doctrine of necessity or otherwise.

pension amounts are payable in the ordinary course of the Debtor's business to the extent they otherwise meet the requirements of § 363(c)(1) (which, as discussed above, they do). For this reason, the Debtor has continued to pay pension amounts falling due post-petition.

With respect to Fr. McGovern, Fr. Wiggins, and Mr. DeLuca, the Debtor disagrees that it has contracts with these men or that they have prepetition "claims" against the Debtor. The Debtor believes the Committee is conflating "agreements" with "contracts." For instance, there may well have been "agreements" between these men and the Debtor, in that each understood and agreed what would be the nature of their relationship post-removal. However, to say that these agreements rise to the level of "contracts," in turn giving rise to "claims," skips over a whole host of intervening legal inquiries that would need to be answered before a conclusion could be drawn that a contract existed (e.g., offer and acceptance, clear and definite terms, mutuality of obligation, bargained-for consideration, compliance with the statute of frauds, and the like). The Debtor does not understand itself to be party to any contracts with the relevant individuals.

The Committee is also conflating the *fact* of payment (i.e., the historical practice between the Debtor and these men) with a *right* to payment (i.e., a "claim" as defined in 11 U.S.C. § 101(5)). Not every payment that is made is made on account of a "claim." For instance, the fact that an individual chapter 13 debtor tithes to his church and has done so regularly at all relevant times prepetition does not mean the church has a "right to payment" from the debtor of future tithes—this is so even if the individual and his church both believe the individual is under a moral obligation to make the payments. The debtor's ecclesiastical obligations, such as they may be, are simply not treated in his bankruptcy case (in the sense of

being modifiable or dischargable via some power under the Bankruptcy Code), and post-petition tithing does not constitute payment of a prepetition claim.

Nevertheless, even if Frs. McGovern and Wiggins, and Mr. DeLuca did have prepetition "claims" against the Debtor on some theory, the Debtor's provision of medical coverage to them on a post-petition basis would not be on account of those claims, but rather on account of the Debtor's affirmative obligations under Canon Law to provide sustenance and charity to these men. Accordingly, it would be permissible to the extent consistent with § 363(c)(1).

## III. The Amount of Sustenance Payable under Canon Law is Not at Issue in the Motion, and May Not Be Determined by the Court

The specific relief requested in the Motion with respect to sustenance obligations was authority "to provide such sustenance payments as the Debtor, in its sole discretion, determines are required to be made to or for the benefit of retired Diocesan clergy pursuant to Canon Law". (Motion, Prop. Ord. at 2.) The legal issue presented by this request for relief is not whether Frs. McGovern or Wiggins are in fact owed a sustenance obligation under Canon Law. Rather, it is whether amounts determined by the Debtor, in its sole discretion, to be payable under Canon Law may be paid pursuant to § 363(c)(1) of the Bankruptcy Code. In other words, the Motion takes as its starting point that a canonical obligation may exist (depending on the financial disclosures yet to be received from Frs. McGovern and Wiggins), and does not seek the Court's guidance on this point.

In response to the Motion, the Committee posits that Fr. McGovern "is a highly educated, relatively young man who does not need sustenance." (Comm. Obj. ¶ 3.) Similarly, it posits that Fr. Wiggins "appears too young to need 'sustenance.'" (Comm. Obj. ¶ 55.) Both of these statements, of course, presuppose that (i) the Debtor has asserted either or both of these

men "need" sustenance (which it has not) and (ii) whether a "sustenance" obligation exists under

Canon Law depends on the priest's age or education level (which it may or may not). In its

motion to compel discovery [D.I. 202] (the "Motion to Compel"), the Committee sought

production of documents concerning Fr. McGovern's and Fr. Wiggins's "eligibility to receive

sustenance payments" (Mot. Compel at ¶ 22).

