# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CATHOLIC DIOCESE OF WILMINGTON, INC., | ) | Case No. 09-13560 (CSS) |
| a Delaware Corporation, | ) | |
| | ) | |
| Debtor. | ) | Hearing date: October 21, 2010 at 1:00 p.m. |
| | ) | Obj. Deadline: October 14, 2010 at 4:00 p.m. |
| | ) | |

## REPLY IN FURTHER SUPPORT OF MOTION OF CATHOLIC DIOCESE FOUNDATION AND FOR AN ORDER AUTHORIZING THE DEBTOR TO MAKE A LIMITED DISTRIBUTION FROM THE POOLED INVESTMENT ACCOUNT

The Catholic Diocese Foundation (the "Foundation") hereby responds to *The Opposition to Motion of Catholic Diocese Foundation for Order Authorizing Debtor to Make Distribution from Pooled Investment Account to Pay Ashby & Geddes the Amount of $348,000* (the "Opposition") [Docket No. 814] filed by the Official Committee of Unsecured Creditors ("the Committee") of the Catholic Diocese of Wilmington, Inc. (the "Debtor") as follows:

### Introduction

1. In November 2009, the Pooled Investment Participants retained Ashby & Geddes to represent their interests in the PIA when the Committee raised an objection to the Debtor's initial motion for interim and final orders authorizing it to process withdrawal requests from non-debtor Pooled Investment Participants [D.I. 127].[1] In December 2009, when the Committee commenced an adversary proceeding against certain of the Pooled Investment Participants, Ashby & Geddes agreed to represent the defendants named in that action, which representation extended through trial, post-trial motions and the currently pending appeal. In a year's time, Ashby & Geddes has charged the defendants $348,000 for its legal fees and expenses. The two

---

[1] Capitalized terms not otherwise defined herein are given the same meaning ascribed to them in the Foundation's Motion.

senior partners working on the matter did not bill for their time; all others working on the case had their time billed at a 20% discount.

2. While the Foundation's *pro rata* share of these fees is approximately 60%, its Board of Trustees voted at a recent meeting to pay the entire amount on behalf of all the participants.[2] It did so in an effort to alleviate the financial burden this expense would impose on those participants. To that end, after extensive discussion over a number of months with the Committee, the Foundation filed a motion on September 30, 2010, seeking the Court's authority to withdraw funds from the PIA (a) to pay Ashby & Geddes' attorneys' fees, (b) to pay its real estate taxes and (c) to fund the operations of St. Paul's School. On October 11, 2010 – the same day on which the Committee filed its opposition to the Foundation's and the other non-debtor appellants' motion to expedite their Third Circuit appeal – the Committee informed the Foundation that it would no longer object to its requests, other than the payment of Ashby & Geddes' fees.

3. The Foundation submits this reply in further support of its Motion, requesting that the Court authorize the Debtor to make payment to the Foundation from the Pooled Investment Account in the amount of $348,000.

## Argument

4. As the Court recognized at its September 3, 2010 hearing on a similar motion for withdrawal from the pooled investment account, its Opinion respecting Phase I of the adversary

---

[2] It is within its mission and the customary practice of the Foundation to approve grants in favor of a group of Diocesan organizations suffering the same hardship. By way of example, the Foundation has, in the past, set up a revolving trust to fund the removal of asbestos from a number of parish schools. The Foundation has also assisted entities, including the Debtor, with their attorneys' fees.

2

proceeding threw a "curve ball...into this process." (Sept. 3, 2010 Tr. at 67:6-7).[3] Nonetheless, it reminded the parties that any participant "that put money in the PIA ha[s] claims against the estate in connection with that money." (*Id.* at 63:19-21). The Court further observed that "the status quo of continuing to allow the mission of the Catholic Diocese of Wilmington, i.e., its business reason to continue subject, of course, to the Bankruptcy Code and to appropriate limitations is something that the Court should allow and will allow." (*Id.* at 67:14-19). It is against this background that the Foundation and other Pooled Investment Participants have come to the Court seeking authority to make withdrawals from the PIA.

