# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CATHOLIC DIOCESE OF WILMINGTON, INC., | ) Case No. 09-13560 (CSS) |
| a Delaware Corporation, | ) |
| | ) Re Docket No. 1283 & 1289 |
| Debtor.[1] | ) |
| | ) |

### REPLY OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO OBJECTION OF THE OFFICIAL COMMITTEE OF LAY EMPLOYEES TO THE CATHOLIC DIOCESE OF WILMINGTON INC.'S DISCLOSURE STATEMENT WITH RESPECT TO SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION

The Official Committee of Unsecured Creditors (the "Committee") hereby replies to the "Objection Of The Official Committee Of Lay Employees To The Catholic Diocese Of Wilmington Inc.'s Disclosure Statement With Respect To Second Amended Chapter 11 Plan Of Reorganization" (D. I. 1283) ("Objection"). The Court should overrule the Objection because: (a) no claim exists for the alleged underfunding of the Lay Pension Plan, (b) the Non Debtor Catholic Entities, who employ the vast majority of the Lay are the employers primarily responsible for the Lay Pension Plan (a copy of which is attached hereto as Exhibit A) and (c) the Lay Pension Plan is current on its pension obligations.

## I.

## INTRODUCTION

1.      This bankruptcy case was filed for one reason and one reason only: the Diocese was responsible for horrendous sexual abuse of the children under its care. This

---

[1] The last four digits of the Debtor 's federal tax identification number are 5439. The Debtor's mailing address is 1925 Delaware Avenue, P.O. Box 2030, Wilmington, Delaware 19899-2030.

case was not filed because the Diocese's employees demanded that the Debtor shore up the pension plan reserves. The Lay Employees are not entitled to and never were entitled to any minimum funding of their pension plan. Now, the Lay Employees demand money that they simply are not entitled to receive and their demand will be at the expense of sex abuse survivors who have suffered most of their lives waiting for the Diocese to take responsibility for the failure of its clergy and its employees to protect the children who were entrusted to them. The Lay Employees Committee's lip service to the global settlement with the abuse survivors belies its real goal: derailing the global settlement and prosecution of litigation at the expense of the survivors while the pensioners continue to get their monthly checks.

2.    To the extent that the Objection carries any weight with the Court, the Debtor should amend the Second Amended Plan (the "Reorganization Plan") to provide a choice for the Lay Employees: accept the Plan or the Debtor will terminate the Lay Pension Plan and pay in full of the amounts due to the Lay Employees pursuant to the termination provisions of the Lay Pension Plan, i.e. the amounts actually funded to the Lay Pension Plan. If the Debtor is unwilling to put that choice to its employees and the employees of related Catholic entities, the Committee requests that the Court *sua sponte* terminate the Debtor's plan exclusivity so that the Committee can file a plan that contains such treatment.

## II.

## BACKGROUND

3.    CDOW is the sponsor of a defined benefit pension plan for its own Lay Employees and the Lay Employees of affiliated Catholic entities (including Catholic Charities, Inc.) and parishes (including lay teachers in parish schools) within the Diocese

-2-

(the "Lay Pension Plan").  Benefits under the Lay Pension Plan were funded from two

sources.  One source was amounts held in trust under an agreement of trust with Mellon

Bank, N.A. (now Bank of New York Mellon) dated August 1, 1999, (the "Lay Pension

Plan Trust").  The other source was a sub-fund within the Pooled Investment Account

("PIA") maintained by CDOW in a cash management and/or custodial account at Bank of

New York Mellon (the "Lay Pension Fund").

