## EXHIBIT A

### DEFINITIONS

1.  "Abuse" means sexual conduct or misconduct, sexual abuse or molestation, indecent assault and/or battery, rape, lascivious behavior, undue familiarity, pedophilia, ephebophilia, or sexually-related physical, psychological or emotional harm, or contacts or interactions of a sexual nature between a child and an adult, or a nonconsenting adult and another adult. A child or nonconsenting adult is abused whether or not this activity involves explicit force, whether or not it involves genital or other physical contact and whether or not there is physical, psychological or emotional harm to the child or nonconsenting adult.

2.  "Administrative Claim" means a Claim for costs and expenses of administration that is allowable and entitled to priority under §§ 503, 507(a)(2) and/or 507(b) of the Bankruptcy Code, including any post-petition tax claims, any actual and necessary expenses of preserving the Estate, any actual and necessary expenses of operating the business of the Debtor, all Professional Claims, and any fees or charges assessed against the Estate under 28 U.S.C. § 1930.

3.  "Administrative Claim Bar Date" has the meaning set forth in Section 2.1(b)(1).

4.  "Administrative Claim Objection Deadline" shall have the meaning set forth in Section 2.1(b)(2).

5.  "Allied Irish Banks Claim" means the Claim of Allied Irish Banks, p.l.c. arising under that certain Reimbursement Agreement (Security Agreement) dated as of November 14, 2002, by and among the Debtor, as applicant, and Allied Irish Banks, p.l.c., as letter-of-credit issuer, the Indenture, and related documents.

6.  "Allow," "Allowed" or "Allowance" when used with respect to a Claim against the Debtor or property of the Debtor, means a Claim: (a) which has been listed on the Schedules as other than disputed, contingent or unliquidated and as to which no Proof of Claim or objection to the scheduled amount has been timely filed; (b) as to which a Proof of Claim has been timely filed, or deemed timely filed by order of the Bankruptcy Court, and either (i) no objection thereto has been timely filed, or application to subordinate or otherwise limit recovery has been made or (ii) the Claim has been allowed (but only to the extent allowed) by a Final Order of the Bankruptcy Court; (c) which has been allowed under the provisions of the Plan; (d) which is a Professional Claim for which a fee award amount has been approved by Final Order of the Bankruptcy Court; or (e) which is allowed pursuant to any stipulation of amount and nature of Claim executed by the Plan Administrator and the holder of the Claim on or after the Effective Date. To the extent the term "Allowed" is used in the Plan with respect to a specified Class of Claims or an unclassified category of Claims (i.e., "Allowed [Class designation/unclassified Claim category] Claim"), the resulting phrase shall mean an Allowed Claim of the specified Class or unclassified category of Claims. "Allowed" when used with respect to a Survivor Claim against a Non-Debtor Catholic Entity means a Claim (a) which has been

allowed under the provisions of the Plan or (b) which is allowed pursuant to any stipulation of amount and nature of Claim executed by the Plan Administrator and holder of the Claim on or after the Effective Date.

7.      "Alter Ego Claims" means, collectively, any and all Causes of Action against any Non-Debtor Catholic Entity under applicable nonbankruptcy law premised upon such Non-Debtor Catholic Entity's alleged status as an "alter ego" of the Debtor, the Diocese, and/or the Bishop, including any Cause of Action styled as an "alter ego," "veil piercing," "reverse veil piercing," or "enterprise liability" action.

8.      "Assets" of the Debtor or the Estate means, collectively, any and all property of the Debtor or the Estate, respectively, of every kind and character, wherever located, whether real or personal, tangible or intangible, and specifically including Cash (including the residual balance of any reserves established under the Plan) and Causes of Action.

9.      "Ballot" means the ballot, the form of which has been approved by the Bankruptcy Court, accompanying the Disclosure Statement provided to each holder of a Claim entitled to vote to accept or reject the Plan.

10.     "Bankruptcy Code" means title 11 of the United States Code, §§ 101-1532, as now in effect or as hereafter amended.

11.     "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

12.     "Bankruptcy Rules" means, as the context requires, the Federal Rules of Bankruptcy Procedure applicable to this Chapter 11 Case and/or the local bankruptcy rules for the Bankruptcy Court as now in effect or as the same may from time to time hereafter be amended.

13.     "Bar Date" means the date or dates established by the Bankruptcy Court as the last date for filing proofs of claim against the Debtor, including the Bar Dates established pursuant to the *Order Pursuant to Bankruptcy Rule 3003(c)(3) and Local Rule 2002-1(e) Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* [Docket No. 308]. The Plan does not affect or extend any date established by any other Order and the earliest date applicable to the filing or assertion of any Claim shall govern and control.

14.     "Bishop" means, as the context requires, (i) the office of the ordinary of the Diocese under Canon Law, or (ii) Most Rev. W. Francis Malooly, D.D.

15.     "Bishop's Discretionary Fund" means Cash on deposit in the Debtor's commercial checking account numbered 810004-418-8 with Citizens Bank, N.A., up to the amount represented by general ledger account F130 in the Debtor's books and records.

16.     "Business Day" means any day that is not a Saturday, a Sunday or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a).

A-2

17.     "Canon Law" means the Code of Canon Law of the Holy Roman Catholic Church, as codified in 1983 and as may hereafter be amended.

18.     "Capital Campaign Fund" means the fractional equitable interest in the Pooled Investment Account represented by sub-fund F0090 in the Debtor's books and records.

19.     "Cash" means cash or cash equivalents, including wire transfers, checks and other readily marketable direct obligations of the United States of America and certificates of deposit issued by banks.

20.     "Causes of Action" means, except as provided otherwise in the Plan, the Confirmation Order or any document, instrument, release or other agreement entered into in connection with the Plan, all Claims, actions, choses in action, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, controversies, variances, trespasses, damages, judgments, third-party claims, counterclaims and cross claims of the Debtor and/or its Estate, the Creditors Committee, the Lay Employees Committee, the Plan Trust (as successor to the Debtor and/or its Estate, the Creditors Committee or the Lay Employees Committee), or the Settlement Trust (as successor to the Debtor and/or its Estate with respect to the Order/Perpetrator Indemnification Claims), including an action that is or may be pending on the Effective Date or instituted by the Plan Administrator after the Effective Date against any Person based on law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, known or unknown, including Designated Causes of Action and Chapter 5 Actions; provided, however, that any affirmative defense or cross-claim asserted with respect to a Claim shall not be deemed a Cause of Action to the extent that it seeks to disallow or reduce, or is offset against, such Claim.

21.     "CDOW-Only Plan" means the Plan if either (i) it is rejected by Class 3A or (ii) it is accepted by Class 3A, but all conditions for a Settlement Plan under Section 5.2 are not satisfied or duly waived (by a writing executed by the Debtor) as of the Confirmation Date.

22.     "Chapter 5 Actions" means all Claims and Causes of Action which arise or may be brought under §§ 522, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code.

23.     "Chapter 11 Case" means the chapter 11 case, No. 09-13560 (CSS), pending for the Debtor in the Bankruptcy Court.

24.     "Channeling Injunction" means, if the Plan is confirmed as a Settlement Plan, the injunction imposed pursuant to Section 16.3.

25.     "Claim" means (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal equitable, secured or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

A-3

26.  "Class" means a category of holders of Claims as set forth in Article III of the Plan pursuant to Bankruptcy Code § 1122.

27.  "Clergy Pension Claim" means any right of a member of the Debtor's clergy to payment under the Debtor's defined-benefit pension plan for clergy.

28.  "Clergy Pension Fund" means the fractional equitable interest in the Pooled Investment Account represented by sub-fund F0100 in the Debtor's books and records.

29.  "Committee Application Deadline" has the meaning set forth in Section 9.11(b).

30.  "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket.

31.  "Confirmation Hearing" means the hearing or hearings before the Bankruptcy Court pursuant to § 1128 of the Bankruptcy Code and Bankruptcy Rule 3020(b) to consider confirmation of the Plan, as may be continued or adjourned.

32.  "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to § 1129 of the Bankruptcy Code, as such order may be amended, modified or supplemented.

33.  "Cramdown Plan" means the Plan (whether confirmed as a CDOW-Only Plan or as a Settlement Plan) if it is confirmed by the Bankruptcy Court pursuant to § 1129(b) of the Bankruptcy Code.

34.  "Creditor" means any holder of a Claim against the Debtor (including Survivor Claims) arising prior to the Effective Date.

35.  "Creditors Committee" means the official committee of unsecured creditors appointed in this Chapter 11 Case, as such committee may be constituted from time to time.

36.  "Current Underwriters" refers to "Those Certain Underwriters at Lloyd's, London who subscribed to the Policies issued to the Named Insured Diocese of Wilmington for the periods effective from July 1, 1994 to the present."

37.  "Custodian" means Bank of New York Mellon, in its capacity as custodian of the Pooled Investment Account.

38.  "De Minimis Distribution" means, if the Plan is confirmed as a CDOW-Only Plan, a Distribution in an amount equal to or less than fifty dollars ($50).

39.  "Debtor" means Catholic Diocese of Wilmington, Inc., prior to the Effective Date.

40.  "Debtor in Possession" means the Debtor in the capacity and with the status and rights conferred by §§ 1107 and 1108 of the Bankruptcy Code.

YCST01:10153468.16

068902.1001

41.     "Debtor Releasors" means the Debtor, on behalf of the Estate, its representatives (including the Creditors Committee and the Lay Employees Committee, to the extent authorized to act on behalf of the Estate), and its successors (including the Settlement Trust (if the Plan is confirmed as a Settlement Plan), the Plan Trust (if the Plan is confirmed as a CDOW-Only Plan), and the Reorganized Debtor).

42.     "DEDA" means the Delaware Economic Development Authority.

43.     "DEDA Bond Transaction Claims" means, collectively, the Allied Irish Banks Claim and the Wilmington Trust Claim.

44.     "DEDA Loan Agreement" means that certain Loan Agreement dated as of November 1, 2002, by and between Wilmington Trust Company (as assignee of DEDA) and Catholic Diocese of Wilmington, Inc. with respect to the DEDA Variable Rate Revenue Bonds, Series of 2002 (Catholic Diocese of Wilmington, Inc. Project) issued November 14, 2002, in the principal amount of $12,500,000.

45.     "Designated Causes of Action" means, if the Plan is confirmed as a CDOW-Only Plan, collectively: (i) any Order/Perpetrator Indemnification Claim, and (ii) any Cause of Action pending in the Bankruptcy Court as of the Effective Date.

46.     "Designated Insurance Policies" shall have the meaning set forth in Section 11.1.

47.     "Diocese" and "Diocesan" refers to the juridic person of the Roman Catholic Diocese of Wilmington under Canon Law.

48.     "Diocesan Schools" means, collectively, all schools owned or operated by, or otherwise affiliated with Diocese of Wilmington Schools, Inc., any Parish, or any Parish Corporation.

