# Exhibit B

Modified Second Amended Disclosure Statement Blackline

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CATHOLIC DIOCESE OF WILMINGTON, INC., a Delaware Corporation, | Case No. 09-13560 (CSS) |
| Debtor.[1] | Honorable Christopher S. Sontchi |

## DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE WITH RESPECT TO THE SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF CATHOLIC DIOCESE OF WILMINGTON, INC.

~~PLEASE NOTE THAT THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE UNDER § 1125 OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE CHAPTER 11 PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN. THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF § 1125 OF THE BANKRUPTCY CODE.~~

Dated: ~~April 19,~~May 23, 2011

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Anthony G. Flynn (No. 74)
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Maris J. Finnegan (No. 5294)
Patrick A. Jackson (No. 4976)
Justin H. Rucki (No. 5304)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600

---

[1] The last four digits of the Debtor 's federal tax identification number are 5439. The Debtor's mailing address is 1925 Delaware Avenue, P.O. Box 2030, Wilmington, Delaware 19899-2030.

Facsimile: (302) 571-6600

*Counsel to the Debtor*

    068902.1001

**TABLE OF CONTENTS**

| | | **Page** |
|---|---|---|
| I. | INTRODUCTION | 1 |
| A. | General Information Regarding this Disclosure Statement | 3 |
| B. | Disclosure Statement Enclosures | 4̶5 |
| C. | Summary of Plan Treatment of Claims | 5 |
| D. | Estimated Claims and Distributions | 7 |
| 1. | In Settlement Plan | 7̶8 |
| 2. | In CDOW-Only Plan | 9 |
| a. | *Assuming the Status Quo* | 1̶0̶11 |
| b. | *Assuming Maximum Plan Trust Assets* | 1̶1̶13 |
| c. | *Assuming Minimum Plan Trust Assets* | 1̶2̶11 |
| E. | Recommendation | 13 |
| II. | ELIGIBILITY TO VOTE | 1̶3̶14 |
| III. | BACKGROUND OF THE DEBTOR AND THE CHAPTER 11 CASE | 1̶4̶15 |
| A. | General Background | 1̶4̶15 |
| 1. | Structure and Organization of the Church | 15 |
| a. | *Juridic Persons and Property Ownership* | 15 |
| b. | *Dioceses and Parishes* | 16 |
| c. | *Religious Orders* | 1̶6̶17 |
| 2. | The Diocese and the Debtor | 17 |
| 3. | The Parishes and the Non-Debtor Parish Corporations | 18 |
| 4. | Other Non-Debtor Catholic Entities | 19 |
| a. | *Catholic Diocese Foundation* | 19 |
| b. | *Entities Managed by the Bishop* | 1̶9̶20 |
| B. | CDOW's Operations and Assets | 2̶1̶22 |
| 1. | CDOW's Sources of Income | 2̶1̶22 |
| a. | *Parish Assessments* | 2̶1̶22 |
| b. | *Annual Appeal* | 2̶1̶22 |
| 2. | Operations | 2̶2̶23 |
| a. | *Payroll Services* | 2̶2̶23 |
| b. | *Health Insurance* | 2̶3̶24 |
| c. | *Lay Employee Pension Plan* | 2̶3̶24 |
| d. | *Clergy Pension Plan* | 24 |
| e. | *Pooled Investment Program* | 2̶4̶25 |
| 3. | CDOW's Assets | 2̶5̶26 |
| 4. | Insurance | 2̶7̶28 |
| C. | The Clergy Sex Abuse Crisis | 2̶9̶30 |

YCST01:~~10788119.2~~10788119.4                                                                 068902.1001

|   |   |   |   |   |
|---|---|---|---|---|
| D. | Events Leading to the Chapter 11 Filing | | | 3031 |
| | 1. | The Child Victim Act and the Pending Litigation | | 3031 |
| | 2. | The DEDA Bond Transaction | | 3233 |
| | | a. | *The Allied Irish Bank Letter of Credit* | 3334 |
| | | b. | *The Covenant Default; Negotiations with Allied Irish Bank* | 3334 |
| E. | Purpose of the Chapter 11 Filing | | | 3435 |
| F. | The Chapter 11 Case | | | 3536 |
| | 1. | Debtor in Possession Status | | 3536 |
| | 2. | Entry of the Debtor's First-Day Orders | | 3536 |
| | 3. | Appointment of Official Committees | | 3536 |
| | 4. | Retention of Professionals | | 3536 |
| | 5. | Extensions of Exclusivity | | 3637 |
| | 6. | Schedules and Statement of Financial Affairs; Claims Bar Date and Aggregate Claims Asserted | | 3637 |
| | 7. | Litigation | | 3738 |
| | | a. | *Extension of Automatic Stay to Non-Debtor Parish Corporations* | 3738 |
| | | b. | *The Pooled Investment Account* | 4041 |
| | | c. | *The Lay Pension Litigation* | 4142 |
| | | d. | *Other Contested Matters* | 4243 |
| | 8. | Global Mediation | | 4344 |
| | 9. | Cash Position | | 4546 |
| | 10. | Professional Fees | | 4647 |
| IV. | GENERAL STRUCTURE OF THE PLAN; SUBSTANTIVE CONSOLIDATION | | | 4647 |
| V. | THE PLAN | | | 4748 |
| A. | Classification of Claims | | | 4749 |
| B. | Treatment of Claims | | | 4849 |
| | 1. | Secured Claims | | 4849 |
| | 2. | Priority Claims | | 4850 |
| | 3. | Survivor Claims | | 4850 |
| | | a. | *Treatment Under a Settlement Plan* | 4950 |
| | | b. | *Treatment Under a CDOW-Only Plan* | 4950 |
| | 4. | Lay Pension Claims | | 4950 |
| | | a. | *Treatment Under a Settlement Plan* | 4950 |
| | | b. | *Treatment Under a CDOW-Only Plan* | 4951 |
| | | c. | *Modification and Reaffirmation of Lay Pension Plan* | 4951 |
| | 5. | DEDA Bond Transaction Claims | | 5052 |
| | | a. | *Treatment Under a Settlement Plan* | 5052 |
| | | b. | *Treatment Under a CDOW-Only Plan* | 5052 |

YCST01:10788119.310788119.4                    068902.1001

      6.     Clergy Pension Claims ........................................................................... ~~51~~53

           a.    *Treatment Under a Settlement Plan* .................................. ~~51~~53

           b.    *Treatment Under a CDOW-Only Plan* .......................... ~~51~~53

      7.     Gift Annuity Claims .............................................................................. ~~51~~53

           a.    *Treatment Under a Settlement Plan* .................................. ~~51~~53

           b.    *Treatment Under a CDOW-Only Plan* .......................... ~~51~~53

      8.     Other Unsecured Claims ....................................................................... ~~51~~54

           a.    *Treatment Under a Settlement Plan* .................................. ~~52~~54

           b.    *Treatment Under a CDOW-Only Plan* .......................... ~~52~~54

      9.     Penalty Claims ...................................................................................... ~~52~~54

           a.    *Treatment Under a Settlement Plan* .................................. ~~52~~54

           b.    *Treatment Under a CDOW-Only Plan* .......................... ~~52~~54

C.    Proposed Settlements Embodied in Plan ........................................................ ~~52~~54

    1.     Provisions Applicable to Settlement Plan ............................................ ~~52~~54

           a.    *NDCE Settlement Contribution* ...................................... ~~52~~54

           b.    *Insurer Settlement Contribution* .................................... ~~53~~55

           c.    *Assignment of Estate's Order/Perpetrator Indemnification Claims to Settlement Trust* ....................... ~~53~~55

           d.    *Assignment of Third-Party Indemnity Claims to Parish-Only Survivor Claimants* .............................. ~~53~~55

           e.    *Resolution of PIA Litigation* ......................................... ~~53~~56

           f.    *Suspension of Duties of Fee Examiner* ......................... ~~54~~56

           g.    *Debtor Waiver and Release of Estate Causes of Action Against Non-Debtor Catholic Entities and Settling Insurers* ..................................................... ~~54~~56

           h.    *Additional Documentation; Non-Material Modifications* ................. ~~54~~57

           i.    *Non-Settling Insurers Unaffected* .................................. ~~55~~57

    2.     Conditions Precedent to Settlement Plan ............................................ ~~55~~57

    3.     Provisions Applicable to CDOW-Only Plan ...................................... ~~55~~58

           a.    *Resolution of PIA Investment Claims.* ........................... ~~55~~58

           b.    *Limitation on PIA Distribution Clawback Claims* ......... ~~55~~58

           c.    *St. Ann Indemnity Claim.* ............................................. ~~55~~58

    4.     Reservation of Rights ........................................................................... ~~55~~58

D.    Means of Implementing a Settlement Plan ................................................... ~~56~~59

    1.     Vesting Assets in the Settlement Trust ................................................ ~~56~~59

    2.     Assumption of Liability for Survivor Claims ..................................... ~~56~~59

    3.     Settlement Trust Distribution Procedures ............................................ ~~56~~59

E.    The Settlement Trust in a Settlement Plan .................................................... ~~57~~60

    1.     No Execution ......................................................................................... ~~57~~60

    2.     Settlement Trust Agreement .................................................................. ~~57~~60

| | | |
|---|---|---|
| 3. | Tax Matters | 58 61 |
| 4. | Appointment of the Settlement Trustee | 58 61 |
| 5. | Appointment of the Settlement Arbitrator | 58 61 |
| 6. | Miscellaneous Provisions | 58 61 |
| F. | Means of Implementing a CDOW-Only Plan | 59 62 |
| 1. | Vesting Assets in the Plan Trust | 59 62 |
| 2. | Assumption of Plan Obligations and Liability for Claims | 59 63 |
| 3. | IBNR Reserves | 60 63 |
| 4. | Retention of Jurisdiction | 60 63 |
| G. | The Plan Trust in a CDOW-Only Plan | 60 64 |
| 1. | Plan Trust Agreement | 61 64 |
| 2. | Tax Matters | 61 64 |
| 3. | Appointment of the Plan Trustee | 61 64 |
| 4. | Rights and Responsibilities of the Plan Trustee | 61 65 |
| 5. | Investment Powers; Permitted Cash Expenditures | 62 65 |
| 6. | Registry of Beneficial Interests | 62 65 |
| 7. | Non-Transferability of Interests | 62 65 |
| 8. | Termination | 62 65 |
| 9. | Plan Oversight Committee | 62 66 |
| 10. | Liability; Indemnification | 62 66 |
| 11. | Retention of Professionals | 63 67 |
| 12. | Preservation of All Causes of Action | 63 67 |
| 13. | Succession to Litigation | 64 67 |
| H. | Procedures for Liquidation and Allowance of Survivor Claims  in a CDOW-Only Plan | 64 67 |
| 1. | Election of ADR, Litigation, or Convenience Treatment | 64 67 |
| 2. | Survivor ADR Process | 64 68 |
| 3. | Survivor Litigation Process | 65 68 |
| 4. | Survivor Convenience Process | 65 68 |
| 5. | Effect of No Election | 65 68 |
| 6. | Civil Complaint by Survivor Litigation Claimant | 65 69 |
| 7. | Agreements Outside the ADR and Litigation Procedures | 66 69 |
| I. | Insurance Policies | 66 69 |
| 1. | Continuation of Insurance Policies | 66 69 |
| 2. | Insurance Provisions Applicable to CDOW-Only Plan | 66 70 |
| J. | The Pooled Investment Account | 67 70 |
| 1. | Continuation of PIA Custody Agreement and Investment Management Agreements | 67 70 |

YCST01:10788119.2 10788119.4

068902.1001

|   |   |   |   |
|---|---|---|---|
| 2. | Continuation of Trust Relationships | | ~~67~~70 |
| 3. | Rights of Custodian and Investment Managers | | ~~67~~71 |
| 4. | Dispute Escrows in CDOW-Only Plan | | ~~68~~71 |
|  | a. | *Non-Debtor PIA Dispute Escrow* | ~~68~~71 |
|  | b. | *Restricted Fund Dispute Escrow* | ~~68~~72 |
|  | c. | *Lay Pension Dispute Escrow* | ~~69~~73 |
|  | d. | *Accounting* | ~~70~~73 |
| 5. | Use of Undisputed Restricted PIA Funds | | ~~70~~73 |
| 6. | Final § 345 Waiver | | ~~70~~73 |
| K. | Procedures for General Claims Administration | | ~~70~~74 |
| 1. | Reservation of Rights to Object to Claims | | ~~71~~74 |
| 2. | Objections to Claims | | ~~71~~74 |
| 3. | Service of Objections | | ~~71~~75 |
| 4. | Determination of Claims | | ~~72~~75 |
| 5. | No Distributions Pending Allowance | | ~~72~~75 |
| 6. | Claim Estimation | | ~~72~~76 |
| L. | Distributions under the Plan | | ~~73~~76 |
| 1. | Timing of Distributions | | ~~73~~76 |
| 2. | Payment Date | | ~~73~~77 |
| 3. | Undeliverable Distributions | | ~~74~~77 |
| 4. | Setoffs | | ~~74~~77 |
| 5. | No Interest on Claims | | ~~74~~77 |
| 6. | Withholding Taxes | | ~~74~~78 |
| M. | Effectiveness of the Plan | | ~~75~~78 |
| N. | Effects of Confirmation | | ~~76~~79 |
| 1. | Dissolution of Official Committees | | ~~76~~79 |
| 2. | Discharge Injunction | | ~~76~~79 |
| 3. | Channeling Injunction in Settlement Plan | | ~~77~~80 |
| 4. | Exculpation; Limitation of Liability | | ~~77~~81 |
| O. | The Reorganized Debtor | | ~~78~~81 |
| 1. | Continued Corporate Existence, Corporate Action and Vesting of Assets | | ~~78~~81 |
| 2. | Voluntary Undertakings of the Reorganized Debtor, the Bishop, and the Non-Debtor Catholic Entities | | ~~79~~82 |
|  | a. | *Lay Pension Plan Reaffirmation Agreement* | ~~79~~82 |
|  | b. | *Establishment of Charitable Trust for Abuse Survivors* | ~~79~~83 |
|  | c. | *Additional Non-Monetary Undertakings for the Protection of Children* | ~~79~~83 |
| 3. | Mandatory Arbitration of Disputes | | ~~79~~83 |
| P. | Miscellaneous Provisions | | ~~79~~83 |

v

| | | |
|---|---|---|
| 1. | Rejection of Unassumed Executory Contracts | ~~79~~83 |
| 2. | Final Order | ~~80~~84 |
| 3. | Amendments and Modifications | ~~80~~84 |
| 4. | U.S. Trustee Reports | ~~80~~84 |
| 5. | No Waiver | ~~80~~84 |
| 6. | Tax Exemption | ~~80~~84 |
| 7. | Non-Severability | ~~81~~85 |
| 8. | Revocation | ~~81~~85 |
| 9. | Controlling Documents | ~~81~~85 |
| 10. | Governing Law | ~~81~~85 |
| 11. | Notices | ~~81~~85 |
| 12. | Filing of Additional Documents | ~~82~~86 |
| 13. | Powers of Officers | ~~82~~86 |
| 14. | Direction to a Party | ~~82~~86 |
| 15. | Successors and Assigns | ~~83~~87 |
| 16. | Certain Actions | ~~83~~87 |
| 17. | Final Decree | ~~83~~87 |
| VI. | PLAN AS SETTLEMENT COMMUNICATION | ~~83~~87 |
| VII. | RULE 9019, CRAMDOWN REQUESTS | ~~83~~87 |
| VIII. | CERTAIN FACTORS TO BE CONSIDERED REGARDING THE PLAN | ~~84~~88 |
| A. | Allowance of Claims | ~~84~~88 |
| B. | Objections to Classification of Claims Pursuant to § 1122 of the Bankruptcy Code | ~~84~~88 |
| C. | Modification of Survivor Claim Procedures | ~~85~~89 |
| D. | Valuation Risk | ~~85~~89 |
| E. | Market Risk | ~~85~~89 |
| F. | Appellate Risk | ~~86~~90 |
| G. | Risk of Non-Confirmation of the Plan | ~~86~~90 |
| H. | Nonconsensual Confirmation | ~~86~~90 |
| I. | Delays of Confirmation and/or Effective Date | ~~86~~90 |
| J. | Settlement/Plan Trust Operations | ~~87~~91 |
| K. | Non-Transferability | ~~87~~91 |
| L. | Uncertainty of Value | ~~87~~91 |
| IX. | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | ~~87~~91 |
| X. | ACCEPTANCE AND CONFIRMATION OF THE PLAN; VOTING REQUIREMENTS | ~~87~~91 |
| A. | Best Interests Test | ~~88~~92 |
| B. | Financial Feasibility Test | ~~89~~93 |

    C.    Acceptance by Impaired Classes ........................................................ 8994

    D.    Voting Procedures ........................................................................... 9095

        1.    Ballots ................................................................................ 9095

        2.    Deadline for Voting ........................................................... 9195

        3.    Importance of Your Vote .................................................... 9196

XI.      RECOMMENDATION AND CONCLUSION ..................................... 9297

EXHIBIT A – THE PLAN ..................................................................................... A-1

EXHIBIT B – ORDER APPROVING DISCLOSURE STATEMENT ................. B-1

EXHIBIT C – CHAPTER 7 LIQUIDATION ~~ANALYSIS~~ANALYSES ............. C-1

EXHIBIT D – FINANCIAL PROJECTIONS ....................................................... D-1

EXHIBIT E – INSURANCE COVERAGE PRE-1977 ......................................... E-1

EXHIBIT F – INSURANCE COVERAGE 1977-1994 ........................................ F-1

EXHIBIT G – CLAIMS-MADE INSURANCE COVERAGE 2007-2009 ............ G-1


EXHIBIT H – DISPUTED NON-DEBTOR PIA FUNDS
         (BALANCES AS OF FEBRUARY 28, 2011) ..................... H-1

EXHIBIT I – NON-DEBTOR CATHOLIC ENTITY PLEDGES TOWARD
         CONSUMMATION OF SETTLEMENT PLAN ................... I-1

# I.   INTRODUCTION

Catholic Diocese of Wilmington, Inc. ("CDOW" or the "Debtor"), which is the secular legal embodiment of the Roman Catholic Diocese of Wilmington (the "Diocese"), filed a voluntary petition under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), on October 18, 2009 (the "Petition Date"), thereby commencing case number 09-13560 (CSS) (the "Chapter 11 Case") currently pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Since filing for bankruptcy protection, CDOW has continued to operate and manage its affairs as a debtor in possession pursuant to sections 1107 and 1008 of the Bankruptcy Code. On September 22, 2010, the Debtor filed its Chapter 11 Plan of Reorganization, which was subsequently amended (as may be further amended, the "Plan").[2]

This Chapter 11 Case arises against the backdrop of terrible pain and a profound breach of trust. Members of the clergy sexually abused children entrusted to their care, and that sin was compounded in many cases by the failure of other church officials to take appropriate action. For years now the Diocese has been working with abuse survivors and their families to address these injuries and redress these wrongs. Over the past many years, the Diocese has been a leader among Catholic dioceses in taking responsibility quickly and seeking to do what it can to help and compensate the injured, to initiate policies to ensure that these wrongs do not happen again, and to provide a safe environment for children.

On July 10, 2007, the Delaware Child Victim's Act, 10 Del. C. § 8145 (the "CVA"), was enacted into law. Between the enactment of the CVA and the Petition Date, CDOW was named in 131 sexual abuse civil actions involving 142 plaintiffs. CDOW worked hard to settle as many of these cases as possible, with some success. However, and unfortunately, CDOW simply did not have enough money to satisfy the demands of the plaintiffs, the needs of other abuse survivors, and the claims of its other creditors, including the financiers of the construction of the new schools made possible by the Bringing the Vision to Life campaign, and the more than 1,700 lay and clergy pensioners whose dedicated service to the Diocese, its agencies, and ministries over the years has been absolutely critical to the fulfillment of the Diocese's mission. Under these circumstances, the only way for CDOW to treat the abuse survivors, and its other creditors, fairly and equitably, was to seek bankruptcy protection to ensure that CDOW's limited assets would be distributed ratably among all creditors.

The Plan is the product of months of mediation conducted by a federal judge and a retired state court judge with representatives of abuse survivors, lay employees, insurers and others. It also is informed by the outcomes of recent court cases, and, especially, by soul-searching discussions within the Diocesan family. These discussions have led to an offer by certain Non-Debtor Catholic Entities,[3] who are not themselves in bankruptcy (and several of whom are not involved in abuse litigation), to contribute ~~almost~~approximately $62 million of

---

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Plan.

[3] These Non-Debtor Catholic Entities include Catholic Diocese Foundation, Catholic Cemeteries, Inc., Siena Hall, Inc., Seton Villa, Inc., Children's Home, Inc., and certain Parish Corporations. The primary condition on which they are making their assets available is that the Parish Corporations, and all Diocesan-related entities, be released from all litigation regarding Survivor Claims.

their own assets to a settlement trust (the "Settlement Trust")[4] for the benefit of abuse survivors, in hopes of bringing this bankruptcy to a successful conclusion – meaning a solution that fairly compensates abuse survivors while safeguarding the future of the Diocesan parishes and schools, and making sure that the Reorganized Debtor is able to meet its pension obligations to all employees and continue important ministries. These discussions have also led to an offer by the liability insurers for the Debtor and its related co-defendants to contribute approximately $15.6 million to the Settlement Trust.

The Plan offers an important choice for survivors of sexual abuse. The choice is between (i) implementing a $77.425-million global settlement of abuse claims against the Debtor and its related entities that was reached on February 2, 2011, between the Debtor and state-court counsel for substantially all of the survivor-claimants (the "Settlement Plan" alternative), and (ii) resolving only claims against the Debtor, by creating a trust for the benefit of all creditors (the "Plan Trust"), which would be funded only with assets of the Debtor, as determined by the judicial process (the "CDOW-Only Plan" alternative). Both options would bring the Debtor out of bankruptcy. However, the Debtor views the CDOW-Only Plan as a far inferior alternative for all stakeholders. After set-asides for health insurance, workers compensation and administrative expenses relating to the bankruptcy, **the estimated total of assets available for distribution under a CDOW-Only Plan could be as little as $13.4 million**, depending on the outcome of the Pooled Investment Account litigation and other disputes. This amount would then be apportioned among all creditors, including abuse survivors and pension beneficiaries.

Although the Debtor considers the Settlement Plan the far superior alternative, this is not to say that it will be easy. To the contrary, a Settlement Plan will entail severe sacrifices in the Diocesan family. For example, because Catholic Diocese Foundation would shoulder the largest financial burden – ~~almost~~approximately $~~54~~53.4 million – a Settlement Plan would end Foundation's historic role as the primary underwriter of the building of schools and churches, and the provider of financial support for a myriad of other good works. In addition, property, including the Bishop's home, will be sold, ministries will be curtailed, and some layoffs will be necessary.

Under both the Settlement Plan and the CDOW-Only Plan, steps will be taken to shore up the financial security of the lay employee pension plan. The claims of the Debtor's other creditors, principally Allied Irish Bank, also will be addressed under both scenarios. Finally, and importantly, under both scenarios, there will be significant voluntary undertakings by the Reorganized Debtor, and by the Bishop, to further promote healing and reconciliation, and to reaffirm the commitment of the Diocese to preventing sexual abuse. In addition to the Diocese's continued compliance with the *Charter for the Protection of Children & Young People* adopted by the U.S. Conference of Catholic Bishops in 2002, and the *For the Sake of God's Children* program established by the Diocese in 2003, the non-monetary provisions of the Plan include making publicly available documents in diocesan files related to sexual abuse by

---

[4] In total, Non-Debtor Catholic Entities have conditionally pledged approximately $57.8 million in cash or Disputed Non-Debtor PIA Funds, and real property having appraised values (as of September 2010) of approximately $7.9 million, to the Debtor toward the consummation of a Settlement Plan. Amounts in excess of the NDCE Settlement Contribution will be applied toward payments of administrative costs and the creation of reserves that are necessary in order to consummate the Plan. Specific pledges from Non-Debtor Catholic Entities are outlined in Exhibit I hereto and discussed in Sections III.A.3. and III.A.4. below.

2

068902.1001

abusive clergy, religious and lay employees. **These undertakings, which were the product of close collaboration with the Official Committee of Unsecured Creditors, are the most extensive ever offered in a diocesan bankruptcy or settlement of clergy sex abuse claims.**

As the Bishop stated when CDOW filed for bankruptcy protection in October 2009, his goal is to fairly compensate all survivors of clergy sexual abuse within the Diocese and to assure the continuation of the Diocese's charitable, educational and spiritual ministries. The Debtor believes the Settlement Plan fulfills both goals, since the vast majority of Diocesan ministry happens on the parish and school level and, in the absence of a global settlement of abuse claims, it is the parishes and schools that would suffer the most. The Official Committee of Lay Employees (the "Lay Employees Committee") has indicated it opposes the Settlement Plan and intends to object to confirmation of the Plan as a Settlement Plan.

A.   **General Information Regarding this Disclosure Statement**

This Disclosure Statement was prepared by the Debtor's professionals in conjunction with, and based on information provided by, the Debtor's officers and employees throughout the Chapter 11 Case. The Debtor is solely responsible for the information contained in this Disclosure Statement. This Disclosure Statement does not constitute financial or legal advice. Creditors of the Debtor should consult their own advisors if they have questions about the Plan or this Disclosure Statement. As noted above, capitalized terms used in this Disclosure Statement and not expressly defined herein have the meaning ascribed to them in the Plan. A reference in this Disclosure Statement to a "Section" refers to a section of this Disclosure Statement, unless otherwise indicated.

WHILE THIS DISCLOSURE STATEMENT DESCRIBES CERTAIN BACKGROUND MATTERS AND THE MATERIAL TERMS OF THE PLAN, IT IS INTENDED AS A SUMMARY DOCUMENT ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ATTACHED TO THE PLAN AND THIS DISCLOSURE STATEMENT. SIMILARLY, DESCRIPTIONS IN THIS DISCLOSURE STATEMENT OF PLEADINGS, ORDERS, AND PROCEEDINGS IN THE CHAPTER 11 CASE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE RELEVANT DOCKET ITEMS. YOU SHOULD READ THE PLAN AND THE EXHIBITS TO OBTAIN A FULL UNDERSTANDING OF THEIR PROVISIONS. ADDITIONAL COPIES OF THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED TO THIS DISCLOSURE STATEMENT, AS WELL AS ANY DOCKET ITEMS FROM THE CHAPTER 11 CASE, ARE AVAILABLE FOR INSPECTION DURING REGULAR BUSINESS HOURS AT THE OFFICE OF THE CLERK OF THE BANKRUPTCY COURT, UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 3RD FLOOR, 824 MARKET STREET, WILMINGTON, DELAWARE 19801. IN ADDITION, COPIES MAY BE OBTAINED FOR A CHARGE THROUGH DELAWARE DOCUMENT RETRIEVAL, 230 NORTH MARKET STREET, P.O. BOX 27, WILMINGTON, DELAWARE 19801, (302) 658-9971, OR VIEWED ON THE INTERNET AT THE BANKRUPTCY COURT'S WEBSITE (HTTP://WWW.DEB.USCOURTS.GOV) BY FOLLOWING THE DIRECTIONS FOR ACCESSING THE ECF SYSTEM ON SUCH WEBSITE. COPIES ARE ALSO AVAILABLE FREE OF CHARGE ON THE GARDEN CITY GROUP, INC.'S

DEDICATED WEB PAGE RELATED TO THE CHAPTER 11 CASE (HTTP://WWW.CDOWREORGANIZATION.COM).

THE STATEMENTS AND INFORMATION CONCERNING THE DEBTOR AND THE PLAN SET FORTH IN THIS DISCLOSURE STATEMENT CONSTITUTE THE ONLY STATEMENTS OR INFORMATION CONCERNING SUCH MATTERS THAT HAVE BEEN APPROVED BY THE BANKRUPTCY COURT FOR THE PURPOSE OF SOLICITING ACCEPTANCES OR REJECTIONS OF THE PLAN. **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES <u>NOT</u> CONSTITUTE A FINDING OF FACT OR CONCLUSION OF LAW BY THE BANKRUPTCY COURT AS TO ANY FACTUAL OR LEGAL ASSERTION MADE BY THE DEBTOR HEREIN, NOR DOES NOT MEAN THAT THE BANKRUPTCY COURT AGREES WITH ANY SUCH FACTUAL OR LEGAL ASSERTION MADE BY THE DEBTOR HEREIN, NOR DOES IT MEAN THAT THE BANKRUPTCY COURT RECOMMENDS ACCEPTANCE OR REJECTION OF THE PLAN.**

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN. NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN WILL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE THIS DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED. THE DEBTOR ASSUMES NO DUTY TO UPDATE OR SUPPLEMENT THE DISCLOSURES CONTAINED HEREIN AND DOES NOT INTEND TO UPDATE OR SUPPLEMENT THE DISCLOSURES, EXCEPT AS PROVIDED HEREIN AND TO THE EXTENT NECESSARY AT THE HEARING ON CONFIRMATION OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN. CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS, INCLUDING THOSE ESTIMATES OF THE CASH THAT WILL BE AVAILABLE FOR DISTRIBUTION TO THE HOLDERS OF CLAIMS, ESTIMATES OF THE PERCENTAGE RECOVERY OF THE VARIOUS TYPES OF CLAIMS, ESTIMATES OF THE AGGREGATE FINAL ALLOWED AMOUNTS OF THE VARIOUS TYPES OF CLAIMS, ESTIMATES OF THE PROCEEDS FROM THE SALE, LIQUIDATION, OR OTHER DISPOSITION OF THE DEBTOR'S ASSETS AND ESTIMATES OF THE EXPENSES THAT WILL BE INCURRED BY THE PLAN TRUST DURING THE ADMINISTRATION OF THE PLAN. THERE CAN BE NO ASSURANCE THAT ANY FORECASTED OR PROJECTED RESULTS CONTAINED HEREIN WILL BE REALIZED, AND ACTUAL RESULTS MAY VARY FROM THOSE SHOWN HEREIN, POSSIBLY BY MATERIAL AMOUNTS.

YCST01:~~10788119.2~~10788119.4     068902.1001

**B.** **Disclosure Statement Enclosures**

Accompanying this Disclosure Statement are:

- A copy of the Plan (Exhibit A)

- A copy of the Order approving the Disclosure Statement entered _____, 2011 [Docket No. ____] (Exhibit B);

- ~~An analysis~~Analyses of a hypothetical liquidation of the Debtor under chapter 7 of the Bankruptcy Code (Exhibit C);

- Summary financial projections for the three years following confirmation of the Plan (Exhibit D);

- Lists of insurance policies covering the Debtor and the Non-Debtor Catholic Entities (Exhibits E-G);

- Balances of Disputed Non-Debtor PIA Funds as of February 28, 2011 (Exhibit H);

- A ballot for acceptance or rejection of the Plan for Holders of Impaired Claims entitled to vote to accept or reject the Plan (the "Ballot"); and

- A notice setting forth: (i) the deadline for casting ballots either accepting or rejecting the Plan; (ii) the deadline for filing objections to confirmation of the Plan; and (iii) the date, time and location of the Confirmation Hearing (the "Notice").

**C.** **Summary of Plan Treatment of Claims**

The Plan designates a series of Classes of Claims against the Debtor. These Classes take into account the differing nature of the various Claims, the assets from which they may be satisfied, and their relative priorities under the Bankruptcy Code. Several Classes of Claims will receive different treatment based on whether the Plan is confirmed as a Settlement Plan or a CDOW-Only Plan.

As discussed further below, if the Plan is confirmed as a Settlement Plan, then the Non-Debtor Catholic Entities and Settling Insurers will contribute $77.425 million to a Settlement Trust for the benefit of holders of Survivor Claims, in exchange for, among other things (i) entry of a permanent injunction channeling Survivor Claims to the Settlement Trust, and (ii) release from Causes of Action of the Debtor's Estate. In addition, contributions of approximately **$9.9 million** will be made to the Lay Pension Plan Trust for the benefit of lay pensioners. The Plan will proceed as a Settlement Plan if 85% of Survivor Claimants represented by counsel vote in favor of the Plan and consent to the proposed settlement and channeling injunction, and the Bankruptcy Court finds that the settlement and channeling injunction is

5

binding on all other holders of Survivor Claims. Otherwise, the Plan will proceed as a CDOW-Only Plan.

If the Plan is confirmed as a CDOW-Only Plan, the Non-Debtor Catholic Entities and the Settling Insurers will <u>not</u> voluntarily provide any consideration to the Plan Trust and will <u>not</u> be released from any Causes of Action of the Debtor's bankruptcy estate or any litigation concerning Survivor Claims. The Debtor anticipates that a CDOW-Only Plan would necessitate years of additional litigation to determine the scope of the property of the Debtor's bankruptcy estate and to liquidate the amount of any contribution and indemnity claims of Parish Corporations against the Debtor.

The following table (the "<u>Plan Summary Table</u>") summarizes the classification and treatment of Claims under the Plan (including certain unclassified Claims). **THE PLAN SUMMARY TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND DOES NOT ADDRESS ALL ISSUES REGARDING CLASSIFICATION, TREATMENT, AND ULTIMATE RECOVERIES. THE PLAN SUMMARY TABLE IS <u>NOT</u> A SUBSTITUTE FOR A FULL REVIEW OF THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.**

| Summary of Classification and Treatment of Claims under the Plan | | |
|---|---|---|
| **CLASS** | **DESCRIPTION** | **TREATMENT OF ALLOWED CLAIMS WITHIN CLASS[5]** |
| n/a | Administrative Claims | Paid in Cash equal to the Allowed amount of such Claim. |
| n/a | Priority Tax Claims (if any)[6] | Paid in Cash equal to the Allowed Amount of such Claim. |
| 1 | Secured Claims | Legal, equitable, and contractual rights to which such Claim entitles its holder shall be reinstated in full on the Effective Date. |
| 2 | Priority Claims | Paid in Cash equal to the Allowed amount of such Claim, which shall not include any interest, penalty, or premium. |
| 3A | Survivor Claims | <u>Settlement:</u> Claimants will receive a distribution from the Settlement Trust in accordance with Settlement Trust Distribution Procedures to be proposed by the Creditors Committee, subject to approval by the Bankruptcy Court.<br><br><u>CDOW-Only:</u> Claimants will receive a Pro Rata distribution from the Plan Trust, to be funded solely by CDOW Assets. Survivors will elect between convenience treatment, arbitration, or litigation of their Claims. |

---

[5] The treatment of any Allowed Claim within a Class is subject to any agreement between the Holder of such Allowed Claim and the Debtor (if before the Effective Date) or the Plan Administrator (on and after the Effective Date) which provides treatment of such Allowed Claim on terms no less favorable to the Debtor than the treatment provided in the Plan.

[6] As the Debtor is a tax-exempt entity, it does not anticipate any Priority Tax Claims.

YCST01:~~10788119.2~~10788119.4                                    068902.1001

| Summary of Classification and Treatment of Claims under the Plan | | |
|---|---|---|
| CLASS | DESCRIPTION | TREATMENT OF ALLOWED CLAIMS WITHIN CLASS |
| 3B | Lay Pension Claims | **Settlement:** The Lay Pension Plan Trust will receive (i) the Lay Pension Fund (valued at $4,892,601 as of 2/28/11) and (ii) distribution of $5 million for the benefit of lay pensioners. |
| | | **CDOW-Only:** The Lay Pension Plan Trust will receive a Pro Rata distribution from the Plan Trust on account of the Lay Pension Claims, for the benefit of lay pensioners. |
| 3C | DEDA Bond Transaction Claims | Claimants will receive either (i) a promissory note from the Reorganized Debtor (on terms agreeable to the Debtor and the claimant), or (ii) Pro Rata distribution from the Capital Campaign Fund, a Restricted Asset. However, if the Plan is confirmed as CDOW-Only and the Capital Campaign Fund is determined to be an Unrestricted Asset of the Estate, claimants will receive a Pro Rata distribution from the Plan Trust. |
| 3D | Clergy Pension Claims | The legal, equitable, and contractual rights to which such Claim entitles its holder shall be reinstated in full on the Effective Date. However, if the Plan is confirmed as CDOW-Only Plan and the Clergy Pension Fund is determined to be an Unrestricted Asset of the Estate, claimants will receive a Pro Rata distribution from the Plan Trust. |
| 3E | Gift Annuity Claims | Legal, equitable, and contractual rights to which such Claim entitles its holder shall be reinstated in full on the Effective Date. However, if Plan is confirmed as CDOW-Only Plan and the Gift Annuity Funds are determined to be Unrestricted Assets of the Estate, claimants will receive a Pro Rata distribution from the Plan Trust. |
| 3F | Other Unsecured Claims | **Settlement:** Legal, equitable, and contractual rights to which such Claim entitles its holder shall be reinstated in full on the Effective Date. |
| | | **CDOW-Only:** Claimants will receive a Pro Rata distribution from the Plan Trust. |
| 4 | Penalty Claims | Will not retain or receive any property on account of such Claims. |

THE TREATMENT AND DISTRIBUTIONS, IF ANY, PROVIDED TO HOLDERS OF ALLOWED CLAIMS PURSUANT TO THE PLAN WILL BE IN FULL AND COMPLETE SATISFACTION OF ALL LEGAL, EQUITABLE, OR CONTRACTUAL RIGHTS REPRESENTED BY SUCH CLAIMS.

### D. Estimated Claims and Distributions

The tables in this Section summarize the estimated (i) Allowed Claims in each Class, and (ii) the amount to be distributed to each Class pursuant to the Plan, after payment of estimated S/A/P Claims and/or Plan Administration Expenses, expressed both as an aggregate dollar amount and as a percentage of the Allowed claim amount.

PLEASE NOTE THAT THE ALLOWED CLAIM AMOUNTS SET FORTH IN THIS SECTION REPRESENT THE DEBTOR'S ESTIMATES REGARDING LIKELY OUTCOMES UNDER THE PLAN. THE PLAN DOES NOT PROPOSE TO LIQUIDATE, FIX, OR OTHERWISE LIMIT THE AGGREGATE ALLOWED AMOUNT OF CLAIMS IN ANY CLASS AT THE AMOUNTS SET FORTH BELOW, AND IT IS POSSIBLE

**THAT THE ALLOWED AMOUNT OF CLAIMS IN ANY CLASS WILL BE HIGHER OR LOWER THAN THE AMOUNTS SET FORTH BELOW.**

### 1. In Settlement Plan

The following table summarizes estimated aggregate Claim amounts, distributions to creditors, and percentage recoveries in a Settlement Plan.

| Class | Description | Allowed Amount (thousands) | NPV of Total Distribution (thousands) | | Anticipated % Recovery | |
|---|---|---|---|---|---|---|
| | | | On Effective Date | Over Time | On Effective Date | Over Time |
| 3A | Survivor Claims | $77,425 | $77,425 | | 100% | |
| 3B | Lay Pension Claims | $47,190[7] | $9,893 | $47,190 | 21% | 100%** |
| 3C | DEDA Bond Transaction Claims | $11,408 | $8,873 | | 77.8% | |
| 3D | Clergy Pension Claims | $13,107 | N/A* | $13,107 | N/A** | 100%** |
| 3E | Gift Annuity Claims | $106 | N/A* | $106 | N/A** | 100%** |
| 3F | Other Unsecured Claims | $300 | N/A* | $300 | N/A** | 100%** |
| 4 | Penalty Claims | Unknown | $0 | | 0% | |

In a Settlement Plan, Survivor Claims would be liquidated and allowed in accordance with the Settlement Trust Distribution Procedures, which the Debtor expects will provide for the distribution of the entire corpus of the Settlement Trust among Survivor claimants. Thus, in effect, Survivor Claims are allowed for distribution purposes in the aggregate amount equal to the settlement amount of $77.425 million, resulting in an average of approximately $509,375 per claimant before deducting costs of administration of the Settlement Trust.[8] The actual recovery upon any given Claim, of course, may be less than, or greater than, the average, depending on factors such as the nature, severity, and duration of the Abuse. Thus, in severe cases, the Settlement Plan may well yield recoveries of $1-3 million for certain Survivors.

---

[7] Represents the actuarial net present value of benefits as of January 1, 2010, less the present funding available in the Lay Pension Plan Trust, as discussed in Section III.B.2.c. below.

* ~~Because these Classes of Claims are unimpaired in a Settlement Plan, the Claims would be paid in the ordinary course and would not receive a specific distribution as of the Effective Date~~Represents anticipated payments from the Reorganized Debtor.

** ~~Because these Classes of Claims are unimpaired in a Settlement Plan, the Claims would be paid in the ordinary course by the Reorganized Debtor and would not receive a distribution from the Estate on the Effective Date.

[8] 147 Confidential Tort Proofs of Claim were filed in this case by Survivors, and five (5) Parish-Only Survivor Claimants have asserted claims against non-debtor Parish Corporations which would be entitled to a distribution from the Settlement Trust under the Plan. Thus, for purposes of determining the average allowed Survivor Claim in a Settlement Plan, the Debtor divided the aggregate allowed claim amount by 152.

8

068902.1001

In a Settlement Plan, Lay Pension Claims would be paid in the ordinary course by the Lay Pension Plan Trust, which will be funded on the Effective Date in the amount of approximately $9.9 million. Thereafter, as discussed further in Sections V.C.4.c. and V.P.2.a. below, the Reorganized Debtor ~~will reaffirm the Debtor's obligations~~intends (i) to pay all accrued and vested benefits under the Lay Pension Plan through December 31, 2011,[9] and (ii) provide funding of at least $2 million per year to the Lay Pension Plan Trust, until such time as the Lay Pension Plan is fully funded on an actuarial basis. In addition to this minimum $2 million of annual funding, the Bishop anticipates undertaking additional fundraising activities in the future (e.g., devoting a portion of a future capital campaign) to provide additional contributions to the Lay Pension Plan Trust. **Please note, however, that if the Bankruptcy Court does not approve the Lay Pension Plan Reaffirmation Agreement, then the Reorganized Debtor's pledge to honor benefits** under the Lay Pension Plan ~~Trust Agreement, as will be modified and amended, and will provide requisite funding to the Lay Pension Plan Trust in the ordinary course~~**and to provide additional funding to the Lay Pension Plan Trust will be legally unenforceable against the Reorganized Debtor by operation of § 524 of the Bankruptcy Code. While the Plan requires the Debtor to use its best efforts to obtain approval of the Lay Pension Plan Reaffirmation Agreement by the Bankruptcy Court, such approval is not a condition of confirmation or effectiveness of the Settlement Plan.**

The table above assumes that the DEDA Bond Transaction Claims would be satisfied via Pro Rata distributions from the Capital Campaign Fund. However, as discussed below, the Plan would permit the refinancing of the DEDA Bond Transaction Claims by the Reorganized Debtor on terms agreeable to the claimant and the Debtor~~.~~, and subject to approval by the Bankruptcy Court at the Confirmation Hearing. As discussed below, Clergy Pension Claims, Gift Annuity Claims, and Other Unsecured Claims would be unimpaired by a Settlement Plan, and would receive payment in the ordinary course. Penalty Claims (e.g., for punitive damages) are not estimated for purposes of the table above, and would receive no distribution because the Plan does not provide for payment in full of all senior classes of claims.

## 2. In CDOW-Only Plan

The following tables summarize estimated aggregate Claim amounts and distributions from the Plan Trust in a CDOW-Only Plan, based on the effect of certain litigation outcomes regarding pending (or expected) disputes regarding the scope of the property of the Debtor's bankruptcy estate. The litigation outcomes illustrated below are not exhaustive of all potential litigation outcomes under a CDOW-Only Plan. Indeed, given the differences between the disputed assets themselves, the nature of the disputes and the relative costs and benefits of pursuing them to a litigated result, and the procedural posture of pending litigation, it is simply not possible to predict all potential permutations of litigated outcomes, and the Debtor has not attempted to do so. Rather, the Debtor has assumed "extreme" litigation outcomes that illustrate (i) the maximum and minimum amount of Plan Trust Assets that would ultimately be available

---

[9] The Lay Pension Plan will be suspended as of December 31, 2011, after which point the Debtor will no longer provide a defined-benefit retirement benefit for lay employees. It is expected that a replacement retirement benefit (e.g., a "403(b)" plan), will be offered by the Debtor and/or the affiliated employers. However, as of yet, the nature and terms of the replacement retirement benefit have not been determined.

9

068902.1001

for distribution to creditors, and (ii) how those assets would be shared among creditors under the terms of the Plan.

For purposes of the following tables, the Debtor has not attempted to predict the possible effect of substantive consolidation of the Debtor with any Non-Debtor Catholic Entity, because (i) such predictions would necessarily turn on information not in the Debtor's possession (e.g., realizable asset values and claims information) and (ii) as discussed in more detail in Section IV, the Debtor believes, based upon controlling law and the facts and circumstances in this case, that the likelihood of entry of a Final Order substantively consolidating the Debtor with any Non-Debtor Catholic Entity is remote.

The Allowed amount of Survivor Claims would ultimately be determined in accordance with the convenience procedure, via arbitration, or litigation (at the election of each Survivor claimant), all as described more fully herein. However, for purposes of estimating potential Creditor recoveries in a CDOW-Only Plan, the tables below estimate "low" and "high" amounts for Allowed Survivor Claims by multiplying the 148 Survivor Claims asserted in this Chapter 11 Case[10] by, respectively, (i) the average payout per abuse claim in the chapter 11 case of the Diocese of Davenport, Iowa (approximately $237,000), and (ii) twice the average payout per abuse claim under the settlements in the chapter 11 cases of the Davenport diocese, the Archdiocese of Portland, Oregon, the Diocese of Spokane, Washington, and the Diocese of Tucson, Arizona, and the proposed settlement in this Chapter 11 Case ($363,500 x 2 = $727,000).[11] The actual recovery upon any given Claim, of course, may be less than, or greater than, the average, and would likely turn on such factors as (i) whether the Claim relates to abuse by Diocesan priest or employee, on the one hand, or by a Religious Order clergy or employee, on the other hand,[12] (ii) the existence of absolute legal defenses, (iii) the existence and quality of evidence establishing the Abuse and/or the alleged negligence on the part of the Debtor, and (iv) the nature, severity, and duration of the Abuse. **Please note that estimates of distributions from the Plan Trust in a CDOW-Only Plan necessarily make certain assumptions as to the amount of S/A/P Claims, Plan Administration Expenses, and ultimate recoveries on non-Cash Plan Trust Assets, all as set forth more fully in the Chapter 7 Liquidation** ~~Analysis~~**Analyses attached hereto as** **Exhibit C**.[13]

---

[10] In addition to the 147 Confidential Tort Proofs of Claim filed by Survivors in this case, one Parish-Only Survivor Claimant was assigned a Parish Corporation's Third-Party Indemnity Claim against the Debtor as part of a settlement between the Parish-Only Survivor Claimant and the Parish Corporation. The Plan provides that this Third-Party Indemnity Claim will be treated for all intents and purposes as a Survivor Claim against the Debtor.

[11] The Debtor excluded from this calculation the average payout per abuse claim in the Diocese of Fairbanks, Alaska case, which was approximately $33,000 per claim, plus an as-yet undetermined amount of insurance proceeds.

[12] Because the Diocese and the Diocesan Bishop do not ordain, train, or supervise Religious Order employees, the Debtor expects that the Allowed amount of a Survivor Claim premised upon abuse by a Diocesan priest or employee would be substantially higher (by a 10:1 margin, or greater) than the Allowed amount of a comparable Survivor Claim arising from abuse by a Religious Order cleric or employee.

[13] To facilitate comparison of the following chapter 11 distribution analyses under a CDOW-Only Plan to potential outcomes of a hypothetical chapter 7 liquidation, Exhibit C contains alternative liquidation analyses based upon the alternative litigation assumptions set forth in Sections I.D.2.a.-c. below.

a.   *Assuming Minimum Plan Trust Assets*

The table below assumes that the Disputed Non-Debtor PIA Funds, the Restricted PIA Funds, and the Lay Pension Fund are all determined not to be Unrestricted Assets of the Debtor's bankruptcy estate, and are not contributed to the Plan Trust.

| CDOW-Only Plan (Disputed Pooled Investments All Out) | | | | | |
|---|---|---|---|---|---|
| **Class** | **Description** | **Allowed Amount (thousands)** | | **Total Distribution from Plan Trust Assets (thousands)** | | **% Recovery from Plan Trust Assets** |
| | | **Low** | **High** | **w/ Low Class 3A** | **w/ High Class 3A** | |
| 3A | Survivor Claims | $35,076 | $107,596 | $5,701 | $9,311 | 8.7% - 16.3% |
| 3B | Lay Pension Claims | $47,190 | | $7,670 | $4,084 | 8.7% - 16.3% |
| 3C | DEDA Bond Transaction Claims | $11,408 | | N/A (Paid by Reorganized Debtor and/or from Restricted Assets) | | |
| 3D | Clergy Pension Claims | $13,107 | | N/A (Paid by Reorganized Debtor and/or from Restricted Assets) | | |
| 3E | Gift Annuity Claims | $106 | | N/A (Paid by Reorganized Debtor and/or from Restricted Assets) | | |
| 3F | Other Unsecured Claims | $300 | | $49 | $26 | 8.7% - 16.3% |
| 4 | Penalty Claims | Unknown | | $0 | | 0% |

b.   a. *Assuming the Status Quo*

The table below assumes the current status quo for any matters that are subject to pending litigation, with footnotes indicating where a particular litigated outcome would affect the amount of Allowed Claims and/or distributions to Classes of Creditors under the Plan.

| CDOW-Only Plan (Status Quo) | | | | | |
|---|---|---|---|---|---|
| **Class** | **Description** | **Allowed Amount (thousands)** | | **Total Distribution from Plan Trust Assets (thousands)** | | **% Recovery from Plan Trust Assets** |
| | | **Low** | **High** | **w/ Low Class 3A** | **w/ High Class 3A** | |
| 3A | Survivor Claims | $35,076 | $107,596 | $21,343 | $45,773 | 42.5% - 60.8% |
| 3B | Lay Pension Claims | $47,190[14] | | $28,714 | $20,076 | 42.5% - 60.8% |

[14] The Lay Employees Committee has commenced an action to recover the Lay Pension Fund (valued at $4,892,601 as of 2/28/11) for the benefit of lay pensioners. The Creditors Committee has indicated it would oppose this action. If the Lay Employees Committee were successful, the Debtor estimates that the Claims payable by the Plan Trust and the Plan Trust Assets would both decrease by approximately $4.9 million.

11

YCST01:<s>10788119.2</s>10788119.4                                                                      068902.1001

| | | Allowed Amount (thousands) | | Total Distribution from Plan Trust Assets (thousands) | | % Recovery from Plan Trust Assets |
|---|---|---|---|---|---|---|
| **CDOW-Only Plan (Status Quo)** | | | | | | |
| Class | Description | Low | High | w/ Low Class 3A | w/ High Class 3A | |
| 3C | DEDA Bond Transaction Claims | $11,408 | | N/A (Paid by Reorganized Debtor and/or from Restricted Assets)[15] | | |
| 3D | Clergy Pension Claims | $13,107 | | N/A (Paid by Reorganized Debtor and/or from Restricted Assets)[16] | | |
| 3E | Gift Annuity Claims | $106 | | N/A (Paid by Reorganized Debtor and/or from Restricted Assets)[17] | | |
| 3F | Other Unsecured Claims | $86,273[18] | | $52,495 | $36,702 | 42.5% - 60.8% |
| 4 | Penalty Claims | Unknown | | $0 | $0 | 0% |

c. ~~b.~~ *Assuming* _Maximum_ *Plan Trust Assets*

The table below assumes that all funds in the Pooled Investment Account, including those the Debtor considers to be Restricted Assets, are determined to be Unrestricted Assets of the Debtor's bankruptcy estate and are contributed to the Plan Trust.

| | | Allowed Amount (thousands) | | Total Distribution from Plan Trust Assets (thousands) | | % Recovery from Plan Trust Assets |
|---|---|---|---|---|---|---|
| **CDOW-Only Plan (Pooled Investments All In)** | | | | | | |
| Class | Description | Low | High | w/ Low Class 3A | w/ High Class 3A | |
| 3A | Survivor Claims | $35,076 | $107,596 | $24,612 | $54,889 | 51% - 70.2% |

[15] Class 3C Claims would not receive any distribution from Plan Trust Assets unless the Capital Campaign Fund were determined to be an Unrestricted Asset of the Estate, in which case, the Debtor estimates that the Unsecured Claims payable by the Plan Trust would increase by approximately $11.4 million and the Plan Trust Assets would increase by approximately $8.9 million. The Debtor believes, and this table thus assumes, that the Capital Campaign Fund is a Restricted Asset.

[16] Class 3D Claims would not receive any distribution from Plan Trust Assets unless the Clergy Pension Fund were determined by a Final Order to be an Unrestricted Asset of the Estate, in which case, the Debtor estimates that the Plan Trust Assets would increase by approximately $3.7 million and the Unsecured Claims payable by the Plan Trust would increase by approximately $13.1 million. The Debtor believes, and this table thus assumes, that the Clergy Pension Fund is a Restricted Asset.

[17] Class 3E Claims would not receive any distribution from Plan Trust Assets unless the Gift Annuity Funds were determined by a Final Order to be Unrestricted Assets of the Estate, in which case, the Debtor estimates that the Claims payable by the Plan Trust and the Plan Trust Assets would both increase by approximately $106,000. The Debtor believes, and this table thus assumes, that the Gift Annuity Funds are Restricted Assets.

[18] **As illustrated by the third table below, if a Final Order is entered determining the Disputed Non-Debtor PIA Funds are not property of the Debtor's bankruptcy estate, the Debtor estimates that the Claims payable by the Plan Trust would decrease by approximately $75.8 million and the Plan Trust Assets would decrease by approximately $84.2 million.**

12

| CDOW-Only Plan (Pooled Investments All In) | | | | | |
|---|---|---|---|---|---|
| Class | Description | Allowed Amount (thousands) | | Total Distribution from Plan Trust Assets (thousands) | | % Recovery from Plan Trust Assets |
| | | Low | High | w/ Low Class 3A | w/ High Class 3A | |
| 3B | Lay Pension Claims | $47,190 | | $33,112 | $24,074 | 51% - 70.2% |
| 3C | DEDA Bond Transaction Claims | $11,408 | | $8,005 | $5,820 | 51% - 70.2% |
| 3D | Clergy Pension Claims | $13,107 | | $9,197 | $6,686 | 51% - 70.2% |
| 3E | Gift Annuity Claims | $106 | | $74 | $54 | 51% - 70.2% |
| 3F | Other Unsecured Claims | $86,273 | | $60,535 | $44,011 | 51% - 70.2% |
| 4 | Penalty Claims | Unknown | | $0 | | 0% |

e. *Assuming* ~~Minimum~~ *Plan Trust Assets*

~~The table below assumes that the Disputed Non-Debtor PIA Funds, the Restricted PIA Funds, and the Lay Pension Fund are all determined not to be Unrestricted Assets of the Debtor's bankruptcy estate, and are not contributed to the Plan Trust.~~

| ~~CDOW-Only Plan (Disputed Pooled Investments All Out)~~ | | | | | | |
|---|---|---|---|---|---|---|
| ~~Class~~ | ~~Description~~ | ~~Allowed Amount (thousands)~~ | | ~~Total Distribution from Plan Trust Assets (thousands)~~ | | ~~% Recovery from Plan Trust Assets~~ |
| | | ~~Low~~ | ~~High~~ | ~~w/ Low Class 3A~~ | ~~w/ High Class 3A~~ | |
| ~~3A~~ | ~~Survivor Claims~~ | ~~$35,076~~ | ~~$107,596~~ | ~~$5,701~~ | ~~$9,311~~ | ~~8.7% - 16.3%~~ |
| ~~3B~~ | ~~Lay Pension Claims~~ | ~~$47,190~~ | | ~~$7,670~~ | ~~$4,084~~ | ~~8.7% - 16.3%~~ |
| ~~3C~~ | ~~DEDA Bond Transaction Claims~~ | ~~$11,408~~ | | ~~N/A (Paid by Reorganized Debtor and/or from Restricted Assets)~~ | | |
| ~~3D~~ | ~~Clergy Pension Claims~~ | ~~$13,107~~ | | ~~N/A (Paid by Reorganized Debtor and/or from Restricted Assets)~~ | | |
| ~~3E~~ | ~~Gift Annuity Claims~~ | ~~$106~~ | | ~~N/A (Paid by Reorganized Debtor and/or from Restricted Assets)~~ | | |
| ~~3F~~ | ~~Other Unsecured Claims~~ | ~~$300~~ | | ~~$49~~ | ~~$26~~ | ~~8.7% - 16.3%~~ |
| ~~4~~ | ~~Penalty Claims~~ | ~~Unknown~~ | | ~~$0~~ | | ~~0%~~ |

13

**PLEASE NOTE** THAT NOTHING HEREIN IS INTENDED, NOR SHOULD IT BE CONSTRUED, AS AN ADMISSION BY THE DEBTOR AS TO THE ESTIMATED OR ALLOWED AMOUNT OF ANY CLAIM OR GROUP THEREOF, OR AS A GUARANTEE OR ASSURANCE OF A PARTICULAR RECOVERY, OR RANGE OF RECOVERIES, ON ANY ALLOWED CLAIM OR GROUP THEREOF. THE DEBTOR RESERVES ALL RIGHTS WITH RESPECT TO THE ESTIMATION AND ALLOWANCE OF CLAIMS.

### E. Recommendation

THE DEBTOR RECOMMENDS THAT ALL CREDITORS ENTITLED TO VOTE ON THE PLAN CAST THEIR BALLOTS TO ACCEPT THE PLAN, AND. THE DEBTOR RECOMMENDS THAT ~~ALL~~ HOLDERS OF SURVIVOR CLAIMS ~~VOTE TO APPROVE THE PROPOSED GLOBAL,~~ LAY PENSION CLAIMS, AND DEDA BOND TRANSACTION CLAIMS CAST THEIR BALLOTS TO ACCEPT THE PLAN BOTH AS A SETTLEMENT ~~EMBODIED~~PLAN AND, IN THE ALTERNATIVE, AS A CDOW-ONLY PLAN. THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN AS A SETTLEMENT PLAN WILL PROVIDE THE GREATEST AND EARLIEST POSSIBLE RECOVERIES TO HOLDERS OF SURVIVOR CLAIMS AND WILL PROVIDE THE BEST POSSIBLE OUTCOME TO OTHER CREDITORS.~~IN THE ABSENCE OF A GLOBAL SETTLEMENT, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN AS A CDOW-ONLY PLAN WILL PROVIDE THE GREATEST AND EARLIEST POSSIBLE RECOVERIES TO CREDITORS~~ AND STAKEHOLDERS.

~~FAILURE TO ACHIEVE CONFIRMATION OF THE PLAN COULD RESULT IN THE ESTATE BECOMING ADMINISTRATIVELY INSOLVENT~~

THE LAY EMPLOYEES COMMITTEE RECOMMENDS THAT HOLDERS OF LAY PENSION CLAIMS CAST THEIR BALLOTS TO REJECT THE PLAN AS A SETTLEMENT PLAN (I.E., VOTE NO ON THE SETTLEMENT PLAN), BUT DOES RECOMMEND THAT HOLDERS OF LAY PENSION CLAIMS CAST THEIR BALLOTS TO ACCEPT THE PLAN AS A CDOW-ONLY PLAN (I.E., VOTE YES ON THE CDOW-ONLY PLAN).

## II. ELIGIBILITY TO VOTE

Pursuant to the provisions of the Bankruptcy Code, only classes of claims that are "impaired" under a plan may vote to accept or reject such plan. Generally, a claim is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected the Plan under § 1126(g) of the Bankruptcy Code and therefore, such holders do not need to vote on the Plan.

Under the Plan, the Claims in Classes 1 (Secured Claims) and 2 (Priority Claims) are unimpaired and conclusively presumed to have accepted the Plan. Holders of Claims in Classes

3A (Survivor Claims), 3B (Lay Pension Claims), and 3C (DEDA Bond Transaction Claims) are impaired and are entitled to vote to accept or reject the Plan. Holders of Claims in Classes 3D (Clergy Pension Claims), 3E (Gift Annuity Claims), and 3F (Other Unsecured Claims) are potentially impaired and are entitled to vote to accept or reject the Plan. Holders of Claims in Class 4 (Penalty Claims) are impaired, but will not retain or receive any property under the Plan and, accordingly, are conclusively presumed to have rejected the Plan.

The record date for determining any Creditor's eligibility to vote on the Plan is [_____];May 19, 2011. Only those Creditors entitled to vote on the Plan will receive a Ballot with this Disclosure Statement. Only Creditors may vote unless a properly executed, written power of attorney is submitted with the Ballot evidencing such Creditor's intention to have such other person complete the Ballot on the Creditor's behalf. Notwithstanding the foregoing, the signature of an attorney on a Ballot shall constitute the attorney's certification to the Bankruptcy Court that he or she has authority to vote the Claim on behalf of the Creditor, and shall satisfy the power-of-attorney requirement.

**CREDITORS WHOSE CLAIMS ARE SUBJECT TO A PENDING OBJECTION TO ALLOWANCE BY THE DEBTOR ARE NOT ELIGIBLE TO VOTE UNLESS SUCH OBJECTIONS ARE RESOLVED IN THEIR FAVOR OR, AFTER NOTICE AND A HEARING PURSUANT TO BANKRUPTCY RULE 3018(a), THE BANKRUPTCY COURT ALLOWS THE CLAIM TEMPORARILY OR ESTIMATES THE AMOUNT OF THE CLAIM FOR THE PURPOSE OF VOTING TO ACCEPT OR REJECT THE PLAN. ANY SUCH CREDITOR THAT WANTS ITS CLAIM TO BE ALLOWED TEMPORARILY OR ESTIMATED FOR THE PURPOSE OF VOTING MUST TAKE THE STEPS NECESSARY TO ARRANGE AN APPROPRIATE HEARING WITH THE BANKRUPTCY COURT UNDER BANKRUPTCY RULE 3018(a).**

## III.    BACKGROUND OF THE DEBTOR AND THE CHAPTER 11 CASE

### A.    General Background[19]

As noted above, the Debtor is the secular legal embodiment of the Diocese,[20] the latter of which is an entity having an ecclesiastical legal existence under the Code of Canon Law ("Canon Law") governing the Roman Catholic Church (the "Church").[21] The Ordinary of the Diocese, currently the Most Reverend W. Francis Malooly (the "Bishop") is the sole member and president of the Debtor.

---

[19] In the interest of brevity, discussion of Canon Law and Church doctrine and belief is by way of general summary only, does not capture many nuances or complexities, and eschews terms of art in favor of more common terminology. Statements concerning Canon Law are qualified in their entirety by the actual Code of Canon Law as interpreted and applied by the Church. Matters of faith asserted as facts herein reflect the established belief and doctrine of the Church. Qualifying phrases such as "the Church teaches that" or "the Debtor believes that" have been omitted for the sake of brevity, but should be implied wherever the context so requires.

[20] For the avoidance of doubt, the term "Diocese" is used herein exclusively to refer to the juridic person of the Diocese under Canon Law, and the terms "CDOW" or the "Debtor" are used herein exclusively to refer to the secular legal embodiment of the Diocese.

[21] For the avoidance of doubt, the capitalized term "Church" is used herein exclusively to refer to the universal church (i.e., the "one, holy, catholic, and apostolic church" of Catholic belief, seated in the Vatican and headed by Pope Benedict XVI). Particular places of worship are referred to as "churches" without capitalization.

15

068902.1001

## 1.    Structure and Organization of the Church

The supreme authority of the Church is vested in the Pope (currently, Pope Benedict XVI), in whom continues the ecclesial office held by Peter, the first of the Apostles of Jesus Christ. By virtue of his office, the Pope possesses supreme, full, immediate and universal ordinary power[22] in the Church. He exercises such power in concert with the College of Bishops, as successors of the other Apostles, of which he is the head.

The Catholic community is composed of the ordained clergy (bishops, priests, and deacons) and the laity. Bishops are the primary clergy, administering all sacraments and providing leadership and governance within the Church. Priests administer most sacraments and lead local congregations, but cannot ordain other clergy nor consecrate buildings. Deacons play a limited sacramental role in the liturgy.

### a.    *Juridic Persons and Property Ownership*

In addition to "moral persons" (namely, the Church itself and the Pope) and "physical persons" (i.e., individuals), Canon Law recognizes "juridic persons," which are the subjects in Canon Law of obligations and rights which correspond to their nature.

Juridic persons are constituted either by prescript of Canon Law or by special grant of competent authority given through a decree, and they have perpetual existence unless extinguished in accordance with Canon Law. Juridic persons in the Church are either aggregates of persons or aggregates of things, ordered for a purpose which is in keeping with the mission of the Church and which transcends the purpose of the individuals. "Public" juridic persons fulfill their purposes in the name of the Church.

A particular public juridic person "owns" all property it has acquired by valid means. However, property owned by public juridic persons has the character of Church property (*de bonis ecclesiae temporalibus* – "temporal goods of the Church") and must be applied always to the purposes for which the Church is allowed to own property, namely: the organization of divine worship, the care and support of the clergy, and the works of the apostolate and of charity, especially for the needy. Property is thus held in trust by public juridic persons, who are represented by physical persons, the administrators of such property. Canonical administrators are stewards who are required to manage property "with the diligence of a good householder." This requires administrators, among other things, to:

(i) exercise vigilance so that the goods entrusted to their care are not lost or damaged;

(ii) take care that the ownership of ecclesiastical goods is protected by civilly valid methods;

(iii) observe the prescripts of both Canon Law and civil law or those imposed by a founder, a donor, or legitimate authority, and especially be on guard so that no damage comes to the Church from the non-observance of civil laws; and

---

[22] "Ordinary" power is governing power which inheres in an office by grant of divine law, as opposed to being delegated from some other governing power.

YCST01:~~10788119.2~~10788119.4                                                                 068902.1001

(iv) invest the money which is left over after expenses and can be usefully set aside for the purposes of the public juridic person.

Apart from requiring the ownership of property of a public juridic person to be protected by civilly valid means, Canon Law does not prescribe or limit the forms of secular legal entity that may be used to hold property or conduct the business of such public juridic person.

b.     *Dioceses and Parishes*

A "diocese" is a portion of the Christian faithful which is entrusted to a bishop for him to shepherd with the cooperation of the ordained clergy, so that, adhering to the bishop and gathered by him in the Holy Spirit through the gospel and the sacraments, it constitutes a particular church in which the Church is truly present and operative. As a general rule, a diocese is territorial and encompasses all the Christian faithful within its geographical bounds.

A diocese is divided into distinct parts, or "parishes." A parish is a certain community of the Christian faithful stably constituted in a particular church, whose pastoral care is entrusted to a priest as its proper pastor under the authority of the diocesan bishop. As a general rule, each parish is territorial and encompasses all the Christian faithful within its geographical bounds. Temporal goods of a parish include the church itself and a rectory (which serves as both the pastor's residence and the parish's administrative offices), and may also include social halls, schools, cemeteries, convents, and missions.

Under Canon Law, dioceses and parishes are public juridic persons having separate and distinct canonical legal existence from each other and from the Church.

c.     *Religious Orders*

Canon Law provides for the creation of "institutes of consecrated life" which enable men and women who profess the evangelical counsels of chastity, poverty (or perfect charity), and obedience by religious vows or other sacred bonds, to be joined to the Church in a special way without becoming members of the Church hierarchy. The most well-known form of consecrated life is that of "religious institutes" (hereinafter, the "Religious Orders"), which are characterized by the public profession of vows, life in common as brothers and sisters, and a separation from the world proper to the character and purpose of each institute.

Under Canon Law, Religious Orders are public juridic persons having separate and distinct canonical legal existence from dioceses, parishes, and the Church itself. Religious Orders are autonomous, and therefore exempt from the direct authority and governance of the local dioceses where they operate. Religious Order priests do not report to, or take direction from, diocesan bishops, who have no authority to supervise, punish or reassign Religious Order priests.

2.     **The Diocese and the Debtor**

The Diocese was established in March of 1868 by Pope Pius IX under the leadership of its first bishop, the Right Reverend Thomas Andrew Becker. Now under the

leadership of Bishop Malooly, the Diocese serves approximately 233,000 Catholic faithful and 57 parishes (the "Parishes") within a territory comprising the City of Wilmington and the Counties of New Castle, Kent, and Sussex in Delaware, and the nine eastern-shore counties of Caroline, Cecil, Dorchester, Kent, Queen Anne, Somerset, Talbot, Wicomico, and Worcester in Maryland. Within the Diocese there are 2 diocesan and 3 parish high schools, and 4 inter-parochial and 18 parish elementary schools, with a total enrollment of approximately 12,000 students.

The Parishes are the epicenters of pastoral activity within the Diocese. The pastors and other clergy of the Parishes are primarily responsible for proclaiming the word of God to those living within the Parish, celebrating the sacraments and directing the sacred liturgy, instructing the laity in the truths of the faith, fostering works through which the spirit of the gospel is promoted, and caring for the Catholic education of the children and youth. The role of the Diocese is primarily to provide resources, spiritual leadership, direction and support to the Parishes.

One of the vehicles available to assist the Bishop in his administration of the Diocese is the "curia," otherwise known as the Diocesan Central Offices and Ministries (the "Diocesan Curia"). The Diocesan Curia are organized into six functional departments, namely: Pastoral Services, Development, Finance, Communications, Catholic Education, and Catholic Charities. Each of these departments itself comprises a number of related ministries[23] or administrative offices. An organizational chart illustrating the ministries and offices within the Diocesan Curia is attached to the *Declaration of the Reverend Monsignor J. Thomas Cini in Support of Chapter 11 Petition and First-Day Relief* filed October 19, 2009 [Docket No. 9] (the "Cini Declaration").

From its creation until 1972, the Diocese existed civilly as an unincorporated association under Delaware state law. In December 1972, CDOW was formed pursuant to the Delaware General Corporation Law by the Most Reverend Thomas J. Mardaga, the Diocese's sixth bishop. Among CDOW's stated purposes are to promote the teachings of Jesus Christ, as taught and set forth by the Church, throughout the territory of the Diocese, and to serve as the legal entity by which the Bishop shall conduct the temporal affairs of the Diocese. In addition, CDOW is charged with acting as trustee where real, personal, or mixed property is received by grant, gift, devise or bequest, in trust, to be used for religious, educational or charitable purposes in accordance with the terms and conditions of said trusts.

CDOW is a not-for-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501(c)(3). It has (and may only have) as its sole member the Bishop, who is also the corporation's president. CDOW does not have a board of directors or any comparable governing body. However, the Diocesan Administrative Council, whose members are appointed by the Bishop, is entitled to make recommendations to the Bishop. Consistent with the general purposes of the Diocese, CDOW provides financial and certain "back-office" support for the Parishes and certain other Catholic charitable entities operating within the Diocese's territorial jurisdiction. CDOW also holds and manages certain restricted funds (including, but not

---

[23] A "ministry" is that which provides spiritual, pastoral, formational, educational or charitable services to others.

limited to, funds held in trust) received by CDOW via grant, gift, devise, or bequest to be used for Catholic religious, educational or other charitable purposes.

### 3. The Parishes and the Non-Debtor Parish Corporations

As noted above, the Parishes exist as public juridic persons under Canon Law, separate and distinct from the Diocese and the Church.

The secular legal embodiments of the Parishes are non-stock member corporations (the "Parish Corporations") formed under Delaware's Religious Societies and Corporations Statute, 27 Del. C. § 101 *et seq.*, or Maryland's Religious Corporations Law, Md. Code Corporations & Associations Art. 5-301 through 313, as applicable. As required by these statutes,[24] the Bishop is a member of each Parish Corporation. Other members include the Chancellor of the Diocese, the pastor of the Parish, and two lay members of the Parish elected annually by their fellow parishioners. The pastor of each Parish is the president and treasurer of its Parish Corporation. In terms of secular legal structure, Parish Corporations have no corporate relationship with the Debtor and are not "affiliates" of the Debtor within the meaning of § 101(2) of the Bankruptcy Code. Additionally, the Debtor does not believe these entities are "insiders" of the Debtor within the meaning of § 101(31) of the Bankruptcy Code.

Real property of each Parish is owned by, and titled in the name of, the Parish Corporation.[25] Each Parish Corporation owns a church and a rectory, and twenty also own and operate schools. Several Parish Corporations also own missions, social halls, convents, and/or cemeteries. In addition, Parish Corporations maintain their own bank accounts and investment accounts.[26]

The Parish Corporations have not sought bankruptcy relief and are not debtors in the Chapter 11 Case. However, in exchange for the Non-Debtor Catholic Entities' contribution of approximately $62 million to the Settlement Trust for the benefit of holders of Survivor Claims, the Settlement Plan would provide for an injunction prohibiting prosecution of Survivor Claims against Parish Corporations and channeling such Claims to the Settlement Trust for liquidation, allowance and payment in accordance with the Settlement Trust's distribution procedures. The following Parish Corporations have conditionally pledged cash and/or Disputed Non-Debtor PIA Funds toward the consummation of a Settlement Plan: Corpus Christi Roman Catholic Church ($250,000); Immaculate Heart of Mary Roman Catholic Church ($200,000); St. Edmond Roman Catholic Church ($200,000); St. Elizabeth Roman Catholic Church ($300,000); St. John the Beloved Roman Catholic Church ($500,000); St. Joseph on the Brandywine Roman

---

[24] *See* 27 Del. C. § 115; Md. Corporations & Associations Code § 5-315.

[25] This fact distinguishes CDOW's chapter 11 case significantly from the widely publicized diocesan bankruptcy cases in Spokane, Washington, Portland, Oregon, San Diego, California, and Fairbanks, Alaska. In each of those cases, the parishes existed civilly as unincorporated associations, and the diocese existed civilly as a "corporation sole" through the office of the diocesan bishop, which held legal title to all parish real property. A central issue in those cases was whether the real property of the parishes was included within property of the diocesan corporation sole's bankruptcy estate.

[26] As discussed below, certain Parish Corporations participate in a pooled investment program administered by CDOW.

068902.1001

Catholic Church ($150,000); St. Peter the Apostle Roman Catholic Church ($100,000); St. Thomas the Apostle Roman Catholic Church ($500,000).

**4.** **Other Non-Debtor Catholic Entities**

A number of Catholic not-for-profit corporations assist the Diocese and the Parishes in their pastoral ministry. Unlike the Debtor and the Parish Corporations, these entities have no canonical legal existence, existing solely as secular legal entities.

a. *Catholic Diocese Foundation*

Catholic Diocese Foundation ("Foundation") f/k/a the Catholic Foundation of the Diocese of Wilmington, Inc., was formed in 1928 by the Most Reverend Edward John FitzMaurice, the Diocese's fourth bishop, for the purposes of promoting the Catholic religion, Catholic education and Catholic charity within the Diocese, and of acting as trustee in cases where real, personal or mixed property is accepted by Foundation by grant, gift, devise or bequest to be used for religious, educational or charitable purposes, in accordance with the terms and conditions of said trust. Foundation was capitalized initially with donations from the faithful and a sizeable donation from John J. Raskob, a prominent businessman and philanthropist.

Foundation is a Delaware non-stock corporation having eleven members, who also constitute its board of directors. The Bishop is one member; the remaining members are elected by the board of directors, with the requirement that five members shall always be Diocesan priests and five members shall always be lay parishioners within the Diocese. Each member has one vote as a director. Foundation's operations consist primarily of the investment and management of its assets and the making of charitable grants. Although Foundation's purposes are closely aligned with the Debtor's purposes, Foundation is a separate corporation and is neither a part of the Diocese nor an "affiliate" of the Debtor within the meaning of § 101(2) of the Bankruptcy Code. Additionally, the Debtor does not believe Foundation is an "insider" of the Debtor within the meaning of § 101(31) of the Bankruptcy Code.

Foundation has conditionally pledged substantially all of its assets, including Disputed Non-Debtor PIA Funds in the amount of approximately $47 million, and certain real properties having an appraised value (as of September 2010) of approximately $6.3 million toward the consummation of a Settlement Plan.

b. *Entities Managed by the Bishop*

The following Non-Debtor Catholic Entities are managed either directly or indirectly by the Bishop:

(1)    Catholic Charities, Inc. ("Charities") – Incorporated in 1943, Charities coordinates Catholic charitable and social service programs within the Diocese, delivering critical, direct-care human services to individuals and families residing in Delaware and the eastern shore of Maryland, regardless of their religion, race, or ability to pay.

(2)    Diocese of Wilmington Schools, Inc. ("DOW Schools") – DOW Schools was incorporated in 1969 to manage and maintain real estate (both land and buildings) for educational purposes. DOW Schools owns St. Mark's High School in Wilmington, Delaware, St. Thomas More Preparatory School in Magnolia, Delaware, Christ the Teacher Catholic School in Newark, Delaware, and Most Blessed Sacrament Catholic School in Ocean Pines, Maryland.

(3)    Catholic Cemeteries, Inc. ("Cemeteries") – Formed in 1881 by special act of the Delaware legislature, Cemeteries owns and operates three cemeteries in Delaware, and also assists Parishes with their own cemeteries, providing assistance with the practical details of arranging for burial, pre-need planning, and memorializing. Cemeteries has conditionally pledged substantially all of its operating reserves, consisting of Disputed Non-Debtor PIA Funds in the amount of approximately $3.4 million, toward the consummation of a Settlement Plan.

(4)    Catholic Ministry of the Elderly, Inc. ("Ministry to the Elderly") – Ministry to the Elderly was incorporated in 1978 to own and operate Marydale Retirement Community, a 108-unit housing facility for low-income senior citizens and handicapped adults subsidized by the U.S. Department of Housing and Urban Development.

(5)    Catholic Press of Wilmington, Inc. ("Catholic Press") – Catholic Press was incorporated in 1965 to own and publish an annual Catholic Directory and *The Dialog*, a weekly Catholic information newspaper circulated to approximately 55,000 households within the Diocese.

(6)    Catholic Youth Organization, Inc. ("Catholic Youth") – Incorporated in 1946 and currently d/b/a Catholic Youth Ministry, Inc., Catholic Youth's objective is to promote and encourage, through moral, social, athletic and religious influences, wholesome supervised recreational and formational activities for young people.

(7)    Seton Villa, Inc. ("Seton Villa") – Formed in 1904 as Sisters of Charity of St. Peters School, Inc., Seton Villa's purpose is to deliver social services to dependent, neglected and abused children. Until July 2010, Seton Villa operated a home for 6-10 children who formerly resided in Delaware state hospitals. Seton Villa currently has no operations. Seton Villa has conditionally pledged cash and Disputed Non-Debtor PIA Funds in the amount of approximately $2.2 million toward the consummation of a Settlement Plan.

(8)    Siena Hall, Inc. ("Siena Hall") – Siena Hall was incorporated in 1905 as the Roman Catholic Male Protectory, Inc. and formerly owned and operated a boys' home. At the present time, Siena Hall's only ~~asset is cash that~~assets are its investment reserves, income from which is used to fund Charities' services for the care and welfare of children. Siena Hall has conditionally pledged Disputed Non-Debtor PIA Funds in the amount of $1.5 million toward the consummation of a Settlement Plan.

21

(9)    Children's Home, Inc. ("Children's Home") – Formed in 1863 under different ownership, CHI owns a vacant home in north Wilmington, Delaware in which it previously operated an orphanage. CHI also ~~holds cash,~~has investment reserves, income from which is also used to fund Charities' services for the care and welfare of children. Children's Home has conditionally pledged Disputed Non-Debtor PIA Funds in the amount of $1.5 million and its real property (having an appraised value, as of September 2010, of $1.6 million) toward the consummation of a Settlement Plan.

In terms of the ecclesial organizational structure of the Diocese, the foregoing entities generally correspond to departments, ministries, and administrative offices within the Diocesan Curia. Specifically, the Catholic Charities Department corresponds generally to Charities, with Seton Villa, Siena Hall, and Children's Home constituting ministries within the department. Catholic Youth is a ministry within the Catholic Education Department, and Cemeteries is a ministry within the Pastoral Services Department. Ministry to the Elderly and Catholic Press are ministries that report directly to the Moderator of the Curia, currently Rev. Msgr. J. Thomas Cini, who is also the Vicar General of Administration of the Diocese.

In terms of secular legal structure, the foregoing entities have no corporate relationship with the Debtor, and are not "affiliates" of the Debtor within the meaning of § 101(2) of the Bankruptcy Code. Additionally, the Debtor does not believe these entities are "insiders" of the Debtor within the meaning of § 101(31) of the Bankruptcy Code.

### B.    CDOW's Operations and Assets

#### 1.    CDOW's Sources of Income

There are three primary sources of funds used by CDOW to support its operations: (i) an annual tax on Parish income (the "Parish Assessments"); (ii) an annual appeal to all parishioners within the Diocese (the "Annual Appeal"); and (iii) earnings on assets held for investment. In addition, CDOW may from time to time take up special appeals or "capital campaigns" for specified purposes such as the construction of new facilities or repairs to existing facilities.

##### a.    *Parish Assessments*

The Parish Assessments are a percentage of the first collections taken by the Parishes at their masses, and are payable to the Diocese by the Parishes pursuant to Canon Law and Church custom. There is no secular legal basis for the Parish Assessments or any secular law that obligates any Parish Corporation to remit the Parish Assessments, or any portion thereof, to CDOW. The Parish Assessments are billed on a quarterly basis and used to support CDOW's general operations, including expenses associated with the Lay Employee Pension Plan (as defined below), which indirectly benefit of all Parish Corporations. For the fiscal year ended June 30, 2010, amounts billed for Parish Assessments totaled $3,863,750.

##### b.    *Annual Appeal*

The Annual Appeal is a Diocese-wide unified effort, occurring in the spring of each year, in which all parishioners within the Diocese are asked to provide critical financial

22

068902.1001

support to more than two dozen specific services, programs, and Catholic ministries, which is used to underwrite operating budgets.[27] Solicitation for the Annual Appeal typically begins with "Circle of Honor" dinners early in the year,[28] followed by a mailing to all parishioners,[29] and ending with in-pew solicitations at masses on "Commitment Weekend," typically in March or April.

The programs supported by the Annual Appeal are concentrated in the following five areas:

(1)    Catholic Education – Includes Campus Ministry, Catholic Youth Ministry, Boy & Girl Scouts, Catholic Schools, Deaf & Special Needs Ministry, and Religious Education.

(2)    High Schools – Includes Padua Academy, St. Elizabeth, and St. Mark's in Wilmington, Delaware; St. Thomas More Preparatory School in Magnolia, Delaware; and Ss. Peter & Paul in Easton, Maryland.

(3)    Pastoral Services – Includes Institutional Chaplains, Hispanic Ministry, Ministry for Black Catholics, Office of Worship, Office for Religious Archives, the Tribunal, and Ordained Permanent Deacons.

(4)    Catholic Charities – Includes AIDS Ministry, Adoption Services and Pregnancy Counseling, Bayard House (a fully-licensed residential program serving homeless or transitional pregnant minors and young women in Delaware), Casa San Francisco (an emergency shelter and food pantry in Milton, Delaware), Clinical and Children's Services, Catholic Charities Thrift Store, Crisis Alleviation, Energy Assistance Program, Family Life Bureau, Immigration and Refugee Resettlement Program, Parish Social Ministry, and Seton Center (a multi-purpose neighborhood community center located in a low-income area of Princess Anne, Maryland).

(5)    Communications    –    Includes    the    Diocesan    Office    of Communications and *The Dialog*.

The solicitation brochure for the Annual Appeal provides a revenue target and identifies the percentage of the contributions that will go to each of the five program areas. The brochure provides specifically that Annual Appeal gifts are used solely to fund the ministries, programs, and services outlined therein and that no Annual Appeal gift has ever been or will be used to satisfy legal fees or settlement costs associated with matters of sexual abuse (discussed further below). CDOW believes this limitation on the use of the Annual Appeal gifts is necessary

---

[27] The Annual Appeal is not an endowment-building campaign. Funds raised via the Annual Appeal in a given year are spent on budgeted items, and new funds are solicited the following year, and so on.

[28] These dinners honor a relatively small number of parishioners who give at "Circle of Honor" gift levels of $500, $1,000, $2,500, or $5,000. The success of the Annual Appeal depends heavily on these donations. For instance, nearly $2.24 million (51%) of the 2008 Annual Appeal revenue came from 2,156 parishioners who gave gifts at "Circle of Honor" levels.

[29] A copy of the mailed solicitation brochure for the 2009 Annual Appeal is attached to the Cini Declaration as Exhibit C.

to ensure the Catholic faithful will continue giving at levels necessary to support the ministries, programs, and services benefited by the Annual Appeal.

## 2. Operations

Through the Diocesan Curia, CDOW provides centralized pastoral and educational support, communications, fundraising, and administrative services for the Non-Debtor Catholic Entities. Services provided by CDOW include, but are not limited to, the following.

### a. *Payroll Services*

Through ADP, CDOW provides payroll processing services to certain Non-Debtor Catholic Entities. For a given pay period, CDOW calculates amounts owing to the employees of the Non-Debtor Catholic Entities, which forward the appropriate amount to a payroll account maintained by CDOW (the "Payroll Account"). ADP prepares payroll checks, which are drawn upon the Payroll Account. By centralizing the payroll processing services at CDOW and maintaining a single relationship with ADP, CDOW is able to provide administrative cost savings to the Non-Debtor Catholic Entities with only a minimal marginal cost increase to CDOW.

### b. *Health Insurance*

Through Blue Cross/Blue Shield of Delaware ("BC/BS"), CDOW manages a self-insured health-insurance program (the "Group Health Insurance Plan") for the benefit of employees of CDOW and the Non-Debtor Catholic Entities. The Non-Debtor Catholic Entities pay a monthly premium for their participation in the Group Health Insurance Plan. Monthly premiums are established based upon experience rating. Historically, premiums collected from the Non-Debtor Catholic Entities have covered the cost of claims made by their employees.

By covering their employees under a single plan, CDOW and the Non-Debtor Catholic Entities benefit from significant cost savings as a result of the pooled risk and the allocation of plan overhead. Indeed, a health insurance plan for any one of these entities alone would be prohibitively expensive, due to the small number of employees that would be covered.

### c. *Lay Employee Pension Plan*

CDOW sponsors the Lay Employees of the Diocese of Wilmington Pension Plan (the "Lay Pension Plan"), a defined-benefit pension plan covering employees of CDOW and the Non-Debtor Catholic Entities. Amounts necessary to fund obligations under the Lay Employee Pension Plan consist of (i) amounts held in an irrevocable trust (the "Lay Pension Plan Trust") under that certain Trust Agreement dated August 1, 1999, between CDOW and Mellon Bank, N.A., as Trustee, and (ii) certain investments on deposit in the Pooled Investment Program (as defined below, such investments constituting the "Lay Pension Fund"). The Lay Pension Plan is a "church plan" as defined in Section 3(33) of the Employee Retirement Income Security Act of 1974 ("ERISA") and as such is exempt from the provisions of ERISA pursuant to Section 4 of ERISA. The Pension Plan is also a "church plan" as defined in Section 414(e) of the Internal

068902.1001

Revenue Code of 1986 (the "IRC") and is, therefore, exempt from most of the provisions of the IRC that are applicable to qualified retirement plans.

CDOW historically made all contributions to the Lay Pension Plan and, with few exceptions, did not collect any amounts from the Non-Debtor Catholic Entities that were specifically earmarked as employer contributions to the Lay Employee Pension Plan. However, as noted above, Parish Corporations' employer contributions to the Lay Pension Plan were effectively subsumed within the Parish Assessments.

As of February 28, 2011, the value of the assets in the Lay Pension Plan Trust was approximately $4.95 million, and the value of the assets in the Lay Pension Fund was approximately $4,894.89 million. Based on the most recent actuarial estimates, the Debtor believes that, as of January 1, 2010, the net present value of accrued benefits under the Lay Pension Plan was approximately $53.3 million, of which approximately $52.1 million were vested.

d. *Clergy Pension Plan*

Consistent with Canon Law and Church custom, CDOW provides a pension plan for retired Diocesan priests (the "Clergy Pension Plan"). At present, 2829 of the 2931 eligible clergy pensioners[30] each receive pension benefits of approximately $21,500 per year, which benefits are paid from a restricted sub-fund within the Pooled Investment Account (the "Clergy Pension Fund") that was funded originally from a $1 million restricted gift from Foundation in 1978. *In accordance with the Stipulated Order Dismissing Debtor's Motion for Order Authorizing Debtor (I) to Continue Providing Pensions, Sustenance and/or Medical Coverage in the Ordinary Course to Certain Retired or Removed Priests Accused of Sexual Abuse, and (II) to Use Certain Restricted Assets to Pay Prepetition Priest Pension Obligations [Docket No. 342], the Debtor does not currently provide pension benefits to Rev. John Sarro or Rev. Douglas Dempster, both of whom were removed from the public ministry[31] and are currently subject to laicization proceedings before the Vatican on account of admitted, corroborated or otherwise substantiated allegations of sexual abuse of minors. Upon their laiciziation, Sarro and Dempster would no longer be eligible for benefits under the Clergy Pension Plan.*

As of January 31, February 28, 2011, the value of the assets in the Clergy Pension Fund was approximately $3.7 million. Based on actuarial estimates, the Debtor believes that, as of January 1, 2010, the net present value of vested benefits under the Clergy Pension Plan was approximately $13.1 million.

---

[30] *In accordance with the Stipulated Order Dismissing Debtor's Motion for Order Authorizing Debtor (I) to Continue Providing Pensions, Sustenance and/or Medical Coverage in the Ordinary Course to Certain Retired or Removed Priests Accused of Sexual Abuse, and (II) to Use Certain Restricted Assets to Pay Prepetition Priest Pension Obligations* [Docket No. 342], the Debtor does not currently provide pension benefits to one of the eligible clergy pensioners.

[31] Sarro was credibly accused in 1998 of abuse relating to a time he was serving overseas, and he was removed from the public ministry that year. No lawsuit has been filed against Sarro or the Debtor on account of this abuse. The Debtor settled a claim of "John Goe #1" in 1993 involving credible allegations of abuse by Dempster, and he was removed from the public ministry that year. Sarro and Dempster are not accused of abuse in any of the lawsuits currently pending against the Debtor. However, John Goe #1 has sued Dempster and three Parish Corporations in a case to which the Debtor is not a party, on account of the claims settled by the Debtor in 1993.

25

e.  *Pooled Investment Program*

The Debtor and certain ~~of the Non-Debtor Catholic Entities~~non-debtor entities (collectively, the "Non-Debtor Pooled ~~Investment Participants~~Investors") participate in an investment program (the "Pooled Investment Program") managed by the Debtor, as trustee, in which funds are pooled for investment purposes in a custodial account (the "Pooled Investment Account" or "PIA") maintained by the Debtor at Bank of New York Mellon (f/k/a Mellon Bank) ("Mellon" or the "Custodian"). Money in the PIA is invested in twelve sub-accounts – one "cash management" account (i.e., a Mellon money-market fund) and eleven diversified "custody" accounts managed by individual investment managers or mutual funds. The Debtor accounts for the Non-Debtor Pooled ~~Investment Participants~~Investors' beneficial interests in the PIA as "sub-funds" within each PIA, each sub-fund representing a fractional interest in one or more of the cash management and/or custody accounts depending on the particular Non-Debtor Pooled ~~Investment Participant~~Investor's preferred investment mix. There are more than 170 such sub-funds, approximately 75 of which represent ~~non-debtor~~Non-Debtor Pooled ~~Investment Participants~~Investors' interests in the PIA. The Debtor keeps meticulous, extensive and accurate accounting records as to each of the sub-fund's share of the assets in each of the investment accounts and the cash management account.

The Non-Debtor Pooled ~~Investment Participants~~Investors participate in the Pooled Investment Program because pooling their investment capital with a single custodian enables them to access investment opportunities that may otherwise be unavailable to them individually, and to benefit from reduced transaction costs and the allocation of overhead. As of February 28, 2011, the PIA had a gross balance of approximately $127 million, and the assets in the ~~non-debtor~~Non-Debtor Pooled ~~Investment Participants~~Investors' sub-funds were valued at approximately $84.2 million in the aggregate, as set forth more particularly in Exhibit H hereto. As discussed below, on June 28, 2010, the Bankruptcy Court ruled that the non-debtor Pooled Investment Participants' sub-funds, save for those of St. Ann's Roman Catholic Church,[32] were property of the Debtor's bankruptcy estate. This ruling is presently on appeal to the Third Circuit Court of Appeals.

3.  **CDOW's Assets**

CDOW owns certain real estate as set forth below, with appraised values as of September 2010:

| Address | Description | Appraised Value[33] |
|---|---|---|
| 1307 North Bancroft Parkway Wilmington, Delaware | Bishop's Residence | $515,000 |
| 1626 North Union Street Wilmington, Delaware | Education Office | $1,150,000 |

---

[32] As of the date of the Court's ruling, St. Ann's investments were valued at approximately $1.5 million.

[33] Based on appraisals conducted by Delaware Appraisal Group on behalf of Catholic Diocese Foundation in or about July 2010, without reduction for the estimated costs of sale.

26

| Address | Description | Appraised Value[33] |
|---|---|---|
| 1925 Delaware Avenue Wilmington, Delaware | Chancery Office | $1,350,000 |
| 45 and 51 Lovett Avenue Newark, Delaware | Neumann Center at the University of Delaware | $1,100,000 |
| | TOTAL | $4,115,000 |

If the Plan is confirmed as a Settlement Plan, the Bishop's residence will be sold, and it is expected the remaining properties will be retained by the Reorganized Debtor. If the Plan is confirmed as a CDOW-Only Plan, then subject to the Reorganized Debtor's right to retain up to $3 million in the aggregate of Reorganization Assets, all of these real properties, or money's worth, will be contributed to the Plan Trust for the benefit of Creditors of the Debtor.

CDOW also holds the following unrestricted personal property, with estimated values as of February 28, 2011:

| Unrestricted Asset | Estimated Value |
|---|---|
| Insurance Assets (CDOW interest only)[34] | $ 13,306,559 |
| Cash and Equivalents | $ 591,152 |
| PIA Investments (Includes Lay Pension Fund: $4,892,601) | $ 9,808,156 |
| Disputed Non-Debtor PIA Funds[35] | $ 84,238,228 |
| Notes Receivable | $ 1,450,331 |
| Miscellaneous Assets | $ 1,047,695 |
| TOTAL | $ 110,442,121 |

If the Plan is confirmed as a Settlement Plan, (i) any portion of the Disputed Non-Debtor PIA Funds not ~~contributed to the~~pledged by the Non-Debtor Pooled Investors toward consummation of a Settlement ~~Trust as part of the NDCE Settlement Contribution will be returned to the non-~~

---

[34] CDOW is a co-insured with non-debtor Parish Corporations under a number of policies. As discussed further below, in a Settlement Plan, the non-debtors' economic interest in these policies would be contributed to the Plan Trust for the benefit of holders of Allowed Survivor Claims. In a CDOW-Only Plan, the allocation of the proceeds of shared insurance between CDOW and the non-debtors would likely need to be resolved via litigation.

[35] Identification of the Disputed Non-Debtor PIA Funds as Unrestricted Assets is without prejudice to the rights of any Non-Debtor Pooled Investor to assert such assets are subject to legally enforceable restrictions on use and/or disposition.

27

068902.1001

debtor pooled investors Plan will revert to the Non-Debtor Pooled Investors, (ii) the Lay Pension Fund and an additional $5 million would be contributed to the Lay Pension Plan Trust, and (iii) the remaining Unrestricted Assets, if any, after establishment of necessary reserves for the payment of administrative expenses, would revest in the Reorganized Debtor. If the Plan is confirmed as a CDOW-Only Plan, then subject fully to (i) the PIA Dispute Escrow and Lay Pension Dispute Escrow provisions of the Plan discussed below and (ii) the Reorganized Debtor's right to retain up to $3 million in the aggregate of Reorganization Assets, the Unrestricted Assets will be contributed to the Plan Trust for the benefit of Creditors of the Debtor.

Finally, CDOW holds the following personal property which the Debtor believes is subject to donor-imposed restrictions on use and/or disposition because (i) it was solicited for specific or limited purposes (e.g., the Annual Appeal, capital campaign funds, and special collections), (ii) it is held in trust, or (iii) the donor imposed such restrictions in making the gift, devise, or bequest of such property to CDOW.

| Restricted Asset | Estimated Value |
|---|---|
| Cash and Equivalents (Includes Bishop's Discretionary Fund: $82,639) | $ 460,775 |
| Restricted PIA Funds (Includes Capital Campaign Fund of $8,872,826; Clergy Pension Fund of $3,657,985; and Gift Annuity Funds totaling $106,760) | $ 32,982,956 |
| Beneficial Interest in Life Insurance Policies | $ 53,743 |
| TOTAL | $ 33,497,474 |

Consistent with CDOW's obligations under Canon Law, its corporate purposes, applicable state law governing trusts and charitable gifts, and §§ 363(d) and 1129(a)(16) of the Bankruptcy Code,[36] the Plan proposes to respect any and all legally enforceable restrictions on the use or disposition of assets in its possession. Accordingly, subject fully to the Restricted Fund Dispute Escrow provisions applicable if the Plan is confirmed as a CDOW-Only Plan, the Reorganized Debtor will retain the Restricted Assets.[37]

### 4. Insurance

CDOW owns certain insurance policies that provide coverage for Survivor Claims and for a breach of fiduciary duty claim that has been asserted by the Lay Employees Committee.

---

[36] Sections 363(d) and 1129(a)(16) require a not-for-profit debtor to abide by applicable nonbankruptcy law governing the transfer of property by not-for-profit entities with respect to any transfers of property during its bankruptcy case or under its chapter 11 plan.

[37] As discussed below, the Bishop's Discretionary Fund will be used to establish a charitable trust to provide financial assistance to Abuse Survivors and their families.

Prior to 1977, CDOW and Non-Debtor Catholic Entities, including Parish Corporations, purchased individual policies providing property and liability insurance coverage. So far as is known, during the period 1960-77, all of the CDOW policies, and most of the Parish Corporation policies, were placed through Waldorf & Associates, a domestic broker, and Wright Deen & Co., a London broker, and were issued by certain Underwriters at Lloyd's, London. Most of the placing slips and related documentation of these pre-1977 London policies are lost or were destroyed, but an inventory of these policies, including the available limits of coverage, is attached hereto as Exhibit E. A search for additional documentation of pre-1977 London policies is ongoing, and to assist in that regard, the Debtor has retained R.M. Fields, an insurance archaeologist.

Prior to 1977, certain Parish Corporations purchased insurance domestically through a broker or brokers other than Waldorf & Associates. None of these policies yet has been located, but a search for them is ongoing.

Beginning in 1977, CDOW initiated through Waldorf & Associates a single, comprehensive insurance program which, from 1977-present, continuously has provided property, liability and certain other coverages for CDOW and Non-Debtor Catholic Entities, including all Parish Corporations. The primary insurers under this program are certain Underwriters at Lloyd's, London. The excess insurers include both domestic and London Market companies.

Between 1977-94 all of the policies issued to CDOW and Non-Debtor Catholic Entities were "occurrence"-based policies, i.e., the policies provide coverage for occurrences within the specified policy periods. With the exception of certain excess policies, all of the occurrence-based policies covering CDOW and Non-Debtor Catholic Entities have been located. A listing of these policies, including the available limits of coverage, is attached hereto as Exhibit F. A search for the missing excess policies is ongoing.

Beginning in 1994, the policies issued to CDOW and Non-Debtor Catholic Entities primarily were "claims-made" policies, i.e., the policies provide coverage for claims made during the specified policy period, regardless of the date of the occurrence, subject to a 1994 Continuity Date (occurrences prior to the Continuity Date are not covered under the current claims-made policies). Only three Survivor Claims, and the breach of fiduciary duty claim asserted by the Lay Employees Committee, fall within the post-1994 claims-made coverage. A listing of these policies, including the limits of coverage available for these four claims, is attached as Exhibit G.

In connection with Survivor Claims involving clerical sex abuse prior to 1977, and on behalf of certain Underwriters at Lloyd's, London, Resolute Management Services ("Resolute") has declined to acknowledge coverage under any of the pre-1977 policies, except certain policies issued to one of the Parish Corporations (St. Elizabeth's Roman Catholic Church). The primary reason for this declination is the nature of the available documentation of these policies. Resolute also disputes that policies listed in Exhibit E that identify the Assured as "Bishop of Wilmington" provide separate coverage for CDOW, apart from its liability related to a specific parish. Nevertheless, the Debtor and Resolute are in negotiations regarding these pre-1977 policies. If the parties are unable to reach agreement, then it may be necessary to institute a

068902.1001

declaratory judgment action to secure coverage under these policies for Survivor Claims involving clerical sex abuse prior to 1977.

In connection with Survivor Claims involving clerical sex abuse from 1977-94, Resolute Management Services has acknowledged the pertinent primary policies, and is providing a defense to CDOW and the defendant Parish Corporations under a reservation of rights to decline or limit coverage, based on further investigation and discovery concerning the claims. With the exception of Mission Insurance Company, the excess insurers during this period also have preliminarily acknowledged the potential for coverage under the policies they issued, subject to a reservation of rights. Mission Insurance Company was the umbrella liability insurer of CDOW and Non-Debtor Catholic Entities from 1980-85, but is insolvent.

In connection with the three Survivor Claims involving clerical sex abuse after 1994, and in connection with the breach of fiduciary duty claim asserted by the Lay Employees Committee, the Underwriters at Lloyd's, London, preliminarily have acknowledged coverage under the applicable claims-made policies, subject to a reservation of rights.

### C.  The Clergy Sex Abuse Crisis

Over the last fifty years a tragedy that runs contrary to every teaching and tradition of the Church has unfolded in the Church as a whole and in the Diocese in particular: a small number of clergy and others took advantage of their positions of trust and respect in the community to sexually abuse children. Specifically, certain clergy working within the Diocese's territorial jurisdiction – including both Diocesan priests and Religious Order priests – sexually abused children. Because these children typically were unable to tell anyone about their abuse however, in many instances the abuse was not reported until decades after it occurred. This usually was long after the accused priests had died, making it difficult to investigate the accusations, and impossible to prosecute the abusers. Nevertheless, CDOW has responded to this crisis pastorally, routinely offering counseling and other support to survivors, and, in many cases, providing compensation.

In response to the clergy sex abuse crisis, the United States Conference of Catholic Bishops (the "USCCB") formed an Ad Hoc Committee on Sexual Abuse (the "AHCSA") to investigate and make recommendations to deal with sexual abuse of minors by clergy. The result of the AHCSA's efforts was a comprehensive *Charter for the Protection of Children and Young People* (the "*Charter*"), which was adopted by the USCCB at its June 2002 meeting. CDOW implemented the *Charter* immediately. In accordance with the *Charter*, and applicable law, CDOW reports all instances of abuse of a person who is currently a minor to the Attorney General's Office in Delaware or the local State's Attorney in Maryland, as applicable.

When a credible allegation is received regarding a priest currently in ministry or living in retirement, he is removed from ministry and not permitted to function or present

YCST01: 10788119.2 10788119.4                    068902.1001

himself as a priest, pending an investigation. If the allegation is established, then the case is reported to the Vatican, and a request is made to "laicize" the priest.[38]

In accordance with Article 1 of the *Charter*, CDOW reaches out to survivors and their families, in recognition that its first obligation to survivors of sexual abuse is healing and reconciliation. A representative of CDOW speaks with the survivor (and/or family), apologizes for the offense, listens to the survivor's experience, offers counseling and spiritual help, and provides for therapy, by paying the expenses incurred by the survivor, and assisting the survivor in obtaining treatment, if the survivor requests such assistance.

Again in compliance with the *Charter*, CDOW has appointed a Victim Assistance Coordinator, a licensed therapist/counselor with many years of experience in handling sexual abuse, to coordinate assistance with survivors. The services offered by CDOW are in place for each survivor for as long as necessary. In many cases, the assistance is given for years. In several cases CDOW has settled with survivors, paying in lump sum both out-of-pocket expenses incurred by the survivor for treatment for the abuse, and expected medical expenses into the future based upon expert advice.

Indeed, as a matter of policy, CDOW has attempted to settle through mediation or other suitable alternative dispute resolution any and all claims arising from credible allegations of clergy sex abuse, whether or not such claims are asserted in a formal lawsuit, including claims that are time-barred under the applicable statute of limitations.

In 2003, CDOW implemented a safe environment program entitled "For the Sake of God's Children." Among other things, this program establishes a process to assess suitability for ministry through criminal background checks of each employee or volunteer who works with youth and young people on a regular, recurring basis. The program, which was written by and for lay people within the Diocese, now serves as the model in at least three other dioceses around the country. Since its implementation, some 16,000 persons have participated in background checks, committed to the ethical standards or volunteer covenant, and received education about the nature and prevention of child abuse in all its various forms.

In the fall of 2006, CDOW began full implementation of "Keeping Our Promises," a safe-environment curriculum for pre-kindergarten through grade 12 that is used in both the Catholic schools within the Diocese and in the Parish religious education programs. The Diocese ensures compliance through an annual audit process conducted by The Gavin Group at the direction of the Office of Child and Youth Protection of the USCCB.

### D. Events Leading to the Chapter 11 Filing

#### 1. The Child Victim Act and the Pending Litigation

In 2006, the Delaware legislature considered, but did not pass, legislation to modify the statute of limitations for civil actions arising from sexual abuse of a child. In October

---

[38] Laicization is the process under Canon Law whereby the Church permanently revokes a priest's ordination into the priesthood and returns him to the lay state. Laicization is the harshest punishment that the Church can impose upon a priest, short of excommunication.

YCST01:~~10788119.2~~10788119.4

068902.1001

2006, Francis G. DeLuca, a former Diocesan priest,[39] was arrested in Syracuse, New York on charges of child sexual abuse, to which he later pleaded guilty.

Shortly after DeLuca's arrest, Bishop Saltarelli released the names of 18 Diocesan priests regarding whom there were admitted, corroborated or otherwise substantiated allegations of sexual abuse of minors. It was one of the most detailed voluntary disclosures of its kind in the United States. In all of those cases, the Diocese shared information about abuse allegations with law-enforcement authorities. All eight of the priests who were living at the time of Bishop Saltarelli's announcement previously had been removed from any ministerial duties, and for all eight priests, the Diocese has initiated or completed the process of laicization.

On July 10, 2007, the CVA was enacted into law. The CVA abolished any statute of limitations applicable to causes of action for damages based on the sexual abuse of a minor, and established a two-year "window" during which any survivor of child sex abuse whose claims were barred by the prior statute of limitations could bring a civil action in the Delaware Superior Court. On February 22, 2011, the Delaware Supreme Court upheld the constitutionality of the CVA under the Delaware state constitution in *Sheehan v. Oblates of St. Francis de Sales*, No. 730, 2009.

In the 20 years prior to enactment of the Child Victim's Act, CDOW had settled 13 claims relating to child sexual abuse. Within the two-year statutory window that expired July 9, 2009, CDOW was named as a defendant in 131 sexual abuse actions under the CVA involving 142 plaintiffs. These actions assert various theories of primary and vicarious tort liability against CDOW (and in some instances, its personnel, including the Bishop and the Vicar General) on account of alleged sexual abuse occurring as long ago as 1952. Five of these cases were settled or dismissed prepetition. Post-petition, CDOW settled one case and was dismissed from another case. Of the 124 remaining cases against CDOW, 77 involve alleged abuse by Diocesan priests, and 40 involve alleged abuse by Religious Order priests or other clerics. One case involves both Religious Order priests and a Diocesan priest. Six cases involve alleged abusers who are not priests. Parish Corporations are named as co-defendants in 73 of the CVA cases, as well as in five CVA cases in which CDOW is not named as a defendant.

CDOW has insurance coverage available (subject to certain coverage disputes) for some, but not all, of the CVA cases pending against it. CDOW is defending each of the cases civilly, but, per its standard policy, CDOW has also attempted to resolve the cases through mediation. Prior to the Petition Date, CDOW had succeeded in settling four cases, and one claim outside of litigation.[40]

Prior to the commencement of its chapter 11 case, CDOW paid the uninsured legal fees and expenses of the Parish Corporations in the ordinary course.

Managing the Superior Court litigation was difficult and extremely costly for CDOW. CVA cases against the Debtor are currently pending in New Castle, Sussex, and Kent

---

[39] DeLuca was ordained in 1958 and served in the Diocese for 35 years until his dismissal from the public ministry in Delaware in 1993 after being accused of sexually abusing a minor in the 1960s. The day after DeLuca's arrest in Syracuse, the Diocese filed a request with the Vatican to laicize DeLuca. DeLuca was laicized by Pope Benedict XVI in August 2008.

[40] None of these settlements was made or paid within 90 days prior to the Petition Date.

Counties before ten different Superior Court judges.[41] There is also one CVA case against the Debtor pending in the United Stated District Court for the District of Delaware.

On February 25, 2009, the Superior Court entered a case management order referring all pretrial motions in the CVA Cases to the Honorable Calvin R. Scott, Jr. As of the Petition Date, trial dates had been set for 17 of the CVA cases (the "Scheduled Cases"), though in many instances the Superior Court had not yet entered a scheduling order. Eight of the Scheduled Cases, all involving alleged abuse by DeLuca, were subject to a single scheduling order. The first of these cases, captioned *John Michael Vai v. Catholic Diocese of Wilmington, Inc.,* et al., C.A. No. 08C-06-044 JTV, was scheduled to commence on October 19, 2009, as a 10-day jury trial. The Superior Court had intended to conduct consecutively-scheduled 10-day jury trials until each of the eight scheduled DeLuca cases was completed. The remaining Scheduled Cases were set for trials beginning in November 2009 and continuing at regular intervals through December 2011.

In order to efficiently administer this overwhelming caseload, and facilitate their disposition, all defendants in the CVA cases, joined by 34 plaintiffs, proposed to the Superior Court a comprehensive alternative dispute resolution ("ADR") process, to be pursued prior to responsive pleadings, motion practice, and formal discovery. The goal of the ADR proposal was to promote the most efficient, most economical, and earliest possible settlement of the CVA cases which were not scheduled for trial when the two-year window closed on July 9, 2009.

On October 5, 2009, Judge Scott entered an ADR Order that provides for (i) the prompt, informal exchange by all parties of relevant documents in all cases; (ii) claim statements by all plaintiffs; (iii) the appointment of a mediator; (iv) a preliminary mediation between the defendants and their insurers; and (v) a structured mediation between the plaintiffs and the defendants, all to be accomplished within 4½ months. The ADR Order did not apply to the 17 CVA cases that were scheduled for trial prior to entry of the Order, including the eight DeLuca cases described above.

There were vigorous efforts to settle the DeLuca cases prior to the Petition Date, including two all-day mediation sessions, conducted in Philadelphia by former Pennsylvania Court of Common Pleas Judge Thomas Rutter, on June 16 and August 24, 2009. Representatives of CDOW's insurers participated in both mediations. Both mediations were unsuccessful. One week after the second mediation, the individual DeLuca plaintiffs unequivocally rejected the best settlement offer of CDOW, made at the end of that mediation. Despite this rejection, CDOW left its settlement offer open for one month.

On September 18, 2009, the DeLuca plaintiffs served and filed individual statutory settlement demands far in excess of CDOW's best settlement offer. CDOW then withdrew its offer. In light of the statutory settlement demands, CDOW reconsidered its approach to settlement and, on October 2, 2009, made a new settlement proposal. This proposal also was rejected. CDOW persisted and, on October 9, through Judge Rutter, made another settlement offer. This offer was rejected by the plaintiffs on October 15, 2009. Finally, on

---

[41] All told, approximately 175 cases involving at least 190 plaintiffs have been filed in the Superior Court within the CVA's statutory window. As noted above, CDOW was named as a defendant in 131 of these, approximately 75% of the total.

October 16, three days before the scheduled start of the Vai trial, CDOW conveyed to the DeLuca plaintiffs a final settlement proposal. This proposal was rejected the next day, but with the assistance of Judge Rutter, the parties negotiated further for the remainder of the weekend. However, the negotiations reached an impasse late on Sunday, October 18, 2009, as the parties were unable to reconcile their positions. Throughout the process, CDOW was concerned that too large a settlement of a select group of CVA cases would leave it with insufficient assets to fairly compensate the CVA plaintiffs whose cases were subject to the global ADR process. As a result of this impasse in settlement, CDOW had no choice but to seek bankruptcy protection.

## 2. The DEDA Bond Transaction

In November 2002, CDOW obtained a loan of $12.5 million from the Delaware Economic Development Authority ("DEDA") to finance (i) the construction of Christ the Teacher in Newark, Delaware, on land owned by Foundation and (ii) certain improvements to St. Thomas More Preparatory School. To raise the funds to make the loan, DEDA issued variable rate revenue bonds due 2032 (the "DEDA Bonds") pursuant to a Trust Indenture (the "Indenture") between DEDA and Wilmington Trust Company, as Indenture Trustee (the "Bond Trustee"). DEDA loaned the proceeds from issuance of the bonds to CDOW pursuant to a loan agreement (the "Loan Agreement"), then assigned its rights under the Loan Agreement to the Bond Trustee.

### a. *The Allied Irish Bank Letter of Credit*

In connection with the transaction, Allied Irish Bank ("AIB") issued an irrevocable letter of credit in the amount of $12,689,072 (the "Allied Irish LC") in favor of the Bond Trustee. Pursuant to a reimbursement agreement with AIB (the "Reimbursement Agreement"), CDOW is obligated to reimburse AIB for the amount of any draw on the Allied Irish LC. The Allied Irish LC is unsecured.

Following completion of the construction funded by the proceeds of the DEDA Bonds, in 2004, Foundation and CDOW transferred the real property and improvements to DOW Schools. Thereafter, CDOW made payments to the Bond Trustee as and when required under the Loan Agreement. As of the Petition Date, approximately $11 million of principal remained outstanding under the Loan Agreement and the DEDA Bonds.

The Creditors Committee contends CDOW's transfer of property to DOW Schools is potentially avoidable. The Debtor disagrees.

### b. *The Covenant Default; Negotiations with Allied Irish Bank*

The Allied Irish LC was scheduled to expire by its terms on November 15, 2009. CDOW's inability or failure to obtain a renewal commitment within a time certain prior to such expiration would have constituted an event of default under the Indenture and the Loan Agreement. In the event of a default under the Indenture, the Bond Trustee was entitled to draw the entire amount of the Allied Irish LC, up to the outstanding amount of principal and interest due under the DEDA Bonds. Thereafter, pursuant to the Reimbursement Agreement, AIB would

be entitled to pursue all available remedies against CDOW to obtain reimbursement of the amounts drawn under the Allied Irish LC.

In addition, the Reimbursement Agreement required CDOW to maintain an unrestricted fund balance of at least $35 million. Failure to meet this covenant constituted an event of default entitling AIB, among other things, (i) to demand that CDOW provide cash collateral to secure the Allied Irish LC, or (ii) to issue a notice of default to the Bond Trustee, which would constitute an event of default under the Indenture and trigger a draw under the Allied Irish LC.

In the weeks prior to the Petition Date, representatives of Allied Irish Bank and the Debtor met to discuss the impending trials in the 8 scheduled DeLuca cases, the global ADR process for the non-scheduled CVA cases, and, more generally, the Debtor's financial condition and inability to comply with the net unrestricted funds covenant. As a result of this meeting, the Debtor was uncertain whether the Allied Irish LC would be renewed, raising the specter of an acceleration of the loan indebtedness and/or a draw on the Allied Irish LC, followed by the exercise of remedies by the Bond Trustee or Allied Irish Bank, as applicable.

Following the Petition Date, on October 29, 2009, the Bond Trustee drew on the Letter of Credit in the amount of $11,006,275, resulting in liability to the Debtor under the Reimbursement Agreement. On November 2, 2009, the Bond Trustee effectuated the mandatory repurchase of the DEDA Bonds using the proceeds of the Allied Irish LC. The DEDA Bonds are now held by the Bond Trustee on behalf of AIB. Both the Bond Trustee and AIB assert claims against the Debtor for fees, charges, and expenses (including attorneys' fees) under the applicable agreements.

### E.  Purpose of the Chapter 11 Filing

The Debtor did not seek chapter 11 relief to dodge responsibility for past criminal misconduct by clergy – or for mistakes made by past Bishops. Nor did the Debtor seek bankruptcy relief to hide the truth or to deny survivors their day in court. Indeed, the Debtor is committed to pursuing the truth. For example, the Debtor has never sought to seal depositions of priests accused of sexual abuse, and it has consistently supported the unsealing of such records. The Debtor also has never sought to seal the priest files it has produced in discovery in the CVA lawsuits. The Debtor itself has publicly corroborated many of the incidents of abuse, and has provided more details about what actions were taken – or sometimes, tragically, not taken – by its past Bishops. All such information is in the Superior Court records of the cases that were scheduled for trial on October 19, 2009, and the Debtor does not believe that significant new facts would have emerged at trial. (Indeed, as discussed further below, the Plan itself provides for the release of all, or substantially all, of these records.)

Trial or no trial, the fact remained that the Debtor is a not-for-profit religious organization with limited resources, including limited insurance coverage for the 131 lawsuits pending against it. In addition to this litigation, the Debtor faced an impending default on approximately $11 million of unsecured bond indebtedness, and it had substantial unfunded pension liabilities. The Debtor acknowledges it has a moral obligation to try to compensate all survivors of clergy sexual abuse fairly. As a result, it could not allow any single plaintiff to

recover a disproportionate share of the limited funds available from the Debtor simply because such plaintiff's case got to trial first. Similarly, the Debtor could not ignore the legally valid claims of its other creditors who, like the CVA plaintiffs, are entitled to a ratable share of the Debtor's limited assets.

Beyond the Debtor's moral obligations to creditors, the Debtor has a fundamental moral obligation to the Catholic faithful it serves – and to the donors and benefactors who have entrusted the Debtor with the material fruits of their life's labor – to continue the ministries of the Church in fulfillment of the Debtor's canonical and secular legal purposes. In order to do this, the Debtor must survive.

The Debtor's purposes in seeking chapter 11 relief, therefore, were twofold: first, to protect and preserve the assets that are properly available for distribution to the Debtor's general creditors and ensure that, whatever assets can be marshaled, they will be distributed equitably to all creditors, not just a select few; second, to continue the work of the Church within the Diocese to the fullest extent possible using the resources dedicated to those purposes.

### F.    The Chapter 11 Case

#### 1.    Debtor in Possession Status

Since filing for bankruptcy protection, the Debtor has continued to operate as a debtor in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtor is authorized to operate in the ordinary course. Transactions outside of the ordinary course, as well as certain transactions within the ordinary course, must be approved by the Bankruptcy Court.

#### 2.    Entry of the Debtor's First-Day Orders

Shortly after filing its bankruptcy petition, the Debtor filed several motions (the "First Day Motions") with the Bankruptcy Court that were intended to stabilize the Debtor and enable it to continue its operations. Pursuant to the First Day Motions, the Debtor sought and obtained from the Bankruptcy Court, among other relief, the following: (i) approval of the appointment of The Garden City Group, Inc. (the "Balloting Agent") as claims, notice and balloting agent in the Chapter 11 Case [Docket Nos. 10 and 32]; (ii) authorization to use the Debtor's existing cash management system, bank accounts, and business forms, and for a waiver of the deposit requirements of § 345 of the Bankruptcy Code [Docket Nos. 11, 42, 142, and 242]; and (iii) authority to honor prepetition employees wages and benefits [Docket Nos. 12, 41 and 243]. Shortly thereafter, the Debtor sought and obtained approval of interim compensation procedures for professionals employed in the Chapter 11 Case [Docket Nos. 47 and 107].

#### 3.    Appointment of Official Committees

By notice dated November 5, 2009 [Docket No. 82], the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors Committee") comprising seven individuals with pending sexual abuse

tort lawsuits against the Debtor and others. Since its formation, the Creditors Committee has been an active participant in the Chapter 11 Case.

On April 30, 2010, the U.S. Trustee appointed a second official committee, the Official Committee of Lay Employees (the "Lay Employees Committee"), pursuant to § 1102 of the Bankruptcy Code [Docket No. 461]. On May 7, 2010, the Creditors Committee filed a motion asking the Bankruptcy Court to rescind the appointment and disband the Lay Employees Committee (the "Motion to Disband") [Docket No. 469]. The Motion to Disband was stayed initially by the Mediation Order (as hereinafter defined), and remains pending. Since its formation, the Lay Employees Committee has been an active participant in the Chapter 11 Case.

### 4. Retention of Professionals

The Debtor has retained professionals to assist it in managing the chapter 11 bankruptcy process, including Young Conaway Stargatt & Taylor, LLP as the Debtor's bankruptcy counsel [Docket Nos. 94 and 171], The Ramaekers Group, LLC as the Debtor's financial advisor [Docket Nos. 62 and 172], Sitrick and Company Inc. as the Debtor's Corporate Communications Consultant [Docket Nos. 114 and 160], and R.M. Fields, LP as insurance archeologist [Docket Nos. 626 and 707].

The Creditors Committee has retained several professionals in this Chapter 11 Case, including: Pachulski Stang Ziehl & Jones LLP as counsel [Docket Nos. 150 and 233]; Morgan, Lewis & Bockius LLP as special insurance counsel [Docket Nos. 371 and 499] and, later, as special pension counsel [Docket Nos. 866 and 938]; Schnader Harrison Segal & Lewis LLP as special appellate counsel [Docket Nos. 873 and 939]; LECG, LLC as financial advisor [Docket Nos. 173 and 232]; and Business Management International, Inc. as consultant [Docket Nos. 299 and 359].

The Lay Employees Committee has retained Greenberg Traurig LLP as its counsel [Docket Nos. 419 and 835], without prejudice to the Motion to Disband.

### 5. Extensions of Exclusivity

By orders dated March 1 [Docket No. 360], August 9 [Docket No. 632], and October 21 [Docket No. 834], 2010, and January 21 [Docket No. 1076] and March 18 [Docket No. 1192], 2011, the Bankruptcy Court extended (i) through and including April 19, 2011, the period within which the Debtor has the exclusive right to file a chapter 11 plan, and (ii) through and including June 20, 2011, the period during which the Debtor has the exclusive right to solicit acceptances of a chapter 11 plan.

### 6. Schedules and Statement of Financial Affairs; Claims Bar Date and Aggregate Claims Asserted

The Debtor filed its Schedules of Assets and Liabilities and Statement of Financial Affairs (collectively, the "Schedules") on November 24, 2009 [Docket No. 146]. On February 17, 2010, the Debtor amended certain of its Schedules [Docket No. 200].

On February 1, 2010, the Bankruptcy Court entered the *Order Pursuant to Bankruptcy Rule 3003(c)(3) and Local Rule 2002-1(e) Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* [Docket No. 308] (the "Bar Date Order"). Pursuant to the Bar Date Order, the deadline for submitting Proofs of Claim in the Chapter 11 Case was April 15, 2010 (the "Bar Date"). Subject to certain limited exceptions contained in the Bankruptcy Code, in the General Bar Date Order (including with respect to Claims arising from the rejection of executory contracts after the General Bar Date), all Proofs of Claim filed against the Debtor (including Proofs of Claim filed by governmental units) were required to be submitted by the Bar Date.

As of the date hereof, approximately 1,300 Proofs of Claim had been filed asserting Claims against the Debtor in liquidated amounts totaling approximately $303.1 million, and Claims not identified as contingent, unliquidated, or disputed totaling approximately $200,000 had been listed on the Debtor's Schedules and not superseded by filed Proofs of Claim. Accordingly, approximately $303.3 million of liquidated Claims have been asserted against the Debtor. In addition, 147 Proofs of Claim asserting unliquidated Survivor Claims have been filed against the Debtor.

As of the date hereof, no Administrative Claims other than Professional Claims have been asserted against the Debtor's Estate. No Order has been entered establishing an Administrative Claim Bar Date. The Debtor has generally been paying undisputed Administrative Claims in the ordinary course post-petition. However, upon establishment of the Administrative Claim Bar Date, it is possible that additional Administrative Claims may be filed.

In sum, filed Claims as of the date hereof (exclusive of Professional Claims), are as follows:

| Secured | | Administrative | | Priority | | General Unsecured | |
|---|---|---|---|---|---|---|---|
| # | $ Amount | # | $ Amount | # | $ Amount | # | $ Amount |
| 16 | $14,462,689 | 0 | $0 | 1,118 | $97,489,436 | 73 | $191,160,883 |

A number of these claims, particularly pension claims, are duplicative and assert as liquidated amounts what are in fact contingent, unliquidated claims that would need to be estimated for allowance purposes. In addition, the Debtor believes that all, or substantially all, of the Claims filed as secured or priority status are in fact general unsecured Claims. The foregoing table is by way of summary only. The Debtor's estimates as to the ultimate Allowed amount and priority of filed Claims are set forth above and in the hypothetical liquidation analysis attached hereto as Exhibit C.

### 7. Litigation

During the Chapter 11 Case, the Debtor has been involved in three adversary proceedings and several contested matters.

a.    *Extension of Automatic Stay to Non-Debtor Parish Corporations*

On October 19, 2009, the Debtor commenced adversary proceeding no. 09-52275 (the "TRO Adversary Proceeding") against certain CVA plaintiffs (the "TRO Defendants") by filing a complaint [Adv. Docket No. 1] pursuant to which the Debtor sought certain declaratory and injunctive relief against the Defendants. On the same day, the Debtor also filed in the TRO Adversary Proceeding a motion for a temporary restraining order [Adv. Docket No. 3] (the "TRO Motion"). Pursuant to the TRO Motion, the Debtor sought to obtain a temporary restraining order against the TRO Defendants to enjoin the prosecution of their respective personal injury actions against certain Parish Corporations.

On November 2, 2009, the Bankruptcy Court commenced an evidentiary hearing on the TRO Motion and related papers. The hearing was continued to November 6, 2009. Prior to November 6, 2009, the Creditors Committee, the Debtor, and the TRO Defendants, through their respective counsel, engaged in settlement negotiations over the relief sought in the TRO Motion and matters related thereto in the Chapter 11 Case and the pending state court litigation between the TRO Defendants and certain non-debtor parties to such litigation. At the start of the hearing on November 6, 2009, counsel for the Debtor, the TRO Defendants, the Creditors Committee, and State Court Counsel[42] (i) advised the Bankruptcy Court that a proposed settlement (the "Settlement") had been reached among the Debtor, the Creditors Committee, the Defendants, State Court Counsel, and the Parish Corporations, (ii) set forth the material terms of the Settlement on the record, and (iii) advised the Bankruptcy Court that the parties would be submitting a written stipulation and proposed form of order memorializing the Settlement by way of certification of counsel. The Bankruptcy Court "So Ordered" the record to immediately effectuate the Settlement subject to receiving the proposed form of order.

On December 7, 2009, as directed by the Bankruptcy Court, the Debtor submitted a fully executed stipulation [Adv. Docket No. 27] (the "Stipulation") which provided, among other things, that the Debtor could file, and the Creditors Committee and State Court Counsel would not oppose, a motion to extend the automatic stay to the Parish Co-Defendant Cases. On November 13, 2009, in accordance with the terms of the Settlement and the Stipulation, the Debtor filed a motion [Docket No. 116] to extend the automatic stay to all pending actions arising under the CVA in which the Debtor and a Parish Corporation are co-defendants (collectively, the "Parish Co-Defendant Cases") until sixty (60) days after the deadline for creditors to file prepetition claims in the Bankruptcy Case. On February 4, 2010, the Court entered an order [Docket No. 321] (the "Parish Stay Order") extending the automatic stay to the Parish Co-Defendant Cases until sixty (60) days after the deadline for creditors to file prepetition claims in the Bankruptcy Case – the "Bar Date" – which was subsequently fixed as April 15, 2010. Thus, in accordance with the Parish Stay Order, the consensual extension of the automatic stay with respect to the Parish Co-Defendant Cases was originally set to expire on June 14, 2010.

On April 19, 2010, the Bankruptcy Court ordered the Debtor, Creditors Committee and other interested parties (the "Mediation Parties") to meet and confer with respect to appointing a mediator and establishing mediation procedures. The Mediation Parties conferred on April 28, 2010 but were unable to reach a consensus on an appropriate mediator and how to

---

[42] "State Court Counsel" consists of Manly & Stewart, the Law Office of Bart Dalton and counsel for the TRO Defendants, *i.e.*, The Neuberger Firm, P.A. and Jacobs & Crumplar, P.A.

proceed with mediation of the Bankruptcy Case (the "Mediation"). On June 1, 2010, the Bankruptcy Court entered an order [Docket No. 514] which, among other things: (i) appointed the Honorable Kevin Gross and former Judge Thomas Rutter as the co-mediators of the Mediation; and (ii) renewed the existing extension of the stay applicable to the Parish Co-Defendant Cases through and including July 30, 2010.

At the direction of the Mediators, the Mediation Parties participated in mediation sessions on June 25-27 and July 2-3, 2010, with the goal of negotiating a consensual chapter 11 plan. While these initial mediation sessions did not result in a negotiated plan, progress was made on several fronts, and the Mediators reconvened the Mediation on August 31, 2010 and September 1, 2010. On July 28, 2010, in the hope that the August 31 and September 1, 2010 sessions would result in a consensual resolution of the pending abuse cases, the Debtor filed a motion [Docket No. 604] (the "Renewed Stay Extension Motion") for an order renewing the existing extension of the automatic stay to the Parish Corporations to stay the Parish Co-Defendant Cases and the Non-Debtor Insurance Case (as such term is defined therein) in their entirety until ninety (90) days after the conclusion of the Mediation.

On August 12, 2010, the Bankruptcy Court commenced an evidentiary hearing on the Renewed Stay Extension Motion. At the conclusion of the hearing, the Bankruptcy Court granted in part and denied in part the Renewed Stay Extension Motion. As set forth on the record, the Bankruptcy Court ordered that the stay previously imposed was further extended with respect to most of the Parish Co-Defendant Cases through and including September 3, 2010. The Bankruptcy Court also held, among other things, that the stay no longer applied to certain Parish Co-Defendants Cases, which had already been scheduled for trial. Thereafter, on September 3, 2010, the Bankruptcy Court held a hearing at which time it, among other things, renewed the existing extension of the automatic stay to the Parish Co-Defendant Cases through and including September 24, 2010 [Docket No. 731].

On September 22, 2010, the Debtor filed its initial chapter 11 plan and a motion [Docket No. 766] for an order (i) renewing the existing extension of the automatic stay to the Parish Corporations and (ii) imposing a stay of litigation against certain Parish Corporations in cases in which the Debtor was not named a defendant, but was expected to be named a third-party defendant by the Parish Corporation (the "Parish-Only Cases"). On September 24, 2010, the Bankruptcy Court held a hearing at which time it, among other things renewed the existing extension of the automatic stay to the Parish Co-Defendant Cases through and including the earlier of (i) the conclusion of the Confirmation Hearing and (ii) December 31, 2010 [Docket No. 778].

In early December 2010, Creditors Committee member John Vai, whose abuse litigation against St. Elizabeth Roman Catholic Church had been permitted to go forward by the Bankruptcy Court, obtained a verdict of $3,000,001 against St. Elizabeth ($3 million compensatory damages, $1 punitive damages). Vai has requested that the Superior Court impose pre-judgment interest from January 1, 1967, on the $3 million compensatory damages award, which request is opposed by St. Elizabeth and is currently under advisement by the Superior Court. To the extent that Vai's verdict stands and is collectible, a portion presumably will be

satisfied by insurance proceeds which would otherwise be available for contribution to the Plan Trust, as the Debtor was a co-insured with St. Elizabeth.

In early January 2011, survivor-claimant Joseph Curry, whose abuse litigation against St. Dennis Roman Catholic Church had been permitted to go forward by the Bankruptcy Court, reached a settlement with St. Dennis that would have required payment of approximately $1.7 from insurance policies under which the Debtor was a co-insured. St. Dennis sought relief from the automatic stay to access the insurance proceeds [Docket Nos. 1002 & 1031], which was opposed by the Creditors Committee [Docket No. 1018]. The Bankruptcy Court held a hearing on January 3 and 4, 2011, to consider the stay relief request. At this hearing, the Bankruptcy Court clarified that its prior ruling permitting certain lawsuits to go forward against non-debtor Parish Corporations did <u>not</u> authorize the satisfaction of survivor claims using property of the Debtor's bankruptcy estate outside a chapter 11 plan. St. Dennis's request for stay relief was denied without prejudice [Docket No. 1044].

On December 30, 2010, the Debtor filed a motion to renew the existing extension of the automatic stay to the Parish Co-Defendant Cases through and including the earlier of (i) the conclusion of the Confirmation Hearing and (ii) June 30, 2011 [Docket No. 1029]. This motion was granted without objection on January 21, 2011 [Docket No. 1077].

> b.  *The Pooled Investment Account*

> (1)  <u>The PIA Motion</u>

On November 11, 2009, the Debtor filed its *Motion for (I) Interim and Final Orders (A) Authorizing the Debtor to Use its Pooled Investment Account and Process Withdrawal Requests from Non-Debtor Pooled Investors in the Ordinary Course, (B) Waiving Section 345 Deposit Guidelines, (C) Scheduling a Final Hearing, and (D) Granting Related Relief; and (II) a Final Order Authorizing the Debtor to Take All Actions Necessary or Appropriate to Transfer Possession of Pooled Investment Funds to One or More Non-Debtor Fiduciaries* [Docket No. 96] (the "<u>PIA Motion</u>"). In the PIA Motion, the Debtor sought (i) interim and final waiver of the deposit guidelines of § 345 of the Bankruptcy Code, (ii) interim authority to honor limited requests for withdrawals of Pooled Investment Funds by Non-Debtor Pooled Investors in the ordinary course pursuant to §§ 363 and 105 of the Bankruptcy Code, and (iii) final authority pursuant to §§ 541(b)(1) and (d) to process all withdrawal requests and, ultimately, to transition non-debtor Pooled Investment Funds to one or more non-debtor fiduciaries. The basis for the relief requested in the PIA Motion was twofold: <u>first</u>, that the honor of withdrawal requests by Non-Debtor Pooled Investors was within the ordinary course for the Debtor, and thus was permissible under § 363(c) of the Bankruptcy Code; <u>second</u>, that the Non-Debtor Pooled Investors' interests in the PIA were not property of the Debtor's Estate because the Debtor held such interests as trustee for the benefit of the Non-Debtor Pooled Investors. The PIA Motion was joined by certain of the Non-Debtor Pooled Investors [Docket No. 115], who briefly explained their need for access to their Pooled Investment Funds to sustain their operations in the near term.

The Creditors Committee objected to the PIA Motion [Docket No. 127], and on November 11, 2009, the Bankruptcy Court held a telephonic hearing to discuss matters related to

the PIA Motion. To resolve the ultimate "property of the estate" issue, the Court suggested the Committee commence an adversary proceeding seeking a declaratory judgment. In the meantime, on November 20, 2009, the Bankruptcy Court entered a consensual order granting, in part, the relief requested in the PIA Motion on an interim basis [Docket No. 141], and authorizing distribution of $530,000 in the aggregate of Pooled Investment Funds to certain Non-Debtor Pooled Investors. Since that time, the Court has entered eighteen further orders granting, in part, the relief requested in the PIA Motion on an interim basis [Docket Nos. 285, 347, 362, 387, 394, 423, 455, 526, 562, 568, 753, 810, 846, 897, 1022, 1104, 1148, and 1209], and authorizing distribution of an additional $3,974,738 in the aggregate of Pooled Investment Funds to certain Non-Debtor Pooled Investors.

(2)    The PIA Adversary

On December 18, 2009, the Creditors Committee commenced an adversary proceeding against the Debtor and certain Non-Debtor Pooled Investors (Adv. Proc. No. 09-52866) (the "PIA Adversary") seeking (i) declaratory relief with respect to ownership of the Pooled Investment Funds and (ii) substantive consolidation of the non-debtor defendants with the Debtor. The Court bifurcated the PIA Adversary into two phases, the first ("Phase I") addressing solely the Second and Fourth Claims for Relief in the complaint, concerning, respectively, (i) the existence of a trust relationship between the Debtor and defendant Non-Debtor Pooled Investors and (ii) the ability to identify and trace the investments of the defendant Non-Debtor Pooled Investors in the PIA. The Court held a trial on Phase I of the PIA Adversary on June 2-8, 2010, and issued a written opinion on June 28, 2010 (the "Phase I Opinion"), confirming that a trust relationship existed between the Debtor and the Non-Debtor Defendants, but finding that, with the exception of St. Ann's Roman Catholic Church, the Non-Debtor Pooled Investors' investments were not identifiable or traceable under federal law. Accordingly, with the exception of St. Ann's fractional interest in the PIA, the entire PIA constituted property of the Debtor's bankruptcy estate, subject to the right of any non-defendant, Non-Debtor Pooled Investors to come forward and prove their trust funds are identifiable and traceable.[43] The Bankruptcy Court went on to find that the Non-Debtor Defendants had claims against the Debtor for their lost investments (the "PIA Investment Claims").

The defendant Non-Debtor Pooled Investors, joined by the Debtor, moved for reconsideration of the Phase I Opinion, which was denied by opinion and order dated July 21, 2010. The defendant Non-Debtor Pooled Investors and the Debtor (collectively, the "Appellants") timely filed Notices of Appeal from the Phase I Opinion, the opinion on reconsideration, and the related orders and judgment on August 2, 2010.

On August 19, 2010, over the objection of the Creditors Committee, the Bankruptcy Court certified the appeals directly to the Third Circuit Court of Appeals pursuant to 28 U.S.C. § 158(d)(2)(A)(ii) and (iii) and Bankruptcy Rule 8001(f). The Appellants timely filed petitions with the Third Circuit for permission to seek direct appeal, which petitions were

---

[43] If the Plan is confirmed as a CDOW-Only Plan, the Debtor expects that certain Non-Debtor Pooled Investors would come forward to establish that their funds are identifiable by the same reasoning applied by the Bankruptcy Court to St. Ann's.

42

granted by the Third Circuit. Briefing of the appeals is currently underway, but has been stayed pending confirmation of the Plan.

On September 22, 2010, the defendant Non-Debtor Pooled Investors filed a motion for judgment on the pleadings with respect to the second phase of the PIA Adversary. The debtor joined in this motion and also moved for judgment on the pleadings. Following an initial round of briefing and oral argument, and supplemental briefing, the Bankruptcy Court has taken the matter under advisement.

### c.    *The Lay Pension Litigation*

On January 4, 2011, the Lay Employees Committee commenced an adversary proceeding against the Debtor (Adv. Proc. No. 11-50022) (the "Lay Pension Litigation") seeking declarations that the Lay Pension Fund is held in trust for the benefit of lay pensioners and is not property of the Debtor's bankruptcy estate, and that the Debtor breached duties to lay pensioners in its management of the Lay Pension Plan.

Given that the Plan, if confirmed as a Settlement Plan, would provide for distribution of the Lay Pension Fund to the Lay Pension Plan Trust for the benefit of lay pensioners, the Lay Employees Committee has agreed to extend the deadline for responding to the Lay Employees Committee's complaint to a date to be determined. The Creditors Committee has indicated that, if the Lay Pension Litigation were to go forward, it would seek to intervene on behalf of the Debtor's estate.

### d.    *Other Contested Matters*

Other contested matters have arisen in this Chapter 11 Case, a number of which were resolved, and some of which remain pending as of the date hereof. Information about these contested matters is available on the docket. What follows is a summary table of certain litigation items, with docket numbers for ease of reference:

| Pleading | Related Dkt. Nos. | Status |
|---|---|---|
| *Motion for Relief from Stay* filed by James E. Sheehan [Docket No. 3] | 4, 59, 65, 77 | Settled |
| *Motion for Order Designating Bishop W. Francis Malooly as Debtor for Examination Pursuant to Bankruptcy Code Section 343 and for Executing Schedules of Assets and Liabilities and Statment of Financial Affairs Pursuant to Bankruptcy Code Section 521* filed by Unofficial Committee forof Abuse Survivors [Docket No. 19] | 58, 68, 76 | Denied |
| *Motion For Limited Relief From the Automatic Stay to Permit Taking of De Bene Esse Depositions Pursuant to Mediation Order* filed by Unofficial Committee forof Abuse Survivors [Docket No. 27] | 6, 63, 281, 282 | Settled |

YCST01:10788119.310788119.4                                   068902.1001

| Pleading | Related Dkt. Nos. | Status |
|---|---|---|
| *Motion to Authorize the Debtor (I) to Continue Providing Pensions, Sustenance and/or Medical Coverage in the Ordinary Course to Certain Retired or Removed Priests Accused of Sexual Abuse; and (II) to Use Certain Restricted Funds to Pay Prepetition Priest Pension Obligations* filed by the Debtor [Docket No. 137] | 185, 188, 202, 209, 210, 221, 290, 291, 301, 302, 310, 312, 315, 340, 342 | Settled |
| *Motion of St. Ann's Roman Catholic Church for Relief from or Annulment of the Automatic Stay to Continue State Court Litigation* [Docket No. 287] | 317, 318, 330 | Denied |
| *Motion for Order Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure for Production of Documents and Examination of Witnesses Re Debtor (Capuchin Franciscan Friars, Province of The Sacred Stigmata (Corp.))* filed by Creditors Committee [Docket No. 439] | 450, 472, 484 | Granted in part |
| *Motion of The Official Committee of Unsecured Creditors to Disband Lay Employee Committee* [Docket No. 469] | 471, 502, 514, 734 | Pending |
| *Motion for Relief from Stay to Pursue Litigation up to the Limits of Insurance Proceeds to Enforce Rights of Indemnification and Contribution* filed by W.S. Cumby & Sons, Inc. [Docket No. 474] | N/A | Pending |
| *Motion to Strike the Joinder of the Unofficial Committee of 91 State Court Abuse Survivors in the Motion of the Official Committee of Unsecured Creditors to Disband the Lay Employee Committee* filed by Catholic Charities, Inc. [Docket No. 476] | 488, 497, 502, 514, 734 | Pending |
| *Emergency Motion of the Official Committee of Unsecured Creditors to Hold Catholic Diocese of Wilmington, Inc. and Other Parties in Civil Contempt for Violation of the Automatic Stay and Mediation Order and Request for Expedited Consideration Thereon* [Docket No. 534] | 544, 555, 556, 557 | Denied as moot. |
| *Motion to Hold The Catholic Diocese of Wilmington, Inc.,[ et al.] in Contempt in Violation of the Court's November 12, 2009 Order and Request for Expedited Consideration Thereon* filed by James E. Sheehan [Docket No. 546] | 554, 565 | ~~Moot~~Pending[44] |
| <u>Debtor's request for sanctions under 28 U.S.C. § 1927 in connection with Sheehan contempt motion [Docket No. 554]</u> | <u>546, 565</u> | <u>Pending</u> |
| Debtor's *Motion to Extend the Period Within Which the Debtor May Remove Actions* [Docket No. 582] | 601, 602 | Granted |
| *Joinder and Motion of The Cathedral of St. Peter Roman Catholic Church, Pursuant to Sections 105(a), 362 and 363 of the Bankruptcy Code, for an Order Granting Relief from the Automatic Stay and Authorizing the Debtor to Make a Limited Distribution from the Pooled Investment Account* [Docket No. 627] | 710, 718, 751, 753 | Granted |
| *Emergency Motion (With Respect to the DeLuca 7 and Curry Cases) To Fix Deadline to Remove State Court Actions* filed by Creditors Committee [Docket No. 689] | 697, 762, 767, 770, 772, 777 | Denied |

---

[44] The Debtor believes this motion is moot based upon the Court's denial, on mootness grounds, of a substantially identical motion by the Creditors Committee [Docket No. 557]. Sheehan disagrees.

YCST01:~~10788119.3~~10788119.4

068902.1001

| Pleading | Related Dkt. Nos. | Status |
|---|---|---|
| *Motion for Relief from Stay for an Order Modifying the Automatic Stay to Permit Liquidation/Valuation of the Claims of the DeLuca 7 and Curry Against The Diocese at the Upcoming State Court Trials* filed by Unofficial Committee forof Abuse Survivors [Docket No. 738] | 745, 747 | Denied |
| *Motion of Catholic Diocese Foundation and Catholic Cemeteries, Inc. for an Order Authorizing the Debtor to Make a Limited Distribution from the Pooled Investment Account* [Docket No. 785] | 814, 819, 846 | Granted |
| *Motion for Relief from the Automatic Stay Pursuant to 11 U.S.C. 362(d) to Permit Use of Insurance Proceeds to Pay the Obligations of Any Settlement Reached in a State Court Proceeding* filed by St. Dennis Roman Catholic Church [Docket No. 1002] | 1018, 1031, 1039, 1044 | Denied |

**8. Global Mediation**

On February 24, 2010, while discussions with the Debtor were still ongoing as to the possibility of selecting a global case mediator for the Chapter 11 Case, the Creditors Committee filed a motion to appoint former Judge Thomas Rutter as mediator [Docket No. 54]. On March 12, 2010, the Debtor objected to this motion and cross-moved to appoint Judge Gross to mediate property-of-the-estate issues [Docket No. 383]. A number of Insurers objected to the proposed global mediation [Docket Nos. 396, 397, 398, 399, and 407], as did the then *ad hoc* committee of lay employees [Docket No. 401]. As noted above, the Bankruptcy Court ordered the Mediation Parties to meet and confer regarding the Mediation, but those discussions reached an impasse. On May 3, 2010, by letter to all parties, the Bankruptcy Court appointed Judge Gross to mediate discussions regarding the selection of a mediator and a procedure for mediation of the substantive issues in the Chapter 11 Case. On May 13, 2010, Judge Gross reported to the Bankruptcy Court and recommended that he and former Judge Rutter be appointed co-mediators of the Chapter 11 Case, that all Mediation Parties be required to participate in the mediation, that issues involving the Mediation Parties be held in abeyance pending the Mediation, including particularly the PIA Adversary, the motion to disband the Lay Employees Committee, and the extension of the stay of litigation involving the Parish Corporations.

As noted above, on June 1, 2010, the Bankruptcy Court entered an order (as subsequently amended, the "Mediation Order") adopting some, but not all, of Judge Gross's recommendations. In particular, the Mediation Order generally stayed the Chapter 11 Case, save for routine and consensual matters, and matters necessary to avoid immediate and irreparable harm to a party, but permitted the PIA Adversary to proceed to trial on Phase I. As noted above, mediation sessions were held on June 25-27, July 2-3, and August 31-September 1, 2010, with the goal of negotiating a consensual chapter 11 plan. While these mediation sessions did not result in a negotiated plan, the Debtor believes that progress was made on several fronts. On September 3, 2010, the Bankruptcy Court entered an order [Docket No. 734] lifting the general stay of the Chapter 11 Case but leaving open the Mediation to permit the Mediators to call additional sessions, if necessary. Since the end of formal mediation sessions, the Debtor, the

45

Official Committees, and other third parties continued discussions and negotiations, assisted by the Mediators, and the Mediators retained the right to schedule additional, formal sessions.

On February 2, 2011, the Debtor, its insurers, and counsel for substantially all of the abuse survivor-claimants held an informal settlement conference. At the conclusion of this conference, an agreement was reached to settle all survivor claims against the Debtor, the Parish Corporations, and the other Non-Debtor Catholic Entities. This settlement is embodied in the Plan and is described further herein.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**9.** **Cash Position**

As of February 28, 2011, the Debtor had unrestricted cash on hand of approximately $591,152, unrestricted investments of approximately $9,808,156 (exclusive of Disputed Non-Debtor PIA Funds), and restricted investments of $32,982,956. The Debtor's anticipated cash usage for operations through the end of July 2011 is reflected on the following table:

| PROJECTED CHANGE IN ASSETS FROM OPERATIONS From 3/1/2011 to 7/31/11 | Total |
|---|---|
| **CDOW OPERATIONS** | |
| **CDOW Revenue** | |
| Assessments | $1,277,500 |
| Operational Income | $779,975 |
| Designated Income (Education) | $231,875 |
| **Total CDOW Revenue** | **$2,289,350** |
| | |
| **CDOW Expenses** | |
| Payroll & Taxes | $1,090,000 |
| Medical Payments | -0- |
| Other Compensation | $256,875 |
| Other Operational | $1,170,938 |
| Capital Expenditures | -0- |
| **Total CDOW Expenses** | **$2,517,813** |
| | |
| **CDOW NET OPERATING CASH** | **($228,463)** |
| | |
| **BENEFITS & INSURANCE PROGRAM ADMINISTRATION** | |
| **Medical Program** | |
| Premiums Received | $5,162,500 |
| Expenses | $5,162,500 |
| Net Medical | -0- |
| | |
| **Workers Compensation** | |
| Premiums Received | -0- |
| Expenses | $62,500 |
| Net Workers Comp | **($62,500)** |
| | |
| **Property & Liability Insurance** | |
| Premiums Received | $81,250 |
| Expenses | $51,250 |
| Net P&L Insurance | **$30,000** |
| | |
| **NET CHANGE IN LIQUIDITY** | **($260,963)** |

YCST01:10788119.210788119.4
068902.1001

### 10. Professional Fees

In addition to changes in liquidity as a result of operations, the Debtor has made, and expects to make, payments of professionals' fees between February 1, 2011, and June 30, 2011. The aggregate amount of these accrued and projected fees (the amount of which will depend on whether the Plan is confirmed as a CDOW-Only Plan or a Settlement Plan) are set forth in the Liquidation Analysis attached hereto as Exhibit C.

From the Petition Date through February 28, 2011, the Debtor had expended $7,980,834 for professionals' fees (including for the Creditors Committee's professionals), and had accrued much more, which will become payable at the time of confirmation of the Plan. In the absence of a global settlement of Survivor Claims, the Debtor expects that professionals' fees would have continued to accrue at a rate of approximately $800,000 per month. Even if this Plan is confirmed as a Settlement Plan, the Debtor expects it will have expended almost $14.5 million in the aggregate on professionals' fees in this case. If this Case is confirmed as a CDOW-Only Plan, the Debtor expects it will have expended almost $18 million, which could otherwise have been paid to Survivors and other creditors.

## IV. GENERAL STRUCTURE OF THE PLAN; SUBSTANTIVE CONSOLIDATION

It has been suggested that the Plan should "substantively consolidate" the Debtor with one or more of the Non-Debtor Catholic Entities. Substantive consolidation is an equitable remedy under federal law, which treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims of creditors against the separate entities morph to claims against the consolidated survivor.

Consolidation restructures (and thus revalues) rights of creditors, and for certain creditors this may result in significantly less recovery. That is, instead of looking to assets of the entity with whom they dealt for the payment of their debts, the creditors now must share those assets with all creditors of all consolidated entities, raising the specter for some of a significant distribution diminution. For example, if a solvent entity (i.e., having assets greater than or equal to its debts) were substantively consolidated with an insolvent entity (i.e., having debts greater than its assets), creditors of the solvent entity could be worse off as a result of the consolidation, while creditors of the insolvent entity were better off, as demonstrated in the following table:

|  | Assets | Debts | Creditor Recovery |
|---|---|---|---|
| Solvent Entity | $100 | $100 | 100% |
| Insolvent Entity | $50 | $100 | 50% |
| Consolidated Entity | $150 | $200 | 75% |

Because of its potential effect on innocent creditors, substantive consolidation is considered a remedy of last resort, to be used sparingly. The Third Circuit's decision in *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005), which is controlling authority in the Bankruptcy Court, sets forth

48

068902.1001

the only circumstances under which substantive consolidation may be permitted within the Third Circuit. In *Owens Corning*, the Third Circuit ruled that, absent the consent of affected creditors, a proponent of substantive consolidation must prove either (i) that pre-bankruptcy, the entities to be consolidated "disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity" or (ii) that post-bankruptcy, the entities' assets and liabilities "are so scrambled that separating them is prohibitive and hurts all creditors." 419 F.3d at 211.

As discussed above, the Debtor and the Non-Debtor Catholic Entities are separate legal entities under Delaware or Maryland state law, as applicable. As such, absent a party with standing making the requisite evidentiary showing for substantive consolidation under *Owens Corning*, the Plan cannot substantively consolidate the Debtor with the Non-Debtor Catholic Entities. At all relevant times prior to the Petition Date, the Debtor and the Non-Debtor Catholic Entities observed corporate formalities, and in no way "disregarded" entity separateness. In addition, the Debtor is unaware of any creditor who relied on any perceived lack of entity separateness in deciding whether to extend credit to the Debtor. Finally, the Debtor and the Non-Debtor Catholic Entities' assets and liabilities are in no way "scrambled," much less to such a degree that separating them would be cost-prohibitive to all creditors of all entities. Accordingly, the Debtor does not believe it would be possible for a chapter 11 plan to be confirmed that purported to substantively consolidate the Debtor with the Non-Debtor Catholic Entities.

## V.      THE PLAN

The following summary of certain principal provisions of the Plan is qualified in its entirety by reference to the Plan, which is attached as Exhibit A to this Disclosure Statement. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions. In the event of any discrepancy between this Disclosure Statement, including the following summary description, and any provision of the Plan, the Plan or order confirming the Plan will control.

### A.      Definitions and Interpretive Provisions

Article I of the Plan incorporates certain defined terms and sets forth certain principles governing the interpretation of the Plan. Creditors are urged to review these definitions and interpretive provisions and, if necessary, obtain the advice of counsel. Section 1.2(k) of the Plan provides that the Plan supersedes all prior drafts of the Plan, and all prior negotiations, agreements, and understandings with respect to the Plan, evidence of which shall not affect the interpretation of any provision of the Plan. The Unofficial Committee of Abuse Survivors asserts that evidence of prior negotiations will be necessary to interpret and enforce the Plan and, accordingly, objects to this provision. The Debtor disagrees that evidence of prior negotiations among certain parties is at all relevant to enforcement of a Plan that is voted upon by creditors and confirmed by the Bankruptcy Court after notice and a hearing. The Bankruptcy Court has reserved ruling on this issue until the Confirmation Hearing.

49

## B.    ~~A.~~ Classification of Claims

The categories of Claims listed below classify Claims (except for Administrative Claims, and Priority Tax Claims) for all purposes, including voting, confirmation and distribution pursuant to the Plan. As provided in § 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims shall not be classified for the purposes of voting or receiving distributions under the Plan. Rather, all such Claims shall be treated separately as unclassified Claims on the terms set forth in Article II of the Plan.

| CLASS | DESCRIPTION | STATUS |
|-------|-------------|--------|
| Class 1 | Secured Claims | Unimpaired - not entitled to vote |
| Class 2 | Priority Claims | Unimpaired - not entitled to vote |
| Class 3A | Survivor Claims | Impaired - entitled to vote |
| Class 3B | Lay Pension Claims | Impaired - entitled to vote |
| Class 3C | DEDA Bond Transaction Claims | Impaired - entitled to vote |
| Class 3D | Clergy Pension Claims | Potentially Impaired - entitled to vote |
| Class 3E | Gift Annuity Claims | Potentially Impaired - entitled to vote |
| Class 3F | Other Unsecured Claims | Potentially Impaired - entitled to vote |
| Class 4 | Penalty Claims. | Impaired - not entitled to vote |

Consistent with § 1122 of the Bankruptcy Code, a Claim is classified by the Plan in a particular Class only to the extent the Claim is within the description of the Class, and a Claim is classified in a different Class to the extent it is within the description of that different Class.

## C.    ~~B.~~ Treatment of Claims

The treatment of Claims in the Plan is in full and complete satisfaction of the legal, contractual, and equitable rights that each Person holding an Allowed Claim may have in or against the Debtor or its property. This treatment supersedes and replaces any agreements or rights those Persons have in or against the Debtor or its property. All Distributions under the Plan will be tendered to the Person holding the Allowed Claim in accordance with the terms of the Plan. **EXCEPT AS SPECIFICALLY SET FORTH IN THE PLAN, NO DISTRIBUTIONS WILL BE MADE AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF ANY CLAIM THAT IS NOT AN ALLOWED CLAIM.**

### 1.    Secured Claims

With respect to each Allowed Secured Claim, the legal, equitable, and contractual rights to which such Allowed Secured Claim entitles its holder shall be reinstated in full on the Effective Date.

068902.1001

## 2. Priority Claims

Unless the holder of an Allowed Priority Claim and the Debtor (if prior to the Effective Date) or the Plan Administrator (on and after the Effective Date) agree to a different treatment, on the later of the Effective Date (or as soon thereafter as practicable) and the date a Priority Claim becomes an Allowed Claim (or as soon thereafter as is practicable), the Plan Administrator shall pay each such Allowed Priority Claim in full, in Cash, without interest.

## 3. Survivor Claims

Survivor Claims will be liquidated and Allowed, or Disallowed, in accordance with the Settlement Trust Distribution Procedures (if the Plan is confirmed as a Settlement Plan) or Article X of the Plan (if the Plan is confirmed as a CDOW-Only Plan), as applicable. If the Plan is confirmed as a Settlement Plan, the definition of "Survivor Claims" will be broader and include more Claims and claimants than the definition of "Survivor Claims" under a CDOW-Only Plan, as set forth in the Plan. Some of these additional Survivor Claims will consist of the Third-Party Indemnity Claims assigned to Parish-Only Survivor Claimants pursuant to Section 5.1(d) of the Plan. The Parish-Only Survivor Claimants shall receive Class 3A Ballots solely for the purposes of (i) voting to accept or reject the Plan as a Settlement Plan, (ii) if applicable, indicating their approval of the settlements embodied in Article V of the Plan and agreement to be bound by the Channeling Injunction set forth in Section 16.3 of the Plan, and (iii) making any elections that may be required by the Settlement Trust Distribution Procedures to be proposed by the Creditors Committee pursuant to Section 6.5 of the Plan.

a. *Treatment Under a Settlement Plan*. If the Plan is confirmed as a Settlement Plan, each holder of a Survivor Claim shall receive a distribution on such Claim from the Settlement Trust, in accordance with the Settlement Trust Distribution Procedures, in full satisfaction, settlement, and release of, and in exchange for, his or her Survivor Claim.

b. *Treatment Under a CDOW-Only Plan*. If the Plan is confirmed as a CDOW-Only Plan, (i) Survivor Claims shall be liquidated and Allowed, or Disallowed, in accordance with Article X of the Plan; (ii) each holder of an Allowed Survivor Convenience Claim, within ten (10) days after Allowance of such Claim pursuant to Section 10.6 of the Plan, shall receive an initial Distribution from the Plan Trust in the amount equal to 50% of his or her Allowed Claim (i.e., $37,500 for Claims arising out of Abuse by Diocesan priests or employees, or $12,500 for Claims arising out of Abuse by Religious Order clerics or employees, as applicable), which Distribution shall be final and indefeasible, and shall not be subject to reduction or disgorgement for any reason; and (iii) each holder of an Allowed Survivor Claim shall receive a Pro Rata Distribution on such Claim from the Plan Trust in full satisfaction, settlement, and release of, and in exchange for, his or her Survivor Claim, provided that the amount of Distribution to any holder of a Survivor Convenience Claim shall be reduced by the amount of the Distribution made pursuant to Section 4.3(b)(2) of the Plan.

## 4. Lay Pension Claims

a. *Treatment Under a Settlement Plan*. If the Plan is confirmed as a Settlement Plan, then in full satisfaction, settlement, and release of, and in exchange for, all Allowed Lay Pension Claims,

51

and as a condition precedent to the Effective Date: (i) the Debtor shall direct the Custodian to liquidate and distribute, or distribute via in-kind or inter-custodial transfer, the Lay Pension Fund to the Lay Pension Plan Trust on behalf of the Debtor; and (ii) Cash or other property having a value not less than $5,000,000 in the aggregate (the value of any non-Cash property being determined by Order of the Bankruptcy Court, after notice and a hearing, which hearing may be the Confirmation Hearing) shall be contributed by or on behalf of the Debtor to the Lay Pension Plan Trust. The Lay Employees Committee asserts that the Settlement Plan violates the confirmation requirements of the Bankruptcy Code, and is not capable of being confirmed by the Bankruptcy Court. The Lay Employees Committee asserts the Settlement Plan is not confirmable by the Bankruptcy Court as the Settlement Plan, among other things: (i) discriminates unfairly against Lay Pension Claims in violation of § 1129(b)(1) of the Bankruptcy Code; (ii) fails the "best interests of creditors" test under § 1129(a)(7) of the Bankruptcy Code; (iii) fails the "fair and equitable" test under § 1129(b) of the Bankruptcy Code; and (iv) fails the feasibility test under § 1129(a)(11) of the Bankruptcy Code. The Debtor disagrees, and the Bankruptcy Court has reserved ruling on this matter until the Confirmation Hearing.

      b.    *Treatment Under a CDOW-Only Plan*. If the Plan is confirmed as a CDOW-Only Plan, each holder of an Allowed Lay Pension Claim shall be entitled to a Pro Rata Distribution from the Plan Trust in full satisfaction, settlement, and release of, and in exchange for, his or her Allowed Lay Pension Claim, which distribution shall be made to the Lay Pension Plan Trust on behalf of such holder.

YCST01:10788119.210788119.4
068902.1001

c. *Modification and Reaffirmation of Lay Pension Plan* ~~Irrespective whether the Plan is confirmed as a Settlement Plan or a CDOW-Only Plan, the Reorganized Debtor will reaffirm.~~ Notwithstanding the discharge of the Debtor's obligations[45] under the Lay Pension Plan, ~~the terms of which reaffirmation will be subject to negotiations~~ pursuant to the Plan, the Debtor will use its best efforts to gain Bankruptcy Court Approval of a Lay Pension Plan Reaffirmation Agreement to be filed not less than seven (7) days before the Voting Deadline. "Reaffirmation" is a process whereby, with Bankruptcy Court approval, the Reorganized Debtor would bind itself to honor a discharged debt, which agreement will become legally enforceable notwithstanding the bankruptcy discharge. The specific terms of the Lay Pension Plan Reaffirmation Agreement are expected to be the product of further discussions between the Debtor and the Lay Employees Committee. **However, the Plan requires that the Lay Pension Plan Reaffirmation Agreement (i) require the Reorganized Debtor to pay all accrued and vested benefits under the Lay Pension Plan through December 31, 2011, (ii) specify that benefits need not be paid in the form of a third-party annuity contract, and (iii) require the Reorganized Debtor to contribute at least $2 million per year to the Lay Pension Plan Trust until the Lay Pension Plan is fully funded on an actuarial basis.** The proposed reaffirmation is made possible by the funding to be provided to the Lay Pension Plan Trust (i) in a Settlement Plan, as a result of the contribution of the Lay Pension Fund and $5 million to the Lay Pension Plan Trust, and (ii) in a CDOW-Only Plan, as a result of the Pro Rata distributions to be made upon Lay Pension Claims.

**HOLDERS OF LAY PENSION CLAIMS SHOULD NOTE THAT, WHILE THE PLAN REQUIRES THE DEBTOR TO USE ITS BEST EFFORTS TO GAIN APPROVAL OF THE LAY PENSION PLAN REAFFIRMATION AGREEMENT BY THE BANKRUPTCY COURT, SUCH APPROVAL IS NOT A CONDITION OF EFFECTIVENESS OF THE PLAN. IF THE BANKRUPTCY COURT DOES NOT APPROVE THE LAY PENSION PLAN REAFFIRMATION AGREEMENT, IT IS NONETHELESS EXPECTED THE REORGANIZED DEBTOR WOULD HONOR THE TERMS OF SUCH AGREEMENT. HOWEVER, ABSENT APPROVAL BY THE COURT, THE LAY PENSION PLAN REAFFIRMATION AGREEMENT WOULD BE LEGALLY UNENFORCEABLE AGAINST THE REORGANIZED DEBTOR.**

~~PLEASE~~**OTHER CREDITORS SHOULD** NOTE THAT THE REORGANIZED DEBTOR'S REAFFIRMATION OF THE LAY PENSION PLAN **(AS MODIFIED),** IF APPROVED BY THE BANKRUPTCY COURT, <u>WILL</u> <u>NOT</u> AFFECT THE AMOUNT OF DISTRIBUTIONS TO OTHER CREDITORS UNDER THE PLAN.

5. **DEDA Bond Transaction Claims**

a. *Treatment Under a Settlement Plan.* If the Plan is confirmed as a Settlement Plan, then in full satisfaction, settlement, and release of, and in exchange for, all DEDA Bond Transaction Claims, each holder of an Allowed DEDA Bond Transaction Claim shall, at its election prior to such time set forth in Section 4.5(c) of the Plan, receive either: (1) a promissory note substantially in the form to be proposed by the Debtor and filed with the

---

[45] ~~Confirmation of the Plan will discharge the Debtor's obligations under the Lay Pension Plan, rendering the terms of that Plan legally unenforceable against the Reorganized Debtor. Reaffirmation is a process whereby, with Bankruptcy Court approval, the Reorganized Debtor can agree to bind itself to honor a discharged debt, which agreement will become legally enforceable notwithstanding the bankruptcy discharge.~~

53

068902.1001

Supplemental Plan Documents, which note shall be agreeable in all respects to the Debtor, in its sole discretion,# and executed by the Reorganized Debtor (and payable solely by the Reorganized Debtor, and not by the Plan Trust) on the Effective Date in a principal amount equal to the Allowed amount of such DEDA Bond Transaction Claim; or (2) a Pro Rata distribution on such Claim from the Capital Campaign Fund.

        b.    *Treatment Under a CDOW-Only Plan.* If the Plan is confirmed as a CDOW-Only Plan, then in full satisfaction, settlement, and release of, and in exchange for, all DEDA Bond Transaction Claims, each holder of an Allowed DEDA Bond Transaction Claim shall, at its election prior to such time set forth in Section 4.5(c) of the Plan, receive either: (1) a promissory note substantially in the form to be proposed by the Debtor and filed with the Supplemental Plan Documents, which note shall be agreeable in all respects to the Debtor, in its sole discretion,# and executed by the Reorganized Debtor (and payable solely by the Reorganized Debtor, and not by the Plan Trust) on the Effective Date in a principal amount equal to the Allowed amount of such DEDA Bond Transaction Claim; or (2) subject fully to Section 12.4(b) of the Plan (to the extent the Capital Campaign Fund is a Disputed Restricted PIA Fund), a Pro Rata distribution on such Claim from the Capital Campaign Fund, provided, however, that if the Capital Campaign Fund is determined by a Final Order to have been an Unrestricted Asset of the Debtor, then (i) any promissory note executed by the Reorganized Debtor in accordance with the foregoing and Section 4.5(ab)(1) of the Plan shall be deemed cancelled, void *ab initio*, and without legal effect, and (ii) as soon as practicable after entry of such Final Order, (A) the Reorganized Debtor shall direct the Custodian to liquidate and distribute, or distribute via in-kind or inter-custodial transfer, the Capital Campaign Fund to the Plan Trust on behalf of the Debtor, and (B) each holder of an Allowed DEDA Bond Transaction Claim shall receive a Pro Rata distribution on such Claim from the Plan Trust in full satisfaction, settlement, and release of, and in exchange for, its DEDA Bond Transaction Claim.

**6.    Clergy Pension Claims**

        a.    *Treatment Under a Settlement Plan.* If the Plan is confirmed as a Settlement Plan, then with respect to each Clergy Pension Claim (including the Clergy Pension Claims of Frs. Sarro and Dempster, discussed at Section III.B.2.d. above), the legal, equitable, and contractual rights to which such Claim entitles its holder shall be reinstated in full on the Effective Date.

        b.    *Treatment Under a CDOW-Only Plan.* If the Plan is confirmed as a CDOW-Only Plan, then with respect to each Clergy Pension Claim (including the Clergy Pension Claims of Frs. Sarro and Dempster, discussed at Section III.B.2.d. above), the legal, equitable, and contractual rights to which such Claim entitles its holder shall be reinstated in full on the Effective Date; provided, however, that if the Clergy Pension Fund is determined by a Final Order to have been an Unrestricted Asset of the Debtor, then as soon as practicable thereafter, the Reorganized Debtor shall direct the Custodian to liquidate and distribute, or distribute via in-kind or inter-custodial transfer, the Clergy Pension Fund to the Plan Trust on

---

# Absent a change in circumstances, the Debtor expects it would only agree to a promissory note (i) on economic terms at least as favorable to the Reorganized Debtor as the DEDA Bond Loan (including a maturity of 20 years or more, with below-market interest), or (ii) that is without recourse to any property other than the Capital Campaign Fund.

068902.1001

behalf of the Debtor, and each holder of an Allowed Clergy Pension Claim shall receive a Pro Rata distribution on such Claim from the Plan Trust in full satisfaction, settlement, and release of, and in exchange for, such Clergy Pension Claim.

7.    **Gift Annuity Claims**[46]

a.    *Treatment Under a Settlement Plan.* If the Plan is confirmed as a Settlement Plan, then with respect to each Gift Annuity Claim, the legal, equitable, and contractual rights to which such Claim entitles its holder shall be reinstated in full on the Effective Date.

b.    *Treatment Under a CDOW-Only Plan.* If the Plan is confirmed as a CDOW-Only Plan, then with respect to each Gift Annuity Claim, the legal, equitable, and contractual rights to which such Claim entitles its holder shall be reinstated in full on the Effective Date; provided, however, that to the extent any Gift Annuity Fund is determined by a Final Order to have been an Unrestricted Asset of the Debtor, then as soon as practicable thereafter, (i) the Reorganized Debtor shall direct the Custodian to liquidate and distribute, or distribute via in-kind or inter-custodial transfer, such Gift Annuity Fund to the Plan Trust on behalf of the Debtor, (ii) the Plan Trustee shall File a motion in the Bankruptcy Court pursuant to Bankruptcy Code § 502(c)(1) to estimate for distribution purposes the Allowed amount of the Gift Annuity Claim corresponding to the Gift Annuity Fund, and (iii) the holder of such Allowed Gift Annuity Claim shall receive a Pro Rata distribution on such Claim from the Plan Trust in full satisfaction, settlement, and release of, and in exchange for, his or her Gift Annuity Claim.

8.    **Other Unsecured Claims**

"Other Unsecured Claims" consist of Unsecured Claims other than S/A/P Claims, Survivor Claims, Lay Pension Claims, DEDA Bond Transaction Claims, Clergy Pension Claims, Gift Annuity Claims, and Penalty Claims. "Other Unsecured Claims" includes, but is not limited to, the claims of vendors and providers of services to the Debtor.

a.    *Treatment Under a Settlement Plan.* If the Plan is confirmed as a Settlement Plan, then with respect to each Other Unsecured Claim, the legal, equitable, and contractual rights to which such Claim entitles its holder shall be reinstated in full on the Effective Date.

b.    *Treatment Under a CDOW-Only Plan.* If the Plan is confirmed as a CDOW-Only Plan, then each holder of an Allowed Other Unsecured Claim shall receive a Pro Rata distribution from the Plan Trust in full satisfaction, settlement, and release of, and in exchange for, its Other Unsecured Claim.

---

[46] A gift annuity is a form of tax-advantaged charitable giving whereby a donor provides cash or investment property in exchange for fixed, periodic annuity payments for the remainder of the donor's life. The annuity is paid using investment income from the corpus of the gift, and upon the donor's death, the corpus of the gift vests in the donee as an unrestricted asset. The Debtor currently makes payments to five gift annuitants from five Restricted PIA Funds (the "Gift Annuity Funds," as defined in the Plan) that were valued at approximately $106,000 in the aggregate as of February 28, 2011.

**9.** **Penalty Claims**

        a.    *Treatment Under a Settlement Plan.* If the Plan is confirmed as a Settlement Plan, then holders of Penalty Claims shall not receive or retain any property under the Plan on account of such Claims.

        b.    *Treatment Under a CDOW-Only Plan.* If the Plan is confirmed as a CDOW-Only Plan, then if, and only if, all Allowed Pari Passu Claims are paid in full (including any Claims entitled to a distribution pursuant to § 726(a)(1)-(3) of the Bankruptcy Code), each holder of an Allowed Penalty Claim shall receive a Pro Rata distribution from the Plan Trust in full satisfaction, settlement, and release of, and in exchange for, its Penalty Claim. Holders of Penalty Claims are not expected to receive or retain any property under the Plan on account of such Claims.

**D.**   ~~C.~~  ~~Proposed~~ **Proposed Settlements Embodied in Plan**

      **1.**     **Provisions Applicable to Settlement Plan**

        If the Plan is confirmed as a Settlement Plan, then the following provisions contained in Section 5.1 of the Plan shall apply:

        a.    *NDCE Settlement Contribution.* On or before the Settlement Funding Date, Cash in the amount of $~~61,793,441~~61,968,441 in the aggregate shall be contributed to the Settlement Trust by or on behalf of the Non-Debtor Catholic Entities in consideration for, and conditioned upon, (i) treatment of the Non-Debtor Catholic Entities as Protected Parties under Section 16.3 of the Plan, (ii) treatment of the Survivor Claims of the Parish-Only Survivor Claimants as Survivor Claims as set forth in Section 5.1(d) of the Plan, (iii) resolution of the PIA Litigation as set forth in Section 5.1(e) of the Plan, (iii) waiver and release of all Causes of Action of the Estate against the Non-Debtor Catholic Entities or property of the Non-Debtor Catholic Entities (including Alter Ego Claims, Substantive Consolidation Claims, PIA Distribution Clawback Claims, and PIA Surcharge Claims) as set forth in Section 5.1(g) of the Plan, (iv) resolution of all potential disputes regarding Restricted PIA Funds as set forth in Section 5.1(h) of the Plan, and (v) the Confirmation Order's provision for payment to Survivor John Vai from the Settlement Trust as set forth in Section 15.1(e)(1)(ii) of the Plan. As additional consideration for, and expressly conditioned upon, clauses (i)-(iv) of the preceding sentence, and subject to the occurrence of the Effective Date, each of the Non-Debtor Catholic Entities shall (i) agree to the non-monetary undertakings set forth in Exhibits D and E to the Plan; (ii) waive and release any and all ~~Claims against the Estate (including~~ PIA Investment Claims, PIA Breach Claims, and Third-Party Indemnity Claims~~) other than any Third-Party Indemnity Claim previously assigned to a Parish-Only Survivor Claimant, or to be assigned to a Parish-Only Survivor Claimant in accordance with~~ arising from or relating to any Survivor Claim that is subject to the channeling injunction in Section ~~5.1(d)~~16.3 of the Plan; (iii) consent to the sale of the Non-Debtor Catholic Entities' interests, if any, in any Settled Insurance Policy to the applicable Settling Insurer and to the contribution of the proceeds of such sale to the Settlement Trust in accordance with Section 5.1(b) of the Plan; (iv) upon request by a Settling Insurer, execute Insurance Buy-Back Agreements with respect to any Settled Insurance Policies in which the Non-Debtor Catholic Entities have, or may have, an interest; and (v) assign to the

                                     068902.1001

Settlement Trust all right, title and interest in and to any and all Order/Perpetrator Indemnification Claims.

b. *Insurer Settlement Contribution.* On or before the Settlement Funding Date, Cash in the amount of $~~$15,631,559~~$15,456,559 in the aggregate shall be contributed by the Settling Insurers to the Settlement Trust, in consideration for, and expressly conditioned upon, (i) the Bankruptcy Court's approval of the sale of the Estate's interest in each Settled Insurance Policy to the applicable Settling Insurer pursuant to § 363(b) and 1123(a)(5) of the Bankruptcy Code, free and clear of all claims and interests, in accordance with the form of Insurance Buy-Back Agreement to be filed as a Supplemental Plan Document, (ii) treatment of the Settling Insurers as Protected Parties under Section 16.3 of the Plan, (iii) waiver and release of all Causes of Action of the Estate against the Settling Insurers or property of the Settling Insurers as set forth in Section 5.1(g) of the Plan. As additional consideration for, and expressly conditioned upon, clauses (i)-(iii) of the preceding sentence, and subject to the occurrence of the Effective Date, each of the Settling Insurers shall assign to the Settlement Trust all right, title and interest in and to any and all Order/Perpetrator Indemnification Claims.

**PLEASE NOTE THAT THE SETTLED INSURANCE POLICIES DO NOT INCLUDE ANY POLICIES THAT ARE POTENTIALLY IMPLICATED BY THE LAY PENSION LITIGATION.**

c. *Assignment of Estate's Order/Perpetrator Indemnification Claims to Settlement Trust.* As additional consideration for, and expressly conditioned upon, treatment of the Non-Debtor Catholic Entities in accordance with Sections 16.3 and 5.1(e), (g) and (h) of the Plan, and subject to the occurrence of the Effective Date, the Debtor, on behalf of itself and its Estate, shall assign to the Settlement Trust all right, title and interest in and to any and all Order/Perpetrator Indemnification Claims.

d. *Assignment of Third-Party Indemnity Claims to Parish-Only Survivor Claimants.* As additional consideration for, and expressly conditioned upon, treatment of the Non-Debtor Catholic Entities in accordance with Sections 16.3 and 5.1(e), (g) and (h) of the Plan, and subject to the occurrence of the Effective Date, each Non-Debtor Catholic Entity shall assign to each Parish-Only Survivor Claimant all right, title and interest in and to any Third-Party Indemnity Claim against the Debtor arising from or relating to the Survivor Claim of such Parish-Only Survivor Claimant.

e. *Resolution of PIA Litigation.* In consideration of the Non-Debtor Catholic Entities' agreement to provide the NDCE Settlement Contribution and other consideration set forth in Section 5.1(a) of the Plan, and to withdraw the appeal of the Phase I Judgment and Orders as set forth in Section 5.1(e) of the Plan, the Confirmation Order shall (i) provide that, subject to the occurrence of the Effective Date, the Phase I Judgment and Orders are vacated and the PIA Litigation is dismissed, with prejudice, (ii) declare that, subject to the occurrence of the Effective Date, the Disputed Non-Debtor PIA Funds are not property of the estate by operation of § 541(d) of the Bankruptcy Code; and (iii) effective immediately upon entry of the Confirmation Order, authorize the transfer of Cash proceeds of Disputed Non-Debtor PIA Funds to the Settlement Trust in an aggregate amount not to exceed the NDCE Settlement Contribution. As soon as practicable after the Effective Date, the ~~Debtors~~Debtor and

57

the Non-Debtor Catholic Entities Party to the PIA Litigation shall withdraw (or move to dismiss, to the extent necessary) their appeal of the Phase I Judgment and Orders. It is expected that, after deducting amounts pledged by Non-Debtor Pooled Investors toward consummation of a Settlement Plan, the resolution of the PIA Litigation would result in the reversion of approximately $27.9 million of Disputed Non-Debtor PIA Funds to the Non-Debtor Pooled Investors.[47] The largest share of these assets (approximately $10.7 million total) would revert to Charities and its related entities, which would continue to use the income from these assets to underwrite Charities' general operating budget and, particularly, its ministries to children. Approximately $7.8 million would revert to DOW Schools for the benefit of St. Mark's High School, St. Thomas More Preparatory School, Christ the Teacher Catholic School, and Most Blessed Sacrament Catholic School. And approximately $4.9 million would revert to Cemeteries, which would continue to use the income from these assets for the perpetual care and maintenance of cemeteries.

   f. *Suspension of Duties of Fee Examiner.* To facilitate the Reorganized Debtor's performance of its financial obligations under the Plan, the Debtor shall request that the Bankruptcy Court suspend the duties of the Fee Examiner as of the Confirmation Date. Suspension of the Fee Examiner's duties pursuant to Section 5.1(f) of the Plan shall not limit the statutory rights and obligations of parties in interest in this Chapter 11 Case, including the rights of parties in interest to object to Professional Claims.

   g. *Debtor Waiver and Release of Estate Causes of Action Against Non-Debtor Catholic Entities and Settling Insurers.* In consideration of the contributions and other consideration to be provided by the Non-Debtor Catholic Entities and the Settling Insurers pursuant to Section 5.1(a) and (b) of the Plan, the Debtor, on behalf of itself and the Debtor Releasors, irrevocably and unconditionally, without limitation, shall release, acquit, and forever discharge each of the Non-Debtor Catholic Entities and Settling Insurers from any and all Causes of Action of the Estate (including Chapter 5 Actions, Alter Ego Claims, and Substantive Consolidation Claims) against any such Non-Debtor Catholic Entity[48] or Settling Insurer, or the property of any such Non-Debtor Catholic Entity or Settling Insurer, such release to be effective upon the Effective Date.

   h. *Resolution of Disputes Regarding Restricted PIA Funds.* The Confirmation Order shall find, subject to the occurrence of the Effective Date, that the Restricted PIA Funds (including the Capital Campaign Fund, the Clergy Pension Fund, and the Gift Annuity Funds) are Restricted Assets and constitute Undisputed Restricted PIA Funds for all purposes under the Plan.

   h. *Additional Documentation; Non-Material Modifications.* From and after the Effective Date, the Settlement Trustee, the Reorganized Debtor, and the Settling Parties shall be authorized to enter into, execute, adopt, deliver and/or implement all contracts, leases, instruments, releases, and other agreements or documents necessary to effectuate or

---

[47] The Non-Debtor Pooled Investors' respective shares of the Disputed Non-Debtor PIA Funds (valued as of February 28, 2011) are set forth in Exhibit H hereto.

[48] Apart from certain PIA Distribution Clawback Claims and the Debtor's right to payment under certain notes receivable from Non-Debtor Catholic Entities, the Debtor does not believe it there are any potentially viable Claims or Causes of Action of the Estate against the Non-Debtor Catholic Entities.

memorialize the settlements contained in Article V of the Plan without further Order of the Bankruptcy Court. Additionally, the Settlement Trustee, the Reorganized Debtor, and the Settling Parties may make technical and/or immaterial alterations, amendments, modifications or supplements to the terms of any settlement contained in Article V of the Plan, subject to Bankruptcy Court approval, provided that the amendment or modification does not materially and adversely change the treatment of any holder of a Survivor Claim without the prior written agreement of such holder. A Class of Claims that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or supplemented under Section 5.1(i) of the Plan, if the proposed alteration, amendment, modification or supplement does not materially and adversely change the treatment of the Claims within such Class. An Order of the Bankruptcy Court approving any amendment or modification made pursuant to Section 5.1(i) of the Plan shall constitute an Order in aid of consummation of the Plan and shall not require the re-solicitation of votes on the Plan.

j.      i. *Non-Settling Insurers Unaffected.* For the avoidance of doubt, the rights and obligations of Non-Settling Insurers shall be unaffected by Article V of the Plan and shall be governed solely by Article XI of the Plan.

**PLEASE NOTE THAT THE COMPREHENSIVE SETTLEMENTS OF ESTATE CAUSES OF ACTION AND DISPUTES REGARDING THE SCOPE OF THE PROPERTY OF THE DEBTOR'S BANKRUPTCY ESTATE THAT ARE PROPOSED IN SECTION 5.1 OF THE PLAN ARE INTENDED TO BE (AND IF APPROVED BY THE BANKRUPTCY COURT, WILL BE) BINDING UPON ANY AND ALL CREDITORS, IRRESPECTIVE OF WHETHER SUCH CREDITORS VOTED TO ACCEPT THE PLAN AS A SETTLEMENT PLAN.**

2.      **Conditions Precedent to Settlement Plan**

The Plan shall constitute a Settlement Plan if it is accepted by Class 3A (Survivor Claims) and the other conditions set forth in Section 5.2 of the Plan are each either satisfied or duly waived (by a writing executed by the Debtor) as of the Confirmation Date.

3.      **Provisions Applicable to CDOW-Only Plan**

If the Plan is confirmed as a CDOW-Only Plan, then the following provisions contained in Section 5.3 of the Plan shall apply:

a.      *Resolution of PIA Investment Claims.* The Confirmation Order shall provide that the PIA Investment Claims of the Non-Debtor Pooled Investors shall be Allowed in the amounts with respect to each of the Disputed Non-Debtor PIA Funds(i.e., for investments lost as a result of the Bankruptcy Court's conclusion that Disputed Non-Debtor PIA Funds were commingled with assets of the Debtor and were not identifiable) shall be Allowed in the amounts set forth in Exhibit B to the Plan, provided, however, that to the extent any Disputed Non-Debtor PIA Funds are determined by a Final Order not to be Unrestricted Assets of the Estate, the PIA Investment Claims with respect to such Disputed Non-Debtor PIA Funds shall be

59

Disallowed. The purpose of this resolution is twofold. First, fixing the PIA Investment Claims at the investment balances as of the Petition Date is appropriate in light of § 502(b) of the Bankruptcy Code, which requires the Bankruptcy Court to determine the Allowed amount of claims as of the Petition Date (whereas, the PIA Investment Claims asserted by the Non-Debtor Pooled Investors included investment balances as of a date post-petition, which included post-petition appreciation). Second, because a PIA Investment Claim is premised upon the loss of an investment in the Pooled Investment Account, if it were to be determined that a Disputed Non-Debtor PIA Fund was not property of the Debtor's bankruptcy estate, then there would be no lost investment, and no PIA Investment Claim.

        b.    *Limitation on PIA Distribution Clawback Claims.* The Confirmation Order shall provide that, notwithstanding anything to the contrary in any Interim PIA Withdrawal Order, the amount of any PIA Distribution Clawback Claim against a Non-Debtor Pooled Investor shall be reduced by the value of any property transferred to the Debtor by or on behalf of such Non-Debtor Pooled Investor between the Petition Date and the Effective Date, except to the extent that such Non-Debtor Pooled Investor was under a Secular Legal Duty to transfer property to the Debtor.

        c.    *St. Ann Indemnity Claim.* The St. Ann Indemnity Claim shall be liquidated and Allowed (or Disallowed) as if it were a Survivor Claim against the Debtor, and the Debtor, on behalf of itself and the Debtor Releasors, shall waive any defense to such Claim that is based upon Survivor John Dougherty's prior release of Claims against the Debtor.

### 4.    Reservation of Rights

    The Debtor reserves the right to sell property of the Estate and/or compromise Causes of Action on behalf of the Estate at any time prior to the Effective Date, subject to Bankruptcy Court approval. Notice of any such sale or compromise sought as part of the Plan shall be Filed as a Supplemental Plan Document, and approval of such sale or settlement shall be considered at the Confirmation Hearing or as soon thereafter as is practicable.

### 5.    Forbearance from Prosecution of CDOW-Only Plan

    The Debtor shall not seek confirmation of the Plan as a CDOW-Only Plan until after it has sought confirmation of the Plan as a Settlement Plan. If the Bankruptcy Court does not confirm the Plan as a Settlement Plan, the Debtor shall meet and confer with the Creditors Committee and the Lay Employees Committee to establish a schedule for litigation, if any, relating to confirmation of the Plan as a CDOW-Only Plan. Pending the occurrence of this meet-and-confer and the Bankruptcy Court's entry of an order regarding discovery and pleading deadlines related thereto, no party in interest will be required to file any pleading or initiate/continue any discovery related to confirmation of the Plan as a CDOW-Only Plan.

### E.  ~~D.~~  Means of Implementing a Settlement Plan

    Article VI of the Plan sets forth the means for implementation and consummation of the Plan as a Settlement Plan. Article VI of the Plan shall apply only if the Plan is confirmed as a Settlement Plan. As set forth in Article VI, the Debtor proposes that the Plan be

implemented and consummated as a Settlement Plan through the means contemplated by § 1123(a)(5)(A), (B), and (D)-(G) and § 1123(b)(2)-(4) and (6) of the Bankruptcy Code on and after the Effective Date. Article VI further provides for the following means of implementation if the Plan is confirmed as a Settlement Plan:

### 1. Vesting Assets in the Settlement Trust

On the Effective Date, all Settlement Trust Assets shall vest in the Settlement Trust, and the Debtor, the Non-Debtor Catholic Entities, and the Settling Insurers, as applicable, shall be deemed for all purposes to have transferred all right, title, and interest in and to the Settlement Trust Assets to the Settlement Trust for the benefit of the holders of Survivor Claims, whether or not such Claims are Allowed Claims as of the Effective Date. From and after the Effective Date, the Reorganized Debtor, the Non-Debtor Catholic Entities, and the Settling Insurers shall have no further interest in or with respect to the Settlement Trust Assets. Settlement Trust assets comprise the following: (i) the NDCE Settlement Contribution of approximately $62 million, (ii) the Insurer Settlement Contribution of approximately $15.5 million, and (iii) any Estate causes of action against Religious Orders and Perpetrators for indemnification or contribution in connection with Survivor Claims.

### 2. Assumption of Liability for Survivor Claims

On the Effective Date the Settlement Trust shall assume liability for, and shall succeed to all rights and defenses of the Debtor and the Non-Debtor Catholic Entities with respect to, all Survivor Claims arising prior to the Effective Date (other than Survivor Claims that are Administrative Claims), which shall be Allowed and liquidated, or Disallowed, solely pursuant to the Settlement Trust Distribution Procedures.

### 3. Settlement Trust Distribution Procedures

The Creditors Committee shall, in a Supplemental Plan Document, propose Settlement Trust Distribution Procedures, subject to approval by the Bankruptcy Court at the Confirmation Hearing. The Settlement Trust Distribution Procedures may include any appropriate provision not inconsistent with the applicable provisions of the Plan and the Bankruptcy Code, provided, however, that nothing in the Settlement Trust Distribution Procedures shall (i) impose any costs, directly or indirectly, upon the Estate or any Protected Party relating to the liquidation and Allowance (or Disallowance) of Survivor Claims, or distributions from the Settlement Trust to holders of Survivor Claims, or (ii) otherwise modify the rights or obligations of the Estate or any Protected Party as otherwise set forth in the Plan. If the proposed Settlement Trust Distribution Procedures will require holders of Survivor Claims to make elections on their Ballots, then in connection with the Debtor's request for approval of the Disclosure Statement, the Creditors Committee shall File and seek approval by the Bankruptcy Court of an addendum to this Disclosure Statement, to be included in the Solicitation Packages sent to holders of Survivor Claims, which contains "adequate information" about the proposed Settlement Trust Distribution Procedures within the meaning of § 1125(a)(1) of the Bankruptcy Code.

### 4. Retention of Jurisdiction

Pursuant to §§ 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. §§ 1334 and 157, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction (i) over the Chapter 11 Case, and (ii) to hear and determine all core proceedings arising under the Bankruptcy Code or in the Chapter 11 Case, including matters concerning the interpretation, implementation, consummation, execution, or administration of the Plan. Subject to, but without limiting the generality of, the foregoing, the Bankruptcy Court's post-Effective Date jurisdiction shall include jurisdiction over the specific matters set forth in Section 6.6 of the Plan.

**F.** ~~E.~~ **The Settlement Trust in a Settlement Plan**

Article VII of the Plan details the formation and funding of the Settlement Trust. Article VII of the Plan shall apply only if the Plan is confirmed as a Settlement Plan. As set forth in Article VII, on or prior to the Effective Date, the Settlement Trust shall be formed and funded with the NDCE Settlement Contribution and the Insurer Settlement Contribution. The holders of Survivor Claims shall be the sole beneficiaries of the Settlement Trust. Article VII further provides that the following terms shall govern the Settlement Trust:

### 1. No Execution

All funds held in the Settlement Trust will remain property of the Settlement Trust until such time as the funds have actually been paid to and received by a Person or Entity entitled to receive payment pursuant to the terms of the Plan and the Settlement Trust Documents. Except as expressly provided in the Settlement Trust Documents and the Plan, the Settlement Trust shall not be responsible for any Claims against the Debtor.

### 2. Settlement Trust Agreement

The Creditors Committee shall File the proposed Settlement Trust Agreement with the Bankruptcy Court as a Supplemental Plan Document. The Settlement Trust Agreement shall contain provisions customary to settlement trust agreements utilized in comparable circumstances, including any and all provisions necessary to govern the rights, powers, obligations and appointment and removal of the Settlement Trustee. The Settlement Trust Agreement shall also contain provisions necessary to ensure the Settlement Trust will receive future payments from Religious Orders if and when holders of Survivor Claims receive property from the Religious Orders and/or the Religious Orders' insurance companies related to claims of such holders against Religious Orders.

### 3. Tax Matters

The Settlement Trust is expected to be tax exempt. The Settlement Trustee shall file such income tax and other returns and documents as are required to comply with the applicable provisions of the IRC and the Treasury Regulations promulgated thereunder, and Delaware law and the regulations promulgated thereunder, and shall pay from the Settlement Trust all taxes, assessments, and levies upon the Settlement Trust, if any.

### 4. Appointment of the Settlement Trustee

Subject to approval by the Bankruptcy Court, the Settlement Trustee will be Marla Eskin, Esq. The Settlement Trustee shall be appointed by the Bankruptcy Court in the Confirmation Order and shall commence serving no later than on the Effective Date. The Settlement Trustee will act only pursuant to the provisions of the Plan, the Confirmation Order, and the Settlement Trust Documents. The Settlement Trustee may not assign any of its rights or obligations. The Settlement Trustee will be responsible for defending the Settlement Trust against all Survivor Claims and will serve as the paying agent responsible for distribution of payments to holders of Survivor Claims. The Settlement Trustee will be entitled to receive a reasonable fee and reimbursement of reasonable costs and expenses for its services, with such fees and costscosts to be paid from the Settlement Trust. The Unofficial Committee of Abuse Survivors asserts that fees and costs of the Settlement Trustee should be borne by the Reorganized Debtor, and not the Settlement Trust. The Debtor disagrees. The Bankruptcy Court has reserved ruling on this issue until the Confirmation Hearing.

### 5. Appointment of the Settlement Arbitrator

Subject to approval by the Bankruptcy Court, the proposed Settlement Arbitrator will be Hon. Thomas B. Rutter (retired). The Settlement Arbitrator shall be appointed by the Bankruptcy Court in the Confirmation Order (or re-appointed, to the extent previously appointed by Order of the Bankruptcy Court) and shall commence serving no later than on the Effective Date. The Settlement Arbitrator will be entitled to receive a reasonable fee and reimbursement of reasonable costs and expenses for its services, with such fees and cost to be paid from the Settlement Trust. The Unofficial Committee of Abuse Survivors asserts that fees and costs of the Settlement Arbitrator should be borne by the Reorganized Debtor, and not the Settlement Trust. The Debtor disagrees. The Bankruptcy Court has reserved ruling on this issue until the Confirmation Hearing.

### 6. Miscellaneous Provisions

All funds paid to the Settlement Trustee pursuant to the Plan will be deposited in the Settlement Trust. The Settlement Trustee shall invest all funds that are deposited in the Settlement Trust at its discretion subject to the terms of the Settlement Trust Documents. The Settlement Trustee may distribute funds to the beneficiaries of the Settlement Trust by payment to the client trust accounts of the attorneys of record representing the beneficiaries as determined by the filed proofs of claim. The Settlement Trustee shall have no liability to the beneficiaries of the Settlement Trust on account of the administration of the funds once the funds are transferred to the client trust accounts of the beneficiaries' attorneys of record. Pursuant to the instructions of the Settlement Arbitrator and notwithstanding any provision of Allocation Plan, the Settlement Trustee may make interim payments to beneficiaries of a Creditor Pool. Upon entry of an order by a court of competent jurisdiction authorizing termination and dissolution of the Settlement Trust, the Settlement Trustee will promptly proceed to wind up the affairs of the Settlement Trust. Upon termination of the Settlement Trust, and provided that all fees and expenses of the Settlement Trust have been paid or provided for in full and that no more than $50,000 remains in the Settlement Trust, the Settlement Trustee will deliver all funds and other investments remaining in the Settlement Trust, if any, including any investment earnings

thereon, to a charity supporting survivors of childhood sexual abuse to be chosen by the Settlement Trustee after consultation with members of the dissolved Creditors Committee.

## G. F. Means of Implementing a CDOW-Only Plan

Article VIII of the Plan sets forth the means for implementation and consummation of the Plan as a CDOW-Only Plan. Article VIII of the Plan shall apply only if the Plan is confirmed as a CDOW-Only Plan. As set forth in Article VIII, the Debtor proposes that the Plan be implemented and consummated as a CDOW-Only Plan through the means contemplated by § 1123(a)(5)(A), (B), and (D)-(G) and § 1123(b)(2)-(4) and (6) of the Bankruptcy Code on and after the Effective Date. Article VIII further provides for the following means of implementation if the Plan is confirmed as a CDOW-Only Plan:

### 1. Vesting Assets in the Plan Trust

On the Effective Date, all Plan Trust Assets shall vest in the Plan Trust, and the Debtor shall be deemed for all purposes to have transferred all right, title, and interest of its Estate in the Plan Trust Assets to the Plan Trust for the benefit of the holders of Claims against the Debtor's Estate, whether or not such Claims are Allowed Claims as of the Effective Date. Plan Trust Assets will include all Unrestricted Assets (including the Disputed Non-Debtor PIA Funds, the Disputed Restricted PIA Funds, and the Lay Pension Fund, to the extent they are determined by a Final Order to be Unrestricted Assets), except up to $3 million worth of assets (to be identified by the Debtor and valued by the Bankruptcy Court) that will be retained by the Reorganized Debtor. Additionally, the Plan Trust Assets will include (i) any surplus IBNR Reserves after the payment of all covered insurance claims, (ii) the Estate's rights to any proceeds of any Designated Insurance Policies, (iii) all Causes of Action of the Estate.

On the Effective Date or as soon as practicable thereafter, the Reorganized Debtor shall take all actions reasonably necessary to transfer control of any Plan Trust Assets not subject to Sections 8.5, 11.2(a), or 12.4 of the Plan (governing IBNR Reserves, Designated Insurance Policies, and the escrow of disputed sub-funds in the Pooled Investment Account) to the Plan Trust. Upon the transfer of control of Plan Trust Assets in accordance with the foregoing sentence, the Reorganized Debtor shall have no further interest in or with respect to such Plan Trust Assets. From and after the Effective Date, with respect to the IBNR Reserves and the Designated Insurance Policies, the Reorganized Debtor shall perform the duties set forth in Sections 8.5 and 11.2(a) of the Plan, respectively; and upon completion of its duties under Sections 8.5 or 11.2(a) of the Plan, as applicable, the Reorganized Debtor shall have no further interest in or with respect to the IBNR Reserves or the Designated Insurance Policies, respectively. From and after the Effective Date, the Reorganized Debtor shall manage the Disputed Non-Debtor PIA Funds, the Disputed Restricted PIA Funds, and the Lay Pension Fund as set forth in Sections 12.4(a), (b) and (c) of the Plan, respectively. Upon completion of its duties under Sections 12.4(a), (b) or (c) of the Plan, as applicable, the Reorganized Debtor shall have no further interest in or with respect to the Disputed Non-Debtor PIA Funds, the Disputed Restricted PIA Funds, or the Lay Pension Fund, respectively.

## 2.   Assumption of Plan Obligations and Liability for Claims

On the Effective Date, all of the Debtor's rights and obligations, if any, with respect to each and every S/A/P Claim and Unsecured Claim, and all other rights and obligations of the Debtor under the Plan, shall be assigned to and assumed by the Plan Trust, provided that the Reorganized Debtor shall have standing, and shall retain the right, to object to any Claim. In particular, and without limiting the generality of the foregoing, on the Effective Date the Plan Trust shall assume liability for, and shall succeed to all rights and defenses of the Debtor with respect to, all Survivor Claims arising prior to the Effective Date, provided, however, that such assumption of liability by the Plan Trust shall not relieve the Debtor, the Reorganized Debtor, any Non-Debtor Catholic Entity, or any Insurer of any obligation arising under any Designated Insurance Policy.

## 3.   IBNR Reserves

The Reorganized Debtor shall hold and administer the IBNR Reserves for the benefit of the Plan Trust, and shall provide the Plan Trust monthly reports of claims paid from the IBNR Reserves. The Reorganized Debtor shall remit to the Plan Trust any surplus remaining in the IBNR Reserves after all covered claims for self-insured plan years that commenced prior to the Effective Date have been paid, as determined by the Third-Party Administrators. The Reorganized Debtor may, but shall not be required to, maintain the IBNR Reserves in the Pooled Investment Account, provided that if the IBNR Reserves are maintained in the Pooled Investment Account, they shall be managed by the Reorganized Debtor in accordance with the PIA Custody Agreement and the Investment Management Agreements, in consultation with the Plan Trustee, for the benefit of the Plan Trust to the extent of its residual interest in the surplus, if any, of the IBNR Reserves. The Bankruptcy Court shall have exclusive jurisdiction to resolve any disputes between the Reorganized Debtor and the Plan Trustee regarding the management of the IBNR Reserves pursuant to Section 8.5 of the Plan.

## 4.   Retention of Jurisdiction

Pursuant to §§ 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. §§ 1334 and 157, on and after the Effective Date, the Bankruptcy Court shall retain (i) original and exclusive jurisdiction over the Chapter 11 Case, (ii) original, but not exclusive, jurisdiction to hear and determine all core proceedings arising under the Bankruptcy Code or arising in the Chapter 11 Case, (iii) original, but not exclusive, jurisdiction to hear and make proposed findings of fact and conclusions of law in any non-core proceedings related to the Chapter 11 Case and having a close nexus with the Plan, including matters concerning the interpretation, implementation, consummation, execution, or administration of the Plan. Subject to, but without limiting the generality of the foregoing, the Bankruptcy Court's post-Effective Date jurisdiction shall include jurisdiction over the specific matters set forth in Section 8.6(a) of the Plan. Furthermore, pursuant to Section 8.6(b) of the Plan and §§ 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. §§ 1334, on and after the Effective Date, the District Court shall retain original, but not exclusive, jurisdiction to hear and determine all matters arising under the Bankruptcy Code or arising in or related to the Chapter 11 Case. Subject to, but without limiting the generality of, the foregoing, the District Court's post-

Effective Date jurisdiction shall include jurisdiction over the specific matters set forth in Section 8.6(b) of the Plan.

### H. ~~G.~~ The Plan Trust in a CDOW-Only Plan

Article IX of the Plan details the formation, funding and management of the Plan Trust. Article IX of the Plan shall apply only if the Plan is confirmed as a CDOW-Only Plan. As set forth in Article IX, on or prior to the Effective Date, the Plan Trust shall be formed and funded with all Plan Trust Assets consisting of Cash. The holders of Claims shall be the sole beneficiaries of the Plan Trust. Article IX further provides that the following terms shall govern the Plan Trust:

#### 1. Plan Trust Agreement

The Debtor shall File the proposed Plan Trust Agreement with the Bankruptcy Court as a Supplemental Plan Document. The Plan Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including any and all provisions necessary to govern the rights, powers, obligations and appointment and removal of the Plan Trustee. The Plan Trust shall be established for the sole purpose of liquidating and distributing the Plan Trust Assets, with no objective to continue or engage in the conduct of a trade or business.

#### 2. Tax Matters

The Plan Trust shall not be deemed to be the same legal entity as the Debtor, but only the assignee of certain assets and liabilities of the Debtor and a representative of the Estate for delineated purposes within the meaning of § 1123(b)(3) of the Bankruptcy Code. Neither the Plan Trust nor any portion thereof, nor any reserve, account or fund established by the Plan (including pursuant to Section 12.4 of the Plan) shall be treated as a "disputed ownership fund" within the meaning of Treasury Regulations § 1.468B-9(b)(1). The Plan Trust is expected to be tax exempt. The Plan Trustee shall file such income tax and other returns and documents as are required to comply with the applicable provisions of the IRC and the Treasury Regulations promulgated thereunder, and Delaware law and the regulations promulgated thereunder, and shall pay from the Plan Trust all taxes, assessments, and levies upon the Plan Trust, if any.

#### 3. Appointment of the Plan Trustee

After consultation with the Official Committees, the Debtor shall nominate a Plan Trustee, who shall be identified in the Plan Trust Agreement Filed in accordance with Section 9.3 of the Plan. The Plan Trustee shall be appointed by the Bankruptcy Court in the Confirmation Order and shall commence serving as the Plan Trustee on the Effective Date; provided, however, that the Person appointed as Plan Trustee shall be permitted to act in accordance with the terms of the Plan Trust Agreement from such earlier date as authorized by the Debtor, in consultation with the Official Committees, through the Effective Date and shall be entitled to seek compensation in accordance with the terms of the Plan Trust Agreement and the Plan.

66

068902.1001

4. **Rights and Responsibilities of the Plan Trustee**

The Plan Trustee shall be deemed the Estate's representative in accordance with § 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified in Section 9.6 of the Plan and the Plan Trust Agreement, including but not limited to the powers of a trustee under §§ 704, 108 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules (including commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting Claims, defenses, offsets and privileges). Acts by the Plan Trustee will require consultation with the Plan Oversight Committee in accordance with, and only to the extent set forth in, the Plan Trust Agreement. If there is any inconsistency or ambiguity between the Plan and Confirmation Order or the Plan Trust Agreement in respect of the Plan Oversight Committee's role in the Plan Trustee's authority to act, the provisions of the Plan Trust Agreement shall control.

5. **Investment Powers; Permitted Cash Expenditures**

All funds held by the Plan Trust shall be invested in Cash or short-term highly liquid investments that are readily convertible to known amounts of Cash as more particularly described in the Plan Trust Agreement. The Plan Trustee may expend the Cash of the Plan Trust (i) as reasonably necessary to meet current liabilities and to maintain the value of the respective Assets of the Plan Trust during liquidation, (ii) to pay reasonable administrative expenses (including any taxes imposed on the Plan Trust and any professionals' fees) and (iii) to satisfy other liabilities incurred by the Plan Trust in accordance with the Plan or the Plan Trust Agreement.

6. **Registry of Beneficial Interests**

To evidence the beneficial interest in the Plan Trust of each holder of such an interest, the Plan Trustee shall maintain a registry of such holders.

7. **Non-Transferability of Interests**

Upon issuance thereof, interests in the Plan Trust shall be non-transferable, except with respect to a transfer by will or under the laws of descent and distribution. Any such transfer, however, shall not be effective until and unless the Plan Trustee receives written notice of such transfer.

8. **Termination**

The Plan Trust shall terminate after its liquidation, administration and distribution of the Plan Trust Assets in accordance with the Plan and its full performance of all other duties and functions set forth herein or in the Plan Trust Agreement. The Plan Trust shall terminate no later than the fifth (5th) anniversary of the Effective Date; provided, however, that, within a period of six (6) months prior to such termination date or any extended termination date, the Plan Trustee, with the consent of the Plan Oversight Committee or by Order of the Bankruptcy Court, may extend the term of the Plan Trust if it is necessary to facilitate or complete the liquidation of the Plan Trust Assets administered by the Plan Trust; provided further, however, that the

67

aggregate of all such extensions shall not exceed three (3) years without further Order of the Bankruptcy Court.

## 9. Plan Oversight Committee

A Plan Oversight Committee shall be shall be deemed appointed on the Effective Date and as soon as practicable thereafter shall adopt bylaws to govern the actions of the Plan Oversight Committee. The membership, rights and duties, and compensation of the Plan Oversight Committee shall be as set forth in Section 9.11 of the Plan and the Plan Trust Agreement.

## 10. Liability; Indemnification

Neither the Plan Trustee, the Plan Oversight Committee, their respective members, designees or professionals, or any duly designated agent or representative of the Plan Trustee or the Plan Oversight Committee, nor their respective employees, shall be liable for the act or omission of any other member, designee, agent or representative of such Plan Trustee or Plan Oversight Committee, nor shall such Plan Trustee, or any member of the Plan Oversight Committee, be liable for any act or omission taken or omitted to be taken in its capacity as Plan Trustee, or as a member of the Plan Oversight Committee, respectively, other than for specific acts or omissions resulting from such Plan Trustee's or such member's willful misconduct, gross negligence, fraud, or breach of the fiduciary duty of loyalty. The Plan Trustee or the Plan Oversight Committee may, in connection with the performance of its functions and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, neither the Plan Trustee nor the Plan Oversight Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Plan Trustee or Plan Oversight Committee or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or fraud. The Plan Trust shall indemnify and hold harmless the Plan Trustee and Plan Oversight Committee and its members, designees and professionals, and all duly designated agents and representatives thereof (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including reasonable attorneys' fees, disbursements, and related expenses) which such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Plan Trust or the Plan or the discharge of their duties under the Plan; provided, however, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, fraud, or breach of the fiduciary duty of loyalty.

## 11. Retention of Professionals

The Plan Trust may retain professionals, including counsel, accountants, financial advisors, auditors and other agents, on the terms set forth in Section 9.13(a) of the Plan. The

YCST01:10788119.310788119.4                                                                                    068902.1001

Plan Oversight Committee shall have the right to retain counsel on the terms set forth in Section 9.13(b) of the Plan.

### 12. Preservation of All Causes of Action

Except as otherwise provided in the Plan, the Confirmation Order or other Order of the Bankruptcy Court, or in any contract, instrument, release or agreement entered into in connection with the Plan, in accordance with § 1123(b) of the Bankruptcy Code, the Plan Trust shall be vested with, retain, and may exclusively enforce and prosecute any Claims or Causes of Action that the Debtor, the Estate, the Creditors Committee, the Lay Employees Committee or the Plan Trust may have against any Person. The Plan Trustee may pursue such retained Claims or Causes of Action in accordance with the best interests of the Creditors, the Estate, and/or the Plan Trust.

### 13. Succession to Litigation

On the Effective Date, and subject fully to Article V of the Plan, the Plan Trust shall succeed (i) to the interests of the Creditors Committee in any contested matter or adversary proceeding commenced by the Creditors Committee, including any appeal therefrom, which is pending as of the Effective Date, including the PIA Litigation; and (ii) to the interests of the Debtor in any contested matter, adversary proceeding, or nonbankruptcy litigation against the Debtor, including any appeal therefrom, which is pending as of the Effective Date, other than the PIA Litigation. The Reorganized Debtor shall succeed to the interests of the Debtor in the PIA Litigation.

### I. ~~H.~~ Procedures for Liquidation and Allowance of Survivor Claims in a CDOW-Only Plan

Article X of the Plan details the procedures for liquidation and allowance of Survivor Claims if the Plan is confirmed as a CDOW-Only Plan. Article X of the Plan shall apply only if the Plan is confirmed as a CDOW-Only Plan. The following is a summary of the terms of Article X:

#### 1. Election of ADR, Litigation, or Convenience Treatment

To the extent not previously removed pursuant to Bankruptcy Rule 9001 and 28 U.S.C. § 1452, all cases pending in the Superior Court in which Survivor Claims are asserted shall be removed to the District Court for liquidation and Allowance (or Disallowance) of Survivor Claims in accordance with the Bankruptcy Code and Sections 10.4, 10.5 and 10.6 of the Plan. Each holder of a Survivor Claim shall elect to be treated as a holder of (i) a Survivor ADR Claim, liquidation and Allowance (or Disallowance) of which shall be governed by Section 10.4 of the Plan, (ii) a Survivor Litigation Claim, liquidation and Allowance (or Disallowance) of which shall be governed by Section 10.5 of the Plan, or (iii) a Survivor Convenience Claim, liquidation and Allowance (or Disallowance) of which shall be governed by Section 10.6 of the Plan. The election required by this Section must be in a writing served on the Plan Trustee no later than (i) thirty (30) days after a notice of the Effective Date is Filed with the Bankruptcy

YCST01:~~10788119.2~~10788119.4                                                                 068902.1001

Court and served, or (ii) such later date, if any, as the Bankruptcy Court shall order upon application made prior to the end of such 30-day period (the "Survivor Election Deadline").

## 2. Survivor ADR Process

After consultation with the Creditors Committee, the Debtor shall, in a Supplemental Plan Document, identify a disinterested Person to serve as arbitrator (the "Survivor Claims Arbitrator") and propose binding arbitration procedures (the "Survivor Claims Arbitration Procedures"), subject to approval by the Bankruptcy Court at the Confirmation Hearing, by which the Survivor Claims Arbitrator shall determine the Allowed amount of any Survivor ADR Claims (which, for the avoidance of doubt, shall be limited only to compensatory damages and shall not include any punitive or exemplary damages or pre-judgment interest).

## 3. Survivor Litigation Process

After consultation with the Creditors Committee, the Debtor shall, in a Supplemental Plan Document, identify a disinterested Person other than the Survivor Claims Arbitrator to serve as special mediator (the "Survivor Claims Mediator"), subject to approval by the Bankruptcy Court at the Confirmation Hearing, to whom all Survivor Litigation Claims shall be referred pursuant to Del. Bankr. L.R. 9019-3. Should the Plan Trust and the holder of a Survivor Litigation Claim be unable to reach agreement as to the Allowed amount of the Survivor Litigation Claim (which, for the avoidance of doubt, shall be limited to compensatory damages and shall not include any punitive or exemplary damages or pre-judgment interest) via mediation, the claimant may elect (i) to submit to binding arbitration before the Survivor Claims Arbitrator, which election shall be irrevocable, or (ii) to proceed with litigation against the Plan Trust in the District Court, which election shall be revocable at any time prior to the earliest of the date on which the Plan Trust has Filed a dispositive motion with respect to, or a trial has commenced on, the Claim.

## 4. Survivor Convenience Process

Each holder of a Survivor Convenience Claim shall tender to the Survivor Claims Arbitrator a sworn statement in the form to be Filed as a Supplemental Plan Document. Each Survivor Convenience Claim shall be Allowed in the amount of $75,000 (for Claims arising out of Abuse by Diocesan priests or employees) or $25,000 (for Claims arising out of Abuse by Religious Order clerics or employees), as applicable, if the Survivor Claims Arbitrator determines that (i) a Proof of Claim was timely filed by the holder of such Survivor Convenience Claim, or was deemed timely filed by Order of the Bankruptcy Court, and (ii) the sworn statement, along with the Proof of Claim filed by the holder of such Claim, establish a *Prima Facie* Case of Abuse.

## 5. Effect of No Election

Each holder of a Survivor Claim who does not elect to be treated as a holder of (i) a Survivor ADR Claim, (ii) a Survivor Litigation Claim, or (iii) a Survivor Convenience Claim by making such election by the Survivor Election Deadline in accordance with Section 10.2 of

the Plan shall be deemed to have elected treatment as a holder of a Survivor Convenience Claim, which election shall be irrevocable.

### 6. Civil Complaint by Survivor Litigation Claimant

If a holder of a Survivor Litigation Claim has not Filed a civil complaint alleging such Claim in the Superior Court or District Court before making an election to be treated as a holder of a Survivor Litigation Claim, such holder must File in the District Court and serve on the Plan Trust such a complaint within sixty (60) days after the Effective Date. If a holder of a Survivor Litigation Claim does not File and serve such complaint, such holder shall be deemed to have elected treatment as a holder of a Survivor Convenience Claim, which election shall be irrevocable.

### 7. Agreements Outside the ADR and Litigation Procedures

For the avoidance of doubt, nothing in the Plan shall preclude the holder of a Survivor Claim and the Plan Trust from stipulating to the Allowed amount of such Survivor Claim as otherwise permitted by the Plan Trust Agreement, the Bankruptcy Code, and the Bankruptcy Rules.

## J. ~~I.~~ Insurance Policies

### 1. Continuation of Insurance Policies

The Debtor shall identify in a Supplemental Plan Document all known Insurance Policies and specify which of such Insurance Policies are expected to be Settled Insurance Policies in a Settlement Plan. If the Plan is confirmed as a Settlement Plan, the Settled Insurance Policies shall be sold to the Settling Insurers pursuant to § 363 of the Bankruptcy Code in accordance with Section 5.1(b) of the Plan. Irrespective whether the Plan is confirmed as a Settlement Plan or a CDOW-Only Plan, on the Effective Date, all Insurance Policies that were not previously sold to a Settling Insurer pursuant to § 363 of the Bankruptcy Code (the "Designated Insurance Policies") shall, as applicable, either be deemed assumed by the Reorganized Debtor pursuant to §§ 365 and 1123(a)(5)(A) of the Bankruptcy Code, to the extent such Insurance Policy is or was an Executory Contract of the Debtor, or continued in accordance with its terms pursuant to § 1123(a)(5)(A) of the Bankruptcy Code, to the extent such Insurance Policy is not an Executory Contract of the Debtor, such that each of the parties' contractual, legal, and equitable rights under each such Designated Insurance Policy shall remain unaltered. To the extent that any or all of the Designated Insurance Policies are considered to be Executory Contracts, then the Plan shall constitute a motion to assume the Designated Insurance Policies in connection with the Plan. Subject to the occurrence of the Effective Date, the Confirmation Order shall approve such assumption pursuant to §§ 365(a) and 1123(a)(5)(A) of the Bankruptcy Code and include a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtor, the Estate, and all parties in interest in the Chapter 11 Case. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtor existing as of the Effective Date with respect to any Designated Insurance Policy. The

Debtor reserves the right to seek rejection of any Designated Insurance Policy or other available relief prior to the Effective Date.

### 2. Insurance Provisions Applicable to CDOW-Only Plan

If the Plan is confirmed as a CDOW-Only Plan, then regardless of whether the Designated Insurance Policies are assumed and assigned to the Reorganized Debtor or continued in accordance with their terms, the Estate's rights to any proceeds of such Designated Insurance Policies shall vest in the Plan Trust pursuant to §§ 541(c)(1) and 1123(a)(5)(B) of the Bankruptcy Code. From and after the Effective Date, the Reorganized Debtor shall cooperate reasonably with the Plan Trust to maximize the proceeds of the Designated Insurance Policies (including, upon reasonable request by the Plan Trust, by commencing and prosecuting one or more Insurance Actions with respect to the Designated Insurance Policies), and the reasonable expenses of the Reorganized Debtor, including professional fees, in so doing shall constitute Plan Administration Expenses payable from the Plan Administration Expense Reserve. Furthermore, if the Plan is confirmed as a CDOW-Only Plan, the insurance neutrality provision in Section 11.2(b) of the Plan and the additional insurance protections in Section 11.2(c) of the Plan shall be effective.

### K. ~~J.~~ The Pooled Investment Account

#### 1. Continuation of PIA Custody Agreement and Investment Management Agreements

To the extent that the PIA Custody Agreement and the Investment Management Agreements are considered to be Executory Contracts, then notwithstanding anything contained in the Plan to the contrary, the Plan shall constitute a motion to assume the PIA Custody Agreement and the Investment Management Agreements in connection with the Plan pursuant to §§ 365 and 1123(a)(5)(A) of the Bankruptcy Code. Subject to the occurrence of the Effective Date, the Confirmation Order shall approve each such assumption pursuant to §§ 365(a) and 1123(a)(5)(A) of the Bankruptcy Code and include a finding by the Bankruptcy Court that each such assumption is in the best interests of the Debtor, the Estate, and all parties in interest in the Chapter 11 Case. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtor existing as of the Effective Date with respect to the PIA Custody Agreement or the Investment Management Agreements. The Debtor reserves the right to seek rejection of the PIA Custody Agreement or any Investment Management Agreement, or seek other available relief, prior to the Effective Date. To the extent the PIA Custody Agreement and the Investment Management Agreements are not considered to be Executory Contracts, all rights thereunder shall be preserved and shall vest in the Reorganized Debtor pursuant to Section 17.1 of the Plan and § 1123(a)(5)(A) of the Bankruptcy Code.

#### 2. Continuation of Trust Relationships

The Reorganized Debtor shall succeed to, and assume, all rights, responsibilities, and duties of the Debtor as trustee for the benefit of the Non-Debtor Pooled Investors under applicable bankruptcy law.

## 3. Rights of Custodian and Investment Managers

For the avoidance of doubt, nothing in the Plan is intended, nor shall it be construed, to recognize or impose any duty on the part of the Custodian or any Investment Managers (i) to any person other than the Debtor or the Reorganized Debtor, or (ii) beyond the duties imposed by the PIA Custody Agreement and Investment Management Agreements, as applicable. Notwithstanding anything to the contrary in the Plan, the Custodian and Investment Managers shall have no liability, or otherwise be in violation of the Plan, for acting in accordance with the PIA Custody Agreement and Investment Management Agreements, as applicable, including by processing any transactions initiated by the Debtor or the Reorganized Debtor that are permitted by the PIA Custody Agreement and Investment Management Agreements, as applicable. The Custodian and the Investment Managers shall be authorized to exercise their rights and perform their obligations under the PIA Custody Agreement and the Investment Management Agreements, as applicable, in the ordinary course in accordance with prepetition practices without further Order of the Bankruptcy Court. Without limiting the generality of the foregoing, the Custodian and the Investment Managers shall be authorized to surcharge the Pooled Investment Account as authorized in the PIA Custody Agreement and the Investment Management Agreements, as applicable (including for reimbursements and offsets for fees and expenses, and overdrafts), without application to the Bankruptcy Court or notice to any party (except as otherwise provided in the PIA Custody Agreement or the Investment Management Agreements, as applicable).

## 4. Dispute Escrows in CDOW-Only Plan

a. *Non-Debtor PIA Dispute Escrow*. Pursuant to Section 12.4(a) of the Plan, which shall apply only if the Plan is confirmed as a CDOW-Only Plan, the Confirmation Order shall (i) identify all Disputed Non-Debtor PIA Funds as of the Confirmation Date and (ii) provide that, notwithstanding anything to the contrary in the PIA Custody Agreement, such Disputed Non-Debtor PIA Funds shall be deemed to be held *in custodia legis* pending entry of a Final Order determining whether such Disputed Non-Debtor PIA Funds constitute Unrestricted Assets of the Estate. While *in custodia legis*, the Disputed Non-Debtor PIA Funds (i) shall not be subject to attachment, encumbrance, or forfeiture by any means without prior Order of the Bankruptcy Court, and (ii) shall be managed by the Reorganized Debtor in accordance with the PIA Custody Agreement and the Investment Management Agreements, in consultation with the Plan Trustee and the Non-Debtor Pooled Investors, for the benefit of the Plan Trust and the Non-Debtor Pooled Investors, as their respective interests in the Disputed Non-Debtor PIA Funds may lie. The Bankruptcy Court shall have exclusive jurisdiction to resolve any disputes between the Reorganized Debtor, the Plan Trustee, and the Non-Debtor Pooled Investors regarding the management of Disputed Non-Debtor PIA Funds pursuant to Section 12.4(a) of the Plan. Distributions from the Disputed Non-Debtor PIA Funds shall be subject to further Order of the Bankruptcy Court.

Section 12.4(a)(2) of the Plan further provides that as soon as practicable upon request by the Plan Trustee after entry of a Final Order determining any Disputed Non-Debtor PIA Fund to be an Unrestricted Asset of the Estate, the Reorganized Debtor shall direct the Custodian to liquidate and distribute, or distribute via in-kind or inter-custodial transfer, such Disputed Non-Debtor PIA Fund to the Plan Trust on behalf of the Debtor. Upon entry of a Final

73

Order determining any Disputed Non-Debtor PIA Fund not to be an Unrestricted Asset of the Estate, the Reorganized Debtor shall be authorized to process withdrawal requests from the applicable Non-Debtor Pooled Investor without further Order of the Bankruptcy Court.

b. *Restricted Fund Dispute Escrow.* Pursuant to Section 12.4(b) of the Plan, which shall apply only if the Plan is confirmed as a CDOW-Only Plan, the Confirmation Order shall (i) identify all Disputed Restricted PIA Funds as of the Confirmation Date and (ii) provide that, notwithstanding anything to the contrary in the PIA Custody Agreement, such Disputed Restricted PIA Funds shall be deemed to be held *in custodia legis* pending entry of a Final Order determining whether such funds constitute Unrestricted Assets of the Estate. While *in custodia legis*, the Disputed Non-Debtor PIA Funds (i) shall not be subject to attachment, encumbrance, or forfeiture by any means without prior Order of the Bankruptcy Court, and (ii) shall be managed by the Reorganized Debtor in accordance with the PIA Custody Agreement and the Investment Management Agreements, in consultation with the Plan Trustee, for the benefit of the Reorganized Debtor and the Plan Trust, as their respective interests in the Disputed Restricted PIA Funds may lie. The Bankruptcy Court shall have exclusive jurisdiction to resolve any disputes between the Reorganized Debtor and the Plan Trustee regarding the management of Disputed Restricted PIA Funds pursuant to Section 12.4(b) of the Plan.

Pursuant to Section 12.4(b) of the Plan, the Reorganized Debtor shall be permitted to use Disputed Restricted PIA Funds other than the Capital Campaign Fund in the ordinary course in accordance with applicable nonbankruptcy law that governs the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust, without further order of the Bankruptcy Court; provided, however, that the total value of each Disputed Restricted PIA Fund so utilized in each 12-month period from and after the Effective Date shall not exceed 5.5% of the total value of such Disputed Restricted PIA Fund on the last day of the last full month prior to the beginning of such period, without further Order of the Bankruptcy Court; and provided further, however, that the Reorganized Debtor shall provide the Plan Trustee monthly reports including the amount and purpose of any uses of Disputed Restricted PIA Funds. To the extent the Capital Campaign Fund is a Disputed Restricted PIA Fund, distributions from the Capital Campaign Fund shall be subject to further Order of the Bankruptcy Court.

Section 12.4(b) of the Plan further provides that upon entry of a Final Order determining any Disputed Restricted PIA Fund to be an Unrestricted Asset of the Estate, the Reorganized Debtor shall direct the Custodian to liquidate and distribute, or distribute via in-kind or inter-custodial transfer, such Disputed Restricted PIA Fund to the Plan Trust on behalf of the Debtor. Upon entry of a Final Order determining any Disputed Restricted PIA Fund to be a Restricted Asset, the Reorganized Debtor shall be authorized to use such Disputed Restricted PIA Fund, without further notice to any Person or Order of the Bankruptcy Court, in accordance with applicable nonbankruptcy law that governs the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust, provided that, to the extent the holders of Allowed DEDA Bond Transaction Claims elect treatment under Section 4.5(a)(2) of the Plan, the Capital Campaign Fund, the Capital Campaign Fund shall be distributed in accordance with Section 4.5(a)(2) of the Plan.

74

c.     *Lay Pension Dispute Escrow.* Pursuant to Section 12.4(c) of the Plan, which shall apply only if the Plan is confirmed as a CDOW-Only Plan, the Confirmation Order shall provide that, notwithstanding anything to the contrary in the PIA Custody Agreement, the Lay Pension Fund shall be deemed to be held *in custodia legis* subject to the provisions of Section 12.4(c) of the Plan. While *in custodia legis*, the Lay Pension Fund (i) shall not be subject to attachment, encumbrance, or forfeiture by any means without prior Order of the Bankruptcy Court, and (ii) shall be managed by the Reorganized Debtor in accordance with the PIA Custody Agreement and the Investment Management Agreements, in consultation with the Plan Trustee and the Lay Employees Committee, for the benefit of the Plan Trust and the Lay Pension Plan, as their respective interests in the Lay Pension Fund may lie. The Bankruptcy Court shall have exclusive jurisdiction to resolve any disputes between the Reorganized Debtor, the Plan Trustee, and the Lay Employees Committee regarding the management of Lay Pension Fund pursuant to Section 12.4(c) of the Plan. Distributions from the Lay Pension Fund shall be subject to further Order of the Bankruptcy Court.

Section 12.4(c) of the Plan further provides that upon entry of a Final Order determining the Lay Pension Fund to be an Unrestricted Asset of the Estate, the Reorganized Debtor shall direct the Custodian to liquidate and distribute, or distribute via in-kind or inter-custodial transfer, such Lay Pension Fund to the Plan Trust on behalf of the Debtor. Upon entry of a Final Order determining the Lay Pension Fund to be held in trust for the benefit of the Lay Pension Plan, or to be a Restricted Asset, the Reorganized Debtor shall direct the Custodian to liquidate and distribute, or distribute via in-kind or inter-custodial transfer, the Lay Pension Fund to the Lay Pension Plan Trust on behalf of the Debtor.

d.     *Accounting.* Pursuant to Section 12.4(d) of the Plan, which shall apply only if the Plan is confirmed as a CDOW-Only Plan, until entry of a Final Order determining whether each of the Disputed Non-Debtor PIA Funds, the Lay Pension Fund, and any Disputed Restricted PIA Funds are Unrestricted Assets of the Estate, the Reorganized Debtor shall continue to utilize sub-fund accounting with respect to the Pooled Investment Account so that all post-Effective Date transfers and transactions respecting the Pooled Investment Account shall be adequately and promptly documented in, and readily ascertainable from, the Reorganized Debtor's books and records, to the same extent maintained by the Debtor prior to the commencement of the Chapter 11 Case. Nothing contained herein shall prevent the Reorganized Debtor from establishing any additional sub-fund(s) within the Pooled Investment Account as it may deem necessary and appropriate, and the Custodian is authorized to process the Reorganized Debtor's request to account for transactions with respect to such sub-fund(s).

5.     **Use of Undisputed Restricted PIA Funds**

On and after the Effective Date, the Reorganized Debtor shall be entitled to use Undisputed Restricted PIA Funds, without further notice to any Person or Order of the Bankruptcy Court, in accordance with applicable nonbankruptcy law that governs the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

6.     **Final § 345 Waiver**

068902.1001

The Plan shall constitute a renewed motion to waive the deposit requirements of § 345(b) of the Bankruptcy Code in connection with the Pooled Investment Account. Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute (i) a final waiver of the deposit requirements of § 345(b) of the Bankruptcy Code, to the extent applicable, with respect to the Pooled Investment Account, for cause, and (ii) a finding by the Bankruptcy Court that such waiver is in the best interests of the Debtor, the Estate, and all parties in interest in the Chapter 11 Case.

### L. ~~K.~~ Procedures for General Claims Administration

Article XIII of the Plan details the procedures for the general administration of Claims. If the Plan is confirmed as a CDOW-Only Plan, then Article XIII shall govern the liquidation and allowance of all Claims~~, including Survivor Claims,~~ except as otherwise set forth in the Plan. If the Plan is confirmed as a Settlement Plan, then notwithstanding anything to the contrary in Article XIII, the liquidation and Allowance (or Disallowance) of ~~Survivor~~Class 3A Claims shall be governed exclusively by the Settlement Trust Distribution Procedures, and the Reorganized Debtor shall have no standing to object to Allowance of any ~~Survivor~~Class 3A Claim. The following is a summary of the terms of Article XIII.

#### 1. Reservation of Rights to Object to Claims

Unless a Claim is expressly described as an Allowed Claim pursuant to or under the Plan, or otherwise becomes an Allowed Claim prior to the Effective Date, upon the Effective Date, the Plan Administrator shall be deemed to have a reservation of any and all rights, interests and objections of the Debtor, the Official Committees, or the Estate to any and all Claims and motions or requests for the payment of or on account of Claims, whether administrative expense, priority, secured or unsecured, including any and all rights, interests and objections to the validity or amount of any and all alleged Administrative Claims, Priority Tax Claims, Priority Claims, Secured Claims, Unsecured Claims, Liens and security interests, whether under the Bankruptcy Code, other applicable law or contract. The Debtor's or Official Committees' failure to object to any Claim in the Chapter 11 Case shall be without prejudice to the Plan Administrator's rights to contest or otherwise defend against such Claim in the Bankruptcy Court as set forth in Section 13.2 of the Plan when and if such Claim is sought to be enforced by the holder of such Claim.

#### 2. Objections to Claims

Prior to the Effective Date, the Debtor shall be responsible for pursuing any objection to the Allowance of any Claim. From and after the Effective Date, the Plan Administrator will retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving and making distributions, if any, with respect to all Claims (including those Claims that are subject to objection by the Debtor as of the Effective Date), provided, however, that nothing in Section 13.3 of the Plan shall affect the right of any party in interest (including the Reorganized Debtor) to object to any Claim to the extent such objection is otherwise permitted by the Bankruptcy Code, the Bankruptcy Rules, and the Plan. Unless otherwise provided in the Plan or by Order of the Bankruptcy Court, any objections to Claims by the Plan Administrator will be Filed and served not later than one (1) year after the later of (i) the

Effective Date or (ii) the date such Claim is Filed, provided that the Plan Administrator may request (and the Bankruptcy Court may grant) extensions of such deadline, or of any Bankruptcy Court approved extensions thereof, by Filing a motion with the Bankruptcy Court without any requirement to provide notice to any Person, based upon a reasonable exercise of the Plan Administrator's business judgment. A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to the Plan.

### 3.    Service of Objections

An objection to a Claim shall be deemed properly served on the holder of such Claim if the objector effects service by any of the following methods: (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for such holder is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of such holder in the Chapter 11 Case.

### 4.    Determination of Claims

From and after the Effective Date, any Claim as to which a Proof of Claim or motion or request for payment was timely Filed in the Chapter 11 Case, or deemed timely Filed by Order of the Bankruptcy Court, may be determined and (so long as such determination has not been stayed, reversed or amended and as to which determination (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was Filed or, if Filed, remains pending) liquidated pursuant to (i) an Order of the Bankruptcy Court, (ii) applicable bankruptcy law, (iii) agreement of the parties without the need for Bankruptcy Court approval, (iv) applicable non-bankruptcy law or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim and (c) an application to otherwise limit recovery with respect to such Claim, Filed by the Debtor, the Plan Administrator, or any other party in interest on or prior to any applicable deadline for Filing such objection or application with respect to such Claim. Any such Claim so determined and liquidated shall be deemed to be an Allowed Claim for such liquidated amount and shall be satisfied in accordance with the Plan. Nothing contained in Section 13.5 of the Plan shall constitute or be deemed a waiver of any Claims, rights, interests or Causes of Action that the Debtor or the Plan Administrator may have against any Person in connection with or arising out of any Claim or Claims, including any rights under 28 U.S.C. § 157.

### 5.    No Distributions Pending Allowance

No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim; provided, however, that in the event that only a portion of such Claim is an Allowed Claim, the Plan Administrator may, in its discretion, make a distribution in accordance with Article XIV of the Plan on account of the portion of such Claim that is an Allowed Claim.

6. **Claim Estimation**

In order to effectuate distributions pursuant to the Plan and avoid undue delay in the administration of the Chapter 11 Case, the Debtor (if prior to the Effective Date) and the Plan Administrator (on and after the Effective Date), after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), shall have the right to seek an Order of the Bankruptcy Court or the District Court, pursuant to § 502(c) of the Bankruptcy Code, estimating or limiting the amount of (i) property that must be withheld from or reserved for distribution purposes on account of such Disputed Claim(s), (ii) such Claim for allowance or disallowance purposes, or (iii) such Claim for any other purpose permitted under the Bankruptcy Code; provided, however, that the Bankruptcy Court or the District Court, as applicable, shall determine (i) whether such Claims are subject to estimation pursuant to § 502(c) of the Bankruptcy Code and (ii) the timing and procedures for such estimation proceedings, if any, such matters being beyond the scope of the Plan. If the Plan is confirmed as a CDOW-Only Plan, then on and after the Effective Date, the Reorganized Debtor shall have the right to continue to prosecute any motion commenced by the Debtor pursuant to Section 13.7 of the Plan, and the reasonable fees and expenses of the professionals of the Reorganized Debtor in connection therewith shall constitute Plan Administration Expenses payable from the Plan Administration Expense Reserve.

**M.** L. **Distributions under the Plan**

Article XIV of the Plan details the general procedures for distributions under the Plan. If the Plan is confirmed as a CDOW-Only Plan, then Article XIV shall govern the timing and manner of distributions on account of all Claims, including Survivor Claims, except as otherwise set forth in the Plan. If the Plan is confirmed as a Settlement Plan, then notwithstanding anything to the contrary in Article XIV, the timing and manner of distributions on account of Allowed Survivor Claims shall be governed exclusively by the Settlement Trust Agreement and applicable nonbankruptcy law. The following is a summary of the terms of Article XIV:

1. **Timing of Distributions**

On the Effective Date, the Plan Administrator shall establish the S/A/P Claims Reserve for all Disputed S/A/P Claims and Allowed S/A/P Claims not paid prior to the Effective Date. As soon as practicable after (and to the extent) that a Disputed S/A/P Claim becomes an Allowed S/A/P Claim, the Plan Administrator shall make a payment from the S/A/P Claims Reserve to the holder of such Claim in the Allowed amount of such Claim. After (and to the extent) a Disputed S/A/P Claim is determined not to be an Allowed S/A/P Claim, the portion of the S/A/P Claims Reserve reserved for such Claim shall be released from the S/A/P Claims Reserve and distributed or retained by the Plan Administrator, as applicable, pursuant to the terms of the Plan.

If the Plan is confirmed as a CDOW-Only Plan, the Plan Trust shall (i) be authorized to make annual interim Distributions on account of Allowed Claims from the Plan Trust, provided that any such distribution is warranted, economical and not unduly burdensome to the Plan Trust, and (ii) have the right to make more frequent interim distributions to holders of

Allowed Claims if the Plan Trustee determines that such interim distributions are warranted, economical and not unduly burdensome to the Plan Trust; provided, however, that any such distribution(s) shall only be made if (i) the Plan Administration Expense Reserve and S/A/P Claims Reserve are fully funded and will remain fully funded after such interim distributions are made and (ii) the Plan Trust retains amounts reasonably necessary to meet contingent liabilities, to maintain the value of the Plan Trust Assets during liquidation, and to satisfy other liabilities or expenses incurred by the Plan Trust in accordance with the Plan or the Plan Trust Agreement.

### 2. Payment Date

Whenever any payment or distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day.

### 3. Undeliverable Distributions

If payment or distribution to the holder of an Allowed Claim under the Plan is returned for lack of a current address for the holder or otherwise, the Plan Administrator shall File with the Bankruptcy Court the name, if known, and last known address of the holder and the reason for its inability to make payment. If, after the passage of ninety (90) days, the payment or distribution still cannot be made, the payment or distribution and any further payment or distribution to the holder shall be distributed to the other holders of Allowed Claims in the appropriate Class or Classes (or retained by the Plan Administrator, to the extent all Allowed Claims in the appropriate Class or Classes have been satisfied in full) and the Allowed Claim shall be deemed satisfied and released, with no recourse to the Plan Administrator or property of the Plan Administrator, to the same extent as if payment or distribution had been made to the holder of the Allowed Claim.

### 4. Setoffs

The Plan Administrator may, to the extent permitted under applicable law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, the Claims, rights and Causes of Action of any nature that the Plan Administrator may hold against the holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; provided, however, that neither such a setoff nor the allowance of any Claim under Section 14.5 of the Plan shall constitute a waiver or release by the Plan Administrator of any such Claims, rights and Causes of Action that the Plan Administrator possesses against such holder.

### 5. No Interest on Claims

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a postpetition agreement in writing between the Debtor and a holder of a Claim and approved by an Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claim, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any provision of the Plan, Confirmation Order or Plan Trust Agreement, interest shall not accrue on or be paid on any Disputed Claim in

068902.1001

respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes and Allowed Claim.

### 6. Withholding Taxes

The Plan Administrator shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. As a condition to making any distribution under the Plan, the Plan Administrator may require that the holder of an Allowed Claim provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

### N. M. Effectiveness of the Plan

The Plan shall not become effective as a Settlement Plan unless and until each of the conditions set forth in Sections 15.1(a)-(e) of the Plan shall have been satisfied in full in accordance with the provisions set forth therein. The Plan shall not become effective as a CDOW-Only Plan unless and until each of the conditions set forth in Sections 15.1(a)-(d) and 15.1(f) of the Plan shall have been satisfied in full in accordance with the provisions set forth therein. The conditions set forth in Section 15.1 of the Plan may be waived by the Debtor in writing, provided that waiver of any of the conditions set forth in subsections 15.1(e)(1)-(3) of the Plan shall require the written agreement of State Court Counsel.

If after the Confirmation Order is entered confirming the Plan as a Settlement Plan, each of the applicable conditions to effectiveness has not been satisfied or duly waived by ninety (90) days after the Confirmation Date, then upon motion by the Debtor, and after notice and a hearing, the Confirmation Order may be (i) modified by the Bankruptcy Court to confirm the Plan as a CDOW-Only Plan, to the extent the requirements for confirmation of the Plan as a CDOW-Only Plan are satisfied, or (ii) vacated by the Bankruptcy Court; provided however, that notwithstanding the Filing of such a motion, the Confirmation Order shall not be modified or vacated if each of the conditions to effectiveness is either satisfied or duly waived before the Bankruptcy Court enters an Order granting the relief requested in such motion. Prior to filing any motion to modify the Confirmation Order to confirm the plan as a CDOW-Only Plan, the Debtor shall meet and confer with the Creditors Committee and the Lay Employees Committee to establish a schedule for litigation, if any, relating to confirmation of the Plan as a CDOW-Only Plan. Pending the occurrence of this meet-and-confer and the Bankruptcy Court's entry of an order regarding discovery and pleading deadlines related thereto, no party in interest will be required to fileFile any pleading or initiate/continue any discovery related to confirmation of the Plan as a CDOW-Only Plan. If the Confirmation Order is modified pursuant to Section 15.2 of the Plan to confirm the Plan as a CDOW-Only Plan, then for all purposes under the Plan, (i) the order as modified shall constitute the "Confirmation Order," (ii) the date of entry of such order on the Bankruptcy Court's docket shall constitute the "Confirmation Date," and (iii) the hearing to consider confirmation of the Plan as a Settlement Plan and the subsequent hearing to consider modification of the Confirmation Order to confirm the Plan as a CDOW-Only Plan shall, collectively, constitute the "Confirmation Hearing." If the Confirmation Order is vacated pursuant to Section 15.2 of the Plan, the Plan shall be null and void in all respects, and nothing

contained in the Plan, this Disclosure Statement, nor any pleadings Filed in connection with the approval thereof shall (i) constitute a waiver or release of any Claims against the Debtor, (ii) prejudice in any manner the rights of the holder of any Claim against the Debtor, (iii) prejudice in any manner the rights of the Debtor in the Chapter 11 Case, or (iv) constitute an admission of any fact or legal position or a waiver of any legal rights held by any Person prior to the Confirmation Date.

If after the Confirmation Order is entered confirming the Plan as a CDOW-Only Plan, each of the applicable conditions to effectiveness has not been satisfied or duly waived by ninety (90) days after the Confirmation Date, then upon motion by the Debtor, and after notice and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court; provided however, that notwithstanding the Filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions to effectiveness is either satisfied or duly waived before the Bankruptcy Court enters an Order granting the relief requested in such motion. If the Confirmation Order is vacated pursuant to Section 15.3 of the Plan, the Plan shall be null and void in all respects, and nothing contained in the Plan, this Disclosure Statement, nor any pleadings Filed in connection with the approval thereof shall (i) constitute a waiver or release of any Claims against the Debtor, (ii) prejudice in any manner the rights of the holder of any Claim against the Debtor, (iii) prejudice in any manner the rights of the Debtor in the Chapter 11 Case, or (iv) constitute an admission of any fact or legal position or a waiver of any legal rights held by any Person prior to the Confirmation Date.

## O. ~~N.~~ Effects of Confirmation

### 1. Dissolution of Official Committees

On the Effective Date, the Official Committees shall dissolve automatically, whereupon their members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective Orders entered during the Chapter 11 Case, which shall remain in full force and effect according to their terms, provided that such parties shall continue to have a right to be heard with respect to any and all (i) applications for Professional Claims and (ii) requests for compensation and reimbursement of expenses pursuant to § 503(b) of the Bankruptcy Code for making a substantial contribution in the Chapter 11 Case. Notwithstanding the foregoing, if the Plan is confirmed as a CDOW-Only Plan, the Lay Employees Committee shall continue to exist post-Effective Date as an *ad hoc* committee solely for the purpose of prosecuting the Lay Pension Litigation, and the reasonable fees and expenses of counsel to such committee shall constitute Plan Administration Expenses.

### 2. Discharge Injunction

*Except as otherwise expressly provided in the Plan or in the Confirmation Order, and subject fully to Section 11.2(b) and (c) of the Plan (if the Plan is confirmed as a CDOW-Only Plan), on the Effective Date, pursuant to § 1141(d) of the Bankruptcy Code, the Debtor shall be discharged from any Claim that arose prior to the Effective Date, and all*

*Persons who have held or asserted, hold or assert, or may in the future hold or assert a Discharged Claim shall be permanently stayed, enjoined, and restrained from taking any action, directly or indirectly for the purposes of asserting, enforcing or attempting to assert of enforce any Discharged Claim, including: (i) commencing or continuing in any manner, any action or any other proceeding of any kind with respect to any Discharged Claim against the Debtor, the Reorganized Debtor, or property of the Reorganized Debtor; (ii) seeking the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or Order against the Debtor, the Reorganized Debtor, or property of the Reorganized Debtor, with respect to any Discharged Claim; (iii) creating, perfecting, or enforcing any encumbrance or lien of any kind against the Debtor, the Reorganized Debtor, or property of the Reorganized Debtor with respect to any Discharged Claim; (iv) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to the Reorganized Debtor with respect to any Discharged Claim; and (v) taking any act, in any manner and in any place whatsoever, that does not conform to or comply with provisions of the Plan. In the event any Person takes any action that is prohibited by, or is otherwise inconsistent with the provisions of the discharge injunction in Section 16.2 of the Plan, the remainder of the Plan or Confirmation Order, then, upon notice to the Bankruptcy Court by an affected party, the action or proceeding in which the Claim of such Person is asserted will automatically be transferred to the Bankruptcy Court or the District Court for enforcement of the Plan. In a successful action to enforce the injunctive provisions of Section 16.2 of the Plan in response to a willful violation thereof, the moving party (i) shall be entitled to an award of costs (including reasonable attorneys' fees) against the non-moving party, and (ii) may seek such other legal or equitable remedies as are just and proper.*

### 3. Channeling Injunction in Settlement Plan

*If the Plan is confirmed as a Settlement Plan, then on and after the Effective Date, in consideration of (a) the promises and obligations of the Debtor, the Reorganized Debtor, the Bishop, and the Non-Debtor Catholic Entities under the Plan (including the provision of the NDCE Settlement Contribution and the non-monetary undertakings set forth in Sections 17.5(b)-(c) of the Plan), and (b) consideration provided, or to be provided, by the Settling Insurers, all Persons who have held or asserted, hold or assert, or may in the future hold or assert any Survivor Claim arising prior to the Effective Date (other than a Survivor Claim that is an Administrative Claim) shall be forever barred and permanently enjoined from pursuing such Survivor Claim against any Protected Party based upon or in any manner arising from or related to any acts or omissions of any Protected Party including (w) for damages of any type, including bodily injury, personal injury, emotional distress, wrongful death and/or loss of consortium, (x) for exemplary or punitive damages, (y) for attorneys' fees and other expenses, fees or costs, (z) for any remedy at law, in equity or admiralty whatsoever, heretofore, now or hereafter asserted against any Protected Party; and all Survivor Claims arising prior to the Effective Date (other than a Survivor Claim that is an Administrative Claim) shall be channeled to and shall be treated, administered, determined, and, if Allowed, paid under the procedures and protocols and in the amounts as established under the Plan and the Settlement Trust Agreement as the sole and exclusive remedy for all Survivor Claimants. This channeling injunction is an integral part of the Plan and essential to its consummation and implementation. It is intended that the channeling of the Survivor Claims as provided in Section 16.3 of the Plan shall inure to and for the benefit of the Protected*

*Parties and shall not, directly or indirectly, inure to or for the benefit of the Holy See (State of Vatican City) or any Non-Settling Insurer, Religious Order, or Perpetrator. In a successful action to enforce the injunctive provisions of Section 16.3 of the Plan in response to a willful violation thereof, the moving party (i) shall be entitled to an award of costs (including reasonable attorneys' fees) against the non-moving party, and (ii) may seek such other legal or equitable remedies as are just and proper.*

<u>PLEASE NOTE THAT THE CHANNELING INJUNCTION SET FORTH IN THE PLAN WOULD NOT BAR OR ENJOIN THE ASSERTION OF ANY CLAIM AGAINST A NON-DEBTOR CATHOLIC ENTITY THAT IS NOT A SURVIVOR CLAIM. IN PARTICULAR, THE PLAN WOULD NOT PRECLUDE A LAY EMPLOYEE OF A NON-DEBTOR CATHOLIC ENTITY FROM ASSERTING CLAIMS AGAINST HIS OR HER EMPLOYER FOR WAGES OR BENEFITS, OR CLAIMS (IF ANY) ARISING FROM OR RELATED TO THE LAY PENSION PLAN.</u>

    **4.**    **Exculpation; Limitation of Liability**

*From and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party shall be released from, any Claim, Cause of Action or liability to any other Exculpated Party, to any holder of a Claim, or to any other party in interest, for any act or omission that occurred during and in connection with the Chapter 11 Case or in connection with the preparation and Filing of the Chapter 11 Case, the formulation, negotiation, and/or pursuit of confirmation of the Plan, the consummation of the Plan, and/or the administration of the Plan and/or the property to be distributed under the Plan, except for Claims, Causes of Action or liabilities arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty of any Exculpated Party, in each case subject to determination of such by Final Order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan. Without limiting the generality of the foregoing, the Debtor and its officers, member, employees, attorneys, financial advisors, and other Professionals shall be entitled to and granted the benefits of § 1125(e) of the Bankruptcy Code. For the avoidance of doubt, Section 16.4 of the Plan shall not, directly or indirectly, inure to or for the benefit of the Holy See (State of Vatican City), any Religious Order, or any Perpetrator.*

**PLEASE TAKE NOTICE THAT SURVIVOR CLAIMS AGAINST NON-DEBTOR CATHOLIC ENTITIES THAT WERE PREVIOUSLY LIQUIDATED BY AGREEMENT, REDUCED TO JUDGMENT, AND/OR ARE SECURED IN WHOLE OR IN PART BY A LIEN IN PROPERTY OF A NON-DEBTOR CATHOLIC ENTITY SHALL BE SUBJECT TO THE RELEASE AND CHANNELING INJUNCTION IF THE PLAN IS CONFIRMED AS A SETTLEMENT PLAN.**

    **P.**    ~~Q.~~ **The Reorganized Debtor**

        **1.**    **Continued Corporate Existence, Corporate Action and Vesting of Assets**

The Debtor will, as the Reorganized Debtor, continue to exist after the Effective Date as a separate entity in accordance with the applicable laws of the State of Delaware, with all the powers of a not-for-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501(c)(3) under applicable law and without prejudice to any right to alter or terminate such existence under applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith. Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the Reorganization Assets, in accordance with §§ 1141 and 1123(a)(5) of the Bankruptcy Code, shall vest in the Reorganized Debtor (or such other entity or entities specified by the Debtor in a Supplemental Plan Document, and subject to approval by the Bankruptcy Court at the Confirmation Hearing) on the Effective Date, free and clear of all Liens, Claims, and interests of Creditors, including successor liability Claims. Reorganization Assets will include (i) if the Plan is confirmed as a CDOW-Only Plan, all Restricted Assets and up to $3 million of Unrestricted Assets (to be identified by the Debtor and valued by the Bankruptcy Court), and (ii) if the Plan is confirmed as a Settlement Plan, all Restricted Assets and Unrestricted Assets that are not contributed to the Settlement Trust or the Lay Pension Plan Trust pursuant to the Plan.[49] On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire and dispose of property without notice to any Person, and without supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

In accordance with § 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the Persons proposed to serve as officers of the Reorganized Debtor on and after the Effective Date shall be set forth in a Supplemental Plan Document.

The Reorganized Debtor shall be entitled to seek such Orders, judgments, injunctions, rulings, and other assistance as it deems necessary to carry out the intentions and purposes, and to give full effect to the provisions, of the Plan.

### 2. Voluntary Undertakings of the Reorganized Debtor, the Bishop, and the Non-Debtor Catholic Entities

#### a. *Lay Pension Plan Reaffirmation Agreement*

Pursuant to § 524(c) of the Bankruptcy Code, and subject to approval by the Bankruptcy Court, the Reorganized Debtor will reaffirm the Debtor's obligations under the Lay Pension Plan to the extent set forth in the Lay Pension Plan Reaffirmation Agreement to be Filed by the Debtor as a Supplemental Plan Documentat least seven (7) days prior to the Voting Deadline. The Lay Pension Plan Reaffirmation Agreement shall include provisions (i) requiring that the Reorganized Debtor pay all accrued benefits under the Lay Pension Plan that are vested as of December 31, 2011, (ii) expressly stating that benefits need not be paid in the form of a third-party annuity contract, and (iii) requiring that the Reorganized Debtor make periodic contributions to the Lay Pension Plan Trust in an amount not less than two million dollars

---

[49] It is expected that the $5 million required contribution to the Lay Pension Plan Trust, the payment of administrative claims (primarily, professionals' fees), and the establishment of necessary reserves for payment of post-confirmation costs of administering the Plan will consume all the Debtor's unrestricted cash and investments.

($2,000,000) per annum, until such time as the Lay Pension Plan is fully funded on an actuarial basis. The Lay Pension Plan Reaffirmation Agreement may include any other appropriate provision not inconsistent with the applicable provisions of the Plan and the Bankruptcy Code. The Debtor will use its best efforts to gain approval of the Lay Pension Plan Reaffirmation Agreement by the Bankruptcy Court at the Confirmation Hearing. If the Lay Pension Plan Reaffirmation Agreement is not approved by the Bankruptcy Court, the Debtor will request an express ruling from the Bankruptcy Court that, pursuant to § 524(f) of the Bankruptcy Code, nothing in the Plan, the Confirmation Order, or the Bankruptcy Code shall prohibit (i) the Reorganized Debtor from voluntarily honoring the Lay Pension Plan Reaffirmation Agreement or (ii) any holder of a Lay Pension Claim from accepting the Reorganized Debtor's performance under the Lay Pension Plan Reaffirmation Agreement.

b. *Establishment of Charitable Trust for Abuse Survivors*

The Bishop will establish and manage a charitable trust fund to provide medical, psychological, educational, or other material assistance to Survivors and their families, as determined by the Bishop in his discretion. This fund will be capitalized initially with the Bishop's Discretionary Fund (valued at $82,639 as of February 28, 2011), and thereafter will be funded with the proceeds of any gifts and donations to the Reorganized Debtor for the benefit of Survivors.

c. *Additional Non-Monetary Undertakings for the Protection of Children*

If the Plan is confirmed as a Settlement Plan, the Bishop, the Reorganized Debtor, and the Non-Debtor Catholic Entities will agree to the non-monetary undertakings set forth in Exhibits D and E to the Plan. If the Plan is confirmed as a CDOW-Only Plan, the Bishop and the Reorganized Debtor will agree to the non-monetary undertakings set forth in Exhibit F to the Plan.

### 3. Mandatory Arbitration of Disputes

The Confirmation Order shall refer all disputes regarding compliance with the voluntary undertakings in Sections 17.5(b) or (c) of the Plan to a disinterested Person the Debtor shall identify in a Supplemental Plan Document to serve as an arbitrator (the "Special Arbitrator"). The appointment of the Special Arbitrator is subject to approval by the Bankruptcy Court. Decisions by the Special Arbitrator shall be final and non-reviewable by any court or other tribunal or authority. Responsibility for paying the reasonable fees and expenses of the Special Arbitrator in connection with the arbitration of such disputes shall be shared by the parties to the dispute.

### Q. ~~P.~~ Miscellaneous Provisions

### 1. Rejection of Unassumed Executory Contracts

On the Effective Date, except for any Executory Contract (i) that was previously assumed or rejected by an Order of the Bankruptcy Court (including the Confirmation Order) or otherwise pursuant to § 365 of the Bankruptcy Code or (ii) that is subject to a pending motion to

assume or reject before the Bankruptcy Court, each Executory Contract entered into by the Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms, and which is not expressly assumed in the Plan, shall be rejected pursuant to §§ 365 and 1123 of the Bankruptcy Code, effective as of the Confirmation Date. The Confirmation Order shall constitute an Order of the Bankruptcy Court approving such rejection pursuant to §§ 365 and 1123 of the Bankruptcy Code as of the Effective Date.

### 2. Final Order

Except as otherwise expressly provided in the Plan, any requirement in the Plan for a Final Order may be waived by the Debtor (if prior to the Effective Date) or the Plan Administrator (on or after the Effective Date) upon written notice to the Bankruptcy Court. No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any Order that is not a Final Order.

### 3. Amendments and Modifications

The Debtor may modify the Plan at any time prior to the Confirmation Hearing in accordance with § 1127(a) of the Bankruptcy Code. After the Confirmation Date and prior to "substantial consummation" (as such term is defined in § 1101(2) of the Bankruptcy Code) of the Plan, the Reorganized Debtor, or the Plan Trust, as appropriate, may modify the Plan in accordance with § 1127(b) of the Bankruptcy Code by the Filing a motion on notice to the Bankruptcy Rule 2002 service list only, and the solicitation of all Creditors and other parties in interest shall not be required unless directed by the Bankruptcy Court.

### 4. U.S. Trustee Reports

From the Effective Date until a Final Decree is entered, the Plan Administrator shall, within thirty (30) days of the end of each fiscal quarter, File with the Bankruptcy Court and submit to the U.S. Trustee quarterly reports setting forth all receipts and disbursements as required by the U.S. Trustee guidelines.

### 5. No Waiver

The failure of the Debtor to object to any Claim for purposes of voting shall not be deemed a waiver of the Debtor's or the Plan Administrator's right to object to such Claim, in whole or in part.

### 6. Tax Exemption

Pursuant to § 1146 of the Bankruptcy Code, the delivery or recording of an instrument of transfer on or after the Confirmation Date shall be deemed to be made pursuant to and under the Plan, including any such acts by the Debtor (if prior to the Effective Date), and the Plan Administrator (on or after the Effective Date), including any subsequent transfers of property by the Plan Administrator, and shall not be taxed under any law imposing a stamp tax, transfer tax or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order and the Plan, be ordered and directed to

accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

## 7.    Non-Severability

Except as specifically provided in the Plan, the terms of the Plan constitute interrelated compromises and are not severable, and no provision of the Plan may be stricken, altered, or invalidated, except by amendment of the Plan by the Debtor.

## 8.    Revocation

The Debtor reserves the right to revoke and withdraw the Plan prior to the Confirmation Date, in which case the Plan shall be null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor, the Creditors Committee or the Lay Employees Committee, or any other Person or to prejudice in any manner the rights of the Debtor, the Creditors Committee or the Lay Employees Committee, or any other Person in any further proceedings involving the Debtor, or be deemed an admission by the Debtor, including with respect to the amount or allowability of any Claim or the value of any property of the Estate.

## 9.    Controlling Documents

In the event and to the extent that any provision of the Plan or the Plan Trust Agreement is inconsistent with any provision of the Disclosure Statement, the provisions of the Plan or Plan Trust Agreement, as applicable, shall control and take precedence. In the event and to the extent that any provision of the Plan Trust Agreement is inconsistent with any provision of the Plan, the Plan shall control and take precedence. In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of the Plan or the Plan Trust Agreement, the provisions of the Confirmation Order shall control and take precedence.

## 10.    Governing Law

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), and unless specifically stated, the rights, duties, and obligations arising under the Plan, any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control) and any corporate governance matters with respect to the Plan Trust or the Reorganized Debtor shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to conflicts of law principles.

## 11.    Notices

Any notices or requests by parties in interest under or in connection with the Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

**If to the Debtor or the Reorganized Debtor:**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Attn:   Anthony G. Flynn
         Patrick A. Jackson

**If to the Plan Trust or the Plan Trustee:**

The parties identified in the Plan Trust Agreement to receive notices.

**If to the Plan Oversight Committee, the Survivor Claims Arbitrator, the Survivor Claims Mediator, the Special Arbitrator, or the Settlement Arbitrator:**

The parties identified in the Confirmation Order to receive notices.

**If to the Settlement Trust or the Settlement Trustee:**

The parties identified in the Settlement Trust Agreement to receive notices.

**12.    Filing of Additional Documents**

At any time before "substantial consummation" (as such term is defined in § 1102(2) of the Bankruptcy Code) of the Plan, the Debtor, the Plan Trust, the Settlement Trust, and/or the Reorganized Debtor, as appropriate, may File with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or otherwise to comply with applicable law.

**13.    Powers of Officers**

The officers of the Debtor or the Reorganized Debtor, as the case may be, shall have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Plan.

**14.    Direction to a Party**

On and after the Effective Date, the Plan Trust or the Reorganized Debtor, as applicable, may apply to the Bankruptcy Court for entry of an Order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the

Plan, and to perform any other act (including satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

### 15. Successors and Assigns

The Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including the Reorganized Debtor. The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator successor, or assign of such entity.

### 16. Certain Actions

By reason of entry of the Confirmation Order, prior to, on or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the officers of the Debtor under the Plan, including (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (b) the adoption, execution, and implementation of other matters provided for under the Plan involving the Debtor or organizational structure of the Debtor, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant applicable non-bankruptcy law, without any requirement of further action by the officers of the Debtor.

### 17. Final Decree

Once the Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the Plan Administrator or such other party as the Bankruptcy Court may designate in the Confirmation Order, shall File a motion with the Bankruptcy Court to obtain a Final Decree to close the Chapter 11 Case.

## VI. PLAN AS SETTLEMENT COMMUNICATION

The Plan (including in Article V) furnishes or offers or promises to furnish – or accepts or offers or promises to accept – valuable consideration in compromising or attempting to compromise Claims and Causes of Action that are disputed as to validity and/or amount (including Survivor Claims, the PIA Litigation, and other Claims and Causes of Action against Settling Parties). Accordingly, the Plan, this Disclosure Statement, and any communications regarding the Plan or this Disclosure Statement are subject in all respects to Federal Rule of Evidence 408 and any comparable provision(s) of applicable state law precluding their use as evidence of liability for, or the validity or invalidity of, any disputed Claim or Cause of Action. Additionally, counsel for any Survivor should treat the Plan and this Disclosure Statement as an offer of settlement that must be transmitted to his or her client in accordance with applicable rules and standards governing the practice of law before the Bankruptcy Court.

## VII. RULE 9019, CRAMDOWN REQUESTS

Pursuant to Bankruptcy Rule 9019 and through the Plan, the Debtor requests approval of all compromises and settlements included in the Plan, including the compromises and settlements set forth in Article V of the Plan. In addition, through the Plan, Debtor requests

confirmation of the Plan as a Cramdown Plan with respect to any Impaired Class that does not accept the Plan or is deemed to have rejected the Plan (provided, however, that the Plan shall not proceed as a Settlement Plan unless the Plan is accepted by Class 3A).

## VIII. CERTAIN FACTORS TO BE CONSIDERED REGARDING THE PLAN

Holders of Claims against the Debtor should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

### A. Allowance of Claims

This Disclosure Statement has been prepared based on preliminary information and review of filed Claims and the Debtor's books and records. Upon completion of more detailed analysis of filed Claims, the actual amount of Allowed Claims may differ from the Debtor's current estimates, and such difference may be material.

In a Settlement Plan, Survivor Claims against Non-Debtor Catholic Entities will be channeled to, and satisfied from, the Settlement Trust. While the notice of the General Claims Bar Date advised potential Survivor Claimants of the necessity of filing proofs of claim with respect to any claim based upon abuse by any member of the clergy or other person associated with the Debtor, which would include most, if not all, Survivor Claims against Non-Debtor Catholic Entities, the Bankruptcy Court could find it necessary to establish a supplemental bar date for the assertion of Survivor Claims against Non-Debtor Catholic Entities, which could conceivably result in the assertion of additional Survivor Claims payable from the Settlement Trust. In addition, even with respect to Claims subject to the General Claims Bar Date, the Bankruptcy Court may allow the assertion of late-filed Claims upon a showing of "excusable neglect" by the claimant. Thus, the number of Survivor Claims payable from the Settlement Trust may vary from the Debtor's estimates in this Disclosure Statement.

The Debtor's estimate of recoveries for holders of Allowed Claims in Classes 3A, 3B, 3C, 3D, 3E, and 3F in a CDOW-Only Plan are based on estimates of the legitimate Secured, Administrative, Priority Tax, and Priority Claims, including estimates for IBNR Reserves and professional fees to complete the case (collectively, "S/A/P Claims"). An increase in medical claims experience or the litigation of additional issues in the case – including, but not limited to, significant litigation over confirmation of the Plan – could cause the actual S/A/P Claims to vary materially from the estimates. There can be no assurance that the Debtor's estimates of the likely aggregate allowed amount of such S/A/P Claims will prove to be accurate. In addition, S/A/P Claims may be Allowed in amounts in excess of the ~~Debtors~~Debtor's current expectations. The Debtor makes no assumption about the performance of its investments. The actual amount of Cash available for distribution to holders of Allowed Claims in Classes 3A, 3B, 3C, 3D, 3E, and 3F in a CDOW-Only Plan could be less than estimated, and the difference could be material.

**B.** **Objections to Classification of Claims Pursuant to § 1122 of the Bankruptcy Code**

In evaluating whether the Plan meets the requirements for confirmation under § 1129 of the Bankruptcy Code, this Disclosure Statement assumes the validity of the Plan's classifications of claims. If the holder of a Claim were to object to the proposed classification of such Claim in the Plan pursuant to § 1122 of the Bankruptcy Code, and prevail in such objection, then the requirements for confirmation of the Plan may be different from what is set forth in this Disclosure Statement. This difference may or may not have a material effect on the confirmability of the Plan.

**C.** **Modification of Survivor Claim Procedures**

As described above, the Plan assumes the establishment of procedures for the liquidation and allowance of Survivor Claims, which is expected to reduce litigation costs associated with such Claims. If the procedures are not approved by the Bankruptcy Court, or if the Bankruptcy Court concludes that the structure of and/or assumptions underlying the procedures must change, both the Allowed amounts of Survivor Claims and the anticipated recovery percentage of Claims in Class 3A may be altered, and such alteration may be material.

**D.** **Valuation Risk**

The Debtor is a tax-exempt, not-for-profit corporation and has not adopted Statement of Financial Accounting Standards No. 93 ("SFAS93"). SFAS93 requires not-for-profit organizations to recognize depreciation as a cost of using up the future economic benefits of its long-lived tangible assets. Since the Debtor has not adopted SFAS93, it does not recognize and record depreciation on its property and equipment or any other asset. Accordingly, owned property and equipment are stated on the Debtor's books at original cost. Appraisals of the Debtor's real estate were conducted in 2010, and the Debtor previously obtained an appraisal of its collection of bishops' rings and crosses in 2009. These assets continue to be carried on the Debtor's books at cost, but for purposes of this Disclosure Statement, estimated appraised values were assumed. It would be prohibitively expensive, unduly burdensome, and an inefficient use of Estate assets for the Debtor to obtain current market valuations of all of its assets in connection with the preparation of this Disclosure Statement. In addition, even if the Debtor had appraised values for all its assets, amounts ultimately realized from the disposition of such assets could vary from the appraisals. Indeed, in instances where appraisals were available, such appraisals did not include the costs of disposition (e.g., brokers' fees, closing costs), and there are no assurances the net proceeds of disposition would equal to appraised value. Accordingly, the asset values assumed for purposes of this Disclosure Statement may vary from actual realizable values of the assets, and such variance may be material.

**E.** **Market Risk**

A significant portion of the Debtor's assets are in the Pooled Investment Account. The PIA is comprised of various types of investment options including: securities, corporate bonds, government bonds and treasury bonds, many of which fluctuate substantially in value. These investment options are held either separately or in various managed investment funds as

068902.1001

part of the PIA. Investment performance has varied over time and by fund manager. As such, no attempt has been made to project changes in the market value of these assets as of the Effective Date. The actual recovery on these assets may be materially different from the value assumed for purposes of this Disclosure Statement.

## F.    Appellate Risk

The issue of the inclusion of the Disputed Non-Debtor PIA Funds in the Estate is currently on appeal, and if the Plan is confirmed as a CDOW-Only Plan, a decision by a higher court overturning the Phase I ruling would result in a substantial diminution in Plan Trust Assets from what is assumed for purposes of the financial projections in this Disclosure Statement. Thus, the actual distributions to creditors under a CDOW-Only Plan may be materially different from the distributions assumed for purposes of this Disclosure Statement.

## G.    Risk of Non-Confirmation of the Plan

Even if all Impaired Classes accept or could be deemed to have accepted the Plan, the Plan might not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things: (a) that the Confirmation of the Plan not be followed by a need for further liquidation or reorganization; (b) that the value of distributions to dissenting holders not be less than the value of distributions to such holders if the Debtor were liquidated under chapter 7 of the Bankruptcy Code; and (c) that the Plan and the Debtor otherwise comply with the applicable provisions of the Bankruptcy Code. Although the Debtor believes that the Plan will meet all applicable tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**Additionally, if the Plan is not confirmed, professionals' fees continue to accrue at (or near) the rate at which they have accrued throughout this case, and litigation outcomes ultimately result in property not being included in the Debtor's bankruptcy estate, it is possible that the Debtor's bankruptcy estate may become administratively insolvent, resulting in no payment to general unsecured creditors.**

## H.    Nonconsensual Confirmation

Pursuant to the "cramdown" provisions of § 1129 of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan if at least one Impaired Class of Claims against such Debtor has accepted the Plan (with such acceptance being determined without including the acceptance of any "insider" in such Class) and, as to each Impaired Class of Claims that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Impaired Class.

The Debtor reserves the right to modify the terms of the Plan as necessary for Confirmation without the acceptance of all Impaired Classes (provided, however, that the Plan will not proceed as a Settlement Plan if it is not accepted by Class 3A). Such modification could result in less favorable treatment for any non-accepting Classes than the treatment currently provided by the Plan.

### I.   Delays of Confirmation and/or Effective Date

Any delay in Confirmation and effectiveness of the Plan could result in, among other things, increased Administrative Claims. These or any other negative effects of delays in Confirmation or effectiveness of the Plan could endanger the ultimate consummation of the Plan and materially alter creditor outcomes.

### J.   Settlement/Plan Trust Operations

The ultimate amount of Cash available to satisfy the Allowed amount of Claims in Classes 3A, 3B, 3D, 3E and 3F may depend, in part, on the manner in which the Settlement Trustee or the Plan Trustee operates the Settlement Trust or Plan Trust, as applicable, and the expenses incurred by the Settlement Trust or the Plan Trust. Available Cash also will be affected by the performance and relative success of the Settlement Trustee or the Plan Trustee in liquidating Settlement Trust Assets or Plan Trust Assets, as applicable, including the prosecution of Causes of Action against potential defendants. The less successful the pursuit of such matters, the less Cash there will be available for distribution to satisfy Allowed Claims. For the avoidance of doubt, the Debtor has not assumed any recovery on account of such potential Causes of Action for purposes of (i) estimating recoveries on Allowed Claims under the Chapter 7 Liquidation Analysis or (ii) determining whether the Plan meets the Feasibility Test.

### K.   Non-Transferability

Holders of Claims in Classes 3A, 3B, 3C, 3D, 3E, and 3F also should be aware that their rights to distribution from the Settlement Trust or the Plan Trust, as applicable, are not transferable. Therefore, there will not be any trading market for such rights, nor will those the rights be listed on any public exchange or other market. The lack of liquidity of the rights to distributions from the Settlement Trust or the Plan Trust may have a negative impact on their value.

### L.   Uncertainty of Value

In addition to the prohibition on the transfer of rights to distributions from the Settlement Trust or the Plan Trust as discussed above, the value of such rights will depend on the various risks and uncertainties outlined above. The realizable value of Settlement Trust Assets or Plan Trust Assets will vary depending upon the extent to which these risks materialize. In addition, the resolution of Causes of Action held by the Settlement Trust or the Plan Trust and the reconciliation, liquidation and allowance of Claims may require a substantial amount of time, during which time interest will not accrue on Allowed Claims in the subject Classes. These delays could reduce the ultimate value of any recovery.

## IX.   ~~CERTAIN~~ FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE DEBTOR HAS NOT REQUESTED A RULING FROM THE IRS OR AN OPINION OF COUNSEL WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN. THUS, NO ASSURANCE CAN BE GIVEN AS TO THE TAX CONSEQUENCES OF THE PLAN. EACH HOLDER OF A CLAIM IS URGED TO CONSULT ITS OWN TAX

ADVISOR FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## X.    ACCEPTANCE AND CONFIRMATION OF THE PLAN; VOTING REQUIREMENTS

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtor, including that (i) the Plan has classified Claims in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Debtor has complied with applicable provisions of the Bankruptcy Code; (iv) the Debtor has proposed the Plan in good faith and not by any means forbidden by law; (v) the disclosure required by § 1125 of the Bankruptcy Code has been made; (vi) the Plan has been accepted by the requisite votes of Creditors in each class (except to the extent that cramdown is available under § 1129(b) of the Bankruptcy Code); (vii) the Plan is feasible and confirmation is not likely to be followed by further financial restructuring of the Debtor; (viii) the Plan is in the "best interests" of all Holders of Claims in an Impaired class (see "Best Interests Test" below); and (ix) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date. The Debtor believes that the Plan satisfies all the requirements for confirmation.

### A.    Best Interests Test

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired allowed claim or interest either (i) accepts the plan or (ii) receives or retains under the plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code on the effective date (the "Best Interests Test"). The first step in meeting this test is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtor's assets in the context of a chapter 7 liquidation in which a chapter 7 trustee is appointed and charged with reducing to cash any and all assets of the Debtor. Accordingly, this is the assumption employed in preparing the Liquidation Analysis. The Bankruptcy Court will determine whether the Cash and property issued under the Plan to each Class equals or exceeds the value that would be allocated to the holders of Claims in a liquidation under Chapter 7 of the Bankruptcy Code. The Debtor believes that the holders of Claims against in the Debtor will have an equal or greater recovery as a result of the liquidation of the Debtor's assets by the Plan Trust as discussed herein and than could be realized in a Chapter 7 liquidation.

Accordingly, the only question is whether the creditors will have recovered more (or at least as much) under the Plan than they would recover through an asset liquidation by a Chapter 7 trustee.

To determine the value that a holder of a Claim in an Impaired Class would receive if the Debtor were liquidated under Chapter 7, the Bankruptcy Court must determine the aggregate dollar amount that would be generated from the liquidation of the Debtor's Assets if the Debtor's Chapter 11 Case had been converted to a Chapter 7 liquidation case and the Debtor's Assets were liquidated by a Chapter 7 trustee (the "Liquidation Value"). The Liquidation Value would

94

consist of the net proceeds from distribution of the Debtor's Assets, augmented by Cash held by the Debtor and reduced by certain increased costs and Claims that arise in a Chapter 7 liquidation case that do not arise in a Chapter 11 case.

As explained below, the Liquidation Value available for satisfaction of Claims against the Debtor would be reduced by: (a) the costs, fees and expenses of the liquidation under Chapter 7, which would include disposition expenses and the compensation of a trustee and his counsel and other retained professionals, (b) the fees of the Chapter 7 trustee, and (c) certain other costs arising from conversion of the Chapter 11 Case to Chapter 7. In addition, the shortened time available in a Chapter 7 to sell assets such as real estate may reduce the net recovery. A hypothetical chapter 7 liquidation analysis prepared by the Debtor (the "Liquidation Analysis") is attached to this Disclosure Statement as Exhibit C. As is evident from the Liquidation Analysis, the Debtor believes that Creditors will clearly benefit from confirmation of the Plan.

It is also anticipated that a Chapter 7 liquidation would result in a significant delay in payments being made to Creditors. Bankruptcy Rule 3002(c) provides that conversion of Chapter 11 cases to Chapter 7 will trigger a new bar date for filing claims against the Estate, and that the new bar date will be more than 90 days after the Chapter 11 cases convert. Not only would a Chapter 7 liquidation delay distribution to Creditors, but it is possible that additional Claims that were not asserted in the Chapter 11 Cases, or were late-filed, could be filed against the Estate. The Debtor has received and is analyzing late-filed Claims and may file claims objections in the near future. Reopening the Bar Dates in connection with conversion to Chapter 7 would provide these and other claimants an additional opportunity to timely file Claims against the Estate. Moreover, the Debtor would lose the benefit of having an established Administrative Claim Bar Date.

For the reasons set forth above, the Debtor believes that the Plan provides a superior recovery for the holders of Claims, and the Plan meets the requirements of the Best Interests Test.

The Lay Employees Committee asserts that the Best Interests Test could not be satisfied with respect to Lay Pension Claims in a Settlement Plan because Lay Pension Claims would receive a distribution of more than $9.9 million in a hypothetical chapter 7 liquidation. The Debtor disagrees, and the Bankruptcy Court has reserved ruling on this matter until the Confirmation Hearing.

### B.     Financial Feasibility Test

In order to confirm a plan, the Bankruptcy Code requires the Bankruptcy Court to find that confirmation of the plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor (the "Feasibility Test"). Thus, for a plan to meet the Feasibility Test, the Bankruptcy Court must find that there is a reasonable likelihood that the reorganized debtor will possess the working capital and other resources necessary to meet its obligations under the plan. Based upon the Financial Projections attached to this Disclosure Statement as Exhibit D and the assumptions set forth therein, the Debtor believes that it will be able to make all distributions required pursuant to the Plan and to fund its operations going

068902.1001

forward and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

The Lay Employees Committee asserts that the Feasibility Test could not be satisfied in a Settlement Plan because the Reorganized Debtor would be unable to meet its obligations under the Lay Pension Plan Reaffirmation Agreement. The Debtor disagrees, and the Bankruptcy Court has reserved ruling on this matter until the Confirmation Hearing.

## C. Acceptance by Impaired Classes

Section 1129(a) of the Bankruptcy Code requires that each class of claims that is Impaired under the Plan accept the Plan, subject to the "cramdown" exception contained in section 1129(b) of the Bankruptcy Code. Under § 1129(b), if at least one but not all Impaired classes do not accept the Plan, the Bankruptcy Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner required by the Bankruptcy Code. The process by which non-accepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown." The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting classes of claims if (i) the Plan meets all confirmation requirements except the requirement of § 1129(a)(8) of the Bankruptcy Code that the Plan be accepted by each class of claims that is Impaired and (ii) the Plan does not "discriminate unfairly" and is "fair and equitable" toward each Impaired class that has not voted to accept the Plan, as referred to in § 1129(b) of the Bankruptcy Code and applicable case law.

A class of claims under a plan "accepts" the plan if the plan is accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims in the class that actually vote on the plan.

A class that is not "impaired" under a plan is conclusively presumed to have accepted the plan. Solicitation of acceptances from such a class is not required. A class is "impaired" unless (i) the legal, equitable and contractual rights to which a claim in the class entitles the holder are not modified or (ii) the effect of any default is cured and the original terms of the obligation are reinstated. Under the Plan, Classes 1 (Secured Claims) and 2 (Priority Claims) are not Impaired and are deemed to accept the Plan, while Class 4 (Penalty Claims) will not receive or retain any property under the Plan on account of Claims and is conclusively presumed to have rejected the Plan. All other Classes of Claims under the Plan are Impaired (or potentially so) under the Plan and Holders of Claims in such Classes are entitled to vote to accept or reject the Plan.

The Debtor believes the Plan provides fair and equitable treatment of impaired Claims, as either (a) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed Claim or (b) the Holders of Claims that are junior to such Class of impaired claims will not receive or retain any property under the Plan. Pursuant to the Plan, no Holders of any Claim junior to the holders of such impaired Classes will receive or retain any property on account of such junior Claims. The Lay Employees Committee asserts that the Settlement Plan does not provide fair and equitable treatment of Lay Pension Claims. The Debtor disagrees, and the Bankruptcy Court has reserved ruling on this matter until the Confirmation Hearing.

As noted above, holders of Claims in Class 4 (Penalty Claims) are not expected to receive any property under the Plan and are therefore deemed to reject the Plan. However, the Plan provides fair and equitable treatment to these holders because there are no Classes junior to these Classes and no Class senior to these Classes is being paid more than in full on its Allowed Claims.

If any Impaired Class fails to accept the Plan, the Debtor intends to request that the Bankruptcy Code confirm the Plan pursuant to § 1129(b) of the Bankruptcy Code with respect to those Classes.

### D. Voting Procedures

#### 1. Ballots

If voting for or against the Plan, please use only the Ballot or Ballots sent to you with this Disclosure Statement. Votes cast to accept or reject the Plan will be counted by Class. Please read the voting instructions on the reverse side of the Ballot for a thorough explanation of voting procedures.

**IF YOU BELIEVE THAT YOU ARE A HOLDER OF A CLAIM IN A VOTING CLASS FOR WHICH YOU DID NOT RECEIVE A BALLOT, IF YOUR BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE QUESTIONS CONCERNING VOTING PROCEDURES, PLEASE CONTACT THE GARDEN CITY GROUP, INC. AT (800) 761-6220. THE GARDEN CITY GROUP, INC. CANNOT PROVIDE YOU WITH LEGAL ADVICE.**

If you are entitled to vote to accept or reject the Plan (either as a Settlement Plan, or a CDOW-Only Plan, or both), a Ballot is enclosed for the purpose of voting on the Plan. If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots that must be used to vote in each separate Class.

Unless otherwise directed in your solicitation package, mail your completed Ballot(s) to: CDOW Ballot Processing, c/o The Garden City Group, Inc., P.O. Box 9561, Dublin, Ohio 43017-4861 (if by mail) or CDOW Ballot Processing, c/o The Garden City Group, Inc., 5151 Blazer Parkway, Suite A, Dublin, Ohio 43017 (if by personal delivery or overnight courier). **DO NOT RETURN BALLOTS TO THE BANKRUPTCY COURT.** A Ballot that does not indicate an acceptance or rejection of the Plan will not be counted either as a vote to accept or a vote to reject the Plan. If you cast more than one Ballot voting the same Claim before the Voting Deadline, the last Ballot received before the voting deadline will be deemed to reflect your intent and thus will supersede any prior Ballots. Additionally, you may not split your votes for your Claims within a particular Class under the Plan either to accept or reject the Plan. Therefore, a Ballot or a group of Ballots within a Plan Class received from a single creditor that partially rejects and partially accepts the Plan will not be counted.

Unless the Bankruptcy Court permits you to do so after notice and hearing to determine whether sufficient cause exists to permit the change, you may not change your vote after the voting deadline passes. **DO NOT RETURN ANY DEBT INSTRUMENTS OR**

OTHER SECURITIES WITH YOUR BALLOT. FACSIMILE, EMAIL OR
ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE ACCEPTED.

2.     **Deadline for Voting**

IN ORDER TO BE COUNTED, BALLOTS MUST BE <u>RECEIVED</u> BY
4~~5~~:00 P.M. (PREVAILING EASTERN TIME) ON ——————,<u>JUNE 30,</u> 2011.

3.     **Importance of Your Vote**

Your vote is important. The Bankruptcy Code defines acceptance by a Class of
Claims as acceptance by Holders of at least two-thirds in amount and a majority in number of
Allowed Claims in that Class that vote. **ONLY THOSE CREDITORS WHO ACTUALLY
VOTE ARE COUNTED FOR PURPOSES OF DETERMINING WHETHER A CLASS
HAS VOTED TO ACCEPT THE PLAN. YOUR FAILURE TO VOTE WILL LEAVE TO
OTHERS THE DECISION TO ACCEPT OR REJECT THE PLAN.**

<u>[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]</u>

YCST01:~~10788119.3~~10788119.4                                    068902.1001

## XI.    RECOMMENDATION AND CONCLUSION

THE DEBTOR BELIEVES THAT CONFIRMATION AND CONSUMMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND THAT THE PLAN SHOULD BE CONFIRMED. THE DEBTOR STRONGLY RECOMMENDS THAT ALL CREDITORS RECEIVING A BALLOT VOTE IN FAVOR OF THE PLAN, AND THAT ~~ALL SURVIVORS RECEIVING A BALLOT VOTE IN FAVOR OF THE PROPOSED GLOBAL SETTLEMENT EMBODIED IN THE PLAN.~~HOLDERS OF SURVIVOR CLAIMS, LAY PENSION CLAIMS, AND DEDA BOND TRANSACTION CLAIMS VOTE TO ACCEPT THE PLAN BOTH AS A SETTLEMENT PLAN AND, IN THE ALTERNATIVE, AS A CDOW-ONLY PLAN. THE LAY EMPLOYEES COMMITTEE DISAGREES AND RECOMMENDS THAT HOLDERS OF LAY PENSION CLAIMS CAST THEIR BALLOTS TO REJECT THE PLAN AS A SETTLEMENT PLAN (I.E., VOTE NO ON THE SETTLEMENT PLAN), BUT IT DOES RECOMMEND THAT HOLDERS OF LAY PENSION CLAIMS CAST THEIR BALLOTS TO ACCEPT THE PLAN AS A CDOW-ONLY PLAN (I.E., VOTE YES ON THE CDOW-ONLY PLAN).

Dated: Wilmington, Delaware
       ~~April 19,~~May 23, 2011

Respectfully submitted,

CATHOLIC DIOCESE OF WILMINGTON, INC.

_____
By: Most Rev. W. Francis Malooly, D.D.
Its: President and Sole Member

99

## EXHIBIT A

## THE PLAN [FILED AT DOCKET NO. ___]

# EXHIBIT B

## ORDER APPROVING DISCLOSURE STATEMENT [RESERVED]

YCST01:10788119.310788119.4          068902.1001

**EXHIBIT C**

**CHAPTER 7 LIQUIDATION ~~ANALYSIS~~ANALYSES**

# CATHOLIC DIOCESE OF WILMINGTON, INC.
## LIQUIDATION ANALYSIS - Minimum Assets (Compare Section I.D.2.a.)
### ($,000 USD)

| | Notes | Book Value as of 02/28/2011 | Potential Recovery % | Potential Recovery $ |
|---|---|---|---|---|
| Unrestricted Cash and Equivalents | A | $591 | 100% | $591 |
| Unrestricted PIA Funds | B | $9,808 | 100% | $9,808 |
| Real Property | C | $3,965 | 80% | $3,172 |
| Accounts Receivable | D | $3,369 | 5% | $168 |
| Notes Receivable | E | $1,450 | 90% | $1,305 |
| PIA Distribution Clawback Claims | F | $0 | 0% | $0 |
| Miscellaneous Unrestricted Assets | G | $1,048 | 90% | $943 |
| Interest in Life Insurance Policies, less Restrictions | H | $0 | 0% | $0 |
| Insurance Recoveries | I | $0 | | $13,307 |
| Disputed Non-Debtor PIA Funds (as of Petition Date) | J | $0 | 0% | $0 |
| Disputed Non-Debtor PIA Funds (postpetition appreciation) | K | $0 | 0% | $0 |
| Impact of Operations on Gross Proceeds Apr-Jul, 2011 | L | -$261 | 100% | -$261 |
| **Gross Liquidation Proceeds** | | **$19,970** | | **$29,034** |
| | | | | |
| **Secured Debt** | | | | $0 |
| | | | | |
| **Liquidation Costs** | | | | |
| Shutdown Costs | M | | | $320 |
| Litigation Support | M | | | $100 |
| Chapter 7 Trustee Fees | N | | -3% | $851 |
| US Trustee Fees | N | | | $50 |
| Chapter 7 Professional Fees | O | | | $3,500 |
| **Total Liquidation Costs** | | | | $4,821 |
| | | | | |
| **Net Liquidation Proceeds Available for Unsecured Creditors** | | | | **$24,213** |
| | | | | |
| **Administrative and Priority Claims** | | | | |
| Accrued Compensation | P | | | $0 |
| Accrued Vacation and Benefits | Q | | | $148 |
| Administrative Professional Fees | R | | | $10,000 |
| Insurance IBNR | S | | | $2,644 |
| Est. Allowed Priority Claims | T | | | $0 |
| **Total Administrative and Priority Claims** | | | | $12,792 |
| | | | | |
| **Net Liquidation Proceeds Available for Pre Petition General Unsecured Creditors** | | | | **$11,421** |

| | Notes | Estimated Claims Low Survivor Avg. | Estimated Claims High Survivor Avg. | Amount of Distribution Low Survivor Avg. | Amount of Distribution High Survivor Avg. | Dist as % of Claim Low Dist. % | Dist as % of Claim High Dist. % |
|---|---|---|---|---|---|---|---|
| 3A Survivor Claims | U | $35,076 | $107,596 | $8,575 | $10,306 | 9.6% | 24.4% |
| 3B Lay Pension Claims (vested benefits) | V | $47,190 | $47,190 | $0 | $0 | 0.0% | 0.0% |
| 3C DEDA Bond Transaction Claims | W | $11,408 | $11,408 | $0 | $0 | 0.0% | 0.0% |
| Gift Annuity Claims | X | $106 | $106 | $0 | $0 | 0.0% | 0.0% |
| 3D Clergy Pension Claims | Y | $13,107 | $13,107 | $0 | $0 | 0.0% | 0.0% |
| 3F PIA Investment Claims | Z | $0 | $0 | $0 | $0 | 0.0% | 0.0% |
| 3F Miscellaneous/Trade Claims | AA | $300 | $300 | $73 | $29 | 9.6% | 24.4% |
| Lay Pension Termination Liability (unvested benefits) | AB | $1,141 | $1,141 | $279 | $109 | 9.6% | 24.4% |
| Third-Party Indemnity Claims | AC | $9,700 | $9,700 | $2,371 | $929 | 9.6% | 24.4% |
| PIA Breach Claims | AD | $500 | $500 | $122 | $48 | 9.6% | 24.4% |
| | | $118,528 | $191,048 | $11,421 | $11,421 | | |
| | | | | | | | |
| **Net Liquidation Proceeds Available for Subordinated Unsecured Creditors** | | | | **$0** | **$0** | | |
| | | | | | | | |
| 4 Penalty Claims | AE | | | $0 | $0 | | |

# CATHOLIC DIOCESE OF WILMINGTON, INC.
## LIQUIDATION ANALYSIS - Status Quo (Compare Section I.D.2.b.)
### ($,000 USD)

| | Notes | Book Value as of 02/28/2011 | Potential Recovery % | Potential Recovery $ |
|---|---|---|---|---|
| Unrestricted Cash and Equivalents | A | $591 | 100% | $591 |
| Unrestricted PIA Funds | B | $9,808 | 100% | $9,808 |
| Real Property | C | $3,965 | 80% | $3,172 |
| Accounts Receivable | D | $3,369 | 5% | $168 |
| Notes Receivable | E | $1,450 | 90% | $1,305 |
| PIA Distribution Clawback Claims | F | $3,975 | 100% | $3,975 |
| Miscellaneous Unrestricted Assets | G | $1,048 | 90% | $943 |
| Interest in Life Insurance Policies, less Restrictions | H | $0 | 0% | $0 |
| Insurance Recoveries | I | $0 | | $13,307 |
| Disputed Non-Debtor PIA Funds (as of Petition Date) | J | $75,773 | 100% | $75,773 |
| Disputed Non-Debtor PIA Funds (postpetition appreciation) | K | $8,465 | 100% | $8,465 |
| Impact of Operations on Gross Proceeds Apr-Jul, 2011 | L | -$261 | 100% | -$261 |
| **Gross Liquidation Proceeds** | | **$108,183** | | **$117,247** |
| | | | | |
| Secured Debt | | | | $0 |
| | | | | |
| **Liquidation Costs** | | | | |
| Shutdown Costs | M | | | $320 |
| Litigation Support | M | | | $100 |
| Chapter 7 Trustee Fees | N | | -3% | $3,497 |
| US Trustee Fees | N | | | $50 |
| Chapter 7 Professional Fees | O | | | $3,500 |
| **Total Liquidation Costs** | | | | **$7,467** |
| | | | | |
| **Net Liquidation Proceeds Available for Unsecured Creditors** | | | | **$109,779** |
| | | | | |
| **Administrative and Priority Claims** | | | | |
| Accrued Compensation | P | | | $0 |
| Accrued Vacation and Benefits | Q | | | $148 |
| Administrative Professional Fees | R | | | $10,000 |
| Insurance IBNR | S | | | $2,644 |
| Est. Allowed Priority Claims | T | | | $0 |
| **Total Administrative and Priority Claims** | | | | **$12,792** |
| | | | | |
| **Net Liquidation Proceeds Available for Pre Petition General Unsecured Creditors** | | | | **$96,988** |

| | | Estimated Claims Low Survivor Avg. | Estimated Claims High Survivor Avg. | Amount of Distribution Low Survivor Avg. | Amount of Distribution High Survivor Avg. | Dist as % of Claim Low Dist. % | Dist as % of Claim High Dist. % |
|---|---|---|---|---|---|---|---|
| 3A | Survivor Claims | U | $35,076 | $107,596 | $18,992 | $41,468 | 38.5% | 54.1% |
| 3B | Lay Pension Claims (vested benefits) | V | $47,190 | $47,190 | $25,551 | $18,187 | 38.5% | 54.1% |
| 3C | DEDA Bond Transaction Claims | W | $11,408 | $11,408 | $0 | $0 | 0.0% | 0.0% |
| | Gift Annuity Claims | X | $106 | $106 | $0 | $0 | 0.0% | 0.0% |
| 3D | Clergy Pension Claims | Y | $13,107 | $13,107 | $5,116 | $3,642 | 27.8% | 39.0% |
| 3F | PIA Investment Claims | Z | $75,773 | $75,773 | $41,026 | $29,203 | 38.5% | 54.1% |
| 3F | Miscellaneous/Trade Claims | AA | $300 | $300 | $162 | $116 | 38.5% | 54.1% |
| | Lay Pension Termination Liability (unvested benefits) | AB | $1,141 | $1,141 | $618 | $440 | 38.5% | 54.1% |
| | Third-Party Indemnity Claims | AC | $9,700 | $9,700 | $5,252 | $3,738 | 38.5% | 54.1% |
| | PIA Breach Claims | AD | $500 | $500 | $271 | $193 | 38.5% | 54.1% |
| | | | $194,301 | $266,821 | $96,988 | $96,988 | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Net Liquidation Proceeds Available for Subordinated Unsecured Creditors** | | | | | $0 | $0 | |
| | | | | | | | |
| 4 | Penalty Claims | AE | | | $0 | $0 | |

# CATHOLIC DIOCESE OF WILMINGTON, INC.

## LIQUIDATION ANALYSIS - Maximum Assets (Compare Section I.D.2.c.)

($,000 USD)

| | Notes | Book Value as of 02/28/2011 | Potential Recovery % | Potential Recovery $ |
|---|---|---|---|---|
| Unrestricted Cash and Equivalents | A | $591 | 100% | $591 |
| Unrestricted PIA Funds | B | $42,791 | 100% | $42,791 |
| Real Property | C | $3,965 | 80% | $3,172 |
| Accounts Receivable | D | $3,369 | 5% | $168 |
| Notes Receivable | E | $1,450 | 90% | $1,305 |
| PIA Distribution Clawback Claims | F | $3,975 | 100% | $3,975 |
| Miscellaneous Unrestricted Assets | G | $1,048 | 90% | $943 |
| Interest in Life Insurance Policies | H | $54 | 100% | $54 |
| Insurance Recoveries | I | $0 | | $13,307 |
| Disputed Non-Debtor PIA Funds (as of Petition Date) | J | $75,773 | 100% | $75,773 |
| Disputed Non-Debtor PIA Funds (postpetition appreciation) | K | $8,465 | 100% | $8,465 |
| Impact of Operations on Gross Proceeds Apr-Jul, 2011 | L | -$261 | 100% | -$261 |
| **Gross Liquidation Proceeds** | | **$141,220** | | **$150,284** |
| | | | | |
| Secured Debt | | | | $0 |
| | | | | |
| Liquidation Costs | | | | |
| Shutdown Costs | M | | | $320 |
| Litigation Support | M | | | $100 |
| Chapter 7 Trustee Fees | N | | -3% | $4,489 |
| US Trustee Fees | N | | | $50 |
| Chapter 7 Professional Fees | O | | | $3,500 |
| **Total Liquidation Costs** | | | | $8,459 |
| | | | | |
| **Net Liquidation Proceeds Available for Unsecured Creditors** | | | | **$141,825** |
| | | | | |
| Administrative and Priority Claims | | | | |
| Accrued Compensation | P | | | $0 |
| Accrued Vacation and Benefits | Q | | | $148 |
| Administrative Professional Fees | R | | | $10,000 |
| Insurance IBNR | S | | | $2,644 |
| Est. Allowed Priority Claims | T | | | $0 |
| **Total Administrative and Priority Claims** | | | | $12,792 |
| | | | | |
| **Net Liquidation Proceeds Available for Pre Petition General Unsecured Creditors** | | | | **$129,033** |

| | | Estimated Claims Low Survivor Avg. | Estimated Claims High Survivor Avg. | Amount of Distribution Low Survivor Avg. | Amount of Distribution High Survivor Avg. | Dist as % of Claim Low Dist. % | Dist as % of Claim High Dist. % |
|---|---|---|---|---|---|---|---|
| 3A | Survivor Claims | U | $35,076 | $107,596 | $23,294 | $52,033 | 48.4% | 66.4% |
| 3B | Lay Pension Claims (vested benefits) | V | $47,190 | $47,190 | $31,338 | $22,821 | 48.4% | 66.4% |
| 3C | DEDA Bond Transaction Claims | W | $11,408 | $11,408 | $7,576 | $5,517 | 48.4% | 66.4% |
| | Gift Annuity Claims | X | $106 | $106 | $70 | $51 | 48.4% | 66.4% |
| 3D | Clergy Pension Claims | Y | $13,107 | $13,107 | $8,704 | $6,338 | 48.4% | 66.4% |
| 3F | PIA Investment Claims | Z | $75,773 | $75,773 | $50,320 | $36,643 | 48.4% | 66.4% |
| 3F | Miscellaneous/Trade Claims | AA | $300 | $300 | $199 | $145 | 48.4% | 66.4% |
| | Lay Pension Termination Liability (unvested benefits) | AB | $1,141 | $1,141 | $758 | $552 | 48.4% | 66.4% |
| | Third-Party Indemnity Claims | AC | $9,700 | $9,700 | $6,442 | $4,691 | 48.4% | 66.4% |
| | PIA Breach Claims | AD | $500 | $500 | $332 | $242 | 48.4% | 66.4% |
| | | | $194,301 | $266,821 | $129,033 | $129,033 | | |

| | | | | |
|---|---|---|---|---|
| Net Liquidation Proceeds Available for Subordinated Unsecured Creditors | | | $0 | $0 |
| | | | | |
| 4 Penalty Claims | AE | | $0 | $0 |

# NOTES TO LIQUIDATION ~~ANALYSIS~~ANALYSES

## I.     INTRODUCTION

The Debtor, with the assistance of its restructuring professionals, has prepared ~~this~~these hypothetical liquidation ~~analysis~~analyses (the "Liquidation ~~Analysis~~Analyses") in connection with the Disclosure Statement. The Debtor believes the Plan satisfies the "best interest of creditors" test set forth in § 1129(a)(7) of the Bankruptcy Code with respect to each impaired Class of creditors under the Plan. The Debtor believes these Classes will receive at least as much as they would if the Debtor's assets were liquidated in a case under chapter 7 of the Bankruptcy Code. The Debtor believes this Liquidation ~~Analysis~~Analyses and the conclusions set forth herein are fair and accurate, and represent management's best judgment with regard to the results of a liquidation of this Debtor. There are four (4) impaired Classes under the Plan:

- Class 3A Claims (Survivor Claims);

- Class 3B Claims (Lay Pension Claims);

- Class 3C Claims (DEDA Bond Transaction Claims);

- Class 4 Claims (Penalty Claims).

In addition, there are three (3) potentially impaired[1] Classes under the Plan:

- Class 3D Claims (Clergy Pension Claims);

- Class 3E Claims (Gift Annuity Claims); and

- Class 3F Claims (Other Unsecured Claims).

The Liquidation ~~Analysis is~~Analyses are based on the Debtor's unaudited and preliminary balance sheet as of February 28, 2011, appraisals of the Debtor's real estate and certain other personal property, and other information as disclosed in the Debtor's Schedules and Statement of Financial Affairs, and ~~assumes~~assume a hypothetical conversion of the Debtor's current Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code on or about August 1, 2011 (the "Liquidation Date"). ~~It~~They further ~~assumes~~assume that all parishes would stop paying assessments or otherwise providing financial support to the Debtor immediately upon conversion to chapter 7.

The Liquidation ~~Analysis~~Analyses also ~~assumes~~assume that the liquidation of the Debtor would be completed during a four-month period after the Liquidation Date, during which time all of the Debtor's major assets would be sold and initial distributions to creditors would be made, net of liquidation-related costs. Although the liquidation of some assets might not require four months, other assets would be more difficult to collect or sell, thus requiring a liquidation period that could require substantially longer than four months. The liquidation period would allow for the

---

[1] These Classes are unimpaired in a Settlement Plan, but in a CDOW-Only Plan (i) Class 3F is impaired and (ii) Classes 3D and 3E may become impaired in the event the restricted assets available to satisfy the claims in these Classes are determined to be Unrestricted Assets of the Debtor's Estate.

C- 5

orderly sale or abandonment of fixed assets and the orderly wind-down of daily operations. For certain assets, estimates of the liquidation values were made for each asset individually. For other assets, liquidation values were assessed for general classes of assets by estimating the percentage recoveries that a trustee might achieve through an orderly disposition. It is presumed that over an additional 18-month period, the chapter 7 trustee would resolve all claims and other matters involving the Debtor's estate and make additional distributions.

It is assumed that proceeds realized from the liquidation of the Debtor's unrestricted assets would be aggregated in a common distribution "pot~~."~~_._" For purposes of ~~this~~_these_ Liquidation ~~Analysis~~_Analyses_, each and every Claim asserted against the Debtor is presumed to be entitled to a distribution from the aggregated net proceeds. Neither the Debtor nor its restructuring advisor has evaluated the validity or value of these claims. The Debtor, if before the Liquidation Date, or the chapter 7 trustee, if after the Liquidation Date, may object to certain Claims. Certain assets or their proceeds are only available to satisfy certain claims due to legally enforceable restrictions on the use or distribution of such funds. **The Liquidation ~~Analysis assumes~~_Analyses assume_ that each claim for which restricted funds are ~~available~~_or may be_ available (specifically, the_ Lay Pension Claims,_ DEDA Bond Transaction Claims, Clergy Pension Claims, and Gift Annuity Claims) would first be paid to the extent of the restricted funds, and the remaining claim, if any, would then share *pari passu* with other general unsecured claims as necessary to provide the holder of such claim with a percentage recovery at least equal to the percentage paid to other creditors. The Liquidation ~~Analysis~~_Analyses_ further ~~assumes~~_assume_ that, if a given creditor's percentage recovery from restricted assets exceeded the percentage recovery for general unsecured claims from general assets, the chapter 7 trustee would make no further distributions to such creditor.**

The Liquidation ~~Analysis reflects~~_Analyses reflect_ the estimated cash proceeds, net of estimated liquidation-related costs, that would be realized if the Debtor were to be liquidated in an orderly manner through a chapter 7 process. The Liquidation ~~Analysis assumes~~_Analyses assume_ that liquidation proceeds would be distributed in accordance with § 726 of the Bankruptcy Code. If a chapter 7 liquidation were pursued for the Debtor, the amount of liquidation value available to unsecured creditors would be reduced (i) by the costs of the liquidation, including fees and expenses of the chapter 7 trustee, fees and expenses of other professionals retained by the trustee to assist with the liquidation, and asset disposition expenses; and (ii) by priority and administrative claims against the bankruptcy estate, including unpaid operating expenses and any accrued and unpaid professional fees allowed in the chapter 11 case.

A chapter 7 liquidation would likely prompt certain other events to occur, including the establishment of a new bar date for asserting claims, the termination of the Debtor's pension and benefit plans, and the rejection of remaining executory contracts and unexpired leases, including equipment leases. In addition, several Third-Party Indemnity Claims relating to sexual abuse litigation may be asserted against the Debtor by certain Non-Debtor Catholic Entities. ~~If the Plan is confirmed as a Settlement Plan, the Third-Party Indemnity Claims of the Non-Debtor Catholic Entities are waived, and Cash is contributed to the Settlement Trust for the sole benefit of holders of Survivor Claims. In a chapter 7 liquidation, and under the Plan if confirmed as a CDOW-Only Plan, Third-Party Indemnity Claims would not be waived_ who, in a Settlement Plan, would benefit from a channeling injunction protecting them from Survivor Claims arising prior to the Effective Date_. Thus, a hypothetical chapter 7 estate would likely be subjected to

considerably more claims than would the chapter 11 Estate if the Plan were confirmed as a Settlement Plan. Estimated claim amounts for some, but not all, of these categories of additional claims are set forth in the Liquidation ~~Analysis~~Analyses. No attempt has been made to estimate each and every additional general unsecured claim that might result in the event of a liquidation under chapter 7.

~~This~~These Liquidation ~~Analysis~~Analyses necessarily ~~contains~~contain an estimate of the amount of liquidated Claims that will ultimately become Allowed Claims, but generally assumes that Disputed Claims against the Debtor will be resolved in favor of the Debtor. Accordingly, estimates for non-Survivor ~~claims~~Claims are based solely upon the Debtor's own books and records, where applicable. Estimation of Survivor Claims for purposes of ~~this~~these Liquidation ~~Analysis~~Analyses is discussed below.

The Liquidation ~~Analysis assumes~~Analyses assume that there are no recoveries from the pursuit of any potential preferences, fraudulent conveyances, or other causes of action and does not include the estimated costs of pursuing those actions. The Lay Employees Committee asserts that the Liquidation Analyses are misleading because the Debtor does not value potential causes of action. The Debtor disagrees, however, because the Debtor is unaware of any such causes of action that would be viable.

Like the alternative CDOW-Only Plan distribution analyses in Section I.D.2. of the Disclosure Statement, the Liquidation Analyses assume three different potential litigation outcomes regarding pending (or expected) disputes regarding the scope of the property of the Debtor's bankruptcy estate. The first such litigation outcome is that Disputed Non-Debtor PIA Funds, the Restricted PIA Funds, and the Lay Pension Fund are all determined not to be Unrestricted Assets of the Debtor's bankruptcy estate, and therefore are not available for distribution to the Debtor's general creditors (the "Minimum Assets" Liquidation Analysis). (Compare Section I.D.2.a.) The second litigation outcome assumes the current *status quo* for any matters that are subject to pending litigation (the "Status Quo" Liquidation Analysis). (Compare Section I.D.2.b.) The final litigation outcome assumes all property held by the Debtor is determined by a Final Order to be Unrestricted Assets of the Debtor's bankruptcy estate (the "Maximum Assets" Liquidation Analysis). (Compare Section I.D.2.c.)

The litigation outcomes illustrated in the Liquidation Analyses are not exhaustive of all potential litigation outcomes in a hypothetical chapter 7 liquidation of the Debtor. Indeed, given the differences between the disputed assets themselves, the nature of the disputes and the relative costs and benefits of pursuing them to a litigated result, and the procedural posture of pending litigation, it is simply not possible to predict all potential permutations of litigated outcomes, and the Debtor has not attempted to do so. Rather, the Debtor has assumed "extreme" litigation outcomes that illustrate (i) the maximum and minimum amount of estate assets that would ultimately be available for distribution to creditors, and (ii) how those assets would be shared among creditors.

For purposes of the Liquidation Analyses, the Debtor has not attempted to predict the possible effect of substantive consolidation of the Debtor with any Non-Debtor Catholic Entity, because (i) such predictions would necessarily turn on information not in the Debtor's possession (e.g., realizable asset values and claims information) and (ii) as discussed in more detail in Section IV

C- 7

of the Disclosure Statement, the Debtor believes, based upon controlling law and the facts and circumstances in this case, that the likelihood of entry of a Final Order substantively consolidating the Debtor with any Non-Debtor Catholic Entity is remote.

## II. GLOBAL NOTES

### A. Basis of Presentation

To the extent possible, the Liquidation ~~Analysis reflects~~Analyses reflect the assets and liabilities of the Debtor as shown in its Financial Statements. The Financial Statements do not, and thus the Liquidation ~~Analysis does~~Analyses do not, purport to represent financial information prepared in accordance with U.S. Generally Accepted Accounting Principles.

### B. Causes of Action

As of the time the Debtor prepared ~~this~~these Liquidation ~~Analysis~~Analyses, the Debtor was unaware of any viable causes of action against third parties, other than cross-claims and/or counterclaims asserted, or that may be asserted, in connection with pending litigation. The Debtor during the course of the bankruptcy has reserved all of its rights with respect to any causes of action it may have against any party, and as a result, the chapter 7 trustee could choose to bring such causes of action and these causes of action may affect the assets and/or expenses of the estate.

### C. Valuation

The Debtor is a tax-exempt, not-for-profit corporation and has not adopted Statement of Financial Accounting Standards No. 93 ("SFAS93"). SFAS93 requires not-for-profit organizations to recognize depreciation as a cost of using up the future economic benefits of its long-lived tangible assets. Since the Debtor has not adopted SFAS93, it does not recognize and record depreciation on its property and equipment or any other asset. Accordingly, owned property and equipment are stated on the Debtor's books at original cost plus, in some circumstances, the cost of capital improvements. It would be unduly burdensome and an inefficient use of estate assets for the Debtor to obtain current market valuations of all of its assets in connection with the preparation of ~~this~~these Liquidation ~~Analysis~~Analyses. However, the Debtor did obtain appraisals on its collection of rings, crosses and chalices, and certain of its real estate. These assets continue to be carried on the Debtor's books at cost, but for purposes of ~~this~~these Liquidation ~~Analysis~~Analyses, appraised values for insurance purposes were used.

### D. The Pooled Investment Account

Assets within the Pooled Investment Account include (i) Disputed Non-Debtor PIA Funds, (ii) Restricted PIA Funds, and (iii) Unrestricted PIA Funds (collectively with the Disputed Non-Debtor PIA Funds and the Restricted PIA Funds, "Pooled Investment Assets"). Pooled Investment Assets are valued as of February 28, 2011, the close of the last reporting period for which data is available prior to the date this analysis was prepared.

In the PIA Litigation, the Bankruptcy Court ruled that the Disputed Non-Debtor PIA Funds are property of the Debtor's bankruptcy estate, which ruling is currently on appeal. ~~If the~~

~~Bankruptcy Court's ruling were overturned, the assets shown in this Liquidation Analysis would be reduced by approximately $84.2 million and the liabilities would be reduced by approximately $75.8 million, which would substantially reduce the percentage distribution to creditors.~~ The Plan contemplates that, if the Plan is confirmed as a CDOW-Only Plan, Disputed Non-Debtor PIA Funds will be held in escrow pending resolution of the PIA Litigation by a Final Order. However, for purposes of ~~this~~the "Status Quo" and "Maximum Assets" Liquidation ~~Analysis~~Analyses, it is assumed that the Disputed Non-Debtor PIA Funds are unrestricted assets of the estate distributable to general creditors. <u>If the Bankruptcy Court's ruling were overturned completely, the unrestricted assets of the estate would be reduced by approximately $84.2 million and the liabilities would be reduced by approximately $75.8 million, which would substantially reduce the percentage distribution to creditors as illustrated in the "Minimum Assets" Liquidation Analysis.</u>

### E. Restricted Assets

A substantial portion of the Debtor's assets are subject to donor-imposed restrictions on use or disposition which the Debtor believes preclude the use of such assets, or proceeds thereof, to satisfy the claims of general creditors of the Debtor. The majority of these Restricted Assets are maintained in the Pooled Investment Account. The <u>"Minimum Assets" and "Status Quo"</u> Liquidation ~~Analysis assumes~~<u>Analyses assume</u> that, consistent with § 363(d)(1) of the Bankruptcy Code, the chapter 7 trustee would abide by any legally enforceable restrictions to which Restricted Assets are subject, and would not use Restricted Assets for general administrative or corporate purposes, or to satisfy the claims of general creditors. For this reason, Restricted Assets are not listed as a "top line" asset in ~~the~~these Liquidation ~~Analysis~~Analyses. However, as noted above and discussed below with respect to the <u>Lay Pension Claims,</u> DEDA Bond Transaction Claims, ~~the~~ Clergy Pension Claims, and ~~the~~ Gift Annuity Claims, the <u>"Minimum Assets" and "Status Quo"</u> Liquidation ~~Analysis does~~<u>Analyses do</u> assume that the chapter 7 trustee would exhaust any Restricted Assets before making a distribution on such claim from unrestricted assets. <u>The "Maximum Assets" Liquidation Analysis assumes that all assets held by the Debtor are determined to be unrestricted and available for distribution to general creditors.</u>

### E. Reservation of Rights

Estimation of claims in ~~this~~these Liquidation ~~Analysis~~Analyses is not intended, nor should it be construed, as an admission or acknowledgment of the validity or amount of any Claim. Except as expressly provided, and expressly subject to confirmation of, the Plan, the Debtor reserves all rights with respect to all Claims asserted against the Estate.

## III. LINE-ITEM NOTES

### A. Unrestricted Cash and Cash Equivalents

Represents unrestricted cash held in corporate accounts as of February 28, 2011. Prior to the Liquidation Date, this balance would be expected to be reduced by the amount set forth in line L (Impact of Operations on Gross Proceeds). Projected cash balances are valued at 100% for purposes of the Liquidation ~~Analysis~~Analyses. <u>It is assumed that all restricted cash of the</u>

Debtor would be used in the ordinary course of business prior to the Liquidation Date. Accordingly, the "Maximum Assets" Liquidation Analysis does not contemplate any additional cash beyond the unrestricted cash.

## B.    Unrestricted PIA Funds

Unrestricted PIA Funds comprise various types of investment options including: securities, corporate bonds, government bonds and treasuries, many of which fluctuate substantially in value. These investment options are held either separately or in various managed investment funds as part of the Pooled Investment Account. No attempt has been made to project the market value of these assets as of the Liquidation Date, and they have been valued at their market value as of February 28, 2011.

For purposes of thisthe "Status Quo" and "Maximum Assets" Liquidation AnalysisAnalyses, the total Unrestricted PIA Funds includes the Lay Pension Fund. The Lay Employees Committee has commenced an action asserting that the Lay Pension Fund is restricted to be used only for payment of Lay Pension Claims. Because the Lay Pension Litigation has commenced, the Plan contemplates that, in a CDOW-Only Plan, the Lay Pension Fund will be held in escrow pending resolution of such litigation. However, for purposes of the chapter 11 distribution analysis and this "Status Quo" and "Maximum Assets" Liquidation AnalysisAnalyses, it is assumed that the Lay Pension Fund is an unrestricted asset of the estate distributable to general creditors. The "Minimum Assets" Liquidation Analysis assumes that the Lay Pension Fund is a Restricted Asset that is used to satisfy Lay Pension Claims. In a Settlement Plan, the Lay Pension Fund would be contributed to the Lay Pension Plan Trust by the Debtor.

## C.    Real Estate

The real estate of the Debtor consists of a variety of buildings and the land on which they sit, and is identified in Section III.B.3. of the Disclosure Statement. All real estate has been independently appraised and the value in the Liquidation Analysis reflects these appraised values. Due to the passage of time since the appraisals and the current state of the real estate markets in Delaware, as well as the costs that would be associated with any sale, the Liquidation Analysis assumes a recovery of 80% of the appraised value of the real property. Due to market conditions and risk, the value realized from the sale of the real property may be higher or lower than the value assumed by the Liquidation AnalysisAnalyses, and this variance may be significant.

## D.    Accounts Receivable

The Debtor's accounts receivable comprise outstanding parish assessments and rights to reimbursement from Non-Debtor Catholic Entities for health insurance and workers' compensation insurance.

It is anticipated that the vast majority of non-parish accounts receivable and parish accounts receivable for health and workers compensation insurance will have been fully converted to cash that is included in the estimated cash balance as of the Liquidation Date. The Liquidation Analysis assumes that receivables for parish assessments will be uncollectible by the chapter 7 trustee because there is no secular legal basis for payment or collection of these amounts. As

such, for purposes of this Liquidation Analysis, accounts receivable are valued between 0% and 10% of their book value.

### E.  Notes Receivable

Notes Receivable of the Debtor are assumed for the purposes of this Liquidation Analysis to be legally enforceable. It is further assumed that collections on the Notes Receivable would be approximately 85%-95% of the net book value.

### F.  PIA Distribution Clawback

This represents distributions made to ~~non-debtor~~Non-Debtor Pooled ~~Investment Participants~~Investors on account of their respective Disputed Non-Debtor PIA Funds between the Petition Date and February 28, 2011, pursuant to the series of interim orders entered by the Bankruptcy Court. The orders provide that such distributions are presumed to be recoverable pursuant to § 549 of the Bankruptcy Code, subject to the ~~non-debtor~~Non-Debtor Pooled ~~Investment Participants~~Investors' right to rebut such presumption. For purposes of the "Status Quo" and "Maximum Assets" Liquidation ~~Analysis~~Analyses it is assumed (i) that no ~~non-debtor~~Non-Debtor Pooled ~~Investment Participant~~Investor would rebut the presumption of avoidability with respect to any of these distributions, and (ii) accordingly, the chapter 7 trustee would set off the amount of these distributions dollar-for-dollar against any distributions to be made on account of PIA Investment Claims. The foregoing assumptions are for illustration purposes only, and are without prejudice to the right of any ~~non-debtor~~Non-Debtor Pooled ~~Investment Participant~~Investor to rebut the presumption of avoidability established by the Bankruptcy Court's orders (which would eliminate the chapter 7 trustee's setoff rights and, as a result, reduce the amount of assets available for distribution to other creditors). <u>The "Minimum Assets" Liquidation Analysis assumes that the property distributed to Non-Debtor Pooled Investors pursuant to the Bankruptcy Court's interim orders is determined to have belonged to the Non-Debtor Pooled Investors, thus nullifying any PIA Distribution Clawback Claims of the estate.</u>

### G.  Miscellaneous Unrestricted Assets

The Debtor has estimated a realizable value for certain personal property. This property includes items such as used furniture and appliances. It also includes miscellaneous artwork. The Debtor determined that the benefit of assigning a realizable value to a relatively small amount of used personal property did not justify the significant cost and delay in obtaining a professional appraisal.

The Debtor expects to receive the net proceeds from the sale of the property owned by St. Stanislaus Kostka ~~parish~~Roman Catholic Church, which is the secular legal embodiment of a Parish that was closed prepetition. Because the Debtor's expectancy interest in proceeds of real property is not an interest in the property itself, its value is included in the Miscellaneous Unrestricted Assets, not the Real Estate.

The Debtor's collection of former bishops' rings, crosses, and chalices, are listed at replacement value included in a professional appraisal dated December 8, 2009. Replacement value is used to designate the amount of insurance that may be or should be carried on items of personal

property in order to indemnify someone in the event of loss or damage. The actual realizable value of these items (e.g., in a sale) may differ materially from the replacement value. Indeed, the Debtor also obtained an appraisal at fair market value of these items, which was significantly less than the replacement value.

The Debtor is occasionally the beneficiary of wills and trusts. However, these endowments are completely at the discretion of the donor and are inherently revocable. The Debtor cannot ascertain whether it will be the beneficiary of such endowments, nor can it ascertain any amount relating thereto. Accordingly, the value is estimated at $0.00.

The Debtor has estimated a realizable value for its automobiles based upon the Kelley Blue Book website (www.kbb.com), using the "fair" to "good" condition range.

The Debtor has estimated a realizable value for its used office equipment and furniture, with the assistance of its restructuring advisors using their experience in disposing of these types of assets in other cases and the current market conditions for such assets.

## H.   Interest in Life Insurance Policies, less Restrictions

The Debtor is the beneficiary of a number of life insurance policies. Because these policies were part of a solicitation for restricted education purposes, the "Minimum Assets" and "Status Quo" Liquidation Analyses assume the value of these policies is not available for distribution to general unsecured creditors andof the value in theDebtor. The "Maximum Assets" Liquidation Analysis is $0.00. assumes these policies are unrestricted assets of the estate available for distribution to general creditors.

## I.   Insurance Recoveries

The Debtor has an interest in a number of liability insurance policies covering a number of periods (the "Liability Coverage"). The details of the Liability Coverage have been shared with the Official Committee of Unsecured Creditors and are discussed at length in the Disclosure Statement. The Debtor reserves all rights with respect to the Liability Coverage. This amount represents the estimated insurance proceeds that would be realized by the chapter 7 trustee from the Debtor's interest in the Liability Coverage.

## J.   Disputed Non-Debtor PIA Funds (as of Petition Date)

This represents the value of the Disputed Non-Debtor PIA Funds as of October 20, 2009, the nearest day to the Petition Date for which reliable data is available. The "Status Quo" and "Maximum Assets" Liquidation Analyses assume these assets are determined to be unrestricted assets of the estate. The "Minimum Assets" Liquidation Analysis assumes these assets are determined to belong to the Non-Debtor Pooled Investors, and are thus not included in the chapter 7 estate.

## K.   Disputed Non-Debtor PIA Funds (Post-Petition Appreciation)

This represents the appreciation in the value of the Disputed Non-Debtor PIA Funds between October 20, 2009, and February 28, 2011. The "Status Quo" and "Maximum Assets"

C-12

Liquidation Analyses assume these assets are determined to be unrestricted assets of the estate. The "Minimum Assets" Liquidation Analysis assumes these assets are determined to belong to the Non-Debtor Pooled Investors, and are thus not included in the chapter 7 estate.

**L.     Impact of Operations on Gross Proceeds**

The Debtor has analyzed its projected revenue and expenses for the period from March 1, 2011 through July 31, 2011. This number represents the estimated net decrease to Gross Liquidation Proceeds that operations will have during the period between the valuation date and the Liquidation Date. This projection further assumes that CVA defendant Parish Corporations will not withhold assessment funding from CDOW prior to the Effective Date to defray the cost of litigation against them.

**M.     Shutdown Costs; Litigation Support**

Estimates for corporate payroll and operating costs incurred during the liquidation are based upon the assumption that certain corporate functions would be retained to oversee the liquidation process. Certain minimum staff would be required at the physical locations during the four months of the liquidation period to prepare necessary financial documents, to review and preserve files and store documents. For purposes of estimating the maximum liquidation value for the Debtor, no payments for employee retention or incentives through the chapter 7 liquidation period are assumed to be made.

The hypothetical chapter 7 trustee would require support after shutdown from current Debtor employees to effectively collect receivables, negotiate and/or dispute claims, provide court testimony in claims resolution matters, and assist in insurance negotiations. In a chapter 7 the cost of these people are wind-down expenses. In the Plan, if confirmed as a CDOW-Only Plan, these services are provided by the Reorganized Debtor without employee cost to the Plan Trust.

**N.     Chapter 7 Trustee Fees; U.S. Trustee Fees**

Chapter 7 trustee fees include those fees associated with the appointment of a chapter 7 trustee in accordance with § 326 of the Bankruptcy Code. Under the Bankruptcy Code, trustee fees are subject to caps depending on the amount of distributions made, generally at rates between 3% and 5% of the total liquidation value of the Debtor. U.S. Trustee fees are quarterly fees assessed on disbursements from the bankruptcy estate.

**O.     Chapter 7 Professional Fees**

Chapter 7 professional fees include legal, appraisal, broker and accounting fees expected to be incurred during the liquidation period that are not already deducted from liquidation values. Professional fees are assumed to be $3.5 million for legal advisors, financial advisors and other expenses because significant issues remain that will most likely require litigation. Trustee professionals will spend significant time getting up to speed on difficult issues that the Debtor has already paid its professionals to learn.

**P.     Accrued Compensation**

This amount includes accrued employee compensation and related taxes. The Debtor pays payroll at the end of each month that is current through the date of the payroll. Because the Liquidation ~~Analysis assumes~~Analyses assume a beginning-of-month Liquidation Date, accrued payroll is expected to be $0.00.

### Q. Accrued Vacation and Benefits

The Debtor accrues for its vacation obligation. Vacation is earned on the first day of the Debtor's fiscal year (July 1) for the year. For purposes of ~~this~~these Liquidation ~~Analysis~~Analyses, the accrued but unused vacation obligation balance on the Debtor's records on its February 28, 2011, financial statements is used as the balance on the Liquidation Date as an accrued administrative expense.

### R. Chapter 11 Professional Fees

Chapter 11 professional fees include legal, appraisal, financial advisory and/or accounting fees, for retained firms and those expected to be retained, that have been incurred or are projected to be incurred through the assumed Liquidation Date.

In the chapter 11 distribution analyses, by way of comparison, the Debtor assumed that, between March 1, 2011, and an assumed Effective Date of August 1, 2011, there will be chapter 11 administrative expenses (including previously accrued, but unpaid) of (i) $10 million, if the Plan is confirmed as a CDOW-Only Plan, and (ii) $6.5 million if the Plan is confirmed as a Settlement Plan.

### S. Insurance IBNR Reserves

The Debtor provides self-insured medical plans for lay employees of the Debtor and the Non-Debtor Catholic Entities and for clergy. This line item represents the amount of cash needed to pay medical claims for services provided during the pendency of the Chapter 11 Case and prior to the Liquidation Date, but not yet paid. Claims for medical benefits are estimated to come in for three months after the service date. The Third-Party Administrators have estimated these claims at approximately $225,000 per week and suggest that approximately three months of bills remain incurred but not paid at any point in time. These constitute an administrative expense of the Debtor.

### T. Priority Claims

The Debtor believes it will have insubstantial, if any, Priority Claims. The Debtor is a not-for-profit corporation and does not file or pay income or property taxes, and prepetition payroll has been paid during the bankruptcy.

### U. Survivor Claims

The item represents the Debtor's estimate of the range of allowed Survivor Claim, including compensatory damages only. The Debtor arrived at the "low" and "high" amounts for Allowed

Survivor Claims by multiplying the 148 Survivor Claims asserted in this Chapter 11 Case[2] by, respectively, (i) the average payout per abuse claim in the chapter 11 case of the Diocese of Davenport, Iowa (approximately $237,000), and (ii) twice the average payout per abuse claim under the settlements in the chapter 11 cases of the Davenport diocese, the Archdiocese of Portland, Oregon, the Diocese of Spokane, Washington, and the Diocese of Tucson, Arizona, and the proposed settlement in this Chapter 11 Case ($363,500 x 2 = $727,000).[3] As of the date of ~~this~~these Liquidation ~~Analysis~~Analyses, no order or finding has been entered by the Bankruptcy Court or any other court estimating or otherwise fixing the amount of any Survivor Claim against the Debtor.

The Debtor believes that nationwide bankruptcy settlements are likely to be better predictors of the ultimate amount of Allowed Survivor Claims in this case than prepetition settlements by the Debtor and nationwide non-bankruptcy settlements, in particular because settlements outside of bankruptcy are made against a backdrop of potential punitive damages and the possible avoidance of bankruptcy,[4] both of which command a premium not specifically related to the amount of compensatory damages that would be awarded on account of the abuse at issue.

The Debtor also believes that nationwide bankruptcy settlements are likely to be better predictors of the ultimate amount of Allowed Survivor Claims in this case than the few Delaware jury verdicts that are available for comparison, because the settlements have covered a much wider population of claims, and in a bankruptcy context where, again, the threat of punitive damages is muted. Abuse verdicts by Delaware juries against individual Perpetrators (premised upon an intentional tort theory) have resulted in significant compensatory and punitive damage awards, whereas recent damages awards against corporate defendants (premised upon a negligence and/or gross negligence theory) have been $0 (against the Oblates of St. Francis de Sales, which judgment was reversed on appeal (retrial pending)) and $3 million (against St. Elizabeth Roman Catholic Church).

## V.    Lay Pension Claims (Vested Benefits)

The Debtor maintains the Lay Pension Plan for employees of the Debtor and the Non-Debtor Catholic Entities. This plan is not governed by ERISA funding requirements and is substantially underfunded vis-à-vis the accrued, vested pension benefits under the Lay Pension Plan. The "vested" Lay Pension Claims represent (i) the estimated net present value of accrued future pension benefits that were vested as of January 1, 2010, based upon actuarial assumptions as to life expectancies and the applicable discount rate. For the purpose of this Liquidation Analysis, less (ii) the current funding in the Lay Pension Plan Trust. The allowed amount of Lay Pension

---

[2] In addition to the 147 Confidential Tort Proofs of Claim filed by Survivors in this case, one Parish-Only Survivor Claimant was assigned a Parish Corporation's Third-Party Indemnity Claim against the Debtor as part of a settlement between the Parish-Only Survivor Claimant and the Parish Corporation. The Plan provides that this Third-Party Indemnity Claim will be treated for all intents and purposes as a Survivor Claim against the Debtor.

[3] The Debtor excluded from this calculation the average payout per abuse claim in the Diocese of Fairbanks, Alaska case, which was approximately $33,000 per claim, plus an as-yet undetermined amount of insurance proceeds.

[4] The Diocese of San Diego, California reached a settlement during its chapter 11 case which was effectuated outside of bankruptcy following the voluntary dismissal of the case. The Debtor considers this to be a non-bankruptcy settlement, however, because that chapter 11 case was at peril of involuntary dismissal had a settlement not been reached.

Claims is reduced by the funding in the Lay Pension Plan Trust because, to the extent of such funding, the Debtor had already satisfied such Claims prepetition. For the purpose of these Liquidation Analyses, the Debtor estimated the ~~value of these claims~~allowed amount of Lay Pension Claims based upon actuarial analysis performed by The Standard, an independent provider of financial products and services.

### W.    DEDA Bond Transaction Claims

The DEDA Bond Transaction Claims arise ~~from an unsecured letter of credit issued~~ in connection with ~~a~~ tax-exempt public bond financing obtained by the Debtor for the construction of schools prepetition. For purposes of ~~this~~the Liquidation ~~Analysis~~Analyses, the DEDA Bond Transaction Claims are estimated to be equal to the amount asserted in Allied Irish Bank's proof of claim, plus the claims for interest and expenses by Wilmington Trust. The "Minimum Assets" and "Status Quo" Liquidation ~~Analysis~~Analyses further ~~assumes~~assume that the chapter 7 trustee would satisfy the DEDA Bond Transaction Claims using the restricted Capital Campaign Fund (valued at approximately $8.9 million as of February 28, 2011). Because the resulting percentage distribution on the DEDA Bond Transaction Claims from the Capital Campaign Fund would exceed – substantially – the percentage distribution to general creditors from unrestricted assets of the estate, the "Minimum Assets" and "Status Quo" Liquidation ~~Analysis assumes~~Analyses assume the chapter 7 trustee would make no further distributions upon the DEDA Bond Transaction Claims. ~~If~~The "Maximum Assets" Liquidation Analysis assumes that the Capital Campaign Fund ~~were~~is determined to be an unrestricted asset of the estate, ~~the assets available for distribution to general creditors would increase in an amount equal to the value of the Capital Campaign Fund, and~~ that the DEDA Bond Transaction Claims would share *pari passu* with all general creditors.

### X.    Gift Annuity Claims

The Debtor holds several Gift Annuity Funds (having an aggregate value of approximately $106,000 as of February 28, 2011), representing tax-advantaged gifts made to the Debtor in exchange for a stream of income to the donor during his or her lifetime. The gifts are invested in the Pooled Investment Account as Restricted PIA Funds and the earnings therefrom are used to pay the donor-annuitant. Upon the donor-annuitant's death, the gift becomes a general unrestricted asset of the Debtor. For purposes of ~~this~~these Liquidation ~~Analysis~~Analyses, it is assumed the net present value of future annuity payments due to the donor-annuitants is equal to the value of the Gift Annuity Funds~~, and~~. The "Minimum Assets" and "Status Quo" Liquidation Analyses assume that the holders of Gift Annuity Claims would receive their respective Gift Annuity Funds in full satisfaction of their claims in a hypothetical chapter 7 liquidation. ~~If~~The "Maximum Assets" Liquidation Analysis assumes that the Gift Annuity Funds ~~were~~are determined to be unrestricted assets of the estate, ~~the assets available for distribution to general creditors would increase in an amount equal to the value of the Gift Annuity Funds, and~~ that the Gift Annuity Claims would share *pari passu* with all general creditors.

### Y.    Clergy Pension Claims

The Debtor maintains a pension plan for the benefit of diocesan clergy. This plan is not governed by ERISA funding requirements and is substantially underfunded vis-à-vis accrued.

vested benefits. The Clergy Pension Claims represent the estimated net present value of future pension benefits that were vested as of the Petition Date, based upon actuarial assumptions as to life expectancy and the applicable discount rate. The "Minimum Assets" and "Status Quo" Liquidation ~~Analysis~~Analyses further ~~assumes~~assume that the chapter 7 trustee would satisfy the Clergy Pension Claims using the restricted Clergy Pension Fund (valued at approximately $3.7 million as of February 28, 2011). Because the resulting percentage distribution on the Clergy Pension Claims from the Clergy Pension Fund in the "Status Quo" scenario would be less than the percentage distribution to general creditors from unrestricted assets, the "Status Quo" Liquidation Analysis assumes the chapter 7 trustee would make further distributions upon the Clergy Pension Claims from general assets until the percentage distribution on such claims at least equaled the percentage distribution on general claims. ~~If the Clergy Pension Fund were~~Because the percentage distribution on the Clergy Pension Claims from the Clergy Pension Fund in the "Minimum Assets" scenario would exceed the percentage distribution to general creditors, the "Minimum Assets" Liquidation Analysis assumes that the chapter 7 trustee would make no further distributions to Clergy Pension Claims. The "Maximum Assets" Liquidation Analysis assumes that the Clergy Pension Fund is determined to be an unrestricted asset of the estate, ~~the assets available for distribution to general creditors would increase in an amount equal to the value of the Clergy Pension Fund,~~ and that the Clergy Pension Claims would share *pari passu* with all general creditors.

### Z. PIA Investment Claims

Section 502(b) of the Bankruptcy Code requires claims to be allowed as of the Petition Date. Accordingly, this amount reflects the value of the Disputed Non-Debtor PIA Funds as of October 20, 2009, the nearest day to the Petition Date for which reliable data is available. The "Minimum Assets" Liquidation Analysis assumes it is determined that the Disputed Non-Debtor PIA Funds belong to the Non-Debtor Pooled Investors, thus nullifying any PIA Investment Claims.

### AA. Miscellaneous/Trade Claims

For purposes of ~~the~~these Liquidation ~~Analysis~~Analyses, it is assumed that unsecured claims will consist of the Debtor's accounts payables as of the Petition Date, less any amounts entitled to priority under §§ 503(b)(9) and 507(a)(4) of the Bankruptcy Code. The Debtor expects that additional claims might arise as a result of cessation of operations as contemplated herein, but does not expect such claims to be substantial in amount.

### AB. Lay Pension Claims (Unvested Benefits)

The "unvested" Lay Pension Claims represent the estimated net present value of future pension benefits that were accrued and unvested as of January 1, 2010, but which may become vested upon termination of the Lay Pension Plan. Estimates were based upon analysis performed by The Standard, an independent provider of financial products and services, utilizing actuarial assumptions as to life expectancies and the applicable discount rate.

### AC. Third-Party Indemnity Claims

This amount represents Third Party Indemnity Claims, primarily of Parish Corporations, arising from or relating to Survivor Claims. As of the date of ~~this~~these Liquidation ~~Analysis~~Analyses, no order or finding has been entered by the Bankruptcy Court or any other court estimating or otherwise fixing the amount of any Third-Party Indemnity Claim against the Debtor.

### AD. PIA Breach Claims

This amount represents the estimated claims for indemnification and reimbursement of legal fees and costs incurred by the non-debtor Pooled Investment Participants in defense of the PIA Litigation, and other amounts that may be asserted by the Pooled Investment Participants as consequential damages resulting from the Debtor's alleged breach of fiduciary duties in connection with the Pooled Investment Account.

### AE. Penalty Claims

Under the Bankruptcy Code, Penalty Claims (including, without limitation, any claims for punitive damages in connection with Survivor Claims) are subordinated to general unsecured creditors for distribution purposes. Because general unsecured claims would not be paid in full in a hypothetical chapter 7 liquidation, Penalty Claims would receive no distribution. Accordingly, no estimate of the potential allowed amount of Penalty Claims, if any, is provided.

# EXHIBIT D

# FINANCIAL PROJECTIONS

068902.1001

# Catholic Diocese of Wilmington, Inc.
## 3 Year Financial Projections

5/17/2011

| | Projection 2014 | % | Projection 2013 | % | Budget 2011 | % | Projection 2012 | % | Actual 2010 | % | Actual 2009 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **General Revenues:** | | | | | | | | | | | | |
| Assessments | 4,105,358 | 46% | 4,044,688 | 46% | 3,835,547 | 46% | 3,986,039 | 47% | 3,863,750 | 49% | 3,869,750 | 49% |
| Net Appeal | 4,348,484 | 49% | 4,242,424 | 49% | 4,038,000 | 49% | 4,138,950 | 48% | 4,057,580 | 51% | 3,846,175 | 48% |
| Communications Collection | 18,000 | 0% | 18,000 | 0% | 18,000 | 0% | 18,000 | 0% | 10,567 | 0% | 21,862 | 0% |
| Campaign for Human Development Collection | 3,000 | 0% | 3,000 | 0% | 3,000 | 0% | 3,000 | 0% | 3,000 | 0% | 3,000 | 0% |
| Affiliated Pension Contribution | 397,838 | 4% | 386,250 | 4% | 380,000 | 5% | 375,000 | 4% | | | 175,097 | 2% |
| Gifts and Contributions and Other | 37,945 | 0% | 37,945 | 0% | 37,945 | 0% | 37,945 | 0% | 27,636 | 0% | 46,990 | 1% |
| **Total Revenues** | 8,910,625 | 100% | 8,732,307 | 100% | 8,312,492 | 100% | 8,558,934 | 100% | 7,962,533 | 100% | 7,962,874 | 100% |
| **Net Budget Expenses:** | | | | | | | | | | | | |
| Administration | 2,343,888 | 28% | 2,282,629 | 28% | 2,918,648 | 35% | 2,435,258 | 30% | 2,706,589 | 40% | 2,260,312 | 31% |
| Pension Contribution | 2,101,250 | 25% | 2,050,000 | 26% | 1,380,000 | 17% | 2,000,000 | 25% | 250,000 | 4% | 1,000,000 | 14% |
| Catholic Charities | 816,714 | 10% | 800,700 | 10% | 1,030,292 | 13% | 785,000 | 10% | 1,131,211 | 17% | 1,233,454 | 17% |
| Catholic Education | 822,078 | 10% | 788,478 | 10% | 887,868 | 11% | 756,656 | 9% | 864,273 | 13% | 881,209 | 12% |
| Communications | 292,217 | 4% | 284,683 | 4% | 123,878 | 2% | 277,404 | 3% | 113,030 | 2% | 121,058 | 2% |
| Development | 505,407 | 6% | 489,748 | 6% | 508,543 | 6% | 474,746 | 6% | 503,909 | 7% | 489,600 | 7% |
| Finance | 581,093 | 7% | 557,681 | 7% | 578,239 | 7% | 535,446 | 7% | 575,357 | 8% | 567,485 | 8% |
| Pastoral Services | 797,655 | 10% | 765,801 | 10% | 813,630 | 10% | 735,788 | 9% | 698,323 | 10% | 773,425 | 11% |
| **Net Budget Expenses** | 8,260,303 | 100% | 8,019,719 | 100% | 8,241,098 | 100% | 8,000,297 | 100% | 6,842,692 | 100% | 7,326,543 | 100% |
| **Operating Surplus (Deficit)** | 650,322 | | 712,588 | | 71,394 | | 558,637 | | 1,119,841 | | 636,331 | |
| **Less: Non-Operating Expenses** | | | | | | | | | | | | |
| St. Thomas More Academy Funding | 0 | 0% | 0 | 0% | 0 | | 0 | 0% | 211,960 | 70% | 556,669 | 73% |
| Most Blessed Sacrament School Funding | 0 | 0% | 0 | 0% | 0 | | 0 | 0% | 92,412 | 30% | 201,900 | 27% |
| Debt Service Costs | 647,186 | 100% | 647,186 | 100% | 0 | | 540,000 | 100% | 0 | 0% | 0 | 0% |
| **Total Non-Operating Expenses** | 647,186 | 100% | 647,186 | 100% | 0 | 0% | 540,000 | 100% | 304,372 | 100% | 758,569 | 100% |
| **Total Surplus (Deficit)** | 3,136 | | 65,402 | | 71,394 | | 18,637 | | 815,469 | | (122,238) | |
| **Total All Expenses** | 8,907,489 | | 8,666,905 | | 8,241,098 | | 8,540,297 | | 7,147,064 | | 8,085,112 | |

D-2

## EXHIBIT H

## DISPUTED NON-DEBTOR PIA FUNDS
### (Balances as of February 28, 2011)

| Sub-Fund # | Amount ($) | Non-Debtor Pooled Investor |
|---|---|---|
| F0550 | 1,511,543.28 | St. Thomas the Apostle Roman Catholic Church |
| F0560, F0565, F0570 | 596,455.49 | Corpus Christi Roman Catholic Church |
| F0592 | 141,956.96 | St. Francis de Sales Roman Catholic Church |
| F0600 | 524.98 | Holy Rosary Roman Catholic Church |
| F0620 | 3,544.24 | Mullery Memorial Scholarship Trust |
| F0640 | 379,091.80 | Our Lady of Lourdes Roman Catholic Church |
| F0655 | 111,176.13 | St. Mary Refuge of Sinners Roman Catholic Church |
| F0660 | 46,303.92 | Holy Cross Roman Catholic Church |
| F0545, F0670, F1080, F1090 | 517,053.44 | Cathedral of St. Peter Roman Catholic Church |
| F0680, F0690 | 115,213.67 | Holy Family Roman Catholic Church |
| F0700 | 113,241.43 | St. Polycarp Roman Catholic Church |
| F0710 | 13,134.71 | St. Paul Roman Catholic Church |
| F1230, F1240 | 102,236.75 | St. Benedict Roman Catholic Church |
| F1250 | 4,989.62 | St. Luke/St. Andrew Roman Catholic Church |
| F1260 | 144,270.74 | St. Edmond Roman Catholic Church |
| F1270, F1280 | 324,043.38 | St. John the Beloved Roman Catholic Church |

| Sub-Fund # | Amount ($) | Non-Debtor Pooled Investor |
|---|---|---|
| F0720, F0745, F0750, F0760 | 48,392,199.15 | Catholic Diocese Foundation |
| F0770, F0775, F0780, F0790, F0870 | 2,489,162.08 | Catholic Charities, Inc. |
| F0800, F0810 | 3,899,678.22 | Seton Villa, Inc. |
| F0820 | 4,005,550.85 | Siena Hall, Inc. |
| F0830 | 4,846,888.48 | Children's Home, Inc. |
| F0840, F0842, F0843, F0844, F0845, F0846, F0847, F0848, F0849, F0850, F0860 | 8,284,156.00 | Catholic Cemeteries, Inc. |
| F0880, F0890, F0891, F0892, F0900, F1130, F1140, F1150, F1160, F1170, F1180, F1190, F1200 | 7,806,004.22 | Diocese of Wilmington Schools, Inc. |
| F0910, F0920 | 261,527.74 | Catholic Youth Organization, Inc. |
| F0930 | 128,280.97 | Society for the Propagation of the Faith |
| **TOTAL** | **84,238,228.25** | |

**EXHIBIT I**

**NON-DEBTOR CATHOLIC ENTITY PLEDGES
TOWARD CONSUMMATION OF SETTLEMENT PLAN**

| Non-Debtor Catholic Entity | Cash and/or Investments ($) | Real Property($)[50] |
|---|---|---|
| Catholic Diocese Foundation | 47,070,858 | 6,343,000 |
| Catholic Charities, Inc. | = | = |
| DOW Schools, Inc. | = | = |
| Catholic Cemeteries, Inc. | 3,393,007 | = |
| Catholic Ministry to the Elderly, Inc. | = | = |
| Catholic Press of Wilmington, Inc. | = | = |
| Catholic Youth Organization, Inc. | = | = |
| Seton Villa, Inc. | 2,170,434 | = |
| Children's Home, Inc. | 1,500,000 | 1,600,000 |
| Siena Hall, Inc. | 1,500,000 | = |
| Cathedral of St. Peter Roman Catholic Church | = | = |
| Christ Our King Roman Catholic Church | = | = |
| Corpus Christi Roman Catholic Church | 250,000 | = |
| Good Shepherd Roman Catholic Church | = | = |
| Holy Child Roman Catholic Church | = | = |
| Holy Cross Roman Catholic Church | = | = |
| Holy Family Roman Catholic Church | = | = |
| Holy Name of Jesus Roman Catholic Church | = | = |
| Holy Rosary Roman Catholic Church | = | = |
| Holy Spirit Roman Catholic Church | = | = |
| Immaculate Conception Roman Catholic Church (Elkton) | = | = |
| Immaculate Conception Roman Catholic Church (Marydel) | = | = |
| Immaculate Heart of Mary Roman Catholic Church | 200,000 | = |
| Our Lady of Fatima Roman Catholic Church | = | = |
| Our Lady of Good Counsel Roman Catholic Church | = | = |

---

[50] Reflects appraised value as of September 2010.

YCST01:10788119.4

068902.1001

| Non-Debtor Catholic Entity | Cash and/or Investments ($) | Real Property($)[5] |
|---|---|---|
| Our Lady of Lourdes Roman Catholic Church | = | = |
| Our Mother of Sorrows Roman Catholic Church | = | = |
| Parish of The Resurrection Roman Catholic Church | = | = |
| Sacred Heart Roman Catholic Church | = | = |
| St. Andrew Roman Catholic Church | = | = |
| St. Ann Roman Catholic Church (Bethany Beach) | = | = |
| St. Ann Roman Catholic Church (Wilmington) | = | = |
| St. Anthony of Padua Roman Catholic Church | = | = |
| St. Benedict Roman Catholic Church | = | = |
| St. Catherine of Siena Roman Catholic Church | = | = |
| St. Christopher Roman Catholic Church | = | = |
| St. Dennis Roman Catholic Church | = | = |
| St. Edmond Roman Catholic Church | 200,000 | = |
| St. Elizabeth Roman Catholic Church | 300,000 | = |
| St. Elizabeth Ann Seton Roman Catholic Church | = | = |
| St. Francis de Sales Roman Catholic Church | = | = |
| St. Hedwig Roman Catholic Church | = | = |
| St. Helena Roman Catholic Church | = | = |
| St. John Neumann Roman Catholic Church | = | = |
| St. John the Apostle Roman Catholic Church | = | = |
| St. John the Baptist – Holy Angels Roman Catholic Church | = | = |
| St. John the Beloved Roman Catholic Church | 500,000 | = |
| St. Joseph Roman Catholic Church (Middletown) | = | = |
| St. Joseph Roman Catholic Church (Wilmington) | = | = |
| St. Joseph on the Brandywine Roman Catholic Church | 150,000 | = |
| St. Jude the Apostle Roman Catholic Church | = | = |
| St. Luke Roman Catholic Church | = | = |
| St. Margaret of Scotland Roman Catholic Church | = | = |
| St. Mary of the Assumption Roman Catholic Church | = | = |

YCST01:10788119.4

068902.1001

| Non-Debtor Catholic Entity | Cash and/or Investments ($) | Real Property($)[5][0] |
|---|---|---|
| St. Mary of the Immaculate Conception Roman Catholic Church | - | - |
| St. Mary Magdalen Roman Catholic Church | - | - |
| St. Mary Refuge of Sinners Roman Catholic Church | - | - |
| St. Mary Star of the Sea Roman Catholic Church | - | - |
| St. Matthew Roman Catholic Church | - | - |
| St. Michael the Archangel Roman Catholic Church | - | - |
| St. Patrick Roman Catholic Church | - | - |
| St. Paul Roman Catholic Church (Delaware City) | - | - |
| St. Paul Roman Catholic Church (Wilmington) | - | - |
| Ss. Peter and Paul Roman Catholic Church | - | - |
| St. Peter the Apostle Roman Catholic Church | 100,000 | - |
| St. Polycarp Roman Catholic Church | - | - |
| St. Thomas the Apostle Roman Catholic Church | 500,000 | - |
| **TOTAL** | **57,834,299** | **7,943,000** |

YCST01:10788119.4

068902.1001