**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| **CATHOLIC DIOCESE OF WILMINGTON,** | : | **Chapter 11** |
| **INC., a Delaware corporation,** | : | |
| | : | **Case No. 09-13560 (CSS)** |
| Debtor. | : | |
| | : | |
| | : | **Ref.  D.I. 1321** |

**OPPOSITION AND OBJECTIONS OF THE UNOFFICIAL COMMITTEE OF STATE
COURT ABUSE SURVIVORS TO THE SECOND AMENDED CHAPTER 11 PLAN OF
REORGANIZATION OF CATHOLIC DIOCESE OF WILMINGTON, INC. (D.I. 1321)**

**THE NEUBERGER FIRM, P.A.**
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
2 E. 7th Street, Suite 302
Wilmington, DE  19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: June 30, 2011

**JACOBS & CRUMPLAR, P.A.**
**ROBERT JACOBS, ESQ. (#244)**
**THOMAS C. CRUMPLAR, ESQ. (#942)**
2 E. 7th Street, Suite 400
Wilmington, DE 19801
(302) 656-5445
Bob@JCDELaw.com
Tom@JCDELaw.com

Attorneys for the Unofficial Committee of
State Court Abuse Survivors Affected by the
Diocese's Proposed Plan

## NATURE AND STAGE OF THE PROCEEDING

On behalf of the Unofficial Committee of State Court Abuse Survivors ("Abuse Survivors"), the undersigned counsel hereby submits this opposition and objections to the Catholic Diocese of Wilmington, Inc.'s ("Diocese") Second Amended Chapter 11 Plan of Reorganization (D.I. 1321).[1]

## DISCUSSION

**A.  Objection 1 - Timing of Payment and Distribution to the Survivors.**

**1.  What Was Known At the Time of the Agreement.**  As review of the docket, history and media accounts of this bankruptcy case reveals, the claims of the Lay Employee Committee, Allied Irish Bank and other creditors were well-known to the Diocese as of February 2, 2011.[2]

**2.  The Plain Terms of the Agreement.**  Acting with this awareness and knowledge, on February 2, 2011, the Diocese reached an agreement with state court counsel to settle the abuse survivors' claims.[3]  The terms of that settlement are reflected in a Settlement Term Sheet (Tab A attached),[4] which provided that the settlement funds would be paid over, for

---

[1] Thomas S. Neuberger, lead counsel for the unofficial committee of state court abuse survivors, reserves his right to amend this pleading due to his unavailability this week.  His mother in law died suddenly on Sunday June 26th and the funeral and burial is occurring on June 30th the date this pleading is due.  Co-counsel Stephen J. Neuberger also was mostly unavailable this week since the deceased was his grandmother.

[2] See, e.g. In re Papatones, 143 F.3d 623, 624 n. 3 (1st Cir.1998) ("The court may take judicial notice of its own orders and of records in a case before the court ...."); Neuberger v. Gordon, 567 F.Supp.2d 622, 630 (D.Del. 2008) (a court may take judicial notice of media accounts to demonstrate what was in the public realm at the time).

[3] The settlement was reached after all day negotiations, which followed eight months of mediation and settlement discussions.

[4] As previously noted in plaintiff's objections to the Diocese's Disclosure Statement, the Term Sheet does not reflect the actual agreement and handshake deal reached earlier that evening between counsel as to the treatment of survivor John Vai.  (D.I. 1278 at 2).  However, this material breach is immaterial for purposes of addressing this present objection and is not further addressed herein.

the benefit of the survivors, no later than 60 days after this Court's confirmation of the Plan. Specifically -

> These funds shall be paid within ninety (90) days of the date of this Term Sheet or within sixty (60) days of Plan Confirmation ... whichever is later.

(Tab A at 1).[5]  Such prompt payment for distribution was a key, material term of the settlement because it would allow this long painful process to end at last, and the survivors to forever turn the page and finally start to try to heal and rebuild their long shattered lives.[6]  This was the lynch pin of the deal reached with the Diocese to resolve this survivor driven bankruptcy.  The 90 day provision also demonstrates that the transfer of the settlement funds to the survivors sooner rather than later, and at a date certain instead of an unknown date far into the future, was the intent of the parties.[7]

### a.  Payment Was Not Conditioned on Resolution of Appeals or Any Other Claims.

Despite being fully aware of the claims of Allied Irish Bank and the Lay Employee Committee on February 2, 2011, nothing in the Settlement Term Sheet conditioned its performance upon resolution of these claims or the resolution of any appeals arising from this Court's treatment of those claims.  Instead, the only conditions noted was the Diocese's ability to sell certain properties.  This demonstrates that conditions were specifically contemplated, but

---

[5]  At the time, it was anticipated that this process could be wrapped up by approximately June 2011 at the latest.

[6]  The Court recently noted many of these same concerns.  (See May 20, 2011 Disclosure Hearing Tr. at 17-18 - noting the importance in bringing this case to a conclusion as soon as possible given the advanced age of many of the survivors, that many of the survivors have been suffering for 40-50 years, the long pre and post bankruptcy state court litigation process the survivors have endured, the length of these bankruptcy proceedings, and other equities involved favoring swift resolution).

