# EXHIBIT 4

**Insurance Buy-Back Agreements**

a.  **Fire State Insurance Company, Nutmeg Insurance Company, and Twin City Insurance Company**

<u>SETTLEMENT AGREEMENT</u>

This Settlement Agreement ("Agreement") is made as of the Execution Date by First State Insurance Company, Nutmeg Insurance Company and Twin City Insurance Company and the Catholic Diocese of Wilmington, Delaware.

<u>RECITALS</u>

WHEREAS, the Hartford Insurers issued or allegedly issued the Policies, which are excess liability insurance policies, to the Diocese; and

WHEREAS, the Diocese is the subject of pending sexual molestation Claims; and

WHEREAS, in response to pending sexual molestation Claims the Diocese commenced the Bankruptcy Case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and

WHEREAS, the Diocese has resolved the sexual molestation Claims through a settlement with the claimants that will be incorporated into the Diocese's Plan of Reorganization in the Bankruptcy Case; and

WHEREAS, the Parties disagree about the extent, if any, to which the Policies afford coverage for sexual molestation Claims against the Diocese; and

WHEREAS, the Parties wish to resolve all Claims that have arisen or could in the future arise relating to the Policies by agreeing, in connection with its Plan of Reorganization, to a sale of the Policies by the Diocese to the Hartford Insurers free and clear of all Interests under Sections 363(f) and 1123(b)(4) of the Bankruptcy Code; and

WHEREAS, through this Agreement, the Parties seek to provide Hartford with the broadest possible release with respect to the Policies and to provide that Hartford shall

have no further obligations to any Person for any and all Claims that have been or could have been or could in the future be asserted against Hartford relating to the Policies.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and intending to be legally bound, the Parties agree as follows:

I.    DEFINITIONS

As used in this Agreement, including the Recitals, the following terms have meanings set forth below.

1.    "Approval Date" means the date on which the Confirmation Order becomes a Final Order.

2.    "Bankruptcy Case" means the case styled *In re Catholic Diocese of Wilmington,* Case No. 09 BK 13560 pending in the Bankruptcy Court.

3.    "Bankruptcy Code" means Title 11 in the applicable provisions of Titles 18 and 28 of the United States Code, as amended from time to time.

4.    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or such other court as may have jurisdiction over the Bankruptcy Case.

5.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

6.    "Claims" means any and all past, present, or future, known or unknown, foreseen or unforeseen, direct or indirect, fixed or contingent, matured or unmatured, liquidated or unliquidated, claims, proofs of claim, causes of actions, cross-claims, liabilities, rights, demands (including letter demands, notices, or inquires from any person or government agency), penalties, assessments, damages, requests, suits, lawsuits, costs

2

(including attorneys' fees and expenses), interest of any kind, actions, administrative

proceedings, criminal proceedings, or orders, of whatever nature, character, type, or

description, whenever and however occurring, whether at law or in equity, and whether

sounding in tort or contract, or any statutory, regulatory or common law claim or remedy

of any type including, without limitation, (a) any claim seeking any type of relief,

including compensatory, consequential, exemplary or punitive damages, rescission, or

declaratory or injunctive relief; (b) any claim for billing or premium adjustments; or (c)

any claim on account of alleged bad faith, failure to act in good faith, violation of any

duty of good faith and fair dealing, violation of any unfair claims practices act or similar

statute, regulation or code, any type of alleged misconduct; or any other act or omission

of an insurer of any type for which a claimant might seek relief.

7.    "Confirmation Order" means an order entered in the Bankruptcy Case, the

form of which shall be subject to Hartford's approval (which approval may not be

unreasonably withheld), which Order shall, in connection with confirming the Diocese'

Plan of Reorganization, (i) approve this Agreement, (ii) authorize the Parties to undertake

the settlement and the transactions contemplated by this Agreement, (iii) authorize the

sale of the Policies to the Hartford Insurers free and clear of any and all Interests,

pursuant to 11 U.S.C. § 363(b), (f), (iv) provide that the Hartford Insurers are good faith

purchasers of the Policies and, as such, are entitled to all protections provided to a good

faith purchaser under Bankruptcy Code Section 363(m); and (v) provide for the

Injunction.

8.     "Diocese" means the Catholic Diocese of Wilmington, Delaware, debtor and debtor in possession, and to the extent that the Diocese has the right, power or authority to bind them, (1) all priests who are, or who ever have been, incardinated, or otherwise associated with or claiming to be associated with, assigned to or under the control and/or supervision of the Diocese; (2) all persons or entities claiming any right, title or interest in or under the Policies, including without limitation any and all named insureds under the Policies, additional insureds under the Policies, and insureds added by endorsement to the Policies; (3) all affiliated persons of the Diocese (but only in their capacities as such), including without limitation all past, present and future directors, trustees, officers, officials, employees, agents, representatives, attorneys, consultants, advisors, contributors, volunteers, predecessors, successors, and assigns; and (4) all past, present and future divisions, subsidiaries, foundations, and funds of the Diocese, including without limitation all parishes, churches, education and welfare corporations, schools, corporations, companies, organizations and/or entities under its jurisdiction or control, and all of their respective affiliated persons (but only in their capacities as such), including without limitation all past, present and future directors, trustees, officers, officials, employees, agents, representatives, attorneys, consultants, advisors, contributors, volunteers, predecessors, successors, and assigns.

9.     "Estate" means the bankruptcy estate created under Section 541 of the Bankruptcy Code for the Diocese as a result of the filing of the Bankruptcy Case.

10.     "Execution Date" means the first day upon which all Parties have executed this Agreement.

4

11.    "Final Order" means an order or judgment (including any modification or amendment thereof) that remains in effect and has not been reversed, vacated or stayed, and as to which the time to appeal or seek review, rehearing or writ of certiorari has expired and as to which no appeal or petition for review, reconsideration, rehearing or certiorari has been taken or, if taken, has been resolved and no longer remains pending.

12.    "Hartford" means the companies comprising The Hartford Financial Services Group Inc., individually and collectively, including First State Insurance Company, Nutmeg Insurance Company, Twin City Insurance Company, and (acting in their capacities as such) each of their respective past, present, and future directors, officers, shareholders, employees, agents, partners, representatives, attorneys, parent and affiliated corporations, subsidiaries, divisions, joint ventures, predecessors, successors, beneficiaries, and assigns.

13.    "Hartford Insurers" means First State Insurance Company, Nutmeg Insurance Company, and Twin City Insurance Company.

14.    "Injunction" means a permanent injunction pursuant to Sections 105(a) and 363 of the Bankruptcy Code to be included in the Plan of Reorganization and to become effective upon the Approval Date permanently enjoining the prosecution, continuation or commencement of any Interest (not otherwise released under the Agreement) that any Person holds or asserts or may in the future hold or assert against Hartford, arising out of, in connection with and/or in any way related to any of the Policies.

15.    "Interests" means all liens, Claims, encumbrances, interests and other rights of any nature, whether at law or in equity.

16.    "Other Insurer" means any Person that provided, or claims to have provided, any insurance coverage to the Diocese.

17.    "Parties" means the Diocese and Hartford Insurers.

18.    "Person" means and includes a natural person or persons, a group of natural persons acting as individuals, a group of natural individuals acting in collegial capacity (e.g., as a committee, board of directors, etc.), a corporation, partnership, limited liability company or limited partnership, a proprietorship, joint venture, trust, legal representative, or any other unincorporated association, business organization or enterprise, any government entity and any successor in interest, heir, executor, administrator, trustee, trustee in bankruptcy, or receiver of any person or entity.

19.    "Plan of Reorganization" means (i) the Settlement Plan set forth in the Second Amended Chapter 11 Plan of Reorganization of Catholic Diocese of Wilmington, Inc., dated May 23, 2011, Docket Number 1321, and all Exhibits thereto; and (ii) any alterations,  amendments and modifications to the Settlement Plan made after May 23, 2011, but only with the approval of the Hartford Insurers to the extent any such alterations, amendments or  modifications affect the rights of the Hartford Insurers under the Settlement Plan.

20.    "Policies" means (a) the insurance policies listed on Exhibit 1 attached hereto, and (b) any other known or unknown primary, umbrella, excess, or other liability insurance policies, contracts and or coverage's of any nature, type or kind, issued or allegedly issued by Hartford under which the Diocese claims to be an insured, named

6

insured, additional insured, additional named insured, or otherwise entitled to any insurance coverage or benefits.

21.     "Settlement Amount" means the sum of Two Hundred Fifty Thousand Dollars ($250,000.00) to be paid on behalf of the Hartford Insurers pursuant to Section 2.2 of this Agreement.

22.     As used in this Agreement, the singular and masculine gender shall mean also the plural and feminine or neuter, as may be appropriate, "it" shall include "he" and "she"; and "each" and "all" includes "each" and "every."

Unless the context of this Agreement otherwise requires, (1) words using the singular or plural number also include the plural or singular number, respectively; (2) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement: (3) the words "include, "includes" or "including" shall be deemed to be followed by the words "without limitation," and (4) the word "or" shall be disjunctive but not exclusive.

References to this Agreement and other documents shall be deemed to include all subsequent amendments and other modification thereto.

II.     <u>SALE OF POLICIES AND PAYMENT OF SETTLEMENT AMOUNTS</u>

2.1     Subject to all of the terms and conditions of this Agreement, in full and final settlement of all responsibilities under and arising out of the Policies, and in consideration of the conveyance of the Policies to the Hartford Insurers, the Hartford Insurers shall purchase from the Diocese, and the Diocese shall sell, convey, transfer and deliver to the Hartford Insurers, upon payment of the Settlement Amount, each of the

7

Policies, and any and all rights under the Policies, free and clean of any and all Interests of any and all Persons.  Upon payment of the Settlement Amount, and upon request of the Hartford Insurers, the Diocese shall execute and deliver to the Hartford Insurers a bill of sale, in form and substance acceptable to the Hartford Insurers, evidencing such sale of the Policies to the Hartford Insurers.

 2.2 Subject to all of the terms of this Agreement in full and final settlement of all responsibilities under and arising out of the Policies, and in consideration of the sale of the Policies to the Hartford Insurers free and clear of any and all Interests of any Person, First State Insurance Company shall pay to the Diocese the Settlement Amount within thirty (30) days after receiving written notice from the Diocese that all Conditions Precedent to the Effective Date of the Settlement Plan (as those terms are defined in the Settlement Plan) other than the funding of the Settlement Trust, as set forth in Section 15.1 of the Settlement Plan, have been met.  The Diocese covenants and agrees, and the Plan of Reorganization shall provide, that the proceeds of the Settlement Amount shall be used only for the purpose of paying liabilities of the Diocese related to sexual molestation Claims being resolved under the Plan of Reorganization.

 2.3 The Parties agree that (i) the Settlement Amount is the total amount Hartford  is obligated to pay on account of any and all Claims of any kind made under or related to the Policies; (ii) under no circumstance will Hartford ever be obligated to make any additional payments to the Diocese, or any other Person in connection with the Policies; (iii) all limits of liability of the Policies, including all per occurrence and aggregate limits, shall be deemed fully and property exhausted; (iv) the Settlement

Amount is the full purchase price of the Policies, and upon payment of the Settlement

Amount, the Hartford Insurers shall be deemed to own the Policies free and clear of any

and all Interests of any Person; (v) subject to the terms of this Agreement and the

occurrence of the Approval Date, Hartford shall have no further obligation to the

Diocese, or any other Person under the Policies for any Claim; and (vi) the Settlement

Amount is at least equal to the fair value of the Policies.

2.4    Effective immediately upon payment of the Settlement Amount, and

without any further action by any of the Parties, all of the Diocese's rights and the rights

of all other Persons under and with respect to the Policies shall be permanently and

irrevocably extinguished as if the Policies had never been issued.

III.    <u>BANKRUPTCY-RELATED OBLIGATIONS</u>

3.1    Within thirty (30) calendar days after the Execution Date, the Diocese shall,

pursuant to Bankruptcy Rule 3016, file a Plan of Reorganization providing for approval

of this Agreement and the Injunction, and shall use reasonable best efforts to obtain entry

of the Confirmation Order as a Final Order.  The Diocese covenants and agrees that it

will use his best efforts to obtain the Confirmation Order and that it will vigorously

defend any objection to the approval of this Agreement, or to confirmation of its Plan of

Reorganization, by any party.  The disclosure statement with respect to the Plan of

Reorganization shall contain a description of the Injunction that complies with Rule

3016(c).

3.2    If the Confirmation Order or any other orders of the Bankruptcy Court

relating to this Agreement shall be appealed by any Person (or a petition for certiorari or

motion for rehearing or reargument shall be filed with respect thereto), the Diocese agrees to take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion; provided however, that nothing herein shall preclude the Parties from consummating the transactions contemplated herein if the Confirmation Order shall have been entered and has not been stayed and the Hartford Insurers, in their sole discretion, waive in writing the requirement that the Confirmation Order be a Final Order; provided, however, that in the event the Plan of Reorganization does not become effective, then this Agreement shall be null and void.

3.3     Each of the Parties further agrees not to take any appeal from, or to seek to reopen, reargue or obtain reconsideration of, or otherwise contest or challenge in any way, directly or indirectly, any aspect of the Confirmation Order providing for approval of this Agreement, or any other order provided for by, or executed or entered pursuant to, or in implementation of, this Agreement, except to the extent that any such order shall be inconsistent with the terms hereof.

3.4     The Diocese agrees to cooperate with the Hartford Insurers and their representatives in connection with the Confirmation Order and the Bankruptcy Cases. Such cooperation shall include consulting with the Hartford Insurers at their request concerning the status of the Bankruptcy Cases, including the status of the Plan of Reorganization, and providing the Hartford Insurers with copies of requested pleadings, notices, proposed orders and other documents relating to the Bankruptcy Cases, the Motion and/or the service of the Motion as soon as reasonably practicable. The Diocese further covenants and agrees that the Diocese will not submit to the Bankruptcy Court for

approval any motion, adversary proceeding, filing or other request the approval of which

could conflict with, supersede, abrogate, nullify, modify or restrict the terms of the

Agreement and the rights of Hartford hereunder, or in any way prevent or interfere with

the consummation or performance of the transactions contemplated by this Agreement,

including any transaction that is contemplated by or approved pursuant to the

Confirmation Order, to the extent necessary to give effect to this Agreement.

3.5    In the event any Person asserts a Claim against Hartford after the Approval

Date, arising out of or related to any matter released by this Agreement, Hartford shall

notify the Diocese and the Diocese shall immediately seek an order from the Bankruptcy

Court enjoining such Claim.

3.6    On the same day the Diocese files its Plan of Reorganization, or as soon as

practicable thereafter, the Diocese shall serve a copy of the Plan of Reorganization on (i)

each Person known to the Diocese to have a Claim against it through participating in the

Bankruptcy Case, the filing of a lawsuit, or the filing of a proof of claim or other

assertion of a Claim, or otherwise (or to his, her, or its counsel of record); (ii) any and all

Persons known to the Diocese entitled or allegedly entitled to insurance coverage under

the Policies, including additional insureds (or Persons claiming to be additional insureds)

and those Persons falling within a policy definition of "named insured"; (iii) all other

Persons who or that have filed timely proofs of claim in the Bankruptcy Case; (iv) all

Persons on the master service list maintained in the Bankruptcy Case; (v) all liability

insurers from which the Diocese has sought coverage for any sexual molestation Claim;

and (vi) all other parties in interest pursuant to Bankruptcy Rules 2002 and 6004 and any

other applicable local rules, including any Person who or that filed a notice of appearance and demand for service of papers in the Bankruptcy Case. In addition, to ensure the broadest notice possible, the Diocese shall publish notice of the Plan of Reorganization and the hearings on confirmation thereof, in USA Today. As soon as reasonably practical after filing the Plan of Reorganization, the Diocese shall file in the Bankruptcy Case a certificate of the service provided by mail and by publication

3.7    Any Claim that Hartford may have that shall arise out of the Diocese's obligations under this Agreement, and that shall arise prior to the Plan of Reorganization becoming effective, shall be a post-petition administrative expense. Any Claim that Hartford may have that shall arise out of the Diocese's obligations under this Agreement, and that shall arise after the Plan of Reorganization becoming effective, shall be an obligation of the Reorganized Diocese.

IV.    RELEASE

4.1    Effective upon the Approval Date, and without any further action of the Parties:

(a)    The Diocese hereby fully, finally, and completely remises, releases, acquits and forever discharges Hartford from any and all Claims whether actual or alleged, known or unknown, accrued or unaccrued, existing or potential, suspected or unsuspected with respect to, relating to, or in any way arising out of the Policies. The release of Hartford under this Section 4.1 of the Agreement shall include, but shall not be limited to, any and all Claims for coverage with respect to, relating to, or in any way arising out of the Policies whether for property damage, bodily injury, personal injury,

advertising injury, or any other form of loss covered, or potentially covered, under the Policies.  In addition, the Diocese, hereby withdraws any and all requests, demands, or tenders for defense or indemnity previously submitted to Hartford under the Policies and further surrenders, relinquishes, and releases any further right to tender or present any Claims whatsoever to Hartford under the Policies.  Furthermore, by virtue of the foregoing releases, Hartford shall have no duty to defend or indemnify the Diocese with respect to any past, present, or future Claim, nor shall Hartford have any other duty or obligation whatsoever to any other Person with respect to any and all Claims arising out of, in connection with, and relating to the Policies.

(b)     Hartford hereby fully, finally, and completely remises, releases, acquits and forever discharges the Diocese from any and all Claims whether actual or alleged, known or unknown, accrued or unaccrued, existing or potential, suspected or unsuspected with respect to, relating to, or in  any way arising out of the Policies. Hartford also waives any and all rights of subrogation, indemnification, and/or contribution that it has, or may have, against any person as a result of or on account of its payment of the Settlement Amount, including without limitation any rights based on any "Other Insurance" clause in the Policies.

4.2    Releases Do Not Extend To Obligations Under The Agreement.  The releases set forth in Section 4.1 of this Agreement are not intended to, and shall not, extend to or otherwise release or discharge any rights, privileges, benefits, duties, or obligations of an of the Parties by reason of, or otherwise arising under, this Agreement.

4.3    Changes In Fact Or Law. The Parties acknowledge that there may be changes in the law with respect to interpretation of coverage under the Policies or otherwise and/or the Parties may hereafter discover facts different from, or in addition to, those which they now believe to be true with respect to any and all of the claims herein released. Nevertheless, the Parties hereby agree that the releases set forth above shall be and remain effective in all respects, notwithstanding any changes in the law and/or the discovery of such additional or different facts. Moreover, the Diocese understands that Claims that have been or may be asserted against the Diocese may increase or decrease in amount or in severity over time, that Claims that have been or may be asserted against the Diocese may include progressive, cumulative, unknown, and/or unforeseen elements, and that there may be hidden, unknown, and unknowable damages, defense expenses, or other costs related to such Claims. Nevertheless, the Parties irrevocably and knowingly agree that the releases contained in Section 4.1 of this Agreement include a full and complete and irrevocable release and discharge from all known and unknown rights or Claims or Interest arising out of, in connection with, and/or relating to the Policies.

4.4    General Release. In furtherance of their express intent to fully, finally, and irrevocably release and discharge each other for all Claims, known and unknown, as set forth in this Section 4 of the Agreement, each of the Parties expressly waives any and all rights it may have under any contract, statute, code, regulation, ordinance, or the common law, which may limit or restrict the effect of a general release as to Claims released herein, arising out of, in connection with, and/or relating to the Policies.

4.5     Reinsurance. The releases set forth in this Section 4 of the Agreement shall not apply to or have any effect on Hartford's right to any claim for reinsurance in connection with the Policies.

4.6     Beneficiaries Of Release. Subject to the other provisions of this Agreement, to the extent that the releases set forth in this Section 4 of the Agreement run to the favor of any Persons who are not signatories hereto, this Agreement is hereby declared to be made in and for their respective benefits and uses.

4.7     No Assignment Of Claims. The Diocese warrants and represents that it has not sold, assigned, transferred, conveyed, or otherwise disposed of any Claims that it has, or may ever have, against Hartford and the Hartford Insurers. Moreover, the Diocese represents, warrants, and agrees that it will not in any way assist any Person in the establishment of any Claim against Hartford that arises out of, results from, or in any way relates to, Hartford's investigation, handling, defense, or settlement by Hartford of Claims released under this Agreement.

V.     REPRESENTATIONS AND WARRANTIES OF THE PARTIES

Each of the Parties separately represents and warrants as follows:

a)     Subject to the entry of the Confirmation Order, it or he has the requisite power and authority to enter into this Agreement and to perform the obligations imposed on it by this Agreement;

b)     Subject to the Approval Date, the execution and delivery of, and the performance of the obligations contemplated by this Agreement have been approved by

15

duly authorized representatives of the Party, and by all other necessary actions of the Party;

   c) Each Party has expressly authorized its or his undersigned representative to execute this Agreement on the Party's behalf as its or his duly authorized agent;

   d) This Agreement has been thoroughly negotiated and analyzed by its or his counsel and has been executed and delivered in good faith, pursuant to arm's length negotiations, and for value and valuable consideration; and

   e) Each Party will use its best efforts to seek entry of the Approval Order.

## VI. JUDGMENT REDUCTION

  The Diocese hereby agrees that, with respect to any Claim, case, controversy, arbitration, lawsuit or other proceeding of any kind involving the Diocese:

   a) The Diocese will not seek to obtain payment from any Other Insurer of any amount that may be attributable or allocable to Hartford under the Policies; and

   b) Without limiting the effect of the Injunction and the releases (set forth in Section 4 of this Agreement), in the event that any Other Insurer obtains a judicial determination, settlement or binding arbitration award that it is entitled to obtain a sum certain from Hartford as a result of a Claim for contribution, subrogation, indemnification or other similar Claim against Hartford for Hartford's alleged share or equitable share, or to enforce subrogation rights, if any, of the defense and/or indemnity obligations of Hartford for any Claims released pursuant to this Agreement, the Diocese

shall voluntarily reduce its judgment or Claim against, or settlement with, such Other Insurer(s) to the extent necessary to eliminate such contribution, subrogation or indemnification Claims against Hartford.  To ensure that such a reduction is accomplished, Hartford shall be entitled to assert this Section 6 as a defense to any action for any such portion of the judgment, settlement, or binding arbitration award, and shall be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction and to protect Hartford from any liability for the judgment, settlement, or binding arbitration award or any portion thereof.

   c) Neither the Hartford nor the Hartford Insurers shall seek reimbursement for any payments they are obligated to make under this Agreement, whether by way of a Claim for contribution, subrogation, indemnification or otherwise from any Other Insurer or from anyone other than Hartford's reinsurers in their capacity as reinsurers of Hartford.  Notwithstanding and foregoing, if a third party pursues a contribution, subrogation or indemnification Claim against Hartford relating to any of the Policies, then Hartford shall be free to assert such a Claim against such third party notwithstanding any provision in this Agreement to the contrary.  The Diocese shall use its reasonable best efforts to obtain from all Other Insurers with which the Diocese executes a settlement after the Execution Date, agreements similar to those contained in this Section 6.c.

VII. <u>MISCELLANEOUS PROVISIONS</u>

  7.1 <u>Termination Rights.</u>  If the Bankruptcy Court declines to enter the Confirmation Order, or if the Confirmation Order is vacated, modified in a way that is

not acceptable to the Hartford Insurers, or reversed on appeal, the Hartford Insurers may terminate this Agreement by delivering written notice to the Diocese. In the event that the Hartford Insurers terminate this Agreement, (1) the Agreement shall be deemed null and void; (2) the Hartford Insurers shall not be obligated to pay the Settlement Amount pursuant to this Agreement; (3) Hartford and the Diocese shall have all of the rights, defenses and obligations under or with respect to any and all Policies that they would have had absent this Agreement; and (4) any and all otherwise applicable statutes of limitations or repose, or other time-related limitations, shall be deemed to have been tolled for the period from the Execution Date through the date that the Agreement becomes null and void pursuant to the terms of this Agreement.

7.2    _Amendments._  Neither this Agreement nor any term set forth herein may be changed, waived, discharged, or terminated except by a writing signed by the Parties (or their successors or assigns).

7.3    _No Precedential Value._  The settlement reflected in this Agreement shall be without precedential value, and it is not intended to be, nor shall it be construed as, an interpretation of any insurance policies.  It shall not be used as evidence, or in any other manner, in any court or other dispute resolution proceeding, to create, prove, or interpret the obligations of Hartford under any insurance policies issued to the Diocese or to any other Person, provided, however, that this Agreement may be used as evidence in any defense of Hartford of any obligation arising under the Policies.

7.4    _Agreement Voluntarily Entered Into By Each Of The Parties._  This Agreement is executed voluntarily by each of the Parties without any duress or undue

influence on the part, or on behalf, of any of them. The Parties represent and warrant to each other that they have read and fully understand each of the provisions of this Agreement and have relied on the advice and representations of competent legal counsel of their own choosing.

7.5    <u>Interpretation.</u> This Agreement has been negotiated at arm's length and between and among Persons sophisticated and knowledgeable in the matters dealt with in this Agreement. In addition, this Agreement was drafted by experienced and knowledgeable legal counsel for each of the Parties. Accordingly, neither Party shall be presumptively entitled to have any provisions of the Agreement construed against the other Party in accordance with any rule of law, legal decision or doctrine.

7.6    <u>No Admission of Liability.</u> The Parties agree that this Agreement is the result of a compromise of disputed issues of coverage, and that the execution and delivery of this Agreement by any of the Parties shall not constitute or be construed as an admission of any liability, a course of performance, or wrongdoing on the part of any of them. The Parties acknowledge that this Agreement is not, and cannot be construed as, any admission by Hartford that any defense, indemnity, or other coverage obligation exists under the Policies, or that Hartford has any other obligation of any nature whatsoever with respect to the Policies. By entering into this Agreement, neither the Diocese nor Hartford has waived nor will be deemed to have waived any right, obligation, privilege, defense or position it may have asserted or might assert in connection with any claim, matter, Person, or insurance policy outside the scope of this Agreement. No Person other than the Parties hereto shall have any legally enforceable

rights or benefits under this Agreement except as specifically set forth in Section 4.6 of this Agreement.

7.7    Attorneys' Fees, Costs, And Expenses.  Each of the Parties shall bear its own costs, attorneys' fees, and expenses in connection with the negotiations for and preparation of this Agreement.

7.8    Entire And Integrated Agreement.  This Agreement is intended by the Parties as a final expression of their agreement and is intended to be a complete and exclusive statement of the agreement and understanding of the Parties with respect to the subject matters contained herein.  This Agreement supersedes any and all prior promises, representations, warranties, agreements, understandings, and undertakings between or among the Parties with respect to such subject matters, and there are no promises, representations, warranties, agreements, understandings, or undertakings with respect to such subject matters other than those set forth or referred to herein.

7.9    No Third Party Beneficiaries.  Except as set forth in Section 4.6 of this Agreement,  nothing in this Agreement is intended or shall be construed to give any Person, other than Hartford and the Diocese and their respective successors and permitted assigns, any legal or equitable right, remedy, or claim under or in respect to this Agreement or any provisions contained herein; this Agreement and any conditions and provisions hereof being and intended to be for the sole and exclusive benefit of Hartford and the Diocese as well as each of their successors and permitted assigns, and for the benefit of no other Person.  Notwithstanding the foregoing, neither this Agreement nor the rights and obligations set forth herein shall be assigned without the prior written

consent of the other Party, except that this Section shall not prohibit any assignment by a

Hartford Insurer (a) made by merger, consolidation, or operation of law or (b) to a Person

who succeeds to all or substantially all of such Hartford Insurer's assets.

7.10    Notice.  Any notice or request required or desired to be given pursuant to

this Agreement shall be sufficient if made in writing and sent by first class mail, postage

prepaid, or facsimile to the Parties at the addresses set forth below or to such other

Persons as any of them may designate in writing from time to time:

a.    As to Hartford:

John P. Rogers
The Hartford
Hartford Plaza
Hartford, CT 06155

As to the Diocese:

Rev. Msgr. J. Thomas Cini
Vicar General for Administration
Catholic Diocese of Wilmington
P.O. Box 2030
Wilmington, DE 19899-2030

with a copy to:

Anthony G. Flynn, Esq.
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
aflynn@ycst.com

7.11    Headings.  The section titles, captions, and headings contained in this

Agreement are inserted as a matter of convenience and for reference, and shall in no way

be construed to define, limit, or extend the scope of this Agreement or the effect of any of its provisions.

7.12   Recitals.  The recitals set forth at the beginning of this Agreement shall not be admissible to prove the truth of the matters asserted in any action or proceeding involving any of the Parties (other than an action or proceeding brought to enforce the terms of this Agreement), nor do any of the Parties intend such recitals to constitute admissions of fact by any of them.

7.13   Agreement Inadmissible.  Any evidence of the terms or negotiations or discussions associated with this Agreement shall be inadmissible in any action or proceeding for purposes establishing any rights, duties or obligations of the Parties, except in (a) an action or proceeding to enforce the terms or effect of this Agreement, (b) proceedings before the Bankruptcy Court to secure the Approval Order, or (c) any possible action or proceeding between Hartford and any of its reinsurers bearing responsibility for any of Hartford's obligations under this Agreement.  Except as set forth herein, this Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Parties' rights or obligations to each other or to any other Person.

7.14   Additional Necessary Documents.  The Parties, and each of them, agree to execute such additional documents as may be reasonably required in order to carry out the purpose and intent of this Agreement, or to evidence anything contained herein.

7.15   Execution in Counterparts.  This Agreement may be signed in multiple counterparts and the separate signature pages executed by Parties may be combined to

create a document binding on all of the Parties and together shall constitute one and the same instrument.

**IN WITNESS WHEREOF, THIS AGREEMENT HAS BEEN READ AND SIGNED UNDER SEAL IN DUPLICATE ORIGINALS BY THE DULY AUTHORIZED REPRESENTATIVES OF THE PARTIES:**

**FIRST STATE  INSURANCE COMPANY**

By: _____(SEAL)

Title: _____

Date: _____

**NUTMEG INSURANCE COMPANY**

**By:** _____(SEAL)

**Title:** _____

**Date:** _____

**TWIN CITY INSURANCE COMPANY**

By: _____(SEAL)

Title: _____

Date: _____

**CATHOLIC DIOCESE OF WILMINGTON, DELAWARE**


**By:** _____(SEAL)

**Title:** _____

**Date:** _____

## Exhibit 1

| | | |
|---|---|---|
| First State Insurance Co. | EU 0001642 | (7/22/86-6/30/87) |
| First State Insurance Co. | EU 0004550 | (6/30/87-7/1/88) |
| First State Insurance Co. | EU 0004610 | (7/1/88-7/1/89) |
| First State Insurance Co. | EU 0004636 | (7/1/89-7/1/90)[1] |
| First State Insurance Co. | FL 0000435 | (7/1/89-7/1/90) |
| First State Insurance Co. | FL 0000495 | (7/1/90-7/1/91) |
| First State Insurance Co. | FL 0002651 | (7/1/91-7/1/92) |
| First State Insurance Co. | FL 0002698 | (7/1/92-7/1/93) |
| Nutmeg Insurance Co. | YA 0000130 | (7/1/93-7/1/94) |
| Nutmeg Insurance Co. | QK 0000151 | (7/1/94-7/1/95) |
| Twin City Insurance Co. | KK 0000157 | (7/1/95-7/1/96) |
| Twin City Insurance Co. | KK 0000161 | (7/1/96-7/1/97) |

---

[1] Policy cancelled flat and rewritten to policy FL 0000435

b.      **Fireman's Fund Insurance Company, Adriatic Insurance Company, Allianz S.p.A. and Allianz**

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release is entered into by and among the Catholic Diocese of Wilmington, Inc. and Fireman's Fund Insurance Company, Adriatic Insurance Company, Allianz S.p.A. and Allianz, as of the date of the execution of this Agreement by all parties hereto, and in accordance with the terms and conditions set forth below.

### Background[1]

WHEREAS, FFIC allegedly issued to CDOW certain policies of insurance affording insurance coverage to CDOW subject to the terms, conditions, exclusions and limits of liability applicable thereto;

WHEREAS, CDOW has been named as a defendant in various suits alleging sexual abuse and molestation by priests and other individuals affiliated with CDOW;

WHEREAS, CDOW has notified FFIC of the claims and suits which have been asserted against it and has demanded that FFIC defend and indemnify it in connection therewith pursuant to the Policies;

WHEREAS, FFIC has denied that CDOW is entitled to any defense or indemnity in connection with claims and suits arising from the underlying claims of sexual abuse and molestation asserted against CDOW;

WHEREAS, CDOW commenced its Bankruptcy Case, by filing its voluntary petition for relief under the Bankruptcy Code on October 18, 2009, in the Bankruptcy Court;

WHEREAS, CDOW has filed a proposed Settlement Plan in the Bankruptcy Case seeking to, *inter alia*: (i) channel all past, present and future Survivor Claims against CDOW to a Trust to be established upon confirmation of the Settlement Plan, (ii) discharge the liabilities

---

[1]    All capitalized terms refer to terms as defined in the Definitions section, *supra*.

associated with the Survivor Claims, and (iii) obtain releases for various non-debtor entities, including, without limitation, FFIC, from any and all Survivor Claims;

WHEREAS, FFIC contends that questions of insurance coverage are presented by CDOW's claim for defense and indemnification from FFIC under the Policies;

WHEREAS, CDOW and FFIC now desire to compromise, settle and adjust fully and finally all disputes which now or hereafter may exist between them with respect to any and all claims, known and unknown, past, present or future, which have or may arise under any and all coverages of the Policies, including without limitation any general liability, personal injury, products liability, completed operations, premises, operations, property, automobile or contractual coverage which may be contained therein, (hereinafter collectively referred to as "all coverages"), pursuant to a sale of all right, title and interest of CDOW in the Policies to FFIC under sections 363 and 1123 of the Bankruptcy Code and a general release of all obligations of FFIC under the Policies, and otherwise on the terms hereinafter set forth.

WHEREAS, the rights and obligations of the parties specified herein are each separate material rights and obligations of the parties under this Agreement, and that the parties would not have entered into this Agreement without the specific promises of the other party to perform such obligations. The failure by either party to perform any of the obligations or abide by any of the rights owing to the other party specified herein, would constitute a material breach of this Agreement excusing further performance of the other party under this Agreement.

NOW, THEREFORE, with the foregoing Background incorporated herein by reference, in consideration of the foregoing and the mutual promises and covenants set forth below, CDOW and FFIC mutually agree, as follows:

1. <u>Definitions</u>. As used in this Agreement, the following defined terms shall have the following meanings:

1.1. "Agreement" means this Settlement Agreement and Release.

1.2. "Approval Motion" means a motion or motions, as the case may be, to be filed by CDOW pursuant to Bankruptcy Rule 9019 requesting the Bankruptcy Court to enter the Approval Order (and to the extent required by section 105(a) of the Bankruptcy Code, the United States District Court) that includes, without limitation, the Channeling Injunction in the Settlement Plan in favor of FFIC, in form and substance acceptable to FFIC, in its reasonable sole discretion, pursuant to section 105(a) of the Bankruptcy Code restraining, enjoining and prohibiting CDOW, any and all holders of Claims, whether presently known or unknown, any Non-Debtor Insured and any other Person from (i) commencing, continuing, or otherwise proceeding against FFIC or anyone acting on its behalf, directly or indirectly, to collect, recover or receive payment of, or in connection with, any Claims, or taking any other actions against FDIC, or anyone acting on its behalf, relating to any Claims and/or Policies; and (ii) satisfying, enforcing, levying, attaching, collecting, or otherwise recovering against FFIC, or anyone acting on its behalf, by any means or in any manner, whether directly or indirectly, any settlement or judgment relating to, or in connection with, any Claims and/or the Policies.

1.3. "Approval Order" means an order of the Bankruptcy Court, in the form attached hereto as Exhibit "A," approving this Agreement and

authorizing CDOW to perform the obligations hereunder, which is requested pursuant to the Approval Motion.

      1.4. "Bankruptcy Case" means the Chapter 11 case styled *In re Catholic Diocese of Wilmington, Inc.*, commenced on October 18, 2009, and pending in the Bankruptcy Court, at Case No. 09-13560 (CSS).

      1.5. "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as now in effect or hereafter amended.

      1.6. "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware, and the United States District Court for the District of Delaware with respect to any proceeding or portion of the Bankruptcy Case as to which it has withdrawn reference or shall have sole authority to enter a Final Order or judgment.

      1.7. "CDOW" means, collectively, Catholic Diocese of Wilmington, Inc., on behalf of itself, and its predecessors, parents, subsidiaries, affiliated companies, successors in interest, and/or their shareholders, directors, and officers.

      1.8. "Confirmation Order" means the order of the Bankruptcy Court (and to the extent required by section 105(a) of the Bankruptcy Code, or otherwise, the United States District Court) confirming the Settlement Plan pursuant to § 1129 of the Bankruptcy Code, as such order may be amended, modified or supplemented , which Settlement Plan shall include, without limitation, the Channeling Injunction (as defined in the Settlement Plan) in favor of FFIC, in form and substance acceptable to FFIC, in its sole discretion,

4

pursuant to section 105(a) of the Bankruptcy Code restraining, enjoining and prohibiting CDOW, the Trust, any and all holders of Claims, whether presently known or unknown, any Non-Debtor Insured and any other Person from (i) commencing, continuing, or otherwise proceeding against FFIC or anyone acting on its behalf, directly or indirectly, to collect, recover or receive payment of, or in connection with, any Claims or taking any other actions against FFIC, or anyone acting on its behalf, relating to any Claims and/or Policies; and (ii) satisfying enforcing, levying, attaching, collecting, or otherwise recovering against FFIC, or anyone acting on its behalf, by any means or in any manner, whether directly or indirectly, any settlement or judgment relating to, or in connection with, any Claims and/or the Policies.

      1.9. "Claim" means (a) any right to payment asserted against CDOW and/or FFIC arising out of, or related to, any one or more of the Policies, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; (b) any right to an equitable remedy against CDOW and/or FFIC arising out of or related to any one or more of the Policies, for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured; and/or (c) any and all other claims, demands, allegations, duties, liabilities and obligations (whether presently known or unknown, asserted or unasserted, foreseen or unforeseen) of any nature whatsoever, which have been, or could have been, or might be,

asserted by CDOW and/or any other Person against FFIC based upon, arising out of, or relating to, any one or more of the Policies including, but not limited to, any Survivor Claims, any Insurance Coverage Claim, any contribution claims by other insurers of CDOW, bad faith or extra contractual claims under any statutory or other basis whatsoever, and attorneys' fees.

1.10.  "Effective Date" means the first business day (a) that is at least fourteen (14) days after entry of the Approval Order on the docket of the Bankruptcy Court; (b) on which all of the conditions precedent to settlement, as set forth in section [5] of this Agreement, have been satisfied or waived; and (c) on which no stay pending appeal of the Approval Order or the Confirmation Order is in effect.

1.11.  "FFIC" means Fireman's Fund Insurance Company, Adriatic Insurance Company, Allianz  S.p.A. and Allianz, collectively, on behalf of themselves and, for purposes of the Release, all of their predecessors, successors, assigns, and their past, present and future affiliates, parents, holding companies, merged and/or acquired companies, subsidiaries, divisions and/or companies or corporations owned, controlled or under their common ownership or control, and each of their respective past, present and future officers, directors, principals, shareholders in their status as shareholders, employees, attorneys, accountants, consultants, representatives and agents.

1.12.  "Final Order" means (a) a judgment, order or other decree approved or entered by any Court of the United States of America (including, without limitation, the Bankruptcy Court), which judgment, order, or

other decree has not been reversed, stayed, modified or amended and as to which

the time to appeal, petition for certiorari, or seek reargument or rehearing has

expired and as to which no appeal, reargument, petition for certiorari, or

rehearing is pending or as to which any right to appeal, reargue, petition for

certiorari or seek rehearing has been waived in writing in a manner satisfactory

to Settling Insurers or, if an appeal, reargument, certiorari, or rehearing thereof

has been sought, the order or judgment of the Bankruptcy Court has been

affirmed by the highest court to which the order was appealed or from which the

reargument or rehearing was sought, or certiorari has been denied, and the time

to take any further appeal or to seek certiorari or further reargument or rehearing

has expired.

      1.13.  "Insurance Coverage Claim" means any Claim by any

Person for indemnification, contribution, ultimate net loss, defense, defense

costs, subrogation, reimbursement, payment of any sum or performance of any

obligation under any provision of the Policies, arising out of Claims asserted

against CDOW for actual, potential, or alleged bodily injury, emotional distress,

sickness, disease, or the fear or apprehension thereof, property damage,

environmental impairment, economic loss, breach of fiduciary duty, personal

injury, contractual liability, loss, negligence, or arising from or out of any other

Claim of any nature against CDOW that gives rise to or potentially gives rise to

coverage under the Policies.

      1.14.  "Non-Debtor Insured" means any Person other than

CDOW that is also an actual or alleged named insured, or additional insured

under, or in any manner claims an interest in, any of the Policies or any proceeds thereof.

1.15. "Person" means any individual, corporation, partnership, limited liability company, unincorporated company or association, trust, joint venture, or any other form of legal entity or organization, including, without limitation, any government or political subdivision or any agency or instrumentality thereof.

1.16. "Parties" means CDOW, FFIC and the Trust, to the extent provided by section 1 of this Agreement.

1.17. " "Policies" means any and all insurance policies of any kind whatsoever, whether known or unknown, alleged or confirmed, and whether or not identified, which were, at any time prior to execution of this Agreement, issued or alleged to have been issued by FFIC to CDOW and the Non-Debtor Insureds, or naming CDOW and/or the Non-Debtor Insureds as an additional insured, or under which CDOW and/or the Non-Debtor Insureds assert or may assert a right to coverage, including, without limitation, those insurance policies set forth on Exhibit "B" attached hereto.

1.18. "Release" means the release set forth in section [3] of this Agreement.

1.19. "Settlement Plan" means (i) the Settlement Plan set forth in the Second Amended Chapter 11 Plan of Reorganization of Catholic Diocese of Wilmington, Inc., dated May 23, 2011, Docket Number 1321 and all Exhibits thereto; and (ii) any alterations, amendments and modifications to the

8

Settlement Plan made after May 23, 2011, but only with the express written consent of FFIC.

1.20. "Survivor Claims" means claims of sexual abuse and molestation as defined in the Settlement Plan.

1.21. Each defined term stated in a singular form shall include the plural form, and each defined term stated in a plural form shall include the singular form.

2. <u>Settlement, Purchase And Sale of Policies</u>. In settlement and full and final accord and satisfaction of all disputes between the Parties, and subject to all of the terms and conditions contained in this Agreement, upon the Effective Date, FFIC shall purchase from CDOW, and CDOW shall sell, convey, assign, transfer and deliver to FFIC, each of the Policies, and any and all rights under the Policies, free and clear of any liens, claims and/or interests of all persons or entities to the fullest extent permissible under the Bankruptcy Code and other applicable law. In consideration of the sale of the Policies to FFIC, and the Release of FFIC as provided herein, and subject to all of the terms and conditions contained in this Agreement, FFIC agrees to pay to CDOW the total sum of $650,000 (Six Hundred and Fifty Thousand Dollars) (the "Settlement Amount"). The Settlement Amount shall be paid within twenty (20) days of the Effective Date. Such payment shall be in consideration of the sale of the Policies, the Release, and otherwise in full and final settlement of any and all claims, past, present and future, which have been or which hereafter may be asserted by CDOW, the Trust or by any other Person for defense and/or indemnification from FFIC under any and all coverages of the Policies. CDOW expressly acknowledges and agrees that the payment by FFIC of the Settlement Amount is given in exchange for a complete policyholder release commuting all coverage under the policies

9

issued by FFIC to CDOW, the effect of which shall be as if no coverage was ever issued by FFIC to CDOW, and that no further claims or requests for coverage under any and all coverages of the Policies will be made by CDOW and/or the Trust upon FFIC.

2.1.  CDOW acknowledges that in consideration of the payment by FFIC of the Settlement Amount to CDOW, any and all obligations which now or hereafter may exist on the part of FFIC arising from the claims which have been or which hereafter may be asserted by CDOW under any and all coverages of the Policies will be deemed to have been extinguished.  CDOW expressly accepts the payment by FFIC of the Settlement Amount to CDOW in full and complete satisfaction of any and all obligations which now or may exist on the part of FFIC with respect to any request for insurance coverage from CDOW under any and all coverages of the Policies, including but not limited to any obligation on the part of FFIC to investigate, defend, pay legal fees or costs, or to pay administrative or consulting costs or fees, costs associated with psychological care, counseling or related efforts to address claims involving intentional or negligent infliction of emotional distress involving underlying claims against CDOW, settle claims or suits, or to pay or contribute to settlements, or judgments, investigative or remedial costs pertaining thereto.

2.2.  The proceeds of the Settlement Amount shall be used for the sole and exclusive purposes of:

2.2.1.  Payments to holders of Survivor Claims in the Bankruptcy Case as provided by the Settlement Plan; *provided, however*, that FFIC shall have no liability or responsibility for any

allocation of the Settlement Amount among holders of any allowed

Survivor Claims or their respective attorneys; and

2.2.2. Payment of any of CDOW's and/or the

Trust's indemnification obligations pursuant to section [6] of this

Agreement.

2.3. The Parties expressly agree that the Settlement Amount

is the total amount that FFIC is obligated to pay on account of, or in connection

with, the sale of the Policies and the Release; and under no circumstances will

FFIC ever be obligated to make any payments, other than the Settlement

Amount, to CDOW, the Trust, or any other person or entity, on account of

Survivor Claims or any and all other claims in connection with the Policies. The

Parties further agree that the Settlement Amount is at least equal to the fair value

of the Policies, and that upon implementation of the terms of this Agreement

pursuant to an Approval Order (as defined herein), FFIC shall be deemed to own

the Policies free and clear of any liens, claims and/or interests of CDOW, the

Trust, or any other person or entity. FFIC may allocate the Settlement Amount

to and among the respective Policies in any manner it deems appropriate.

3. Release. In consideration of the mutual obligations and undertakings of the

Parties set forth herein, including FFIC payment of the Settlement Amount, CDOW does hereby,

as of the Effective Date, compromise, settle, discharge and irrevocably, unconditionally, fully

and finally release, acquit, hold harmless and forever discharge FFIC from any and all past,

present and future Claims, debts, demands, allegations, actions, causes of actions, suits, duties,

dues, sums of money, bills, accounts, reckonings, bonds, specialties, indemnities, exonerations,

11

covenants, contracts, controversies, agreements, promises, doings, omissions, trespasses,

variances, damages, judgments, extents, costs, expenses, losses, exposures, executions, violations

of law, fines, penalties, responsibilities, obligations and liabilities whatsoever, whether in law or

equity or otherwise, of whatever character, nature or kind, whether arising out of bodily injury,

property damage, personal injury or otherwise, whether known or unknown, suspected, claimed

or alleged, fixed or contingent, that CDOW and/or any Person ever had (from the beginning of

the world to the Effective Date) may now have, or hereafter can, shall, or may have against FFIC

based upon, arising, directly or indirectly, out of events concerning, in any way, manner or

fashion related to, connected with, or having anything to do with the Claims and/or the Policies.

3.1. It is expressly acknowledged that this Release

includes, without limitation, any actions or claims for insurance coverage,

breaches of insurance contracts, costs, liabilities, consequential damages,

noncontractual or extra-contractual damages, bad faith, breach of any duty of

good faith and fair dealing, actual or constructive fraud, misrepresentation,

insurer misconduct, misfeasance and/or malfeasance, insurance code violations,

Unfair Claims Practices Act or other similar statutes of each of the 50 states, the

District of Columbia or wherever (where applicable), any other alleged

wrongdoing whether sounding in contract, tort or any other theory, prejudgment

interest, penalty interest, attorneys fees or exemplary or punitive damages, which

CDOW and/or any other Person now, or in the future, owns or holds, or has at

any time prior hereto owned or held with respect to any and all claimed, potential

or actual obligations of FFIC under the Policies, based on any act or omission in

the handling or disposition of any request that insurance be issued or any request

for insurance coverage tendered to FFIC, the making, drafting, negotiation, execution or performance of this Agreement. CDOW acknowledges that it has no Claims or causes of action against FFIC for bad faith or extra-contractual damages with respect to or arising out of the Policies or otherwise.

        3.2.  The Parties acknowledge that certain Claims for which CDOW has sought coverage under the Policies (especially Survivor Claims) that have been or may be asserted against CDOW may increase or decrease in amount or in severity over time; that such Claims may include progressive, cumulative, unknown and/or unforeseen elements; and that there may be hidden, unknown, and unknowable damages, defense expenses, or other costs related to such claims. Nevertheless, CDOW agrees that any and all duties and obligations of FFIC, of any kind or nature whatsoever, past, present or future, that exist or might be deemed to exist under or in connection with the Policies and the Claims, are hereby satisfied, discharged, terminated and released and a complete cancellation, rescission, extinguishment, voiding and termination of the Policies, and a complete waiver, surrender and abandonment of any and all past, present and future rights and insurance coverage under the Policies, is hereby effected. CDOW acknowledges that the effect of this Agreement and this Release is that the Policies shall be considered null and void *ab initio* and of no further force and effect, and that CDOW has no liability insurance coverage from FFIC arising under and/or pursuant to the Policies or otherwise; that all limits of the Policies of whatever nature, shall be deemed fully and properly exhausted as

13

of the Effective Date; and the original Policies shall be immediately surrendered to FFIC for cancellation without further demand or notice.

3.3. This Agreement and this Release fully and finally settle all disputes and obligations by and among the Parties with respect to the Claims and/or the Policies. This Agreement is a permanent and binding accord and resolution of the rights and obligations of the Parties hereto with respect to all Claims by and among the Parties, whether known, unknown or unknowable, actual or contingent, foreseen or unforeseen, suspected or unsuspected, asserted or unasserted, past, existing, potential or future and each and every known and unknown, actual or contingent, suspected or unsuspected, anticipated or unanticipated, past, existing, potential or future Claim, cause of action, obligation, cost, expense, fee, liability, damage, demand, suit or proceeding against CDOW, whether formal or informal, or request for relief or action or forbearance of any kind, nature or description, whether made or threatened, by any Person, entity or agency against CDOW for or arising from a Claim. CDOW acknowledges that it has been advised by counsel in the negotiation of this Agreement, and expressly include within the scope of the waivers and releases set forth in this Release all Claims that are not known to them or are not ascertainable at the time this Agreement is executed.

3.4. CDOW intends to release FFIC to the fullest extent permitted by law consistent with this Agreement, and will not assert any Claim or institute any action or proceeding or lawsuit (including, but not limited to, any counterclaims, cross-claims, or third party complaints) or proceeding of any

nature whatsoever against FFIC with respect to the matters, conduct, transactions, occurrences, facts or circumstances alleged in, arising from, relating to, or concerning the Policies and/or the Claims.  CDOW shall not commence against FFIC any action, suit or proceeding of any nature whatsoever with respect to the matters, conduct, transactions, occurrences, facts or circumstances alleged in, arising from, or related to, the Claims and/or the Policies.  Without limiting any aspect of the Release, CDOW shall withdraw any and all requests, demands, or tenders for indemnity and/or defense previously submitted to FFIC under the Policies, and CDOW covenants that it will never tender or present any Claims whatsoever, including, without limitation, any Survivor Claims, to FFIC under the Policies.  CDOW agrees that FFIC shall have no duty to defend or indemnify CDOW and/or any Non-Debtor Insured with respect to any Claim under the Policies, nor shall FFIC have any other duty or obligation to Debtors and/or any Non-Debtor Insured who claims any entitlement to coverage under, and/or proceeds of, the Policies.

3.5.  In furtherance of its express intent to fully, forever and irrevocably release and discharge FFIC from all released Claims, known and unknown, from the beginning of time until the end of time, the Estate expressly waive any and all rights they may have under any statute, code, ordinance or the common law, which may limit or restrict the effect of a general release as to released insurance coverage claims which the CDOW does not know or suspect to exist in their favor at the time of the execution of this Agreement, including, to

the extent deemed applicable, any and all rights under California Civil Code

Section 1542, which provides as follows:

> "A general release does not extend to claims which the creditor
> does not know or suspect to exist in his favor at the time of
> executing the release, which if known by him, must have
> materially affected his settlement with the debtor."

CDOW understands and agrees that, by entering into this Agreement, they are expressly,

knowingly and intentionally waiving the provisions of California Civil Code Section 1542 and

electing instead to be bound exclusively by this Agreement.  If, contrary to the specific intent of

CDOW, any released Insurance Coverage Claims conferred by, or arising out of statutory code

or regulations are deemed to exist despite the releases provided herein, the Estates hereby

forever, expressly and irrevocably waive entitlement to all such released Insurance Coverage

Claims, known and unknown, from the beginning of time until the end of time; and it is

expressly agreed that the provisions of California Civil Code Section 1542 do not apply.

3.6.  FFIC hereby releases CDOW and all other persons or

entities identified as named insureds or additional named insureds under the

Policies from all claims which FFIC may have arising from CDOW's request for

insurance coverage from FFIC, including but not limited to any claims to recover

either the Settlement Amount or for any sums previously paid by FFIC with

respect to legal fees and costs incurred in connection with the defense of CDOW.

3.7.  Upon receipt by CDOW of the Settlement Amount, all

pending claims for coverage by CDOW upon FFIC, including without limitation

any potential claims, shall be deemed withdrawn.

4.  Support of Settlement.  The Parties agree to support this Agreement including,

without limitation, cooperating and using their best efforts to take all actions as reasonably may

be required to obtain the approval of the Bankruptcy Court to this Agreement. The Parties shall provide sworn testimony, if necessary, in order for the Bankruptcy Court to determine that this Agreement is a reasonable compromise settlement and was negotiated in good faith and is in the best interest of creditors, and to ensure that the order approving this Agreement becomes a final order. CDOW shall also oppose actions taken by any person or entity either in opposition to approval of this Agreement or directly against FFIC. The costs and expenses of mailing and/or publishing any notice with respect to the Approval Motion shall be paid for by CDOW.

4.1. The Settlement Plan shall incorporate this Agreement and otherwise shall not be inconsistent with the terms of this Agreement. CDOW shall further use its best efforts to ensure that the Settlement Plan includes a supplemental permanent injunction pursuant to section 105(a) of the Bankruptcy Code in favor of all of FFIC channeling all Survivor Claims to the Trust and enjoining the holders of Survivor Claims and any other person that may assert any claim for coverage under the Policies from pursuing any such claims against FFIC. If a plan of reorganization is filed by any Person other than CDOW, CDOW shall use its best efforts to obtain in any order confirming such plan a supplemental permanent injunction pursuant to section 105(a) of the Bankruptcy Code in favor of all of FFIC as set forth herein.

4.2. Each of the Parties further agrees not to take any appeal from, or to seek to reopen, reargue or obtain reconsideration of, or otherwise contest or challenge in any way, directly or indirectly, any Approval Order provided for by, entered pursuant to, or in implementation of, this Agreement, except to the extent that any such Approval Order (i) shall be materially

inconsistent with the terms hereof; or (ii) the appeal relates to issues other than the settlement contemplated by this Agreement. If the Confirmation Order or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), CDOW agrees to take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion; provided however, that nothing herein shall preclude the Parties from consummating the transactions contemplated herein if the Confirmation Order shall have been entered and has not been stayed and FFIC, in its sole discretion, waives in writing the requirement that the Confirmation Order be a Final Order.

      4.3.  Each Party further agrees that it shall, at its expense and at any reasonable time and from time to time, at the request of the other Party hereto, take such action and execute and deliver (and cause its attorneys to execute and deliver) any and all further instruments and documents, including, without limitation, a bill of sale in form and substance acceptable to FFIC, evidencing the sale of the Policies to FFIC, that are reasonable and necessary for the purpose of implementing and giving full force and effect to, the provisions of this Agreement, and any Approval Order. From and after the Approval Order becomes a final order, the Parties shall take all actions reasonably necessary, including, without limitation, seeking injunctive relief, to ensure that this Agreement, and any Approval Order are implemented and enforced in full, and the Parties shall cooperate with and assist each other as reasonably requested with respect thereto. CDOW agrees that it will cooperate with FFIC and take

any action (including, without limitation, joining in any litigation in Bankruptcy Court or any other court of appropriate jurisdiction to effectuate and/or enforce this Agreement and any Approval Order) to oppose any effort by any Person to proceed directly against FFIC to recover any claim or take any other actions which are prohibited by this Agreement and/or by any Approval Order.

4.4.  CDOW shall cooperate with FFIC in connection with FFIC's presentation of any claims to its reinsurers for any portion of the Settlement Amount that may be covered by any reinsurance contracts including, without limitation, providing access to any information and documents that are not available in FFIC's files.  CDOW further agrees that FFIC may retain copies of any confidential information or documents that CDOW has provided, or will provide, to FFIC.

4.5.  Neither CDOW nor the Trust shall cooperate with or otherwise assist any person or entity who or which may attempt to impose liability upon FFIC by reason of, in connection with, or relating to any claims that involve, arise from and/or relate to the Policies.  The Parties agree that they shall not take any position in any proceeding that is inconsistent with the rights and/or obligations assumed or imposed on them under this Agreement.

4.6.  If FFIC so requests, CDOW shall file court papers (which shall be prepared by FFIC) supporting the position that the release provided in this Agreement is effective to extinguish any and all obligations of FFIC that involve, arise from and/or relate to the Policies to the full extent set forth in this Agreement.  It is expressly understood, however, that nothing in this

19

Agreement gives CDOW the right to file any pleading, motion, or other document in the name or on behalf of FFIC, and that CDOW is expressly prohibited from taking any action in the name or on behalf of FFIC, it being the intent of the Parties that any attorneys for CDOW shall not and do not represent FFIC.

4.7.  CDOW shall take all reasonable actions to minimize the possibility of any cross-claims or other actions against FFIC in connection with any Claims that involve, arise from and/or relate to the Policies by any other insurer of CDOW or by any surety furnishing any bond securing CDOW's obligations.  If CDOW settles any Claim asserted by any Person, CDOW agrees that any papers executed in settlement of any such Claim or any lawsuit relating to any such Claim shall recite that any release given also runs to FFIC.

4.8.  Any and all obligations, duties and responsibilities of the Parties under or relating to the Policies are hereby tolled and suspended until thirty (30) days after such time as this Agreement is either (i) terminated in accordance with section [14] of this Agreement or (ii) consummated upon the Effective Date.  The tolling and suspension shall survive any termination of this Agreement pursuant to section [14] of this Agreement and shall be fully effective for all purposes notwithstanding any such termination of this Agreement or the failure of the Bankruptcy Court to enter the Approval Order.

4.9.  Any time prior to the Effective Date, within seven (7) business days after its receipt of written notice from CDOW that any Person has commenced (or is continuing) litigation or otherwise has asserted or pursued a

Claim against FFIC arising out of or relating to the Policies, CDOW shall file a motion or complaint in the Bankruptcy Court (on an emergency basis if necessary to prevent imminent harm to FFIC), in form and substance reasonably acceptable to FFIC (which acceptance shall not be unreasonably withheld), seeking entry of a protective order (which may be a stipulated order on consent). Any such protective order shall (a) enforce the automatic stay imposed by section 362 of the Bankruptcy Code to stay, bar, or prohibit such Claim against FFIC; and/or (b) restrain and/or enjoin such Person from commencing, asserting, or continuing any such Claim against FFIC pursuant to section 105(a) of the Bankruptcy Code.  If the Bankruptcy Court declines to enter such protective order or, if it does enter such protective order, prior to the date it enters the protective order (or at any other time when such protective order is not in full force and effect) CDOW shall defend FFIC or, at the option of FFIC, shall credit against the Settlement Amount the reasonable attorneys' fees and expenses incurred by any of FFIC in defending against the Claim.

      4.10.  CDOW and the Trust agree that its continuing duty to cooperate with FFIC, is a material aspect of this Agreement and upon which obligations FFIC is expressly relying as part of the consideration for entering into this Agreement.  CDOW agrees to immediately discuss with FFIC any strategy with respect to the resolution of Claims.

5. <u>Conditions Precedent To Settlement</u>. FFIC's obligation to pay the Settlement Amount is made expressly contingent upon satisfaction of the following conditions:

5.1. The Bankruptcy Court has been requested, by the Approval Motion (the form and substance of which shall be subject to approval by FFIC), and/or pursuant to CDOW's request for confirmation of the Settlement Plan, to approve this fully executed Agreement, upon actual and adequate notice by (first class mail, postage pre-paid) to:  (a) all creditors of CDOW and all parties in interest in the Bankruptcy Case; provided, however, that notice to the holders of Survivor Claims may be given to their counsel of record; (b) all affiliates of CDOW; (c) all Non-Debtor Insureds; (d) the United States Trustee; (e) all Persons that have filed a notice of appearance and demand for service of papers in the Bankruptcy Case under Bankruptcy Rule 2002(i); (f) all Persons asserting a Claim; (g) all committees appointed by the United States Trustee or otherwise participating in the Bankruptcy Case; (h) all other insurers of CDOW; and (i) all other Persons designated by the Bankruptcy Court as requiring notice in order to be bound by an Approval Order.  CDOW shall use its best efforts to ascertain the identity and addresses of aforesaid Persons entitled to notice through a diligent review of its books and records.  CDOW and any claims agent appointed in the Bankruptcy Case shall cooperate with FFIC by promptly providing any information necessary to provide notice as required by section [5.1] of this Agreement.  For the purposes of this Agreement, adequate notice shall also include notice of the hearing on the Approval Motion by publication in the national edition of [national newspaper] and the [local

newspaper] (and/or in any other publication as required by the Bankruptcy Court) in a manner as approved by the Bankruptcy Court as being adequate and sufficient; and a hearing on the Approval Motion shall have been held and concluded.

5.2.  An Approval Order shall have been entered by the Bankruptcy Court in its entirety and shall have become a final order in its entirety, and shall not have become subject to any other final order that restricts any of the Parties from performing their obligations hereunder.

5.3.  A Confirmation Order confirming the Settlement Plan shall have been entered by the Bankruptcy Court in its entirety and shall have become a final order in its entirety, and shall not have become subject to any other final order that restricts any of the Parties from performing their obligations hereunder or otherwise restricts the full implementation of the supplemental permanent injunction contained in the Settlement Plan and/or the consummation of the Settlement Plan, as the case may be.

5.4.  The Confirmation Order shall:

A.  approve (i) this Agreement pursuant to Federal Rule of Bankruptcy Procedure 9019, and sections 363(b), (f) and (m) of the Bankruptcy Code; and (ii) the sale of the Policies to FFIC;

B.  authorize the Parties to undertake the settlement and the transactions contemplated by this Agreement;

C.  authorize the sale of the Policies to FFIC free and clear of any and all liens, claims or interests;

23

D.  The permanent Channeling Injunction as defined in and contained in the Settlement Plan, enjoining and restraining all entities who have held or asserted, hold or assert, or may in the future hold or assert a Claim from taking any action, directly or indirectly for the purposes of asserting, enforcing or attempting to assert or enforce any channeled Claim, including; (i) commencing or continuing in any manner, any action or any other proceeding of any kind with respect to any channeled claim or against FFIC; (ii) seeking the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against FFIC or the property of FFIC with respect to any channeled Claim; (iii) creating, perfecting or enforcing any encumbrance or lien of any kind against FFIC or the property of FFIC with respect to any channeled Claim; (iv) asserting any rights of setoff, subrogation or recoupment of any kind against any obligation due to FFIC with respect to any channeled Claim; and (v) taking any act, in any manner and in any place whatsoever, that does not conform to or comply with this Agreement.

E.  A provision stating that all injunctions or stays provided for in the Confirmation Order and in the Settlement Plan, the injunctive provisions of sections 524 and 1141 of the Bankruptcy Code, and all injunctions or stays protecting FFIC, are permanent and will remain in full force and effect following the effective date of the Settlement Plan.

In the event that the Confirmation Order does not include the approval and authorizations set forth in the above sub-paragraphs, this Agreement shall be void ab initio.

The Confirmation Order also shall contain the following factual findings and legal conclusions:

A.  the Agreement is fair and equitable and in the best interest of the estate and its creditors after consideration of (i) the probability of success in litigating the dispute, should it be litigated; (ii) the likely difficulties in collection; (iii) the probable complexity of any litigation of the dispute, the expense, inconvenience and delay necessarily attending such litigation, and the cost savings to CDOW of avoiding such litigation; and (iv) the paramount interest of creditors;

B.  FFIC is a good faith purchaser of the Policies and, as such, is entitled to all protections provided to good faith purchasers under section 363(m) of the Bankruptcy Code; and,

C.  the consideration exchanged by the Parties pursuant to this Agreement constitutes a fair and reasonable settlement of the Parties' disputes and of their respective rights and obligations relating to the Policies and satisfy, to the extent necessary, the provisions for approval of such settlements pursuant to Fed. R. Bankr. P. 9019;

D.  the releases contained in this Agreement and this policy buyback comply with the Bankruptcy Code; and

E.  notice of the sale free and clear of claims and interests was sufficient, and the requirements of Fed. R. Bankr. P. 6004(c) were satisfied, because notice of the motion seeking approval of the Agreement and the motion itself were served upon (i) all known claimants or counsel for claimants who filed a proof

25

of claim in the Bankruptcy case, who were scheduled by CDOW, or whose claims are pending and tendered under the Policies, at the address provided for notice in the proof of claim or the address listed for such claimant in CDOW's schedules, or the address of such claimant last known to CDOW, as applicable, (ii) all Persons who filed a notice of appearance in the Bankruptcy Case, and (iii) all Persons known or alleged by CDOW to have provided general liability insurance to CDOW.

In the event that the above factual findings and legal conclusions are not entered by the Bankruptcy Court, this Agreement shall be void ab initio.

6.  <u>Reasonably Equivalent Value</u>

The Parties acknowledge and agree that:  (i) this Agreement was bargained for and entered into in good faith and as the result of arms-length negotiations; (ii) based on their respective independent assessments, with the assistance and advice of counsel, of the probability of success, the complexity, the delay in obtaining relief, and the expense of resolving their disputes, the payment of the Settlement Amount pursuant to this Agreement constitute a fair and reasonable settlement of CDOW's claims; (iii) the payments and other benefits received under this Agreement by CDOW constitute reasonably equivalent value for the release, indemnity, and other benefits received by FFIC under this Agreement; and (iv) this Agreement constitutes a full and final resolution of all issues between the Parties.

7.  <u>Indemnification</u>.  It is expressly understood and agreed that the Settlement Amount being paid by FFIC is intended to fully and finally satisfy and extinguish any and all liability, possible payment obligations, costs or expenses that FFIC might otherwise incur, directly or indirectly, in any way related to, arising out of, or in connection with, the Claims

and/or the Policies; and that the Settlement Amount is the total amount that FFIC will ever be obligated to pay to the CDOW or any other Person under, or in connection with, the Policies.

     7.1.  In the event that any Person including, but not limited to, any holder of a Claim, any Non-Debtor Insured or any other insurer of CDOW, asserts any type of Claim or demand against FFIC with respect to the Policies relating to, arising from or in connection with, directly or indirectly, any Claim, then CDOW and/or the Trust, at their own expense, shall (up to the Settlement Amount) defend, indemnify, save and hold harmless FFIC from and against all such Claims (including, but not limited to, claims, counter-claims, cross-claims, actions, direct actions or claims for contribution, indemnity or subrogation) and from any and all costs, loss, expenses, judgment, settlement, liability, demand, right, assessment, debt, obligation, deficiency or other payment of any kind, including attorneys' fees, incurred in defending against any such Claims or demand or any related suit, action or proceeding.

     7.2.  In any legal proceeding involving the assertion of any Claims against FFIC for which FFIC may seek indemnity from the CDOW and/or the Trust, FFIC shall have the absolute right to choose its own independent counsel to be retained to defend it, as it so chooses, in such legal proceeding, and FFIC shall have the absolute and exclusive right to determine any substantive litigation positions in any such legal proceedings including, without limitation, substantive litigation positions regarding coverage and the meaning, construction and interpretation of the Policies.  If FFIC so requests, CDOW and/or the Trust shall file court papers supporting the position that the

Release is effective to extinguish any and all obligations of FFIC under the Policies to the full extent set forth in this Agreement. It is expressly understood, however, that nothing in this Agreement gives CDOW and/or the Trust the right to file any pleading, motion or other document in the name or on behalf of FFIC and that CDOW and/or the Trust are expressly prohibited from taking any action in the name or on behalf of FFIC, it being the intent of all Parties that any attorneys for CDOW and/or the Trust shall not and do not represent FFIC.

7.3.  CDOW and the Trust's obligations to indemnify FFIC up to the Settlement Amount shall survive the Effective Date and the consummation of this Agreement and shall be a continuing obligation of any successor and/or assignee of either or all of them.

7.4.  If the Settlement Amount or its proceeds is transferred to any Person (other than as distribution by CDOW and/or the Trust and to holders of Claims allowed in the Bankruptcy Case by the Bankruptcy Court), it shall be under and subject to FFIC's first priority lien and security interest; and any such Person shall expressly acknowledge FFIC's first priority lien and security interest and its continuing obligation to indemnify FFIC.

7.5.  CDOW and/or the Trust may use such proceeds, from time to time, to make payments to holders of Claims allowed by Final Order of the Bankruptcy Court in accordance with the terms of any order of distribution entered in the Bankruptcy Case.

7.6.  In the event any Insurance Coverage Claim is brought by CDOW against any insurer other than FFIC and results in an adjudication on

28

the merits, whether in court or in another tribunal with jurisdiction, that CDOW

and/or the Trust would have been entitled to coverage from the FFIC under any

of the Policies for any Claim released by this Agreement, and the recovery that

CDOW and/or the Trust obtain against such insurer includes amounts allocable

to any of the FFIC, CDOW and the Trust agree that they will not seek to obtain

payments from such insurer or to enforce any related judgment to the extent such

payments or judgment represent any FFIC's allocable share of any obligation

owed to CDOW.  In the event that CDOW and/or the Trust obtain a judgment or

binding arbitration award against any other insurer in connection with any Claim

released pursuant to this Agreement, and that insurer thereafter obtains a

judgment or binding arbitration award against any of FFIC on the ground that the

judgment or binding arbitration award granted to CDOW against that other

insurer included sums which are allocable to any of FFIC, CDOW and/or the

Trust agree to reduce their judgment or binding arbitration award against the

other insurer to avoid such liability being imposed on FFIC.  Such a reduction in

CDOW's judgment or binding arbitration award will be accomplished by

subtracting from the judgment or binding arbitration award against the other

insurer the share of the judgment or binding arbitration award, if any, that is held

to be allocable to the FFIC.  To ensure that such a reduction is accomplished,

FFIC shall be entitled to assert this right as a defense in any Claim against it for

any such portion of the judgment or binding arbitration award, and shall be

entitled to have the court or appropriate tribunal issue such orders as are

necessary to effectuate the reduction to protect it from any liability for the judgment or binding arbitration award.

8. <u>Judgment Reduction</u>.  In any proceeding, suit or action involving one or more of the Parties, the Trust, or any insurer with respect to the Claims where any Person has asserted, asserts or could assert any contribution claim or similar claim against FFIC under, arising out of, related to, and/or in connection with the Policies with respect to insurance rights that are released under this Agreement, any judgment obtained by the Parties or the Trust against such other entity shall be automatically reduced by the amount, if any, of any judgment that entity obtains against FFIC, the purpose being to ensure that FFIC does not become obligated to pay more than the Settlement Amount.  The Parties or the Trust, as the case may be, shall cooperate with FFIC in any litigation asserting contribution claims against FFIC with respect to any liability under, arising out of, related to, and/or in connection with any of the Policies, and shall support arguments made by FFIC that their obligations with respect to such claims have been fully released, satisfied and extinguished by the settlement and this Agreement.  This reduction of judgment provision may be relied upon by FFIC as a defense in any such litigation.  In order to effectuate this judgment reduction clause in any action against another entity where FFIC is not a party, such Party or the Trust, as the case may be, shall either (1) obtain a finding from that court of what amount FFIC would be required to pay such other insurer under its contribution claim or other claim, before entry of judgment against such other entity, or (2) set aside the money in escrow paid from such other entity until such rights are adjudicated in a proceeding involving FFIC where this judgment reduction clause can be applied.

9. <u>Construction</u>.  Nothing contained herein shall be construed to be an admission of any kind by any signatory hereto.  Specifically, and without limitation, nothing contained

herein constitutes an admission by FFIC that CDOW was or is entitled to any insurance coverage from FFIC under the Policies in connection with any claims which have been or may be asserted against CDOW.

9.1.  This Agreement is the result of a compromise accord, is the product of arms-length negotiations, and is not intended to be, nor shall it be, construed as an insurance policy interpretation.  This Agreement is restricted and limited to the matters addressed herein, and shall not be used by either FFIC or CDOW in any court or dispute resolution proceeding to infer coverage or to create, prove or interpret claims under any insurance policy issued by FFIC. Nothing contained herein, however, shall be deemed or construed to prohibit either FFIC or CDOW from introducing this Agreement into evidence for the purpose of enforcing the terms of this Agreement.

9.2.  The parties to this Agreement each represent and warrant that they have not and will not in any manner assign, transfer, convey or sell, or purport to assign, transfer, convey or sell to any entity or person any cause of action, chose in action, or part thereof, arising out of or connected with the matters released herein, and that they are the only persons or entities entitled to recover for damages under such claims, causes of action, actions, and rights. The parties to this Agreement each also represent and warrant that no subrogation of any such causes of action, chose in action, or part thereof, has taken place.  The parties to this Agreement each further represent and warrant that they will not in any way voluntarily assist any other person or entity in the establishment of any claim, cause of action, action or right against the other

parties to this Agreement arising out of, resulting from or in any way relating to the handling by FFIC of CDOW claim for insurance coverage from FFIC.

9.3.  This Agreement prevails over prior communications regarding the matters contained herein between the signatories hereto or their representatives.  This Agreement has been reviewed by counsel for the signatories hereto, and shall not be construed against any signatory, each signatory expressly waiving the doctrine of *contra proferentum.*

10.  No Third Party Rights.  This Agreement is intended to confer rights and benefits only on the signatories hereto as described in this Agreement, and is not intended to confer any right or benefit upon any other person or entity.  This Agreement is an integrated Agreement and contains the entire Agreement regarding the matters herein between the signatories hereto, and no representations, warranties or promises have been made or relied on by any signatory hereto other than as set forth herein.  No person or entity other than the signatories hereto shall have any legally enforceable right under this Agreement.  All rights of action for any breach of this Agreement are hereby reserved to the signatories herein.

11.  Representations, Warranties and Covenants.  Each of the Parties represents, warrants and covenants to the other that:

11.1.  Each is a corporation duly organized and validly existing in good standing under the laws of one of the States of the United States; and has all requisite power and authority to execute and deliver this Agreement and any other documents necessary to consummate this Agreement and to perform their respective obligations hereunder and thereunder.  The individuals who have executed this Agreement on behalf of the Parties expressly represent

and warrant that they are fully authorized to sign on behalf of such Parties for the

purpose of duly binding such Parties to the terms of this Agreement subject only,

in the case of CDOW, to approval of the Bankruptcy Court as contemplated

herein.

11.2.   The execution, delivery and performance of this

Agreement and any other documents necessary to consummate this Agreement

do not, and will not (i) require any approval by any court (other than the

Bankruptcy Court and such other courts of the United States in the event of an

appeal); (ii) require any action by or in respect of, notice to or filing with, any

governmental entity, agency or FFIC; or (iii) contravene, or constitute a default

under any contract or instrument to which any of them is a party or result in a

violation of any provision of applicable law or regulation.

11.3.   This Agreement constitutes a valid and binding

agreement enforceable in accordance with its terms and, when executed and

delivered in accordance with the terms of this Agreement and in the form of the

accompanying exhibits and any other documents necessary to consummate this

Agreement, will constitute valid and binding instruments enforceable in

accordance with their terms.

11.4.   CDOW is the sole owner of all of the Policies and all of

the rights, obligations, coverages, Claims, causes and/or choses in action which

are intended to be affected by this Agreement; and no subrogation of any such

Claims, causes and/or choses in action has taken place.   CDOW is not effected,

permitted or attempted to effect any assignment of any of the Policies or any

33

Claims as they relate to the Policies. CDOW covenants that it will not in the future effect, permit or attempt to effect any assignment of any of the Policies or Claims as they relate to the Policies to any Person without the prior written consent of FFIC.

11.5. Until such time as the Approval Order becomes a Final Order and, if so, thereafter, CDOW shall not commence, or continue against FFIC any action, suit or proceeding of any nature whatsoever with respect to the matters, conduct, transactions, occurrences, facts or other circumstances alleged in, arising from, or related to any Claims and/or the Policies.

11.6. CDOW shall use its best efforts to provide actual notice of the Approval Motion to any and all known or potential holders of Claims which a diligent review of CDOW's books and records would reveal. As of the date the Approval Order is entered, CDOW shall not have any knowledge or information that any Person holding a Claim that has not received actual notice of the Approval Motion intends to proceed directly against FFIC to enforce such Claims in the Bankruptcy Case or otherwise.

11.7. These representations, warranties and covenants are continuing and shall survive the Effective Date and the consummation of this Agreement.

11.8. That they have read this Agreement and know the contents hereof, that the terms hereof are contractual and not by way of recital, and that they have signed this Agreement of their own free acts; and

11.9. That in making this Agreement, they have obtained the advice of legal counsel.

12. <u>No Precedent</u>. This Agreement is intended to be and is a compromise of disputed claims among the Parties. The Parties acknowledge and agree that all undertakings and agreements contained in this Agreement have been voluntarily agreed to solely for the purpose of finally compromising, settling and resolving all questions, disputes and issues between them relating to the Claims (including, without limitation, the existence of insurance coverage for CDOW under the Policies) or otherwise, without incurring expense, inconvenience and uncertainty of protracted litigation. This Agreement and any proceeding taken pursuant hereto shall not in any event be construed as, interpreted as, or deemed to be evidence of an admission or concession by any of the Parties for any purpose, or deemed to constitute a waiver of any legal position or any defenses or other rights which any of the Parties might otherwise assert in any context. Neither this Agreement nor any of its provisions nor any other documents related hereto, nor any negotiations, statements or testimony taken in connection herewith may be offered or received in evidence in, or used for any other purpose in connection with any suit, action or legal proceeding which any of the Parties may now have or in the future have with any other Person or entity, as an admission or concession of liability or wrongdoing or as any admission or concession on the part of any of the Parties, except in connection with any action or legal proceeding to enforce this Agreement, regarding the nature or existence of any rights, duties or obligations under and/or in relation to any of the Policies or any other policies of insurance alleged or otherwise, any interpretation of any insurance coverage under and/or in relation to any of the Policies or any other policies of insurance alleged or otherwise, or as any admission or concession whatsoever on the part of any of the Parties, except in connection with

any action or legal proceeding to enforce the terms of this Agreement.  By entering into this

Agreement, FFIC does not admit as a legal matter that it owes any duty or obligation to defend

or indemnify CDOW with respect to any Policies or any Claims.  This Agreement and its

provisions are not intended, nor shall they be cited, construed or represented in any litigation or

otherwise, to reflect the corporate position of FFIC as to the proper construction of any insurance

policies.  The Parties further acknowledge and agree that all undertakings and agreements

contained in this Agreement have been agreed to solely for the purpose of effectuating voluntary

settlements of the Claims, and shall not be deemed to constitute an admission or concession by

any of them for any purpose; nor shall such undertakings and agreements or this Agreement

itself be deemed to constitute a waiver of any legal position or any defenses existing or any other

agreements, or otherwise, which any of the Parties might otherwise assert in any context.  FFIC's

entry into this Agreement does not constitute an endorsement of any statement of position of any

kind as to any other aspect of the Cases.  FFIC reserves all rights to object to and/or oppose the

entry of any order, in the Cases that is inconsistent with any terms of this Agreement.  The

Parties further acknowledge and agree that nothing contained in this Agreement shall be

construed as a waiver, estoppel or invalidation of any position that the Parties may take in the

future with respect to the existence of an insurance policy or policies, or coverage, claims or

defenses related to any policies.  This Agreement creates no rights in any Person to any

insurance policy and, in the event that this Agreement is terminated, except where specifically

stated otherwise, it is agreed and understood that each of the Parties has reserved all of its claims,

rights, defenses and positions.

      13.  <u>Binding Effect</u>.  This Agreement (which shall include the Exhibits attached

hereto) shall inure to the benefit of and be binding upon the Parties and their respective parents,

subsidiaries, affiliated companies, transferees, assigns, representatives, principals, agents, officers, directors, employees, predecessors, successors and assigns under the Bankruptcy Code and otherwise.  Upon the Confirmation Order becoming a final order, this Agreement shall become immediately and automatically binding upon the Trust, and the Trust shall be deemed to be a Party to this Agreement without the need for further action.  Once the Effective Date has occurred, this Agreement, and the obligations of the Parties hereunder, shall survive the dismissal or conversion of the Bankruptcy Case, and shall be binding on any subsequent trustee appointed in the Bankruptcy Case under any chapter of the Bankruptcy Code.

14. <u>Confidentiality</u>.  The terms of this Agreement, as well as the discussions that led up to it, are strictly confidential, and shall not be disclosed to any Person not a Party to this Agreement, or not a director, employee, agent or representative of a Party with a need to know about this Agreement, except to (i) the United States Trustee; (ii) any reinsurers or reinsurance intermediaries of FFIC or any retrocessionaire of a reinsurer of FFIC; (iii) to outside auditors or accountants of the Parties, with appropriate assurances of confidentiality or (iv) under a written agreement of confidentiality or protective order: (a) to insurance regulators; (b) to the extent necessary to obtain the approval of the Bankruptcy Court and then only under seal; (c) in any action or proceeding to enforce this Agreement; (d) for the purpose of demonstrating or proving the exhaustion of any limits of liability contained in the Policies to any other insurer of any of the Parties that may be affected by any impairment of the Policies; and (e) as otherwise agreed to by the Parties in a written amendment to this Agreement.  No such disclosures shall be made until the Person to receive such confidential documents or information is advised in writing of its protected and confidential nature.  If any application or request of any kind for disclosure of this Agreement or its terms is received by any of the Parties, except with respect to (iv)(c) above, that

Party shall give the other Parties immediate (and in any case not less than thirty (30) days) written notice upon receipt of such application or request setting forth all information sought to be disclosed, the identity of each Person to whom such information is sought to be disclosed, the confidentiality agreements governing any such proposed disclosure and the circumstances pursuant to which such proposed disclosure is to be made; and no disclosure shall be made before the Parties shall have a reasonable opportunity to challenge such proposed disclosure. Should a court order the disclosure of this Agreement or its terms to any Person, the Parties shall use their best efforts to maintain this Agreement and its terms under seal and/or protective order. This provision shall not prevent disclosure of the existence, as opposed to the terms, of this Agreement. All negotiations leading up to this Agreement, all communications generated pursuant to it, and the implementation of this Agreement will be deemed to fall within the protection afforded settlements, offers to compromise and compromises by Rule 408 of the Federal Rules of Evidence and analogous state law principles.

15. <u>Availability of Injunctive Relief</u>. Each of the Parties expressly agree and acknowledge that irreparable injury may result to the other in the event of a breach by any of them of this Agreement, and in the event of such a breach, or the threat thereof, the aggrieved party shall be entitled, in addition to any other available remedies and without a showing of actual damage, to temporary or permanent injunctive or other equitable relief to restrain any and/or enjoin any actual, prospective or threatened violation of this Agreement.

16. <u>Termination</u>. This Agreement shall terminate and be of no further force and effect, and the Parties shall be released from all obligations hereunder (except for any provisions hereof which shall survive such termination) if, at any time, any of the conditions precedent as set forth in sections [5.1] through [5.5] of this Agreement cannot be satisfied.

16.1.  In the event of any termination of this Agreement, each of the Parties shall be released from all obligations hereunder (except for any provisions hereof that shall survive such termination), and each Party shall be restored to its respective position existing immediately prior to the execution of this Agreement, without prejudice.

16.2.  In the event of any termination of this  Agreement, the Parties acknowledge and agree that this Agreement and all negotiations and proceedings connected herewith shall be without prejudice to any of the rights or remedies of any of the Parties and no part of this Agreement or any statement by any Party, any findings of fact or any conclusions of law related thereto may be used in any manner by any Party in any action, suit or proceeding as evidence of the respective rights, liabilities, duties, or obligations of the Parties.

17.  Construction.  This Agreement was negotiated at arm's length by parties of equal bargaining power with each party participating in the joint drafting effort and each receiving advice from competent legal counsel of their own choosing.  It is the intent of the Parties that no part of this Agreement (as a result of any claimed ambiguity or otherwise) should be construed for or against either of the Parties on account of the drafting or the identity of the drafter.  In the event that any dispute, disagreement or controversy arises regarding this Agreement, the Parties hereto shall be considered joint authors and no provision shall be interpreted against FFIC because they are insurance companies.  This Agreement is not a contract of insurance and the Parties agree that any special rules of interpretation or construction of contracts of insurance, including, without limitation, the doctrine of *contra proferentem*, shall not apply.  The Parties further acknowledge and agree that the obligations and Release are in

good faith and are reasonable in the context of the overall compromise settlement embodied in this Agreement.

      18. <u>Notice</u>. All notices or other communications which any Party desires or is required to give shall be given in writing and shall be deemed to have been given if hand delivered, sent by telecopier or mailed by depositing in the United States mail, prepaid to the party at the address noted below or such other address as a party may designate in writing from time to time:

      CDOW:

      Rev. Msgr. J. Thomas Cini
      Vicar General for Administration
      Catholic Diocese of Wilmington
      P.O. Box 2030
      Wilmington, DE 19899-2030

      With copies to:

      Anthony G. Flynn, Esq.
      Young Conaway Stargatt & Taylor LLP
      The Brandywine Building
      1000 West St., 17th Floor
      P.O. Box 391
      Wilmington, DE 19899-0391
      aflynn@ycst.com

FFIC:

Director of Hazardous Waste
Fireman's Fund Insurance Companies
Historical Claims Department
777 San Marin Drive
Novato, CA 94998-3400

Allianz S.p.A.

Daniel Kane
Allianz S.p.A./RAS
Historical Claims Department
777 San Marin Drive
Novato, CA  94998-3400

With copies to:

Gary D. Centola, Esq.
Rivkin Radler LLP
926 RXR Plaza
Uniondale, New York  11556-0926

19. <u>Severability</u>.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provisions will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement, which shall remain in effect and be interpreted so as best to reasonably effect the intent of the Parties. Notwithstanding the foregoing, the provisions in this Agreement regarding the entry of the Approval Order as a final order (including a permanent injunction prohibiting the bringing of Claims against FFIC), and the effectiveness of the Release [and the indemnification] of FFIC shall not be severable from this Agreement.

20. <u>Governing Law</u>.  This Agreement shall be governed by and construed and enforced in accordance with the bankruptcy laws of the United States and the laws of the State of

[Delaware] without giving effect to the rules and principles of conflict of laws under the laws of the State of [Delaware].

21.  Dispute Resolution.  Should any dispute arise concerning the terms, meaning or implementation of this Agreement, the Parties shall use their best efforts to reach a prompt resolution of such dispute.  In the event that they are unable to do so, the Bankruptcy Court and, in the event of an appeal, any other courts of the United States, if necessary, shall have exclusive and continuing jurisdiction to resolve all disputes concerning the interpretation and enforcement of this Agreement and any other documents executed in conjunction with this Agreement.

22.  Assignment.  No rights or obligations under this Agreement may be assigned to any entity without the express written consent by FFIC.  The identity of any present or future counter-parties to this Agreement is a material term of this Agreement upon which FFIC is expressly relying in undertaking the obligations in this Agreement, and any attempted assignment without FFIC's prior written consent shall constitute a material breach of this Agreement excusing all further performance by FFIC.

23.  Counterparts.  The parties to this Agreement hereby agree that this Agreement may be executed in counterparts, and that all such counterparts shall constitute one instrument binding on the signatories in accordance therewith, notwithstanding that all signatories are not signatories to the original or the same counterpart.

24. No Waiver.  No waiver or indulgence of any breach or series of breaches of this Agreement shall be deemed or construed as a waiver of any other breach of the same or any other provision hereof or affect the enforceability of any part or all of this Agreement, and no waiver shall be valid unless executed in writing by the waiving party.

25. <u>Headings</u>.  The paragraph headings in this Agreement are inserted for convenience of reference only and are not part of the substance of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Settlement Agreement and Release under seal on the dates shown below:

CATHOLIC DIOCESE OF WILMINGTON, INC.

_____ (SEAL)

_____

WITNESS

Dated:_____

FIREMAN'S FUND INSURANCE COMPANY,
ADRIATIC INSURANCE COMPANY, ALLIANZ
S.p.A. and ALLIANZ

_____ (SEAL)

_____

WITNESS

Dated:_____

**EXHIBIT B**

**Policies Allegedly Issued by Fireman's Fund Insurance Company, Adriatic Insurance Company, Allianz S.p.A. and Allianz**

| Policy | Period |
|--------|--------|
| EL-1971 | 7/1/77-7/1/78 |
| EL-794361 | 3/9/80-3/9/81 |
| XLB 142-06-08 | 1/17/80-7/1/80 |
| XLX-168-65-15 | 7/1/84-7/1/85 |
| XLX-175-05-91 | 7/1/85-6/30-86 |

2509070 v1

c.      **Scottsdale Insurance Company**

# SETTLEMENT, MUTUAL RELEASE AND POLICY BUYBACK AGREEMENT

## BETWEEN THE CATHOLIC DIOCESE OF WILMINGTON, INC.
## AND
## SCOTTSDALE INSURANCE COMPANY

**Parties to Agreement.** This Settlement, Mutual Release and Policy Buyback Agreement (the "*Agreement*") is made and entered into by and between the Roman Catholic Bishop of Wilmington, and successors, d/b/a the Catholic Diocese of Wilmington, Inc. (the "*Seller*"), on its own behalf and on behalf of the **Seller Releasing Parties** (defined in paragraph I.A.5,) who are or were insureds under those seven (7) individual policies of insurance issued by **National Casualty Company** ("National Casualty") and **Scottsdale Insurance Company** ("Scottsdale"), with effective dates July 1, 1990 through July 1, 1997 (defined particularly in paragraphs I.A.2.a. and I.A.2.b.), (collectively the "*Buyer*"), on their own behalf and on behalf of the **Buyer Releasing Parties** (defined in paragraph I.A.6.). Seller and Buyer shall be referred to herein as the "*Parties*" or singularly as a "*Party*."

## I.    BACKGROUND

### A.    BACKGROUND AND CERTAIN DEFINITIONS

#### 1.    General Description of Claims.

a.    **Claims** (defined in paragraph I.A.l.b.) and/or lawsuits have been made or filed against Seller and/or others and Claims and/or lawsuits may be made and filed against Seller and/or others by entities or individuals in the future, alleging various acts or omissions, including, without limitation, those related to sexual and/or physical abuse committed by priests and other personnel for which entities or individuals seek or may seek to hold Seller and/or others liable, or for which other entities or individuals may seek to impose liabilities on Seller and/or others.

b.    **"*Claim*"** shall have the meaning set out in Section 101(5) of the Bankruptcy Code (11 U.S.CA. § 101(5)), as follows:

"The term 'claim' means–

**(A)** right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured."

"*Claim*" also includes all present or future claims alleging various acts or omissions, including, but without limitation, those related to sexual and/or physical abuse committed by priests and other personnel, whether or not brought pursuant to the Delaware Child Victim's Act of 2007, 10 *Del. C.* § 8145, and **Contribution and Related Claims** (defined in paragraph I.A.9.) by any person or entity.

2.     **The National Casualty Company and Scottsdale Insurance Company Policies.**

a.     National Casualty Company entered into the following contracts of insurance with Seller and certain other insureds: Policy No. UM011250 (a/k/a UMO0011250) in effect from 07/01/1990 through 07/01/1991; Policy No. UM009866 (a/k/a UMO0009866) in effect from 07/01/1991 through 07/01/1992; Policy No. UM008674 (a/k/a UMO0008674) in effect from 07/01/1992 through 07/01/1993; and Policy No. UM0020811 (a/k/a UMO0020811) in effect from 07/01/1993 through 07/01/1994.

b.     Scottsdale Insurance Company entered into the following contracts of insurance with Seller and certain other insureds: Policy No. UMB056467 (a/k/a UMB0056467) in effect from 07/01/1994 through 07/01/1995; Policy No. UMB057458 (a/k/a UMB0057458) in effect from 07/01/1995 through 07/01/1996; and Policy No. UMB0028449 in effect from 07/01/1996 through 07/01/1997.

c.     Hereinafter, the "*Scottsdale Policies*" shall refer collectively to any and all insurance contracts or policies of any kind ever actually or allegedly entered into between Seller and other insureds, on the one hand, and **National Casualty Company** or **Scottsdale Insurance Company**, on the other hand, for the period July 1, 1990 to July 1, 1997, whether or not listed herein, identified in prior correspondence or pleadings, and whether known or unknown.

d.     By referencing the "Scottsdale Policies" Buyer does not concede that Seller or anyone else has established entitlement to coverage under any policy issued by any Buyer-affiliated insurer for any Tort Claims (defined

in paragraph I.A.3.). Buyer's position regarding coverage is disputed by Seller.

e.      As noted above, disputes have arisen between Seller and Buyer concerning the existence and terms of the Scottsdale Policies, including: (i) the existence, nature, and limits of coverage under the Scottsdale Policies; (ii) the Buyer's obligations, if any, to Seller and others allegedly insured under the Scottsdale Policies; and (iii) the potential coverage under the Scottsdale Policies, if any, for the Tort Claims.

3.      **Tort Claims Definition.** "Tort Claims" shall refer to any and all Claims or interests, past, present or future, direct or indirect, presently known or unknown, including allegations or Claims for damages, indemnity, contribution, or otherwise, against Seller or other insureds under the Scottsdale Policies, by anyone who alleges injury or damage during the July 1, 1990 to July 1, 1997 Scottsdale Policy periods that is allegedly compensable or potentially compensable under the Scottsdale Policies, including, without limitation, those related to sexual or physical abuse committed by priests or other personnel.

4.      **The Bankruptcy Case.** On October 18, 2009, Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"), in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"), which case is currently pending as Case No. 09-13560 (CSS) (the "*Bankruptcy Case*").

5.      **The Seller Releasing Parties.** "Seller Releasing Parties" means all persons or entities that are or were insured under the Scottsdale Policies for the period between July 1, 1990 and July 1, 1997, whether or not listed as an insured thereunder or alleged by Seller to be an insured thereunder, and includes, without limitation: (i) all persons, entities, offices, agencies, parishes, missions, churches, cemeteries, schools, or other institutions who participated in Seller's insurance program during the period of the Scottsdale Policies and who were, are or claim to be insured under the Scottsdale Policies; (ii) all predecessors, successors and assigns of any of the above in subsection (i); and (iii) Seller's Bishop and his predecessors, successors and assigns.

6.      **The Buyer Releasing Parties.** "Buyer Releasing Parties" means: (i) all predecessors, successors, and assigns of Buyer; and (ii) Buyer's directors and their predecessors, successors and assigns.

7.      **The Buyer Released Parties.** "Buyer Released Parties" is defined in paragraph II.C.1.a.

8.      **The Seller Released Parties.** "Seller Released Parties" is defined in paragraph II.C.4.a.

9.      **Contribution and Related Claims.** "Contribution and Related Claims" means any Claim by any person or entity, including without limitation any insurers for Seller and the Selling Releasing Parties, or Buyer and the Buyer Releasing Parties, based on contribution,

indemnity, subrogation or any similar legal theories (including attorney fees and costs) related, directly or indirectly, to the Scottsdale Policies.

          **10.**    **Settlement of Claims.** Seller and Buyer desire to effect a full and final settlement, compromise, mutual release, and resolution of the Claims, defenses, rights, disputes and disagreements specifically accomplished elsewhere in this Agreement.

          **11.**    **The Effective Date of This Agreement.** The "Effective Date" of this Agreement is set out in paragraph II.A.

          **12.**    **Sale and Buyback of Scottsdale Policies.** As part of the settlement, compromise, mutual release, and resolution of the matters resolved herein (see paragraph II.D.1.), the Parties, the Seller Releasing Parties, and the Buyer Releasing Parties wish to effect a sale and buyback to Buyer of Seller's and the Seller Releasing Parties' interests in the Scottsdale Policies free and clear of all liens, Claims. encumbrances and other interests pursuant to section 363 of the Bankruptcy Code.

          **13.**    **Arm's Length Negotiations.** This Agreement has been negotiated at arm's length and in good faith by the Parties hereto, and each Party has received the advice of counsel in the negotiation, preparation, drafting and execution of this Agreement.

          NOW, THEREFORE, in consideration of the above premises and the mutual promises and agreements contained herein,

IT IS AGREED AS FOLLOWS:

**II.**    **AGREEMENT**

    **A.**    **CONDITIONS TO THE EFFECTIVE DATE.** This Agreement, which includes all prior written paragraphs, including the Background Section I., shall become effective on the date (the "Effective Date") that all the following conditions have been satisfied or, as to each condition other than II.A.l, II.A.2, and II.A.4, are waived by Buyer:

          1.    Both Parties have executed this Agreement.

          2.    Buyer has paid the Settlement Amount, and Seller has deposited it in the Settlement Trust as defined in the Settlement Plan referred to in paragraph II.A.1.e. (as such terms are hereinafter defined in paragraphs II.B.1. and 2.).

          3.    Seller has returned to Buyer the Scottsdale Policies (to the extent such original contracts are found to exist), or has otherwise complied with paragraph II.C.3. below.

4.     The Bankruptcy Court, or any court sitting in review of that court, has entered an **Approval Order** (as such term is defined in paragraph II.E.l herein) and such order has become a Final Order. As used herein, the term "*Final Order*" shall mean an order that has not been reversed, withdrawn, vacated or stayed, and as to which the time to appeal or seek review, rehearing or writ of certiorari has expired and as to which no appeal or petition for review, reconsideration or certiorari has been taken, or, if such appeal has been taken, it has been resolved by a Final Order).

5.     The Bankruptcy Court has entered a Final Order confirming (the "*Confirmation Order*") the Settlement Plan set forth in the Second Amended Plan of Reorganization of Catholic Diocese of Wilmington, Inc., dated May 23, 2011, D.I. 1321 and all Exhibits thereto  (the "*Plan*") which Plan contains releases, channeling and other injunctions, and exculpations in favor of the Buyer Released Parties and in form and substance acceptable to the Buyer Released Parties in their sole discretion.

## B.     THE SETTLEMENT AMOUNT

1.     <u>Deposit of Settlement Amount.</u> The Parties intend to promptly execute this Agreement.  Upon notification by Seller that the Conditions Precedent to Effectiveness have been fulfilled and Seller's providing Buyer with instructions on how payment should be made, Buyer shall cause to be deposited into the Settlement Trust the sum of two hundred twenty-five thousand dollars ($225,000.00) (the "*Settlement Amount*" or the "*Settlement Funds*").  Payment may be made by check or wire transfer.

**[The remainder of this page is intentionally left blank]**

2. **Transfer of Ownership of Settlement Amount and the Scottsdale Policies Upon Occurrence of Effective Date.** Until the occurrence of the Effective Date, all right, title, and interest in and to the Settlement Funds and the Account shall remain with Buyer, and all right, title, and interest in the Scottsdale Policies, if any, shall remain with Seller and any other insureds, if any, under the Scottsdale Policies. The Parties agree that unless and until the Effective Date occurs, the Account and its proceeds are the property of Buyer and not the property of Seller or of Seller's estate. Upon the occurrence of the Effective Date, all right, title, and interest in and to the Settlement Funds and the Account shall vest in Seller and Seller's estate, and the right, title, and interest of Seller and the Seller Releasing Parties in the Scottsdale Insurance Policies shall vest in Buyer.

3. **Use of Settlement Amount.** The Parties agree that after the Effective Date occurs, the Account and its proceeds are the property of Seller or of Seller's estate, and Buyer shall take such steps and execute such documents reasonably necessary to effectuate the transfer the funds and/or the Account to Seller. Except as otherwise ordered by the Bankruptcy Court after notice and a hearing, Seller agrees that it shall use any and all sums received hereunder solely toward the resolution of Tort Claims.

## C. RELEASES AND CONTRIBUTION CLAIMS

1. **Release of Buyer.**

a.     In addition to, and not in substitution for, those Releases provided to the Buyer Released Parties (as defined herein) provided under the Plan, upon the occurrence of the Effective Date, Seller and the "*Seller Releasing Parties*" hereby completely release and forever discharge: (i) Buyer and the Buyer Releasing Parties, and all of their employees, directors, officers, shareholders, agents, representatives and attorneys (including the law firms of Deasey, Mahoney, Valentini & North, Ltd. and Morris James, LLP, including any attorney, partner, counsel, associate, or employee of any type of said law firms); (ii) predecessors, successors and assigns (hereinafter, collectively, the "**Buyer Released Parties**"); and (iii) all other persons and entities who acted on behalf of such Buyer Released Parties (who are also included as part of the Buyer Released Parties); from: any and all actions, causes of action, suits, charges, complaints, Claims, liabilities, damages (including those for bad faith, punitive damages, extra-contractual liability, Contribution and Related Claims, tort damages, or statutory damages), obligations, promises, contracts, acts, agreements, controversies, demands, fees, costs, losses, debts and expenses (including attorneys fees and costs) of any nature whatsoever, whether legal or equitable, known or unknown, past, present, or future,

suspected or unsuspected, fixed or contingent, that are related, directly or indirectly, to the Scottsdale Policies.

b.  It is further understood and agreed that the releases in paragraph II.C.l. do not affect the right of Seller or the Seller Releasing Parties to assert future claims on: (i) lost policies, if any, other than the Scottsdale Policies; or (ii) excess, reinsurance, or other insurance, if any, on policies other than the Scottsdale Policies.

c.  Seller acknowledges, represents and warrants that it is the owner of the Scottsdale Policies, that it is the owner of the Claims it released herein, and that it has not assigned and will not assign or otherwise transfer any such Claims to any person or entity.

d.  Seller and all of the Seller Releasing Parties further agree that if, contrary to the Parties' specific intent, any Claims released pursuant to this paragraph II.C.l. are deemed to survive this Agreement, even though they are encompassed by the terms of the release set forth in this paragraph II.C.1, Seller and all the Seller Releasing Parties hereby forever, expressly and irrevocably, waive entitlement to and agree not to assert any and all such Claims.

2.  **Release of the Scottsdale Policies.**

a.  Upon the occurrence of the Effective Date, Seller and the Seller Releasing Parties agree that Buyer will have bought back the Scottsdale Policies free and clear of all liens, Claims, encumbrances and other interests (including but not limited to Contribution and Related Claims by any person or entity), and all rights of Seller, any of the Seller Releasing Parties, or any party claiming by, through, on behalf of, or under Seller or the Seller Releasing Parties, of any nature whatsoever under the Scottsdale Policies.

b.  Seller and the Seller Releasing Parties, and Buyer and the Buyer Releasing Parties, agree that upon Buyer's payment of the Settlement Amount, then: (i) Buyer will have fully and completely performed any and all obligations, if any, under the Scottsdale Policies owed to Seller or to any of the Seller Releasing Parties, including payment of all Claims under the Scottsdale Policies with respect to Seller and the Seller Releasing Parties, whether past. present or future, known or unknown; and (ii) Buyer's payment of the Settlement Amount effects a complete sale and buyback, outright, of Seller's and the Seller Releasing Parties' interest in and to the Scottsdale Policies to Buyer, free and clear of all liens, Claims,

encumbrances and other interests and rights (including but not limited to Contribution and Related Claims of any person or entity).

c.  Upon the occurrence of the Effective Date, the Parties intend that all rights, title or interest which Seller or the Seller Releasing Parties may have had, may presently have, or in the future may have in relation to the Scottsdale Policies arc hereby completely released. In this connection, the Parties intend, and Seller and the Seller Releasing Parties agree that Seller accepts the Settlement Amount in full and complete satisfaction of any and all of Buyer's past. present and future obligations to Seller and the Seller Releasing Parties under the Scottsdale Policies or arising therefrom.

**3.    Return of the Scottsdale Policies.**

a.  Upon the occurrence of the Effective Date, Seller shall promptly physically return the Scottsdale Policies to Buyer by sending to counsel for Buyer: (i) the original of any such contract, if located; (ii) if no original can be located, a copy of such contract, if one is found, and a certification that no original could be found. in which case the copy delivered to Buyer shall be treated for all purposes as if it were an original; or (iii) if no original or copy can be located, a certification to that effect, which shall have the same force and effect as if the Original of that contract were returned to Buyer.

b.  In the event that any of the original Scottsdale Policies are subsequently discovered by Seller, such original(s) shall promptly be sent to Buyer. In the event that any new evidence or indicia of the Scottsdale Policies are found, Seller shall promptly provide a certification concerning that policy or policies per subparagraph a.(iii) above and deliver such new evidence to Buyer.

**4.    Release of Seller.**

a.  Upon the occurrence of the Effective Date, Buyer and the "**Buyer Releasing Parties**" hereby completely release and forever discharge: (i) Seller and the Seller Releasing Parties, and all of their employees, directors, officers, shareholders, agents, representatives, and attorneys (including the law firm of Young Conaway Stargatt & Taylor, LLP, including any attorney, partner, counsel, associate, or employee of any type of said law firm); (ii) predecessors, successors, and assigns (hereinafter, collectively, the "**Seller Released Parties**"); and (iii) all other persons and entities who acted on behalf of such Seller Released Parties (who are also included as part of the Seller Released Parties); from: any

and all actions, causes of action, suits, charges, complaints, Claims, liabilities, damages (including those for bad faith, punitive damages, extra-contractual liability, Contribution and Related Claims, tort damages, or statutory damages), obligations, promises, contracts, acts, agreements, controversies, demands, fees, costs, losses, debts, and expenses (including attorneys fees and costs) of any nature whatsoever, whether legal or equitable, known or unknown, past, present, or future, suspected or unsuspected, fixed or contingent, that are related, directly or indirectly, to the Scottsdale Policies.

b.    It is further understood and agreed that the releases in paragraph II.C.2. do not affect the right of Seller or the Seller Releasing Parties to assert future claims on: (i) lost policies, if any, other than the Scottsdale Policies; or (ii) excess, reinsurance, or other insurance, if any, on policies other than the Scottsdale Policies.

c.    Buyer acknowledges, represents and warrants that it is the owner of the Claims released herein, and that it has not assigned and will not assign or otherwise transfer such Claims to any person or entity.

d.    Buyer and all of the Buyer Releasing Parties agree that if, contrary to the Parties' specific intent, any Claims released pursuant to this paragraph II.C.4. are deemed to survive this Agreement, even though they are encompassed by the terms of this release set forth in this paragraph II.C.4., Buyer and all of the Buyer Releasing Parties hereby forever, expressly and irrevocably, waive entitlement to and agree not to assert any and all such Claims.

**5.    Contribution and Related Claims.**

a.    Upon the occurrence of the Effective Date, Buyer will not make any Contribution and Related Claims against any insurer of Seller or the Seller Released Parties who are insureds under the Scottsdale Policies (including claims for contribution or reimbursement of any part or all of the Settlement Amount paid to Seller hereunder or other payments or costs and attorney fees associated with the Scottsdale Policies; provided, however, that if any other insurers for Seller or for any Seller Released Party attempts (despite the complete releases contained herein and the "free and clear" sale and buyback of the Scottsdale Policies pursuant to this Agreement) to assert any Contribution and Related Claims against Buyer with respect to the Scottsdale Policies, then Buyer shall retain all of its rights, claims, Contribution and Related Claims, Claims, or defenses

against such other insurers who are making Contribution and Related Claims against Buyer.

b.      Upon the occurrence of the Effective Date, other insurance companies will be barred from asserting cross-claims or initiating proceedings against Buyer for Contribution and Related Claims related directly or indirectly to the Scottsdale Policies.

c.      Upon the occurrence of the Effective Date and the payment by Buyer of the Settlement Amount: (i) the Buyer's obligations with respect to the Scottsdale Policies shall completely terminate. To the greatest extent allowed by law, no other insurer for Seller or the Seller Released Parties, upon the Effective Date, shall be entitled to recover any Contribution and Related Claims from Buyer with regard to the Scottsdale Policies.

d.      In an effort to minimize the possibility of attempted assertion of Contribution and Related Claims against Buyer by any other insurer for Seller or the Seller Releasing Parties, Seller agrees to use reasonable best efforts (not including monetary concessions) to obtain a release or waiver from any such other insurer of any and all Contribution and Related Claims against Buyer whenever Seller negotiates a settlement with any such other insurer with respect to such other insurer's obligations to the Seller or the Seller Releasing Parties who are insureds under the Scottsdale Policies. If requested, Buyer agrees that it will provide releases and waivers to any other insurer commensurate with the releases and waivers with respect to Contribution and Related Claims that any other insurer provides to Buyer.

## D.   SALE FREE AND CLEAR

1.      **Sale and Buyback of Interests in the Scottsdale Policies.** Upon the occurrence of the Effective Date, this Agreement effects a sale and buyback of the Scottsdale Policies to Buyer. Seller and the Seller Releasing Parties hereby sell their interests in the Scottsdale Policies to Buyer, and Buyer hereby buys back all of their interests in the Scottsdale Policies from Seller and the Seller Releasing Parties, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, free and clear of liens, Claims, Contribution and Related Claims, encumbrances, and other interests.

2.      **Good Faith Purchase; Fair and Reasonable Settlement: Reasonable Equivalent Value; Compliance with Law.** The Parties acknowledge and agree that: (i) Buyer is a good faith purchaser of Seller's and the Seller Releasing Parties' interests in the Scottsdale Policies, within the meaning of section 363(m) of the Bankruptcy Code; (ii) the consideration exchanged by the Parties pursuant to this Agreement constitutes a fair and reasonable settlement

of the Parties' disputes and of their respective rights and obligations relating to the Scottsdale Policies, and satisfy, to the extent necessary, the provisions for approval of such settlements pursuant to Fed. R. Bankr. P. 9019; (iii) the releases contained in this Agreement and this policy buyback comply with the Bankruptcy Code; and (iv) this Agreement in no way voids, annuls or attempts to void or annul the Scottsdale Policies, and, which, with respect to Seller and the Seller Releasing Parties, has been fully performed.

       3.    **Good Faith Efforts re: Sale and Buyback.** In furtherance of the sale and buyback free and clear under section 363 of the Bankruptcy Code to Buyer by Seller and the Seller Releasing Parties of their interests in the Scottsdale Policies, the Parties agree that Seller will use its best efforts in the Bankruptcy Court and/or the District Court to include, in any plan and any order confirming such plan, an injunction that protects Buyer, its predecessors, successors, and assigns, and their respective officers and directors, against the assertion of Claims that in any way relate to the Scottsdale Policies. Such efforts shall include, without limitation, urging the Bankruptcy Court and/or the District Court to overrule any objections to an injunction and/or to a plan that contains an injunction, and defending against any motion, objection, or other challenge to the Bankruptcy Court's and/or District Court's entry of an order approving an injunction and/or confirming a plan that contains an injunction. If an appeal of any order confirming a plan is filed and the appeal raises the issue of the injunction described in this paragraph, Seller shall, at Buyer's expense (meaning only that Buyer will draft all briefs. motions, memoranda, affidavits, or other documents, subject to Seller's reasonable approval thereof), take steps to pursue or defend against such appeal, provided that Seller can do so without the issue of the injunction as it relates solely to Buyer and described in this paragraph being the sole source of delay in the effective date of such plan. Seller will use its best efforts to oppose entry of any stay pending appeal relating to the issue of the injunction described in this paragraph, and to vacate such stay if entered. Seller's best efforts do not include making monetary concessions.

       4.    **No Collusion in Connection with Sale and Buyback.** In furtherance of the sale and buyback free and clear under section 363 of the Bankruptcy Code to Buyer by Seller, the Parties acknowledge and agree that there are no grounds or bases to avoid such sale under 363(n) of the Bankruptcy Code.

    E.    **THE APPROVAL ORDER**

       1.    This Agreement is subject to and conditioned on the Bankruptcy Court entering an order approving this Agreement, a form of which is attached hereto as Exhibit A (the "*Approval Order*").

       2.    After all Parties have executed this Agreement, Seller shall file a motion: (i) seeking an Approval Order pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and sections 105(a) and 363 of the Bankruptcy

Code; and (ii) requesting a hearing for the next available Court date after allowing adequate time for publication notice. The Sellers shall support approval of the motion, file responses to any objections, and take all reasonable steps to defend against any appeal from the Approval Order.

3. Seller shall provide written notice of the Parties' intent to seek approval of the Agreement to: (i) all known claimants or counsel for claimants who have filed a proof of claim in the Bankruptcy Case, who were scheduled by Seller (whether or not scheduled as non-contingent, liquidated and/or undisputed), or whose claims are pending and were tendered under the Scottsdale Policies as of the commencement of the Bankruptcy case, including all holders of Tort Claims or Contribution and Related Claims, and any other known creditors or claimants, at the address provided for notice in the proof of claim filed by each such claimant or the address listed for such claimant in Seller's schedules, or the address of such claimant last known to Seller, as applicable; (ii) all persons or entities who have filed a notice of appearance in the Bankruptcy Case; (iii) all entities known or alleged by Seller to have provided general liability insurance to Seller; (iv) counsel for the Official Committee of Unsecured Creditors; (v) counsel for the Official Committee of Lay Employees; and (vi) counsel for the Unofficial Committee of Abuse Survivors; via service on each such attorney of record in the Bankruptcy Case (if known), its registered agent for service of process in Delaware (if known), or at its address last known to Seller. Such notice shall be published one time in *USA Today* and *The Delaware News Journal* or in such other newspaper(s) as the Bankruptcy Court may order.

## F.    REPRESENTATIONS AND WARRANTIES OF THE PARTIES

1.    **Corporations.**  To the extent a Party is a corporation or other legal entity, each of the Parties separately represent and warrant that it has the requisite power and authority to enter into this Agreement and to perform the obligations contemplated by this Agreement, subject only to approval of the courts, as provided herein.

2.    **Individuals Signing Agreement.**  Each of the Parties represents and warrants that the individual who executes this Agreement on its behalf is duly authorized to do so.

3.    **Seller Releasing Parties and Buyer Releasing Parties.**

a.    Seller represents and warrants that it executed this Agreement on behalf of each and every one of the Seller Releasing Parties that is

or was an insured under the Scottsdale Policies, and that it is authorized to do so.

b.  Seller represents and warrants that it has not executed this Agreement on behalf of any Seller Releasing Party who was not an insured under the Scottsdale Policies, and states that it is not authorized to do so.

c.  Buyer represents and warrants that it executed this Agreement on behalf of each and everyone of the Buyer Releasing Parties, and states that it is authorized to do so.

4.  **Advice of Counsel.** In executing this Agreement, the Parties acknowledge that they have consulted with and have obtained the advice and counsel of their attorneys, and that they have voluntarily executed this Agreement: (i) after independent investigation and arm's length negotiations; (ii) without fraud, duress or undue influence; (iii) in good faith; and (iv) for good and valuable consideration.

5.  **No Assignments by Seller.** Seller represents and warrants that it has not assigned or otherwise transferred or subrogated any interest in the Scottsdale Policies. Seller also represents and warrants that it has not assigned or otherwise transferred or subrogated any interests in any Claims against Buyer that are the subject matter hereof.

6.  **Potential Mistaken Facts.** With respect to the matters released herein, the Parties specifically acknowledge that they may hereafter discover facts in addition to or different from those which they now believe to be true with respect to the released matters, but agree that they have taken that possibility into account in reaching this Agreement and that the mutual releases shall be and remain in effect notwithstanding the discovery or existence of any such additional or different facts, as to which each Party expressly assumes the risk.

G.  **MISCELLANEOUS**

1.  **Resolution of Disputes.**

a.  The Bankruptcy Court shall retain exclusive jurisdiction to enforce this Agreement and to interpret and resolve any disputes relating to this Agreement.

b.  If the Bankruptcy Court refuses or declines to exercise jurisdiction over any such dispute, the Parties agree to promptly meet and attempt to mutually resolve the dispute. If agreeable to both sides, the Parties may submit the dispute to a nonbinding ; alternative dispute resolution process, such as a mediation and/or settlement conference. Unless otherwise agreed to by the Parties, such meeting, mediation and/or settlement conference shall take place promptly in Wilmington, Delaware, or any other mutually

agreed upon location. Each Party shall pay its own attorney fees and costs for the meeting, mediation and/or settlement conference and shall share equally the costs of the mediator or the person conducting the settlement conference.

c.     In the event the meeting, mediation and/or settlement conference does not resolve the dispute, then either or both Parties may submit such dispute to the United States District Court for the District of Delaware. But, if such federal court lacks jurisdiction over the dispute, then either Party may submit such dispute to the Court of the State of Delaware, Wilmington. Appropriate appeal rights from either or both courts are reserved to the Parties. Either party may also remove the Case from state to federal court if federal jurisdiction is present. The Parties agree to submit to the jurisdiction of the aforesaid courts and consent to service of process by facsimile or e-mail, followed by certified mail, addressed in accordance with the notice provisions set forth herein.

   **2.     Applicable Law.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of Delaware, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Agreement and any other agreements, documents, and instruments executed in connection with this Agreement, except as otherwise expressly provided in the Agreement, the documents, or instruments.

   **3.     Limited Use of Agreement.** This Agreement shall not be construed as precedent nor as an admission by any Party as to the truth or merit of any contention made in connection with any Tort Claims, the Bankruptcy Case, or in any other litigation of any type, or with any other alleged liability, culpability, wrongdoing or insurance coverage. Settlement negotiations leading up to this Agreement and all related discussions and negotiations shall be deemed to fall within the protection afforded to compromises and offers to compromise by Rule 408 of the Federal Rules of Evidence or Rule 408 of the Delaware Uniform Rules of Evidence. Any evidence of the terms of this Agreement or negotiations or discussions associated with this Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties or obligations of the Parties, except in: (i) a proceeding to obtain the Approval Order; or (ii) an action or proceeding to enforce the terms of this Agreement. This Agreement shall not be used as evidence or in any other manner in any court or dispute resolution proceeding to prove the terms of any of the Scottsdale Policies, or to create, prove or interpret the Parties' right and obligations, if any, under the Scottsdale Policies, or as to any other person or any claims of any party against the Parties. This Agreement is executed to avoid costs and risks of litigation and as a compromise of disputed liabilities in light of the facts and circumstances of this particular matter.

4.    **No Admissions.** The Parties agree that nothing contained in this Agreement shall be deemed or construed to constitute: (i) an admission by Seller or Buyer that Seller, the Seller Releasing Parties, or any other person was or is entitled to any insurance coverage under the Scottsdale Policies; (ii) an admission by Seller or Buyer as to the validity or non-validity of any of the positions or defenses to coverage that have been or could have been asserted by Seller or Buyer; or (iii) an admission by Seller or Buyer of any liability whatsoever with respect to any of the Tort Claims.

5.    **Binding Agreement.** This Agreement shall be binding upon the Parties, the Seller Releasing Parties and the Buyer Releasing Parties, and upon their respective representatives, successors, and assigns, and shall inure to the benefit of the Parties, the Seller Released Parties and the Buyer Released Parties, as well as to their administrators, representatives, executors, successors and assigns. The releases set forth in this Agreement do not release any Party, the Seller Releasing Parties, or the Buyer Releasing Parties from the obligations contained in this Agreement. Obligations arising under this Agreement shall not be discharged in the Bankruptcy Case or any plan confirmed therein.

6.    **No Third-Party Beneficiaries.** The Parties agree that, except as set forth in this Agreement, there are no third-party beneficiaries of this Agreement, including but not limited to individuals and/or entities holding or asserting Tort Claims and other insurers of Seller or the Seller Releasing Parties.

7.    **Prompt Execution of Documents.** The Parties agree to promptly execute all documents and do all things necessary to effectuate fully the terms of this Agreement.

8.    **The Agreement.** This Agreement constitutes a single integrated written contract that expresses the entire agreement and understanding between the Parties. Except as otherwise expressly provided, this Agreement supersedes all prior communications, settlements, and understandings between the Parties and their representatives regarding the matters addressed by this Agreement. Except as explicitly set forth in this Agreement, there are no representations, warranties, promises, or inducements, whether oral, written, expressed, or implied, that in any way affect or condition the validity of this Agreement or alter or supplement its terms. Any statements, promises, or inducements, whether made by any Party or any agents of any Party, that are not contained in this Agreement shall not be valid or binding. No amendment, modification, addendum or revision of this Agreement shall be valid unless it is in writing and signed by the Party or Parties to be bound, in which event there is no need for legal consideration.

9.    **No Waiver of Breaches.** No waiver or indulgence of any breach or series of breaches of this Agreement shall be deemed or construed as a waiver of any other breach of the same or any other provision hereof or affect the enforceability of any part or all of this Agreement, and no waiver shall be valid unless executed in writing by the waiving party.

10.    **No Waiver by Parties.** By entering into this Agreement, none of the Parties has waived, or shall be deemed to have waived, any rights, obligations, or positions it or they have asserted or may in the future assert in connection with any matter or person outside the scope of this Agreement.

11.    **No Benefit to Other Insurers.** This Agreement is not intended to benefit any insurer not a party hereto. Any insurer who is not a party to this Agreement is not a third-party beneficiary of this Agreement, and is not entitled to assert any benefit from this Agreement as against any of the Parties to this Agreement (including the Seller, the Seller Releasing Parties, the Buyer, and the Buyer Releasing Parties).

12.    **Without Prejudice.** No part of this Agreement, its negotiation or performance may be used in any manner in any action, suit or proceeding by any person not a not a party hereto as evidence of the rights, duties or obligations of any of the Parties with respect to matters or persons outside the scope of this Agreement. All action taken and statements made by the Parties or by their representatives, relating to this Agreement or participation in this Agreement, including its development and implementation, shall be without prejudice or value as precedent, and shall not be used as a standard by which other matters may be judged.

13.    **Validity of Agreement.** In the event that any substantive provision of this Agreement is found by a court of competent jurisdiction to be invalid or unenforceable, the Parties may jointly elect to: (i) rescind the Agreement, voiding it *ab initio,* with each Party returned to its original rights and positions as if the Agreement had never existed; (ii) enforce and be bound by the remainder of the Agreement; (iii) modify the Agreement by such substituted provisions as the Parties may reasonably agree; or (iv) resolve the issue pursuant to the dispute provisions of paragraph II.G.1.

14.    **Challenge to Agreement.** In the event that any action or proceeding of any type whatsoever is commenced or prosecuted by any Person not a Party hereto to invalidate, challenge, interpret, or prevent the validation, enforcement, or carrying out of all or any of the provisions of this Agreement, the Parties mutually agree, represent, warrant, and covenant to cooperate fully in opposing such challenge, action or proceeding.

15.    **Interpretation of Agreement.** As noted above, this Agreement is the result of arm's length negotiations, and shall be construed in all respects as if it were jointly drafted by the Parties, regardless of who drafted any particular provision. The language of all parts of this Agreement shall in all cases be construed as a whole according to its meaning and not strictly for or against any of the Parties.

16.    **No Attorney Fees or Costs.** Except as otherwise provided in this Agreement, each Party shall be responsible for its own attorney fees and costs incurred in conjunction with the Bankruptcy Case and the preparation of this Agreement.

17.    **Notices.** All notices, demands or other communications to be provided

pursuant to this Agreement shall be in writing and sent by facsimile, email, Federal Express or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other person or address as any of them may designate in writing from time to time:

**To Buyer:**

Ms. Suzan Shughart
Scottsdale Insurance Company
PO Box 4021
Scottsdale, AZ 85258

With a copy to:

John P. Morgenstern
Deasey, Mahoney, Valentini & North, LTD.
1601 Market Street, Suite 3400
Philadelphia, PA 19102

**To Seller:**

Rev. Msgr. J. Thomas Cini
Vicar General for Administration
Catholic Diocese of Wilmington
P.O. Box 2030
Wilmington, DE 19899-2030

With a copy to:

Anthony G. Flynn, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

    **18.**   **Titles and Headings.** Paragraph titles and/or headings contained in this Agreement are included only for ease of reference and shall have no substantive effect.

    **19.**   **Execution in Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

    **20.**   **Signing.** Each of the undersigned Parties agrees to be bound by the terms of this Agreement and executes it under seal as of its own free will.

Roman Catholic Bishop of Wilmington, and successors, d/b/a the Catholic Diocese of Wilmington, Inc., **(on behalf of Seller and the Seller Releasing Parties who are or were insureds under those seven (7) individual policies of insurance issued by National Casualty Company and/or Scottsdale Insurance Company, with effective dates July 1, 1990 through July 1, 1997)**

By: _____(SEAL)

Its: _____

Dated: _____


National Casualty Company and Scottsdale Insurance Company **(on behalf of Buyer and Buyer Releasing Parties)**

By: _____ (SEAL)

Their: _____

Dated: _____

**Approved as to Form**

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____

Anthony G. Flynn

      Counsel for Roman Catholic Bishop of Wilmington, and successors, d/b/a the Catholic Diocese of Wilmington, Inc. (**"Seller"**)

DEASEY, MAHONEY, VALENTINI & NORTH, LTD.

_____

John P. Morgenstern

      Counsel for National Casualty Company and Scottsdale Insurance Company ("**Buyer**")

d.    **Lloyd's Underwriters (pre-1994)**

## CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

This Confidential Settlement Agreement and Release (hereinafter the "Agreement") is made this ___ day of _____, 2011, by and between the Catholic Diocese of Wilmington, Inc. (hereinafter referred to as "Diocese"), the "Parishes", and the "Related Entities" (each as defined below) (collectively, the "Catholic Entities"), and Lloyd's Underwriters (as defined below) (the aforementioned parties being referred to hereinafter individually as a "Party" and collectively as the "Parties").

### WITNESSETH THAT:

WHEREAS, Lloyd's Underwriters severally subscribed to certain policies providing insurance to the Catholic Entities (the "Subject Insurance Policies", as defined below); and,

WHEREAS, certain of the Catholic Entities have incurred and may incur in the future certain liabilities, expenses and losses arising out of certain claims; and,

WHEREAS, some of those certain Catholic Entities tendered demands to Lloyd's Underwriters for coverage under the Subject Insurance Policies for such claims, and Lloyd's Underwriters dispute whether, and to what extent, coverage may attach with respect to any such claims under the Subject Insurance Policies ("Dispute"); and,

WHEREAS, on October 18, 2009, the Diocese filed a petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court"), Case No. 09-13560-CSS ("Bankruptcy Case"); and,

WHEREAS, upon confirmation of the "Settlement Plan" (as defined below) the Catholic Entities will enter into a settlement of all Survivor Claims in the Bankruptcy Case; and,

WHEREAS, whether or not they were subject to claims and whether or not they tendered demands to Underwriters, all Catholic Entities are settling with and releasing Lloyd's Underwriters pursuant to this Agreement; and,

WHEREAS, it is the intention of the Parties that the Subject Insurance Policies be sold, assigned and transferred to Lloyd's Underwriters and that Lloyd's Underwriters shall buy back the

1

Subject Insurance Policies, by payment of the "Settlement Amount" (as defined below); and,

WHEREAS, it is the intention of the Parties that any and all interests of the Catholic Entities in the Subject Insurance Policies shall be extinguished, ended, and forever terminated; and,

WHEREAS, it is the intention of the Parties that the Catholic Entities shall (i) not retain any right, title or interest in or to the Subject Insurance Policies, and (ii) release Lloyd's Underwriters, and that no Lloyd's Underwriter shall have any remaining duties or obligations of any nature whatsoever to any Catholic Entity; and,

WHEREAS, by this Agreement, the Parties intend to adopt, by way of compromise, and without prejudice to or waiver of their respective positions in other matters, without further trial or adjudication of any issues of fact or law, and without Lloyd's Underwriters' admission of liability or responsibility under the Subject Insurance Policies, a full and final settlement that releases and terminates all rights, obligations and liabilities of Lloyd's Underwriters and the Catholic Entities with respect to the Subject Insurance Policies, including, without limitation, all rights, obligations and liabilities relating to the aforesaid claims, without prejudice to their respective positions on policy wordings or any other issues, or in any action.

**AGREEMENTS:**

NOW, THEREFORE, in full consideration of the foregoing and of the mutual agreements herein contained, and intending to be legally bound, the Parties agree as follows:

## 1.  Definitions

The following definitions will apply to the listed terms wherever those terms appear throughout this Agreement as well as in any exhibits or attachments thereto.  Where the listed terms are also further defined elsewhere in the body of this Agreement, the definitions listed here nonetheless apply and shall serve to further explain the meaning of those terms.  Moreover, each defined term stated in a singular form shall include the plural form, each defined term stated in plural form shall include the singular form, and each defined term stated in the masculine form or in the feminine form shall include the other.  Capitalized

terms not defined herein shall take the meaning ascribed to them in the Settlement Plan.

## A. __Diocese__

The term "Diocese" means:

(i)     the Catholic Diocese of Wilmington, Inc.; its predecessors; all its past and present subsidiaries and the predecessors and successors of such subsidiaries; its past and present affiliates and joint ventures and their predecessors and successors; and all its past, present and future assigns; and,

(ii)    any other entity that was in the past or is now affiliated with, related to or associated with the Diocese including, without limitation, any corporations that have been acquired by, merged into or combined with the Diocese or its predecessors, or the Diocese's past and present subsidiaries, affiliates, successors and assigns; and,

(iii)   any and all entities named as insureds, other insureds, or otherwise insured or claimed to be insured under the Subject Insurance Policies and those entities', subsidiaries', affiliates', successors' and assigns' directors, officers, agents and employees; *provided, however*, those Persons included within the definition of "Parishes" or "Related Entities" are not within the definition of "Diocese".

## B. __Lloyd's Underwriters__

The term "Lloyd's Underwriters" means:

(i)     All Underwriters, members, or Names at Lloyds, London (including, without limitation, former underwriters, members or Names) who through their participation in syndicates, severally subscribed, each in his own proportionate share, to one or more of the Subject Insurance Policies. Lloyd's Underwriters shall also include all Underwriters, members or Names at Lloyd's, London, (including, without limitation, former underwriters, members and Names), who, through their participation in syndicates severally subscribed to any of the Subject Insurance Policies in favor of the Catholic Entities: (a) the existence of which has not

presently been established; or (b) the existence of which has been established but as to which identities of names, members, or syndicates are not presently known;

(ii)     All the past, present and future employees (if any), representatives, attorneys, and agents of the persons set forth in subsection 1 above, and their respective predecessors and successors, if any, solely in such capacity;

(iii)    All the respective heirs, executors, successors, including, without limitation, Equitas Insurance Limited ("EIL") to the extent EIL is a successor to any of the Persons identified in subsection (i) above with respect to the subject matter of this Agreement, assigns (including, without limitation, any administrator, receiver, trustee, personal representative or equivalent appointee/s under relevant insolvency law), reinsurers and retrocessionaires (as such) of any of the Persons identified in subsection (i) above.

(iv)     For the avoidance of doubt, the Underwriter Third Party Beneficiaries, who receive certain specified benefits under this Agreement, are not Lloyd's Underwriters for these purposes.

## C.    <u>Underwriter Third Party Beneficiaries</u>

The term "Underwriter Third Party Beneficiaries" means:

(i)      Resolute and the Equitas Entities;

(ii)     EIL to the extent it is not a successor to the persons identified in Section B.(i) above with respect to the subject matter of this Agreement.

(iii)    Any Person from time to time retained by or on behalf of Lloyd's Underwriters to act as their claims handling agent and/or service provider, solely in such capacity;

(iv)     The past, present and future reinsurers and retrocessionaires of the Equitas Entities or any of them, including, without limitation, National Indemnity Company and any other entity from time to time controlled (whether directly or indirectly), by Berkshire Hathaway, Inc., that provides retrocessional reinsurance to any one or more of the Equitas Entities, solely in such capacity;

4

(v)     All past, present and future trustees, officers, directors, employees, subsidiaries, affiliates, representatives, attorneys and agents of the entities set forth in sub-paragraphs (i) to (iv) (inclusive), if any, solely in such capacity; and

(vi)    The respective heirs, executors, successors and assigns (including, without limitation, any administrator, receiver, trustee, personal representative, liquidator (provisional or otherwise) or equivalent appointee/s under relevant insolvency law), of any of the Persons identified in sub-paragraphs (i) to (v) (inclusive) above.

## D.   Resolute

The term "Resolute" means:

Resolute Management Inc. - New England Division and Resolute Management Services Limited (formerly known as Equitas Management Services Limited).

## E.   Equitas Entities

The term "Equitas Entities" means:

Equitas Limited, Equitas Reinsurance Limited, Equitas Holdings Limited, Equitas Policyholders Trustee Limited and any other company from time to time in the Equitas Group.

## F.   Parishes

The term "Parishes" means:

(i)     Cathedral of St. Peter Roman Catholic Church; Christ Our King Roman Catholic Church; Corpus Christi Roman Catholic Church; Good Shepherd Roman Catholic Church; Holy Child Roman Catholic Church; Holy Cross Roman Catholic Church; Holy Family Roman Catholic Church; Holy Name of Jesus Roman Catholic Church; Holy Rosary Roman Catholic Church; Holy Spirit Roman Catholic Church; Immaculate Conception Roman Catholic Church (Elkton); Immaculate Conception Roman Catholic Church (Marydel); Immaculate Heart of Mary Roman Catholic Church; Our Lady of Fatima Roman Catholic Church; Our Lady of Good Counsel Roman Catholic Church; Our Lady of Lourdes Roman Catholic Church; Our Mother of Sorrows Roman Catholic

5

Church; Parish of The Resurrection Roman Catholic Church; Sacred Heart Roman Catholic Church; St. Andrew Roman Catholic Church; St. Ann Roman Catholic Church (Bethany Beach); St. Ann Roman Catholic Church (Wilmington); St. Anthony of Padua Roman Catholic Church; St. Benedict Roman Catholic Church; St. Catherine of Siena Roman Catholic Church; St. Christopher Roman Catholic Church; St. Dennis Roman Catholic Church; St. Elizabeth Roman Catholic Church; St. Elizabeth Ann Seton Roman Catholic Church; St. Francis de Sales Roman Catholic Church; St. Hedwig Roman Catholic Church; St. Helena Roman Catholic Church; St. John Neumann Roman Catholic Church; St. John the Apostle Roman Catholic Church; St. John the Baptist – Holy Angels Roman Catholic Church; St. John the Beloved Roman Catholic Church; St. Joseph Roman Catholic Church (Middletown); St. Joseph Roman Catholic Church (Wilmington); St. Joseph on the Brandywine Roman Catholic Church; St. Jude the Apostle Roman Catholic Church; St. Luke Roman Catholic Church; St. Margaret of Scotland Roman Catholic Church; St. Mary of the Assumption Roman Catholic Church; St. Mary of the Immaculate Conception Roman Catholic Church; St. Mary Magdalen Roman Catholic Church; St. Mary Refuge of Sinners Roman Catholic Church; St. Mary Star of the Sea Roman Catholic Church; St. Matthew Roman Catholic Church; St. Michael the Archangel Roman Catholic Church; St. Patrick Roman Catholic Church; St. Paul Roman Catholic Church (Delaware City); St. Paul Roman Catholic Church (Wilmington); Ss. Peter and Paul Roman Catholic Church; St. Peter the Apostle Roman Catholic Church; St. Polycarp Roman Catholic Church; and St. Thomas the Apostle Roman Catholic Church, their predecessors; all their past and present subsidiaries and the predecessors and successors of such subsidiaries; their past and present affiliates and joint ventures and their predecessors and successors; and all their past, present and future assigns; and,

(ii)     any other entity that was in the past or is now affiliated with, related to or associated with the Parishes including, without limitation, any corporations that have been acquired by, merged into or combined with a Parish or its predecessors, or the Parishes' past and present subsidiaries, affiliates, successors and assigns; *provided, however*, Persons included within the definition of "Parishes" shall not be included in the

6

definition of "Diocese" or "Related Entities" under this Agreement.

## G.   Related Entities

The term "Related Entities" means:

(i)      Diocese of Wilmington Schools, Inc., DOW Schools, Inc.; Catholic Cemeteries, Inc.; Catholic Charities, Inc.; Siena Hall, Inc.; Seton Villa, Inc.; Children's Home, Inc.; Catholic Youth Organization, Inc. d/b/a Catholic Youth Ministry; Catholic Ministry to the Elderly, Inc.; Catholic Press of Wilmington, Inc.; and Catholic Diocese Foundation, their predecessors; all their past and present subsidiaries and the predecessors and successors of such subsidiaries; their past and present affiliates and joint ventures and their predecessors and successors; and all their past, present and future assigns; and,

(ii)     any other entity that was in the past or is now affiliated with, related to or associated with the Related Entities including, without limitation, any corporations that have been acquired by, merged into or combined with a Related Entity or its predecessors, or the Related Entities' past and present subsidiaries, affiliates, successors and assigns; *provided, however*, Persons included within the definition of "Diocese" or "Parishes" are not within the definition of "Related Entities".

## H.   Contribution Claim

The term "Contribution Claim" means any claim, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, by one insurer against another insurer for the reimbursement of money paid by the first insurer for having paid a debt, expense, or liability of its insured in a situation where two or more policies by different insurers cover the same insured for the same loss, and the first insurer contends it has paid more than its proper or proportionate share.

## I.   Person

The term "Person" means an individual, a corporation, a partnership, an association, a trust, any committee or other group established by the Bankruptcy Court, any other entity or

7

organization, and any federal, state or local government or any governmental or quasi-governmental body or political subdivision or any agency, department, board or instrumentality thereof.

## J.    Subject Insurance Policies

The term "Subject Insurance Policies" means: (i) all insurance policies listed in Attachment A hereto; and (ii) all known and unknown insurance policies subscribed by a Lloyd's Underwriter prior to July 1, 1994, and providing insurance to a Catholic Entity whether or not listed in Attachment A hereto.

## K.    Settlement Plan

The term "Settlement Plan" means (i) the Settlement Plan set forth in the Second Amended Chapter 11 Plan of Reorganization of Catholic Diocese of Wilmington, Inc., dated May 23, 2011, Docket Number 1321 and all Exhibits thereto; and (ii) any alterations, amendments and modifications to the Settlement Plan made after May 23, 2011, but only with the express written consent of Lloyd's Underwriters.

## L.    Confirmation Order

The term "Confirmation Order" means the order of the Bankruptcy Court confirming the Settlement Plan pursuant to § 1129 of the Bankruptcy Code, as such order may be amended, modified or supplemented.

## 2.    Settlement Amount

In the Confirmation Order, the Bankruptcy Court shall approve this Agreement and the sale, assignment and transfer of the Subject Insurance Policies by the Catholic Entities to Lloyd's Underwriters pursuant to § 363(b), (f) and (m) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019. Should the Bankruptcy Court not so approve this Agreement, this Agreement shall be void ab initio.

Except as provided below, on the date that is the first business day after the date that is the later of 30 days after (i) the date the Bankruptcy Court has entered the Confirmation Order, which Confirmation Order is accompanied by the findings set forth in Paragraph 5 of this Agreement and such Confirmation Order has become final and non-appealable; and (ii) the date all Parties have executed this Agreement, Lloyd's Underwriters shall pay to the Settlement Trust the total settlement amount of Eight Million Three Hundred and Sixty Thousand and Twenty-six United States Dollars ($8,360,026.00)("Settlement Amount").

On the date that Lloyd's Underwriters pay the Settlement Amount to the Settlement Trust, the sale, assignment and transfer of the Subject Insurance Policies by the Catholic Entities to Lloyd's Underwriters free and clear of all interests of all Persons, including, without limitation, the Catholic Entities, shall be effective and binding, with the intent that no Person shall retain anything whatsoever with respect to the Subject Insurance Policies.

If, before the Settlement Amount has been paid, a Parish or a Related Entity becomes a debtor in a bankruptcy case or insolvency proceeding, under the Bankruptcy Code or otherwise, and Lloyd's Underwriters have not satisfied their payment obligations, then Lloyd's Underwriters shall be excused from performance under this Agreement until such time as such Parish or Related Entity obtains, subject to the limitations imposed by the Bankruptcy Code and subject to the equitable powers of the bankruptcy court, an order from the bankruptcy court approving this Agreement under § 363(b), (f) and (m) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 and authorizing the assumption by such Parish or Related Entity (or any successor thereto) of this Agreement under Bankruptcy Code Section 365 (the "Assumption"), or in the event the insolvency case is proceeding under other law, shall obtain a similar order from the court overseeing the insolvency case approving this Agreement and confirming the binding effect thereof. Each Parish or Related Entity agrees that in the event of a bankruptcy or other insolvency proceeding, it will not present any claim for payment to any Lloyd's Underwriter, until such time as such Parish or Related Entity has made such Assumption and such Assumption has been approved by a bankruptcy court or other applicable court.

3.   **Release**

A.   **By the Catholic Entities**

Upon the Settlement Trust's receipt of the Settlement Amount, each Catholic Entity, and any subsequently appointed trustee or representative acting for a Catholic Entity, shall be deemed to remise, release, covenant not to sue and forever discharge the following:   (i) each Lloyd's Underwriter; (ii) each of that Lloyd's Underwriter's present and former officers, directors, employees, partners, limited partners, shareholders, members, subsidiaries, affiliates, representatives, attorneys and agents (a) in such capacity and (b) in their individual capacity; and (iii) the respective heirs, executors, administrators, successors, assigns and reinsurers (as such) of any of the Persons identified in subparagraphs (i) and (ii) hereof as follows: from and against all manner of action, causes of action, suits, debts, accounts, promises, warranties, damages (consequential or punitive), agreements, costs, expenses, claims or demands whatsoever, in law or in equity, whether presently known or unknown, asserted or unasserted, whether sounding in tort or contract, or arising under the statutes or administrative regulations of any jurisdiction, with respect to any and all past, present or future claims, of any type whatsoever, that such Catholic Entity ever had, now has, or hereafter may have: (1) for insurance coverage, including, without limitation, both defense costs and indemnification claims, with respect to the Subject Insurance Policies; and (2) arising out of or relating to any act, omission, representation, or conduct of any sort in connection with the Subject Insurance Policies.

Those Lloyd's Underwriters entitled to this Release that are described in the definition of Lloyd's Underwriters as entities which subscribed a Subject Insurance Policy either not presently known, or known but to which the identity of the subscribers is not presently known, shall be entitled to all of the terms of this Release (and to the Indemnity set forth in Paragraph 4 below), one-hundred twenty (120) days after the Settlement Trust's receipt of the Settlement Amount.

It is the intention of each Catholic Entity to reserve no rights or benefits whatsoever under or in connection with the Subject Insurance Policies with respect to any past, present or future claims and to assure each Lloyd's Underwriter its peace and freedom from such claims and from all assertions of rights in connection with such claims.

Upon the Settlement Trust's receipt of the Settlement Amount, any and all rights, duties, responsibilities and obligations of any

Lloyd's Underwriter created by or in connection with the Subject Insurance Policies are hereby terminated.  As of the date of such payment the Catholic Entities have no insurance coverage under the Subject Insurance Policies.  This Release is intended to operate as though Lloyd's Underwriters had never subscribed to the Subject Insurance Policies.

This Release extends to all those Lloyd's Underwriters that subscribed to any of the Subject Insurance Policies which include both known and unknown policies.

This Release also extends to the Underwriter Third Party Beneficiaries.  These entities are third-party beneficiaries of the terms of this Release.

Each Catholic Entity acknowledges that it has been advised by its attorneys concerning, and is familiar with, California Civil Code Section 1542 and expressly waives any and all rights under California Civil Code Section 1542 and under any other federal or state statute or law of similar effect.

Each Catholic Entity expressly assumes the risk that acts, omissions, matters, causes or things may have occurred which it does not know or does not suspect to exist.  Each Catholic Entity hereby waives the terms and provisions of any statute, rule or doctrine of common law which either: (i) narrowly construes releases purporting by their terms to release claims in whole or in part based upon, arising from, or related to such acts, omissions, matters, causes or things; or, (ii) which restricts or prohibits the releasing of such claims.

**B.   By Lloyd's Underwriters**

At the same time the Releases described in Paragraph 3.A immediately above become effective, each Lloyd's Underwriter so released, and any subsequently appointed trustee or representative acting for such Lloyd's Underwriter shall be deemed to remise, release, covenant not to sue and forever discharge:  (i) each Catholic Entity; (ii) each of the Catholic Entities' present and former officers, directors, employees, partners, limited partners, shareholders, members, subsidiaries, affiliates, representatives, attorneys and agents (a) in such capacity and (b) in their individual capacity; and (iii) the respective heirs, executors, administrators, successors, and assigns of any of the Persons identified in subparagraphs (i) and (ii) hereof as follows: from and against all manner of action, causes of action, suits, debts, accounts, promises, warranties, damages (consequential or punitive), agreements, costs, expenses, claims or demands

whatsoever, in law or in equity, whether presently known or unknown, asserted or unasserted, whether sounding in tort or in contract, or arising under the statutes or administrative regulations of any jurisdiction, with respect to any and all past, present or future claims, of any type whatsoever, that each such Lloyd's Underwriter ever had, now has or hereinafter may have with respect to the Subject Insurance Policies.

It is the intention of each Lloyd's Underwriter released under the terms of Paragraph 3.A above to reserve no rights or benefits whatsoever under or in connection with the Subject Insurance Policies.

4.    **Indemnification**

A.    In the event that any claim or suit is brought against Lloyd's Underwriters under, arising out of, relating to, or in connection with the Subject Insurance Policies, which claim is subject to the Channeling Injunction provided in the Plan, the Diocese and Lloyd's Underwriters will cooperate in establishing that Lloyd's Underwriters are Protected Parties under the Plan entitled to the protections afforded to such Protected Parties under the Plan; provided, however, that the foregoing shall not in any way affect or limit the Catholic Entities' obligations set forth in Paragraphs 4.B, 4.D and 4.E below

B.    The Catholic Entities shall indemnify and hold harmless Lloyd's Underwriters in respect of any and all claims arising under or relating in any way to the Subject Insurance Policies, including, without limitation, all claims, whether by way of direct action or otherwise, made by:  (i) other insurers of the Catholic Entities; (ii) any Person claiming to be insured under the Subject Insurance Policies; (iii) any Person who has made, will or can make a claim; (iv) any Person who has acquired or been assigned the right to  make a claim under the Subject Insurance Policies; or (v) any federal, state or local government or any political subdivision, agency, department, board or instrumentality thereof, including, without limitation, the State of Minnesota pursuant to the Minnesota Landfill Cleanup Act, Minn. Stat. § 115B.39 et seq. or the Minnesota Insurance Recovery Act of 1996, Minn. Stat. § 115B.441 et seq.  The Parties acknowledge that this indemnification includes, without limitation, claims made by any Person over whom the Catholic Entities do not have control, including, without limitation, former subsidiaries, predecessors in interest, sellers or purchasers of assets, or any other Person who asserts rights to coverage under the Subject Insurance Policies.  For purposes of the indemnification obligation of the

12

Catholic Entities, the term "claim" also includes, without limitation, amounts paid in respect of any judgment, order, decree, settlement, contract or otherwise.

C.    Lloyd's Underwriters shall have the right to defend, with counsel of their choice, all claims identified under Paragraph 4.B immediately above. Lloyd's Underwriters may begin the defense of any claim upon receipt of such a claim. Lloyd's Underwriters agree to notify the Catholic Entities as soon as practicable of claims identified under Paragraph 4.B immediately above and of their choice of counsel.

D.    The Catholic Entities shall reimburse all reasonable and necessary attorneys' fees, expenses and amounts incurred by Lloyd's Underwriters in defending such claims. Lloyd's Underwriters shall defend any such claim in good faith. In defense of any such claim, Lloyd's Underwriters may settle or otherwise resolve a claim without the prior consent of the Catholic Entities.

E.    This indemnification and hold harmless undertaking (Paragraphs 4.A, 4.B, 4.C, 4.D and 4.E immediately above) shall also extend to the benefit of the Underwriter Third Party Beneficiaries. These entities are third-party beneficiaries of the terms of this indemnification and hold harmless undertaking.

5.    **Bankruptcy Obligations**

The Confirmation Order shall:

A.    approve (i) this Agreement pursuant to Federal Rule of Bankruptcy Procedure 9019, and sections 363(b), (f) and (m) of the Bankruptcy Code; and (ii) the sale of the Subject Insurance Policies to Lloyd's Underwriters;

B.    authorize the Parties to undertake the settlement and the transactions contemplated by this Agreement; and,

C.    authorize the sale of the Subject Insurance Policies to Lloyd's Underwriters free and clear of any and all claims or interests on the ground that such interests are in *bona fide* dispute.

In the event that the Confirmation Order does not include the approval and authorizations set forth in the above sub-paragraphs, this Agreement shall be void ab initio. The Diocese shall obtain the entry of the following factual findings and legal conclusions:

13

A.    the Agreement is fair and equitable and in the best interest of the estate and its creditors after consideration of (i) the probability of success in litigating the Dispute, should it be litigated; (ii) the likely difficulties in collection; (iii) the probable complexity of any litigation of the Dispute, the expense, inconvenience and delay necessarily attending such litigation, and the cost savings to the Diocese of avoiding such litigation; and (iv) the paramount interest of creditors;

B.    Lloyd's Underwriters are good faith purchasers of the Subject Insurance Policies and, as such, are entitled to all protections provided to good faith purchasers under section 363(m) of the Bankruptcy Code; and,

C.    notice of the sale free and clear of claims and interests was sufficient, and the requirements of Fed. R. Bankr. P. 6004(c) were satisfied, because notice of the motion seeking approval of the Agreement and the motion itself were served upon (i) all known claimants or counsel for claimants who filed a proof of claim in the Bankruptcy Case, who were scheduled by the Diocese, or whose claims are pending and tendered under the Subject Insurance Policies, at the address provided for notice in the proof of claim or the address listed for such claimant in the Diocese's schedules, or the address of such claimant last known to the Diocese, as applicable, (ii) all Persons who filed a notice of appearance in the Bankruptcy Case, and (iii) all Persons known or alleged by the Catholic Entities to have provided general liability insurance to the Catholic Entities.

In the event that the above factual findings and legal conclusions are not entered by the Bankruptcy Court, this Agreement shall be void ab initio.

6.    **Reasonably Equivalent Value**

The Parties acknowledge and agree that: (i) this Agreement was bargained for and entered into in good faith and as the result of arms-length negotiations; (ii) based on their respective independent assessments, with the assistance and advice of counsel, of the probability of success, the complexity, the delay in obtaining relief, and the expense of resolving their disputes, the payment of the Settlement Amount pursuant to this Agreement constitute a fair and reasonable settlement of the Catholic Entities' claims; (iii) the payments and other benefits received under this Agreement by the Catholic Entities constitute reasonably equivalent value for the release, indemnity, and other

benefits received by Lloyd's Underwriters under this Agreement; and (iv) this Agreement constitutes a full and final resolution of all issues between the Parties, including, without limitation, the Dispute.

## 7.    **Representations and Warranties**

A.    Each Parish and Related Entity acknowledges and warrants that as of the date of this Agreement it is solvent, in that at fair value its assets exceed its liabilities and it has the liquidity to pay its debts.

B.    Each Catholic Entity acknowledges and warrants that no Person other than a Catholic Entity has legal title or rights as an insured, other insured, or otherwise insured or claims to be insured under the Subject Insurance Policies.

C.    Each Catholic Entity represents and warrants that it has the authority to execute this Agreement as its binding and legal obligation.

D.    The Diocese represents and warrants that each Catholic Entity has the authority to execute this Agreement as a binding and legal obligation.

E.    Each Party represents and warrants that the Persons signing this Agreement on its behalf are authorized to execute this Agreement.

F.    Each individual signing this Agreement on behalf of a Party represents and warrants that he or she has the right, power, legal capacity and authority to enter into this Agreement on behalf of such Party and bind such Party to perform each of the obligations specified herein.

## 8.    **Judgment Reduction**

A.    In any proceeding, suit or action between (i) a Catholic Entity; or (ii) the Settlement Trust and any insurer that is not a Lloyd's Underwriter ("Other Insurer"), where the Other Insurer has asserted, asserts, or could assert that it has or may have a Contribution Claim against any Lloyd's Underwriter relating to claims against such Catholic Entity or the Settlement Trust, as applicable, any judgment obtained by such Catholic Entity or the Settlement Trust against such Other Insurer shall be reduced by the amount, if any, that such Lloyd's Underwriter would have been liable to pay the Other Insurer as a result of such Other Insurer's Contribution Claim, so that the Contribution Claim by

the Other Insurer against such Lloyd's Underwriter is thereby satisfied and extinguished.

B.    In order to effectuate the preceding paragraph, such Catholic Entity or the Settlement Trust, as applicable, shall obtain a determination, from the court issuing the judgment against the Other Insurer, of the amount, if any, which such Lloyd's Underwriter would be required to pay the Other Insurer for its Contribution Claim and shall hold any money paid by such Other Insurer in escrow until these judgment reduction provisions can be applied.

C.    All settlements between a Catholic Entity and/or the Settlement Trust and any Other Insurer where the Other Insurer has asserted, asserts, or could assert that it has or may have a Contribution Claim against any Lloyd's Underwriter relating to such Catholic Entity or the Settlement Trust, as applicable, shall bar Contribution Claims by the Other Insurer against Lloyd's Underwriters, relating to the Catholic Entities or the Settlement Trust, as applicable, and identify Lloyd's Underwriters as intended third-party beneficiaries of that provision.


9.    **Confidentiality**

The Parties agree that all matters relating to the terms, negotiation and implementation of this Agreement shall be confidential and are not to be disclosed except by order of court or agreement, in writing, of the Parties, or as necessary to obtain approval by the Bankruptcy Court of the Agreement, except that, provided recipients agree to keep such information confidential, this Agreement may be disclosed to: (i) reinsurers of any Lloyd's Underwriter directly or through intermediaries; (ii) outside auditors or accountants of any Party; (iii) representatives of a non-party insurer subscribing or allegedly subscribing to one or more of the Subject Insurance Policies, which insurer is, has been or may become insolvent in the future including, without limitation, any liquidators, provisional liquidators, scheme administrators, trustees, or similarly empowered Persons or entities acting for such insurer. This Agreement may also be disclosed, as required, to the Inland Revenue, the Internal Revenue Service or other U.S. or U.K. governmental authority that properly requires disclosure, or as otherwise required by law.

In the event a private litigant, by way of document request, interrogatory, subpoena, or questioning at deposition or trial,

attempts to compel disclosure of anything protected by this Paragraph, the Party from whom disclosure is sought shall decline to provide the requested information on the ground that this Confidential Settlement Agreement and Release prevents such disclosure. In the event such private litigant seeks an Order from any court or governmental body to compel such disclosure, or in the event that a court, government official, or governmental body (other than the Inland Revenue or Internal Revenue Service) requests or requires disclosure of anything protected by this paragraph, the Party from whom disclosure is sought shall immediately give written notice by facsimile or hand-delivery to the other Parties, and shall immediately provide copies of all notice papers, orders, requests or other documents in order to allow each Party to take such protective steps as may be appropriate. Notice shall be made under this paragraph to the persons identified in Paragraph 15 of this Agreement.

Material protected by this paragraph shall be deemed to fall within the protection afforded compromises and offers to compromise by Rule 408 of the Federal Rules of Evidence and similar provisions of state law or state rules of court.

## 10. Co-operation

The Catholic Entities will undertake all reasonable actions to co-operate with Lloyd's Underwriters in connection with its respective reinsurers, including, without limitation, responding to reasonable requests for information and meeting with representatives of reinsurers.

## 11. Non-Prejudice and Construction of Agreement

This Agreement is intended to be and is a compromise between the Parties and shall not be construed as an admission of coverage under the Subject Insurance Policies nor shall this Agreement or any provision hereof be construed as a waiver, modification or retraction of the positions of the Parties with respect to the interpretation and application of the Subject Insurance Policies.

This Agreement is the product of informed negotiations and involves compromises of the Parties' previously stated legal positions. Accordingly, this Agreement does not reflect upon the Parties' views as to rights and obligations with respect to matters or Persons outside the scope of this Agreement. This Agreement is without prejudice to positions taken by any Lloyd's Underwriter with regard to other insureds, and without prejudice

with regard to positions taken by any Catholic Entity with regard to other insurers. Except for the express references to Underwriter Third Party Beneficiaries in Paragraphs 3 and 4 above, the Parties specifically disavow any intention to create rights in third parties under or in relation to this Agreement.

This Agreement is the jointly drafted product of arms-length negotiations between the Parties with the benefit of advice from counsel, and the Parties agree that it shall be so construed. As such, no Party will claim that any ambiguity in this agreement shall be construed against another Party.

If any provision of the Settlement Plan or the Plan Trust Agreement conflicts with or is inconsistent with this Agreement in any way whatsoever, then the provisions of this Agreement shall control and take precedence. Neither the Settlement Plan nor the Plan Trust Agreement shall be construed or interpreted to modify or affect any rights or obligations of Lloyd's Underwriters under this Agreement.

## 12.  No Modification

No change or modification of this Agreement shall be valid unless (i) it is made in writing and signed by the Parties, even upon the receipt of additional consideration; and (ii) approved by the Bankruptcy Court.

## 13.  Execution

There will be two signed originals of this Agreement.

## 14.  Governing Law

This Agreement shall be governed by and shall be construed in accordance with the laws of Delaware.

## 15.  Notices

Unless another person is designated, in writing, for receipt of notices hereunder, notices to the respective Parties shall be sent to the following person:

| For Diocese, Related Entities and Parishes: | Rev. Msgr. J. Thomas Cini<br>Vicar General for Administration<br>Catholic Diocese of Wilmington<br>P.O. Box 2030<br>Wilmington, DE 19899-2030 |
|---|---|
| With a copy to: | Anthony G. Flynn, Esq.<br>Young Conaway Stargatt & Taylor LLP<br>The Brandywine Building<br>1000 West St., 17th Floor<br>P.O. Box 391<br>Wilmington, DE 19899-0391<br>aflynn@ycst.com |
| For Resolute Management Services Ltd.: | Equitas Limited Claims Division<br>33 St. Mary Axe<br>London EC3A 8LL ENGLAND |
| With a copy to: | Catalina J. Sugayan<br>Sedgwick, Detert, Moran &<br>Arnold LLP,<br>One North Wacker Drive<br>Suite 4200<br>Chicago, IL 60606-2841 |
| and a copy to: | Russell W. Roten<br>Duane Morris LLP,<br>865 South Figueroa Street<br>Suite 3100<br>Los Angeles, CA 90017-5450 |

## 16. Integration

This Agreement, including the attachments, constitutes the entire Agreement between Lloyd's Underwriters and the Catholic Entities with respect to the subject matter hereof, and supersedes all discussions, agreements and understandings, both written and oral, among the Parties with respect thereto.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement under seal by their duly authorized representatives.

Lloyd's Underwriters have respectively designated Sedgwick, Detert, Moran & Arnold LLP as their attorneys-in-fact for the limited purpose of executing this Agreement on their behalf with express authority to do so.

Catholic Diocese of Wilmington

By: _____ (SEAL)
    (Name)

Title: _____

Date:  July ___, 2011

Christ Our King Roman Catholic
Church

By: _____
    (Name), as its Trustee

Date:  July ___, 2011

Good Shepherd Roman Catholic
Church

By: _____
    (Name), as its Trustee

Date:  July ___, 2011

Holy Cross Roman Catholic Church

By: _____
    (Name), as its Trustee

Date:  July ___, 2011

Holy Name of Jesus Roman Catholic
Church

By: _____
    (Name), as its Trustee

Date:  July ___, 2011

Holy Spirit Roman Catholic Church

By: _____
    (Name), as its Trustee

Date:  July ___, 2011

Cathedral of St. Peter Roman
Catholic Church

By: _____
    (Name), as its Trustee

Date:  July ___, 2011

Corpus Christi Roman Catholic
Church

By: _____
    (Name), as its Trustee

Date:  July ___, 2011

Holy Child Roman Catholic Church

By: _____
    (Name), as its Trustee

Date:  July ___, 2011

Holy Family Roman Catholic Church

By: _____
    (Name), as its Trustee

Date:  July ___, 2011

Holy Rosary Roman Catholic Church

By: _____
    (Name), as its Trustee

Date:  July ___, 2011

Immaculate Conception Roman
Catholic Church (Elkton)

By: _____
    (Name), as its Trustee

Date:  July ___, 2011

20

Immaculate Conception Roman
Catholic Church (Marydel)

By: _____
        (Name), as its Trustee

Date:  July __, 2011

Our Lady of Fatima Roman Catholic
Church

By: _____
        (Name), as its Trustee

Date:  July __, 2011

Our Lady of Lourdes Roman
Catholic Church

By: _____
        (Name), as its Trustee

Date:  July __, 2011

Parish of The Resurrection Roman
Catholic Church

By: _____
        (Name), as its Trustee

Date:  July __, 2011

St. Andrew Roman Catholic Church

By: _____
        (Name), as its Trustee

Date:  July __, 2011

St. Ann Roman Catholic Church
(Wilmington)

By: _____
        (Name), as its Trustee

Date:  July __, 2011

Immaculate Heart of Mary Roman
Catholic Church

By: _____
        (Name), as its Trustee

Date:  July __, 2011

Our Lady of Good Counsel Roman
Catholic Church

By: _____
        (Name), as its Trustee

Date:  July __, 2011

Our Mother of Sorrows Roman
Catholic Church

By: _____
        (Name), as its Trustee

Date:  July __, 2011

Sacred Heart Roman Catholic
Church

By: _____
        (Name), as its Trustee

Date:  July __, 2011

St. Ann Roman Catholic Church
(Bethany Beach)

By: _____
        (Name), as its Trustee

Date:  July __, 2011

St. Anthony of Padua Roman
Catholic Church

By: _____
        (Name), as its Trustee

Date:  July __, 2011

21

St. Benedict Roman Catholic
Church

By: _____
      (Name), as its Trustee

Date:  July __, 2011

St. Christopher Roman Catholic
Church

By: _____
      (Name), as its Trustee

Date:  July __, 2011

St. Elizabeth Roman Catholic
Church

By: _____
      (Name), as its Trustee

Date:  July __, 2011

St. Francis de Sales Roman
Catholic Church

By: _____
      (Name), as its Trustee

Date:  July __, 2011

St. Helena Roman Catholic Church

By: _____
      (Name), as its Trustee


Date:  July __, 2011


St. John the Apostle Roman
Catholic Church

By: _____
      (Name), as its Trustee

Date:  July __, 2011

St. Catherine of Siena Roman
Catholic Church

By: _____
      (Name), as its Trustee

Date:  July __, 2011

St. Dennis Roman Catholic Church

By: _____
      (Name), as its Trustee

Date:  July __, 2011

St. Elizabeth Ann Seton Roman
Catholic Church

By: _____
      (Name), as its Trustee

Date:  July __, 2011

St. Hedwig Roman Catholic Church

By: _____
      (Name), as its Trustee

Date:  July __, 2011

St. John Neumann Roman Catholic
Church

By: _____
      (Name), as its Trustee


Date:  July __, 2011

St. John the Baptist – Holy
Angels Roman Catholic Church

By: _____
      (Name), as its Trustee

Date:  July __, 2011

22

St. John the Beloved Roman
Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011

St. Joseph Roman Catholic Church
(Wilmington)

By: _____
     (Name), as its Trustee

Date: July __, 2011

St. Jude the Apostle Roman
Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011

St. Margaret of Scotland Roman
Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011

St. Mary of the Immaculate
Conception Roman Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011

St. Joseph Roman Catholic Church
(Middletown)

By: _____
     (Name), as its Trustee

Date: July __, 2011

St. Joseph on the Brandywine
Roman Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011

St. Luke Roman Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011

St. Mary of the Assumption Roman
Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011

St. Mary Magdalen Roman Catholic
Church

By: _____
     (Name), as its Trustee

Date: July __, 2011

St. Mary Refuge of Sinners Roman
Catholic Church

By: _____
     (Name), as its Trustee


Date:  July __, 2011

St. Matthew Roman Catholic Church

By: _____
     (Name), as its Trustee

Date:  July __, 2011



St. Patrick Roman Catholic Church

By: _____
     (Name), as its Trustee

Date:  July __, 2011


St. Paul Roman Catholic Church
(Wilmington)

By: _____
     (Name), as its Trustee

Date:  July __, 2011

St. Mary Star of the Sea Roman
Catholic Church

By: _____
     (Name), as its Trustee


Date:  July __, 2011

St. Michael the Archangel Roman
Catholic Church

By: _____
     (Name), as its Trustee


Date:  July __, 2011


St. Paul Roman Catholic Church
(Delaware City)

By: _____
     (Name), as its Trustee

Date:  July __, 2011


Ss. Peter and Paul Roman Catholic
Church

By: _____
     (Name), as its Trustee

Date:  July __, 2011

24

St. Peter the Apostle Roman
Catholic Church

By: _____
     (Name), as its Trustee

Date:  July __, 2011


St. Thomas the Apostle Roman
Catholic Church

By: _____
     (Name), as its Trustee

Date:  July __, 2011

Catholic Cemeteries, Inc.

By: _____
     (Name), as its Trustee

Date:  July __, 2011

Siena Hall, Inc.

By: _____
     (Name), as its Trustee

Date:  July __, 2011

Children's Home, Inc.

By: _____
     (Name), as its Trustee

Date:  July __, 2011


St. Polycarp Roman Catholic
Church

By: _____
     (Name), as its Trustee

Date:  July __, 2011


DOW Schools, Inc.

By: _____
     (Name), as its Trustee

Date:  July __, 2011

Catholic Charities, Inc.

By: _____
     (Name), as its Trustee

Date:  July __, 2011

Seton Villa, Inc.

By: _____
     (Name), as its Trustee

Date:  July __, 2011

Catholic Youth Organization, Inc.
d/b/a Catholic Youth Ministry

By: _____
     (Name), as its Trustee

Date:  July __, 2011

Catholic Ministry to the Elderly, Inc.

By: _____
     (Name), as its Trustee

Date:  July __, 2011


Catholic Diocese Foundation

By: _____
     (Name), as its Trustee

Date:  July __, 2011


Catholic Press of Wilmington, Inc.

By: _____
     (Name), as its Trustee

Date:  July __, 2011


Diocese of Wilmington Schools, Inc.

By: _____
     (Name), as its Trustee

Date:  July __, 2011



Signed:_____
     (name)

(For Lloyd's Underwriters)

Date:  July __, 2011

# ATTACHMENT A identifies all found policies and all policies referenced on the Brokers' Ledgers provided by the Diocese. The Inclusion of the policies referenced on the Brokers' Ledgers included herein is not an admission to the existence of these policies or evidence that these policies exist.

| BOX NO | | | SLIP NO | ASSURED | PERIOD | COVERAGE | LIMIT US$ | RENEWAL OF | |
|---|---|---|---|---|---|---|---|---|---|
| WRI/SLIP | 124 | CH | 423458 | Church of Christ Our King | 12 @ 9/4/62 | Public Liability | BI 10,000/20,000 PD 5,000 | NEW | |
| WRI/SLIP | 124 | CH | 423459 | Church of Christ Our King | 12 @ 9/4/62 | Xs Public liability | BI 100,000/300,000 excess of 10,000/20,000 | NEW | |
| WRI/SLIP | 124 | CH | 424662 | Church of Christ our King | 12 @ 9/4/63 | Public Liability | BI 10,000/20,000 PD 5,000 | CH | 423 458 |
| WRI/SLIP | 124 | CH | 424663 | Church of Christ our King | 12 @ 9/4/63 | Xs Public liability | BI 100,000/300,000 excess of 10,000/20,000 | CH | 423 459 |
| WRI/SLIP | 88 | CH | 429560 | Church of Christ our King | 36 @ 3/1/66 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000/25,000 | CH | 428 688 |
| WRI/SLIP | 101 | CH | 436294 | Church of Christ Our King | 36 @ 3/1/69 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000 | CH | 429 560 |
| WRI/SLIP | 170 | WA | 510092 | Church of Christ our King | 36 @ 3/1/75 | CGL | PI 100,000/300,000/300000 PD 5,000/25,000/25,000/25,000 | CH | 601 180 |
| MIS/EXC H | 67 | CH | 601180 | Church of Christ Our King | 36 @ 3/1/72 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000 | CH | 436 294 |
| WRI/SLIP | 60 | NM | 420456 | Church of Our Lady of Fatima | 12 @ 4/2/61 | Xs Public liability | PI 25,000/50,000/50,000 Xs 10,000/20,000/20,000 | NM | 418 719 |
| WRI/SLIP | 124 | CH | 422689 | Church of Our Lady of Fatima | 12 @ 4/2/62 | Public Liability | BI 10,000/20,000 PD 5,000 | NEW | |
| WRI/SLIP | 124 | CH | 422690 | Church of Our Lady of Fatima | 12 @ 4/2/62 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | CH | 420 456 |
| WRI/SLIP | 124 | CH | 424387 | Church of Our Lady of Fatima | 12 @ 24/4/62 | Public Liability | BI 10,000/20,000 PD 5,000 | NEW | |
| WRI/SLIP | 124 | CH | 424388 | Church of Our Lady of Fatima | 12 @ 24/4/62 | Xs Public liability | BI 100,000/300,000 excess of 10,000/20,000 | NEW | |
| WRI/SLIP | 124 | CH | 424428 | Church of Our Lady of Fatima | 12 @ 4/2/63 | Public Liability | BI 10,000/20,000 PD 5,000 | CH | 422 689 |
| WRI/SLIP | 124 | CH | 424429 | Church of Our Lady of Fatima | 12 @ 4/2/63 | Xs Public liability | BI 100,000/300,000 excess of 10,000/20,000 | CH | 422 690 |
| WRI/SLIP | 90 | CH | 430514 | Church of Our Lady of Fatima | 36 @ 14/4/66 | CGL | PI 100,000/300,000/300,000 PD 25,000/50,000/50,000 | CH | 428 434 |

# ATTACHMENT A identifies all found policies and all policies referenced on the Brokers' Ledgers provided by the Diocese.  The Inclusion of the policies referenced on the Brokers' Ledgers included herein is not an admission to the existence of these policies or evidence that these policies exist.

| BOX NO | | | SLIP NO | ASSURED | PERIOD | COVERAGE | LIMIT US$ | RENEWAL OF | |
|---|---|---|---|---|---|---|---|---|---|
| WRI/SLIP | 100 | CH | 436509 | Church of Our Lady of Fatima | 36 @ 14/4/69 | CGL | PI 100,000/300,000/300,000 PD 25,000/50,000/50,000 | CH | 430 514 |
| WRI/SLIP | 163 | WA | 510198 | Church of Our Lady of Fatima | 36 @ 14/4/75 | CGL | PI 100,000/300,000 PD 25,000/50,000/50,000 | CH | 601 499 |
| WRI/SLIP | 53 | CH | 601499 | Church of Our Lady of Fatima | 36 @ 14/4/72 | CGL | PI 100,000/300,000/300,000 PD 25,000/50,000/50,000 | CH | 436 509 |
| WRI/SLIP | 97 | CH | 434430 | Church of St Catherine of Siena | 36 @ 30/4/68 | CGL | PI 25,000/50,000/50,000 Xs 5,000/25,000/25,000 | | |
| WRI/SLIP | 69 | CH | 424415 | Church of St. Catherine of Siena | 12 @ 2/3/63 | Physical Damage | Physical Damage only | N/A | |
| WRI/SLIP | 163 | WA | 510934 | Church of St. Catherine of Siena | 36 @ 30/4/77 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000/25,000 | CH | 428 286 A |
| WRI/SLIP | 547 | CH | 603442 | Church of St. Catherine of Siena | 12 @ 30/4/73 | N/A | N/A | | |
| | 547 | | | | | | | | |
| WRI/SLIP | 82 | CH | 427354 | Church of the Holy Spirit | 12 @ 6/11/64 | Physical Damage | Physical Damage only | N/A | |
| WRI/SLIP | 88 | CH | 429222 | Church of the Holy Spirit | 36 @ 8/9/65 | CGL | PI 50,000/100,000/100,000 PD 5,000/25,000/25,000/25,000 | CH | 427 354 |
| WRI/SLIP | 99 | CH | 434820 | Church of the Holy Spirit | 36 @ 8/9/68 | CGL | PI 50,000/100,000/100,000 PD 5,000/25,000/25,000 | CH | 429 222 |
| WRI/SLIP | 52 | CH | 600189 | Church of the Holy Spirit | 36 @ 8/9/71 | CGL | PI 50,000/100,000/100,000 PD 5,000/25,000/25,000 | CH | 434 820 |
| WRI/SLIP | 106 | CH | 440396 | Church of the Immaculate Conception | 36 @ 18/2/71 | CGL | PI 100,000/300,000/300,000 PD 25,000/50,000/50,000/50,000 | CH | 434 242 |
| WRI/SLIP | 163 | WA | 510819 | Church of the Immaculate Conception | 36 @ 25/1/77 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | CH | 604 383 |
| MIS/EXC H | 66 | CH | 604383 | Church of the Immaculate Conception | 36 @ 25/1/74 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | CH | 440 396 |
| WRI/SLIP | 103 | CH | 438405 | Church of the Immaculate Heart of Mary | 36 @ 26/3/70 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | CH | 432 394 |

28

# ATTACHMENT A identifies all found policies and all policies referenced on the Brokers' Ledgers provided by the Diocese.  The Inclusion of the policies referenced on the Brokers' Ledgers included herein is not an admission to the existence of these policies or evidence that these policies exist.

| BOX NO | | SLIP NO | | ASSURED | PERIOD | COVERAGE | LIMIT US$ | RENEWAL OF | |
|---|---|---|---|---|---|---|---|---|---|
| WRI/SLIP | 166 | WA | 510542 | Church of the Immaculate Heart of Mary | 36 @ 26/3/76 | CGL | PI : CSL 300,000 a.o.acc/occ PD : 50,000 a.o.acc/occ | CH | 603 383 |
| MIS/EXCH | 66 | CH | 603383 | Church of the Immaculate Heart of Mary | 36 @ 26/3/73 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | CH | 438 405 |
| WRI/SLIP | 93 | CH | 431234 | Church of the Sacred Heart | 36 @ 22/11/66 | CGL | PI 25,000/50,000/50,000 PD 5,000/25,000/25,000/25,000 | CH | 429 534 |
| WRI/SLIP | 103 | CH | 436981 | Church of the Sacred Heart | 36 @ 22/11/69 | CGL | PI 25,000/50,000/50,000 Xs 5,000/25,000/25,000 | CH | 431 234 |
| WRI/SLIP | 164 | WA | 510432 | Church of the Sacred Heart | 36 @ 22/11/75 | CGL | PI 250,000/500,000/500,000 PD 5,000/25,000/25,000 | CH | 601 965 |
| WRI/SLIP | 56 | CH | 601911 | Church of the Sacred Heart | 9 @ 1/9/72 | CGL | PI 25,000/50,000  PD 5,000/25,000 | NEW | |
| WRI/SLIP | 56 | CH | 601965 | Church of the Sacred Heart | 36 @ 22/11/72 | CGL | PI 25,000/50,000/50,000      PD 5,000/25,000/25,000/25,000 | CH | 436 981 |
| WRI/SLIP | 58 | CH | 420145 | Corpus Christi Church | 12 @ 8/11/60 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | NM | 418 552 |
| WRI/SLIP | 124 | CH | 422644 | Corpus Christi Church | 12 @ 8/11/61 | Public Liability | BI 10,000/20,000  PD 5,000 | NEW | |
| WRI/SLIP | 124 | CH | 422645 | Corpus Christi Church | 12 @ 8/11/61 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | CH | 420 145 |
| WRI/SLIP | 124 | CH | 423686 | Corpus Christi Church | 12 @ 8/11/62 | Public Liability | BI 10,000/20,000 PD 5,000 | CH | 422 644 |
| WRI/SLIP | 124 | CH | 423687 | Corpus Christi Church | 12 @ 8/11/62 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | CH | 422 645 |
| WRI/SLIP | 124 | CH | 426739 | Corpus Christi Church | 12 @ 8/11/63 | Public Liability | BI 100,000/300,000  PD 10,000 | CH | 423 686 |
| WRI/SLIP | 87 | CH | 429364 | Corpus Christi Church | 36 @ 15/10/65 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | NM | 428 455 |

# ATTACHMENT A identifies all found policies and all policies referenced on the Brokers' Ledgers provided by the Diocese.  The Inclusion of the policies referenced on the Brokers' Ledgers included herein is not an admission to the existence of these policies or evidence that these policies exist.

| BOX NO | | | SLIP NO | ASSURED | PERIOD | COVERAGE | LIMIT US$ | RENEWAL OF | |
|---|---|---|---|---|---|---|---|---|---|
| WRI/SLIP | 58 | NM | 420135 | Holy Rosary Church | 12 @ 23/11/60 | Xs Public liability | BI 100,000/300,000 xs 10,000/20,000 PD 10,000 xs 5,000 | NM | 418 553 |
| WRI/SLIP | 124 | CH | 422629 | Holy Rosary Church | 12 @ 23/11/61 | Public Liability | BI 10,000/20,000  PD 5,000 | NEW | |
| WRI/SLIP | 124 | CH | 422630 | Holy Rosary Church | 12 @ 23/11/61 | Xs Public liability | BI 50,000/100,000 xs 10,000/20,000   PD 10,000 xs 5,000 | NM | 420 135 |
| WRI/SLIP | 86 | NM | 428958 | Holy Rosary Church | 12 @ 24/8/65 | Physical Damage | Physical Damage only | N/A | |
| WRI/SLIP | 92 | CH | 430953 | Holy Rosary Church | 36 @ 24/8/66 | CGL | PI 50,000/100,000/100,000 PD 5,000/25,000/25,000/25,000 | CH | 429 536 |
| WRI/SLIP | 102 | CH | 436804 | Holy Rosary Church | 36 @ 24/8/69 | CGL | PI 50,000/100,000/100,000 PD 5,000/25,000/25,000 | CH | 430 953 |
| WRI/SLIP | 164 | WA | 510322 | Holy Rosary Church | 36 @ 24/8/75 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | CH | 601 827 |
| WRI/SLIP | 163 | WA | 510253 | Immaculate Conception Church | 36 @ 9/6/75 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | | |
| WRI/SLIP | 124 | CH | 422713 | Mother of Sorrows Church | 12 @ 19/5/62 | Public Liability | BI 10,000/20,000  PD 5,000 | NEW | |
| WRI/SLIP | 124 | CH | 422714 | Mother of Sorrows Church | 12 @ 19/5/62 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | CH | 420 729 |
| WRI/SLIP | 91 | CH | 430859 | Our Lady of Good Counsel Church | 36 @ 26/7/66 | CGL | PI 25,000/50,000/50,000 PD 5,000/25,000/25,000 | CH | 430 585 |
| WRI/SLIP | 102 | CH | 436796 | Our Lady of Good Counsel Church | 36 @ 26/7/69 | CGL | PI 25,000/50,000/50,000 PD 5,000/25,000/25,000/25,000 | NM | 430 859 |
| WRI/SLIP | 164 | WA | 510291 | Our Lady of Good Counsel Church | 36 @ 26/7/75 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | CH | 601 756 |
| MIS/EXCH | 53 | CH | 601756 | Our Lady of Good Counsel Church | 36 @ 26/7/72 | CGL | PI 25,000/50,000/50,000 PD 5,000/25,000/25,000/25,000 | CH | 436 796 |
| WRI/SLIP | 124 | CH | 423470 | Our Lady of Lourdes | 12 @ 24/4/62 | Public Liability | BI 10,000/20,000  PD 5,000 | NEW | |

# ATTACHMENT A identifies all found policies and all policies referenced on the Brokers' Ledgers provided by the Diocese.  The Inclusion of the policies referenced on the Brokers' Ledgers included herein is not an admission to the existence of these policies or evidence that these policies exist.

| BOX NO | | | SLIP NO | | ASSURED | PERIOD | COVERAGE | LIMIT US$ | RENEWAL OF | |
|---|---|---|---|---|---|---|---|---|---|---|
| WRI/SLIP | 124 | CH | 423471 | | Our Lady of Lourdes | 12 @ 24/4/62 | Xs Public liability | BI 100,000/300,000 excess of 10,000/20,000 | NEW | |
| WRI/SLIP | 124 | CH | 424656 | | Our Lady of Lourdes | 12 @ 24/4/63 | Public Liability | BI 10,000/20,000 PD 5,000 | CH | 423 470 |
| WRI/SLIP | 124 | CH | 424657 | | Our Lady of Lourdes | 12 @ 24/4/63 | Xs Public liability | BI 100,000/300,000 excess of 10,000/20,000 | CH | 423 471 |
| WRI/SLIP | 166 | WA | 510666 | | Our Mother of Sorrows Church | 36 @ 6/7/76 | CGL | PI : CSL 300,000 a.o.acc/occ PD : 50,000 a.o.acc/occ | CH | 603 638 |
| WRI/SLIP | 124 | CH | 422660 | | Sacred Heart Church | 12 @ 5/11/61 | Public Liability | BI 10,000/20,000  PD 5,000 | NEW | |
| WRI/SLIP | 124 | CH | 422661 | | Sacred Heart Church | 12 @ 5/11/61 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | NM | 420 144 |
| WRI/SLIP | 124 | CH | 423698 | | Sacred Heart Church | 12 @ 5/11/62 | Public Liability | BI 10,000/20,000  PD 5,000 | CH | 422 660 |
| WRI/SLIP | 124 | CH | 423699 | | Sacred Heart Church | 12 @ 5/11/62 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | CH | 422 661 |
| WRI/SLIP | 58 | NM | 420183 | | St Anne's Church | 12 @ 2/11/60 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | NM | 418 560 |
| WRI/SLIP | 124 | CH | 422664 | | St Anne's Church | 12 @ 2/11/61 | Public Liability | BI 10,000/20,000  PD 5,000 | NEW | |
| WRI/SLIP | 124 | CH | 422665 | | St Anne's Church | 12 @ 2/11/61 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | NM | 420 183 |
| WRI/SLIP | 124 | CH | 423674 | | St Anne's Church | 12 @ 2/11/62 | Public Liability | BI 10,000/20,000 PD 5,000 | CH | 422 664 |
| WRI/SLIP | 124 | CH | 423675 | | St Anne's Church | 12 @ 2/11/62 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | CH | 422 665 |
| WRI/SLIP | 84 | CH | 428438 | | St Anne's Church | 12 @ 1/4/65 | Physical Damage | Physical Damage only | N/A | |
| WRI/SLIP | 90 | CH | 430510 | | St Anne's Church | 36 @ 1/4/66 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | CH | 429 530 |
| WRI/SLIP | 93 | CH | 431239 | | St Anne's Church | 36 @ 2/11/66 | CGL | CSL 300,000 a.o.acc/occ | NEW | |
| WRI/SLIP | 100 | CH | 436563 | | St Anne's Church | 36 @ 1/4/69 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | NM | 430 510 |

31

# ATTACHMENT A identifies all found policies and all policies referenced on the Brokers' Ledgers provided by the Diocese.  The Inclusion of the policies referenced on the Brokers' Ledgers included herein is not an admission to the existence of these policies or evidence that these policies exist.

| BOX NO | | | SLIP NO | | ASSURED | PERIOD | COVERAGE | LIMIT US$ | RENEWAL OF | |
|---|---|---|---|---|---|---|---|---|---|---|
| WRI/SLIP | 103 | CH | 436982 | | St Anne's Church | 36 @ 2/11/69 | CGL | CSL 300,000 a.o.acc/occ | CH | 431 239 |
| WRI/SLIP | 163 | WA | 510196 | | St Anne's Church | 36 @ 1/4/75 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000/30,000 | CH | 601 497 |
| MIS/EXCH | 66 | WA | 510414 | | St Anne's Church | 36 @ 2/11/75 | CGL | CSL 300,000 a.o.acc/occ | | |
| WRI/SLIP | 164 | WA | 510430 | | St Anne's Church | 36 @ 2/11/75 | CGL | PI 300,000 csl  PD 100,000 a.o.acc | CH | 601 998 |
| WRI/SLIP | 166 | WA | 510635 | | St Anne's Church | 36 @ 15/6/76 | CGL | PI : CSL 300,000 a.o.acc/occ PD : 50,000 a.o.acc/occ | CH | 603 660 |
| WRI/SLIP | 53 | CH | 601497 | | St Anne's Church | 36 @ 1/4/72 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000/30,000 | . CH | 436 563 |
| WRI/SLIP | 56 | CH | 601998 | | St Anne's Church | 36 @ 2/11/72 | CGL | CSL 300,000 a.o.acc/occ | CH | 436 982 |
| MIS/EXCH | 53 | CH | 603660 | | St Anne's Church | 36 @ 15/6/73 | CGL | PI 100,000/300,000/300,000 PD 100,000/100,000/100,000 | NEW | |
| WRI/SLIP | 93 | CH | 431219 | | St Anthony Church | 36 @ 5/11/66 | Physical Damage | Physical Damage only | CH | 429 350 |
| WRI/SLIP | 103 | CH | 436972 | | St Anthony Church | 36 @ 5/11/69 | Physical Damage | Physical Damage only | CH | 431 219 |
| WRI/SLIP | 164 | WA | 510434 | | St Anthony Church | 36 @ 5/11/75 | CGL | 300,000 CSL a.o.acc/occ | CH | 601 976 |
| WRI/SLIP | 56 | CH | 601976 | | St Anthony Church | 36 @ 5/11/72 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000/100,000 | CH | 436 972 |
| WRI/SLIP | 124 | CH | 422712 | | St Bernadettes & St. John Church | 12 @ 4/4/62 | Public Liability | BI 10,000/20,000  PD 5,000 | NEW | |
| WRI/SLIP | 124 | CH | 424658 | | St Bernadettes & St. John Church | 12 @ 4/4/63 | Public Liability | BI 10,000/20,000 PD 5,000 | CH | 422 712 |
| WRI/SLIP | 170 | WA | 510058 | | St Bernadettes & St. John Church | 36 @ 25/12/74 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000/100,000 | NEW | |

# ATTACHMENT A identifies all found policies and all policies referenced on the Brokers' Ledgers provided by the Diocese.  The Inclusion of the policies referenced on the Brokers' Ledgers included herein is not an admission to the existence of these policies or evidence that these policies exist.

| BOX NO | | SLIP NO | | ASSURED | PERIOD | COVERAGE | LIMIT US$ | RENEWAL OF | |
|---|---|---|---|---|---|---|---|---|---|
| WRI/SLIP | 96 | CH | 432860 | St Denis Church | 36 @ 1/6/67 | CGL | PI 50,000/100,000/100,000 PD 10,000/30,000/30,000 | CH | 432 740 |
| MIS/EXCH | 67 | CH | 438789 | St Denis Church | 36 @ 1/9/70 | CGL | PI 50,000/100,000/100,000 PD 10,000/30,000/30,000 | | |
| WRI/SLIP | 166 | WA | 510715 | St Denis Church | 36 @ 1/9/76 | CGL | PI : CSL 300,000 a.o.acc/occ PD : 50,000 a.o.acc/occ | CH | 603 794 |
| MIS/EXCH | 67 | CH | 603794 | St Denis Church | 36 @ 1/9/73 | CGL | PI 50,000/100,000/100,000 PD 10,000/30,000/30,000 | CH | 438 789 |
| WRI/SLIP | 124 | CH | 423275 | St Edmund's Church | 12 @ 16/3/62 | Public Liability | BI 10,000/20,000  PD 5,000 | NEW | |
| WRI/SLIP | 124 | CH | 423276 | St Edmund's Church | 12 @ 16/3/62 | Xs Public liability | BI 100,000/300,000 excess of 10,000/20,000 | NEW | |
| WRI/SLIP | 124 | CH | 424638 | St Edmund's Church | 12 @ 16/3/63 | Public Liability | BI 10,000/20,000 PD 5,000 | CH | 423 275 |
| WRI/SLIP | 124 | CH | 424639 | St Edmund's Church | 12 @ 16/3/63 | Xs Public liability | BI 100,000/300,000 excess of 10,000/20,000 | CH | 423 276 |
| MIS/EXCH | 80 | CH | 428493 | St Edmund's Church | 12 @ 16/3/65 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000,25,000 | CH | 426 547 |
| WRI/SLIP | 89 | CH | 430301 | St Edmund's Church | 12 @ 16/3/66 | Physical Damage | Physical Damage only | N/A | |
| WRI/SLIP | 94 | CH | 432395 | St Edmund's Church | 36 @ 16/3/67 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000,25,000 | CH | 430 301 |
| WRI/SLIP | 103 | CH | 438369 | St Edmund's Church | 36 @ 16/3/70 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000,25,000 | CH | 432 395 |
| WRI/SLIP | 166 | WA | 510546 | St Edmund's Church | 36 @ 16/3/76 | CGL | PI : CSL 300,000 a.o.acc/occ PD : 100,000 a.o.acc/occ | CH | 603 387 |
| WRI/SLIP | 57 | NM | 419074 | St Elizabeth's Church | 8/9/60 to 30/3/61 | Xs Public liability | PI 25,000/50,000/50,000 Xs 10,000/20,000/20,000 | NM | 416 384 |
| WRI/SLIP | 60 | NM | 420624 | St Elizabeth's Church | 12 @ 30/3/61 | Xs Public liability | PI 25,000/50,000/50,000 Xs 10,000/20,000/20,000 | NM | 419 074 |

# ATTACHMENT A identifies all found policies and all policies referenced on the Brokers' Ledgers provided by the Diocese.  The Inclusion of the policies referenced on the Brokers' Ledgers included herein is not an admission to the existence of these policies or evidence that these policies exist.

| BOX NO | | SLIP NO | | ASSURED | PERIOD | COVERAGE | LIMIT US$ | RENEWAL OF | |
|---|---|---|---|---|---|---|---|---|---|
| WRI/SLIP | 124 | CH | 422701 | St Elizabeth's Church | 12 @ 30/3/62 | Public Liability | BI 10,000/20,000 PD 5,000 | NEW | |
| WRI/SLIP | 124 | CH | 422702 | St Elizabeth's Church | 12 @ 30/3/62 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | CH | 420 624 |
| WRI/SLIP | 124 | CH | 424637 | St Elizabeth's Church | 12 @ 30/3/63 | Public Liability | BI 10,000/20,000 PD 5,000 | CH | 422 701 |
| WRI/SLIP | 124 | CH | 424638 | St Elizabeth's Church | 12 @ 30/3/63 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | CH | 422 702 |
| WRI/SLIP | 86 | NM | 428969 | St Elizabeth's Church | 12 @ 20/8/65 | Physical Damage | Physical Damage only | N/A | |
| WRI/SLIP | 92 | CH | 430950 | St Elizabeth's Church | 36 @ 20/8/66 | CGL | PI 25,000/50,000/50,000 PD 5,000/25,000/25,000/25,000 | NM | 428 969 |
| WRI/SLIP | 102 | CH | 436805 | St Elizabeth's Church | 36 @ 20/8/69 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | NM | 430 950 |
| WRI/SLIP | 164 | WA | 510332 | St Elizabeth's Church | 36 @ 20/8/75 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | CH | 601 829 |
| MIS/EXCH | 67 | CH | 432841 | St Francis de Sales Church | 36 @ 1/8/68 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | NEW | |
| WRI/SLIP | 99 | CH | 434753 | St Francis de Sales Church | 36 @ 1/8/68 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | CH | 432 841 |
| MIS/EXCH | 67 | CH | 600090 | St Francis de Sales Church | 36 @ 1/8/71 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | | |
| MIS/EXCH | 67 | CH | 604566 | St Francis de Sales Church | 36 @ 1/8/74 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | CH | 600 090 |
| WRI/SLIP | 58 | NM | 420132 | St Francis Xavier Church | 12 @ 15/11/60 | Xs Public liability | PI 100,000/300,000/300,000 PD 10,000/20,000/20,000 | NM | 418 435 |
| WRI/SLIP | 124 | CH | 422646 | St Francis Xavier Church | 12 @ 15/11/61 | Public Liability | BI 10,000/20,000  PD 5,000 | NEW | |
| WRI/SLIP | 124 | CH | 422647 | St Francis Xavier Church | 12 @ 15/11/61 | Xs Public liability | BI 100,000/300,000 excess of 10,000/20,000 | NM | 420 132 |

34

# ATTACHMENT A identifies all found policies and all policies referenced on the Brokers' Ledgers provided by the Diocese.  The Inclusion of the policies referenced on the Brokers' Ledgers included herein is not an admission to the existence of these policies or evidence that these policies exist.

| BOX NO | | SLIP NO | | ASSURED | PERIOD | COVERAGE | LIMIT US$ | RENEWAL OF | |
|---|---|---|---|---|---|---|---|---|---|
| WRI/SLIP | 68 | CH | 423528 | St Francis Xavier Church | 12 @ 9/10/62 | Xs CGL | B I 250,000/500,000 xs 100,000/300,000 | NEW | |
| WRI/SLIP | 124 | CH | 423713 | St Francis Xavier Church | 12 @ 15/11/62 | Xs Public liability | BI 100,000/300,000 excess of 10,000/20,000 | | |
| MIS/EXCH | 79 | CH | 425395 | St Francis Xavier Church | 12 @ 9/11/63 | Xs CGL | BI 250,000/500,000 xs 100,000/300,000 | | |
| MIS/EXCH | 79 | CH | 428402 | St Francis Xavier Church | 12 @ 10/1/65 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000 | | |
| WRI/SLIP | 84 | CH | 428568 | St Francis Xavier Church | 12 @ 10/1/65 | Xs CGL | 250,000/500,000 Excess of 100,000/300/000 | CH | 425 395 |
| WRI/SLIP | 90 | CH | 430703 | St Francis Xavier Church | 36 @ 20/1/66 | Xs CGL | BI 250,000/500,000 xs 100,000/300,000 | CH | 428 568 |
| MIS/EXCH | 69 | CH | 431246 | St Francis Xavier Church | 12 @ 15/11/66 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000 | CH | 429 525 |
| WRI/SLIP | 73 | CH | 433112 | St Francis Xavier Church | 12 @ 15/11/67 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000 | CH | 431 246 |
| WRI/SLIP | 88 | CH | 429209 | St Hedwig's Church | 36 @ 21/9/65 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000/25,000 | CH | 427 432 |
| WRI/SLIP | 99 | CH | 434825 | St Hedwig's Church | 36 @ 21/9/68 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000 | CH | 429 209 |
| WRI/SLIP | 170 | WA | 510034 | St Hedwig's Church | 36 @ 21/9/74 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000/25,000 | CH | 600 178 |
| MIS/EXCH | 66 | CH | 600178 | St Hedwig's Church | 36 @ 21/9/71 | CGL | PI 100,000/300,000/300,000 PD 25,000/50,000/50,000 | CH | 434 825 |
| WRI/SLIP | 163 | WA | 510219 | St Helena's Church | 36 @ 14/5/75 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | CH | 601 463 |
| WRI/SLIP | 53 | CH | 601463 | St Helena's Church | 36 @ 14/5/72 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | NEW | |
| WRI/SLIP | 124 | CH | 423009 | St John's Church / St Patrick's Church | 12 @ 15/3/62 | Public Liability | BI 10,000/20,000  PD 5,000 | NEW | |

35

# ATTACHMENT A identifies all found policies and all policies referenced on the Brokers' Ledgers provided by the Diocese.  The Inclusion of the policies referenced on the Brokers' Ledgers included herein is not an admission to the existence of these policies or evidence that these policies exist.

| BOX NO | | SLIP NO | | ASSURED | PERIOD | COVERAGE | LIMIT US$ | RENEWAL OF | |
|---|---|---|---|---|---|---|---|---|---|
| WRI/SLIP | 124 | CH | 423010 | St John's Church / St Patrick's Church | 12 @ 15/3/62 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | NEW | |
| WRI/SLIP | 124 | CH | 424642 | St John's Church / St Patrick's Church | 12 @ 15/3/63 | Public Liability | BI 10,000/20,000 PD 5,000 | CH | 423 009 |
| WRI/SLIP | 124 | CH | 424643 | St John's Church / St Patrick's Church | 12 @ 15/3/63 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | CH | 423 010 |
| WRI/SLIP | 124 | CH | 423013 | St Joseph on the Brandywine | 12 @ 5/3/62 | Xs Public liability | BI 50,000/100,000 excess of 10,000/20,000 | NEW | |
| WRI/SLIP | 124 | CH | 423014 | St Joseph on the Brandywine | 12 @ 5/3/62 | Public Liability | BI 10,000/20,000  PD 5,000 | NEW | |
| WRI/SLIP | 124 | CH | 424646 | St Joseph on the Brandywine | 12 @ 5/3/63 | Public Liability | BI 10,000/20,000 PD 5,000 | CH | 423 013 |
| WRI/SLIP | 124 | CH | 424647 | St Joseph on the Brandywine | 12 @ 5/3/63 | Xs Public liability | BI 50,000/100,000 excess of 10,000/20,000 | CH | 423 014 |
| WRI/SLIP | 89 | CH | 430318 | St Joseph on the Brandywine | 12 @ 15/3/66 | Physical Damage | Physical Damage only | N/A | |
| WRI/SLIP | 94 | CH | 432397 | St Joseph on the Brandywine | 36 @ 15/5/67 | CGL | PI 50,000/100,000/100,000 PD 5,000/25,000/25,000/25,000 | CH | 430 499 |
| MIS/EXCH | 53 | CH | 438459 | St Joseph on the Brandywine | 36 @ 15/3/70 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | CH | 432 397 |
| WRI/SLIP | 166 | WA | 510544 | St Joseph on the Brandywine | 36 @ 15/3/76 | CGL | PI : CSL 300,000 a.o.acc/occ PD : 50,000 a.o.acc/occ | CH | 603 595 |
| MIS/EXCH | 53 | CH | 603595 | St Joseph on the Brandywine | 36 @ 15/3/73 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | CH | 438 459 |
| WRI/SLIP | 57 | NM | 419180 | Old St. Joseph's Church | 12 @ 18/4/60 | Xs Public liability | 50,000/100,000/100,000    xs 10,000/20,000/20,000 | NM | 416 506 |
| WRI/SLIP | 124 | CH | 420626 | Old St. Joseph's Church | 12 @ 18/4/61 | Xs Public liability | 50,000/100,000/100,000    xs 10,000/20,000/20,000 | NM | 419 180 |
| WRI/SLIP | 124 | CH | 422710 | Old St. Joseph's Church | 18/4/62 - 1/5/62 | Public Liability | BI 10,000/20,000/20,000  PD 5,000/5,000 | NEW | |
| WRI/SLIP | 57 | CH | 600155 | St. Joseph's Church | 36 @ 15/9/71 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | CH | 434 977 |
| WRI/SLIP | 166 | WA | 510559 | St Mary Magdalen Church | 36 @ 19/3/76 | CGL | PI : CSL 300,000 a.o.acc/occ PD : 50,000 a.o.acc/occ | NEW | |

36

# ATTACHMENT A identifies all found policies and all policies referenced on the Brokers' Ledgers provided by the Diocese.  The Inclusion of the policies referenced on the Brokers' Ledgers included herein is not an admission to the existence of these policies or evidence that these policies exist.

| BOX NO | | SLIP NO | | ASSURED | PERIOD | COVERAGE | LIMIT US$ | RENEWAL OF | |
|---|---|---|---|---|---|---|---|---|---|
| WRI/SLIP | 88 | CH | 429502 | St Mary of the Assumption | 36 @ 1/9/65 | CGL | PI 25,000/50,000/50,000 PD 5,000/25,000/25,000/25,000 | NEW | |
| WRI/SLIP | 99 | CH | 434822 | St Mary of the Assumption | 36 @ 1/9/68 | CGL | PI 25,000/50,000/50,000 PD 5,000/25,000/25,000 | CH | 429 502 |
| MIS/EXCH | 67 | CH | 600181 | St Mary of the Assumption | 36 @ 1/9/71 | CGL | PI 25,000/50,000/50,000 PD 5,000/25,000/25,000 | | |
| WRI/SLIP | 124 | CH | 423277 | St Mary's Church | 12 @ 12/3/62 | Public Liability | BI 10,000/20,000 PD 5,000 | NEW | |
| WRI/SLIP | 124 | CH | 423278 | St Mary's Church | 12 @ 12/3/62 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | NEW | |
| WRI/SLIP | 124 | CH | 424635 | St Mary's Church | 12 @ 12/3/63 | Public Liability | BI 10,000/20,000 PD 5,000 | CH | 423 277 |
| WRI/SLIP | 124 | CH | 424636 | St Mary's Church | 12 @ 12/3/63 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | CH | 423 278 |
| WRI/SLIP | 91 | CH | 430858 | St Mary's Church | 36 @ 26/7/66 | CGL | PI 25,000/50,000/50,000 PD 5,000/25,000/25,000 | NM | 430 584 |
| WRI/SLIP | 170 | WA | 510156 | St Mary's Church | 36 @ 1/3/75 | CGL | PI 100,000/30,000/300,000 PD 50,000/100,000/100,000/100,000 | CH | 601 432 |
| WRI/SLIP | 53 | CH | 601432 | St Mary's Church | 36 @ 1/3/72 | CGL | PI 100,000/30,000/300,000 PD 50,000/100,000/100,000/100,000 | NEW | |
| WRI/SLIP | 58 | NM | 420137 | St Matthews Church | 12 @ 26/11/60 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | NM | 418 720 |
| WRI/SLIP | 124 | CH | 422628 | St Matthews Church | 12 @ 26/11/61 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | NM | 420 137 |
| WRI/SLIP | 124 | CH | 423693 | St Matthews Church | 12 @ 26/11/62 | Public Liability | BI 10,000/20,000  PD 5,000 | | |
| WRI/SLIP | 124 | CH | 423694 | St Matthews Church | 12 @ 26/11/62 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | CH | 422 628 |

37

# ATTACHMENT A identifies all found policies and all policies referenced on the Brokers' Ledgers provided by the Diocese.  The Inclusion of the policies referenced on the Brokers' Ledgers included herein is not an admission to the existence of these policies or evidence that these policies exist.

| BOX NO | | SLIP NO | | ASSURED | PERIOD | COVERAGE | LIMIT US$ | RENEWAL OF | |
|---|---|---|---|---|---|---|---|---|---|
| WRI/SLIP | 124 | CH | 422627 | St Matthew's Church | 12 @ 26/11/61 | Public Liability | BI 10,000/20,000  PD 5,000 | NEW | |
| WRI/SLIP | 60 | NM | 420536 | St Michael's Church | 12 @ 18/2/61 | Xs Public liability | PI 100,000/300,000/300,000 Xs 10,000/20,000/20,000 | NM | 418 717 |
| WRI/SLIP | 124 | CH | 422675 | St Michael's Church | 12 @ 3/1/62 | Public Liability | BI 10,000/20,000  PD 5,000 | NEW | |
| WRI/SLIP | 124 | CH | 422693 | St Michael's Church | 12 @ 18/2/62 | Public Liability | BI 10,000/20,000  PD 5,000 | NEW | |
| WRI/SLIP | 124 | CH | 422694 | St Michael's Church | 12 @ 18/2/62 | Xs Public liability | BI 100,000/300,000 excess of 10,000/20,000 | CH | 420 536 |
| WRI/SLIP | 124 | CH | 424385 | St Michael's Church | 12 @ 3/1/63 | Public Liability | BI 10,000/20,000 PD 5,000 | CH | 422 675 |
| WRI/SLIP | 124 | CH | 424386 | St Michael's Church | 12 @ 3/1/63 | Xs Public liability | BI 100,000/300,000 excess of 10,000/20,000 | CH | 422 676 |
| WRI/SLIP | 124 | CH | 424452 | St Michael's Church | 12 @ 18/2/63 | Public Liability | BI 10,000/20,000 PD 5,000 | CH | 422 693 |
| WRI/SLIP | 124 | CH | 424453 | St Michael's Church | 12 @ 18/2/63 | Xs Public liability | BI 100,000/300,000 excess of 10,000/20,000 | CH | 422 694 |
| WRI/SLIP | 94 | CH | 432243 | St Michael's Church | 36 @ 18/2/67 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | CH | 430 503 |
| MIS/EXCH | 81 | CH | 432616 | St Michael's Church | 36 @ 28/4/67 | Umbrella | 1,000,000 xs primaries | | |
| MIS/EXCH | 81 | CH | 434165 | St Michael's Church | 12 @ 3/1/68 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | | |
| WRI/SLIP | 547 | WA | 710012 | St Michael's Church | 12 @ 17/9/74 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | CH | 603 712 |
| WRI/SLIP | 164 | WA | 510361 | St Michael's Church | 36 @ 17/9/75 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | CH | 710 012 |
| WRI/SLIP | 166 | WA | 510514 | St Michael's Church | 36 @ 18/2/76 | CGL | PI : CSL 300,000 a.o.acc/occ PD : 100,000 a.o.acc/occ | CH | 603 277 |
| WRI/SLIP | 166 | WA | 510734 | St Michael's Church | 12 @ 17/9/76 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000 | WA | 510 361 |
| WRI/SLIP | 53 | CH | 601185 | St Michael's Church | 12 @ 3/1/72 | CGL | PI 100,000/300,000/300,000 PD 50,000/50,000/50,000 | CH | 440 259 |

# ATTACHMENT A identifies all found policies and all policies referenced on the Brokers' Ledgers provided by the Diocese. The Inclusion of the policies referenced on the Brokers' Ledgers included herein is not an admission to the existence of these policies or evidence that these policies exist.

| BOX NO | | SLIP NO | | ASSURED | PERIOD | COVERAGE | LIMIT US$ | RENEWAL OF | |
|--------|---|---------|---|---------|--------|----------|-----------|------------|---|
| MIS/EXCH | 81 | CH | 603158 | St Michael's Church | 12 @ 3/1/73 | CGL | PI 100,000/300,000/300,000 PD 50,000/50,000/50,000 | CH | 601885 |
| MIS/EXCH | 81 | CH | 604222 | St Michael's Church | 12 @ 3/1/74 | CGL | PI 100,000/300,000/300,000 PD 50,000/50,000/50,000 | CH | 603158 |
| WRI/SLIP | 59 | NM | 420385 | St Paul's R C Church | 12 @ 15/1/61 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | NM | 418558 |
| WRI/SLIP | 124 | CH | 422677 | St Paul's R C Church | 12 @ 16/1/62 | Public Liability | BI 10,000/20,000  PD 5,000 | NEW | |
| WRI/SLIP | 124 | CH | 422678 | St Paul's R C Church | 12 @ 16/1/62 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | NM | 420385 |
| WRI/SLIP | 124 | CH | 422735 | St Paul's R C Church | 12 @ 4/6/62 | Public Liability | BI 10,000/20,000  PD 5,000 | NEW | |
| WRI/SLIP | 124 | CH | 422736 | St Paul's R C Church | 12 @ 4/6/62 | Xs Public liability | BI 50,000/100,000 excess of 10,000/20,000 | NEW | |
| WRI/SLIP | 124 | CH | 424305 | St Paul's R C Church | 12 @ 16/1/63 | Public Liability | BI 10,000/20,000 PD 5,000 | CH | 422677 |
| WRI/SLIP | 69 | CH | 424306 | St Paul's R C Church | 12 @ 16/1/63 | Xs Public liability | PI 25,000/50,000 Xs 10,000/20,000 | CH | 422678 |
| WRI/SLIP | 87 | CH | 429441 | St Paul's R C Church | 36 @ 10/12/65 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | CH | 428999 |
| WRI/SLIP | 101 | CH | 436178 | St Paul's R C Church | 36 @ 10/1/69 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | CH | 429441 |
| WRI/SLIP | 170 | WA | 510094 | St Paul's R C Church | 36 @ 10/1/75 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | CH | 601168 |
| WRI/SLIP | 163 | WA | 510176 | St Paul's R C Church | 36 @ 14/3/75 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | CH | 601467 |
| MIS/EXCH | 66 | CH | 601168 | St Paul's R C Church | 36 @ 1/10/72 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | CH | 436178 |
| MIS/EXCH | 65 | CH | 601467 | St Paul's R C Church | 36 @ 14/3/72 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | | |
| WRI/SLIP | 57 | NM | 419145 | St Peter's Cathedral | 12 @ 12/2/60 | Xs Public liability | PI 25,000/50,000/50,000 Xs 10,000/20,000/20,000 | NM | 416233 |

39

# <u>ATTACHMENT A identifies all found policies and all policies referenced on the Brokers' Ledgers provided by the Diocese.  The Inclusion of the policies referenced on the Brokers' Ledgers included herein is not an admission to the existence of these policies or evidence that these policies exist.</u>

| BOX NO | | SLIP NO | | ASSURED | PERIOD | COVERAGE | LIMIT US$ | RENEWAL OF | |
|---|---|---|---|---|---|---|---|---|---|
| WRI/SLIP | 60 | NM | 420524 | St Peter's Cathedral | 12 @ 12/2/61 | Xs Public liability | PI 25,000/50,000/50,000 Xs 10,000/20,000/20,000 | NM | 419 145 |
| WRI/SLIP | 124 | CH | 422691 | St Peter's Cathedral | 12 @ 12/2/62 | Public Liability | BI 10,000/20,000  PD 5,000 | NEW | |
| WRI/SLIP | 124 | CH | 422692 | St Peter's Cathedral | 12 @ 12/2/62 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | CH | 420 524 |
| WRI/SLIP | 124 | CH | 424430 | St Peter's Cathedral | 12 @ 12/2/63 | Public Liability | BI 10,000/20,000  PD 5,000 | CH | 422 691 |
| WRI/SLIP | 124 | CH | 424431 | St Peter's Cathedral | 12 @ 12/2/63 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | CH | 422 692 |
| MIS/EXC H | 67 | CH | 430187 | St Peter's Cathedral | 36 @ 12/2/66 | CGL | PI 25,000/50,000/50,000 PD 5,000/25,000/25,000 | | |
| WRI/SLIP | 57 | CH | 430187 | St Peter's Cathedral | 36 @ 12/2/66 | CGL | PI 25,000/50,000/50,000 PD 5,000/25,000/25,000 | CH | 427 576 |
| MIS/EXC H | 67 | CH | 436323 | St Peter's Cathedral | 36 @ 12/2/69 | CGL | PI 25,000/50,000/50,000 PD 5,000/25,000/25,000 | | |
| WRI/SLIP | 170 | WA | 510128 | St Peter's Cathedral | 36 @ 12/2/75 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000/100,000 | CH | 601 326 |
| MIS/EXC H | 67 | CH | 601326 | St Peter's Cathedral | | CGL | PI 25,000/50,000/50,000 PD 5,000/25,000/25,000 | CH | 436 323 |
| WRI/SLIP | 60 | NM | 420445 | St Peter's Church | 12 @ 22/11/60 | Xs Public liability | PI 100,000/300,000/300,000 Xs 10,000/20,000/20,000 | NM | 418 562 |
| WRI/SLIP | 124 | CH | 422631 | St Peter's Church | 12 @ 22/11/62 | Public Liability | BI 10,000/20,000  PD 5,000 | NEW | |
| WRI/SLIP | 124 | CH | 422632 | St Peter's Church | 12 @ 22/11/62 | Xs Public liability | BI 100,000/300,000 xs 10,000/20,000   PD 10,000 xs 5,000 | NM | 420 445 |
| WRI/SLIP | 67 | CH | 423383 | St Peter's Church | 3 @ 1/9/62 | Xs CGL | PI 100,000/500,000/500,000 Xs 10,000/300,000/300,000 | NEW | |
| WRI/SLIP | 124 | CH | 424272 | St Peter's Church | 12 @ 22/11/62 | Public Liability | BI 10,000/20,000  PD 5,000 | CH | 422 631 |

# ATTACHMENT A identifies all found policies and all policies referenced on the Brokers' Ledgers provided by the Diocese.  The Inclusion of the policies referenced on the Brokers' Ledgers included herein is not an admission to the existence of these policies or evidence that these policies exist.

| BOX NO | | SLIP NO | | ASSURED | PERIOD | COVERAGE | LIMIT US$ | RENEWAL OF | |
|---|---|---|---|---|---|---|---|---|---|
| WRI/SLIP | 124 | CH | 424273 | St Peter's Church | 12 @ 22/11/62 | Xs Public liability | BI 100,000/300,000 excess of 10,000/20,000 | CH | 422 632 |
| WRI/SLIP | 84 | CH | 428454 | St Peter's Church | 12 @ 22/11/64 | Xs CGL | PI 100,000/500,000/500,000 Xs 10,000/300,000/300,000 | CH | 426 682 |
| WRI/SLIP | 86 | CH | 428973 | St Peter's Church | 36 @ 15/8/65 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | CH | 427 208 |
| WRI/SLIP | 89 | CH | 430258 | St Peter's Church | 12 @ 22/11/65 | Xs CGL | 100,000/500,000 Excess of 100,000/300,000 | CH | 428 454 |
| WRI/SLIP | 93 | CH | 431264 | St Peter's Church | 12 @ 22/11/66 | Xs CGL | 100,000/500,000 Excess of 100,000/300,000 | CH | 430 258 |
| WRI/SLIP | 94 | CH | 432237 | St Peter's Church | 36 @ 12/2/67 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | NM | 432 147 |
| WRI/SLIP | 94 | CH | 432442 | St Peter's Church | 36 @ 12/2/67 | CGL | 100,000/500,000 excess 100,000/300,000 | CH | 432 164 |
| WRI/SLIP | 75 | CH | 432980 | St Peter's Church | 36 @ 19/9/67 | Umbrella | 1,000,000 xs primaries | NEW | |
| WRI/SLIP | 99 | CH | 434766 | St Peter's Church | 36 @ 15/8/68 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | CH | 428 973 |
| WRI/SLIP | 104 | CH | 438370 | St Peter's Church | 36 @ 12/2/70 | CGL | PI 100,000/300,000/300,000 PD 25,000/50,000/50,000/50,000 | CH | 432 237 |
| WRI/SLIP | 166 | WA | 510510 | St Peter's Church | 36 @ 12/2/76 | CGL | PI : CSL 300,000 a.o.acc/occ PD : 100,000 a.o.acc/occ | CH | 603 168 |
| WRI/SLIP | 57 | CH | 600086 | St Peter's Church | 36 @ 15/8/71 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | CH | 434 766 |
| MIS/EXCH | 65 | CH | 604570 | St Peter's Church | 36 @ 15/8/74 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | CH | 600 086 |
| WRI/SLIP | 93 | CH | 431233 | St Thomas Church | 36 @ 15/11/66 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | CH | 429 528 |

# ATTACHMENT A identifies all found policies and all policies referenced on the Brokers' Ledgers provided by the Diocese. The Inclusion of the policies referenced on the Brokers' Ledgers included herein is not an admission to the existence of these policies or evidence that these policies exist.

| BOX NO | | SLIP NO | | ASSURED | PERIOD | COVERAGE | LIMIT US$ | RENEWAL OF | |
|---|---|---|---|---|---|---|---|---|---|
| MIS/EXCH | 55 | CH | 436970 | St Thomas Church | 36 @ 15/11/69 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | CH | 431 233 |
| WRI/SLIP | 164 | WA | 510428 | St Thomas Church | 36 @ 15/11/75 | CGL | PI 300,000 csl  PD 100,000 a.o.acc | CH | 601 978 |
| MIS/EXCH | 55 | CH | 601978 | St Thomas Church | 36 @ 15/11/72 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | CH | 436 970 |
| WRI/SLIP | 61 | CH | 429065 | Catholic Diocese Foundation | 12 @ 2/7/65 | Physical Damage | Physical Damage only | N/A | |
| WRI/SLIP | 91 | CH | 430874 | Catholic Diocese Foundation | 12 @ 2/7/66 | Physical Damage | Physical Damage only | CH | 429 065 |
| WRI/SLIP | 102 | CH | 436739 | Catholic Diocese Foundation | 12 @ 2/7/69 | Physical Damage | Physical Damage only | N/A | |
| WRI/SLIP | 106 | CH | 440623 | Catholic Diocese Foundation | 12 @ 2/7/71 | Physical Damage | Physical Damage only | CH | 438 611 |
| WRI/SLIP | 164 | WA | 510295 | Catholic Diocese Foundation | 12 @ 2/7/75 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | CH | 604 534 |
| WRI/SLIP | 164 | WA | 510363 | Catholic Diocese Foundation | 36 @ 26/9/75 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | CH | 601 986 |
| WRI/SLIP | 166 | WA | 510653 | Catholic Diocese Foundation | 12 @ 2/7/76 | CGL | PI : CSL 300,000 a.o.acc/occ PD : 50,000 a.o.acc/occ | CH | 510 295 |
| MIS/EXCH | 67 | CH | 601986 | Catholic Diocese Foundation | 36 @ 26/9/72 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | CH | 440 623 |
| MIS/EXCH | 53 | CH | 603629 | Catholic Diocese Foundation | 12 @ 2/7/73 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | CH | 601 618 |
| MIS/EXCH | 53 | CH | 604534 | Catholic Diocese Foundation | 12 @ 2/7/74 | CGL | PI 100,000/300,000/300,000 PD 50,000/100,000/100,000 | CH | 603 629 |
| WRI/SLIP | 60 | NM | 420729 | The Bishop of Wilmington | 12 @ 19/5/61 | Xs Public liability | PI 25,000/50,000/50,000 Xs 10,000/20,000/20,000 | NM | 418 877 |
| WRI/SLIP | 124 | CH | 422628 | The Bishop of Wilmington | 12 @ 26/11/61 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | | |

# ATTACHMENT A identifies all found policies and all policies referenced on the Brokers' Ledgers provided by the Diocese.  The Inclusion of the policies referenced on the Brokers' Ledgers included herein is not an admission to the existence of these policies or evidence that these policies exist.

| BOX NO | | SLIP NO | | ASSURED | PERIOD | COVERAGE | LIMIT US$ | RENEWAL OF | |
|---|---|---|---|---|---|---|---|---|---|
| WRI/SLIP | 124 | CH | 422629 | The Bishop of Wilmington | 12 @ 23/11/61 | Public Liability | BI 10,000/20,000  PD 5,000 | | |
| WRI/SLIP | 124 | CH | 422630 | The Bishop of Wilmington | 12 @ 23/11/61 | Xs Public liability | BI 50,000/100,000 xs 10,000/20,000   PD 10,000 xs 5,000 | | |
| WRI/SLIP | 124 | CH | 423693 | The Bishop of Wilmington | 12 @ 26/11/62 | Public Liability | BI 10,000/20,000  PD 5,000 | | |
| WRI/SLIP | 124 | CH | 423694 | The Bishop of Wilmington | 12 @ 26/11/62 | Xs Public liability | BI 25,000/50,000 excess of 10,000/20,000 | | |
| WRI/SLIP | 81 | CH | 427121 | The Bishop of Wilmington | 12 @ 26/9/64 | Physical Damage | Physical Damage only | N/A | |
| WRI/SLIP | 82 | NM | 427221 | The Bishop of Wilmington | 12 @ 22/10/64 | Physical Damage | Physical Damage only | N/A | |
| WRI/SLIP | 88 | CH | 429170 | The Bishop of Wilmington | 36 @ 26/9/65 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000/25,000 | CH | 428 241 |
| WRI/SLIP | 87 | CH | 429365 | The Bishop of Wilmington | 36 @ 22/10/65 | CGL | PI 50,000/100,000/100,000 PD 10,000/30,000/30,000 | NM | 427 221 |
| WRI/SLIP | 87 | CH | 429366 | The Bishop of Wilmington | 36 @ 25/10/65 | CGL | PI 50,000/100,000/100,000 PD 5,000/25,000/25,000 | NM | 428 261 |
| WRI/SLIP | 90 | CH | 430595 | The Bishop of Wilmington | 36 @ 19/5/66 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000 | CH | 428 816 |
| WRI/SLIP | 90 | CH | 430600 | The Bishop of Wilmington | 36 @ 23/5/66 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000 | | |
| WRI/SLIP | 96 | CH | 432894 | The Bishop of Wilmington | 12 @ 5/8/67 | CGL | PI 50,000/100,000/100,000 PD 5,000/25,000/25,000/25,000 | CH | 432 943 |
| WRI/SLIP | 99 | CH | 434823 | The Bishop of Wilmington | 36 @ 26/9/68 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000 | CH | 429 170 |
| WRI/SLIP | 99 | CH | 434824 | The Bishop of Wilmington | 12 @ 17/9/68 | CGL | PI 50,000/100,000/100,000 PD 5,000/25,000/25,000 | CH | 432 894 |

43

# ATTACHMENT A identifies all found policies and all policies referenced on the Brokers' Ledgers provided by the Diocese.  The Inclusion of the policies referenced on the Brokers' Ledgers included herein is not an admission to the existence of these policies or evidence that these policies exist.

| BOX NO | | SLIP NO | | ASSURED | PERIOD | COVERAGE | LIMIT US$ | RENEWAL OF | |
|---|---|---|---|---|---|---|---|---|---|
| WRI/SLIP | 101 | CH | 436180 | The Bishop of Wilmington | 36 @ 25/1/69 | CGL | PI 50,000/100,000/100,000 PD 5,000/25,000/25,000 | CH | 429 366 |
| WRI/SLIP | 101 | CH | 436182 | The Bishop of Wilmington | 36 @ 22/1/69 | CGL | PI 50,000/100,000/100,000 PD 10,000/30,000/30,000 | NM | 429 365 |
| MIS/EXCH | 65 | CH | 436565 | The Bishop of Wilmington | 36 @ 23/5/69 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000 | CH | 430 600 |
| WRI/SLIP | 102 | CH | 436890 | The Bishop of Wilmington | 12 @ 17/9/69 | CGL | PI 50,000/100,000/100,000 PD 5,000/25,000/25,000 | CH | 434 824 |
| WRI/SLIP | 104 | CH | 438762 | The Bishop of Wilmington | 12 @ 17/9/70 | CGL | PI 50,000/100,000/100,000 PD 5,000/25,000/25,000/25,000 | CH | 436 890 |
| WRI/SLIP | 170 | WA | 510086 | The Bishop of Wilmington | 36 @ 22/1/75 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000/30,000 | CH | 601 178 |
| WRI/SLIP | 163 | WA | 510217 | The Bishop of Wilmington | 36 @ 23/5/75 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000 | CH | 601 659 |
| WRI/SLIP | 166 | WA | 510582 | The Bishop of Wilmington | 36 @ 22/4/76 | CGL | PI/PD CSL 300,000 a.o.acc/occ | CH | 603 518 |
| WRI/SLIP | 52 | CH | 600153 | The Bishop of Wilmington | 12 @ 17/9/71 | CGL | PI 50,000/100,000/100,000 PD 5,000/25,000/25,000 | CH | 438 762 |
| MIS/EXCH | 66 | CH | 600191 | The Bishop of Wilmington | 36 @ 26/9/71 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000/25,000 | CH | 428 241 |
| MIS/EXCH | 66 | CH | 601168 | The Bishop of Wilmington | 36 @ 10/1/72 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | | |
| WRI/SLIP | 53 | CH | 601178 | The Bishop of Wilmington | 36 @ 22/1/72 | CGL | PI 100,000/300,000/300,000 PD 10,000/30,000/30,000 | CH | 436 182 |
| MIS/EXCH | 65 | CH | 601569 | The Bishop of Wilmington | 36 @ 23/5/72 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000 | CH | 436 565 |
| WRI/SLIP | 56 | CH | 601882 | The Bishop of Wilmington | 12 @ 17/9/72 | CGL | PI 50,000/100,000/100,000 PD 5,000/25,000/25,000/25,000 | CH | 600 153 |
| WRI/SLIP | | WA | 710028 | The Bishop of Wilmington | 36 @ 26/9/1974 | CGL | PI 100,000/300,000/300,000 PD 5,000/25,000/25,000 | CH | 600 191 |

44

## ATTACHMENT A identifies all found policies and all policies referenced on the Brokers' Ledgers provided by the Diocese.  The Inclusion of the policies referenced on the Brokers' Ledgers included herein is not an admission to the existence of these policies or evidence that these policies exist.

| BOX NO | SLIP NO | | ASSURED | PERIOD | COVERAGE | LIMIT US$ | RENEWAL OF |
|---|---|---|---|---|---|---|---|
| WRI/SLIP | WA | 510984 | Diocese of Wilmington | 36 @ 7/1/1977 | CGL | $500,000 per occurrence and in the annual aggregate | |
| WRI/SLIP | WA | 511918 | Diocese of Wilmington | 36 @ 7/1/1980 | CGL | $500,000 per occurrence and in the annual aggregate | |
| WRI/SLIP | WA | 512892 | Diocese of Wilmington | 36 @ 7/1/1983 | CGL | $500,000 per occurrence and in the annual aggregate | |
| WRI/SLIP | WA | 513849 | Diocese of Wilmington | 36 @ 7/1/1986 | CGL | $500,000 per occurrence and in the annual aggregate | |
| WRI/SLIP | WA | 515347 | Diocese of Wilmington | 36 @ 7/1/1989 | CGL | $500,000 per occurrence and in the annual aggregate | |
| WRI/SLIP | WA | 517274 | Diocese of Wilmington | 36 @ 7/1/1992 (ending 7/1/1994) | CGL | $500,000 per occurrence and in the annual aggregate | |

e.    **Certain Underwriters at Lloyd's, London (post-1994)**

## CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

This Confidential Settlement Agreement and Release (hereinafter the "Agreement") is made this ___ day of July, 2011, by and between the Catholic Diocese of Wilmington, Inc. (hereinafter referred to as "Diocese"), the "Parishes", and the "Related Entities" (each as defined below) (collectively, the "Catholic Entities"), and Certain Underwriters at Lloyd's, London (hereinafter referred to as "Underwriters") (as defined below) (the aforementioned parties being referred to hereinafter individually as a "Party" and collectively as the "Parties").

### WITNESSETH THAT:

WHEREAS, Underwriters severally subscribed to policies issued to the Diocese of Wilmington which provided insurance to the Catholic Entities for the periods effective from July 1, 1994 to the present (the "Subject Insurance Policies", as defined below); and,

WHEREAS, certain of the Catholic Entities have incurred and may incur in the future certain liabilities, expenses and losses arising out of certain claims; and,

WHEREAS, certain Catholic Entities tendered demands to Underwriters for coverage under the Subject Insurance Policies for such claims, and Underwriters dispute whether, and to what extent, coverage may attach with respect to any such claims under the Subject Insurance Policies ("Dispute"); and,

WHEREAS, on October 18, 2009, the Diocese filed a petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court"), Case No. 09-13560-CSS ("Bankruptcy Case"); and,

WHEREAS, upon confirmation of the "Settlement Plan" (as defined below) the Catholic Entities will enter into a settlement of all Survivor Claims in the Bankruptcy Case; and

WHEREAS, whether or not they were subject to claims and whether or not they tendered demands to Underwriters, all Catholic Entities are settling with and releasing Underwriters pursuant to this Agreement; and,

WHEREAS, it is the intention of the Parties that the Subject Insurance Policies be sold, assigned and transferred to Underwriters and that Underwriters shall buy back the Subject Insurance Policies, free and clear of certain claims, specifically the Subject Claims (as defined below), by payment of the "Settlement Amount" (as defined below), to the extent provided herein; and,

WHEREAS, it is the intention of the Parties that the interests of the Catholic Entities in the Subject Insurance Policies shall be extinguished, ended, and forever terminated, to the extent provided herein; and,

WHEREAS, it is the intention of the Parties that the Catholic Entities shall (i) not retain any right, title or interest in or to the Subject Insurance Policies, and (ii) release Underwriters, and that no

Underwriters shall have any remaining duties or obligations of any nature whatsoever to any Catholic Entity, with regard to the Subject Claims; and,

WHEREAS, by this Agreement, the Parties intend to adopt, by way of compromise, and without prejudice to or waiver of their respective positions in other matters, without further trial or adjudication of any issues of fact or law, and without Underwriters' admission of liability or responsibility under the Subject Insurance Policies, a full and final settlement that releases and terminates certain rights, obligations and liabilities of Underwriters and the Catholic Entities with respect to the Subject Insurance Policies, including, without limitation, certain rights, obligations and liabilities relating to the aforesaid claims, without prejudice to their respective positions on policy wordings or any other issues, or in any action.

WHEREAS, the Parties also intend by this Agreement to reach a global settlement in the Bankruptcy Case such that, in consideration for Underwriters' contribution to the global settlement, the Catholic Entities agree to release and indemnify Underwriters from any and all liability or actions in connection with certain claims.

## AGREEMENTS:

NOW, THEREFORE, in full consideration of the foregoing and of the mutual agreements herein contained, and intending to be legally bound, the Parties agree as follows:

## 1.    Definitions

The following definitions will apply to the listed terms wherever those terms appear throughout this Agreement as well as in any exhibits or attachments thereto. Where the listed terms are also further defined elsewhere in the body of this Agreement, the definitions listed here nonetheless apply and shall serve to further explain the meaning of those terms. Moreover, each defined term stated in a singular form shall include the plural form, each defined term stated in plural form shall include the singular form, and each defined term stated in the masculine form or in the feminine form shall include the other. Capitalized terms not defined herein shall take the meaning ascribed to them in the Settlement Plan.

      A.    Diocese

The term "Diocese" means:

      (i)    the Catholic Diocese of Wilmington, Inc.; its predecessors; all its past and present subsidiaries and the predecessors and successors of such subsidiaries; its past and present affiliates and joint ventures and their predecessors and successors; and, all its past, present and future assigns; and,

      (ii)    any other entity that was in the past or is now affiliated with, related to or associated with the Diocese including, without limitation, any corporations that have been acquired by, merged into or combined with the Diocese or its predecessors, or the Diocese's past and present subsidiaries, affiliates, successors and assigns; and,

(iii)   any and all entities named as insureds, other insureds, or otherwise insured or claimed to be insured under the Subject Insurance Policies and those entities', subsidiaries', affiliates', successors' and assigns' directors, officers, agents and employees; provided, however, those Persons included within the definition of "Parishes" or "Related Entities" are not within the definition of "Diocese."

B.    Underwriters

The term "Underwriters" means:

(i)   All Underwriters, members, or Names at Lloyd's, London (including, without limitation, former underwriters, members or Names), who through their participation in syndicates, severally subscribed, each in his or its own proportionate share, to one or more of the Subject Insurance Policies. Underwriters shall also include all Underwriters, members or Names at Lloyd's, London, (including, without limitation, former underwriters, members and Names), who, through their participation in syndicates severally subscribed to any of the Subject Insurance Policies in favor of the Catholic Entities:   (a) the existence of which has not presently been established; or (b) the existence of which has been established but as to which identities of names, members, or syndicates are not presently known; and

(ii)   All the past, present and future employees (if any), representatives, attorneys, and agents of the persons set forth in subsection (i) above, and their respective predecessors and successors, if any, solely in such capacity, and the respective heirs, executors, successors, assigns (including without limitation, any administrator, receiver, trustee, personal representative or equivalent appointees under relevant insolvency law), reinsurers and retrocessionaires (as such) of any of the Persons identified in sub-section (i) above.

C.    Parishes

The term "Parishes" means:

(i)   Cathedral of St. Peter Roman Catholic Church; Christ Our King Roman Catholic Church; Corpus Christi Roman Catholic Church; Good Shepherd Roman Catholic Church; Holy Child Roman Catholic Church; Holy Cross Roman Catholic Church; Holy Family Roman Catholic Church; Holy Name of Jesus Roman Catholic Church; Holy Rosary Roman Catholic Church; Holy Spirit Roman Catholic Church; Immaculate Conception Roman Catholic Church (Elkton); Immaculate Conception Roman Catholic Church (Marydel); Immaculate Heart of Mary Roman Catholic Church; Our Lady of Fatima Roman Catholic Church; Our Lady of Good Counsel Roman Catholic Church; Our Lady of Lourdes Roman Catholic Church; Our Mother

of Sorrows Roman Catholic Church; Parish of The Resurrection Roman Catholic Church; Sacred Heart Roman Catholic Church; St. Andrew Roman Catholic Church; St. Ann Roman Catholic Church (Bethany Beach); St. Ann Roman Catholic Church (Wilmington); St. Anthony of Padua Roman Catholic Church; St. Benedict Roman Catholic Church; St. Catherine of Siena Roman Catholic Church; St. Christopher Roman Catholic Church; St. Dennis Roman Catholic Church; St. Elizabeth Roman Catholic Church; St. Elizabeth Ann Seton Roman Catholic Church; St. Francis de Sales Roman Catholic Church; St. Hedwig Roman Catholic Church; St. Helena Roman Catholic Church; St. John Neumann Roman Catholic Church; St. John the Apostle Roman Catholic Church; St. John the Baptist - Holy Angels Roman Catholic Church; St. John the Beloved Roman Catholic Church; St. Joseph Roman Catholic Church (Middletown); St. Joseph Roman Catholic Church (Wilmington); St. Joseph on the Brandywine Roman Catholic Church; St. Jude the Apostle Roman Catholic Church; St. Luke Roman Catholic Church; St. Margaret of Scotland Roman Catholic Church; St. Mary of the Assumption Roman Catholic Church; St. Mary of the Immaculate Conception Roman Catholic Church; St. Mary Magdalen Roman Catholic Church; St. Mary Refuge of Sinners Roman Catholic Church; St. Mary Star of the Sea Roman Catholic Church; St. Matthew Roman Catholic Church; St. Michael the Archangel Roman Catholic Church; St. Patrick Roman Catholic Church; St. Paul Roman Catholic Church (Delaware City); St. Paul Roman Catholic Church (Wilmington); Ss. Peter and Paul Roman Catholic Church; St. Peter the Apostle Roman Catholic Church; St. Polycarp Roman Catholic Church; and St. Thomas the Apostle Roman Catholic Church, their predecessors; all their past and present subsidiaries and the predecessors and successors of such subsidiaries; their past and present affiliates and joint ventures and their predecessors and successors; and all their past, present and future assigns; and,

(ii)     any other entity that was in the past or is now affiliated with, related to or associated with the Parishes including, without limitation, any corporations that have been acquired by, merged into or combined with a Parish or its predecessors, or the Parishes' past and present subsidiaries, affiliates, successors and assigns; provided, however, Persons included within the definition of "Parishes" shall not be included in the definition of "Diocese" or "Related Entities" under this Agreement.

D.     Related Entities

The term "Related Entities" means:

(i)     Diocese of Wilmington Schools, Inc.; DOW Schools, Inc.; Catholic Cemeteries, Inc.; Catholic Charities, Inc.; Siena Hall, Inc.; Seton Villa, Inc.; Children's Home, Inc.; Catholic Youth Organization, Inc. d/b/a Catholic Youth Ministry; Catholic Ministry to the Elderly, Inc.; Catholic Press of Wilmington, Inc.; and Catholic Diocese Foundation, their predecessors; all

their past and present subsidiaries and the predecessors and successors of such subsidiaries; their past and present affiliates and joint ventures and their predecessors and successors; and all their past, present and future assigns; and,

(ii)      any other entity that was in the past or is now affiliated with, related to or associated with the Related Entities including, without limitation, any corporations that have been acquired by, merged into or combined with a Related Entity or its predecessors, or the Related Entities' past and present subsidiaries, affiliates, successors and assigns; provided, however, Persons included within the definition of "Diocese" or "Parishes" are not within the definition of "Related Entities."

E.      <u>Contribution Claim</u>

The term "Contribution Claim" means any claim, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, by one insurer against another insurer for the reimbursement of money paid by the first insurer for having paid a debt, expense, or liability of its insured in a situation where two or more policies by different insurers cover the same insured for the same loss, and the first insurer contends it has paid more than its proper or proportionate share.

F.      <u>Person</u>

The term "Person" means an individual, a corporation, a partnership, an association, a committee, a trust, any committee or other group established by the Bankruptcy Court, any other entity or organization, and any federal, state or local government or any governmental or quasi-governmental body or political subdivision or any agency, department, board or instrumentality thereof.

G.      <u>Subject Claims</u>

The term "Subject Claims" means (i) all Sexual Abuse Claims (as defined below), (ii) all Claims against the Diocese in the Bankruptcy Case, including, but not limited to, any Lay Pension Claim and/or the Lay Pension Litigation, (iii) all Claims, including any for contribution or indemnity, by or on behalf of the Parishes and Related Entities relating to the funds contributed to the Settlement Trust, and (iv) any other Claims held by the Catholic Entities directly related to the Claims in the Bankruptcy Case including, but not limited to, the Lay Pension Claim, the Lay Pension Litigation, the PIA Breach Claims, the PIA Investment Claim and/or the PIA Litigation.

H.      <u>Sexual Abuse Claims</u>

The term "Sexual Abuse Claims" means:

(i)      Any and all known or unknown, past, existing, potential or future claims, demands, suits, actions or requests for relief or action or forbearance of any kind or description, including defense of same, arising directly or indirectly from, or in any way relating to, actual or alleged Abuse that have been made or asserted or could be made or asserted against the Diocese, the Parishes and the Related Entities from the

beginning of time up to and including the date of entry of the Confirmation Order. The term "Sexual Abuse Claims" includes, but is not limited to, all Abuse and/or Survivor Claims; and

(ii)        Any and all known or unknown, past, existing, potential or future claims, demands, suits, actions or requests for relief or action or forbearance of any kind or description, including defense of same, arising out of or in any way related to, actual or alleged Abuse, known and/or reported to the Diocese, the Parishes and/or the Related Entities during the period from July 1, 1994 to the date of entry of the Confirmation Order, whether in suit or not, that are not included in sub-section (i) above; and,

(iii)       Any and all past, existing or future claims, demands, suits, actions or other requests for relief or action or forbearance of any kind or description relating to Abuse, at any point in time up to and including the date of entry of the Confirmation Order, including defense of same, asserted by any person either in his or her own or someone else's behalf, required to be reported under the Subject Insurance Policies, that are not otherwise included in sub-sections (i) and (ii) above.

I.      Subject Insurance Policies

The term "Subject Insurance Policies" means:  (i) all insurance policies listed in Attachment A hereto; and (ii) all known and unknown insurance policies subscribed by one or more of the Underwriters, and providing insurance to a Catholic Entity at any time subsequent to July 1, 1994, whether or not listed in Attachment A hereto.

J.      Settlement Plan

The term "Settlement Plan" means (i) the Settlement Plan set forth in the Second Amended Chapter 11 Plan of Reorganization of Catholic Diocese of Wilmington, Inc., dated May 23, 2011, Docket Number 1321 and all Exhibits thereto; and (ii) any alterations, amendments and modifications to the Settlement Plan made after May 23, 2011, but only with the express written consent of Underwriters.

K.      Confirmation Order

The term "Confirmation Order" means the order of the Bankruptcy Court confirming the Settlement Plan pursuant to § 1129 of the Bankruptcy Code, as such order may be amended, modified or supplemented.

2.     **Settlement Amount**

In the Confirmation Order, the Bankruptcy Court shall approve this Agreement and the sale, assignment and transfer of the Subject Insurance Policies by the Catholic Entities to Underwriters free and clear of the Subject Claims, pursuant to § 363(b), (f) and (m) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019.  Should the Bankruptcy Court not so approve this Agreement, this Agreement shall be void ab initio.

Except as provided below, on the date that is the first business day after the date that is the later of 30 days after (i) the date the Bankruptcy Court has entered the Confirmation Order, which Confirmation Order is accompanied by the findings set forth in Paragraph 5 of this Agreement and such Confirmation Order has become final and non-appealable; and (ii) the date all Parties have executed this Agreement, Underwriters shall pay to the Settlement Trust the total settlement amount of Nine Hundred and Seventy One Thousand and Four Hundred and Fifteen United States Dollars ($971,415) ("Settlement Amount").

On the date that Underwriters pay the Settlement Amount to the Settlement Trust, the sale, assignment and transfer of the Subject Insurance Policies by the Catholic Entities to Underwriters free and clear of all claims and interests of all Persons, including, without limitation, the Catholic Entities, shall be effective and binding, with the intent that no Person shall retain anything whatsoever with respect to the Subject Insurance Policies, with regard to the Subject Claims.

If, before the Settlement Amount has been paid, a Parish or a Related Entity becomes a debtor in a bankruptcy case or insolvency proceeding, under the Bankruptcy Code or otherwise, and Underwriters have not satisfied their payment obligations, then Underwriters shall be excused from performance under this Agreement until such time as such Parish or Related Entity obtains an order from the bankruptcy court approving this Agreement under § 363(b), (f) and (m) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 and authorizing the assumption by such Parish or Related Entity (or any successor thereto) of this Agreement under Bankruptcy Code Section 365 (the "Assumption"), or in the event the insolvency case is proceeding under other law, shall obtain a similar order from the court overseeing the insolvency case approving this Agreement and confirming the binding effect thereof. Each Parish or Related Entity agrees that in the event of a bankruptcy or other insolvency proceeding, it will not present any claim for payment to any Underwriter, until such time as such Parish or Related Entity has made such Assumption and such Assumption has been approved by a bankruptcy court or other applicable court.

3.    **Release**

    A.    By the Catholic Entities

Upon the Settlement Trust's receipt of the Settlement Amount, each Catholic Entity, and any subsequently appointed trustee or representative acting for a Catholic Entity, shall be deemed to remise, release, covenant not to sue and forever discharge the following: (i) each Underwriter; (ii) each of that Underwriter's present and former officers, directors, employees, partners, limited partners, shareholders, members, subsidiaries, affiliates, representatives, attorneys and agents (a) in such capacity and (b) in their individual capacity and (iii) the respective heirs, executors, administrators, successors, assigns and reinsurers (as such) of any of the Persons identified in subparagraphs (i) and (ii) hereof as follows: from and against all manner of action, causes of action, suits, debts, accounts, promises, warranties, damages (consequential or punitive), agreements, costs, expenses, claims or demands whatsoever, in law or in equity, whether presently known or unknown, asserted or unasserted, whether sounding in tort or contract, or arising under the statutes or administrative regulations of any jurisdiction, with respect to any and all past, present or future claims, of any type whatsoever, that such Catholic Entity ever had, now has, or hereafter may have: (1) for insurance coverage, including, without limitation, both defense costs and indemnification claims, with respect to the Subject Insurance Policies as applied to the Subject Claims; and

(2) arising out of or relating to any act, omission, representation, or conduct of any sort in connection with the Subject Insurance Policies as applicable to the Subject Claims.

Those Underwriters entitled to this Release that are described in the definition of Underwriters as entities which subscribed a Subject Insurance Policy either not presently known, or known but to which the identity of the subscribers is not presently known, shall be entitled to all of the terms of this Release (and to the Indemnity set forth in Paragraph 4 below), one-hundred twenty (120) days after the Settlement Trust's receipt of the Settlement Amount.

It is the intention of each Catholic Entity to reserve no rights or benefits whatsoever under or in connection with the Subject Insurance Policies with respect to and/or arising from the Subject Claims as against Underwriters to assure the Underwriters their peace and freedom from such Claims and from all assertions of rights in connection with the Subject Claims.

Upon the Settlement Trust's receipt of the Settlement Amount, any and all rights, duties, responsibilities and obligations of any Underwriter created by or in connection with the Subject Insurance Policies as respects the Subject Claims are hereby terminated. As of the date of such payment the Catholic Entities have no insurance coverage under the Subject Insurance Policies as to the Subject Claims. This Release is intended to operate as though Underwriters had never subscribed to the Subject Insurance Policies as to the Subject Claims.

This Release extends to all those Underwriters that subscribed to any of the Subject Insurance Policies which include both known and unknown policies.

Each Catholic Entity acknowledges that it has been advised by its attorneys concerning, and is familiar with California Civil Code Section 1542 and expressly waives any and all rights under California Civil Code Section 1542 and under any other federal or state statute or law of similar effect.

Each Catholic Entity expressly assumes the risk that acts, omissions, matters, causes or things may have occurred which it does not know or does not suspect to exist. Each Catholic Entity hereby waives the terms and provisions of any statute, rule or doctrine of common law which either: (i) narrowly construes releases purporting by their terms to release claims in whole or in part based upon, arising from, or related to such acts, omissions, matters, causes or things; or, (ii) which restricts or prohibits the releasing of such claims.

      B.    <u>By Underwriters</u>

At the same time the Releases described in Paragraph 3.A immediately above become effective, the Underwriters so released, and any subsequently appointed trustee or representative acting for such Underwriters, shall be deemed to remise, release, covenant not to sue and forever discharge: (i) each Catholic Entity; (ii) each of the Catholic Entities' present and former officers, directors, employees, partners, limited partners, shareholders, members, subsidiaries, affiliates, representatives, attorneys and agents (a) in such capacity and (b) in their individual capacity; and (iii) the respective heirs, executors, administrators, successors, and assigns of any of the Persons identified in subparagraphs (i) and (ii) hereof as follows: from and against all manner of action, causes of action, suits, debts, accounts, promises, warranties, damages (consequential or punitive), agreements, costs, expenses, claims or demands whatsoever, in law or in equity, whether presently

known or unknown, asserted or unasserted, whether sounding in tort or in contract, or arising under the statutes or administrative regulations of any jurisdiction, with respect to any and all past, present or future claims, of any type whatsoever, that each such Underwriters ever had, now has or hereinafter may have with respect to the Subject Insurance Policies as respects the Subject Claims, provided, however, that the Catholic Entities shall continue to be bound by any and obligations provided in this Agreement.

**4.** **Indemnification**

A.  It is the intention of the Parties to this Agreement that Underwriters shall have no further financial obligation of any kind with respect to the Subject Claims. Accordingly, Sections 3 and 4 shall be read broadly and liberally because it is the intention of the Parties that any potential claim by plaintiffs or claimants in the Subject Claims or by any other of the Catholic Entities' insurers seeking contribution or subrogation from Underwriters, for any payments or amounts the plaintiffs or claimants claim are due to them and/or for any payment amounts other insurers assert that they have made (or have to make) toward the Subject Claims, shall be automatically extinguished and satisfied without any further action or effort on the part of the Underwriters.

B.  In further pursuit of eliminating any further obligation on the part of the Underwriters for the Subject Claims, the Catholic Entities hereby represent that they have not, or will not assign or transfer or subrogate, to any other person, any claim or right under any of the Subject Policies arising out of, or relating to, in any way the Subject Claims. In the event the Catholic Entities breach the representation set forth in this paragraph, and as a result any Underwriters incur any cost, or are sued, the Catholic Entity shall defend, indemnify and hold the relevant Underwriters harmless with respect to any such claim.

C.  In yet further pursuit of eliminating any further obligation on the part of the Underwriters for the Subject Claims, the Catholic Entities hereby represent that they will: (i) obtain an assignment to the Settlement Trust of any and all Contribution Claims from other Settling Insurers of the Catholic Entities; and (ii) obtain a release from the Settlement Trust of any and all Claims against Underwriters and/or the Subject Insurance Policies.

D.  The Catholic Entities shall indemnify and hold harmless Underwriters in respect of any and all claims arising under or relating in any way to the Subject Insurance Policies as applied to the Subject Claims, including, without limitation, all claims, whether by way of direct action or otherwise, made by: (i) other insurers of the Catholic Entities; (ii) any Person claiming to be insured under the Subject Insurance Policies; (iii) any Person who has made, will or can make a claim; (iv) any Person who has acquired or been assigned the right to make a claim under the Subject Insurance Policies; or (v) any federal, state or local government or any political subdivision, agency, department, board or instrumentality thereof, including, without limitation, the State of Minnesota pursuant to the Minnesota Landfill Cleanup Act, Minn. Stat. § 115B.39 et seq. or the Minnesota Insurance Recovery Act of 1996,

Minn. Stat. § 115B.441 et seq. The Parties acknowledge that this indemnification includes, without limitation, claims made by any Person over whom the Catholic Entities do not have control, including, without limitation, former subsidiaries, predecessors in interest, sellers or purchasers of assets, or any other Person who asserts rights to coverage under the Subject Insurance Policies. For purposes of the indemnification obligation of the Catholic Entities, the term "claim" also includes, without limitation, amounts paid in respect of any judgment, order, decree, settlement, contract or otherwise.

E.  Underwriters shall have the right to defend, with counsel of their choice, all claims identified under Paragraph 4.D immediately above. Underwriters may begin the defense of any claim upon receipt of such a claim. Underwriters agree to notify the Catholic Entities as soon as practicable of claims identified under Paragraph 4.D immediately above and of their choice of counsel.

F.  The Catholic Entities shall reimburse all reasonable and necessary attorneys' fees, expenses and amounts incurred by Underwriters in defending any claims described in this Section 4. Underwriters shall defend any such claim in good faith. In defense of any such claim, Underwriters may not settle or otherwise resolve a claim without the prior consent of the Catholic Entities, which consent shall not be unreasonably withheld.

G.  In the event that any claim or suit is brought against Underwriters under, arising out of, relating to, or in connection with the Subject Insurance Policies, which claim is subject to the Channeling Injunction provided in the Plan, the Diocese and Underwriters will cooperate in establishing that Underwriters are Protected Parties under the Plan entitled to the protections afforded to such Protected Parties under the Plan; provided, however, that the foregoing shall not in any way affect or limit the Catholic Entities' obligations set forth paragraphs 4.A-F above.

## 5. <u>Bankruptcy Obligations</u>

A.  The Confirmation Order must:

   i.   approve (i) this Agreement pursuant to Federal Rule of Bankruptcy Procedure 9019, and sections 363(b), (f) and (m) of the Bankruptcy Code; and (ii) the sale of the Subject Insurance Policies to Underwriters;

   ii.  authorize the Parties to undertake the settlement and the transactions contemplated by this Agreement;

   iii. authorize the sale of the Subject Insurance Policies to Underwriters free and clear of the Subject Claims on the ground that such interests are in *bona fide* dispute;

   iv.  provide Underwriters with all the benefits and protections provided to Settling Insurers in the Settlement Plan, with regard to the Subject Claims; and

v.    provide that the sale of the Subject Insurance Policies shall vest in Underwriters all right, title and interest of the Catholic Entities in such property with regard to, and free and clear of, the Subject Claims such that Underwriters are forever adjudged and unconditionally released as to such Claims.

In the event that the Confirmation Order does not include the approval and authorizations set forth in the above sub-paragraphs, this Agreement shall be void ab initio.

B.    The Diocese shall obtain the entry of the following factual findings and legal conclusions:

i.    the Agreement is fair and equitable and in the best interest of the estate and its creditors after consideration of (i) the probability of success in litigating the Dispute, should it be litigated; (ii) the likely difficulties in collection; (iii) the probable complexity of any litigation of the Dispute, the expense, inconvenience and delay necessarily attending such litigation, and the cost savings to the Diocese of avoiding such litigation; and (iv) the paramount interest of creditors;

ii.    Underwriters are good faith purchasers of the Subject Insurance Policies and, as such, are entitled to all protections provided to good faith purchasers under section 363(m) of the Bankruptcy Code; and,

iii.    notice of the sale free and clear of claims and interests was sufficient, and the requirements of Fed. R. Bankr. P. 6004(c) were satisfied, because notice of the motion seeking approval of the Agreement and the motion itself were served upon (i) all known claimants or counsel for claimants who filed a proof of claim in the Bankruptcy Case, who were scheduled by the Diocese, or whose claims are pending and tendered under the Subject Insurance Policies, at the address provided for notice in the proof of claim or the address listed for such claimant in the Diocese's schedules, or the address of such claimant last known to the Diocese, as applicable, (ii) all Persons who filed a notice of appearance in the Bankruptcy Case, and (iii) all Persons known or alleged by the Catholic Entities to have provided general liability insurance to the Catholic Entities.

In the event that the above factual findings and legal conclusions are not entered by the Bankruptcy Court, this Agreement shall be void ab initio.

## 6.    Reasonably Equivalent Value

The Parties acknowledge and agree that: (i) this Agreement was bargained for and entered into in good faith and as the result of arms-length negotiations; (ii) based on their respective independent assessments, with the assistance and advice of counsel, of the probability of success, the complexity, the delay in obtaining relief, and the expense of resolving their disputes, the payment of the Settlement Amount pursuant to this Agreement constitute a fair and reasonable settlement of the Catholic Entities' claims; (iii) the payments and other benefits received under this Agreement by the Catholic Entities constitute reasonably equivalent value for the release, indemnity, and other benefits received by Underwriters under this Agreement; and (iv) this Agreement constitutes a full and final resolution of all issues between the Parties, including, without limitation, the Dispute.

7.    **Representations and Warranties**

    A.    Each of the Parishes and Related Entities acknowledge and warrant that as of the date of this Agreement they are solvent, in that at fair value their assets exceed their liabilities and they have the liquidity to pay their debts.

    B.    Each Catholic Entity acknowledges and warrants that no Person other than a Catholic Entity has legal title or rights as an insured, other insured, or otherwise insured or claims to be insured under the Subject Insurance Policies.

    C.    Each Catholic Entity represents and warrants that it has the authority to execute this Agreement as its binding and legal obligation.

    D.    The Diocese represents and warrants that each Catholic Entity has the authority to execute this Agreement as a binding and legal obligation.

    E.    Each Party represents and warrants that the Persons signing this Agreement on its behalf are authorized to execute this Agreement.

    F.    Each individual signing this Agreement on behalf of a Party represents and warrants that he or she has the right, power, legal capacity and authority to enter into this Agreement on behalf of such Party and bind such Party to perform each of the obligations specified herein.

8.    **Judgment Reduction**

    A.    In any proceeding, suit or action between a Catholic Entity or the Settlement Trust and any insurer that is not Underwriters ("Other Insurer"), where the Other Insurer has asserted, asserts, or could assert that it has or may have a Contribution Claim against Underwriters relating to claims against such Catholic Entity or the Settlement Trust, as applicable, any judgment obtained by such Catholic Entity or the Settlement Trust against such Other Insurer shall be reduced by the amount, if any, that such Underwriters would have been liable to pay the Other Insurer as a result of such Other Insurer's Contribution Claim, so that the Contribution Claim by the Other Insurer against such Underwriters is thereby satisfied and extinguished.

    B.    In order to effectuate the preceding paragraph, such Catholic Entity or the Settlement Trust, as applicable, shall obtain a determination, from the court issuing the judgment against the Other Insurer, of the amount, if any, which such Underwriters would be required to pay the Other Insurer for its Contribution Claim and shall hold any money paid by such Other Insurer in escrow until these judgment reduction provisions can be applied.

    C.    All settlements between a Catholic Entity and/or the Settlement Trust and any Other Insurer where the Other Insurer has asserted, asserts, or could assert that it has or may have a Contribution Claim against Underwriters relating to such Catholic Entity or the Settlement Trust, as applicable, shall include a bar of any Contribution Claims by the Other Insurer against Underwriters, relating to the Catholic Entities or the

Settlement Trust, as applicable, and identify Underwriters as intended third-party beneficiaries of that provision.

## 9.    Confidentiality

The Parties agree that all matters relating to the terms, negotiation and implementation of this Agreement shall be confidential and are not to be disclosed except by order of court or agreement, in writing, of the Parties, or as necessary to obtain approval by the Bankruptcy Court of the Agreement, except that, provided recipients agree to keep such information confidential, this Agreement may be disclosed to: (i) reinsurers of Underwriters directly or through intermediaries; (ii) outside auditors or accountants of any Party; (iii) representatives of a non-party insurer subscribing or allegedly subscribing to one or more of the Subject Insurance Policies, which insurer is, has been or may become insolvent in the future including, without limitation, any liquidators, provisional liquidators, scheme administrators, trustees, or similarly empowered Persons or entities acting for such insurer. This Agreement may also be disclosed, as required, to the Inland Revenue, the Internal Revenue Service or other U.S. or U.K. governmental authority that properly requires disclosure, or as otherwise required by law.

In the event a private litigant, by way of document request, interrogatory, subpoena, or questioning at deposition or trial, attempts to compel disclosure of anything protected by this Section, the Party from whom disclosure is sought shall decline to provide the requested information on the ground that this Agreement prevents such disclosure. In the event such private litigant seeks an Order from any court or governmental body to compel such disclosure, or in the event that a court, government official, or governmental body (other than the Inland Revenue or Internal Revenue Service) requests or requires disclosure of anything protected by this Section, the Party from whom disclosure is sought shall immediately give written notice by facsimile or hand-delivery to the other Parties, and shall immediately provide copies of all notice papers, orders, requests or other documents in order to allow each Party to take such protective steps as may be appropriate. Notice shall be made under this paragraph to the persons identified in Section 15 of this Agreement.

Material protected by this Section shall be deemed to fall within the protection afforded compromises and offers to compromise by Rule 408 of the Federal Rules of Evidence and similar provisions of state law or state rules of court.

## 10.    Co-operation

The Catholic Entities will undertake all reasonable actions to co-operate with Underwriters in connection with their respective reinsurers, including, without limitation, responding to reasonable requests for information and meeting with representatives of reinsurers.

## 11.    Non-Prejudice and Construction of Agreement

This Agreement is intended to be and is a compromise between the Parties and shall not be construed as an admission of coverage under the Subject Insurance Policies nor shall this Agreement or any provision hereof be construed as a waiver, modification or retraction of the positions of the Parties with respect to the interpretation and application of the Subject Insurance Policies.

This Agreement is the product of informed negotiations and involves compromises of the Parties' previously stated legal positions. Accordingly, this Agreement does not reflect upon the Parties' views as to rights and obligations with respect to matters or Persons outside the scope of this Agreement. This Agreement is without prejudice to positions taken by Underwriters with regard to other insureds, and without prejudice with regard to positions taken by any Catholic Entity with regard to Other Insurers. The Parties specifically disavow any intention to create rights in third parties under or in relation to this Agreement.

This Agreement is the jointly drafted product of arms-length negotiations between the Parties with the benefit of advice from counsel, and the Parties agree that it shall be so construed. As such, no Party will claim that any ambiguity in this agreement shall be construed against another Party.

If any provision of the Settlement Plan or the Settlement Trust Agreement is inconsistent with this Agreement in any way whatsoever, then the provisions of this Agreement shall control and take precedence. The Settlement Plan and the Settlement Trust Agreement shall not be construed or interpreted to impose any obligations or modify any rights of Underwriters.

**12.      No Modification**

No change or modification of this Agreement shall be valid unless (i) it is made in writing and signed by the Parties, even upon the receipt of additional consideration; and (ii) approved by the Bankruptcy Court.

**13.      Execution**

There will be two signed originals of this Agreement.

**14.      Governing Law**

This Agreement shall be governed by and shall be construed in accordance with the laws of Delaware.

**15.      Notices**

Unless another person is designated, in writing, for receipt of notices hereunder, notices to the respective Parties shall be sent to the following person:

For Diocese, Related Entities and Parishes:

Rev. Msgr. J. Thomas Cini
Vicar General for Administration
Catholic Diocese of Wilmington
P.O. Box 2030
Wilmington, DE 19899-2030

With a copy to:

> Anthony G. Flynn, Esq.
> Young Conaway Stargatt & Taylor LLP
> The Brandywine Building
> 1000 West St., 17th Floor
> P.O. Box 391
> Wilmington, DE 19899-0391
> aflynn@ycst.com

For Underwriters:

> Head of Claims
> Kiln Group
> 106 Fenchurch Street
> London EC3V 5NR England
>
> Head of Complex Claims
> XChanging
> 34 Leadenhall Street
> EC3A 1AX England

With a copy to:

> Catalina J. Sugayan
> Sedgwick LLP
> One North Wacker Drive
> Suite 4200
> Chicago, IL  60606-2841

## 16.    Integration

This Agreement, including the attachments, constitutes the entire Agreement between Underwriters and the Catholic Entities with respect to the subject matter hereof, and supersedes all discussions, agreements and understandings, both written and oral, among the Parties with respect thereto.

IN WITNESS WHEREOF, the Parties have executed this Agreement by their duly authorized representatives.

Underwriters have respectively designated Sedgwick LLP as their attorneys-in-fact for the limited purpose of executing this Agreement on their behalf with express authority to do so.

Catholic Diocese of Wilmington                     Cathedral of St. Peter Roman Catholic Church

By: _____ (SEAL)        By: _____
    (Name)                                                                  (Name), as its Trustee

Title: _____
                                  Date:  July __, 2011

Date:  July __, 2011

Christ Our King Roman Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011

Good Shepherd Roman Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011

Holy Cross Roman Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011

Holy Name of Jesus Roman Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011

Holy Spirit Roman Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011

Immaculate Conception Roman Catholic Church
(Marydel)

By: _____
     (Name), as its Trustee

Date: July __, 2011

Corpus Christi Roman Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011

Holy Child Roman Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011

Holy Family Roman Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011

Holy Rosary Roman Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011

Immaculate Conception Roman Catholic Church
(Elkton)

By: _____
     (Name), as its Trustee

Date: July __, 2011

Immaculate Heart of Mary Roman Catholic
Church

By: _____
     (Name), as its Trustee

Date: July __, 2011

Our Lady of Fatima Roman Catholic Church

By: _____
      (Name), as its Trustee

Date:  July __, 2011

Our Lady of Lourdes Roman Catholic Church

By: _____
      (Name), as its Trustee

Date:  July __, 2011

Parish of The Resurrection Roman Catholic Church

By: _____
      (Name), as its Trustee

Date:  July __, 2011

St. Andrew Roman Catholic Church

By: _____
      (Name), as its Trustee

Date:  July __, 2011

St. Ann Roman Catholic Church (Wilmington)

By: _____
      (Name), as its Trustee

Date:  July __, 2011

St. Benedict Roman Catholic Church

By: _____
      (Name), as its Trustee

Date:  July __, 2011

Our Lady of Good Counsel Roman Catholic Church

By: _____
      (Name), as its Trustee

Date:  July __, 2011

Our Mother of Sorrows Roman Catholic Church

By: _____
      (Name), as its Trustee

Date:  July __, 2011

Sacred Heart Roman Catholic Church

By: _____
      (Name), as its Trustee

Date:  July __, 2011

St. Ann Roman Catholic Church (Bethany Beach)

By: _____
      (Name), as its Trustee

Date:  July __, 2011

St. Anthony of Padua Roman Catholic Church

By: _____
      (Name), as its Trustee

Date:  July __, 2011

St. Catherine of Siena Roman Catholic Church

By: _____
      (Name), as its Trustee

Date:  July __, 2011

17

St. Christopher Roman Catholic Church

By: _____
        (Name), as its Trustee

Date: July __, 2011

St. Elizabeth Roman Catholic Church

By: _____
        (Name), as its Trustee

Date: July __, 2011

St. Francis de Sales Roman Catholic Church

By: _____
        (Name), as its Trustee

Date: July __, 2011

St. Helena Roman Catholic Church

By: _____
        (Name), as its Trustee

Date: July __, 2011

St. John the Apostle Roman Catholic Church

By: _____
        (Name), as its Trustee

Date: July __, 2011

St. John the Beloved Roman Catholic Church

By: _____
        (Name), as its Trustee

Date: July __, 2011

St. Dennis Roman Catholic Church

By: _____
        (Name), as its Trustee

Date: July __, 2011

St. Elizabeth Ann Seton Roman Catholic Church

By: _____
        (Name), as its Trustee

Date: July __, 2011

St. Hedwig Roman Catholic Church

By: _____
        (Name), as its Trustee

Date: July __, 2011

St. John Neumann Roman Catholic Church

By: _____
        (Name), as its Trustee

Date: July __, 2011

St. John the Baptist - Holy Angels Roman Catholic Church

By: _____
        (Name), as its Trustee

Date: July __, 2011

St. Joseph Roman Catholic Church (Middletown)

By: _____
        (Name), as its Trustee

Date: July __, 2011

St. Joseph Roman Catholic Church (Wilmington)

By: _____
     (Name), as its Trustee

Date: July __, 2011


St. Jude the Apostle Roman Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011


St. Margaret of Scotland Roman Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011


St. Mary of the Immaculate Conception Roman Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011


St. Mary Refuge of Sinners Roman Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011


St. Joseph on the Brandywine Roman Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011


St. Luke Roman Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011


St. Mary of the Assumption Roman Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011


St. Mary Magdalen Roman Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011


St. Mary Star of the Sea Roman Catholic Church

By: _____
     (Name), as its Trustee

Date: July __, 2011

St. Matthew Roman Catholic Church

By: _____
       (Name), as its Trustee

Date: July __, 2011

St. Patrick Roman Catholic Church

By: _____
       (Name), as its Trustee

Date: July __, 2011

St. Paul Roman Catholic Church (Wilmington)

By: _____
       (Name), as its Trustee

Date: July __, 2011

St. Peter the Apostle Roman Catholic Church

By: _____
       (Name), as its Trustee

Date: July __, 2011

St. Thomas the Apostle Roman Catholic Church

By: _____
       (Name), as its Trustee

Date: July __, 2011

Catholic Cemeteries, Inc.

By: _____
       (Name), as its Trustee

Date: July __, 2011

St. Michael the Archangel Roman Catholic Church

By: _____
       (Name), as its Trustee

Date: July __, 2011

St. Paul Roman Catholic Church (Delaware City)

By: _____
       (Name), as its Trustee

Date: July __, 2011

Ss. Peter and Paul Roman Catholic Church

By: _____
       (Name), as its Trustee

Date: July __, 2011

St. Polycarp Roman Catholic Church

By: _____
       (Name), as its Trustee

Date: July __, 2011

DOW Schools, Inc.

By: _____
       (Name), as its Trustee

Date: July __, 2011

Catholic Charities, Inc.

By: _____
       (Name), as its Trustee

Date: July __, 2011

Siena Hall, Inc.

By: _____
     (Name), as its Trustee

Date: July __, 2011

Children's Home, Inc.

By: _____
     (Name), as its Trustee

Date: July __, 2011

Catholic Ministry to the Elderly, Inc.

By: _____
     (Name), as its Trustee

Date: July __, 2011

Catholic Diocese Foundation

By: _____
     (Name), as its Trustee

Date: July __, 2011

Seton Villa, Inc.

By: _____
     (Name), as its Trustee

Date: July __, 2011

Catholic Youth Organization, Inc. d/b/a Catholic Youth Ministry

By: _____
     (Name), as its Trustee

Date: July __, 2011

Catholic Press of Wilmington, Inc.

By: _____
     (Name), as its Trustee

Date: July __, 2011

Diocese of Wilmington Schools, Inc.

By: _____
     (Name), as its Trustee

Date: July __, 2011

Signed:_____
        (name)

(For Lloyd's Underwriters)

Date: July __, 2011

21

**Attachment A**
**List of All Known Subject Insurance Policies**

Institutional Property Insurance Policies providing Property, Commercial General
Liability, Sexual Misconduct Liability and Other Coverages

| Policy Number | Policy Period |
|---|---|
| 517274 | July 1, 1994 – July 1, 1995 |
| 519208 | July 1, 1995 – July 1, 1996 |
| w00360 | July 1, 1996 – July 1, 1997 |
| w00360 | July 1, 1997 – July 1, 1998 |
| F981897 | July 1, 1998 – June 30, 1999 |
| F992050 | July 1, 1999 – June 30, 2000 |
| F000782 | July 1, 2000 – June 30, 2001 |
| F010549 | July 1, 2001 – June 30, 2002 |
| F020860 | July 1, 2002 – June 30, 2003 |
| LU0333024 | July 1, 2003 – June 30, 2004 |
| LU0435093 | July 1, 2004 – June 30, 2005 |
| LU0535670 | July 1, 2005 – June 30, 2006 |
| LU0636951 | July 1, 2006 – June 30, 2007 |
| F070263 | July 1, 2007 – June 30, 2008 |
| LU0737828 | July 1, 2007 – June 30, 2008 |
| F080128 | July 1, 2008 – June 30, 2009 |
| F090128 | July 1, 2009 – June 30, 2011 |
| F100128 | July 1, 2011 – June 30, 2012 |

Excess Policies

| Policy Number | Policy Period |
|---|---|
| LU0637200 | July 1, 2006 – June 30, 2007 |
| LU0737845 | July 1, 2007 – June 30, 2008 |
| F080129 | July 1, 2008 – June 30, 2009 |

f.      **Granite State Insurance Company and The Insurance Company of the State of Pennsylvania**

# SETTLEMENT, RELEASE, COVENANT NOT TO EXECUTE AND POLICY BUY-BACK AGREEMENT

This Settlement, Release and Policy Buy-back Agreement ("Agreement") is made by, between and among the Catholic Diocese of Wilmington, Inc. a Delaware non-profit corporation (the "Diocese," as defined herein), the Diocese Releasing Parties (as defined herein), and Granite State Insurance Company and The Insurance Company of the State of Pennsylvania (collectively, the "Carriers"), each of their Affiliates, Agents and claim administrators, including Chartis Claims, Inc. (collectively referred to as "Chartis").

The Diocese, the Diocese Releasing Parties, the Carriers and Chartis shall be herein referred to collectively as the "Parties."

## RECITALS

WHEREAS, numerous individuals have asserted, or may in the future assert, claims or suits against the Diocese for injuries allegedly suffered due to sexual, physical and/or emotional abuse by priests or other personnel allegedly negligently hired, supervised or maintained by the Diocese ("Tort Claims," as defined herein); and

WHEREAS, the Diocese contends that the Carriers issued or allegedly issued certain policies of liability to or for the benefit of the Diocese (the "Policies," as defined herein); and

WHEREAS, on October 18, 2009 (the "Petition Date"), the Diocese filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (as defined herein) in the Bankruptcy Court (as defined herein), Case Number 09-13560 (the "Bankruptcy Case"); and

WHEREAS, in the Bankruptcy Case, numerous individuals filed proofs of claim against the Diocese in connection with their alleged Tort Claims; and

WHEREAS, the Diocese has maintained that its Policies are property of the Diocese's bankruptcy estate (the "Estate") under section 541 of the Bankruptcy Code (the "541 Claims"); and

WHEREAS, disputes exist between and among the Diocese, the Carriers and Chartis concerning the existence, nature and limits of coverage, if any, to be provided by the Carriers to the Diocese under the Policies for the Tort Claims (the "Coverage Dispute"); and

WHEREAS, disputes may also exist between the Carriers, Chartis and the Diocese concerning contribution, indemnity, subrogation, equitable subrogation, recoupment or similar claims relating to or arising out of the Tort Claims and the settlement thereof by the Diocese pursuant to a proposed plan of reorganization (the "Contribution Claims," as defined herein);

WHEREAS, the Parties, without any admission of liability or concession as to the validity of the positions or arguments advanced by each other, now wish to effect a full and final settlement, compromise, covenant not to execute, release and resolution of any and all disputes and disagreements by and among them with respect to the Tort Claims, the Policies, the 541 Claims, the Coverage Dispute and the Contribution Claims;

WHEREAS, the Parties, without any admission of liability or concession as to the validity of the positions or arguments advanced by each other, now to wish to effect: (i) a full and final settlement, compromise, covenant not to execute, mutual release and resolution of any and all disputes and disagreements by and between the Diocese, the Diocese Releasing Parties, the Carriers and Chartis to terminate and release any obligations the Carriers have or ever may have with respect to the Tort Claims, the Policies or the Bankruptcy Case; and (ii) the sale of the Policies to the Carriers and Chartis free and clear of all liens, claims, encumbrances and Interests (as defined herein); and

WHEREAS, through this Agreement, the Parties seek to provide each other with the broadest possible releases with respect to the Policies and ensure that neither the Diocese nor the Carriers nor Chartis have any further obligations with respect to the Policies; and

WHEREAS, as part of the settlement, compromise, release and resolution of the matters resolved herein, the Parties wish to effect a sale of the Policies back to the Carriers and Chartis pursuant to section 363 of the Bankruptcy Code, free and clear of all liens, claims, encumbrances and interests; and

WHEREAS, as part of the settlement, compromise, release and resolution of the matters herein, the Parties wish that the proceeds of the sale of the Policies be used to fund payment of Tort Claims under the Plan in exchange for a permanent injunction, enjoining and restraining all Entities from asserting any and all Channeled Claims (as defined herein) against the Carriers and/or Chartis; and

WHEREAS, this Agreement is the product of extensive negotiations and several days of mediation; and

WHEREAS, each Party has received the advice of counsel in the preparation, drafting and execution of this Agreement, which was negotiated at arm's length and in good faith;

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained herein, the sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, subject to the approval of the Bankruptcy Court, the Parties hereby agree as follows:

# I.    **DEFINITIONS AND CONSTRUCTION**

1.1    As used in this Agreement, the following terms shall have the meanings set forth below.  Terms not defined below shall have the meanings ascribed to them in the Bankruptcy Code.

(a)    "541 Claims" shall have the meaning ascribed to such term in the Recitals hereof.

(b)    "Affiliate" means any Entity that controls, is controlled by or is under common control with a Party (for Chartis, specifically including American International Group Inc.), or has ever had any other legal nexus to a Party hereto.  This includes, but is not limited to, all past, present and future parent corporations of a Party, subsidiaries, divisions, merged or acquired companies or operations and their respective predecessors, successors and assigns.

(c)    "Agent" means all past, present and future partners, agents, servants, employees, clergy, representatives, members, officers, executives, directors, shareholders, attorneys and their predecessors, successors, heirs, assigns, executors and administrators.

(d)    "Approval Order" means a Final Order in substantially the form attached hereto as Exhibit 1, with only such modifications as are mutually acceptable to the Carriers, Chartis, the Diocese and the Diocese Releasing Parties in each Party's respective sole discretion, that: (i) approves this Agreement and the sale of the Policies to the Carriers and Chartis free and clear of all Interests; (ii) authorizes the Parties to undertake the settlement and transactions contemplated by this Agreement; and (iii) is entered by the Bankruptcy Court under sections 363 and/or 105 of the Bankruptcy Code and Bankruptcy Rule 9019 and/or under such other provisions as the Bankruptcy Court may order, understanding that the Parties hereto intend the Approval Order to the Confirmation Order confirming the Diocese's "Settlement Plan", as defined herein..

(e)      "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended from time to time.

(f)      "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware and any other court in which the Bankruptcy Case may be pending or which has jurisdiction over the Bankruptcy Case.

(g)      "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

(h)      "Bar Date" means April 15, 2010, the deadline set by the Bankruptcy Court for filing a proof of claim in the Bankruptcy Case.

(i)      "Bishop" means the Most Reverend Bishop of the Diocese and his predecessors, successors and assigns.

(j)      "Buyer" means the Carriers and Chartis.

(k)      "Buyer-Released Claims" shall have the meaning ascribed to such term in Section 5.3 hereof.

(l)      "Channeled Claims" means all Claims, including, without limitation, Tort Claims and Unknown Tort Claims, against the Diocese, the Diocese Releasing Parties and the Carriers and/or Chartis which shall be channeled, treated and administered pursuant to the provisions and protocols of this Agreement and the Plan (as defined herein).

(m)      "Claim" means any of the following:  (i) "Claim" as that term is defined in section 101(5) of the Bankruptcy Code; (ii) demand; or (iii) any claim, whether past, present or future, known or unknown, accrued or unaccrued, asserted or unasserted, foreseen or unforeseen, fixed or contingent, direct or indirect, and, whether in law, equity or otherwise including, without limitation, any claim: (i) arising out of, related to, or involving Tort Claims, Unknown Claims, Extra-Contractual Claims, and Contribution Related Claims; (ii) for any form of damages,

indemnity, defense obligations, insurance premiums (whether retrospectively rated or otherwise), deductibles, self-insured retentions, costs, expenses, contribution or subrogation; (iii) pursuant to or under a contract, other agreement, promise, representation or warranty; or (iv) pursuant to any direct action or statutory or regulatory right of action, assertion of right, complaint, cross-complaint, counterclaim, affirmative defense, writ, demand, inquiry, request, suit, lawsuit, liability, action, cause of action, administrative proceeding, governmental action, order, judgment, settlement, lien, loss, cost or expense.

(n)     "Committee" means the Official Committee of Unsecured Creditors of the Catholic Diocese of Wilmington, Inc., appointed by the United States Trustee on November 5, 2009 to represent the collective interests of Tort Claimants, as such Committee may be reconstituted from time to time.

(o)     "Conditions to Payment" shall have the meaning ascribed to such term in Section 3.1 hereof.

(p)     "Confirmation Order" means a Final Order entered in the Bankruptcy Case that is in a form reasonably acceptable to the Carriers and Chartis and that: (i) approves the Settlement Plan pursuant to section 1129 and any other applicable provision of the Bankruptcy Code; (ii) designates the Carriers and Chartis as Settling Insurers (as defined in the Plan); (iii) includes the Plan Provisions; and (iv) does not materially or adversely affect the interests of the Carriers and Chartis under this Agreement.

(q)     "Contribution Claims" means any Claim by any Entity, including, without limitation, any insurers of any of the Sellers or any of the Diocese Releasing Parties, based on contribution, indemnity, subrogation, equitable subrogation, recoupment, quantum meruit, rights

under "other insurance clauses," or any similar Claim or legal theory (including claims for attorneys' fees and costs) relating to or arising out of, directly or indirectly, the Policies.

(r)    "Diocese" means the Catholic Diocese of Wilmington, Inc., a Delaware nonprofit corporation, as well as all of its past, present and future Affiliates, associated corporations and Entities, employees, officers, directors, shareholders, principals, Agents, attorneys, representatives, predecessors, successors and assigns.

(s)    "Diocese Releasing Parties" means any Entity other than the Diocese that is or may claim to be insured under the Policies or any one of them, including the Diocese's Agents, the Bishop, all past, present, and future bishops of the Diocese and all parishes, churches, schools and other institutions within or affiliated with the Diocese, as it may have been constituted from time to time, at any time prior to the Effective Date (as defined herein) that are either: (i) located within the territorial limits of the Diocese; or (ii) directly or indirectly under or subject to the supervision or control of the Diocese, along with each of their past, present and future subsidiaries, Affiliates, associated corporations and Entities, employees, officers, directors, shareholders, principals, Agents, attorneys, representatives, predecessors, successors and assigns. The Diocese Releasing Parties shall include without limitation all entities executing this Agreement

(t)    "Effective Date" means the date on which all Conditions to Payment have been satisfied and the Settlement Payment is received by the Diocese.

(u)    "Enjoined Claim" means any Claim relating to the Policies including, without limitation, Contribution Claims against the Carriers and/or Chartis and any Claim by or on behalf of a Tort Claimant, whenever and wherever arising or asserted, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, including without limitation

all Claims by way of direct action, statutory or regulatory action or otherwise, Claims for exemplary or punitive damages for attorneys' fees and other expenses, or for any equitable remedy.

(v)     "Entity" means an individual, any corporation, including, without limitation, a corporation sole or non-profit corporation, partnership, association, limited liability company, proprietorship, joint venture, trust, executor, legal representative or any other entity or organization, as well as any federal, international, foreign, state or local governmental or quasi-governmental entity, body, or political subdivision or any agency or instrumentality thereof.

(w)     "Extra-Contractual Claim" means any Claim against the Carriers and/or Chartis, seeking any type of relief, including but not limited to compensatory, exemplary or punitive damages, or attorneys' fees, interest, costs or any other type of relief, on account of alleged bad faith, failure to provide insurance coverage under any Policy, failure or refusal to compromise and settle any Claim insured under any Policy, failure to act in good faith, violation of any covenant or duty of good faith and fair dealing; violation of any unfair claims practices act or similar statute, regulation or code, any type of alleged misconduct or any other act or omission of any type for which the claimant seeks relief other than coverage or benefits under an insurance policy.  Extra-Contractual Claims include, without limitation: (i) any Claim arising out of or relating to the Carriers' and/or Chartis' handling of any request for insurance coverage for any Claim, including any Tort Claim, Unknown Claim and Contribution Claim; and (ii) the conduct of the Parties with respect to the negotiation of this Agreement.

(x)     "Final Order" means an order, judgment or other decree (including any modification or amendment thereof) that remains in effect and has not been reversed, withdrawn, vacated or stayed, and as to which the time to appeal or seek review, rehearing or writ of

certiorari has expired and as to which no appeal or petition for review, reconsideration, rehearing or certiorari has been taken or, if such an appeal has been taken, (a) it has been resolved and no longer remains pending, or (b) an appeal has been timely taken but such order has not been stayed and the Parties have mutually agreed in writing that the order from which such appeal is taken should be deemed to be a Final Order within the meaning of this Agreement.

(y)    "Insured" means any and all Entities and their Agents who are or may claim to be an insured, named insured, person insured, additional insured or additional person insured, or otherwise claim to be entitled to any coverage or benefits under the Policies.

(z)    "Interests" includes, without limitation, all liens, Claims, encumbrances, interests, rights of refusal, security interests, pledges, judgments, demands, charges, defects, options, restrictions and other rights of any nature or kind, whether at law or in equity.

(aa)    "Perpetrator" means an Entity who committed or is alleged to have committed an act of Sexual Abuse upon a Tort Claimant.

(bb)    "Plan" means the "Settlement Plan" as set forth in the Second Amended Chapter 11 Plan of Reorganization of Catholic Diocese of Wilmington, Inc., as such Plan may be modified from time to time in accordance with the terms thereof; provided, however, that such modifications are consistent with the terms of this Agreement and do not materially and adversely affect the interests of the Carriers and/or Chartis under this Agreement.

(cc)    "Plan Provisions" shall have the meaning ascribed to such term in Section 6 hereof.

(dd)    "Policies" means all insurance policies, known or unknown, issued or allegedly issued by the Carriers under which the Diocese or Diocese Releasing Parties are or may claim to be an insured, named insured, person insured, Insured, additional person insured, or otherwise

entitled to any coverage or benefits under any such insurance policies, including, without limitation, the insurance policies and alleged insurance policies identified on <u>Schedule A</u> to this Agreement.  By referencing the "Policies," the Carriers and Chartis  do not concede that the Diocese or anyone else has established the terms or existence of any such policies or entitlement to coverage under the Policies for any Claim, including any Tort Claim.

(ee)    "Reorganized Diocese" means the Diocese from and after the effective date of the Plan.

(ff)    "Sellers" means the Diocese and the Diocese Releasing Parties.

(gg)    "Seller-Released Claims" shall have the meaning ascribed to such term in Section 5.1 hereof.

(hh)    "Settlement Amount" means the payment to be made by the Carriers and Chartis pursuant to Section 2.1 of this Agreement.

(ii)    "Sexual Abuse" means any and all acts or omissions that in any way arise out of, are based upon or involve actual or alleged sexual conduct or misconduct, sexual abuse or molestation, indecent assault and/or battery, rape, lascivious behavior, undue familiarity, pedophilia, ephebophilia or sexually-related physical, psychological or emotional harm, or contacts or interactions of a sexual nature between a child and an adult, or a nonconsenting adult and another adult, by an Entity for which the Diocese is or was legally responsible, or which the Diocese failed to control, direct, train or supervise, or about whose acts and propensities the Diocese failed to warn, disclose or provide information.  A child or nonconsenting adult is abused whether or not this activity involves explicit force, whether or not it involves genital or other physical contact, and whether or not there is physical, psychological or emotional harm to the child or nonconsenting adult.

(jj)    "Tort Claim" means any and all Claims, demands, suits, causes of action, proceedings or any other rights to monetary and/or other relief, for: (i) damages of any type, including but not limited to bodily injury, personal injury, emotional distress, wrongful death and/or loss of consortium; (ii) exemplary or punitive damages;        (iii) attorneys' fees and other expenses, fees or costs; and (iv) any equitable remedy, heretofore, now or hereafter asserted against any of the Parties.

(kk)    "Tort Claimant" means an Entity that asserts a Tort Claim, including any Unknown Claimants.

(ll)    "Unknown Claim" means any and all Tort Claims of any Unknown Claimants.

(mm)   "Unknown Claimant" means the holder of a Tort Claim who did not file a proof of claim by the Bar Date, including without limitation:

   (i)    who has an extended statute of limitations period under the Delaware Code since he or she was under the age of 18 as of the Petition Date;

   (ii)   had not, as of the Petition Date, discovered an injury and the causal relationship between the injury and Sexual Abuse pursuant to the Delaware Code or any repressed memory exception to the Delaware statute of limitations; or

   (ii)   had a mental illness disability that tolled the statute of limitations pursuant to the Delaware Code .

1.2    The following rules of construction shall apply to this Agreement:

1.2.1.  Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein,"

"hereby" and derivative or similar words refer to this entire Agreement; (iv) the words "include," "includes" or "including" shall be deemed to be followed by the words "without limitation;" and (v) the word "or" shall be disjunctive but not exclusive;

    1.2.2.  References to agreements and other documents shall be deemed to include all subsequent amendments and other modifications thereto;

    1.2.3.  References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation;

    1.2.4.  Capitalized terms not defined in this Agreement shall have the meaning ascribed to them by the Bankruptcy Code;

    1.2.5.  The wording of this Agreement was reviewed by legal counsel for each of the Parties and each of them had sufficient opportunities to propose and negotiate changes prior to its execution.  None of the Parties will be entitled to have any wording of this Agreement construed against the other based on any contention as to which of the Parties drafted the language in question or which Party is an insurer.

## II.    PAYMENT OF SETTLEMENT AMOUNTS

    2.1    <u>Payment by the Carriers and Chartis</u>

    2.1.1.  Subject to all of the terms of this Agreement, in full and final settlement of all responsibilities under and arising out of the Policies, and in consideration of the sale of the Policies to the Carriers and Chartis free and clear of all Interests of any Entity, and expressly subject to the fulfillment of all Conditions to Payment identified in Section 3 below, the Carriers and/or Chartis shall pay to  "Catholic Diocese of Wilmington, Inc., Debtor-in-Possession"  the sum of Five Million Dollars ($5,000,000.00) (the "<u>Settlement Amount</u>")by check delivered by

mail to Young Conaway Stargatt & Taylor, counsel to the Diocese, within thirty (30) calendar days after all Conditions to Payment described herein have been fulfilled but in no event earlier than September 12, 2011.

2.1.2.  The Parties expressly agree that the Settlement Amount is the total amount the Carriers and Chartis are obligated to pay on account of any and all Claims of any kind made under or relating to the Policies or with respect to the Extra-Contractual Claims, that under no circumstance will the Carriers or Chartis ever be obligated to make any additional payments to anyone in connection with the Policies, and that all indemnity amounts or limits of liability available or allegedly available under the Policies, including all per person, per occurrence and aggregate limits of liability, shall be deemed fully and properly exhausted. The Parties further agree that the Settlement Amount is the full purchase price of the Policies and that, upon payment of the Settlement Amount, the Carriers and Chartis shall be deemed to own the Policies free and clear of all Interests of any Entity, and there shall be no defense obligations under the Policies.

2.1.3.  Nothing in this Agreement precludes the Carriers and Chartis or the Sellers from allocating payments or the receipt of payments hereunder in such manner as the Carriers and Chartis or the Seller see fit.  Any such allocation by either the Carriers and Chartis or the Sellers shall not be binding on the other.

2.1.4.  Except as otherwise ordered by the Bankruptcy Court, the Sellers agree that they shall use any and all sums received hereunder solely toward payment for indemnity for Tort Claims or for contribution to a trust(s) established for the benefit of Tort Claimants under the Plan, subject to the terms and conditions of the Plan.

III.    **CONDITIONS TO PAYMENT**

3.1    The obligation to pay the Settlement Amount is expressly conditioned on, and payment need not be made unless and until the Diocese has obtained both the Approval Order and the Confirmation Order confirming the "Settlement Plan" which specifically contains the Channeling Injunction, until such orders become Final Orders; and until all "Conditions Precedent" contained in Section 15.1 of the Plan are met and satisfied.

3.1.1    Approval Order.  No later than ten (10) business days after the Effective Date, the Diocese shall file a motion (the "Approval Motion") requesting the Bankruptcy Court to enter the Approval Order and set a hearing date for the motion on the earliest available court date.  The Diocese shall use its reasonable best efforts to obtain entry of the Approval Order, which includes: (i) supporting entry of the Approval Order during all discussions with claimants, their attorneys and guardians *ad litem*;        (ii) filing a written response in the event any objections to the Approval Motion are filed with the Bankruptcy Court; and (iii) taking all reasonable steps to defend against any appeal, petition, motion or other challenge to the Bankruptcy Court's entry of the Approval Order.

3.1.2    The Diocese shall provide appropriate written notice of the Approval Motion to (i) all known claimants or counsel for claimants who have filed a proof of claim in the Bankruptcy Case, who were scheduled by the Diocese (whether or not scheduled as contingent, unliquidated and/or disputed), or whose claims are pending and were tendered under the Policies as of the commencement of the Bankruptcy Case, including all Tort Claimants and all holders of Contribution Claims, and any other known creditors or claimants, at the address provided for notice in the proof of claim filed by each such claimant or the address listed for such claimant in the Diocese's schedules, or the address of such claimant last known to the Sellers, as applicable,

(ii) all Entities who have filed a notice of appearance in the Bankruptcy Case, (iii) all Entities known or alleged by the Seller to have provided general liability insurance to the Sellers (as more specifically listed on Schedule B hereto), (iv) counsel for the Committee and (v) all known Perpetrators, via service to their respective attorney of record in the Bankruptcy Case (if known), their registered agent for service of process in Delaware (if known), or at the address last known to the Diocese. Notice of this Agreement shall also be published one time in *The News Journal* in a form and at a time agreed to by the Parties or as ordered by the Bankruptcy Court.

      3.1.3  Confirmation Order. In conjunction with the Plan, the Diocese shall use its reasonable best efforts to promptly obtain the Confirmation Order confirming the "Settlement Plan:", which shall include the Plan Provisions set forth in Section 6 hereof. Such best efforts include: (i) seeking a confirmation hearing on an appropriately timely basis; (ii) urging the Bankruptcy Court to overrule any objections and confirm the Plan; and (iii) taking all reasonable steps to defend against any appeal, petition, motion or other challenge to the Bankruptcy Court's entry of the Confirmation Order.

## IV.   SALE OF POLICIES

    4.1  Sale and Buy-back of Policies Free and Clear of all Interests. On the Effective Date, this Agreement effects a sale and buy-back of the Policies from the Sellers, and the Carriers and Chartis buy back all of the Policies, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code and applicable law, free and clear of all Interests of all Entities; provided, however, that in the event that the Plan does not become effective, this Agreement shall be void ab initio.

    4.2  Good Faith Purchase; Fair and Reasonable Settlement; Reasonable Equivalent Value; Compliance with Law. The Parties acknowledge and agree that: (i) the Carriers and

Chartis are good faith purchasers of the Policies within the meaning of section 363(m) of the Bankruptcy Code; (ii) the consideration exchanged by the Parties pursuant to this Agreement constitutes a fair and reasonable settlement of the Parties' disputes and of their respective rights and obligations relating to the Policies, and constitutes reasonably equivalent value; (iii) the releases contained in this Agreement and this policy buy-back comply with the Bankruptcy Code and applicable law; and (iv) this Agreement in no way voids, annuls or attempts to void or annul the Policies, which, with respect to each of the Sellers, have been fully performed.

## V.    **RELEASES**

5.1    <u>Release of Buyer</u>. Subject to the satisfaction of the Conditions to Payment, and upon the occurrence of the Effective Date, the Sellers hereby completely release and forever discharge (i) the Carriers and Chartis, (ii) all of the Carriers' and Chartis' respective Affiliates and Agents (including the law firms of McCurdy & Fuller LLP and Saul Ewing LLP and, more specifically, any attorney, partner, counsel, associate or employee of any type of said law firms), (iii) all of the Carriers' and Chartis' respective predecessors, successors and assigns and (iv) all other persons and Entities who acted, or may be deemed to have acted, on behalf of such parties listed in subsections (i) to (iii), from any and all Claims of any nature whatsoever, whether sounding in breach of contract, breach of any duty of good faith and fair dealing, breach of statutory duties, actual or constructive fraud, actual or constructive breach of fiduciary duty, or whether legal or equitable, known or unknown, accrued or unaccrued, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, fixed or contingent, of the Sellers that in any way are related to, connected with, based on or arise out of, directly or indirectly, the Tort Claims, the Policies or the Bankruptcy Case, and which include the 541 Claims, the Contribution Claims and the Extra-Contractual Claims (collectively, the "<u>Seller-Released Claims</u>"). The

Sellers further agree that if, contrary to the Parties' specific intent, any Seller-Released Claims are deemed to survive this Agreement, even though they are encompassed by the terms of the release set forth in this section, the Sellers hereby forever, expressly and irrevocably, waive entitlement to and agree not to assert any and all such Claims.

5.2    Release and Return of the Policies. Upon the occurrence of the Effective Date, the Sellers agree that the Carriers and Chartis will have bought back the Policies free and clear of all Interests and all rights, title and interests of the Sellers, any other party claiming by, through, on behalf of or under the Sellers, or any Entity claiming rights of any nature whatsoever under the Policies, are hereby completely released and forever discharged. On the Effective Date, the Sellers shall physically return the Policies to the Carriers and Chartis by sending to counsel for the Carriers and Chartis: (i) the original of any such Policy, if located; (ii) if no original can be located, a copy of such Policy, if a copy is found, and a certification that no original could be found, in which case the copy shall be treated for all purposes as if it were an original; or (iii) if no original or copy can be located, a certification to that effect, which shall have the same force and effect as if the original of that contract were returned to the Carriers and/or Chartis.  In the event that after the Effective Date an original or copy of a Policy is discovered by the Sellers, such original or copy shall be promptly delivered to the Carriers and Chartis.

5.3    Release of the Sellers. Upon the occurrence of the Effective Date, the Carriers and Chartis hereby completely release and forever discharge (i) the Sellers, (ii) all of the Sellers' employees, directors, officers, shareholders, agents, representatives and attorneys (including the law firm of Young Conaway Stargatt & Taylor, LLP and, more specifically, any attorney, partner, counsel, associate, or employee of any type of said law firm), (iii) all of the Sellers' predecessors, successors and assigns and (iv) all other persons and entities who acted, or may be

deemed to have acted, on behalf of such parties listed in subsections (i) to (iii), from any and all Claims, of any nature whatsoever, whether legal or equitable, known or unknown, past, present, or future, suspected or unsuspected, fixed or contingent, of the Carriers and/or Chartis, that in any way are related to, connected with, based on or arise out of, directly or indirectly, the Tort Claims, the Policies or the Bankruptcy Case (collectively, the "Buyer-Released Claims"). The Carriers and Chartis agree that if, contrary to the Parties' specific intent, any Buyer-Released Claims are deemed to survive this Agreement, even though they are encompassed by the terms of the release set forth in this section, the Carriers and Chartis hereby forever, expressly and irrevocably, waive entitlement to and agree not to assert any and all such Claims.

5.4    Nothing in these sections is intended to, nor shall be construed to, release, waive, relinquish or otherwise affect the Parties' rights and obligations under this Agreement.

5.5    Each of the Parties specifically acknowledges and agrees that it may hereafter discover facts in addition to or different from those which it now believes to be true with respect to the matters released herein, but agrees that it has taken such possibility into account in reaching this Agreement and that the releases shall be and remain in effect notwithstanding the discovery or existence of any such additional or different facts as to which the Parties expressly assume the risk.

## VI.    PLAN PROVISIONS

6.1    The Diocese shall include in the Plan and Confirmation Order the following provisions in a form reasonably acceptable to the Carriers and Chartis, which shall be referred to collectively herein as the "Plan Provisions:"

6.1.1   A complete release and discharge of all Tort Claims, including, without limitation, all Unknown Claims, Contribution Claims, 541 Claims and Extra-Contractual Claims, against any and all Entities and the Carriers and/or Chartis, and excluding only the Perpetrators;

6.1.2.  The permanent Channeling Injunction as defined in and contained in the Plan, enjoining and restraining all Entities who have held or asserted, hold or assert, or may in the future hold or assert a Channeled Claim or an Enjoined Claim from taking any action, directly or indirectly for the purposes of asserting, enforcing or attempting to assert or enforce any Channeled Claim or Enjoined Claim, including;   (i) commencing or continuing in any manner, any action or any other proceeding of any kind with respect to any Channeled Claim or Enjoined Claim against the Carriers and/or Chartis; (ii) seeking the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Carriers and Chartis or the property of the Carriers or Chartis with respect to any Channeled Claim or Enjoined Claim; (iii) creating, perfecting or enforcing any encumbrance or lien of any kind against the Carriers and/or Chartis or the property of the Carriers and/or Chartis with respect to any Channeled Claim or Enjoined Claim; (iv) asserting any rights of setoff, subrogation or recoupment of any kind against any obligation due to the Carriers and/or Chartis with respect to any Channeled Claim or Enjoined Claim; and (v) taking any act, in any manner and in any place whatsoever, that does not conform to or comply with this Agreement.

6.1.3   A provision stating that all injunctions or stays provided for in the Confirmation Order and in the Plan, the injunctive provisions of sections 524 and 1141 of the Bankruptcy Code, and all injunctions or stays protecting the Carriers and Chartis, are permanent and will remain in full force and effect following the effective date of the Plan; and

6.1.4    A provision releasing any and all avoidance actions or claims against the Carriers and Chartis arising under chapter 5 of the Bankruptcy Code with respect to this Agreement and the Claims released hereunder or any policies issued by Chartis.

## VII.    REPRESENTATIONS AND WARRANTIES OF THE PARTIES

7.1    Each of the Parties separately represents and warrants as follows:

7.1.1    To the extent it is a corporation, including, without limitation, a corporation sole or other legal Entity, it has the requisite power and authority to enter into this Agreement and to perform the obligations contemplated by this Agreement, subject only to approval of the Bankruptcy Court;

7.1.2    Subject to entry of the Approval Order and Confirmation Order as Final Orders, the execution, delivery and performance of the obligations contemplated by this Agreement have been approved by duly authorized representatives of each Party, and by all other necessary representatives of the Party;

7.1.3    Each Party has expressly authorized its undersigned representative to execute this Agreement on the Party's behalf as its duly authorized agent; and

7.1.4    This Agreement has been thoroughly negotiated and analyzed by each Party's counsel and has been executed and delivered in good faith, pursuant to arm's length negotiations and for good and valuable consideration.

7.2    The Sellers acknowledge, represent and warrant that they are the owners of the Policies and that they have not assigned or otherwise transferred or subrogated any interest in the Policies or any Claims that are the subject matter hereof.

## VIII.  ACTIONS INVOLVING THIRD PARTIES

8.1    For purposes of supporting the releases granted herein and the extinguishment of any and all rights under the Policies resulting from the sale and buy-back thereof contemplated by this Agreement, the Sellers hereby agree as follows with respect to any Claim against any of them:

8.1.1   They will not seek to obtain payment from any other insurance company of any amount that may be attributable or allocable to the Carriers and/or Chartis; and

8.1.2.   In the event that any insurer of the Sellers obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from the Carriers and/or Chartis as a result of a Contribution Claim against the Carriers and/or Chartis for the Carriers' or Chartis' alleged share or equitable share, or to enforce subrogation rights, if any, of the defense and/or indemnity obligation of the Carriers and Chartis for any Claims released pursuant to this Agreement, the Sellers shall voluntarily reduce the judgment or Claim against, or settlement with, such other insurer(s) to the extent necessary to eliminate such Contribution Claim against the Carriers and/or Chartis.  To ensure that such a reduction is accomplished, the Carriers and Chartis shall be entitled to assert this paragraph as a defense to any action against it for any such portion of the judgment or Claim and shall be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect the Carriers and Chartis from any liability for the judgment or Claim.

8.1.3   The Carriers and Chartis hereby agree that they shall not assert any Contribution Claim against any other insurer of the Sellers unless that other insurer first asserts a Contribution Claim against the Carriers and Chartis.  In such event, the Carriers and Chartis shall retain all of their rights, Claims, Contribution Claims and defenses against such other insurer.

The Sellers shall use their reasonable best efforts to obtain from all insurers with which they settle agreements similar to those contained in this section; provided, however, that the failure of the Sellers, despite their reasonable best efforts, to obtain such an agreement from any insurer with which they settle will not be a basis to terminate this Agreement or excuse the Carriers and/or Chartis from performing their obligations hereunder.

8.2    The Reorganized Diocese, on behalf of itself and the Diocese Releasing Parties, shall indemnify, defend and hold the Carriers and Chartis harmless from and against all Claims against the Carriers and/or Chartis arising out of or related to the Enjoined Claims. The obligation to defend shall include, without limitation, legal fees, litigation expenses and costs, and investigative expenses and costs, and shall extend to all aspects of the defense, including, without limitation, any challenge to the effect and validity of this Agreement.  In defending the Carriers and /or Chartis, the Reorganized Diocese shall use (i) counsel acceptable to the Carriers and /or Chartis and (ii) legal positions approved by the Carriers and /or Chartis, but such acceptance and approval shall not be unreasonably withheld.

## IX.    MISCELLANEOUS

9.1    In the event that any proceedings are commenced to invalidate all or any part of this Agreement, the Parties agree to cooperate fully in opposing such proceedings.

9.2    Each Party agrees to take such steps and to execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Agreement and to preserve its validity and enforceability.  In the event that any action or proceeding of any type whatsoever is commenced or prosecuted by any Entity not a Party hereto to invalidate, interpret or prevent the validation, enforcement or carrying out of all or any of the provisions of this

Agreement, the Parties mutually agree, represent, warrant and covenant to cooperate fully in opposing such action or proceeding.

9.3    The Diocese shall cooperate with the Carriers and Chartis and their respective representatives in connection with the Approval Order, the Confirmation Order and the Bankruptcy Case.    Such cooperation shall include, without limitation, consulting with the Carriers and Chartis at their request concerning the status of proceedings and providing the Carriers and Chartis with copies of requested pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court; provided, however, that nothing contained in this paragraph shall obligate the Diocese to provide to the Carriers and Chartis any information that is otherwise subject to attorney-client or work product privileges.

9.4    This Agreement along with the Plan, Confirmation Order and Approval Order, constitutes a single integrated written contract that expresses the entire agreement and understanding between the Parties.    Except as otherwise expressly provided, this Agreement supersedes all prior communications, settlements, and understandings between the Parties and their representatives regarding the matters addressed by this Agreement.    Except as explicitly set forth in this Agreement, there are no representations, warranties, promises, or inducements, whether oral, written, expressed or implied, that in any way affect or condition the validity of this Agreement or alter or supplement its terms.    Any statements, promises or inducements, whether made by any party or any agent of any party, that are not contained in this Agreement shall not be valid or binding.    Any changes to this Agreement must be made in writing and with the consent of all Parties.

9.5    No part of this agreement, its negotiation or performance may be used in any manner in any action, suit or proceeding by any Entity as evidence of the rights, duties or obligations of any of the Parties with respect to matters or Entities outside the scope of this Agreement.  All actions taken and statements made by the Parties or by their representatives relating to this Agreement or participation in this Agreement, including its development and implementation, shall be without prejudice or value as precedent, and shall not be used as a standard by which other matters may be judged.

9.6    This Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession by any Party of liability, culpability or wrongdoing.  Settlement negotiations leading up to this Agreement and all related discussions and negotiations shall be deemed to fall within the protection afforded to compromises and offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions.  Any evidence of the terms of this Agreement or negotiations or discussions associated with this Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties or obligations of the Parties, except in: (i) a proceeding to obtain the Approval Order or the Confirmation Order; (ii) an action or proceeding to enforce the terms of this Agreement; or (iii) any possible action or proceeding between the Carriers and/or Chartis and any of their reinsurers.  This Agreement shall not be used as evidence or in any other manner in any court or dispute resolution proceeding, to create, prove or interpret either the Carriers' and/or Chartis' obligations under the Policies to the Diocese or to any other Entity or any Claims of any Party against the Carriers and Chartis.

9.7    Neither this Agreement nor the rights and obligations set forth herein shall be assigned without the prior written consent of the other Parties.

9.8    Section titles and/or headings contained in this Agreement are included only for ease of reference and shall have no substantive effect.

9.9    All notices, demands or other communications to be provided pursuant to this Agreement shall be in writing and sent by facsimile or other electronic transmission or by Federal Express or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other person or address as any of them may designate in writing from time to time:

If to the CARRIERS:

175 Water Street, 18th Floor
New York, NY 10038

With a copy to:

Mary McCurdy, Esquire
McCURDY & FULLER LLP
4300 Bohannon Drive, Suite 240
Menlo Park, CA 94025

If to the Diocese:

Rev. Msgr. J. Thomas Cini
Vicar General for Administration
Catholic Diocese of Wilmington
P.O. Box 2030
Wilmington, DE 19899-2030

With a copy to:

Anthony G. Flynn, Esquire
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
aflynn@ycst.com

If to the Committee:

Bruce Grohsgal, Esquire
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 16th Floor
Wilmington, DE 19899-8705

9.10    This Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument.  This Agreement may be executed and delivered by facsimile, which facsimile counterparts shall be deemed to be originals.

9.11    The Parties agree that nothing contained in this Agreement shall be deemed or construed to constitute:  (i) an admission by the Carriers and/or Chartis that the Diocese, the Diocese Releasing Parties or any Entity was or is entitled to any insurance coverage under the Policies or as to the validity of any positions that have been or could have been asserted by the Diocese; (ii) an admission by the Diocese as to the validity of any positions or defenses to coverage that have been or could have been asserted by the Carriers and/or Chartis or any Claims that have or could have been asserted by the Diocese against the Carriers and/or Chartis; and (iii) an admission by the Diocese or the Carriers and/or Chartis of any liability whatsoever with respect to any of the Tort Claims.

9.12    No waiver or indulgence of any breach or series of breaches of this Agreement shall be deemed or construed as a waiver of any breach of the same or any other provision hereof or affect the enforceability of any part or all of this Agreement, and no waiver shall be valid unless executed in writing by the waiving party.

9.13    By entering into this Agreement, none of the Parties has waived, or shall be deemed to have waived, any rights, obligations or positions it or they have asserted or may in the future assert in connection with any matter or person outside the scope of this Agreement.

9.14    All of the entities included in the definition of the Carriers and of Chartis are intended beneficiaries of this Agreement. The Parties agree that, except as set forth in the prior sentence or otherwise set forth in this Agreement, there are no third-party beneficiaries of this Agreement.

9.15    This Agreement shall be regarded as confidential and shall not be disclosed to third parties, except that this Agreement may be disclosed (i) to the Bankruptcy Court insofar as necessary to fulfill a Party's obligations under this Agreement, the Bankruptcy Code and Bankruptcy Rules, as applicable, (ii) to any Party's auditors, regulators or reinsurers, (iii) to any Entity pursuant to court order, and (iv) by any Party, with the written consent of the other Party. The Parties acknowledge and agree, notwithstanding the foregoing, that a copy of this Agreement will be attached to the Approval Motion and the material terms disclosed in any notice required to be given under this Agreement, the Bankruptcy Code or the Bankruptcy Rules in connection with seeking entry of the Approval Order. The Parties agree not to disparage or induce or encourage others to disparage the other with respect to matters relating to this Agreement, the Policies and the Claims resolved herein.

9.16    Except as otherwise provided in this Agreement, each party shall be responsible for their own fees and costs incurred in conjunction with the Bankruptcy Case and this Agreement.

Catholic Diocese of Wilmington

By: _____ (SEAL)
   (Name)

Title: _____

Date: July __, 2011

Cathedral of St. Peter Roman Catholic Church

By: _____ (SEAL)
     (Name), as its Trustee

Date: July __, 2011

Christ Our King Roman Catholic Church

By: _____ (SEAL)
       (Name), as its Trustee

Date:  July __, 2011

Good Shepherd Roman Catholic Church

By: _____ (SEAL)
       (Name), as its Trustee

Date:  July __, 2011

Holy Cross Roman Catholic Church

By: _____ (SEAL)
       (Name), as its Trustee

Date:  July __, 2011

Holy Name of Jesus Roman Catholic Church

By: _____ (SEAL)
       (Name), as its Trustee

Date:  July __, 2011

Holy Spirit Roman Catholic Church

By: _____ (SEAL)
       (Name), as its Trustee

Date:  July __, 2011

Corpus Christi Roman Catholic Church

By: _____ (SEAL)
       (Name), as its Trustee

Date:  July __, 2011

Holy Child Roman Catholic Church

By: _____ (SEAL)
       (Name), as its Trustee

Date:  July __, 2011

Holy Family Roman Catholic Church

By: _____ (SEAL)
       (Name), as its Trustee

Date:  July __, 2011

Holy Rosary Roman Catholic Church

By: _____ (SEAL)
       (Name), as its Trustee

Date:  July __, 2011

Immaculate Conception Roman Catholic Church
(Elkton)

By: _____ (SEAL)
       (Name), as its Trustee

Date:  July __, 2011

Immaculate Conception Roman Catholic Church
(Marydel)

By: _____ (SEAL)
     (Name), as its Trustee

Date: July __, 2011

Our Lady of Fatima Roman Catholic Church

By: _____ (SEAL)
     (Name), as its Trustee

Date: July __, 2011

Our Lady of Lourdes Roman Catholic Church

By: _____ (SEAL)
     (Name), as its Trustee

Date: July __, 2011

Parish of The Resurrection Roman Catholic
Church

By: _____ (SEAL)
     (Name), as its Trustee

Date: July __, 2011

St. Andrew Roman Catholic Church

By: _____ (SEAL)
     (Name), as its Trustee

Date: July __, 2011

Immaculate Heart of Mary Roman Catholic
Church

By: _____ (SEAL)
     (Name), as its Trustee

Date: July __, 2011

Our Lady of Good Counsel Roman Catholic
Church

By: _____ (SEAL)
     (Name), as its Trustee

Date: July __, 2011

Our Mother of Sorrows Roman Catholic Church

By: _____ (SEAL)
     (Name), as its Trustee

Date: July __, 2011

Sacred Heart Roman Catholic Church

By: _____ (SEAL)
     (Name), as its Trustee

Date: July __, 2011

St. Ann Roman Catholic Church (Bethany Beach)

By: _____ (SEAL)
     (Name), as its Trustee

Date: July __, 2011

St. Ann Roman Catholic Church (Wilmington)

By: _____ (SEAL)
    (Name), as its Trustee


Date: July __, 2011

St. Benedict Roman Catholic Church

By: _____ (SEAL)
    (Name), as its Trustee


Date: July __, 2011

St. Christopher Roman Catholic Church

By: _____ (SEAL)
    (Name), as its Trustee


Date: July __, 2011

St. Elizabeth Roman Catholic Church

By: _____ (SEAL)
    (Name), as its Trustee


Date: July __, 2011

St. Francis de Sales Roman Catholic Church

By: _____ (SEAL)
    (Name), as its Trustee


Date: July __, 2011

St. Helena Roman Catholic Church

By: _____ (SEAL)
    (Name), as its Trustee


Date: July __, 2011

St. Anthony of Padua Roman Catholic Church

By: _____ (SEAL)
    (Name), as its Trustee


Date: July __, 2011

St. Catherine of Siena Roman Catholic Church

By: _____ (SEAL)
    (Name), as its Trustee


Date: July __, 2011

St. Dennis Roman Catholic Church

By: _____ (SEAL)
    (Name), as its Trustee


Date: July __, 2011

St. Elizabeth Ann Seton Roman Catholic Church

By: _____ (SEAL)
    (Name), as its Trustee


Date: July __, 2011

St. Hedwig Roman Catholic Church

By: _____ (SEAL)
    (Name), as its Trustee


Date: July __, 2011

St. John Neumann Roman Catholic Church

By: _____ (SEAL)
    (Name), as its Trustee


Date: July __, 2011

St. John the Apostle Roman Catholic Church

By: _____ (SEAL)
  (Name), as its Trustee


Date: July ___, 2011


St. John the Beloved Roman Catholic Church

By: _____ (SEAL)
  (Name), as its Trustee


Date: July ___, 2011

St. Joseph Roman Catholic Church (Wilmington)

By: _____ (SEAL)
  (Name), as its Trustee


Date: July ___, 2011


St. Jude the Apostle Roman Catholic Church

By: _____ (SEAL)
  (Name), as its Trustee


Date: July ___, 2011

St. Margaret of Scotland Roman Catholic Church

By: _____ (SEAL)
  (Name), as its Trustee


Date: July ___, 2011

St. John the Baptist - Holy Angels Roman
Catholic Church

By: _____ (SEAL)
  (Name), as its Trustee


Date: July ___, 2011


St. Joseph Roman Catholic Church (Middletown)

By: _____ (SEAL)
  (Name), as its Trustee


Date: July ___, 2011

St. Joseph on the Brandywine Roman Catholic
Church

By: _____ (SEAL)
  (Name), as its Trustee


Date: July ___, 2011


St. Luke Roman Catholic Church

By: _____ (SEAL)
  (Name), as its Trustee


Date: July ___, 2011

St. Mary of the Assumption Roman Catholic
Church

By: _____ (SEAL)
  (Name), as its Trustee


Date: July ___, 2011

St. Mary of the Immaculate Conception Roman Catholic Church

By: _____ (SEAL)
  (Name), as its Trustee


Date: July __, 2011

St. Mary Refuge of Sinners Roman Catholic Church

By: _____ (SEAL)
  (Name), as its Trustee


Date: July __, 2011

St. Matthew Roman Catholic Church

By: _____ (SEAL)
  (Name), as its Trustee


Date: July __, 2011

St. Patrick Roman Catholic Church

By: _____ (SEAL)
  (Name), as its Trustee


Date: July __, 2011

St. Paul Roman Catholic Church (Wilmington)

By: _____ (SEAL)
  (Name), as its Trustee


Date: July __, 2011

St. Mary Magdalen Roman Catholic Church

By: _____ (SEAL)
  (Name), as its Trustee


Date: July __, 2011

St. Mary Star of the Sea Roman Catholic Church

By: _____ (SEAL)
  (Name), as its Trustee


Date: July __, 2011

St. Michael the Archangel Roman Catholic Church

By: _____ (SEAL)
  (Name), as its Trustee


Date: July __, 2011

St. Paul Roman Catholic Church (Delaware City)

By: _____ (SEAL)
  (Name), as its Trustee


Date: July __, 2011

Ss. Peter and Paul Roman Catholic Church

By: _____ (SEAL)
  (Name), as its Trustee


Date: July __, 2011

St. Peter the Apostle Roman Catholic Church

By: _____ (SEAL)
      (Name), as its Trustee

Date: July __, 2011

St. Polycarp Roman Catholic Church

By: _____ (SEAL)
      (Name), as its Trustee

Date: July __, 2011

St. Thomas the Apostle Roman Catholic Church

By: _____ (SEAL)
      (Name), as its Trustee

Date: July __, 2011

DOW Schools, Inc.

By: _____ (SEAL)
      (Name), as its Trustee

Date: July __, 2011

Catholic Cemeteries, Inc.

By: _____ (SEAL)
      (Name), as its Trustee

Date: July __, 2011

Catholic Charities, Inc.

By: _____ (SEAL)
      (Name), as its Trustee

Date: July __, 2011

Siena Hall, Inc.

By: _____ (SEAL)
      (Name), as its Trustee

Date: July __, 2011

Seton Villa, Inc.

By: _____ (SEAL)
      (Name), as its Trustee

Date: July __, 2011

Children's Home, Inc.

By: _____ (SEAL)
      (Name), as its Trustee

Date: July __, 2011

Catholic Youth Organization, Inc. d/b/a Catholic Youth Ministry

By: _____ (SEAL)
      (Name), as its Trustee

Date: July __, 2011

Catholic Ministry to the Elderly, Inc.

By: _____ (SEAL)
      (Name), as its Trustee

Date:  July __, 2011

Catholic Diocese Foundation

By: _____ (SEAL)
      (Name), as its Trustee

Date:  July __, 2011

Catholic Press of Wilmington, Inc.

By: _____ (SEAL)
      (Name), as its Trustee

Date:  July __, 2011

Signed:_____

      (name)

(For Underwriters)

SCHEDULE "A"

# Chartis Insurance Policies

1)     Granite State Umbrella Policy No. 6485-0429
(6/30/1985-6/30/1986)
$10M/occurrence
*Excess of $500k per occurrence/aggregate*

2)     ICSOP Umbrella Policy No. UML4186-4041
(6/30/1986-6/30/1987)
$5M/occurrence
*Excess of $500k per occurrence/aggregate*

3)     ICSOP Excess Umbrella Policy No. 4486-9146
(8/8/1986-6/30/1987)
$2.5M/occurrence
*Excess of $8M per occurrence/aggregate*

4)     ICSOP Umbrella Policy No. UML4187-4659
(6/30/1987-7/1/1988)
$5M/occurrence
*Excess of $500k per occurrence/aggregate*

5)     ICSOP Umbrella Policy No. 4188-4934
(7/1/1988-7/1/9189)
$5M/occurrence
*Excess of $500k per occurrence/aggregate*

6)     ICSOP Excess Umbrella Policy No. 4488-1278
(8/4/1988-7/1/1989)
$5M/occurrence
*Excess of $10.5M per occurrence/aggregate*

7)     ICSOP Umbrella Policy No. 4189-5601
(7/1/1989-7/1/1990)
$5M/Occurrence
*Excess of $500k per occurrence/aggregate*

SCHEDULE "B"

# List of Insurers of the Diocese

- Granite State Insurance Company
- The Insurance Company of the State of Pennsylvania
- First State Insurance Company
- Nutmeg Insurance Company
- Twin City Insurance Company
- Lloyd's, London
- National Casualty Company
- Scottsdale Insurance Company
- Fireman's Fund Insurance Company
- Adriatic Insurance Company
- Allianz S.p.A.
- Mission Insurance Company
- Transamerica Corporation
- The Hanover Insurance Group, Inc.
- Ullico