In its response to the Motion to Compel [D.I. 236] the Debtor noted that the

Committee's discovery requests, though perhaps legitimate given the "relevance" threshold for

discovery purposes as compared to evidentiary purposes, appeared to invite impermissible

intrusion into the Debtor's determinations with respect to its canonical responsibilities, in

conflict with the Free Exercise and Establishment Clauses of the First Amendment and/or

RFRA.[14] See, e.g., Serbian E. Orthodox Diocese v. Milivojevich, 426 U.S. 696, 713 (1976)

(holding judicial inquiry whether ecclesiastical authorities have complied with church laws and

regulations is inconsistent with "the constitutional mandate that civil courts are bound to accept

the decisions of the highest judicatories of a religious organization of hierarchical polity on

matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law"); Collins

v. African Methodist Episcopal Zion Church, C.A. No. 04C-02-121, 2006 Del. Super. LEXIS

549, *14 n. 43 (Del. Super. Ct. Mar. 29, 2006) (noting the "religious autonomy principle"

articulated by the Supreme Court in Milivojevich implicates both the Free Exercise Clause[15] and

the Establishment Clause). See also, e.g., Curay-Cramer v. Ursuline Acad. of Wilmington, Del.,

Inc., 344 F. Supp. 2d 923, 934 (D. Del. 2004) (Jordan, J.) (finding judicial inquiry into

---

[14] The Debtor's suspicions regarding the Committee's view of the legitimate scope of the Court's inquiry were confirmed (rather poignantly) by the Committee's bold assertion in its supplemental objection as to the scope of Catholic charity which, according to the Committee, "need not extend to unrepentant child molesters, just as it would not extend to Hitler acolytes or unabashed murderers." (Comm. Supp. Obj. ¶ 16.) In point of fact, Catholic charity extends to all human beings.

[15] Where federal law is at issue, the Free Exercise Clause is supplemented by RFRA, which provides statutory free exercise protections in excess of the constitutional minimum protections.

accusations that Catholic school's stated religious purposes for firing a teacher were pretextual raised substantial Establishment Clause concerns regarding excessive entanglement of government with religion), aff'd, 450 F.3d 130 (3d Cir. 2006); Maffei v. Roman Catholic Archbishop of Boston, 867 N.E.2d 300, 310 (Mass. 2007) (The First Amendment "places beyond [court] jurisdiction disputes involving church 'doctrine, Canon Law, polity, discipline, and ministerial relationship.'" (internal citations omitted)).

The Debtor's point was simple: the Court has jurisdiction to determine whether the Debtor's discharge of sustenance obligations under Canon Law (such as they may be) is permissible under § 363(c)(1) of the Bankruptcy Code, but it lacks jurisdiction to determine the scope of those sustenance obligations under Canon Law. To be clear, the Debtor acknowledges that, assuming it has a good-faith basis for so doing, the Committee is entitled to test the Debtor's assertion that a canonical obligation to support removed priests exists.[16] It is also entitled to test whether the Debtor's invocation of this canonical doctrine is pretextual, to the extent the Debtor's subjective state of mind is at all relevant to the § 363(c)(1) inquiry (the Debtor believes it is not). See Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 139 (3d Cir. Del. 2006) (noting "limited inquiry" into whether claimed religious motivations of defendants were pretextual does not raise questions of excessive entanglement). It may not, however, insinuate itself (or more importantly, this Court) into the decision making process as to what Canon Law in fact provides with respect to a given priest. See id. (finding judicial consideration of the contours and application of religious doctrine would violate the First Amendment).

---

[16] The Debtor notes that, as of the date hereof, the Committee has not identified an expert witness (nor indeed, any witnesses) it will call at trial to support its assertion that there is no obligation to support clergy under Canon Law. The Debtor questions whether a *New York Times* article quoting an ambiguous statement by the former Archbishop of New York is sufficient to create a general issue of material fact for trial as to the existence of a Canon Law obligation to support clergy. (Comm. Obj. ¶ 77.)