5.   In opposing the Foundation's request, the Committee submits that any resulting payment would be a "transaction adverse to the interests of the estate," which, it says, should not be allowed under Sections 363(c)(1) or (b)(1) of the Bankruptcy Code. (Opposition at 2). The reality is, however, that while any funds withdrawn from the PIA by the Pooled Investment Participants reduces the remaining PIA funds, the resolution of the issues surrounding the PIA was, as the Court recognized a, "gateway issue for the development of the case." (Jan. 12, 2010 Tr. at 82:25-83:7).[4] Though the Committee claims it is "inappropriate and unfair...to dilute the estate by the fees of two law firms working on the adversary proceeding" (Objection at 3), the history of this case illustrates that the parties were left with no choice. Indeed, it was the Committee that objected to the use of non-Debtor funds in the PIA and commenced an adversary proceeding against the Foundation and certain other Pooled Investment Participants, requiring them to defend their interests therein. To do so, they needed to obtain counsel separate from the Debtor, and did so efficiently and economically. Moreover, and as further explained below, any

---

[3] Excerpts from the September 3, 2010 transcript are attached hereto as <u>Exhibit A</u>.

[4] Excerpts from the January 12, 2010 transcript are attached hereto as <u>Exhibit B</u>.

3

withdrawal from the PIA will not adversely affect the estate given that the amount of such withdrawal must be credited against any distribution to be made to the participant under any chapter 11 plan confirmed in the case.

6. Aside from the nature of this transaction, the Committee maintains that the Foundation's request is not an allowable payment outside the ordinary course of business under Section 363(b)(1) of the Bankruptcy Code. This Court has, however, rejected this argument while addressing a similar request by the Cathedral of St. Peter: Indeed, it explained:

> I think the position that no matter what, a prepetition unsecured creditor or any prepetition creditor cannot receive payments on that claim outside the ordinary course of business, has been soundly rejected by this Court numerous times. And it's often, frankly, endorsed to the opposite by debtors and hundreds of thousands, if not millions, of dollars routinely go out of the debtor's estate on the first day of the case on account of prepetition claims, priority unsecured, sometimes even secured, in connection with warehousemen, et cetera and mechanics liens. Frankly, the argument that that is an unavailable alternative, provided the facts of the doctrine of necessity or whatever other doctrine would be applicable, holds absolutely no merit. There's no question in my mind.

(Aug. 18, 2010 Tr. at 10:17-11:5).[5]

7. In its Motion, the Foundation set forth three examples in which such payments have been approved. (Motion at 8-9). In an effort to distinguish the principles underlying these cases, the Committee contends that the transfers at issue were not "estate-depleting." (Opposition at 8-9). As the Committee is well aware, however, neither are the withdrawals from the PIA. Indeed, accompanying any order authorizing a withdrawal from the PIA is a provision that requires the amount of such transfers to be credited against any distribution to be made to the participant under any chapter 11 plan confirmed in the case. (*See, e.g.,* Thirteenth Interim Order [D.I. 810] at 8). Thus, amounts withdrawn from the PIA under the Court's orders have *no*

---

[5] Excerpts from the August 18, 2010 transcript are attached hereto as Exhibit C.

net affect on the estate. The Debtor's proposed chapter 11 plan of reorganization contemplates a range of possible distributions to the Pooled Investment Participants, the low end of which is 40.4%. (D.I. 787). Thus, putting the outcome of any appeal aside, if the plan is approved, the Foundation will receive, at a minimum, $18 million at the conclusion of the bankruptcy, which will certainly cover this request, as well as any past requests subject to this provision.