      4.     The LEC has asserted that the Lay Pension Fund is a restricted asset that

may only be used to pay benefits under the Lay Pension Plan ("Claim 1").  The estimated

value of Claim 1 is approximately $4.2 million. The Lay Employees Committee (the

"LEC") has also asserted claims for underfunded pension obligations under the Lay

Pension Plan on behalf of the plan participants ("Claim 2").  The value of Claim 2 is

presumably the aggregate value of all of the individual claims that have been filed (the

Lay Employee Committee states that the underfunding in the Lay Pension Plan is

approximately $54 million.  The CDOW has filed a claim as plan fiduciary (the "Plan

Fiduciary") on behalf of the Lay Pension Plan valued in excess of $64 million ("Claim

3").  There are also numerous separate claims that have been filed by the affiliated

Catholic entities that adopted the Lay Pension Plan (the "Participating Employers") for

amounts they may have contributed to the Lay Pension Plan ("Claim 4").  The LEC in its

adversary proceeding also identified "claims for the mismanagement of assets and a

separate claim for "the improper commingling of pension funds" in the PIA.  There are

no estimates of values for the latter two claims.  While the Lay Employee Committee's

adversary proceeding alleges that the Debtor has acknowledged that the Lay Employee

Committee can bring the adversary proceeding (which is not a class action), the Lay

Employee Committee has no standing to assert individual claims of Lay Employees. *Caplin v. Marine Midland Grace Trust Company of New York*, 406 U.S. 416, 92 S.Ct. 1678 (1972)(Chapter X trustee does not have standing to sue on behalf of bondholders); *Williams v. California 1ˢᵗ Bank*, 859 F.2d 664, 667 (9ᵗʰ Cir. 1988)(no trustee has authority to assert general causes of action on behalf of the estate's creditors); *In re Felt Manufacturing Co., Inc.*, 371 B.R. 589 (Bankr. D. N.H. 2007) (creditors committee has no standing to bring claims belonging to individual creditors); *Trenwick America Litigation Trust. v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Court of Chancery of Delaware 2006)(bankruptcy law is clear that litigation trusts do not have standing to pursue direct claims of creditors).

**A.    The Claims.**

5.    The claims by participants in the Lay Pension Plan, and the claim by CDOW as Plan Fiduciary, are duplicative as both are based on the underfunding of the Lay Pension Plan. Although the Lay Employees claims total a large number of claimants, no participant's actual pension benefit or pension accrual has been impaired. In other Diocesan reorganizations, the pension plans continued during and after the bankruptcy proceedings, with no claims recognized for pension benefits as pension benefits were unimpaired. That is the most straightforward approach, and should apply here since CDOW has said it intends to reaffirm the Lay Pension Plan. If the Court nevertheless chooses to recognize the claims of Lay Pension Plan participants, per the plan's governing documents, each participant's plan benefit would be **limited** by the extent to which the Lay Pension Plan is funded. The plan's governing documents state that plan participants have no contractual rights to benefits under the plan. Moreover, most of the participants were not employees of CDOW, but rather were employed by

parishes or related Catholic entities, which employers are not in bankruptcy.  Contractual claims, even if they were recognized, could only be asserted against the participant's employer and the Lay Employees should be suing parishes and schools, since the contractual claims would have arisen out of the employment relationship.

6.      The claim filed on behalf of the Lay Pension Plan by the Plan Fiduciary, is the largest claim in actual dollars and was made with respect to the non-annuitized benefits of Lay Employees.  CDOW characterized the claim as reflecting a "contingent, unliquidated amount."  However, as indicated above with respect to the Lay Employee claims, to date, no participant's actual pension benefit or pension accrual has been impaired and since CDOW intends to reaffirm the Lay Pension Plan, no claim for underfunding of pension benefits should be recognized as pension benefits are unimpaired.  If the Court nevertheless chooses to recognize the claims of the Plan Fiduciary, per plan's governing documents, each participant's plan benefit would be **limited** by the extent to which the Lay Pension Plan is funded so that a claim for the underfunding amount should not be allowed.

7.      The claims in the adversary proceeding alleging improper deposit of pension funds in the PIA, while difficult to evaluate on their merits, should not exceed the amounts deposited in the PIA.  According to the adversary proceeding complaint filed by the Lay Employee Committee, the total amount of alleged pension funds held in the PIA was less than $4,400,000 as of October 1, 2010.  While the assets in the Lay Pension Plan Trust and the Lay Pension Fund may be insufficient to fund plan benefits if the Lay Pension Plan terminated, there are no allegations that the investments themselves were mismanaged.  These Claims may allude to CDOW's decision to allocate certain pension

-5-

assets to the Lay Pension Fund within the PIA rather than to the Lay Pension Trust, but that was a discretionary funding decision by CDOW.