49.     "Disallowed" when used with respect to a Claim against the Debtor, the Settlement Trust (if the Plan is confirmed as a Settlement Plan), or the Plan Trust (if the Plan is confirmed as a CDOW-Only Plan), or property of the Debtor, the Settlement Trust, or the Plan Trust, means a Claim or any portion thereof that (i) has been disallowed by Final Order, (ii) is Scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or the Plan, (iii) is not Scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or the Plan, (iv) has been withdrawn by agreement of the Debtor and the holder thereof, or (v) has been withdrawn by the holder thereof.

50.     "Discharged Claim" means every Claim, or portion thereof, which has been Disallowed or discharged in the Chapter 11 Case.

51.     "Disclosure Statement" means the disclosure statement for the Plan approved by the Bankruptcy Court pursuant to § 1125 of the Bankruptcy Code and Bankruptcy Rule 3017 (including all schedules and exhibits thereto), as such disclosure statement may be amended or modified from time to time.

52.     "Disputed" when used with respect to a Claim against the Debtor, the Settlement Trust (if the Plan is confirmed as a Settlement Plan), or the Plan Trust (if the Plan is confirmed as a CDOW-Only Plan), or property of the Debtor, the Settlement Trust, or the Plan Trust, means a Claim to the extent that: (i) the Allowance of such Claim is the subject of an objection, appeal or motion to estimate that has been timely filed by a party in interest and which objection, appeal or motion has not been determined by a Final Order, or (ii) during the period prior to the deadline fixed by the Plan or the Bankruptcy Court for objecting to such Claim, such Claim is in excess of the amount Scheduled as other than disputed, unliquidated or contingent. In the event that any part of a Claim is Disputed, such Claim in its entirety shall be deemed to constitute a Disputed Claim for purposes of distribution under the Plan unless the Debtor or the Plan Administrator, as applicable, and the holder thereof agree otherwise. To the extent the term "Disputed" is used in the Plan with respect to a specified Class of Claims or an unclassified category of Claims (i.e. "Disputed [Class designation/unclassified Claim category] Claim"), the resulting phrase shall mean a Disputed Claim of the specified Class or unclassified category of Claims.

53.     "Disputed Non-Debtor PIA Funds" means, collectively, the fractional equitable interests, if any, in the Pooled Investment Account represented by (i) the sub-funds in the Debtor's books and records which are identified on <u>Exhibit B</u> and (ii) sub-fund F0120 in the Debtor's books and records. For the avoidance of doubt, balances reported on <u>Exhibit B</u> are as of October 20, 2009, and do not represent the current value of such Disputed Non-Debtor PIA Funds.

54.     "Disputed Restricted PIA Funds" means, if the Plan is confirmed as a CDOW-Only Plan, collectively, any Restricted PIA Funds which are the subject of a *bona fide* dispute as of the Confirmation Date as to whether such Restricted PIA Funds are Restricted Assets.

55.     "District Court" means the United States District Court for the District of Delaware.

56.     "Effective Date" means the Business Day on which the Plan becomes effective pursuant to Article XVI of the Plan; provided however, that if any stay or injunction against enforcement or execution of the Confirmation Order is issued prior to the date that would otherwise be the Effective Date, the Effective Date shall be the first Business Day after all such stays or injunctions are no longer in effect.

57.     "Estate" means the estate created in the Chapter 11 Case pursuant to § 541 of the Bankruptcy Code.

58.     "Executory Contract" means any executory contract or unexpired lease subject to § 365 of the Bankruptcy Code, between the Debtor and any other Person.

59.     "Exculpated Parties" means, collectively, (i) the Debtor, the Estate, the Creditors
Committee, the Lay Employees Committee, the Fee Examiner, the Mediator, the Special
Arbitrator, the Custodian, the Investment Managers, and the Non-Debtor Catholic
Entities; (ii) if the Plan is confirmed as a Settlement Plan, the Settlement Trust, the
Settlement Trustee, the Settlement Arbitrator, and the Settling Insurers; (iii) if the Plan is
confirmed as a CDOW-Only Plan, the Plan Trust, the Plan Trustee, the Plan Oversight
Committee, the Survivor Claims Arbitrator, and the Survivor Claims Mediator; and
(iv) the respective officers, directors, employees, members, attorneys, financial advisors,
and professionals of a Person identified in the preceding clauses (i)-(iii).

60.     "Fee Application" means an application filed with the Bankruptcy Court in accordance
with the Bankruptcy Code and Bankruptcy Rules for payment of a Professional Claim.

61.     "Fee Examiner" means Stuart Maue, the fee examiner appointed in the Chapter 11
Case pursuant to the *Order Appointing Fee Examiner and Establishing Related
Procedures for Compensation and Reimbursement of Expenses for Professionals and
Consideration of Fee Applications* [Docket No. 368], or its successor, if any.

62.     "File," "Filed" or "Filing" means file, filed or filing with the Bankruptcy Court or
District Court, as applicable, or its authorized designee in the Chapter 11 Case.

63.     "Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

64.     "Final Order" means an order or judgment of the Bankruptcy Court, or other court of
competent jurisdiction, as entered on the docket in the Chapter 11 Case or the docket of
any other court of competent jurisdiction, that has not been reversed, stayed, modified or
amended, and as to which the time to appeal or seek certiorari or move for a new trial,
reargument or rehearing has expired, and no appeal or petition for certiorari or other
proceedings for a new trial, reargument or rehearing has been timely taken, or as to which
any appeal that has been taken or any petition for certiorari that has been timely filed has
been withdrawn or resolved by the highest court to which the order or judgment was
appealed or from which certiorari was sought or the new trial, reargument or rehearing
shall have been denied or resulted in no modification of such order.

65.     "Gift Annuity Claims" means Claims arising under charitable gift annuity agreements
with the Debtor.

66.     "Gift Annuity Funds" means, collectively, the fractional equitable interests in the
Pooled Investment Account represented by sub-funds F0485, F0495, F0500, F0510,
F0515, F0520, and F0530 in the Debtor's books and records.

67.     "IBNR Reserves" means, if the Plan is confirmed as a CDOW-Only Plan, reserves of
Assets in an amount necessary to adequately reserve for incurred-but-not-reported claims
under the Debtor's self-insured lay and clergy health plans, which reserves shall be held
and administered by the Reorganized Debtor pursuant to Section 8.5.

68.     "Impaired" means "impaired" within the meaning of § 1124 of the Bankruptcy Code.

A-7

69.     "Insurance Actions" means any actual or potential litigation as to any insurance recoveries or any Insurance Policy and/or rights thereunder.

70.     "Insurance Buy-Back Agreement" means an agreement by and among the Debtor, one or more NDCEs, and a Settling Insurer regarding the sale of one or more Settled Insurance Policies and the release of all Causes of Action arising thereunder or related thereto.

71.     "Insurance Policy" means (i) if the Plan is confirmed as a CDOW-Only Plan, any contract of insurance in effect on or before the Effective Date issued or allegedly issued by any insurance company or insurance broker to or for the benefit of the Debtor or any predecessor in interest of the Debtor, or (ii) if the Plan is confirmed as a Settlement Plan, any contract of insurance in effect on or before the Effective Date issued or allegedly issued by any insurance company or insurance broker to or for the benefit of the Debtor, any Non-Debtor Catholic Entity, or any predecessor in interest of the Debtor or Non-Debtor Catholic Entity.

72.     "Insurer" means (i) if the Plan is confirmed as a CDOW-Only Plan, any insurance company or insurance broker that provided or allegedly provided, directly or indirectly, any coverage to or for the benefit of the Debtor or any predecessor in interest of the Debtor under an Insurance Policy, or (ii) if the Plan is confirmed a Settlement Plan, any insurance company or insurance broker that provided or allegedly provided, directly or indirectly, any coverage to or for the benefit of the Debtor, any Non-Debtor Catholic Entity, or any predecessor in interest of the Debtor or any Non-Debtor Catholic Entity under an Insurance Policy.

73.     "Insurer Settlement Contribution" means, if the Plan is confirmed as a Settlement Plan, Cash in the amount of $15,456,559 in the aggregate to be contributed by the Settling Insurers to the Settlement Trust in accordance with Section 5.1(b).

74.     "Interim PIA Withdrawal Order" means any Order of the Bankruptcy Court authorizing the Debtor to make a distribution from a Disputed Non-Debtor PIA Fund, including the Orders entered on the docket of the Chapter 11 Case as items numbered 141, 285, 347, 362, 387, 394, 423, 455, 526, 562, 568, 753, 810, 846, 897, 1022, 1104, 1148, and 1209.

75.     "Investment Management Agreements" means, collectively, (i) that certain Agreement for Investment Management dated as of April 29, 1993, by and among the Debtor and Friess Associates of Delaware, Inc.; (ii) that certain Investment Management Agreement dated as of April 10, 2006, by and among the Debtor and Harding, Loevner Management, L.P.; (iii) that certain Investment Advisory Agreement dated as of September 13, 2004, by and among the Debtor and ING Clarion Real Estate Securities, L.P.; (iv) that certain Investment Advisory Agreement dated as of May 3, 1994, by and among the Debtor and Arnhold and S. Bleichroeder, Inc., as amended by that certain Amendment to Investment Advisory Agreement dated as of June 5, 2008, by and among the Debtor and Iridian Asset Management LLC; (v) that certain Investment Advisory Agreement dated as of June 19, 1995, by and among the Debtor and Kalmar Investments Inc.; (vi) that certain

letter agreement dated as of March 25, 2003, by and among the Debtor and State Street Global Advisors, a division of State Street Bank and Trust Company; (vii) that certain Agreement of Trust dated as of December 20, 1999, by and among the Debtor and State Street Bank and Trust Company, as amended by that certain letter agreement dated as of February 28, 2003, by and among the Debtor and State Street Bank and Trust Company; and (viii) that certain Revocable Trust Agreement dated as of March 17, 2008, by and among the Debtor and Wellington Trust Company, National Association.

76.     "Investment Managers" means, collectively, the non-debtor parties to the Investment Management Agreements, and their successors and assigns.

77.     "IRC" means the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 *et seq.*, as may be amended.

78.     "Lay Employees Committee" means the official committee of lay employees appointed by the U.S. Trustee in the Chapter 11 Case on April 30, 2010, as such committee may be constituted from time to time.

79.     "Lay Pension Claim" means any Claim against the Debtor arising under the Lay Pension Plan.

80.     "Lay Pension Fund" means the fractional equitable interest in the Pooled Investment Account represented by sub-fund F0105 in the Debtor's books and records.

81.     "Lay Pension Litigation" means the adversary proceeding commenced by the Lay Employees Committee in the Bankruptcy Court (Ad. Proc. No. 11-50022(CSS)) for a declaration that the Lay Pension Fund is held in trust for the benefit of the Lay Pension Plan and/or is a Restricted Asset.

82.     "Lay Pension Plan" means the Diocese of Wilmington Lay Employees Pension Plan sponsored by the Debtor for the benefit of employees of the Debtor and the Non-Debtor Catholic Entities.

83.     "Lay Pension Plan Reaffirmation Agreement" means the document by which the Reorganized Debtor, subject to approval by the Bankruptcy Court, shall reaffirm the Debtor's obligations under the Lay Pension Plan, as such obligations may be modified by such document.