[7]  Clearly a confirmation vote was not contemplated as a prerequisite to trigger the 90 day minimum period or any time thereafter until the property was sold.  The enforcement of the agreement would then be ripe for the survivors to bring before the Court as a proper resolution to the very reason this bankruptcy was filed.

resolution of any appeals or objections were not one of them.  Accordingly, *expressio unius est exclusio alterius*.[8]

"[C]ourts should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it." Allied Capital Corp. v. GC-Sun Holdings, L.P., 910 A.2d 1020, 1035 (Del.Ch. 2006).  All the more so when certain parties, such as the Diocese's law firm, are "sophisticated players who had experience in negotiating the particulars of a debtor-creditor relationship." Id.  Review of counsel for the Diocese's website reveals that they hold themselves out as one of the top bankruptcy firms, not only in Delaware, but in the nation, so they should certainly be held to this higher standard.  In other words - if they meant something else, they should have said it because they know better. "[W]hen interpreting a contract, the role of a court is to effectuate the parties' intent. In doing so, we are constrained by a combination of the parties' words and the plain meaning of those words where no special meaning is intended." AT&T Corp. v. Lillis, 953 A.2d 241, 252 (Del. 2008).  Here, the parties' intent is clear - 60 days after confirmation the money was to be paid to the benefit of the survivors.

> Clear and unambiguous language ... should be given its ordinary and usual meaning. Absent some ambiguity, Delaware courts will not destroy or twist contract language under the guise of construing it. When the language of a ... contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented.

Id.  Here, the language was clear and unambiguous.  Payment 60 days after confirmation.  No mention was made of any appeals. Had the Diocese attempted to insert such language into the

---

[8] Cf. Giuricich v. Emtrol Corp., 449 A.2d 232, 238 (Del. 1982) ("where a provision is expressly included in one section of a statute, but is omitted from another, it is reasonable to assume that the Legislature was aware of the omission and intended it.").

agreement, if any agreement would have been reached at all, significant additional monetary

consideration would have been necessary.

      **3.  The February 3, 2011 Teleconference With the Court.**  Notably, on

February 3, 2011, the Court held a teleconference to discuss the settlement reached the night

before.  (D.I. 1106).   Nowhere during that teleconference did the Diocese put forth its belated

claim that payment of the settlement funds was conditioned upon final resolution of any and all

appeals.  Indeed, during the teleconference, the Diocese indicated that such legalisms were not

particularly relevant to it at all.  (See id. at 15-16 - the Diocese's statement that it intended to be

bound by the settlement even if the Delaware Supreme Court struck down the Child Victim's Act

as unconstitutional, even though such a ruling would have killed 99% of the survivor claims

against it in this bankruptcy).

      **4.  The Intent of the Parties.**  The intent of the parties also is revealed by the

various declarations from state court counsel which are attached, all of which reveal that "Plan

Confirmation" was intended to mean "Plan Confirmation," and did not and does not mean

'resolution of any and all potential appeals.' (See Tabs B, C, D).  As attorney Jacobs explained -

> We did not agree to settle the case for our many injured clients based upon the hope that,
> someday, many years from now, all appeals in this bankruptcy would be resolved and the
> settlement funds would finally be paid.  It is tort lawyer 101 to obtain the settlement funds
> as soon as possible.  I would not have agreed to a deal which delayed the payment of the
> settlement funds as the Diocese now proposes.

(Tab C at ¶ 9).  In attorney Dalton's words -

> It is, was and always has been my understanding that "Plan Confirmation" refers to Judge
> Sontchi's signing off on and approval of the Plan.  It was never my intent or
> understanding that this phrase referred to resolution of appeals by other parties before the
> District Court, the Third Circuit or the U.S. Supreme Court.  Had that been my intent, I
> would have used different words, such as 'resolution of all appeals following
> confirmation' or other similar language.

4

(Tab D at ¶ 7).  As attorney T. Neuberger stated -

> The Diocese's post-hoc efforts to change the plain terms of the settlement agreement are improper.  Had the Diocese indicated the night of February 2, 2011 that the payment would be delayed until after all potential appeals were resolved, we never would have reached a settlement.

(Tab B at ¶ 10). Accordingly, review of the declarations makes clear that it was the intent of the parties that "Plan Confirmation" means "Plan Confirmation."

### 5.  The Diocese's Public Admission that This Was the Intent of the Parties.

Any possible lingering doubt is resolved by the statement of lead Diocesan counsel Anthony Flynn to intrepid News Journal reporter Beth Miller.  When specifically asked by reporter Miller whether any appeal could delay the Diocese's payment of the settlement funds to the abuse survivors, attorney Flynn told her that -

> the diocese has no interest in delaying the process, and said its plan does not block payment if an appeal arises.  He said only an order from Judge Christopher Sontchi could put a stay on the payment.

(Tab E at 2).  Given that attorney Flynn would certainly not have prevaricated in his public statements about such an important matter - all the more so one that directly impacts so many abuse survivors and Catholic faithful, the well being of which means so very much to his client (see, e.g. D.I. 1322 at 1) - it is clear that his understanding of the settlement agreement with the abuse survivors is in accord with the understanding of state court counsel and the plain terms of the Settlement Term Sheet.  Accordingly, even the Diocese agrees that it was the plain, clear and unambiguous intent of the parties that any potential appeals would not delay payment of the settlements funds to the abuse survivors.

### 6.  The Diocese Admits that the Plan is Intended to Reflect the Terms of the Agreement.  The Diocese's proposed 2nd Amended Plan itself admits and states that the "Plan

contemplates, first and foremost, the consummation of a global settlement of clerical sexual

abuse Claims against the Debtor and the Non-Debtor Catholic Entities *memorialized in a certain*

*Settlement Term Sheet dated February 2, 2011*, by and among the Debtor and State Court

Counsel. (D.I. 1321 at 1) (emphasis added).  Accordingly, in addition to its attorney's own public

statements, the President and sole member of the Diocesan corporation - Bishop Malooly -

admits the same.  (See id. at 50 - signature of Bishop Malooly on the Plan submission stating

this).