The Debtor's position has been blown entirely out of proportion by the Survivor Objection, which responds with an irrelevant primer on the belief/action dichotomy under constitutional Free Exercise jurisprudence, followed by a weak critique of the religious autonomy doctrine that fails to address governing Third Circuit precedent cited by the Debtor. (Surv. Obj. pp. 7-9.) On the former point, a pronouncement by this Court as to the scope of the canonical "sustenance" obligation vis-à-vis a given priest would intrude directly into the area of religious belief (i.e., what Canon Law requires), as distinct from religious conduct (i.e., whether the Bankruptcy Code permits the Debtor to comply with Canon Law). On the latter point, the "claimed 'religious autonomy doctrine'" is alive and well in the Third Circuit, as evidenced by the <u>Curay-Cramer</u> case, among others.[17]

The dichotomy between "intra-church" and "third-party" disputes elucidated by Chief Justice Rehnquist in <u>General Council on Finance and Administration of the United Methodist Church v. Superior Court</u>, 439 U.S. 1369 (1978), and relied upon by the bankruptcy courts in Spokane and Portland, is inapposite. A question regarding *the amount of sustenance required by Canon Law* cannot possibly be considered a "secular, third-party dispute" (there being no secular third-parties implicated in the relationship between a priest and the diocese of his incardination). On the other hand, a question regarding *whether the Bankruptcy Code permits the Debtor to comply with* its sustenance obligations under Canon Law, such as they may be, is a legitimate third-party dispute to which the church autonomy doctrine does not necessarily apply. <u>Accord</u> <u>Committee of Tort Litigants v. Catholic Diocese of Spokane (In re Catholic</u>

---

[17] The plaintiff-appellant in <u>Curay-Cramer</u> asserted an employment discrimination claim against Ursuline Academy, which had fired her for her public support of abortion rights. Plaintiff alleged the reasons for her firing were pretextual because other male employees who committed similar offenses against Catholic doctrine were treated differently than she. The Third Circuit found that the very exercise of weighing the relative severity of various offenses to Catholic doctrine would create excessive entanglement of government and religion in violation of the First Amendment. <u>Curay-Cramer</u>, 450 F.3d at 139.

Bishop of Spokane), 329 B.R. 304, 323 (Bankr. E.D. Wash. 2005) (finding dispute *whether*
*bankruptcy law would respect Canon Law principles* governing the ownership of property
between the diocese and its parishes was not an "intra-church dispute" where Canon Law
principles themselves were not at issue).  This is precisely why the Debtor framed the Motion in
the way it did, reserving for itself the sole discretion to determine the nature and extent of its
sustenance obligations under Canon Law.  By so doing, the Debtor was by no means suggesting
the Court is compelled to defer to the Debtor's interpretation of the Bankruptcy Code.  The
Debtor was merely protecting its right to interpret Church doctrine free of outside interference.

## IV.     The Priest Pension Fund is Restricted

As stated in the Motion, the Priest Pension Fund comprises (i) grant funds
received from Foundation in 1978 in response to a grant request by the Senate of Priests to
establish a fully-funded clergy pension plan, (ii) periodic gifts from the Kenney Trust, a third-
party charitable foundation, to care for "aged and sick" diocesan clergy, and (iii) accrued
investment returns on the same.  The circumstances of the grant from Foundation and the gifts
from the Kenney Trust, along with the expressed intent of those donors (Foundation, in its board
minutes, and the Kenney Trust, in its communications with the Debtor), establish that the funds
were intended to be used only for the health and welfare of retired clergy, which is the precise
purpose for which such funds have been (and continue to be) used by the Debtor.  As set forth in
some length in the Motion, the Debtor believes the Priest Pension Fund is subject to donor-
imposed restrictions that are enforceable under resulting trust, charitable trust, or charitable gift
theories, all of which ultimately turn on a factual determination as to the donors' intent.