8. The Committee makes particular effort to distinguish the bankruptcy court's decision in *In re Catholic Bishop of N. Alaska*, which recognized (much like this Court already has, *see, supra*, at 3) that a business justification exists for the continuation of the work of the organizations within a diocese. To do so, it relies first on the fact that the parishes in that diocese "were not separate legal entities" and, therefore, any transaction involving those parishes was not estate-depleting. (Opposition at 9). Made in the face of a pending action in which the Committee maintains that the Debtor and the Pooled Investment Participants are indeed a single entity, such an argument is troubling.

9. Second, the Committee claims that, unlike here, it was the debtor in *In re Bishop of N. Alaska* "that sought authority to make the expenditures rather than a nondebtor entity seeking an advance payment on its prepetition claim." (*Id.*). This argument is equally troubling since the Committee has never objected to the 13 prior applications brought before the Court solely because they were made by the Pooled Investment Participants rather than the Debtor. This is simply the process under which the parties have been operating.

10. It is undisputed that a resolution of the issues respecting the adversary proceeding is critical to this bankruptcy. As this Court recognized in granting the defendants' motion for certification of their appeal directly to the Third Circuit, a resolution of the appeal "could have a

net affect on the estate. The Debtor's proposed chapter 11 plan of reorganization contemplates a range of possible distributions to the Pooled Investment Participants, the low end of which is 40.4%. (D.I. 787). Thus, putting the outcome of any appeal aside, if the plan is approved, the Foundation will receive, at a minimum, $18 million at the conclusion of the bankruptcy, which will certainly cover this request, as well as any past requests subject to this provision.

8. The Committee makes particular effort to distinguish the bankruptcy court's decision in *In re Catholic Bishop of N. Alaska*, which recognized (much like this Court already has, *see, supra*, at 3) that a business justification exists for the continuation of the work of the organizations within a diocese. To do so, it relies first on the fact that the parishes in that diocese "were not separate legal entities" and, therefore, any transaction involving those parishes was not estate-depleting. (Opposition at 9). Made in the face of a pending action in which the Committee maintains that the Debtor and the Pooled Investment Participants are indeed a single entity, such an argument is troubling.

9. Second, the Committee claims that, unlike here, it was the debtor in *In re Bishop of N. Alaska* "that sought authority to make the expenditures rather than a nondebtor entity seeking an advance payment on its prepetition claim." (*Id.*). This argument is equally troubling since the Committee has never objected to the 13 prior applications brought before the Court solely because they were made by the Pooled Investment Participants rather than the Debtor. This is simply the process under which the parties have been operating.

10. It is undisputed that a resolution of the issues respecting the adversary proceeding is critical to this bankruptcy. As this Court recognized in granting the defendants' motion for certification of their appeal directly to the Third Circuit, a resolution of the appeal "could have a

material effect on the outcome of this bankruptcy case." (Aug. 13, 2010 Tr. at 109:6-7).[6] Candidly, the Court explained, "[w]e're talking about whether or not a significant portion of money, close to a hundred million dollars, is or is not property of the estate, and if it is, whether or not seventy-five to a hundred million dollars of claims, additional claims, can be asserted against the debtor's estate." (*Id.* at 109:7-12). The Committee has conceded as much in its recent opposition to the defendants' motion to expedite their appeal in the Third Circuit, in which it recognized that "ownership of the $76 million held in the PIA is *critical* to resolution of the Bankruptcy Case." (*Respondent Official Committee of Unsecured Creditors' Opposition to Appellants' Motion to Expedite Appeal* at 3 (emphasis added)).[7]

11.  Given the *critical* importance of the PIA, the Committee immediately sought to prevent any further disbursements once the Debtor filed for bankruptcy. The Debtor, on the other hand, did not believe that non-debtor funds in the PIA were part of its bankruptcy estate, and thus sought the Court's permission to continue making such disbursements. This resulted in the commencement of an adversary proceeding, in which the Pooled Investment Participants were necessary parties with the right to be represented by counsel – counsel, of course, that was separate from that of the Debtor. To suggest, as the Committee does, that Ashby & Geddes assumed the risk in accepting such representation attaches little importance to the Pooled Investment Participants' right to (and need for separate, disinterested) counsel and counsel's right to be compensated for its work.