### III.

### DISCUSSION

8.    The Court should deny the Lay Employee Committee's demand to stop the Reorganization Plan dead in its tracks for two reasons.

**A.    <u>Pension Benefits Are Not Impaired Under The Reorganization Plan.</u>**

9.    The pension benefits have not been impaired. The Lay Pension Plan is an ongoing plan that has continued to operate during the bankruptcy. While the Lay Pension Plan may be underfunded, the underfunding does not equate to a reduction in any participant's benefit. Notably, no participant's benefit has gone unpaid and every month, the retirees have received their checks. Additionally, no participant's future benefit accrual has been reduced. A pension plan is not required to be fully funded, and many ongoing pension plans are not fully funded.

10.    The Lay Pension Plan is a tax qualified pension plan under section 401(a) of the Code that also is a church plan under section 414(e) of the Internal Revenue Code (the "Code"). For a church plan such as the Lay Pension Plan, section 412(e)(2)(D) of the Code states that church plans are exempt from the minimum funding standards imposed by the Employee Retirement Income Security Act of 1974 ("ERISA"). The Third Circuit, in a pre-ERISA case involving a steel plant closing, found, in applicable part, that the board administering the pension fund did not act unreasonably in deciding that there were sufficient funds in the trust to create an adequate pension plan and to continue making pension payments, rather than terminating the trust and making

-6-

immediate lump sum payments to the former employees. In that case, the fund

agreement made clear that its sole purpose was the creation of *pensions*, and that no

participating employee has any "right, title, or interest in or to or claim against the Fund,

or any part thereof except the right to receive Pensions in the amount and subject to the

terms, conditions, and requirements in the plan." *Knoll v. Phoenix Steel Corp.,* 465 F.2d

1128 (1972) (copy attached); cert denied, 409 U.S. 1126 (1973).

11.    *Hester Tynes and Mary Petti v. Pension Benefit Guaranty Corporation et*

*al.* supports the view that the pension claims of participants in the Lay Pension Plan are

not impaired. A copy of the decision is attached hereto as <u>Exhibit B</u>. In that case,

participants in a pension plan of a hospital challenged the classification of the pension

plan as a "church" plan for purposes of ERISA, and thus ineligible for PBGC insurance.

The decision held that the matter was not "ripe for adjudication." An important factor to

the court was that no plaintiff or similarly situated individual was denied benefits.

12.    The Lay Pension Plan's level of funding is subject to CDOW's discretion.

Section 4.1 of the Lay Pension Plan (Payment of Contributions) requires, in applicable

part, only that "[t]he Employer shall pay to the Trustee from time to time such amounts in

cash as the Administrator and Employer shall determine to be *necessary to provide*

*benefits under the Plan* [emphasis added] determined by the application of accepted

actuarial methods and assumptions and also taking into account the budget limitations of

the Employer." Section 12.11 states that the Employer ""shall have the sole

responsibility for making the contributions provided for under Section 4.1." Section 1.18

of the Lay Pension Plan indicates that "Employer" means CDOW and, where appropriate,

includes any "Participating Employer" that adopts the plan. Pension participation arises

-7-

from the employment relationship, and most participants in the Lay Pension Plan are employed by parishes or related Catholic entities (*i.e.*, Participating Employers), rather than CDOW, so that the contribution requirement under Section 4.1 should be read to mean the Participating Employers.

13.    The Disclosure Statement supports the notion that while not specifically earmarked as employer contributions, Participating Employers' contributions were subsumed in the parish assessments. As discussed above, pension benefits under the Lay Pension Plan have continued to be paid as they come due and CDOW has indicated that the amount currently in the Lay Pension Trust should be sufficient to cover all anticipated pension payments for at least the next six to seven years. Moreover, there should be no uncertainty as to continued sufficiency of contributions to the Trust as a result of CDOW's bankruptcy (barring a change in circumstances), because the Participating Employers are not in bankruptcy. Thus, the participant's pension claims are not ripe for determination.