84.     "Lay Pension Plan Trust" means the trust established by that certain The Catholic Diocese of Wilmington, Inc. Lay Employees Pension Plan Defined Benefit Plan Trust Agreement dated as of November 1, 1998, by and among the Debtor and Mellon Bank, N.A., as subsequently amended from time to time.

85.     "Lay Pension Plan Trustee" means Bank of New York Mellon, as successor to Mellon Bank, N.A., in its capacity as trustee of the Lay Pension Plan Trust.

86.     "Lien" means any mortgage, lien, pledge, security interest or other charge or encumbrance or security device of any kind, upon, or affecting any Asset of the Debtor as contemplated by § 101(37) of the Bankruptcy Code.

87.     "Liquidation Analysis" means the liquidation analysis annexed to and incorporated into the Disclosure Statement.

88.     "Mediator" means Hon. Thomas B. Rutter (retired), one of the co-mediators appointed in the Chapter 11 Case pursuant to the *Amended Order Assigning Matter to Mediators* [Docket No. 502], as subsequently amended.

89.     "NDCE Settlement Contribution" means, if the Plan is confirmed as a Settlement Plan, Cash in the amount of $61,968,441 in the aggregate to be contributed by or on behalf of the Non-Debtor Catholic Entities to the Settlement Trust pursuant to Section 5.1(a).

90.     "Non-Debtor Catholic Entities" means, collectively: the Parishes; the Parish Corporations; the Diocesan Schools; DOW Schools, Inc.; Catholic Cemeteries, Inc.; Catholic Charities, Inc.; Siena Hall, Inc.; Seton Villa, Inc.; Children's Home, Inc.; Catholic Youth Organization, Inc. d/b/a Catholic Youth Ministry; Catholic Ministry to the Elderly, Inc.; Catholic Press of Wilmington, Inc.; and Catholic Diocese Foundation.

91.     "Non-Debtor Pooled Investors" means, collectively: Catholic Diocese Foundation; Catholic Charities, Inc.; Seton Villa, Inc.; Siena Hall, Inc.; Children's Home, Inc.; Catholic Cemeteries, Inc.; DOW Schools, Inc.; Catholic Youth Organization, Inc.; St. Ann Roman Catholic Church (Wilmington); St. Thomas the Apostle Roman Catholic Church; Corpus Christi Roman Catholic Church; Cathedral of St. Peter Roman Catholic Church; Our Lady of Lourdes Roman Catholic Church; St. John the Beloved Roman Catholic Church; St. Edmond Roman Catholic Church; St. Francis de Sales Roman Catholic Church; Holy Family Roman Catholic Church; St. Polycarp Roman Catholic Church; St. Mary Refuge of Sinners Roman Catholic Church; St. Benedict Roman Catholic Church; Holy Cross Roman Catholic Church; St. Paul Roman Catholic Church; St. Luke/St. Andrew Roman Catholic Church; Holy Rosary Roman Catholic Church, Our Mother of Sorrows Roman Catholic Church; Holy Spirit Roman Catholic Church; the Mullery Memorial Scholarship Trust; and the Society for the Propagation of the Faith.

92.     "Non-Settling Insurer" means any Insurer other than a Settling Insurer.

93.     "Official Committees" means, collectively, the Creditors Committee, the Lay Employees Committee, and any other official committee of creditors appointed in the Chapter 11 Case pursuant to § 1102 of the Bankruptcy Code, as may be constituted from time to time.

94.     "Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Case or the docket of any other court of competent jurisdiction.

A-10

95.     "Order/Perpetrator Indemnification Claim" means a Claim against a Religious Order or Perpetrator for indemnification or contribution arising from or relating to a Survivor Claim.

96.     "Other Unsecured Claim" means any Claim that is not an S/A/P Claim, Survivor Claim, Lay Pension Claim, DEDA Bond Transaction Claim, Clergy Pension Claim, Gift Annuity Claim, or Penalty Claim.

97.     "Pari Passu Claims" means, collectively, all Claims in Classes 3A, 3B, 3C, 3D, 3E, and 3F, solely to the extent such Claims are entitled to a distribution under the Plan.

98.     "Parishes" means, collectively, the juridic persons under Canon Law of the following parishes within the Diocese: Cathedral of St. Peter; Christ Our King; Corpus Christi; Good Shepherd; Holy Child; Holy Cross; Holy Family; Holy Name of Jesus; Holy Rosary; Holy Spirit; Immaculate Conception (Elkton); Immaculate Conception (Marydel); Immaculate Heart of Mary; Our Lady of Fatima; Our Lady of Good Counsel; Our Lady of Lourdes; Our Mother of Sorrows; Parish of The Resurrection; Sacred Heart; St. Andrew; St. Ann (Bethany Beach); St. Ann (Wilmington); St. Anthony of Padua; St. Benedict; St. Catherine of Siena; St. Christopher; St. Dennis; St. Edmond; St. Elizabeth; St. Elizabeth Ann Seton; St. Francis de Sales; St. Hedwig; St. Helena; St. John Neumann; St. John the Apostle; St. John the Baptist – Holy Angels; St. John the Beloved; St. Joseph (Middletown); St. Joseph (Wilmington); St. Joseph on the Brandywine; St. Jude the Apostle; St. Luke; St. Margaret of Scotland; St. Mary of the Assumption; St. Mary of the Immaculate Conception; St. Mary Magdalen; St. Mary Refuge of Sinners; St. Mary Star of the Sea; St. Matthew; St. Michael the Archangel; St. Patrick; St. Paul (Delaware City); St. Paul (Wilmington); Ss. Peter and Paul; St. Peter the Apostle; St. Polycarp; and St. Thomas the Apostle.

99.     "Parish Corporations" means, collectively, the secular legal embodiments of the Parishes, including: Cathedral of St. Peter Roman Catholic Church; Christ Our King Roman Catholic Church; Corpus Christi Roman Catholic Church; Good Shepherd Roman Catholic Church; Holy Child Roman Catholic Church; Holy Cross Roman Catholic Church; Holy Family Roman Catholic Church; Holy Name of Jesus Roman Catholic Church; Holy Rosary Roman Catholic Church; Holy Spirit Roman Catholic Church; Immaculate Conception Roman Catholic Church (Elkton); Immaculate Conception Roman Catholic Church (Marydel); Immaculate Heart of Mary Roman Catholic Church; Our Lady of Fatima Roman Catholic Church; Our Lady of Good Counsel Roman Catholic Church; Our Lady of Lourdes Roman Catholic Church; Our Mother of Sorrows Roman Catholic Church; Parish of The Resurrection Roman Catholic Church; Sacred Heart Roman Catholic Church; St. Andrew Roman Catholic Church; St. Ann Roman Catholic Church (Bethany Beach); St. Ann Roman Catholic Church (Wilmington); St. Anthony of Padua Roman Catholic Church; St. Benedict Roman Catholic Church; St. Catherine of Siena Roman Catholic Church; St. Christopher Roman Catholic Church; St. Dennis Roman Catholic Church; St. Edmond Roman Catholic Church; St. Elizabeth Roman Catholic Church; St. Elizabeth Ann Seton Roman Catholic Church; St. Francis de Sales Roman Catholic Church; St. Hedwig Roman Catholic Church; St. Helena Roman Catholic Church; St. John Neumann Roman Catholic Church; St. John the Apostle

Roman Catholic Church; St. John the Baptist – Holy Angels Roman Catholic Church; St. John the Beloved Roman Catholic Church; St. Joseph Roman Catholic Church (Middletown); St. Joseph Roman Catholic Church (Wilmington); St. Joseph on the Brandywine Roman Catholic Church; St. Jude the Apostle Roman Catholic Church; St. Luke Roman Catholic Church; St. Margaret of Scotland Roman Catholic Church; St. Mary of the Assumption Roman Catholic Church; St. Mary of the Immaculate Conception Roman Catholic Church; St. Mary Magdalen Roman Catholic Church; St. Mary Refuge of Sinners Roman Catholic Church; St. Mary Star of the Sea Roman Catholic Church; St. Matthew Roman Catholic Church; St. Michael the Archangel Roman Catholic Church; St. Patrick Roman Catholic Church; St. Paul Roman Catholic Church (Delaware City); St. Paul Roman Catholic Church (Wilmington); Ss. Peter and Paul Roman Catholic Church; St. Peter the Apostle Roman Catholic Church; St. Polycarp Roman Catholic Church; and St. Thomas the Apostle Roman Catholic Church.

100.   "Parish-Only Survivor Claimants" means, collectively, the plaintiffs in each of the following civil actions: *Barry Lamb v. St. Mary Magdalen Roman Catholic Church and St. Francis de Sales Roman Catholic Church*, Case No. 09C-06-187 (CLS) (Del. Super Ct.); *John Goe#1 v. St. John the Beloved Roman Catholic Church, Immaculate Conception Roman Catholic Church, St. Mary Refuge of Sinners, St Johns/Holy Angels, and Rev. Douglas W. Dempster*; Case No. 09C-06-063 (WLW) (Del. Super. Ct.); *John Poe #7 v. Holy Rosary Roman Catholic Church and St. Thomas the Apostle Roman Catholic Church*, Case No. S09C-06-026 (THG) (Del. Super. Ct.); *John Loe #4 v. St. Catherine of Siena Roman Catholic Church*, Case No. 09C-06-189 (CLS) (Del. Super. Ct.); and *John Dougherty v. St. Ann's Roman Catholic Church*, Case No. 09C-06-141 (CLS) (Del. Super. Ct.).

101.   "Penalty Claims" means a Claim against the Debtor, whether secured or unsecured, for any fine, penalty or forfeiture, or for multiple, exemplary or punitive damages, arising before the Petition Date, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such Claim.

102.   "Perpetrator" means an individual who personally committed or is alleged to have personally committed an act of Abuse. For the avoidance of doubt, the term "Perpetrator" does not include any individual who did not personally commit an act of Abuse, against whom a Survivor Claim nonetheless is asserted, or may be asserted, by virtue of such individual's position or service as a member, trustee, officer, official, employee, agent, representative, servant, contractor, consultant, professional, volunteer, or attorney of the Diocese, the Debtor, or any Non-Debtor Catholic Entity.

103.   "Person" means any individual, corporation, limited liability company, general partnership, limited partnership, limited liability partnership, limited liability limited partnership, association, joint stock company, joint venture, estate, trust, unincorporated association, government or any political subdivision thereof, or other entity.

104.   "Petition Date" means October 18, 2009, the date on which the Debtor commenced the Chapter 11 Case by filing a petition for relief under chapter 11 of the Bankruptcy Code.

A-12

105.    "Phase I Judgment and Orders" means, collectively, the judgment (as amended) and orders appearing as docket items 125, 127, 128, 129, and 135 in the adversary proceeding in the Bankruptcy Court styled *Official Committee of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc.,* at al., Adv. Proc. No. 09-52866 (CSS).

106.    "Phase I Opinions" means, collectively, the opinions appearing as docket items 115 and 134 in the adversary proceeding in the Bankruptcy Court styled *Official Committee of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc.,* et al., Adv. Proc. No. 09-52866 (CSS), which opinions are reported at 432 B.R. 135 and 437 B.R. 488, respectively.