       **7.  The Diocese's Inexplicable Flip-Flop.**  Despite all of the above, when one

delves into the legal minutiae of the Plan, it is revealed that the Diocese has flip-flopped and

surreptitiously attempted to sneak in a provision that would bar the payment of the settlement

funds to the survivors until after any and all potential appeals are resolved by the appellate

courts.  Thus, in direct violation of the plain terms of the Settlement Term Sheet and the intent

and understanding of all state court counsel, the Diocese's own lead attorney's public statements

and the Bishop's own legal submissions to the Court, the Diocese now seeks to indefinitely delay

payment of the funds until after all appeals to the District Court, the Third Circuit and the

Supreme Court are resolved.  This will take years and in the interim, more of the abuse survivors

will die, many will continue to suffer and all will be unable to try to start the long, hard road

towards healing, forgiveness and finding peace.

       Simply put, as detailed above, such a material change is a material breach of the key

provision of the Settlement Term Sheet.  Even the Diocese admits that the Settlement Term

Sheet is the cornerstone of this Plan.  As set forth in the declarations of state court counsel above,

without the immediate funding of the Plan, no settlement would have been reached.  The Abuse

Survivors accordingly object to this provision of the Plan and respectfully request that the Court

strike this materially altered term and revise it to reflect the hard fought and duly negotiated term set forth in the term sheet - that the funds will be transferred to the survivors for distribution within 60 days of Plan confirmation.

   **B. Objection 2 - Payment of Professionals.**  There are several professionals necessary to effect the terms of the settlement agreement between the abuse survivors and the Diocese.  The Plan appears to indicate that the Trustee and Claims Reviewer are to be paid from the Settlement Trust.  That such an expense was to be borne by the Settlement Trust and the abuse survivors was never mutually agreed and instead violates the agreement.

   The plain terms of the Settlement Term Sheet state that the settlement funds were being paid "to compensate clerical sexual abuse survivor-claimants." (Tab A at ¶ 1).  Again, at the risk of repetition, this language was carefully chosen by the parties.  Simply put, monies paid to professionals are not being used "to compensate clerical sexual abuse survivor-claimants."  (Id.).  All professional fees and expenses from day one of this bankruptcy up until the date of the settlement agreement of February 2, 2011 (and until the present time as well) have been borne by the Diocese.  This has been the practice in this case and that was the clear intent of the parties as expressed by the clear and unambiguous language of the Settlement Term Sheet.  Given that the Diocese itself admits that the Settlement Term Sheet is the foundation of the Plan, when an issue is specifically addressed in the Term Sheet, it should control contrary language in the Plan.[9]

   Had the Diocese claimed on February 2, 2011, that such professional expenses were to be borne by the abuse survivors, the case would not have settled for the amount selected.  Instead, a greater monetary cushion would have had to have been built in to ensure that $77,425,000 was

---

   [9]  By no means do the Abuse Survivors suggest that every specific provision of the Plan was intended to be covered by the Term Sheet.  However, certain specific provisions were addressed and it is the variation of those provisions to which the Abuse Survivors object.

actually available "to compensate clerical sexual abuse survivor-claimants."  Monies paid to

professionals - be it the Claims Reviewer, the Trustee, any bankruptcy counsel for the Trustee

and all other contemplated professionals - will significantly erode the funds available "to

compensate clerical sexual abuse survivor-claimants."  Review of the monthly fee applications

filed in this case reinforce this obvious point.

Accordingly, the Abuse Survivors object and urge that the Plan be modified to reflect that

the $77,425,000 in settlement funds be used "to compensate clerical sexual abuse survivor-

claimants" as specifically contemplated by the Settlement Term Sheet and that the Diocese be

required to pay for the professional fees and expenses in the future as has been the unaltered

practice throughout the course of this proceeding.

**C.  Objection 3 - Indemnification Provision.**  The Abuse Survivors understand that

negotiations are ongoing to add to the definition of "Exculpated Party" all state court counsel,

with the exception of The Neuberger Firm and Jacobs & Crumplar, unless undersigned counsel

withdraw certain specific pleadings publicly filed on the bankruptcy docket at earlier stages of

this proceeding.  In other words, the Diocese is explicitly conditioning exculpation protection

upon the withdrawal of pleadings filed on behalf of the Abuse Survivors in this case.  The Abuse

Survivors object because such condition violates the First Amendment.[10]

**1.  Such An Exclusion Violates the First Amendment.**  It is well established

that the federal government may not violate the First Amendment.  See, e.g. Citizens United v.

Federal Election Com'n, -- U.S. --, 130 S.Ct. 876 (2010).  Federal judges also may not violate the

First Amendment in the orders they render.  See, e.g. U.S. v. Scarfo, 263 F.3d 80 (3d Cir. 2001)

---

[10]  "In the First Amendment context, reviewing courts have a duty to engage in a searching, independent factual review of the full record."  U.S. v. Scarfo, 263 F.3d 80, 91 (3d Cir. 2001) (citing New York Times Co. v. Sullivan, 376 U.S. 254, 285 (1964)).

(reversing the ruling of a district court judge which violated the First Amendment rights of an

attorney); Conley v. Chaffinch, 2005 WL 2678954 (D.Del. Mar. 4, 2005) (refusing a defense

request for a remedy which violated the First Amendment rights of an attorney before the court).

Indeed it is hornbook law, long taught in every law school, that a private party's attempt to have

a court enforce an agreement which violates Constitutional protections must be denied.  See, e.g.

Shelley v. Kraemer, 334 U.S. 1, 14-23 (1948).  The Third Circuit has noted the "troubling

tendency" and "great potential for abuse" when private parties submit documents to a court for

signature when the provisions of those documents violate First Amendment and/or common law

protections.  Pansy v. Borough of Stroudsburg, 23 F.3d 772, 785 n.14 (3d Cir. 1994).  "[T]he

signature of a federal judge ... convert[s] a private agreement into an order of the court,

requir[ing] the court to use its contempt power to enforce the private agreement.... For this

reason, judges should review such agreements carefully and skeptically before signing them."  Id.