DB02:9202622.2                                                          068902.1001

The Committee does not appear to disagree with the Debtor's legal framework,[18] and even acknowledges that the gifts from the Kenney Trust were restricted (Comm. Obj. ¶ 8). However, the Committee disagrees with the Debtor's conclusion as to the restricted nature of Foundation's contribution to the Priest Pension Fund. According to the Committee, statements by the Foundation board member who abstained from the vote approving the grant regarding the pension fund demonstrate that no trust was intended. (Comm. Obj. ¶ 84.) The Committee also cites language in the Graham Bequest indicating *Foundation* was free to use the money as it saw fit, apparently to establish that the *Debtor* was similarly free to use the money for general purposes (which appears to collapse the Foundation and the Debtor, with no explanation why). These are obviously factual issues to be determined by the Court at trial. The Debtor stands by its analysis in the Motion, and will meet its burden of establishing the restricted nature of the Priest Pension Fund at trial.

Finally, with respect to the gifts from the Kenney Trust, the Committee argues the Debtor violated the use restrictions by paying Mr. DeLuca, Fr. Dempster, and Fr. Sarro, who the Committee contends were neither "aged" nor "sick" at the time of their retirement. (Comm. Obj. ¶ 8.) To clarify, the Debtor did not begin receiving the Kenney Trust funds until 2001, well after each of these men had retired. As of 2001, the Debtor believes each of these men was "aged" and/or "sick" within the meaning of the Kenney Trust's restrictions. Moreover, assuming *arguendo* the use restrictions were violated, the Committee offers no explanation why a charitable trustee's violation of a use restriction on a charitable trust/gift would vitiate the restricted nature of the fund.

---

[18] The lone exception would appear to be the Committee's familiar contention that the Debtor was required to commence an adversary with respect to the Priest Pension Fund. (Comm. Obj. ¶ 84.) The Debtor disagrees that an adversary proceeding is required whenever disputed issues of fact arise with respect to estate property, and notes the Committee provided no legal analysis in support of this argument.

DB02:9202622.2

068902.1001

## V.	Debtor has a Free Exercise Right to Support Retired, Removed, and Former Clergy

The Free Exercise Clause of the First Amendment prevents the government from enacting any law "prohibiting the free exercise [of religion]." U.S. Const., Amdt. 1; see Amdt. 14 (applying First Amendment to the states). The current status of the Supreme Court's constitutional Free Exercise jurisprudence is set forth fairly accurately in sections II.A. through II.D. of the Survivor Objection, and is not particularly controversial. In sum, the government is prohibited from regulating or burdening religious belief as such, but is free to regulate or burden religious activity, so long as it does so (i) by way of neutral laws of general applicability or, alternatively, (ii) by laws narrowly tailored to serve a compelling government interest. The Debtor agrees with the Survivor Objection that the seminal case in the modern Free Exercise jurisprudence is Employment Division v. Smith, 494 U.S. 872 (1990), which established the "neutral law of general applicability" standard. However, the Debtor disagrees that Smith is the end point of the free exercise analysis for present purposes. Rather, it is just the beginning.

Following the Supreme Court's decision in Smith, Congress passed the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb et seq. with the avowed purposes of (i) "restor[ing] the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and . . . guarantee[ing] its application in all cases where free exercise of religion is substantially burdened and (ii) "provid[ing] a claim or defense to persons whose religious exercise is substantially burdened by government." 42 U.S.C. § 2000bb(b). The impetus for RFRA were the following findings by Congress, following the Smith decision:

> (1) the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;

DB02:9202622.2
068902.1001

(2) laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;

(3) governments should not substantially burden religious exercise without compelling justification; and

(4) in [Smith], the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and

(5) the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior government interests.

42 U.S.C. § 2000bb(a).

The operative provisions of RFRA is as follows:

Government [i.e., the Federal government][19] may substantially burden a person's exercise of religion only if it determines that application of the burden to the person (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering that compelling interest.

42 U.S.C. § 2000bb-1. RFRA defines "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb-2(4); 42 U.S.C. § 2000cc-5(7). RFRA is applicable by its terms to "all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after the enactment of [RFRA]." 42 U.S.C. § 2000bb-3(a). As a rule of construction, RFRA provides that "Federal statutory law adopted after [RFRA] is subject to [RFRA] unless such law explicitly excludes such application by reference to [RFRA]." 42 U.S.C. § 2000bb-3(b). None of the post-RFRA amendments to the Bankruptcy Code explicitly exclude application of RFRA. Accordingly, RFRA exists as a statutory gloss over the entirety of the Bankruptcy Code and administration thereof.