12.  The reality is that not every action in a bankruptcy proceeding is taken for the direct benefit of the estate. Contrary to the Committee's assertions, however, this does not mean

---

[6] Excerpts from the August 13, 2010 transcript are attached hereto as <u>Exhibit D</u>.

[7] A copy of the Committee's Opposition is attached hereto as <u>Exhibit E</u>.

that such action is necessarily *adverse* to the interests of the estate. *See, e.g., In re Worldwide Direct Inc.*, 334 B.R. 108, 111-12 (D. Del. 2005) (rejecting trustee's argument that fees incurred by committee counsel could not be recovered because services were not undertaken for the benefit of the estate). Here, the actions taken by the Pooled Investment Participants in defending their interest in the PIA were for their benefit, and there is no dispute on that point. However, as the court observed in *Worldwide Direct*, such a benefit is of no consequence if the actions have a resulting, significant benefit on the bankruptcy process generally. Given the critical importance of the PIA to this bankruptcy, a resolution of the "gateway issues" raised in the adversary proceeding was not adverse to the estate and, in fact, was necessary to materially advance the progress of the case as this Court found in certifying the case for direct appeal to the Third Circuit.

13. Put in perspective, the Foundation's request represents less than 1% of its assets in the PIA.[8] Any payment as a result of this request will also be credited against any distribution made to the Foundation under any chapter 11 plan confirmed in this case and, thus, will not deplete any portion of the PIA that may be recoverable by the members of the Committee or other creditors. Likewise, the $2.1 million that has been withdrawn from the PIA since the Debtor filed for bankruptcy, as the Court recognized, "is not a lot of money even in the context of this case." (Sept. 3, 2010 Tr. at 68:1-3). Indeed, it represents only 2% of the $75 million in the PIA, and has been spread among 13 different participants, many of which have no other source of cash to fund their operations.

14. While the Committee asks the Court to consider "the equities of allowing the

---

[8] The Foundation keeps all of its assets, other than its real estate holdings, in the PIA. Most of the other Pooled Investment Participants followed the same procedures. Any new money that has come into these organizations has been used to pay expenditures that would otherwise be paid by funds in the PIA.

payment to Ashby & Geddes" (Opposition at 11),[9] it should be noted that in May and June alone, the Committee's counsel charged the estate nearly $500,000 in fees in prosecuting the PIA adversary proceeding. In total, Committee counsel has charged over $1.3 million in connection with the adversary proceeding and nearly $2.5 million in its overall representation of the Committee, excluding expenses, through July 2010.

**WHEREFORE**, the Catholic Diocese Foundation respectfully requests entry of an order, substantially in the form attached as Exhibit J to its Motion, authorizing and directing the Debtor to make payment to the Foundation from the Pooled Investment Account in the amount of $348,000, and granting such other and further relief as the Court deems appropriate.

**ASHBY & GEDDES**

*/s/ Philip Trainer, Jr.*

Stephen E. Jenkins (#2152)
Philip Trainer, Jr. (#2788)
Toni-Ann Platia (#5051)
Stacy L. Newman (#5044)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Telephone: (302) 654-1888

*Attorneys for Catholic Diocese Foundation*

Dated: October 18, 2010

---

[9] The "equities" consideration the Committee requests of the Court should be a two-way street. As noted herein, the amount the Foundation seeks for payment to Ashby & Geddes (a) is a relatively de minimis amount, and a fraction of the amount charged by the Committee, and (b) will be credited against any distribution under a Plan. The Committee should not be allowed to lever the mere fact of the existence and structure of the PIA into a litigation advantage over the non-debtor PIA participants. Equity compels no less.