**B.    Termination of the Plan Cuts Off Claims Beyond Amounts Actually Funded.**

14.    The pension claims of plan participants should not be allowed to derail the Reorganization Plan because the Lay Pension Plan, by its terms, **limits** pension benefits if the plan is underfunded to the extent the plan is funded. Section 9.1 of the Lay Pension Plan states that upon plan termination, benefits are only provided "to the extent funded," and that distributions are allocated as specified in the Plan "to the extent of the sufficiency of such assets." Nothing in the Lay Pension Plan compels supplemental funding upon plan termination. If the Lay Pension Plan is underfunded, the benefits are reduced. While these limitations are conjectural because the Lay Pension Plan has not been terminated, the provisions demonstrate that Lay Pension Plan does not promise an

-8-

unreduced benefit upon termination, but only a benefit to the extent the Lay Pension Plan is funded. Further, Section 12.1 of the Lay Pension Plan by its terms is a bar to contractual claims for unpaid benefits. Section 12.1 states that the Lay Pension Plan "shall not be deemed to constitute a contract between the Employer and any Participant." Again, to date no participant would have a claim for unpaid benefits, since all benefits have been paid.

15.    These provisions were commonly found in pension plans prior to ERISA. The following paragraph from a well-known casebook summarizes the state of pre-ERISA law:

> "Before the enactment of ERISA, the sponsoring firm could remain relatively unconcerned about the promised benefit levels. The firm could contract in the plan to limit its responsibility for benefit levels to whatever assets were contained in the fund."

Langbein & Wolk, Pension and Employee Benefits Law 910 (3d ed. 2000).

16.    The limitation on plan benefits in accordance with the terms of the plan was recognized in pre-ERISA case law, whether or not the employer was in bankruptcy. The Studebaker-Packard Corporation is a much studied case under pre-ERISA case law as to the rights of plan participants. In 1959, the Packard Plan was terminated and the Studebaker plan continued. Packard retirees received a settlement that reduced benefits to 85% of their former level. Employees eligible to retire when the plan terminated but who submitted pension applications after September 2, 1958, received a small lump sum payment based on their years of service. Other participants received nothing. James A. Wooten, *"The Most Glorious Story of Failure in the Business": The Studebaker-Packard Corporation and the Origins of ERISA,* 49 Buff. L. Rev. 683 (2001), at 716. In 1964, when the Studebaker pension plan was terminated, vested employees less than age 60

-9-

received a lump sum payment worth 15% of their pension, and non-vested employees received nothing. *Id.* at 731.

17.    This approach is also in line with a pre-ERISA case in the Third Circuit where the Court held, in applicable part, and applying New York law, that employees ceased to possess any enforceable rights against the company in this regard, once the company duly exercised its power to put into effect the amending and terminating conditions expressly set forth in the plan. *Lee Rubber & Tire Corp. v. Lee National Corp.*, 437 F.2d 527 (1971).[2]

18.    Similarly, in this case, the plan document specifies that the Lay Pension Plan is not a contract between the Employee and Employer and contains no obligation for the Employer to fund benefits outside of the assets of the Trust. The Trust agreement states that the "Company" (CDOW) has sole responsibility for determining the sufficiency of contributions. The actuarial valuations and reports refer only to the Employer's "recommended contribution." For purposes of contributions under the Lay Pension Plan, the term "Employer" includes the Participating Employers. Thus, the

---

[2]  We note that, the Court of Chancery of Delaware, New Castle County, found otherwise in a pre-ERISA case involving the pension benefits of certain full time employees of the late William duPont, Jr., held in trust under a trust agreement with Delaware Trust Company. In that case, the employer had established a trust to fund the pension benefits, but died prior to fully funding the trust. Although the trust was underfunded at the time of the plan's termination, the plan specified that it should not be read as creating contractual obligations, the trust fund should be the sole source of benefits under the plan, and an employee might look only to the fund itself for benefits. Further, the trust agreement relieved the trustee from any duty to enforce payment of any contribution made to the trust fund and provided that the trustee shall not be responsible for the adequacy of the Trust Fund to meet and discharge pension and other liabilities under the plan. Finally, the plan stated that no person shall have any interest in or right to any part of the trust fund except as expressly provided for in the plan or trust agreement. Nevertheless, the Court, acknowledging what it saw as the employer's clear "intent" as well as a the "modern trend" in case law to view voluntary pension plans as "constituting offers of additional compensation and as incentives to continuing and more dedicated service," directed that the decedent employer's executors furnish the plan trustee with the funds necessary to pay for the pensioners' vested contractual claims for life time pensions. The application of that case, however, is likely limited (as the lack of case history supports) given the unique facts that required the Court to consider the employer's will and rules of will construction. *Delaware Trust Co. v. Delaware Trust Co.*, 43 Del.Ch. 186, 222 A.2d 320 (1966).