107.    "PIA Breach Claims" means any Claim of a Non-Debtor Pooled Investor against the Debtor for damages as a result of any alleged breach of fiduciary duty by the Debtor with respect to the Pooled Investment Account, other than a PIA Investment Claim.

108.    "PIA Custody Agreement" means that certain Custody Agreement by and between the Debtor and the Custodian dated as of July 23, 1999.

109.    "PIA Distribution Clawback Claim" means any Claim of the Estate against a Non-Debtor Pooled Investor or subsequent transferee for recovery of any amount advanced by the Debtor under an Interim PIA Withdrawal Order.

110.    "PIA Investment Claim" means any Claim of a Non-Debtor Pooled Investor against the Debtor for recovery of its lost investment in the Pooled Investment Account.

111.    "PIA Litigation" means the adversary proceeding in the Bankruptcy Court styled *Official Committee of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc.,* at al., Adv. Proc. No. 09-52866 (CSS), and any related proceedings (including on certification, appeal or remand).

112.    "PIA Surcharge Claim" means any Claim of the Estate in the nature of a surcharge against any Disputed Non-Debtor PIA Fund or Restricted PIA Fund for reimbursement of professionals' fees and expenses incurred by the Debtor successfully defending such Disputed Non-Debtor PIA Fund or Restricted PIA Fund against entry of a Final Order determining it to be an Unrestricted Asset of the Estate.

113.    "Plan" means this chapter 11 plan of reorganization, either in its present form or as it may be altered, amended, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

114.    "Plan Administration Expenses" means, if the Plan is confirmed as a CDOW-Only Plan, any and all costs and expenses incurred by the Plan Trust, the Plan Oversight Committee, or any other Person as provided specifically in the Plan, in connection with the administration of the Plan Trust, including litigation expenses and professional fees, pursuant to the Plan, Confirmation Order, and Plan Trust Agreement.

115.    "Plan Administration Expense Reserve" means, if the Plan is confirmed as a CDOW-Only Plan, the reserve to be established by the Plan Trustee, in consultation with the Plan

Oversight Committee, from Plan Trust Assets in an amount reasonably necessary to fund the Plan Administration Expenses.

116.     "Plan Administrator" means (i) if the Plan is confirmed as a CDOW-Only Plan, the Plan Trustee, and (ii) if the Plan is confirmed as a Settlement Plan, the Reorganized Debtor.

117.     "Plan Oversight Committee" means, if the Plan is confirmed as a CDOW-Only Plan, the committee formed on the Effective Date pursuant to Section 9.11 if the Plan.

118.     "Plan Trust" means, if the Plan is confirmed as a CDOW-Only Plan, the trust created for the benefit of holders of Claims in accordance with the Plan and the Confirmation Order.

119.     "Plan Trust Agreement" means, if the Plan is confirmed as a CDOW-Only Plan, the trust agreement establishing the Plan Trust, as may be amended.

120.     "Plan Trust Assets" means, if the Plan is confirmed as a CDOW-Only Plan, collectively, all Unrestricted Assets as of the Effective Date, other than those Unrestricted Assets the Debtor shall designate as Reorganization Assets (the aggregate value of which shall in no event exceed $3 million as of the Effective Date) in a Supplemental Plan Document, as well as all assets received by the Plan Trust after the Effective Date, including (a) the Unrestricted PIA Funds, (b) the Plan Trust's residual interest in the surplus, if any, of the IBNR Reserves pursuant to Section 8.5, (c) the Estate's rights to any proceeds of any Designated Insurance Policies, (d) all Causes of Action of the Estate against any Person, and (e) the Estate's interest, if any, in the Disputed Non-Debtor PIA Funds, the Disputed Restricted PIA Funds, and the Lay Pension Fund, subject fully to Section 12.4.

121.     "Plan Trust Professionals" means, if the Plan is confirmed as a CDOW-Only Plan, the Plan Trustee, counsel to the Plan Trustee, counsel to the Plan Oversight Committee, and such other professionals retained by the Plan Trustee or the Plan Oversight Committee to assist in the administration of the Plan.

122.     "Plan Trustee" means, if the Plan is confirmed as a CDOW-Only Plan, the Person appointed to act as trustee of the Plan Trust in accordance with the terms of the Plan, the Confirmation Order, and the Plan Trust Agreement, or any successor appointed in accordance with the terms of the Plan, Confirmation Order and the Plan Trust Agreement.

123.     "Pooled Investment Account" means the custody account maintained at Bank of New York Mellon pursuant to the PIA Custody Agreement.

124.     "Post-Confirmation Notice Parties" means (i) if the Plan is confirmed as a CDOW-Only Plan, the Plan Trust, the Plan Oversight Committee, the Reorganized Debtor, the U.S. Trustee, and (solely with respect to Professional Claims and objections to Professional Claims) the Fee Examiner; and (ii) if the Plan is confirmed as a Settlement Plan, the Reorganized Debtor and the U.S. Trustee.

A-14

125.  "Pre-1994 Underwriters" refers to "Those Certain Underwriters at Lloyd's, London signatory to Policies issued to the Diocese of Wilmington and to certain of its Parishes for policy periods from the beginning of time through July 1, 1994."

126.  "*Prima Facie* Case of Abuse" with respect to a Survivor Claim means, if the Plan is confirmed as a CDOW-Only Plan, a *prima facie* showing that the holder of such Survivor Claim, or a Survivor on whose behalf such holder is authorized to assert such Survivor Claim, suffered Abuse for which the Debtor could be held civilly liable to the holder of such Survivor Claim under applicable non-bankruptcy law after giving effect to any applicable statute of limitations and any prior waiver or release executed in favor of the Debtor with respect to such Survivor Claim.

127.  "Priority Claim" means a Claim to the extent that it is of the kind described in, and entitled to priority under § 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

128.  "Priority Tax Claim" means a Claim of a governmental unit of the kind specified in § 507(a)(8) of the Bankruptcy Code.

129.  "Professional" means any professional employed or to be compensated pursuant to §§ 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code.

130.  "Professional Claim" means a Claim for compensation for services and/or reimbursement of expenses pursuant to §§ 327, 328, 330, 331 or 503(b) of the Bankruptcy Code in connection with an application made to the Bankruptcy Court in the Chapter 11 Case.

131.  "Professional Claims Bar Date" has the meaning set forth in Section 2.1(c)(1).

132.  "Proof of Claim" means a proof of claim filed in the Chapter 11 Case pursuant to § 501 of the Bankruptcy Code and/or pursuant to any order of the Bankruptcy Court, together with supporting documents.

133.  "Pro Rata" means, with respect to any Distribution on account of any Allowed Claim in any Class, the ratio of (i) the amount of such Allowed Claim to (ii) the sum of (a) all Allowed Claims in such Class and (b) the aggregate maximum allowable amount of all Disputed Claims in such Class.

134.  "Protected Party" means, if the Plan is confirmed as a Settlement Plan, any of (i) the Debtor, the Reorganized Debtor, the Non-Debtor Catholic Entities, and their respective predecessors and successors, and their past, present, and future members, trustees, officers, officials, employees, agents, representatives, servants, contractors, consultants, professionals, volunteers, attorneys, professionals, affiliates, insiders, subsidiaries, merged or acquired companies or operations, and their successors and assigns, but excluding only the Holy See (State of Vatican City), the Religious Orders, and the Perpetrators, and (ii) the Settling Insurers and their respective predecessors and successors, and their past, present, and future officials, shareholders, subsidiaries, parents, divisions, affiliates, members, officers, directors, employees, servants,

A-15

volunteers, representatives, attorneys, merged or acquired companies or operations or assigns, provided, however, that any successor of an entity identified in clause (i) of this definition shall not constitute a "Protected Party" with respect to any Claim that was not a Claim against the Debtor or a Non-Debtor Catholic Entity as of the Effective Date. Without limiting the generality of the foregoing, the Debtor may, but shall not be required to, specifically identify particular Protected Parties in a Supplemental Plan Document.

135.    "Religious Orders" means, collectively: (i) the Oblates of Saint Francis de Sales; Oblates of St. Francis de Sales, Inc., a Delaware Corporation; The Congregation of the Oblates of St. Francis de Sales, Inc.; the Capuchin Franciscan Friars; Capuchin Franciscan Friars Province of the Sacred Stigmata of St. Francis, a New Jersey Corporation; Brothers of the Holy Cross of the Eastern Province of the United States of America, Inc., a New York Corporation; The Norbertine Fathers of Delaware, Inc.; The Norbertine Fathers, Inc.; The Premonstratensian Fathers, A Wisconsin Corporation; Daughters of Charity of St. Vincent de Paul Northeast Province; and Daughters of Charity Emmitsburg Province; (ii) any past or present member, trustee, officer, or official of any entity in the foregoing clause (i), including Mauro Johri, a.k.a. Brother Mauro Johri, O.F.M. Cap., and his predecessors, as Ministers General of the Capuchin Francis Friars; or (iii) any entity owned or operated by, or otherwise affiliated with, any entity in the foregoing clause (i), including Salesianum School, Inc., St. Edmond's Academy, Inc., and Archmere Academy, Inc., and the religious institutes' Curia.

136.    "Removed Cases" means all cases removed to the District Court pursuant to Bankruptcy Rule 9001 and 28 U.S.C. § 1452, or by the terms of the Plan if confirmed as a CDOW-Only Plan.

137.    "Reorganization Assets" means, collectively, (i) if the Plan is confirmed as a CDOW-Only Plan, (A) those Unrestricted Assets the Debtor shall designate as Reorganization Assets (the aggregate value of which shall in no event exceed $3 million as of the Effective Date) in a Supplemental Plan Document, and (B) all Restricted Assets; and (ii) if the Plan is confirmed as a Settlement Plan, all Assets of the Debtor and the Estate that are not contributed to the Settlement Trust or the Lay Pension Plan Trust pursuant to the Plan.

138.    "Reorganized Debtor" means Catholic Diocese of Wilmington, Inc., on and after the Effective Date.

139.    "Restricted Assets" means, collectively, all Assets of the Debtor or the Estate that are subject to legally enforceable restrictions requiring use or disposition of such Assets for a particular purpose and precluding use of such Assets for the Debtor's general corporate purposes.

140.    "Restricted PIA Funds" means, collectively, the fractional equitable interests, if any, in the Pooled Investment Account represented by the sub-funds in the Debtor's books and records identified on the Statement of Financial Affairs on Line 14 – Restricted Funds.

141.    "S/A/P Claims" means, collectively, Secured Claims, Administrative Claims (including Professional Claims), Priority Claims, and Priority Tax Claims.

142.    "Scheduled" means, with respect to any Claim, that such Claim is listed on the Schedules.

143.    "Schedules" means the Debtor's schedules of assets and liabilities filed with the clerk of the Bankruptcy Court pursuant to pursuant to § 521(a) of the Bankruptcy Code and Bankruptcy Rule 1007, as they have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009.

144.    "Secular Legal Duty" means a duty arising under applicable non-bankruptcy law, the specific performance of which duty could be compelled by a federal court or a state court of general jurisdiction consistent with the Free Exercise and Establishment Clauses of the First Amendment of the United States Constitution.