As explained below, the Diocese's efforts to include such a provision in the Plan violates the

First Amendment since the Court would be signing off on, enforcing and giving legal effect to a

provision which flatly violates the Unconstitutional Conditions Doctrine.

> ### a.  Retaliation for the Exercise of Constitutional Rights Violates the

**First Amendment.**  It has long been established that "[r]etaliation for the exercise of

constitutionally protected rights is itself a violation of rights secured by the Constitution." White

v. Napoleon, 897 F.2d 103, 111-12 (3d Cir. 1990).  Thus, "official retaliation for the exercise of

*any* constitutional right creates an actionable claim." Anderson v. Davila, 125 F.3d 148, 162 (3d

Cir. 1997). "The Supreme Court has explicitly held that an individual has a viable claim against

the government when he is able to prove that the government took action against him in

retaliation for his exercise of First Amendment rights." Id. at 160 (citing Mt. Healthy City Sch.

Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)).

   **b.  The Motivation For the Government Action is Key.**  "[A]n

otherwise legitimate and constitutional government act can become unconstitutional when an

individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment

speech."  Id. at 161.  As far as it relates to the First Amendment, "motives of government

officials are indeed relevant, if not dispositive, when an individual's exercise of speech precedes

government action affecting that individual."  Id.  "[G]overnment actions, which standing alone

do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial

part by a desire to punish an individual for exercise of a constitutional right." Allah v. Seiverling,

229 F.3d 220, 224-25 (3d Cir. 2000).   Motives are key and here the Diocese has stated that it is

denying exculpation protection because of counsel's exercise of their First Amendment rights

and those of their clients.  The Diocese's retaliatory motive is clear.

   **c.  The Unconstitutional Conditions Doctrine.**  For decades, the

Supreme Court has repeatedly and consistently emphasized the applicability of the

unconstitutional conditions doctrine in the First Amendment context.

> For at least a quarter-century, this Court has made clear that even
> though a person has no 'right' to a valuable governmental benefit
> and even though the government may deny him the benefit for any
> number of reasons, there are some reasons upon which the
> government may not rely.  *It may not deny a benefit to a person on
> a basis that infringes his constitutionally protected interests -
> especially, his interest in freedom of speech.*  For if the government
> could deny a benefit to a person because of his constitutionally
> protected speech or associations, his exercise of those freedoms
> would in effect be penalized and inhibited.  *This would allow the
> government to produce a result which it could not command
> directly.  Such interference with constitutional rights is
> impermissible.*

Perry v. Sinderman, 408 U.S. 593, 597 (1972) (internal citation and punctuation omitted)

(emphasis added); see, e.g. O'Hare Truck Service, Inc. v. City of Northlake, 518 U.S. 712, 717

(1996); Bd. of County Comm'rs, Wabaunsee County v. Umbehr, 518 U.S. 668, 674 (1996);

Rumsfeld v. Forum for Academic and Inst. Rights, Inc., 547 U.S. 47, 59 (2006); U.S. v.

American Library Ass'n, Inc., 539 U.S. 194, 210 (2003); Anderson, 125 F.3d at 161.  Here the

Diocese seeks the Court's imprimatur to deny counsel exculpation protection because of the

exercise of the First Amendment rights of both they and their clients.  But as the Supreme Court

stated 44 years ago, "It is too late in the day to doubt that the liberties of religion and expression

may not be infringed by the denial of or placing conditions upon a benefit or privilege."

Keyishian v. Bd. of Regents of Univ. of the State of N.Y., 385 U.S. 589, 606 (1967).

> **d.  The First Amendment Retaliation Test.**  First Amendment retaliation

claims are analyzed under a three part test.  A plaintiff must prove: (1) that he engaged in

constitutionally protected activity;[11] (2) that the government responded with retaliation against

them; and (3) that the protected activity caused the retaliation.[12]  Eichenlaub, 385 F.3d at 282;

Anderson, 123 F.3d at 161.

> **(1).  Counsel's Vigorous Advocacy on Behalf of His Clients is**

**Protected.**  The Neuberger Firm and Jacobs & Crumplar have actively and vigorously litigated

---

[11]  The public concern requirement of Connick v. Myers, 461 U.S. 138, 146 (1983), does not apply to speech outside of the public employee arena.  Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 282-84 (3d Cir. 2004). In other words, even private concern speech by non-public employee citizens is protected from retaliation by state actors.  Id.; see United Mine Workers of America, Dist. 12 v. Ill. State Bar Ass'n, 389 U.S. 217, 223 (1967) ("the First Amendment does not protect speech and assembly only to the extent it can be characterized as political.  'Great secular causes, with small ones, are guarded.  The grievances for redress of which the right of petition was insured, and with it the right of assembly, are not solely religious or political ones.  And the rights of free speech and a free press are not confined to any field of human interest.'").

[12]  The two part Mt. Healthy paradigm for proving causation applies to all types of First Amendment retaliation.  Anderson, 125 F.3d at 163.  Accordingly, following a determination that the speech is protected by the First Amendment, Mt. Healthy requires the plaintiff to demonstrate that his speech was a substantial or motivating factor in the adverse action.  The burden of proof then shifts to the defendants to prove that they would have made the same decision anyway, even in the absence of the protected activity.  Mt. Healthy, 429 U.S. at 287; Nicholas v. Pa. State Univ., 227 F.3d 133, 144 (3d Cir. 2000); Springer v. Henry, 435 F.3d 268, 275 (3d Cir. 2006).

11

on behalf of their clients in this bankruptcy proceeding.  The Supreme Court has long held that "the First Amendment ... protects vigorous advocacy, certainly of lawful ends, against governmental intrusion." NAACP v. Button, 371 U.S. 415, 429 (1963) (citing Thomas v. Collins, 323 U.S. 516, 537 (1945); Herndon v. Lowry, 301 U.S. 242 (1937)); see New York Times Co. v. Sullivan, 376 U.S. 254, 269 (1964).