---

[19] As originally enacted, RFRA applied to state and federal governments. In City of Boerne v. Flores, 521 U.S. 507 (1997), the Supreme Court struck down RFRA as applied to the states as exceeding the scope of Congress's enforcement power under the Fourteenth Amendment. Thereafter, Congress made conforming amendments to RFRA to confirm its limited applicability to the federal government.

**A.      Prohibiting the Debtor from Supporting Retired and Removed
Clergy would Substantially Burden Debtor's Practice of
Religion**

RFRA does not specifically define what constitutes a "substantial burden" on the

practice of religion.  Under the Supreme Court's pre-RFRA case law, however, a substantial

burden was generally found where the government either (1) compelled a person to do something

in contravention of his religious beliefs (or required him to refrain from doing something

required by his religious beliefs), e.g., Hobbie v. Unemployment Appeals Comm'n, 480 U.S.

136, 140-41 (1987), or (2) forced an adherent to choose between following a particular religious

practice or accepting a statute's benefits, Sherbert v. Verner, 374 U.S. 398, 403-04 (1963).

The Bankruptcy Code has been held to substantially burden the free exercise of

individual debtors' religion to the extent it interferes with the religiously motivated practice of

tithing.  See Christians v. Crystal Evangelical Free Church (In re Young), 82 F.3d 1407 (8th Cir.

1996), reaffirmed following remand, 141 F.3d 854 (8th Cir. 1998); Williams v. Greencastle

Baptist Church, C.A. No. 1-95-00076, 1997 Bankr. LEXIS 452 (Bankr. M.D. Pa.  Apr. 15,

1997).  In Young, the Eighth Circuit, applying RFRA, found that a chapter 11 trustee's recovery

of prepetition tithes made by individual chapter 11 debtors to their church would substantially

burden the debtors' free exercise of religion.  82 F.3d at 1418.  The Court noted that, even

though the debtors' church "encourages but does not compel tithing, the debtors consider tithing

to be an important expression of their sincerely held religious beliefs."  Id.  Although tithing was

thus a "religiously motivated, but not religiously compelled" practice, the court found that

permitting recovery of the tithes "would effectively prevent the debtors from tithing, at least for

the year immediately preceding the filing of the bankruptcy petitions."  Id.  The court did not

think it relevant that there were other ways in which the debtors could express their religious

beliefs that were not affected by the Bankruptcy Code, as applied, finding it was "sufficient that

the governmental action in question [i.e., application of § 548] meaningfully curtails, albeit retroactively, a religious practice of more than minimal significance in a way that is not merely incidental." Id. at 1418-19.

The Williams court similarly found that § 548 of the Bankruptcy Code would substantially burden individual chapter 7 debtors' exercise of religion if applied to permit the chapter 7 trustee to recover prepetition tithes paid by the debtors to their church. 1997 Bankr. LEXIS 452 at *8. Noting that the debtors sincerely believed that the Bible *required* them to tithe to their local church, and that there were "temporal consequences" for failing to fulfill this duty, the court observed that "[d]ebtors who practice tithing may be dissuaded from filing for bankruptcy if doing so will result in the inability of the debtors to tithe, or, as in [Williams'] case, a forced recovery of pre-petition tithes given to debtors' churches." Id. at 10. The court reasoned that permitting the trustee to recover the tithes would compromise debtors' freedom to follow the edicts and teachings of their chosen religion. Id.

The Debtor will establish via expert testimony at trial that the support of retired and removed clergy is a mandatory obligation of the Debtor under Canon Law. Thus, to the extent such payments are prohibited by the Bankruptcy Code (e.g., due to a "estate maximization" requirement of § 363(c)(1) or as a result of the prohibition on payment of prepetition "claims," as the Committee has argued) or by this Court (e.g., by "ordering otherwise" under § 363(c)(1) and prohibiting the Debtor from making otherwise ordinary course payments), the prohibition cannot stand unless it is narrowly tailored to serve a compelling governmental interest (which, as discussed below, it is not).