terms of the governing plan documents are a bar to contract claims by employees against the Employer. Assuming that notwithstanding the terms of the Lay Pension Plan, a claim by a participant for underfunding were to be recognized as a contractual claim, it would be a contractual claim against the participant's employer (*i.e.*, the Participating Employer, rather than CDOW) as the promise would have arisen through the employment relationship, not through the sponsorship of the Lay Pension Plan.   If the Participating Employer is not part of the chapter 11, then that participant would not have a claim for an underfunded benefit.

C.    **Substantial Majority of Employees Are Not Employees of Diocese.**

19.    A third and related argument for not allowing the Lay Employee Committee to stop the Debtor's plan is that substantially all of its constituents are not even the Debtor's employees. The contributing employers to the Lay Pension Plan are not part of the bankruptcy, and independently have obligations arising out of plan underfunding, if such obligations even exist at all. CDOW provides certain services to parishes and affiliated Catholic entities, including payroll services through ADP, health insurance, and sponsorship of the Lay Pension Plan. According to the Lay Employee Committee, the parish and affiliated Catholic entities do not directly make contributions to the Lay Pension Plan, and CDOW does not collect any amounts from those entities specifically earmarked as employer contributions to the Lay Pension Plan. Rather, employer contributions from the parish are "effectively subsumed" within parish assessments.   In fact, these Employers may never have actually contributed one dime into the Lay Pension Plan. The Lay Employees should be looking to their employers and not to the Debtor.

-11-

20.    If the Lay Pension Plan were subject to ERISA, the liability for any underfunding would attach to all employers in the controlled group, even those with no participating employees. If ERISA applied, all of the non-filing entities would be jointly and severally liable for any pension underfunding in the event of a plan termination. While there are no clear rules in the non-ERISA context as to the liability of non-filing entities that are contributing employers to the pension plan of a bankrupt employer, equity and common sense require that any participant claims for underfunding should involve all of the contributing employers.

## IV.

## TERMINATION OF PLAN EXCLUSIVITY

21.    The Debtor is faced with a tough choice if it cannot reach a negotiated settlement with the Lay Employee Committee: amend the Reorganization Plan to provide for termination of the Lay Pension Plan. If the Debtor will not terminate the Lay Pension Plan because it is more interested in its employee relations than the welfare of those who survived sexual abuse suffered at its hands, the Committee should be allowed to pursue a plan that provides for termination of the Lay Pension Plan if the Lay Employee class rejects the Reorganization Plan.

*[Remainder of Page Intentionally Left Blank]*

-12-

## V.

## CONCLUSION

For all of the foregoing reasons, the Court should deny the Objection and, if the

Debtor will not amend the Reorganization Plan to provide for the possibility of

termination the Lay Pension Plan, terminate plan exclusivity for the Committee.

Dated:   May /3, 2011

**PACHULSKI STANG ZIEHL & JONES LLP**

Laura Davis Jones (DE Bar No. 2436)
James I. Stang (CA Bar 94435)
Kenneth H. Brown (CA Bar 100396)
Curtis A. Hehn (DE Bar No. 4264)
Gillian N. Brown (CA Bar. 205132)
919 North Market Street, 17th Floor
Wilmington, DE  19899-8705
Telephone: 302/652-4100
Facsimile:  302/652-4400
E-mail:   ljones@pszjlaw.com
                jstang@pszjlaw.com
                kbrown@pszjlaw.com
                chehn@pszjlaw.com
                gbrown@pszjlaw.com

Counsel for the Official Committee of
Unsecured Creditors