145.    "Secured Claim" means a Claim that is secured by a Lien on, or security interest in, property of the Debtor, or that has the benefit of rights of setoff under § 553 of the Bankruptcy Code, but only to the extent of the value of the creditor's interest in the Debtor's interest in such property, or to the extent of the amount subject to setoff, which value shall be determined by the Bankruptcy Court pursuant to §§ 506(a), 553, and/or 1129(b)(2)(A)(i)(II) of the Bankruptcy Code, as applicable.

146.    "Settled Insurance Policy" means an Insurance Policy issued by a Settling Insurer that is subject to the settlement described in Section 5.1, as shall be described more particularly in an Insurance Buy-Back Agreement or other Supplemental Plan Document.

147.    "Settlement Arbitrator" means, if the Plan is confirmed as a Settlement Plan, the Person appointed to act as special arbitrator for the Settlement Trust in accordance with the terms of the Plan, the Confirmation Order, and the Settlement Trust Agreement, or any successor appointed in accordance with the terms of the Plan, Confirmation Order and the Settlement Trust Agreement.

148.    "Settlement Funding Date" means, if the Plan is confirmed as a Settlement Plan, the earlier of (i) the first Business Day that is at least sixty (60) days after the Confirmation Date and (ii) the first Business Day after which all properties set forth in Exhibit C have been sold by the Debtor, Catholic Diocese Foundation, Catholic Cemeteries, Inc., Seton Villa, Inc., or Children's Home, Inc., as applicable.

149.    "Settlement Plan" means the Plan if it is accepted by Class 3A and all conditions for a Settlement Plan under Section 5.2 are either satisfied or duly waived (by a writing executed by the Debtor) as of the Confirmation Date. For the avoidance of doubt, if the Plan is not accepted by Class 3A the Plan shall not constitute, and the Debtor shall not seek confirmation of the Plan as, a Settlement Plan.

150.    "Settlement Trust" means, if the Plan is confirmed as a Settlement Plan, the trust created for the benefit of holders of Class 3A Claims in accordance with the Plan and the Confirmation Order.

A-17

151.    "Settlement Trust Agreement" means, if the Plan is confirmed as a Settlement Plan, the trust agreement establishing the Settlement Trust, as may be amended.

152.    "Settlement Trust Assets" means, if the Plan is confirmed as a Settlement Plan, collectively, the NDCE Settlement Contribution, the Insurer Settlement Contribution, and the Order/Perpetrator Indemnification Claims assigned to the Settlement Trust pursuant to Section 5.1(a)-(c).

153.    "Settlement Trust Distribution Procedures" means, if the Plan is confirmed as a Settlement Plan, the procedures approved by the Bankruptcy Court governing (i) the Allowance and liquidation, or the Disallowance, of Class 3A Claims, and (ii) distributions from the Settlement Trust to holders of Class 3A Claims.

154.    "Settlement Trust Documents" means, if the Plan is confirmed as a Settlement Plan, collectively, the Settlement Trust Agreement and the Settlement Trust Distribution Procedures.

155.    "Settlement Trustee" means, if the Plan is confirmed as a Settlement Plan, the Person appointed to act as trustee of the Settlement Trust in accordance with the terms of the Plan, the Confirmation Order, and the Settlement Trust Agreement, or any successor appointed in accordance with the terms of the Plan, Confirmation Order and the Settlement Trust Agreement, if the Plan is confirmed as a Settlement Plan.

156.    "Settling Parties" means, if the Plan is confirmed as a Settlement Plan, collectively, the Non-Debtor Catholic Entities, the Settling Insurers, and the holders of Class 3A Claims.

157.    "Settling Insurers" means, if the Plan is confirmed as a Settlement Plan, collectively, the Pre-1994 Underwriters; the Current Underwriters; Granite State Insurance Company; The Insurance Company of Pennsylvania; Allianz S.p.A (as successor to Adriatic Insurance Company and Fireman's Fund Insurance Company); Scottsdale Insurance Company; National Casualty Company; and the following indirect the following indirect subsidiaries of Hartford Financial Services Group, Inc.: First State Insurance Company, Nutmeg Insurance Company, and Twin City Fire Insurance Company.

158.    "Special Arbitrator" has the meaning set forth in Section 17.6.

159.    "St. Ann Indemnity Claim" means the Proof of Claim filed by St. Ann Roman Catholic Church on or about April 15, 2010, and numbered 1218 on the official claims register maintained in the Chapter 11 Case.

160.    "State Court Counsel" means, collectively or individually, as the context requires: Jacobs & Crumplar, P.A., The Neuberger Firm, P.A., Manly & Stewart, Dalton & Associates, P.A., Jeff Anderson & Associates, P.A., and Conaty, Curran & Sisk.

161.    "Statement of Financial Affairs" means the Debtor's statement of financial affairs filed with the clerk of the Bankruptcy Court pursuant to § 521(a) of the Bankruptcy Code, as the same may have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009.

162.  "Substantive Consolidation Claims" means, collectively, any and all Causes of Action against any Non-Debtor Catholic Entity under the Bankruptcy Code and/or federal common law, which, if successful, would result in the substantive consolidation (whether partial or complete, deemed or actual) of such Non-Debtor Catholic Entity and/or the assets or liabilities of such Non-Debtor Catholic Entity with the Debtor and/or the Estate or liabilities of the Estate.

163.  "Superior Court" means the Superior Court of the State of Delaware.

164.  "Supplemental Plan Documents" means, collectively, the documents included (or to be included) in the supplemental appendix to the Plan and Filed with the Bankruptcy Court at least fourteen (14) days prior to the Confirmation Hearing, provided, however, that the Debtor may defer the filing of any documents that are applicable only in a CDOW-Only Plan, to the extent necessary, until fourteen (14) days prior to the Confirmation Hearing as may be continued by Order of the Bankruptcy Court in accordance with Sections 5.5 or 15.2, as applicable.

165.  "Survivor" means an individual survivor of Abuse, whether or not such individual is the holder of an Allowed Survivor Claim.

166.  "Survivor ADR Claim" means any Survivor Claim the holder of which elects treatment pursuant to Section 10.4.

167.  "Survivor Claim" means (i) if the Plan is confirmed as a CDOW-Only Plan, any Claim against the Debtor related to or arising out of any and all acts or omissions that in any way arise out of, are based upon, or involve actual or alleged Abuse by a Person for whom the Debtor is or was legally responsible, whom the Debtor failed to control, direct, train or supervise, or about whose acts or propensities the Debtor failed to warn, disclose or provide information, or (ii) if the Plan is confirmed as a Settlement Plan, any Claim against the Debtor or any Protected Party related to or arising out of any and all acts or omissions that in any way arise out of, are based upon, or involve actual or alleged Abuse by a Person for whom the Debtor or any Protected Party is or was legally responsible, or whom the Debtor or any Protected Party failed to control, direct, train or supervise, or about whose acts and propensities the Debtor or any Protected Party failed to warn, disclose or provide information. For the avoidance of doubt, a Survivor Claim includes (i) any Claim for payment or reimbursement for, or provision of, medical or psychological treatment, and (ii) if the Plan is confirmed as a Settlement Plan, any Claim against a Non-Debtor Catholic Entity that was previously liquidated by agreement, reduced to judgment, and/or is secured in whole or in part by a lien in property of any Non-Debtor Catholic Entity. This definition shall not constitute a waiver of any defense that would otherwise be available to the Debtor, the Plan Trust, the Settlement Trust, or any Non-Debtor Catholic Entity under applicable law.

168.  "Survivor Claimant" means the holder of a Survivor Claim.

169.  "Survivor Claims Arbitration Procedures" has the meaning set forth in Section 10.4.

170.  "Survivor Claims Arbitrator" has the meaning set forth in Section 10.4.

A-19

171.    "Survivor Election Deadline" has the meaning set forth in Section 10.2.

172.    "Survivor Claims Mediator" has the meaning set forth in Section 10.5.

173.    "Survivor Convenience Claim" means, if the Plan is confirmed as a CDOW-Only Plan, a Survivor Claim the holder of which elects treatment pursuant to Section 10.6.

174.    "Survivor Litigation Claim" means, if the Plan is confirmed as a CDOW-Only Plan, a Survivor Claim the holder of which elects treatment pursuant to Section 10.5.

175.    "Third-Party Administrators" means the administrators of the Debtor's self-insured lay and clergy healthcare plans.

176.    "Third-Party Indemnity Claim" means a Claim for indemnification or contribution asserted against the Debtor, whether asserted as a cross-claim or a third-party claim.

177.    "Treasury Regulations" means 31 C.F.R. §§ 900 *et seq.*

178.    "Undisputed Restricted PIA Funds" means, collectively, any Restricted PIA Funds which are not Disputed Restricted PIA Funds.

179.    "Unimpaired" means, with respect to a Class of Claims, that such Class is not Impaired.

180.    "Unrestricted Asset" means an Asset of the Estate that is not subject to any legally enforceable restriction requiring use or disposition of such Asset for a particular purpose and precluding use of such Asset for the Debtor's general corporate purposes.

181.    "Unrestricted PIA Funds" means, collectively, (i) the fractional equitable interests, if any, in the Pooled Investment Account represented by sub-funds F0010, F0050, F0060, F0065, F0080, F0085, and F0180 in the Debtor's books and records, (ii) if the Plan is confirmed as a CDOW-Only Plan, then subject to Section 12.4, the Estate's interest, if any, in the Disputed Non-Debtor PIA Funds, the Disputed Restricted PIA Funds, and the Lay Pension Fund, and (iii) if the Plan is confirmed as a CDOW-Only Plan, then to the extent the IBNR Reserves are maintained in the Pooled Investment Account, the Plan Trust's residual interest in the IBNR Reserves pursuant to 9.5.

182.    "Unsecured Claims" means all Claims other than S/A/P Claims.

183.    "U.S. Trustee" means the Office of the United States Trustee for the District of Delaware.

184.    "Voting Deadline" means the deadline established by the Bankruptcy Court by which a holder of a Claim must execute and deliver its Ballot in order to cast a vote to accept or reject the Plan.

068902.1001

185.    "Voting Record Date" means the date established by the Bankruptcy Court for the purpose of determining eligibility to receive a Ballot in order to cast a vote to accept or reject the Plan.

186.    "Wilmington Trust Claim" means the Claim of Wilmington Trust Company arising under the DEDA Loan Agreement, the Indenture, the Reimbursement Agreement (Security Agreement) dated as of November 14, 2002, and related documents.