**(a).  Litigation Has Long Been Recognized as a Means for Achieving Equality of Treatment for All.**  The Supreme Court has long recognized that "litigation is not a technique of resolving private differences; it is a means for achieving the lawful objectives of equality of treatment by all government, federal, state and local ... It is thus a form of political expression." Button, 371 U.S. at 429.  Often times, "litigation may well be the sole practicable avenue open to a minority to petition for redress of grievances." Id. at 430; accord id. at 431 (noting that for certain minority groups, "association for litigation may be the most effective form of political association."); Putnam v. Adams Communication Corp., 1987 WL 13262, *7 (D.Mass. June 15, 1987) ("Litigation is a form of speech.  In many cases, it is the only effective speech available to individuals.").

**(b).  The Attorney Retaliation Line of Cases.**

**(i).  The District of Delaware Precedent Directly On Point.**  In a thorough and analytical opinion analyzing each and every aspect of the decades of U.S. Supreme Court precedent discussed below, the District of Delaware has specifically held that an attorney who vigorously represents his clients in litigation is entitled to First Amendment protection against retaliation for doing so.  Neuberger v. Gordon, 567 F.Supp.2d 622, 634-36 (D.Del. 2008).  This decision should be the end of the matter of attempting to condition a valuable government benefit - exculpation protection - upon the silencing of the expression of

vigorous advocacy which the Diocese finds unpleasant.  As noted above, this retaliatory, unconstitutional condition plainly fails First Amendment muster.

                                    **(ii).  Other Federal Precedent.**  Even if this District of Delaware precedent is ignored, the majority of Courts to address the issue have held that attorneys may bring First Amendment actions arising from retaliation against them for their vigorous advocacy.  In Freeman and Bass, P.A. v. State of N.J. Commm'n of Investigation, 359 F.Supp. 1053 (D.N.J. 1973), two plaintiff's attorneys and their law firm brought a First Amendment action, alleging retaliation against them by the State of New Jersey because of their "long history of vigorous representation of poor and minority working class clients and their professional involvement in controversial causes."  Id. at 1055.  Judge Garth explained that such retaliatory actions taken "to harass and intimidate [them] for their advocacy of unpopular causes ... constitute[s] a violation of [their] First Amendment rights."  Id. at 1055-59; see Anderson, 125 F.3d at 160-64 (actionable First Amendment claim for government retaliation against a client and her attorney for filing a lawsuit challenging illegal police activity).  Thus, this local federal district court in our Circuit and a subsequent Third Circuit judge have recognized that such action violates the First Amendment.

       Similarly, in Taylor v. Ky. State Bar Assoc., 424 F.2d 478 (6th Cir. 1970), the Sixth Circuit addressed a case involving an attorney plaintiff who had "made a career in the defense of unpopular causes and controversial clients, among them, civil liberties organizations, civil rights activists, the poor and the disadvantaged."  Id. at 480.  That attorney plaintiff brought a retaliation action alleging that state disciplinary

> proceedings were instituted in bad faith, with no real hope of
> ultimate success; that said proceedings are calculated to deter,
> intimidate, harass, and punish [him] for his association with and

> representation of persons and organizations advocating
> controversial ideas, and to prevent [him] and deter other Kentucky
> lawyers from representing, in futuro, controversial clients and
> advocating their ideas.

Id.  The Sixth Circuit found that the plaintiff attorney's claim that the disciplinary proceedings

had been brought against him "as an instrument for the suppression of First Amendment

activities, to-wit: the advocacy of unpopular ideas," id. at 481, "stated a claim for which relief

may be granted." Id. at 482.

In the same way, as the Fifth Circuit explained in a retaliation case brought by an attorney

challenging government harassment in retaliation for his representation of certain clients -

> [s]ubjecting an attorney to criminal investigation and prosecution
> with the substantial motivation of dissuading him from associating
> with and representing clients opposing the IRS would violate the
> First Amendment.

Izen v. Catalina, 398 F.3d 363, 367 (5th Cir. 2005); Izen v. Catalina, 382 F.3d 566, 571 (5th Cir.

2004).[13]  Thus, yet another U.S. Court of Appeals has twice recognized that such retaliation is

actionable.  Accordingly, it is clear that The Neuberger Firm and Jacobs & Crumplar's vigorous

advocacy in this bankruptcy on behalf of their gravely injured clients receives First Amendment

protection.[14]

---

[13]  These holdings are not surprising given that, "[a]ny form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." Smith v. Plati, 258 F.3d 1167, 1176 (10th Cir. 2001) (quoting Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000)).  In the Supreme Court's words, it is clear that "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." Hartman v. Moore, 547 U.S. 250, 256 (2006).

[14]  Of course, protection from government retaliation for pursuing the vindication of civil rights and helping others seek legal redress has never been limited to attorneys alone.  See Owens v. Rush, 654 F.2d 1370, 1379 (10th Cir. 1981) (public employee who assisted his wife in vindicating her civil rights and seeking legal redress and was subsequently retaliated against protected by the First Amendment in light of Button, supra.); Rizzo v. Dawson, 778 F.2d 527, 531-32 (9th Cir. 1985) (prisoner who was retaliated against for assisting fellow prisoners in vindicating their legal rights and pursuing legal remedies stated an actionable First Amendment claim under Button); McCormick v. City of Lawrence, Kansas, 253 F.Supp.2d 1156, 1169-70 (D.Kan. 2003) (noting that "First Amendment associational protection is afforded to activities involving the assistance of litigation aimed at