### B. Applicable Provisions of the Bankruptcy Code Do Not Serve "Compelling" Governmental Interests

RFRA does not define "compelling governmental interest". The Supreme Court has held that compelling interests are those "of the highest order." Blackhawk v. Commonwealth of Pennsylvania, 381 F.3d 202, (3d Cir. 2004) (Alito, J.) (quoting Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 546 (1993)). These "highest order" interests have included, e.g., maintaining the tax system, enforcing participation in the social security system, maintaining national security and public safety, providing public education, but have excluded, e.g., preventing fraud in the unemployment compensation system. Young, 82 F.3d at 1419 (surveying Supreme Court precedent). Although the determination as to what qualifies as a "highest order" interest are made on a case-by-case basis, the Supreme Court has held that, where the government action or regulation at issue restricts only protected religious conduct "and fails to enact measures to restrict other conduct from producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling." Lukumi, 508 U.S. at 546-47.

Based on the Objections, the Debtor surmises that the "governmental interest" at stake here would be articulated as one or more of the following: (i) the bankruptcy system generally, (ii) maximization of creditor recoveries by preventing dissipation of estate assets, (iii) preserving the integrity of the Bankruptcy Code's priority and distribution scheme, and (iv) preventing "bad people" from receiving money. The Debtor submits that none of these resemble the "highest order" interests recognized by the Supreme Court. As noted by the Young court,

> bankruptcy is not comparable to national security or public safety. . . .
> [P]rotecting the interests of creditors is not comparable to the collection of
> revenue through the tax system or the fiscal integrity of the social security system
> . . . . Moreover, we cannot see how the recognition of what is in effect a free

DB02:9202622.2

068902.1001

exercise exception to [a discrete provision of the Bankruptcy Code] can undermine the integrity of the bankruptcy system as a whole; its effect will necessarily be limited to the debtor's creditors, . . . and not all creditors or even all debtors.

82 F.3d at 1420. At any rate, under the Lukumi test, none of these interests is "compelling" because the Bankruptcy Code permits (in some instances, outright sanctions) similar alleged harms of the same sort which do *not* involve religiously motivated conduct. For instance, estate assets are dissipated, and creditor recoveries thereby reduced, by the accrual of administrative expenses (including, perhaps most notably, professionals' fees spent litigating matters such as this). Similarly, the policy of ratable distribution of scarce assets *pari passu* among similarly situated creditors is undermined, by Congressional design, by the ever-expanding categories of priority claims built into §§ 503 and 507 of the Bankruptcy Code, none of which recognize an exception for "bad people".

## RESERVATION OF RIGHTS

The Objections make a number of factual allegations that are not addressed in this Reply. The vast majority of these deal with specific accusations of abuse, which are irrelevant to the relief requested in the Motion and, at any rate, unnecessarily cumulative of general averments made in the Motion (i.e., that the Accused Abusers other than Fr. Richardson each have admitted, corroborated or otherwise substantiated allegations of child sexual abuse against them and, accordingly, find themselves in various stages of laicization proceedings in Rome). Other allegations, though potentially relevant, are made in sealed pleadings, making it difficult to respond to them here. Finally, a number of the factual allegations are simply unsupported by the "evidence" cited in support of them (or, in the case of the Committee's supplemental objection, the evidence that was *not* cited). The Debtor cannot possibly address all these factual issues in

this Reply, and respectfully reserves the right to do so at trial, to the extent the Court finds them relevant to the issues presented in the Motion.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests this Court to enter an order granting the relief requested in this Motion, overruling the Objections *in toto*, and awarding the Debtor such other and further relief as is just and proper.

Dated: Wilmington, Delaware
February 2, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Patrick A. Jackson (No. 4976)
Michael A. Cianci (No. 5320)
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Counsel for the Debtor and*
*Debtor in Possession*