YCST01:10153468.16                                    068902.1001

## EXHIBIT B

### DISPUTED NON-DEBTOR PIA FUNDS
#### (Balances as of October 20, 2009)

| Sub-Fund # | Amount ($) | Non-Debtor Pooled Investor |
|---|---|---|
| F0550 | 1,222,517.19 | St. Thomas the Apostle Roman Catholic Church |
| F0560, F0565, F0570 | 662,690.50 | Corpus Christi Roman Catholic Church |
| F0592 | 109,275.05 | St. Francis de Sales Roman Catholic Church |
| F0600 | 526.43 | Holy Rosary Roman Catholic Church |
| F0620 | 3,193.87 | Mullery Memorial Scholarship Trust |
| F0640 | 337,521.64 | Our Lady of Lourdes Roman Catholic Church |
| F0650 | 21,335.23 | Our Mother of Sorrows Roman Catholic Church |
| F0655 | 87,381.82 | St. Mary Refuge of Sinners Roman Catholic Church |
| F0660 | 83,379.08 | Holy Cross Roman Catholic Church |
| F0545, F0670, F1080, F1090 | 432,734.48 | Cathedral of St. Peter Roman Catholic Church |
| F0680, F0690 | 233,203.01 | Holy Family Roman Catholic Church |
| F0700 | 88,101.91 | St. Polycarp Roman Catholic Church |
| F0710 | 10,866.57 | St. Paul Roman Catholic Church |
| F1230, F1240 | 79,446.70 | St. Benedict Roman Catholic Church |
| F1250 | 5,003.52 | St. Luke/St. Andrew Roman Catholic Church |

B-1

| Sub-Fund # | Amount ($) | Non-Debtor Pooled Investor |
|---|---|---|
| F1260 | 125,719.48 | St. Edmond Roman Catholic Church |
| F1270, F1280 | 274,343.42 | St. John the Beloved Roman Catholic Church |
| F0720, F0745, F0750, F0760 | 44,032,520.35 | Catholic Diocese Foundation |
| F0770, F0775, F0780, F0790, F0870 | 2,311,511.54 | Catholic Charities, Inc. |
| F0800, F0810 | 3,435,463.87 | Seton Villa, Inc. |
| F0820 | 3,714,800.31 | Siena Hall, Inc. |
| F0830 | 4,354,390.55 | Children's Home, Inc. |
| F0840, F0842, F0843, F0844, F0845, F0846, F0847, F0848, F0849, F0850, F0860 | 7,260,609.95 | Catholic Cemeteries, Inc. |

B-2

| Sub-Fund # | Amount ($) | Non-Debtor Pooled Investor |
|---|---|---|
| F0880, F0890, F0891, F0892, F0900, F1130, F1140, F1150, F1160, F1170, F1180, F1190, F1200 | 6,556,988.04 | Diocese of Wilmington Schools, Inc. |
| F0910, F0920 | 207,197.96 | Catholic Youth Organization, Inc. |
| F0930 | 101,451.37 | Society for the Propagation of the Faith |
| **TOTAL** | **75,772,886.67** | |

B-3

## EXHIBIT C

## DEBTOR AND NDCE REAL PROPERTY

| Property | Description | Owner |
|---|---|---|
| Bishop's Residence | 1307 North Bancroft Parkway Wilmington, Delaware | Debtor |
| CDF Ocean City | Four parcels of real property located in north Ocean City, Worcester County, Maryland, identified as Worcester County Tax IDs: Map 118, Grid 5, Parcel 7212A, 7201A, 7213A, 7208A, 7209A, 7210A, 7211A; Map 8, Grid 4, Parcel 7216A; Map 8, Grid 4, Parcel 7217A; and Map 8, Grid 10, Parcel 120B | Catholic Diocese Foundation |
| CDF Princess Anne | 12.18 ± acre parcel of vacant real property located on Mt. Vernon Road in Somerset County, Maryland identified as Somerset County Tax ID: Map 8, Grid 24, Parcel 57 (Account #01-013092) | Catholic Diocese Foundation |
| CDF Summit/896 | 669 Old Summit Bridge Road Middletown, Delaware | Catholic Diocese Foundation |
| CDF Easton/Rte 50 | 35.72 ± acre parcel of vacant real property that is located on S Route 50 (Ocean Gateway) and Washington Street in the Town of Easton, Talbot County, Maryland identified as Talbot County Tax ID: Map 108, Parcel 2678F (Account #01-069888) | Catholic Diocese Foundation |
| Children's Home | 2901 Green Street Claymont, Delaware | Children's Home, Inc. |
| Seton Villa | 800 Bellevue Road Wilmington, Delaware | Seton Villa, Inc. |
| Gates of Heaven Parcel | 35.18 ± acre parcel of vacant real property located on Vines Creek Road and Wingate Road at the rear of the Gates of Heaven cemetery property near the Town of Dagsboro in Sussex County, Delaware identified as Sussex County Tax ID: 1-34-10.00-44.01 | Catholic Cemeteries, Inc. |

YCST01:10153468.16                                                                                                068902.1001

## EXHIBIT D

**SETTLEMENT PLAN:
NON-MONETARY PROVISIONS RELATING TO DOCUMENTS**

YCST01:10153468.16                                                                                    068902.1001

## NON-MONETARY PROVISIONS RELATING TO DOCUMENTS

1.    As used herein "CDOW Entities" shall mean the Diocese, all Parishes, and any school, office, association or other entity under the direct or indirect control of the Diocese including, without limitation, all such entities listed in current and future editions of the Official Catholic Directory.

2.    Any Settling Party will subscribe to all non-monetary provisions set forth in the Plan of Reorganization unless expressly agreed to otherwise by the Committee. As used in this term sheet, the term "Settling Parties" will mean the CDOW Entities and, to the extent that they opt in to the global plan settlement, the religious orders and any third party settling through the Plan other than abuse victim claimants. To the extent of any and all privilege waivers and ongoing compliance obligations set forth herein, "Settling Parties" shall also include any and all priests, religious, employees, agents and assigns of the Settling Parties referenced in the prior sentence who are obtaining a release under the Plan of Reorganization.

3.    In connection with the production of Documents set forth herein, the Settling Parties shall waive any and all privileges and defenses, if any, associated with any Constitutional protections the Settling Parties might otherwise seek to assert. The Settling Parties agree that the only bases for withholding Documents from production are the following secular privileges (collectively, the "Stipulated Privileges"): (a) attorney-client privilege; (b) work product protection; (c) priest-penitent privilege (provided, however, that as all communications relevant in this document are presumed to be non-documentary, any privilege raised under this privilege will be specifically identified as "priest-penitent privilege asserted" in the Privilege Log (hereafter defined)); and (d) religious advisor privilege (i) as currently-existing under Delaware law, but only to the extent the relevant Document is privileged under the law of that state, or (ii) as currently-existing under Maryland law but only to the extent the relevant Document is privileged under the law of that state. The Settling Parties further agree that, although they may assert a Stipulated Privilege as to any Document subject to such a Privilege, the Stipulated Privileges shall be defined and interpreted as they now exist under applicable law, and that the Settling Parties will not seek to expand or broaden the scope or nature of the Stipulated Privileges in any venue, legislative, judicial or otherwise. The Settling Parties further agree that the failure to assert an applicable Stipulated Privilege as to any particular Document will not waive the appropriate assertion of such Stipulated Privilege as to any other Document. The Special Arbitrator[1] will rule on any disputes relating to the Stipulated Privileges as set forth below in paragraph 6.

4.    "Documents" shall mean the following, whether public or non-public, to the extent such Documents relate to abusive persons regarding whom there are admitted corroborated or otherwise substantiated allegations of sexual abuse of minors (individually, an "Abusive Person" or collectively "Abusive Persons"):[2] all personnel files, all documents relating

---

[1] The Special Arbitrator will be determined by mutual agreement of the Committee and the applicable Settling Party prior to the Effective Date, and will be replaced by another mutually acceptable party to the extent he or she resigns or is otherwise incapable of serving. In the event the parties cannot agree on a mutually acceptable party to serve as Special Arbitrator, the Bankruptcy Court will, upon motion, appoint one on an expedited basis.

[2] Such Documents to include, without limitation, all correspondence and other communications by, between, among, addressed to, or received by any Bishop of the Diocese, any other Diocesan official including, but not limited to, any

D-2

to the supervision, placement, and/or remedial steps taken with respect to any Abusive Person, including all transcripts (electronic or otherwise) and video depositions from litigation involving any Abusive Person, all exhibits and other documents of any type related to sexual abuse tort litigation; in addition, "Documents" shall also include, to the extent relating to or in any way referencing sexual abuse or alleged sexual abuse of minors, or in any other way relating to the supervision, placement, and/or remedial steps taken with respect to any Abusive Person, the following: all documents, files, and other information including, without limitation, the diaries of all deceased bishops of the Diocese of Wilmington, correspondence, "bishop's papers," in video and audio recordings, archives, electronic data and other media sources of any kind, whether public or non-public and all exhibits and other documents of any type filed or produced in sexual abuse tort litigation.

5.    In order to continue its efforts to prevent sexual abuse from occurring in the future, the CDOW Entities will provide to the Committee the Documents required to be produced, together with a privilege log (the "Privilege Log") of any Documents withheld from production. Production will be on a rolling basis after the Effective Date, and will be completed within 120 days after the Effective Date (the "Production Deadline Date"). Subject to the limitations of paragraph 6, the Committee and its members shall have sole and exclusive authority to use such Documents in any matter that they may deem appropriate.

6.    *No victim's or innocent third party's identity may be released or revealed without his or her express permission.* Within 60 days following the Production Deadline Date, any and all challenges and disputes to the production made by the Settling Parties (as the case may be, a "Documentary Dispute") will be made by detailed letter to the Special Arbitrator and copied to counsel to the CDOW Entities and/or counsel to any non-CDOW Settling Party, as applicable any response by or on behalf of the CDOW Entities regarding a Documentary Dispute shall be made by letter to the Special Arbitrator and copied to counsel for the party who submitted the challenge or dispute within 20 days following the submission. By letter to counsel for the CDOW Entities (or any non-CDOW Settling Party, as applicable) and counsel to the Committee, the Special Arbitrator will rule on any Documentary Dispute within 60 days following the submission the Documentary Dispute to the Special Arbitrator. The Special Arbitrator's letter ruling will be binding on all parties and final and non-reviewable by any court or other tribunal or authority.

7.    Regarding Documents that are medical records, the Settling Parties will comply with applicable laws and regulations to the extent that such laws and regulations have not been waived by the party to whom such Documents relate[3], but, with the exception of Catholic Charities, the Settling Parties agree not to oppose a court order requiring the production of such Documents. Catholic Charities shall produce Documents that are medical records only to the extent (a) such Documents relate to a Settling Party who is also an Abusive Person who received treatment by or through Catholic Charities; or (b) an appropriate records release authorization

---

vicar general, vicar for clergy, chancellor, pastor, priest, lay employee, volunteer, or provincial and/or other member of any religious congregation.

[3] For the avoidance of doubt, it is expressly intended that except for the Stipulated Privileges and disclosure of identities of victims or innocent third parties, any party receiving a release under the Plan as a "Settling Party" will have waived all privileges and disclosure protections, including privileges and disclosure protections associated with HIPPA.

has been executed by a person who received counseling or other treatment services by or through Catholic Charities. No Settling Party will retain counsel for itself to contest the production of any Document, except to the extent such production is contested on the basis of applicable privilege or required non-disclosure. No Settling Party will retain counsel for any third party to contest production of any Document, on any basis, or otherwise support, such a third party challenge. To the extent any Documents required to be produced have been placed under seal, the Settling Parties agree that, if requested, they will support an application to the pertinent court to unseal such Documents.