**(c).  The Citizenry's Right to Access the Independent Legal Bar Willing to Challenge the Powers that Be.**  Citing historical examples of those who fought the system to aid their fellow citizens (Veasey, C.J., 12/15/03 Speech - Tab F at 6-9), the Delaware Supreme Court regularly implores newly minted Delaware attorneys to display the qualities of "independence and courage" (id. at 2), to not "march slavishly to the client's drumbeat to fulfill the client's every wish on tactics" out of "desperat[ion] to keep a real live, paying client happy" (id. at 10) and lose one's "integrity and ethical principles" in the process. (Id. at 5).  "[T]he function of the independent lawyer as a guardian of our freedom ... [and] the citizen's right to consult an independent lawyer and to retain that lawyer to speak on his or her behalf is an aspect of liberty that is priceless." Walters v. Nat'l Ass'n of Radiation Survivors, 473 U.S. 305, 371 (1985) (Stevens J., dissenting) (quoted by Veasey, C.J. - Tab A at 4).  "[T]he citizen's right of access to the independent, private bar is itself an aspect of liberty that is of critical importance in our democracy."  Id.  Representation by "independent and courageous" attorneys who are not afraid to confront the powers that be such as the Diocese, gives tangible meaning to the liberty interest of private citizens who have dared to challenge the decades long cover-up and sexual abuse perpetrated by the Diocese on the most vulnerable sheep in its flock.

**(i).  The Collective First Amendment Right to Counsel**.  As the District of Delaware has recognized, Neuberger, 567 F.Supp.2d at 634-35, it is for this reason that the Supreme Court has long protected the ability of citizens to band together and exercise their inviolate First Amendment associative and petition clause right to be represented by counsel of their choosing for the advocacy of their cause.  See Button, 371 U.S. at

---

vindicating civil rights."); King v. Knoll, 399 F.Supp.2d 1169, 1182 (D.Kan. 2005) (same).  Instead, such protection is well-recognized in the case law.

429-30; Brotherhood of R.R. Trainmen v. Va. Bar, 377 U.S. 1, 8 (1964); United Mine Workers

v. Ill. State Bar Ass'n, 389 U.S. 217, 223 (1967); United Transp. Union v. State Bar of Mich.,

401 U.S. 576, 585 (1971); In re Primus, 436 U.S. 412, 424-32 (1978).   These cases established

the now long settled legal precept that "collective activity undertaken to obtain meaningful

access to the courts is a fundamental right within the protection of the First Amendment."  Bates

v. State Bar of Ariz., 433 U.S. 350, 376 n.32 (1977); accord In re Primus, 436 U.S. at 426;

United Transp. Union, 401 U.S. at 585.  In these cases, the Supreme Court "speaks ... of an

inviolate First Amendment right to be represented by counsel[.]"   Freeman and Bass, 359

F.Supp. at 1056.  Underlying these opinions "was the Court's concern that the aggrieved receive

information regarding their legal rights and the means of effectuating them." Bates, 433 U.S. at

376 n.32.

      **(ii).  The Individual First Amendment Right to**

**Counsel**.  Importantly, as the District of Delaware also has recognized, Neuberger, 567

F.Supp.2d at 635, this right is not limited to groups alone.  Instead the Supreme Court has held

that "[t]his concern applies with at least as much force to aggrieved individuals as it does to

groups."  Id.; accord Denius v. Dunlap, 209 F.3d 944, 954 (7th Cir. 2000) ("the First Amendment

protects the right of an individual or group to consult with an attorney on any legal matter");

Freeman and Bass, 359 F.Supp. at 1057 ("the existence of the associational *group* right

necessarily implies a like right for individuals.") (emphasis in original); Stillman v. Dept. of Def.,

209 F.Supp.2d 185, 215 (D.D.C. 2002) ("an individual's ability to consult with counsel on legal

matters is constitutionally grounded.") (overruled on other grounds by Stillman v. C.I.A., 319

F.3d 546 (D.C.Cir. 2003)).

   Thus, in addition to political parties, unions and advocacy organizations, individual

16

citizens also have an indisputable First Amendment right to consult with and retain legal counsel

for the vigorous advocacy of their cause.  "The right to hire and consult an attorney is protected

by the First Amendment's guarantee of freedom of speech, association and petition."  <u>Denius</u>,

209 F.3d at 953; <u>accord</u> <u>Mothershed v. Justices of the Supreme Court</u>, 410 F.3d 602, 611 (9th Cir.

2005).  Similarly, in the Tenth Circuit's words, "[t]he right to retain and consult with an attorney

... implicates ... clearly established First Amendment rights of association and free speech."

<u>DeLoach v. Bevers</u>, 922 F.2d 618, 620 (10th Cir. 1990); <u>accord</u> <u>Poole v. County of Otero</u>, 271

F.3d 955, 961 (10th Cir. 2001).  As the D.C. Circuit has observed, individuals "have an

undeniable right to retain counsel to ascertain their legal rights."  <u>Martin v. Lauer</u>, 686 F.2d 24,

32 (D.C.Cir. 1982); <u>American Airways Charters, Inc. v. Regan</u>, 746 F.2d 865, 873 (D.C.Cir.

1984); <u>see</u> <u>Doe v. District of Columbia</u>, 697 F.2d 1115, 1119 (D.C.Cir. 1983) ("every litigant has

a powerful interest in being able to retain and consult freely with an attorney").[15]

**(iii).  The Diocese's Efforts Have Chilled The**

**First Amendment Rights of Counsel's Clients**.  Accordingly, it is clear that government action

cannot directly prevent individual citizens or groups of citizens from consulting with legal

counsel of their choosing for the vigorous advocacy of their cause.  It is equally clear that the

unconstitutional conditions doctrine prohibits the government from indirectly taking action

which infringes upon these same First Amendment rights when such an action could not be taken

directly.  <u>See, e.g.</u> <u>Perry</u>, 408 U.S. at 597; <u>Neuberger</u>, 567 F.Supp.2d at 635.