8.     The Settling Parties shall allow the Special Arbitrator to have complete access to inspect Diocesan files and archives to ensure that all Documents have been produced. The Special Arbitrator, at his or her sole discretion, may consult with any person to assist with carrying out his or her duties, but only the Special Arbitrator will have access to inspect Diocesan files and archives. The purpose of this inspection right is to verify that all Documents have been released, which verification shall be final and non-reviewable by any court or other tribunal or authority.

**EXHIBIT E**

**SETTLEMENT PLAN:**
**ADDITIONAL NON-MONETARY PROVISIONS**

E-1

## NON-MONETARY UNDERTAKINGS OF THE
## CATHOLIC DIOCESE OF WILMINGTON, INC.

1.      For a period of not less than ten (10) years after the Effective Date, the Diocese will post on the Diocesan Web site home page (www.cdow.org/), or its successor, the names of all known diocesan clergy or lay employees regarding whom there are admitted, corroborated or otherwise substantiated allegations of sexual abuse, molestation and rape of minors. The Diocese and the Official Committee of Unsecured Creditors will agree on the list of names prior to the Effective Date. Any disputes regarding this list will be resolved by the Special Arbitrator.[1] After the Effective Date, the Diocese will add any additional names to list to the extent the criteria set forth above is satisfied. Notwithstanding the foregoing, the Diocese shall maintain the posting for any longer period of time if recommended by the U.S. Conference of Catholic Bishops.

2.      Diocese will make available reasonable space (approximately 500 words or ½ page) in each issue of the diocesan newspaper, *The Dialog*, or its successor, for one (1) year after the Effective Date to allow any Allowed Tort Claimants (other than persons who elect Convenience Class Treatment) to tell his or her story of abuse by priests, religious or lay employees, if they desire to publish their story. The Diocese reserves the right to object to publishing any letter that contains unnecessary profanity or other objectionable material and to the extent the objection cannot be resolved, it will be decided by the Special Arbitrator, whose decision will be final and non-reviewable. To the extent the Dialog is no longer published, any such letters will be posted on the Diocesan Web site for at least as long as the posting described in paragraph 1 is maintained.

3.      Within a reasonable time after the effective date of the Plan, the Bishop or principal leader of Settling Party will send letters of apology to any Allowed Tort Claimant or immediate family members who requests a letter. Letters of apology will state that the survivor was not at fault for the abuse and that the Diocese takes responsibility for the abuse. The Bishop will personally sign the letters of apology.

4.      The Diocese will institute a policy requiring that the Bishop, all Ecclesiastical Officers, Department Heads and official spokespersons not refer either verbally or in print to sexual abuse claimants as "alleged" claimants, "alleged" victims or "alleged" survivors and will require the same to refer to claimants as "survivors of clergy sexual abuse" or "survivors of sexual abuse perpetrated by lay employees."

5.      Annually, the Bishop, all Ecclesiastical Officers[2] and Department Heads will certify and affirm in writing, that they have no undisclosed knowledge of priests or lay

---

[1] The Special Arbitrator will be determined by mutual agreement of the Committee and the CDOW Entities prior to the Effective Date, and will be replaced by another mutually acceptable party to the extent he or she resigns or is otherwise incapable of serving. If the Committee and the CDOW Entities cannot agree on a mutually acceptable party to serve as Special Arbitrator, the Bankruptcy Court will, upon motion of either party, appoint the Special Arbitrator on an expedited basis.

[2] For the Diocese, Ecclesiastical Officers shall include the Chancellor, the Vicar General for Administration, the Vicar General for Pastoral Services, and the Vicar for Priests. For Religious Congregations, Ecclesiastical Officers shall include the Provincial, members of any Provincial Council, all religious superiors, and any personnel responsible for the placement, supervision, and/or fitness of congregation members.

E-2

employees regarding whom there are admitted, corroborated or otherwise substantiated allegations of sexual abuse of minors after the Effective Date, or, if they have such knowledge, other than through a Stipulated Privilege, that it has been reported to law enforcement in accordance with applicable legal mandatory reporting requirements or reporting protocols. Every five years, all priests, and vowed religious employees, in active ministry of the Diocese also will make such a certification, substantially in the form attached hereto as Exhibit "A," as provided in the "For the Sake of God's Children" program. In connection with his annual certification, the Bishop will write to all priests and religious employees in active ministry and instruct them to inform him about any priests, religious or lay employees regarding whom there are admitted, corroborated or otherwise substantiated allegations of sexual abuse of minors after the Effective Date. With his annual letter, the Bishop will include the certification form attached as Exhibit A, and will encourage priests and religious employees also to sign the certification on an annual basis.

6.      The Diocese will prominently display a plaque in each Diocesan or parish school stating: "The abuse of the spiritual, emotional, physical and moral well-being of the children and young men and women of [name of school] shall not be tolerated" The dimensions of these plaques shall be no less than 8.5 inches by 11 inches shall be placed next to the door of the primary leader, Bishop, Provincial or Principal's office. Plants, furniture, or any other items shall not obstruct these plaques.

7.      The Diocese of Wilmington's seminarians, regardless of where they are in training as candidates for the priesthood in the Diocese of Wilmington, in addition to their education and training at their seminaries regarding the childhood sexual abuse and the prevention, detection and reporting of such abuse, shall be required to hear directly, annually, from survivor-advocates and third-party child protection professionals mutually acceptable to the Diocese and the Child Protection Consultant (defined below) about the devastating impact of childhood sexual abuse on the lives of survivors and the critical importance of the seminarians' responsibility to report any suspicions or knowledge of abuse to the proper civil authorities. Settling Parties such as religious orders or the Provincial shall make similar arrangements for volunteer survivor-advocates and mutually acceptable child protection professionals to speak in front of their seminarians on an annual basis. The Child Protection Consultant will evaluate and make public recommendations with respect to the foregoing programs and shall be permitted to attend and observe the inaugural presentation to the seminarians and subsequently attend and observe these presentations not less frequently than every five years.

8.      As of the Effective Date, the Diocese will retain a third-party expert in the field of child protection that is mutually acceptable to the Diocese and the Committee (the "Child Protection Consultant") for the purpose of: (a) reviewing and making recommendations with respect to the regular seminarian training programs as set forth in paragraph 7 and approving third-party professionals involved with such programs; and (b) evaluating and making public recommendations with respect to all current and future child protection programs administered by the Diocese. Such public recommendations will be issued by the Child Protection Consultant for the first time within 120 days of the Effective Date, and thereafter in accordance with the timetable set forth below. The Diocese will fund all current and future costs and expenses associated with retaining the Child Protection Consultant.

E-3

9.    The Diocese shall publicly announce and post on www.cdow.org/ for a period of five (5) years its policy of releasing all survivors from any confidentiality provisions in settlement agreements, which they signed as a condition to such settlements. The Diocese shall contact counsel for all survivors who entered into such confidentiality agreements to inform them that they are not bound by such agreements. In addition, the Diocese agrees that all confidentiality agreements involving sex abuse survivors are terminated and that the identities of priests or lay persons named in settlement agreements containing confidentiality provisions may be made public. No victim's identity may be released or revealed without his or her permission. The Diocese shall forbid confidentiality provisions in any settlement agreement related to sexual abuse entered into by the Diocese and/or parish except at the written request of the survivor claimant.

10.    Within 30 days of the Effective Date, the Bishop in his official and personal capacity shall issue a written statement of gratitude for the survivors who have the courage to speak about the sexual abuse they suffered as minors. This statement will be posted on www.cdow.org and within fifteen (15) days of the Effective Date published prominently in a ½ page ad in *The Dialog* and a ½ page ad in *The News Journal*. Within two (2) years after the Effective Date, the Bishop will personally visit each parish where a priest regarding whom there are admitted, corroborated or otherwise substantiated allegations of sexual abuse of minors was assigned. The Bishop will express his gratitude for the survivors who have had the courage to speak about the sexual abuse they suffered as minors and will apologize. The Bishop's visit will be scheduled and publicized on www.cdow.org and in parish bulletins at least thirty days in advance.

11.    The Diocese shall continue to require and fund annual mandatory reporting training for all of its employees. The Child Protection Consultant will evaluate and make public recommendations with respect to the foregoing program.

12.    The Diocese shall continue to develop, publish and implement a child abuse prevention curriculum ("Keeping Our Promises") for all Catholic schools in the Diocese of Wilmington affiliated with the Diocese and/or Settling Party, and in all parish religious education programs. Each parochial and private Catholic school in the Diocese of Wilmington affiliated with the Diocese and/or Settling Party shall adopt a curriculum that informs and empowers those served by Catholic education in a manner that fosters dignity, prevents abuse, and encourages communication of potential and actual abuse. The curriculum shall educate children, young people and their parents in a manner that prepares them to create and maintain a safe environment. The curriculum shall be age-appropriate, and include instruction in ways to prevent, identify and report child sex abuse. Full compliance with a ZERO TOLERANCE policy is mandatory. The Child Protection Consultant will evaluate and make public recommendations with respect to the foregoing programs.

13.    The Diocese currently maintains a child protection program called "For the Sake of God's Children." This program includes the education and training of seminarians regarding the detection, prevention and reporting of child sexual abuse, mandatory reporting training for all lay employees with regular contact with children, and a child abuse prevention curriculum, "Keeping Our Promises." This program was designed, and has been implemented and overseen by several committees that include professionals in fields dealing with child abuse. The Child

Protection Consultant will evaluate and make public recommendations with respect to the foregoing programs.

14.    Not less frequently than every five years after the Effective Date, the Diocese will retain the Child Protection Consultant, or another third-party expert that is mutually acceptable to the Diocese and the Child Protection Consultant, to re-evaluate and make recommendations with respect to the programs and procedures referenced above. Upon appointment, such third-party will then act as Child Protection Consultant hereunder until such time as he or she is succeeded by another mutually accepted third-party as described above.[3]

15.    On an annual basis the Diocese will submit to the Child Protection Consultant and publish on its Web site its annual audit, prepared in accordance with the instructions specified on Schedule 1 attached hereto, of: (a) its compliance with the United States Conference of Catholic Bishops' *Charter for the Protection of Children and Young People;* and (b) the foregoing child protection programs. The Diocese may itself retain the Child Protection Consultant to conduct the annual audit.

16.    The Bishop shall issue a public statement regarding the Child Victim's Act that will include an acknowledgement that he has been told by survivors of sexual abuse that the Act helped many of them to come forward and deal with the abuse they suffered, and that he is grateful that they have done so.

17.    The Diocese shall publish on the Diocesan Web site home page (www.cdow.org/), or its successor, as standalone documents, the two finalized, mutually agreed upon lists of non-monetary stipulations for a period of one (1) year.

18.    To the extent any non-CDOW Entity becomes a Settling Party under the Plan, such non-CDOW Settling Party shall be responsible for payment of all costs and expenses associated with such non-CDOW Settling Party's own compliance with the non-monetary provisions.

---

[3] In the event that any sitting Child Protection Consultant is unwilling or unable to choose its successor, the Diocese or any other claimant in the bankruptcy case will petition the Special Arbitrator to appoint a successor Child Protection Consultant. In the event that the Special Arbitrator is unwilling or unable to choose a successor Child Protection Consultant, the Diocese or any other claimant in the bankruptcy case will petition the Bankruptcy Court to appoint a successor Child Protection Consultant.