By retaliating against the Abuse Survivors' attorneys for exercising their First

---

[15]  Other courts, including our District, have held the same.  <u>See</u> <u>Price v. Chaffinch</u>, C.A.No. 04-956 (D.Del. May 15, 2006) (slip op. at 7 n.4) (attached); <u>Cipriani v. Lycoming County Hous. Auth.</u>, 177 F.Supp.2d 303, 323-24 (M.D.Pa. 2001); <u>Stillman</u>, 209 F.Supp.2d at 214-16; <u>Jones v. Sheahan</u>, 2002 WL 959814, *3 (N.D.Ill. May 9, 2002); <u>First Defense Legal Aid v. City of Chicago</u>, 209 F.Supp.2d 935, 940 (N.D.Ill. 2002); <u>In re TI.B.</u>, 762 A.2d 20, 28 (D.C.App. 2000).

Amendment rights, the Diocese chills those same cherished rights and seeks to prevent both the Abuse Survivors and others from exercising them by driving away some of the few attorneys in this state willing to challenge the rich and powerful in our society.

**(iv).  The Diocese's Actions Also Have Chilled Counsel's First Amendment Rights**.  In addition to the many courts cited above, all of which have recognized an attorney's First Amendment right to be free of retaliation for their vigorous advocacy on behalf of the downtrodden, the Supreme Court itself has recognized the same right. As part of its holdings protecting the rights of unions and their members to consult with attorneys and obtain legal advice in the face of the efforts of various states and others to stifle the same, see, e.g. Brotherhood, 377 U.S. at 8, the Supreme Court held that

> of course, lawyers accepting employment under this
> constitutionally protected plan have a like protection which the
> State cannot abridge.

Id.; accord In re Primus, 436 U.S. at 426; see Taylor, 424 F.2d at 482; Izen, 398 F.3d at 367; Izen, 382 F.3d at 571; Anderson, 125 F.3d at 160-64; Freeman and Bass, 359 F.Supp. at 1056. Thus, it is clear that counsel has a First Amendment right to be free of retaliation for taking on causes and vigorously advocating them.  Accordingly, it is clear that the Diocese's efforts to condition exculpation upon ceasing to vigorously advocate, and smite such vigorous advocacy from the court docket, violates counsels' First Amendment rights.

**(2).  The First Amendment Adverse Action Standard.**  In the First Amendment context, "the constitutional violation is not in the harshness of the sanction applied, but in the imposition of *any* disciplinary action for the exercise of permissible free speech." Bennis v. Gable, 823 F.2d 723, 731 (3d Cir. 1987) (emphasis added).  The breadth of its protection is demonstrated by the Supreme Court, Third Circuit and District of Delaware's

repeated recognition that it protects persons "from even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights." Suppan v. Dadonna, 203 F.3d 228, 234 (3d Cir. 2000) (quoting Rutan v. Republican Party, 497 U.S. 62, 76 n.8 (1990)) (internal punctuation omitted); accord O'Connor v. City of Newark, 440 F.3d 125, 128 (3d Cir. 2006); Price v. Chaffinch, 2006 WL 131378, *3 (D.Del. May 12, 2006). "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." Suppan, 203 F.3d at 235 (quoting Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982)).

### (a). The Person of Ordinary Firmness Standard.

Accordingly, adverse action is found if "retaliatory conduct [is] *sufficient to deter a person of ordinary firmness* from exercising his First Amendment rights." Suppan, 203 F.3d at 235 (citing Bart, 677 F.2d at 625) (internal punctuation omitted) (emphasis added); accord O'Connor, 440 F.3d at 128; Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000); see Lapinski v. Bd. of Educ. of the Brandywine Sch. Dist., 2006 WL 167443, *2 (3d Cir. Jan. 24, 2006) (reversing the district court for failing to apply the person of ordinary firmness standard in a First Amendment retaliation case).[16] Put another way, the retaliatory actions must be sufficient to "cause reasonably hardy individuals" to refrain from protected activity. Agosto-de-Feliciano, 889 F.2d at 1217.[17]

---

[16] Numerous other courts have adopted this standard. See, e.g. Bennett v. Hendrix, 423 F.3d 1247, 1254-55 (11th Cir. 2005); Washington v. County of Rockland, 373 F.3d 310, 320 (2d Cir. 2004); Keenan v. Tejeda, 290 F.3d 252, 258 (5th Cir. 2002); Carroll v. Pfeffer, 262 F.3d 847, 850 (8th Cir. 2001); Smith v. Plati, 258 F.3d 1167, 1176 (10th Cir. 2001); Bloch v. Ribar, 156 F.3d 673, 678 (6th Cir. 1998); Agosto-de-Feliciano v. Aponte-Rogue, 889 F.2d 1209, 1217 (1st Cir. 1989) (en banc); Bart, 677 F.2d at 625.

[17] The person of ordinary firmness standard is an easier standard to meet than the statutorily based adverse employment action test under Title VII. See Rivera-Jimenez v. Pierluisi, 362 F.3d 87, 94 (1st Cir. 2004) ("the

This is an objective test, not a subjective one.  <u>Garcia v. City of Trenton</u>, 348 F.3d 726, 729 (8th Cir. 2003).  Because this is an objective standard, an attorney need not demonstrate that he actually was deprived of his First Amendment rights.  <u>Constantine v. Rectors and Visitors of George Mason Univ.</u>, 411 F.3d 474, 500 (4th Cir. 2005).  Importantly, "[s]peech can be chilled, even when not completely silenced." <u>Rhodes v. Robinson</u>, 408 F.3d 559, 568 (9th Cir. 2005); <u>see</u> <u>Constantine</u>, 411 F.3d at 500 ("The cause of action targets conduct that tends to *chill* such activity, not just conduct that *freezes* it completely").  This is because "[t]here is no reason to 'reward' government officials for picking on unusually hardy speakers." <u>Bennett</u>, 423 F.3d at 1252.