## EXHIBIT A

## <u>CERTIFICATION</u>

I understand that priests are to keep confidential all information which is disclosed while serving in a professional role as a religious authority and representative of the church. I understand, and agree to abide by, the state laws of Maryland and Delaware (as applicable depending on my assignment) regarding the religious advisor privilege applicable to such confidential information

In accordance with the norm of canon law (c.963), the sacramental seal is inviolable. I understand, therefore, that it is absolutely forbidden for a confessor to betray the confidence of a penitent in any way and for any reason. I understand that this proscription is applicable whether the penitent is living or dead.

I also understand, however, that the state laws of Delaware and Maryland require that I report child abuse to civil law enforcement authorities, unless I learned of such abuse under the sacramental seal of confession, or in a communication required to be kept confidential under the Delaware or Maryland religious advisor privilege.

To the best of my knowledge, information and belief, I certify that I have no undisclosed knowledge of child abuse after [the Effective Date] that is required to be reported to law enforcement, or, if I have such knowledge, I certify that it has been reported to law enforcement in accordance with applicable civil law.

Dated: _____    _____
                                    [PRIEST]

YCST01:10985210.1                                    068902.1001

**EXHIBIT F**

**CDOW-ONLY PLAN:**
**NON-MONETARY PROVISIONS**

YCST01:10153468.16

068902.1001

## NON-MONETARY UNDERTAKINGS OF THE
## BISHOP AND THE REORGANIZED DEBTOR

**I.    DEFINITIONS**

1.    "Abuse-Related Documents" means the following, to the extent such documents relate to sexual abuse of minors by clergy, religious, and lay employees, members or affiliates of the Diocese, the Debtor, or the Non-Debtor Catholic Entities relating to sexual abuse of minors: any and all personnel files, all communications related to Abusers, electronic transcripts and video depositions of all defendants, plaintiffs and witnesses, all exhibits and other documents of any type related to sexual abuse tort litigation, all documents, information, correspondence or communications (including, without limitation, all correspondence and other communications by, between or among any Bishop of the Diocese, any other Diocesan official including, but not limited to, any vicar general, vicar for clergy, chancellor, pastor, priest, provincial and/or other member of any religious congregation), files, video and audio recordings, archives, electronic data and other media sources of any kind, whether public or non-public.

2.    "Abuser" means persons regarding whom there are admitted, corroborated or otherwise substantiated allegations of sexual abuse of minors, who shall be identified in a Supplemental Plan Document.

3.    "Diocesan Website" means http://www.cdow.org, or its successor site.

**II.    PUBLIC ACCESS TO ABUSE-RELATED DOCUMENTS**

1.    In order to promote healing and reconciliation, and to continue its efforts to prevent sexual abuse from occurring in the future, the Reorganized Debtor will establish and maintain, for a period of not less than ten (10) years from the Confirmation Date, a hard-copy depository of Abuse-Related Documents at a location selected by the Reorganized Debtor, in consultation with the Creditors Committee, and identified in a Supplemental Plan Document. The depository will be open to the general public on Tuesday of each week from 10 a.m. until 4 p.m., or by appointment at a mutually agreeable time.

2.    In connection with the production of Abuse-Related Documents set forth herein, the Reorganized Debtor and the Non-Debtor Catholic Entities shall waive any and all privileges and defenses, if any, associated with any Constitutional protections the Settling Parties might otherwise seek to assert. The Reorganized Debtor and the Non-Debtor Catholic Entities agree that the only bases for withholding Abuse-Related Documents from production are privileges established by statute, court rule, or common law, and laws and regulations requiring non-disclosure (e.g., HIPPA); provided, however, that the Reorganized Debtor and the Non-Debtor Catholic Entities, other than Catholic Charities, Inc., agree not to oppose a court order requiring the production of Abuse-Related Documents that are medical records. Catholic Charities, Inc. shall produce Abuse-Related Documents only to the extent an appropriate records release authorization has been executed by a person who received counseling or other treatment services provided by Catholic Charities, Inc. To the extent any Abuse-Related Documents subject to production are filed with a court under seal, or otherwise have been placed under seal pursuant to a court order or stipulation, the Reorganized Debtor and the Non-Debtor Catholic Entities agree

F-2

that, if requested by the Creditors Committee or by counsel for the holder of an Allowed Survivor Claim, other than a Survivor Convenience Claim, they will support an application to the court to unseal such Abuse-Related Documents.

3.    No Survivor's identity may be released or revealed without his or her express permission.

4.    Neither the Reorganized Debtor nor any Non-Debtor Catholic Entity will retain counsel for itself to contest the production of any Abuse-Related Document, except to the extent such production is contested on the basis of applicable privilege or required non-disclosure, consistent with the foregoing paragraph 3. Neither the Reorganized Debtor nor any Non-Debtor Catholic Entity will retain counsel for any third party to contest production of any Abuse-Related Document, on any basis, or otherwise support such a third party challenge.

5.    The Reorganized Debtor and the Non-Debtor Catholic Entities will allow the Special Arbitrator to have complete access to inspect Diocesan files and archives to verify that all Abuse-Related Documents have been released, such verification being final and non-reviewable by any court or other tribunal or authority.

## II.    APOLOGIES TO SURVIVORS

Within a reasonable time after the allowance of any Survivor Claim pertaining to Abuse by a Diocesan priest or lay employee, the Bishop will send a letter of apology to the Survivor claimant or an immediate family member of the Survivor claimant who requests such a letter. Letters of apology will state that the Survivor was not at fault for the abuse and that the Diocese takes responsibility for the abuse. The Bishop will personally sign the letters of apology.

## III.    CONTINUATION OF CHILD PROTECTION PROGRAMS

The Reorganized Debtor will continue to comply in all respects with (i) the *Charter for the Protection of Children and Young People* adopted by the U.S. Conference of Catholic Bishops in 2002, and (ii) the *For the Sake of God's Children* program adopted by the Diocese in 2003. The Reorganized Debtor will publish on the Diocesan Website the results of the annual audit conducted pursuant to the *Charter for the Protection of Young People*.

## IV.    RELEASE OF SURVIVORS FROM CONFIDENTIALITY OBLIGATIONS

The Bishop will continue the current policy of releasing Survivors from any confidentiality provisions in settlement agreements that they may have signed as a condition to such settlements in the past, and will continue the current policy of forbidding confidentiality provisions in any settlement agreement related to sexual abuse, except at the written request of the Survivor. The Reorganized Debtor will publicly announce this policy and post it on the Diocesan Website for a period of five (5) years, and will attempt to contact counsel for all Survivors who entered into such confidentiality agreements to inform them that they are not bound by such agreements. In addition, the Reorganized Debtor agrees that all confidentiality agreements involving Survivors are terminated and that the identities of priests or lay persons named in settlement agreements containing confidentiality provisions may be made public. The

F-3

Reorganized Debtor will not release or reveal any Survivor's identity without his or her permission.

## V.    PUBLIC LISTING OF ABUSERS

For a period of not less than ten (10) years after the Effective Date, the Reorganized Debtor will post on the home page of the Diocesan Website the names of all known Abusers. The Reorganized Debtor will update the list if and when additional Abusers become known. Notwithstanding the foregoing, the Reorganized Debtor shall maintain the posting for any longer period of time if that is recommended by the U.S. Conference of Catholic Bishops.

## VI.    PUBLICATION OF SURVIVOR STATEMENTS

The Reorganized Debtor will make available reasonable space (approximately 500 words or ½ page) in each issue of the Diocesan newspaper, *The Dialog*, or its successor, for one (1) year after the Effective Date to allow any holder of an Allowed Survivor Claim, other than a Survivor Convenience Claim, to tell his or her story of abuse by priests, religious or lay employees, if he or she desires to publish his or her story. The Reorganized Debtor reserves the right to object to publishing any letter that contains unnecessary profanity or other objectionable material and, to the extent the objection cannot be resolved, it will be decided by the Special Arbitrator whose decision will be final and non-reviewable. To the extent *The Dialog* is no longer published, any such letters will be posted on the Diocesan Website for at least as long as the posting described in the foregoing Section V is maintained.

## VII.    PUBLIC STATEMENTS REGARDING SURVIVORS

The Bishop will institute a policy requiring that all ecclesiastical officers, department heads and official spokespersons of the Diocese not refer either verbally or in print to sexual abuse claimants as "alleged" claimants, "alleged" victims or "alleged" survivors and will require the same to refer to claimants as "survivors of clergy sexual abuse" or "survivors of sexual abuse perpetrated by lay employees."

## VIII.    ANNUAL CERTIFICATION BY BISHOP

Annually, the Bishop will certify in writing that he has no undisclosed knowledge of any Abuser, or, if he has such knowledge, that it has been reported to law enforcement in accordance with applicable legal mandatory reporting requirements or reporting protocols.

## IX.    PLAQUES IN SCHOOLS

The Bishop will institute a policy requiring prominent display of a plaque in each Diocesan or Parish school stating: "The abuse of the children and young men and women of [name of school], or other harm to their spiritual, emotional, physical or moral well-being, shall not be tolerated." The dimensions of these plaques shall be no less than 8.5 inches by 11 inches, and the plaques shall be placed next to the office door of the primary leader, the Bishop, or the principal, as applicable. Plants, furniture, or any other items shall not obstruct these plaques.

F-4

## X.    SEMINARIAN TRAINING

The Bishop will institute a policy requiring Diocesan seminarians, regardless of where they are in training as candidates for the priesthood in the Diocese of Wilmington, in addition to their education and training at their seminaries regarding the childhood sexual abuse and the prevention, detection and reporting of such abuse, to hear directly, annually, from survivor-advocates about the devastating impact of childhood sexual abuse on the lives of survivors and the critical importance of the seminarians' responsibility to report any suspicions or knowledge of abuse to the proper civil authorities.

## XI.    STATEMENT OF GRATITUDE BY BISHOP

Within 30 days of the Effective Date, the Bishop, in his official and personal capacities, shall issue a written statement of gratitude for the Survivors who have the courage to speak about the sexual abuse they suffered as minors. This statement will be posted on the Diocesan Website and, within fifteen (15) days of the Effective Date, published prominently in a ½ page ad in *The Dialog* if still published. Within two (2) years after the Effective Date, the Bishop will personally visit each Parish where an Abuser priest was assigned. The Bishop will express his gratitude for the Survivors who have had the courage to speak about the sexual abuse they suffered as minors and will apologize. The Bishop's visit will be scheduled and publicized on the Diocesan Website and in Parish bulletins at least thirty days in advance.

## XII.    MANDATORY REPORTING TRAINING

The Bishop will continue the current policy requiring, and the Reorganized Debtor shall continue funding, annual mandatory reporting training within the Diocese.

## XIII.    ABUSE PREVENTION CURRICULUM

The Bishop will continue the current policy requiring the development, publication, and implementation of a child abuse prevention curriculum for all Diocesan and Parish schools.

## XIV.    PUBLICATION OF NON-MONETARY UNDERTAKINGS

The Reorganized Debtor will publish on the Diocesan Website home page, as a stand-alone document, these non-monetary undertakings for a period of one (1) year after the Effective Date.

YCST01:10981477.1          068902.1001