As the Third Circuit has explained, a "First Amendment retaliation claim will lie for any individual act which meets this 'deterrence threshold,' *and that threshold is very low*." <u>O'Connor</u>, 440 F.3d at 127-28 (emphasis added); <u>accord</u> <u>Price</u>, 2006 WL 131378, *3.  "First Amendment retaliation claims are always individually actionable, *even when relatively minor*." <u>O'Connor</u>, 440 F.3d at 127-28 (emphasis added).  As the Supreme Court, Third Circuit and District of Delaware have repeatedly noted, the person of ordinary firmness standard may be satisfied even for acts of "retaliation as trivial as failing to hold a birthday party for a public employee if intended to punish her for exercising her free speech rights." <u>Id.</u> (internal punctuation omitted); <u>accord</u> <u>Rutan</u>, 497 U.S. at 76 n.8; <u>Suppan</u>, 203 F.3d at 234-35; <u>Price</u>, 2006 WL 131378, *3.  As our District has explained, this is "an extremely low hurdle to overcome."

standard for showing an adverse employment action is lower in the First Amendment retaliation context than it is in other contexts (such as Title VII)."); <u>Baca v. Sklar</u>, 398 F.3d 1210, 1220 (10th Cir. 2005) ("we have repeatedly concluded that a public employer can violate an employee's First Amendment rights by subjecting an employee to repercussions that would not be actionable under Title VII."); <u>Power v. Summers</u>, 226 F.3d 815, 820-21 (7th Cir. 2000) (noting that the explicit Title VII statutory language upon which Title VII adverse action law is based is not present in 42 U.S.C. § 1983); <u>Banks v. East Baton Rouge Parish Sch. Bd.</u>, 320 F.3d 570, 580 (5th Cir. 2003) (recognizing that "§ 1983's definition of adverse employment action may be broader than Title VII's definition").

Price, 2006 WL 131378, *2.

> **(b).  This Standard is Easily Met.**  The adverse action at issue in this case involves giving exculpation protection from lawsuit and other liability to all individuals involved, including other state court counsel, but refusing to grant it to undersigned counsel in retaliation for their First Amendment protected vigorous advocacy on behalf of their clients.

First, the law makes clear that this "very low" threshold standard, O'Connor, 440 F.3d at 127-28, is satisfied by even "relatively minor" retaliatory actions against a citizen.  Id.  For example, the issuance of $35 parking tickets to a citizen would chill a person of ordinary firmness from exercising their free speech rights, Garcia v. City of Trenton, 348 F.3d 726, 729 (8th Cir. 2003), as would a "campaign of petty harassments."  Bart, 67 F.2d at 624-25.   Similarly, as the numerous attorney retaliation cases cited above make clear, withholding a valuable government benefit - here court ordered exculpation - to discourage an attorney from vigorously representing his client while at the same time giving that benefit to others - clearly satisfies these First Amendment requirements.

Second, as discussed above, by taking these actions against counsel, the Diocese has chilled the First Amendment rights of both counsel and their clients.  As then Judge, now Justice Alito explained, "[t]he loss of First Amendment freedoms ... unquestionably constitutes irreparable injury," Swartzwelder v. McNeilly, 297 F.3d 228, 241 (3d Cir. 2002), and such irreparable injury constitutes adverse action.

Third, undersigned counsel would reasonably be less likely to vigorously advocate on their behalf of their clients if they knew that such vigorous advocacy would cause them to be excluded from exculpation protection granted to all others.  A reasonable attorney or law firm

under the circumstances would be less likely to take on such a case requiring such vigorous advocacy.  This then deleteriously and seriously impinges upon the First Amendment right to counsel held by individual abuse survivors and others.  Such inability to exercise one's First Amendment rights is a serious concern and sufficiently constitutes adverse action.  In the words of the District of Delaware, "this protection must also be extended to the individual's attorney or that individual's right to retain and consult an attorney will be curtailed."  <u>Neuberger</u>, 567 F.Supp.2d at 635.

                        **(3).  Causation.**  Here it is undisputed that the Diocese seeks to deny exculpatory protection because of the First Amendment protected expression of counsel.  For these reasons, the Abuse Survivors object to the exculpation provision.

                    **2.  The State Court Counsel Agreement.**  Putting to the side the First Amendment violation, there is another partial basis for objection to the exculpation provision.  There presently is a signed agreement amongst all state court counsel, which specifically contemplates and consents to a lawsuit in the Court of Chancery against any of them in the event of a violation.  This agreement formed the cornerstone of the unified front presented by the abuse survivors to the Diocese throughout the last several months and resolved certain key issues and disputes that directly led to the settlement reached on February 2, 2011.  Given that the agreement specifically contemplates and consented to a lawsuit in the event of a breach, the Abuse Survivors request that the enforcement of such agreement be specifically carved out as an exception to any such exculpation provision.

## <u>CONCLUSION</u>

        For the reasons set forth above, the Abuse Survivors object to the Diocese's Second Amended Plan.

22

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
2 East 7th Street, Suite 302
Wilmington, DE  19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated:  June 30, 2011

**JACOBS & CRUMPLAR, P.A.**

/s/ Robert Jacobs
**ROBERT JACOBS, ESQ. (#244)**
**THOMAS C. CRUMPLAR, ESQ.(#942)**
2 East 7th Street, Suite 400
Wilmington, DE 19801
(302) 656-5445
Bob@JCDELaw.com
Tom@JCDELaw.com

Attorneys for the Unofficial Committee of
State Court Abuse Survivors Affected by the
Diocese's Proposed Plan