# EXHIBIT A

**Blackline of Insurance Buy-Back Agreements**

a. **Blackline of Fire State Insurance Company, Nutmeg Insurance Company, and Twin City Insurance Company**

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made as of the Execution Date by

First State Insurance Company, Nutmeg Insurance Company and Twin City Insurance

Company and the Catholic Diocese of Wilmington, Delaware.

## RECITALS

WHEREAS, the Hartford Insurers issued or allegedly issued the Policies, which

are excess liability insurance policies, to the Diocese; and

WHEREAS, the Diocese is the subject of pending sexual molestation Claims; and

WHEREAS, in response to pending sexual molestation Claims the Diocese

commenced the Bankruptcy Case by filing a voluntary petition under Chapter 11 of the

Bankruptcy Code in the Bankruptcy Court; and

WHEREAS, the Diocese has resolved the sexual molestation Claims through a

settlement with the claimants that will be incorporated into the Diocese's Plan of

Reorganization in the Bankruptcy Case; and

WHEREAS, the Parties disagree about the extent, if any, to which the Policies

afford coverage for sexual molestation Claims against the Diocese; and

WHEREAS, the Parties wish to resolve all Claims that have arisen or could in the

future arise relating to the Policies by agreeing, in connection with its Plan of

Reorganization, to a sale of the Policies by the Diocese to the Hartford Insurers free and

clear of all Interests under Sections 363(f) and 1123(b)(4) of the Bankruptcy Code; and

WHEREAS, through this Agreement, the Parties seek to provide Hartford with the

broadest possible release with respect to the Policies and to provide that Hartford shall

have no further obligations to any Person for any and all Claims that have been or could have been or could in the future be asserted against Hartford relating to the Policies.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and intending to be legally bound, the Parties agree as follows:

I.   DEFINITIONS

As used in this Agreement, including the Recitals, the following terms have meanings set forth below.

1.   "Approval Date" means the date on which the Confirmation Order becomes a Final Order.

2.   "Bankruptcy Case" means the case styled *In re Catholic Diocese of Wilmington,* Case No. 09 BK 13560 pending in the Bankruptcy Court.

3.   "Bankruptcy Code" means Title 11 in the applicable provisions of Titles 18 and 28 of the United States Code, as amended from time to time.

4.   "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or such other court as may have jurisdiction over the Bankruptcy Case.

5.   "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

6.   "Claims" means any and all past, present, or future, known or unknown, foreseen or unforeseen, direct or indirect, fixed or contingent, matured or unmatured, liquidated or unliquidated, claims, proofs of claim, causes of actions, cross-claims, liabilities, rights, demands (including letter demands, notices, or inquires from any person or government agency), penalties, assessments, damages, requests, suits, lawsuits, costs

(including attorneys' fees and expenses), interest of any kind, actions, administrative

proceedings, criminal proceedings, or orders, of whatever nature, character, type, or

description, whenever and however occurring, whether at law or in equity, and whether

sounding in tort or contract, or any statutory, regulatory or common law claim or remedy

of any type including, without limitation, (a) any claim seeking any type of relief,

including compensatory, consequential, exemplary or punitive damages, rescission, or

declaratory or injunctive relief; (b) any claim for billing or premium adjustments; or (c)

any claim on account of alleged bad faith, failure to act in good faith, violation of any

duty of good faith and fair dealing, violation of any unfair claims practices act or similar

statute, regulation or code, any type of alleged misconduct; or any other act or omission

of an insurer of any type for which a claimant might seek relief.

7.     "Confirmation Order" means an order entered in the Bankruptcy Case, the

form of which shall be subject to Hartford's approval (which approval may not be

unreasonably withheld), which Order shall, in connection with confirming the Diocese'

Plan of Reorganization, (i) approve this Agreement, (ii) authorize the Parties to undertake

the settlement and the transactions contemplated by this Agreement, (iii) authorize the

sale of the Policies to the Hartford Insurers free and clear of any and all Interests,

pursuant to 11 U.S.C. § 363(b), (f), (iv) provide that the Hartford Insurers are good faith

purchasers of the Policies and, as such, are entitled to all protections provided to a good

faith purchaser under Bankruptcy Code Section 363(m); and (v) provide for the

Injunction.

8.    "Diocese" means the Catholic Diocese of Wilmington, Delaware, debtor and debtor in possession, and to the extent that the Diocese has the right, power or authority to bind them, (1) all priests who are, or who ever have been, incardinated, or otherwise associated with or claiming to be associated with, assigned to or under the control and/or supervision of the Diocese; (2) all persons or entities claiming any right, title or interest in or under the Policies, including without limitation any and all named insureds under the Policies, additional insureds under the Policies, and insureds added by endorsement to the Policies; (3) all affiliated persons of the Diocese (but only in their capacities as such), including without limitation all past, present and future directors, trustees, officers, officials, employees, agents, representatives, attorneys, consultants, advisors, contributors, volunteers, predecessors, successors, and assigns; and (4) all past, present and future divisions, subsidiaries, foundations, and funds of the Diocese, including without limitation all parishes, churches, education and welfare corporations, schools, corporations, companies, organizations and/or entities under its jurisdiction or control, and all of their respective affiliated persons (but only in their capacities as such), including without limitation all past, present and future directors, trustees, officers, officials, employees, agents, representatives, attorneys, consultants, advisors, contributors, volunteers, predecessors, successors, and assigns.

9.    "Estate" means the bankruptcy estate created under Section 541 of the Bankruptcy Code for the Diocese as a result of the filing of the Bankruptcy Case.

10. "Execution Date" means the first day upon which all Parties have executed this Agreement.

11. "Final Order" means an order or judgment (including any modification or amendment thereof) that remains in effect and has not been reversed, vacated or stayed, and as to which the time to appeal or seek review, rehearing or writ of certiorari has expired and as to which no appeal or petition for review, reconsideration, rehearing or certiorari has been taken or, if taken, has been resolved and no longer remains pending.

12. "Hartford" means the companies comprising The Hartford Financial Services Group Inc., individually and collectively, including First State Insurance Company, Nutmeg Insurance Company, Twin City Insurance Company, and (acting in their capacities as such) each of their respective past, present, and future directors, officers, shareholders, employees, agents, partners, representatives, attorneys, parent and affiliated corporations, subsidiaries, divisions, joint ventures, predecessors, successors, beneficiaries, and assigns.

13. "Hartford Insurers" means First State Insurance Company, Nutmeg Insurance Company, and Twin City Insurance Company.

14. "Injunction" means a permanent injunction pursuant to Sections 105(a) and 363 of the Bankruptcy Code to be included in the Plan of Reorganization and to become effective upon the Approval Date permanently enjoining the prosecution, continuation or commencement of any Interest (not otherwise released under the Agreement) that any Person holds or asserts or may in the future hold or assert against Hartford, arising out of, in connection with and/or in any way related to any of the Policies.

15.    "Interests" means all liens, Claims, encumbrances, interests and other rights of any nature, whether at law or in equity.

16.    "Other Insurer" means any Person that provided, or claims to have provided, any insurance coverage to the Diocese.

17.    "Parties" means the Diocese and Hartford Insurers.

18.    "Person" means and includes a natural person or persons, a group of natural persons acting as individuals, a group of natural individuals acting in collegial capacity (e.g., as a committee, board of directors, etc.), a corporation, partnership, limited liability company or limited partnership, a proprietorship, joint venture, trust, legal representative, or any other unincorporated association, business organization or enterprise, any government entity and any successor in interest, heir, executor, administrator, trustee, trustee in bankruptcy, or receiver of any person or entity.

19.    "Plan of Reorganization" means [RESERVED].

19.    "Plan of Reorganization" means (i) the Settlement Plan set forth in the Second Amended Chapter 11 Plan of Reorganization of Catholic Diocese of Wilmington, Inc., dated May 23, 2011, Docket Number 1321, and all Exhibits thereto; and (ii) any alterations, amendments and modifications to the Settlement Plan made after May 23, 2011, but only with the approval of the Hartford Insurers to the extent any such alterations, amendments or modifications affect the rights of the Hartford Insurers under the Settlement Plan.

20.    "Policies" means (a) the insurance policies listed on Exhibit 1 attached hereto, and (b) any other known or unknown primary, umbrella, excess, or other liability

insurance policies, contracts and or coverage's of any nature, type or kind, issued or

allegedly issued by Hartford under which the Diocese claims to be an insured, named

insured, additional insured, additional named insured, or otherwise entitled to any

insurance coverage or benefits.

21.    "Settlement Amount" means the sum of Two Hundred Fifty Thousand

Dollars ($250,000.00) to be paid on behalf of the Hartford Insurers pursuant to Section

2.2 of this Agreement.

22.    As used in this Agreement, the singular and masculine gender shall mean

also the plural and feminine or neuter, as may be appropriate, "it" shall include "he" and

"she"; and "each" and "all" includes "each" and "every."

Unless the context of this Agreement otherwise requires, (1) words using the

singular or plural number also include the plural or singular number, respectively; (2) the

terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire

Agreement: (3) the words "include, "includes" or "including" shall be deemed to be

followed by the words "without limitation," and (4) the word "or" shall be disjunctive but

not exclusive.

References to this Agreement and other documents shall be deemed to include all

subsequent amendments and other modification thereto.

II.    SALE OF POLICIES AND PAYMENT OF SETTLEMENT AMOUNTS

2.1    Subject to all of the terms and conditions of this Agreement, in full and

final settlement of all responsibilities under and arising out of the Policies, and in

consideration of the conveyance of the Policies to the Hartford Insurers, the Hartford

Insurers shall purchase from the Diocese, and the Diocese shall sell, convey, transfer and deliver to the Hartford Insurers, upon payment of the Settlement Amount, each of the Policies, and any and all rights under the Policies, free and clean of any and all Interests of any and all Persons.  Upon payment of the Settlement Amount, and upon request of the Hartford Insurers, the Diocese shall execute and deliver to the Hartford Insurers a bill of sale, in form and substance acceptable to the Hartford Insurers, evidencing such sale of the Policies to the Hartford Insurers.

2.2    Subject to all of the terms of this Agreement in full and final settlement of all responsibilities under and arising out of the Policies, and in consideration of the sale of the Policies to the Hartford Insurers free and clear of any and all Interests of any Person, First State Insurance Company shall pay to the Diocese the Settlement Amount within thirty (30) days after ~~the Approval Date~~<u>receiving written notice from the Diocese that all Conditions Precedent to the Effective Date of the Settlement Plan (as those terms are defined in the Settlement Plan) other than the funding of the Settlement Trust, as set forth in Section 15.1 of the Settlement Plan, have been met</u>.  The Diocese covenants and agrees, and the Plan of Reorganization shall provide, that the proceeds of the Settlement Amount shall be used only for the purpose of paying liabilities of the Diocese related to sexual molestation Claims being resolved under the Plan of Reorganization.

2.3    The Parties agree that (i) the Settlement Amount is the total amount Hartford  is obligated to pay on account of any and all Claims of any kind made under or related to the Policies; (ii) under no circumstance will Hartford ever be obligated to make any additional payments to the Diocese, or any other Person in connection with the

Policies; (iii) all limits of liability of the Policies, including all per occurrence and

aggregate limits, shall be deemed fully and property exhausted; (iv) the Settlement

Amount is the full purchase price of the Policies, and upon payment of the Settlement

Amount, the Hartford Insurers shall be deemed to own the Policies free and clear of any

and all Interests of any Person; (v) subject to the terms of this Agreement and the

occurrence of the Approval Date, Hartford shall have no further obligation to the

Diocese, or any other Person under the Policies for any Claim; and (vi) the Settlement

Amount is at least equal to the fair value of the Policies.

~~2.4      [RESERVED]~~

2.4    Effective immediately upon payment of the Settlement Amount, and
without any further action by any of the Parties, all of the Diocese's rights and the rights
of all other Persons under and with respect to the Policies shall be permanently and
irrevocably extinguished as if the Policies had never been issued.

III.    BANKRUPTCY-RELATED OBLIGATIONS

3.1    Within thirty (30) calendar days after the Execution Date, the Diocese shall,

pursuant to Bankruptcy Rule 3016, file a Plan of Reorganization providing for approval

of this Agreement and the Injunction, and shall use reasonable best efforts to obtain entry

of the Confirmation Order as a Final Order.  The Diocese covenants and agrees that it

will use his best efforts to obtain the Confirmation Order and that it will vigorously

defend any objection to the approval of this Agreement, or to confirmation of its Plan of

Reorganization, by any party.  The disclosure statement with respect to the Plan of

Reorganization shall contain a description of the Injunction that complies with Rule 3016(c).

3.2     If the Confirmation Order or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), the Diocese agrees to take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion; provided however, that nothing herein shall preclude the Parties from consummating the transactions contemplated herein if the Confirmation Order shall have been entered and has not been stayed and the Hartford Insurers, in their sole discretion, waive in writing the requirement that the Confirmation Order be a Final Order; provided, however, that in the event the Plan of Reorganization does not become effective, then this Agreement shall be null and void. [RESERVED]

3.3     Each of the Parties further agrees not to take any appeal from, or to seek to reopen, reargue or obtain reconsideration of, or otherwise contest or challenge in any way, directly or indirectly, any aspect of the Confirmation Order providing for approval of this Agreement, or any other order provided for by, or executed or entered pursuant to, or in implementation of, this Agreement, except to the extent that any such order shall be inconsistent with the terms hereof.

3.4     The Diocese agrees to cooperate with the Hartford Insurers and their representatives in connection with the Confirmation Order and the Bankruptcy Cases. Such cooperation shall include consulting with the Hartford Insurers at their request concerning the status of the Bankruptcy Cases, including the status of the Plan of

Reorganization, and providing the Hartford Insurers with copies of requested pleadings, notices, proposed orders and other documents relating to the Bankruptcy Cases, the Motion and/or the service of the Motion as soon as reasonably practicable. The Diocese further covenants and agrees that the Diocese will not submit to the Bankruptcy Court for approval any motion, adversary proceeding, filing or other request the approval of which could conflict with, supersede, abrogate, nullify, modify or restrict the terms of the Agreement and the rights of Hartford hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction that is contemplated by or approved pursuant to the Confirmation Order, to the extent necessary to give effect to this Agreement.

3.5    In the event any Person asserts a Claim against Hartford after the Approval Date, arising out of or related to any matter released by this Agreement, Hartford shall notify the Diocese and the Diocese shall immediately seek an order from the Bankruptcy Court enjoining such Claim.

3.6    On the same day the Diocese files its Plan of Reorganization, or as soon as practicable thereafter, the Diocese shall serve a copy of the Plan of Reorganization on (i) each Person known to the Diocese to have a Claim against it through participating in the Bankruptcy Case, the filing of a lawsuit, or the filing of a proof of claim or other assertion of a Claim, or otherwise (or to his, her, or its counsel of record); (ii) any and all Persons known to the Diocese entitled or allegedly entitled to insurance coverage under the Policies, including additional insureds (or Persons claiming to be additional insureds) and those Persons falling within a policy definition of "named insured"; (iii) all other

Persons who or that have filed timely proofs of claim in the Bankruptcy Case; (iv) all

Persons on the master service list maintained in the Bankruptcy Case; (v) all liability

insurers from which the Diocese has sought coverage for any sexual molestation Claim;

and (vi) all other parties in interest pursuant to Bankruptcy Rules 2002 and 6004 and any

other applicable local rules, including any Person who or that filed a notice of appearance

and demand for service of papers in the Bankruptcy Case.  In addition, to ensure the

broadest notice possible, the Diocese shall publish notice of the Plan of Reorganization

and the hearings on confirmation thereof, in USA Today.  As soon as reasonably practical

after filing the Plan of Reorganization, the Diocese shall file in the Bankruptcy Case a

certificate of the service provided by mail and by publication.

     3.7    Any Claim that Hartford may have that shall arise out of the Diocese's

obligations under this Agreement, and that shall arise prior to the Plan of Reorganization

becoming effective, shall be a post-petition administrative expense.  Any Claim that

Hartford may have that shall arise out of the Diocese's obligations under this Agreement,

and that shall arise after the Plan of Reorganization becoming effective, shall be an

obligation of the Reorganized Diocese.

IV.   <u>RELEASE</u>

     4.1    Effective upon the Approval Date, and without any further action of the

Parties:

         (a)    The Diocese hereby fully, finally, and completely remises, releases,

acquits and forever discharges Hartford from any and all Claims whether actual or

alleged, known or unknown, accrued or unaccrued, existing or potential, suspected or

unsuspected with respect to, relating to, or in any way arising out of the Policies.  The release of Hartford under this Section 4.1 of the Agreement shall include, but shall not be limited to, any and all Claims for coverage with respect to, relating to, or in any way arising out of the Policies whether for property damage, bodily injury, personal injury, advertising injury, or any other form of loss covered, or potentially covered, under the Policies.  In addition, the Diocese, hereby withdraws any and all requests, demands, or tenders for defense or indemnity previously submitted to Hartford under the Policies and further surrenders, relinquishes, and releases any further right to tender or present any Claims whatsoever to Hartford under the Policies.  Furthermore, by virtue of the foregoing releases, Hartford shall have no duty to defend or indemnify the Diocese with respect to any past, present, or future Claim, nor shall Hartford have any other duty or obligation whatsoever to any other Person with respect to any and all Claims arising out of, in connection with, and relating to the Policies.

(b)    Hartford hereby fully, finally, and completely remises, releases, acquits and forever discharges the Diocese from any and all Claims whether actual or alleged, known or unknown, accrued or unaccrued, existing or potential, suspected or unsuspected with respect to, relating to, or in  any way arising out of the Policies. Hartford also waives any and all rights of subrogation, indemnification, and/or contribution that it has, or may have, against any person as a result of or on account of its payment of the Settlement Amount, including without limitation any rights based on any "Other Insurance" clause in the Policies.———— [RESERVED]

4.2     Releases Do Not Extend To Obligations Under The Agreement. The releases set forth in Section 4.1 of this Agreement are not intended to, and shall not, extend to or otherwise release or discharge any rights, privileges, benefits, duties, or obligations of an of the Parties by reason of, or otherwise arising under, this Agreement.

4.3     Changes In Fact Or Law. The Parties acknowledge that there may be changes in the law with respect to interpretation of coverage under the Policies or otherwise and/or the Parties may hereafter discover facts different from, or in addition to, those which they now believe to be true with respect to any and all of the claims herein released. Nevertheless, the Parties hereby agree that the releases set forth above shall be and remain effective in all respects, notwithstanding any changes in the law and/or the discovery of such additional or different facts. Moreover, the Diocese understands that Claims that have been or may be asserted against the Diocese may increase or decrease in amount or in severity over time, that Claims that have been or may be asserted against the Diocese may include progressive, cumulative, unknown, and/or unforeseen elements, and that there may be hidden, unknown, and unknowable damages, defense expenses, or other costs related to such Claims. Nevertheless, the Parties irrevocably and knowingly agree that the releases contained in Section 4.1 of this Agreement include a full and complete and irrevocable release and discharge from all known and unknown rights or Claims or Interest arising out of, in connection with, and/or relating to the Policies.

4.4     General Release. In furtherance of their express intent to fully, finally, and irrevocably release and discharge each other for all Claims, known and unknown,  as set forth in this Section 4 of the Agreement, each of the Parties expressly waives any and all

rights it may have under any contract, statute, code, regulation, ordinance, or the common law, which may limit or restrict the effect of a general release as to Claims released herein, arising out of, in connection with, and/or relating to the Policies.

 4.5 <u>Reinsurance</u>. The releases set forth in this Section 4 of the Agreement shall not apply to or have any effect on Hartford's right to any claim for reinsurance in connection with the Policies.

 4.6 <u>Beneficiaries Of Release</u>. Subject to the other provisions of this Agreement, to the extent that the releases set forth in this Section 4 of the Agreement run to the favor of any Persons who are not signatories hereto, this Agreement is hereby declared to be made in and for their respective benefits and uses.

 4.7 <u>No Assignment Of Claims</u>. The Diocese warrants and represents that it has not sold, assigned, transferred, conveyed, or otherwise disposed of any Claims that it has, or may ever have, against Hartford and the Hartford Insurers. Moreover, the Diocese represents, warrants, and agrees that it will not in any way assist any Person in the establishment of any Claim against Hartford that arises out of, results from, or in any way relates to, Hartford's investigation, handling, defense, or settlement by Hartford of Claims released under this Agreement.

## V. <u>REPRESENTATIONS AND WARRANTIES OF THE PARTIES</u>

 Each of the Parties separately represents and warrants as follows:

 a) Subject to the entry of the Confirmation Order, it or he has the requisite power and authority to enter into this Agreement and to perform the obligations imposed on it by this Agreement;

b)      Subject to the Approval Date, the execution and delivery of, and the performance of the obligations contemplated by this Agreement have been approved by duly authorized representatives of the Party, and by all other necessary actions of the Party;

c)      Each Party has expressly authorized its or his undersigned representative to execute this Agreement on the Party's behalf as its or his duly authorized agent;

d)      This Agreement has been thoroughly negotiated and analyzed by its or his counsel and has been executed and delivered in good faith, pursuant to arm's length negotiations, and for value and valuable consideration; and

e)      Each Party will use its best efforts to seek entry of the Approval Order.

VI.    <u>JUDGMENT REDUCTION</u>

The Diocese hereby agrees that, with respect to any Claim, case, controversy, arbitration, lawsuit or other proceeding of any kind involving the Diocese:

a)      The Diocese will not seek to obtain payment from any Other Insurer of any amount that may be attributable or allocable to Hartford under the Policies; and

b)      Without limiting the effect of the Injunction and the releases (set forth in Section 4 of this Agreement), in the event that any Other Insurer obtains a judicial determination, settlement or binding arbitration award that it is entitled to obtain a sum certain from Hartford as a result of a Claim for contribution, subrogation, indemnification or other similar Claim against Hartford for Hartford's alleged share or

equitable share, or to enforce subrogation rights, if any, of the defense and/or indemnity obligations of Hartford for any Claims released pursuant to this Agreement, the Diocese shall voluntarily reduce its judgment or Claim against, or settlement with, such Other Insurer(s) to the extent necessary to eliminate such contribution, subrogation or indemnification Claims against Hartford.  To ensure that such a reduction is accomplished, Hartford shall be entitled to assert this Section 6 as a defense to any action for any such portion of the judgment, settlement, or binding arbitration award, and shall be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction and to protect Hartford from any liability for the judgment, settlement, or binding arbitration award or any portion thereof.

   c)  Neither the Hartford nor the Hartford Insurers shall seek reimbursement for any payments they are obligated to make under this Agreement, whether by way of a Claim for contribution, subrogation, indemnification or otherwise from any Other Insurer or from anyone other than Hartford's reinsurers in their capacity as reinsurers of Hartford.  Notwithstanding and foregoing, if a third party pursues a contribution, subrogation or indemnification Claim against Hartford relating to any of the Policies, then Hartford shall be free to assert such a Claim against such third party notwithstanding any provision in this Agreement to the contrary.  The Diocese shall use its reasonable best efforts to obtain from all Other Insurers with which the Diocese executes a settlement after the Execution Date, agreements similar to those contained in this Section 6.c.

VII. <u>MISCELLANEOUS PROVISIONS</u>

~~7.1    Termination Rights.  [RESERVED]~~

7.1     Termination Rights.  If the Bankruptcy Court declines to enter the

Confirmation Order, or if the Confirmation Order is vacated, modified in a way that is

not acceptable to the Hartford Insurers, or reversed on appeal, the Hartford Insurers may

terminate this Agreement by delivering written notice to the Diocese.  In the event that

the Hartford Insurers terminate this Agreement, (1) the Agreement shall be deemed null

and void; (2) the Hartford Insurers shall not be obligated to pay the Settlement Amount

pursuant to this Agreement; (3) Hartford and the Diocese shall have all of the rights,

defenses and obligations under or with respect to any and all Policies that they would

have had absent this Agreement; and (4) any and all otherwise applicable statutes of

limitations or repose, or other time-related limitations, shall be deemed to have been

tolled for the period from the Execution Date through the date that the Agreement

becomes null and void pursuant to the terms of this Agreement.

7.2     Amendments.  Neither this Agreement nor any term set forth herein may be

changed, waived, discharged, or terminated except by a writing signed by the Parties (or

their successors or assigns).

7.3     No Precedential Value.  The settlement reflected in this Agreement shall be

without precedential value, and it is not intended to be, nor shall it be construed as, an

interpretation of any insurance policies.  It shall not be used as evidence, or in any other

manner, in any court or other dispute resolution proceeding, to create, prove, or interpret

the obligations of Hartford under any insurance policies issued to the Diocese or to any

other Person, provided, however, that this Agreement may be used as evidence in any defense of Hartford of any obligation arising under the Policies.

7.4    Agreement Voluntarily Entered Into By Each Of The Parties.  This Agreement is executed voluntarily by each of the Parties without any duress or undue influence on the part, or on behalf, of any of them.  The Parties represent and warrant to each other that they have read and fully understand each of the provisions of this Agreement and have relied on the advice and representations of competent legal counsel of their own choosing.

7.5    Interpretation.  This Agreement has been negotiated at arm's length and between and among Persons sophisticated and knowledgeable in the matters dealt with in this Agreement.  In addition, this Agreement was drafted by experienced and knowledgeable legal counsel for each of the Parties.  Accordingly, neither Party shall be presumptively entitled to have any provisions of the Agreement construed against the other Party in accordance with any rule of law, legal decision or doctrine.

7.6    No Admission of Liability.  The Parties agree that this Agreement is the result of a compromise of disputed issues of coverage, and that the execution and delivery of this Agreement by any of the Parties shall not constitute or be construed as an admission of any liability, a course of performance, or wrongdoing on the part of any of them.  The Parties acknowledge that this Agreement is not, and cannot be construed as, any admission by Hartford that any defense, indemnity, or other coverage obligation exists under the Policies, or that Hartford has any other obligation of any nature whatsoever with respect to the Policies.  By entering into this Agreement, neither the

Diocese nor Hartford has waived nor will be deemed to have waived any right, obligation, privilege, defense or position it may have asserted or might assert in connection with any claim, matter, Person, or insurance policy outside the scope of this Agreement. No Person other than the Parties hereto shall have any legally enforceable rights or benefits under this Agreement except as specifically set forth in Section 4.6 of this Agreement.

7.7     <u>Attorneys' Fees, Costs, And Expenses</u>. Each of the Parties shall bear its own costs, attorneys' fees, and expenses in connection with the negotiations for and preparation of this Agreement.

7.8     <u>Entire And Integrated Agreement</u>. This Agreement is intended by the Parties as a final expression of their agreement and is intended to be a complete and exclusive statement of the agreement and understanding of the Parties with respect to the subject matters contained herein. This Agreement supersedes any and all prior promises, representations, warranties, agreements, understandings, and undertakings between or among the Parties with respect to such subject matters, and there are no promises, representations, warranties, agreements, understandings, or undertakings with respect to such subject matters other than those set forth or referred to herein.

7.9     <u>No Third Party Beneficiaries</u>. Except as set forth in Section 4.6 of this Agreement, nothing in this Agreement is intended or shall be construed to give any Person, other than Hartford and the Diocese and their respective successors and permitted assigns, any legal or equitable right, remedy, or claim under or in respect to this Agreement or any provisions contained herein; this Agreement and any conditions and

provisions hereof being and intended to be for the sole and exclusive benefit of Hartford and the Diocese as well as each of their successors and permitted assigns, and for the benefit of no other Person.  Notwithstanding the foregoing, neither this Agreement nor the rights and obligations set forth herein shall be assigned without the prior written consent of the other Party, except that this Section shall not prohibit any assignment by a Hartford Insurer (a) made by merger, consolidation, or operation of law or (b) to a Person who succeeds to all or substantially all of such Hartford Insurer's assets.

7.10   Notice.  Any notice or request required or desired to be given pursuant to this Agreement shall be sufficient if made in writing and sent by first class mail, postage prepaid, or facsimile to the Parties at the addresses set forth below or to such other Persons as any of them may designate in writing from time to time:

a.       As to Hartford:

John P. Rogers
The Hartford
Hartford Plaza
Hartford, CT 06155

As to the Diocese:
[Address]

Rev. Msgr. J. Thomas Cini
Vicar General for Administration
Catholic Diocese of Wilmington
P.O. Box 2030
Wilmington, DE 19899-2030

with a copy to:

Anthony G. Flynn, Esq.
Young Conaway Stargatt & Taylor LLP
The Brandywine Building

1000 West St., 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
aflynn@ycst.com

7.11  <u>Headings</u>.  The section titles, captions, and headings contained in this Agreement are inserted as a matter of convenience and for reference, and shall in no way be construed to define, limit, or extend the scope of this Agreement or the effect of any of its provisions.

7.12  <u>Recitals</u>.  The recitals set forth at the beginning of this Agreement shall not be admissible to prove the truth of the matters asserted in any action or proceeding involving any of the Parties (other than an action or proceeding brought to enforce the terms of this Agreement), nor do any of the Parties intend such recitals to constitute admissions of fact by any of them.

7.13  <u>Agreement Inadmissible</u>.  Any evidence of the terms or negotiations or discussions associated with this Agreement shall be inadmissible in any action or proceeding for purposes establishing any rights, duties or obligations of the Parties, except in (a) an action or proceeding to enforce the terms or effect of this Agreement, (b) proceedings before the Bankruptcy Court to secure the Approval Order, or (c) any possible action or proceeding between Hartford and any of its reinsurers bearing responsibility for any of Hartford's obligations under this Agreement.  Except as set forth herein, this Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Parties' rights or obligations to each other or to any other Person.

7.14   Additional Necessary Documents.  The Parties, and each of them, agree to execute such additional documents as may be reasonably required in order to carry out the purpose and intent of this Agreement, or to evidence anything contained herein.

7.15   Execution in Counterparts.  This Agreement may be signed in multiple counterparts and the separate signature pages executed by Parties may be combined to create a document binding on all of the Parties and together shall constitute one and the same instrument.

~~IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date set forth opposite the respective signatures below.~~

~~Dated: _____~~

**IN WITNESS WHEREOF, THIS AGREEMENT HAS BEEN READ AND SIGNED UNDER SEAL IN DUPLICATE ORIGINALS BY THE DULY AUTHORIZED REPRESENTATIVES OF THE PARTIES:**

**FIRST STATE  INSURANCE COMPANY**


By: _____ (SEAL)

Title: _____

Date: _____


**NUTMEG INSURANCE COMPANY**


**By:** _____ (SEAL)

**Title:** _____

**Date:** _____


**TWIN CITY INSURANCE COMPANY**


By: _____ (SEAL)

Title: _____

Date: _____

## CATHOLIC DIOCESE OF WILMINGTON, DELAWARE

By: _____ (SEAL)

Title: _____

Date: _____

## Exhibit 1

| | | |
|---|---|---|
| First State Insurance Co. | EU 0001642 | (7/22/86-6/30/87) |
| First State Insurance Co. | EU 0004550 | (6/30/87-7/1/88) |
| First State Insurance Co. | EU 0004610 | (7/1/88-7/1/89) |
| First State Insurance Co. | EU 0004636 | (7/1/89-7/1/90)[1] |
| First State Insurance Co. | FL 0000435 | (7/1/89-7/1/90) |
| First State Insurance Co. | FL 0000495 | (7/1/90-7/1/91) |
| First State Insurance Co. | FL 0002651 | (7/1/91-7/1/92) |
| First State Insurance Co. | FL 0002698 | (7/1/92-7/1/93) |
| Nutmeg Insurance Co. | YA 0000130 | (7/1/93-7/1/94) |
| Nutmeg Insurance Co. | QK 0000151 | (7/1/94-7/1/95) |
| Twin City Insurance Co. | KK 0000157 | (7/1/95-7/1/96) |
| Twin City Insurance Co. | KK 0000161 | (7/1/96-7/1/97) |

---

[1] Policy cancelled flat and rewritten to policy FL 0000435

Document comparison by Workshare Professional on Thursday, July 28, 2011 1:17:37 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://WORKSITE01/YCST01/11206411/1 |
| Description | #11206411v1<YCST01> - Buyback - Hartford -- Redacted 6/24/11 |
| Document 2 ID | interwovenSite://WORKSITE01/YCST01/11244084/1 |
| Description | #11244084v1<YCST01> - CDOW - Hartford Buy-back Agreement |
| Rendering set | standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 36 |
| Deletions | 15 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 51 |

b.    **Blackline of Fireman's Fund Insurance Company, Adriatic Insurance Company, Allianz S.p.A. and Allianz**

# SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release is entered into by and among the Catholic Diocese of Wilmington, Inc. and Fireman's Fund Insurance Company, Adriatic Insurance Company, Allianz S.p.A. and Allianz, as of the date of the execution of this Agreement by all parties hereto, and in accordance with the terms and conditions set forth below.

## Background[1]

WHEREAS, FFIC allegedly issued to CDOW certain policies of insurance affording insurance coverage to CDOW subject to the terms, conditions, exclusions and limits of liability applicable thereto;

WHEREAS, CDOW has been named as a defendant in various suits alleging sexual abuse and molestation by priests and other individuals affiliated with CDOW;

WHEREAS, CDOW has notified FFIC of the claims and suits which have been asserted against it and has demanded that FFIC defend and indemnify it in connection therewith pursuant to the Policies;

WHEREAS, FFIC has denied that CDOW is entitled to any defense or indemnity in connection with claims and suits arising from the underlying claims of sexual abuse and molestation asserted against CDOW;

WHEREAS, CDOW commenced its Bankruptcy Case, by filing its voluntary petition for relief under the Bankruptcy Code on October 18, 2009, in the Bankruptcy Court;

WHEREAS, CDOW has filed a proposed Settlement Plan in the Bankruptcy Case seeking to, *inter alia*: (i) channel all past, present and future Survivor Claims against CDOW to a Trust to be established upon confirmation of the Settlement Plan, (ii) discharge the liabilities

---

[1]    All capitalized terms refer to terms as defined in the Definitions section, *supra*.

associated with the Survivor Claims, and (iii) obtain releases for various non-debtor entities, including, without limitation, FFIC, from any and all Survivor Claims;

WHEREAS, FFIC contends that questions of insurance coverage are presented by CDOW's claim for defense and indemnification from FFIC under the Policies;

WHEREAS, CDOW and FFIC now desire to compromise, settle and adjust fully and finally all disputes which now or hereafter may exist between them with respect to any and all claims, known and unknown, past, present or future, which have or may arise under any and all coverages of the Policies, including without limitation any general liability, personal injury, products liability, completed operations, premises, operations, property, automobile or contractual coverage which may be contained therein, (hereinafter collectively referred to as "all coverages"), pursuant to a sale of all right, title and interest of CDOW in the Policies to FFIC under sections 363 and 1123 of the Bankruptcy Code and a general release of all obligations of FFIC under the Policies, and otherwise on the terms hereinafter set forth.

WHEREAS, the rights and obligations of the parties specified herein are each separate material rights and obligations of the parties under this Agreement, and that the parties would not have entered into this Agreement without the specific promises of the other party to perform such obligations. The failure by either party to perform any of the obligations or abide by any of the rights owing to the other party specified herein, would constitute a material breach of this Agreement excusing further performance of the other party under this Agreement.

NOW, THEREFORE, with the foregoing Background incorporated herein by reference, in consideration of the foregoing and the mutual promises and covenants set forth below, CDOW and FFIC mutually agree, as follows:

1.  <u>Definitions</u>.  As used in this Agreement, the following defined terms shall have the following meanings:

1.1.  "Agreement" means this Settlement Agreement and Release.

1.2.  "Approval Motion" means a motion or motions, as the case may be, to be filed by CDOW pursuant to Bankruptcy Rule 9019 requesting the Bankruptcy Court to enter the Approval Order (and to the extent required by section 105(a) of the Bankruptcy Code, the United States District Court) that includes, without limitation, [RESERVED]the Channeling Injunction in the Settlement Plan in favor of FFIC, in form and substance acceptable to FFIC, in its reasonable sole discretion, pursuant to section 105(a) of the Bankruptcy Code restraining, enjoining and prohibiting CDOW, any and all holders of Claims, whether presently known or unknown, any Non-Debtor Insured and any other Person from (i) commencing, continuing, or otherwise proceeding against FFIC or anyone acting on its behalf, directly or indirectly, to collect, recover or receive payment of, or in connection with, any Claims, or taking any other actions against FDIC, or anyone acting on its behalf, relating to any Claims and/or Policies; and (ii) satisfying, enforcing, levying, attaching, collecting, or otherwise recovering against FFIC, or anyone acting on its behalf, by any means or in any manner, whether directly or indirectly, any settlement or judgment relating to, or in connection with, any Claims and/or the Policies.

1.3.  "Approval Order" means [RESERVED].an order of the Bankruptcy Court, in the form attached hereto as Exhibit "A," approving this

Agreement and authorizing CDOW to perform the obligations hereunder, which is requested pursuant to the Approval Motion.

1.4. "Bankruptcy Case" means the Chapter 11 case styled *In re Catholic Diocese of Wilmington, Inc.*, commenced on October 18, 2009, and pending in the Bankruptcy Court, at Case No. 09-13560 (CSS).

1.5. "Bankruptcy Code" ~~means~~ means title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as now in effect or hereafter amended.

1.6. "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware, and the United States District Court for the District of Delaware with respect to any proceeding or portion of the Bankruptcy Case as to which it has withdrawn reference or shall have sole authority to enter a Final Order or judgment.

1.7. "CDOW" means, collectively, Catholic Diocese of Wilmington, Inc., on behalf of itself, and its predecessors, parents, subsidiaries, affiliated companies, successors in interest, and/or their shareholders, directors, and officers.

1.8. "Confirmation Order" means ~~an~~the order of the Bankruptcy Court (and to the extent required by section 105(a) of the Bankruptcy Code, or otherwise, the United States District Court) confirming the Settlement Plan pursuant to ~~section~~§ 1129 of the Bankruptcy Code, ~~a Plan that includes, without limitation, [RESERVED]~~as such order may be amended, modified or supplemented , which Settlement Plan shall include, without limitation, the Channeling Injunction (as defined in the Settlement Plan) in favor

of FFIC, in form and substance acceptable to FFIC, in its sole discretion, pursuant to section 105(a) of the Bankruptcy Code restraining, enjoining and prohibiting CDOW, the Trust, any and all holders of Claims, whether presently known or unknown, any Non-Debtor Insured and any other Person from (i) commencing, continuing, or otherwise proceeding against FFIC or anyone acting on its behalf, directly or indirectly, to collect, recover or receive payment of, or in connection with, any Claims or taking any other actions against FFIC, or anyone acting on its behalf, relating to any Claims and/or Policies; and (ii) satisfying enforcing, levying, attaching, collecting, or otherwise recovering against FFIC, or anyone acting on its behalf, by any means or in any manner, whether directly or indirectly, any settlement or judgment relating to, or in connection with, any Claims and/or the Policies.

      1.9. "Claim" means (a) any right to payment asserted against CDOW and/or FFIC arising out of, or related to, any one or more of the Policies, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; (b) any right to an equitable remedy against CDOW and/or FFIC arising out of or related to any one or more of the Policies, for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured; and/or (c) any and all other claims, demands, allegations, duties, liabilities and obligations (whether presently known or unknown, asserted or unasserted, foreseen or unforeseen) of

any nature whatsoever, which have been, or could have been, or might be, asserted by CDOW and/or any other Person against FFIC based upon, arising out of, or relating to, any one or more of the Policies including, but not limited to, any Survivor Claims, any Insurance Coverage Claim, any contribution claims by other insurers of CDOW, bad faith or extra contractual claims under any statutory or other basis whatsoever, and attorneys' fees.

1.10.  "Effective Date" means the first business day (a) that is at least fourteen (14) days after entry of the Approval Order on the docket of the Bankruptcy Court; (b) on which all of the conditions precedent to settlement, as set forth in section [5] of this Agreement, have been satisfied or waived; ~~(c)~~ ~~[RESERVED];~~ and (~~d~~c) on which no stay pending appeal of the Approval Order or the Confirmation Order is in effect.

1.11.  "FFIC" means Fireman's Fund Insurance Company, Adriatic Insurance Company, Allianz S.p.A. and Allianz, collectively, on behalf of themselves and, for purposes of the Release, all of their predecessors, successors, assigns, and their past, present and future affiliates, parents, holding companies, merged and/or acquired companies, subsidiaries, divisions and/or companies or corporations owned, controlled or under their common ownership or control, and each of their respective past, present and future officers, directors, principals, shareholders in their status as shareholders, employees, attorneys, accountants, consultants, representatives and agents.

1.12.  "Final Order" means (a) a judgment, order or other decree approved or entered by any Court of the United States of America

(including, without limitation, the Bankruptcy Court), which judgment, order, or other decree has not been reversed, stayed, modified or amended and as to which the time to appeal, petition for certiorari, or seek reargument or rehearing has expired and as to which no appeal, reargument, petition for certiorari, or rehearing is pending or as to which any right to appeal, reargue, petition for certiorari or seek rehearing has been waived in writing in a manner satisfactory to Settling Insurers or, if an appeal, reargument, certiorari, or rehearing thereof has been sought, the order or judgment of the Bankruptcy Court has been affirmed by the highest court to which the order was appealed or from which the reargument or rehearing was sought, or certiorari has been denied, and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

   1.13. "Insurance Coverage Claim" means any Claim by any Person for indemnification, contribution, ultimate net loss, defense, defense costs, subrogation, reimbursement, payment of any sum or performance of any obligation under any provision of the Policies, arising out of Claims asserted against CDOW for actual, potential, or alleged bodily injury, emotional distress, sickness, disease, or the fear or apprehension thereof, property damage, environmental impairment, economic loss, breach of fiduciary duty, personal injury, contractual liability, loss, negligence, or arising from or out of any other Claim of any nature against CDOW that gives rise to or potentially gives rise to coverage under the Policies.

1.14.  "Non-Debtor Insured" means any Person other than

CDOW that is also an actual or alleged named insured, or additional insured

under, or in any manner claims an interest in, any of the Policies or any proceeds

thereof.

1.15.  "Person" means any individual, corporation,

partnership, limited liability company, unincorporated company or association,

trust, joint venture, or any other form of legal entity or organization, including,

without limitation, any government or political subdivision or any agency or

instrumentality thereof.

1.16.  ~~1.15.~~  "Parties" means CDOW, FFIC and the Trust, to

the extent provided by section [ ]1 of this Agreement.

1.17.  ~~1.16.~~  ~~"Plan" means the Chapter 11 Plan of~~

~~Reorganization of Catholic Diocese of Wilmington, Inc., dated _____, 2011~~

~~(as may be modified or amended from time to time).~~

~~1.17.~~  "Policies" means any and all insurance policies of any kind

whatsoever, whether known or unknown, alleged or confirmed, and whether or not identified,

which were, at any time prior to execution of this Agreement, issued or alleged to have been

issued by FFIC to CDOW and the Non-Debtor Insureds, or naming CDOW and/or the

Non-Debtor Insureds as an additional insured, or under which CDOW and/or the Non-Debtor

Insureds assert or may assert a right to coverage, including, without limitation, those insurance

policies set forth on Exhibit "B" attached hereto.

1.18.  "Release" means the release set forth in section [3] of

this Agreement.

1.19.  "Settlement Plan" means (i) the Settlement Plan set forth in the Second Amended Chapter 11 Plan of Reorganization of Catholic Diocese of Wilmington, Inc., dated May 23, 2011, Docket Number 1321 and all Exhibits thereto; and (ii) any alterations, amendments and modifications to the Settlement Plan made after May 23, 2011, but only with the express written consent of FFIC.

1.20.  1.19.  "Survivor Claims" means [claims of sexual abuse and molestation as defined in the Settlement Plan.]

1.21.  1.20.  Each defined term stated in a singular form shall include the plural form, and each defined term stated in a plural form shall include the singular form.

2.  Settlement, Purchase And Sale of Policies.  In settlement and full and final accord and satisfaction of all disputes between the Parties, and subject to all of the terms and conditions contained in this Agreement, upon the Effective Date, FFIC shall purchase from CDOW, and CDOW shall sell, convey, assign, transfer and deliver to FFIC, each of the Policies, and any and all rights under the Policies, free and clear of any liens, claims and/or interests of all persons or entities to the fullest extent permissible under the Bankruptcy Code and other applicable law.  In consideration of the sale of the Policies to FFIC, and the Release of FFIC as provided herein, and subject to all of the terms and conditions contained in this Agreement, FFIC agrees to pay to CDOW the total sum of $650,000 (Six Hundred and Fifty Thousand Dollars) (the "Settlement Amount").  The Settlement Amount shall be paid within twenty (20) days of the Effective Date.  Such payment shall be in consideration of the sale of the Policies, the Release, and otherwise in full and final settlement of any and all claims, past, present and future, which

have been or which hereafter may be asserted by CDOW, the Trust or by any other Person for defense and/or indemnification from FFIC under any and all coverages of the Policies. CDOW expressly acknowledges and agrees that the payment by FFIC of the Settlement Amount is given in exchange for a complete policyholder release commuting all coverage under the policies issued by FFIC to CDOW, the effect of which shall be as if no coverage was ever issued by FFIC to CDOW, and that no further claims or requests for coverage under any and all coverages of the Policies will be made by CDOW and/or the Trust upon FFIC.

    2.1.  CDOW acknowledges that in consideration of the payment by FFIC of the Settlement Amount to CDOW, any and all obligations which now or hereafter may exist on the part of FFIC arising from the claims which have been or which hereafter may be asserted by CDOW under any and all coverages of the Policies will be deemed to have been extinguished. CDOW expressly accepts the payment by FFIC of the Settlement Amount to CDOW in full and complete satisfaction of any and all obligations which now or may exist on the part of FFIC with respect to any request for insurance coverage from CDOW under any and all coverages of the Policies, including but not limited to any obligation on the part of FFIC to investigate, defend, pay legal fees or costs, or to pay administrative or consulting costs or fees, costs associated with psychological care, counseling or related efforts to address claims involving intentional or negligent infliction of emotional distress involving underlying claims against CDOW, settle claims or suits, or to pay or contribute to settlements, or judgments, investigative or remedial costs pertaining thereto.

2.2.  The proceeds of the Settlement Amount shall be used for the sole and exclusive purposes of:

2.2.1.  Payments to holders of Survivor Claims in the Bankruptcy Case as provided by the Settlement Plan; *provided, however*, that FFIC shall have no liability or responsibility for any allocation of the Settlement Amount among holders of any allowed Survivor Claims or their respective attorneys; and

2.2.2.  [RESERVED]. Payment of any of CDOW's and/or the Trust's indemnification obligations pursuant to section [6] of this Agreement.

2.3.  The Parties expressly agree that the Settlement Amount is the total amount that FFIC is obligated to pay on account of, or in connection with, the sale of the Policies and the Release; and under no circumstances will FFIC ever be obligated to make any payments, other than the Settlement Amount, to CDOW, the Trust, or any other person or entity, on account of Survivor Claims or any and all other claims in connection with the Policies.  The Parties further agree that the Settlement Amount is at least equal to the fair value of the Policies, and that upon implementation of the terms of this Agreement pursuant to an Approval Order (as defined herein), FFIC shall be deemed to own the Policies free and clear of any liens, claims and/or interests of CDOW, the Trust, or any other person or entity.  FFIC may allocate the Settlement Amount to and among the respective Policies in any manner it deems appropriate.

2.4.  [RESERVED].

3. <u>Release</u>. In consideration of the mutual obligations and undertakings of the

Parties set forth herein, including FFIC payment of the Settlement Amount, CDOW does hereby,

as of the Effective Date, compromise, settle, discharge and irrevocably, unconditionally, fully

and finally release, acquit, hold harmless and forever discharge FFIC from any and all past,

present and future Claims, debts, demands, allegations, actions, causes of actions, suits, duties,

dues, sums of money, bills, accounts, reckonings, bonds, specialties, indemnities, exonerations,

covenants, contracts, controversies, agreements, promises, doings, omissions, trespasses,

variances, damages, judgments, extents, costs, expenses, losses, exposures, executions, violations

of law, fines, penalties, responsibilities, obligations and liabilities whatsoever, whether in law or

equity or otherwise, of whatever character, nature or kind, whether arising out of bodily injury,

property damage, personal injury or otherwise, whether known or unknown, suspected, claimed

or alleged, fixed or contingent, that CDOW [RESERVED]and/or any Person ever had (from the

beginning of the world to the Effective Date) may now have, or hereafter can, shall, or may have

against FFIC based upon, arising, directly or indirectly, out of events concerning, in any way,

manner or fashion related to, connected with, or having anything to do with the Claims and/or

the Policies.

    3.1. It is expressly acknowledged that this Release

    includes, without limitation, any actions or claims for insurance coverage,

    breaches of insurance contracts, costs, liabilities, consequential damages,

    noncontractual or extra-contractual damages, bad faith, breach of any duty of

    good faith and fair dealing, actual or constructive fraud, misrepresentation,

    insurer misconduct, misfeasance and/or malfeasance, insurance code violations,

    Unfair Claims Practices Act or other similar statutes of each of the 50 states, the

District of Columbia or wherever (where applicable), any other alleged wrongdoing whether sounding in contract, tort or any other theory, prejudgment interest, penalty interest, attorneys fees or exemplary or punitive damages, which CDOW and/or any other Person now, or in the future, owns or holds, or has at any time prior hereto owned or held with respect to any and all claimed, potential or actual obligations of FFIC under the Policies, based on any act or omission in the handling or disposition of any request that insurance be issued or any request for insurance coverage tendered to FFIC, the making, drafting, negotiation, execution or performance of this Agreement.   CDOW acknowledges that it has no Claims or causes of action against FFIC for bad faith or extra-contractual damages with respect to or arising out of the Policies or otherwise.

      3.2.   The Parties acknowledge that certain Claims for which CDOW has sought coverage under the Policies (especially Survivor Claims) that have been or may be asserted against CDOW may increase or decrease in amount or in severity over time; that such Claims may include progressive, cumulative, unknown and/or unforeseen elements; and that there may be hidden, unknown, and unknowable damages, defense expenses, or other costs related to such claims.   Nevertheless, CDOW agrees that any and all duties and obligations of FFIC, of any kind or nature whatsoever, past, present or future, that exist or might be deemed to exist under or in connection with the Policies and the Claims, are hereby satisfied, discharged, terminated and released and a complete cancellation, rescission, extinguishment, voiding and termination of the Policies, and a complete waiver, surrender and abandonment of any and all

past, present and future rights and insurance coverage under the Policies, is hereby effected. CDOW acknowledges that the effect of this Agreement and this Release is that the Policies shall be considered null and void *ab initio* and of no further force and effect, and that CDOW has no liability insurance coverage from FFIC arising under and/or pursuant to the Policies or otherwise; that all limits of the Policies of whatever nature, shall be deemed fully and properly exhausted as of the Effective Date; and the original Policies shall be immediately surrendered to FFIC for cancellation without further demand or notice.

3.3. This Agreement and this Release fully and finally settle all disputes and obligations by and among the Parties with respect to the Claims and/or the Policies. This Agreement is a permanent and binding accord and resolution of the rights and obligations of the Parties hereto with respect to all Claims by and among the Parties, whether known, unknown or unknowable, actual or contingent, foreseen or unforeseen, suspected or unsuspected, asserted or unasserted, past, existing, potential or future and each and every known and unknown, actual or contingent, suspected or unsuspected, anticipated or unanticipated, past, existing, potential or future Claim, cause of action, obligation, cost, expense, fee, liability, damage, demand, suit or proceeding against CDOW, whether formal or informal, or request for relief or action or forbearance of any kind, nature or description, whether made or threatened, by any Person, entity or agency against CDOW for or arising from a Claim. CDOW acknowledges that it has been advised by counsel in the negotiation of this Agreement, and expressly include within the scope of the waivers and releases

set forth in this Release all Claims that are not known to them or are not ascertainable at the time this Agreement is executed.

3.4. CDOW intends to release FFIC to the fullest extent permitted by law consistent with this Agreement, and will not assert any Claim or institute any action or proceeding or lawsuit (including, but not limited to, any counterclaims, cross-claims, or third party complaints) or proceeding of any nature whatsoever against FFIC with respect to the matters, conduct, transactions, occurrences, facts or circumstances alleged in, arising from, relating to, or concerning the Policies and/or the Claims. CDOW shall not commence against FFIC any action, suit or proceeding of any nature whatsoever with respect to the matters, conduct, transactions, occurrences, facts or circumstances alleged in, arising from, or related to, the Claims and/or the Policies. Without limiting any aspect of the Release, CDOW shall withdraw any and all requests, demands, or tenders for indemnity and/or defense previously submitted to FFIC under the Policies, and CDOW covenants that it will never tender or present any Claims whatsoever, including, without limitation, any Survivor Claims, to FFIC under the Policies. CDOW agrees that FFIC shall have no duty to defend or indemnify CDOW and/or any Non-Debtor Insured with respect to any Claim under the Policies, nor shall FFIC have any other duty or obligation to Debtors and/or any Non-Debtor Insured who claims any entitlement to coverage under, and/or proceeds of, the Policies.

3.5. In furtherance of its express intent to fully, forever and irrevocably release and discharge FFIC from all released Claims, known and

unknown, from the beginning of time until the end of time, the ~~Estates~~Estate

expressly waive any and all rights they may have under any statute, code,

ordinance or the common law, which may limit or restrict the effect of a general

release as to released insurance coverage claims which the CDOW does not

know or suspect to exist in their favor at the time of the execution of this

Agreement, including, to the extent deemed applicable, any and all rights under

California Civil Code Section 1542, which provides as follows:

"A general release does not extend to claims which the creditor
does not know or suspect to exist in his favor at the time of
executing the release, which if known by him, must have
materially affected his settlement with the debtor."

CDOW understands and agrees that, by entering into this Agreement, they are expressly,

knowingly and intentionally waiving the provisions of California Civil Code Section 1542 and

electing instead to be bound exclusively by this Agreement. If, contrary to the specific intent of

CDOW, any released Insurance Coverage Claims conferred by, or arising out of statutory code

or regulations are deemed to exist despite the releases provided herein, the Estates hereby

forever, expressly and irrevocably waive entitlement to all such released Insurance Coverage

Claims, known and unknown, from the beginning of time until the end of time; and it is

expressly agreed that the provisions of California Civil Code Section 1542 do not apply.

3.6. FFIC hereby releases CDOW and all other persons or

entities identified as named insureds or additional named insureds under the

Policies from all claims which FFIC may have arising from CDOW's request for

insurance coverage from FFIC, including but not limited to any claims to recover

either the Settlement Amount or for any sums previously paid by FFIC with

respect to legal fees and costs incurred in connection with the defense of CDOW.

3.7.  [RESERVED].Upon receipt by CDOW of the Settlement

Amount, all pending claims for coverage by CDOW upon FFIC, including

without limitation any potential claims, shall be deemed withdrawn.

4.  Support of Settlement.  The Parties agree to support this Agreement including,

without limitation, cooperating and using their best efforts to take all actions as reasonably may

be required to obtain the approval of the Bankruptcy Court to this Agreement.  The Parties shall

provide sworn testimony, if necessary, in order for the Bankruptcy Court to determine that this

Agreement is a reasonable compromise settlement and was negotiated in good faith and is in the

best interest of creditors, and to ensure that the order approving this Agreement becomes a final

order.  CDOW shall also oppose actions taken by any person or entity either in opposition to

approval of this Agreement or directly against FFIC.  The costs and expenses of mailing and/or

publishing any notice with respect to the Approval Motion shall be paid for by CDOW.

4.1.  The Settlement Plan shall incorporate this Agreement

and otherwise shall not be inconsistent with the terms of this Agreement.

CDOW shall further use its best efforts to ensure that the Settlement Plan

includes a supplemental permanent injunction pursuant to section 105(a) of the

Bankruptcy Code in favor of all of FFIC channeling all Survivor Claims to the

Trust and enjoining the holders of Survivor Claims and any other person that

may assert any claim for coverage under the Policies from pursuing any such

claims against FFIC.  If a plan of reorganization is filed by any Person other than

CDOW, CDOW shall use its best efforts to obtain in any order confirming such

plan a supplemental permanent injunction pursuant to section 105(a) of the

Bankruptcy Code in favor of all of FFIC as set forth herein.

4.2.  Each of the Parties further agrees not to take any appeal from, or to seek to reopen, reargue or obtain reconsideration of, or otherwise contest or challenge in any way, directly or indirectly, any Approval Order provided for by, entered pursuant to, or in implementation of, this Agreement, except to the extent that any such Approval Order (i) shall be materially inconsistent with the terms hereof; or (ii) the appeal relates to issues other than the settlement contemplated by this Agreement.  If the Confirmation Order or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), CDOW agrees to take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion; provided however, that nothing herein shall preclude the Parties from consummating the transactions contemplated herein if the Confirmation Order shall have been entered and has not been stayed and FFIC, in its sole discretion, waives in writing the requirement that the Confirmation Order be a Final Order.

4.3.  Each Party further agrees that it shall, at its expense and at any reasonable time and from time to time, at the request of the other Party hereto, take such action and execute and deliver (and cause its attorneys to execute and deliver) any and all further instruments and documents, including, without limitation, a bill of sale in form and substance acceptable to FFIC, evidencing the sale of the Policies to FFIC, that are reasonable and necessary for the purpose of implementing and giving full force and effect to, the provisions of this Agreement, and any Approval Order.  From and after the Approval Order

becomes a final order, the Parties shall take all actions reasonably necessary, including, without limitation, seeking injunctive relief, to ensure that this Agreement, and any Approval Order are implemented and enforced in full, and the Parties shall cooperate with and assist each other as reasonably requested with respect thereto. CDOW agrees that it will cooperate with FFIC and take any action (including, without limitation, joining in any litigation in Bankruptcy Court or any other court of appropriate jurisdiction to effectuate and/or enforce this Agreement and any Approval Order) to oppose any effort by any Person to proceed directly against FFIC to recover any claim or take any other actions which are prohibited by this Agreement and/or by any Approval Order.

4.4. CDOW shall cooperate with FFIC in connection with FFIC's presentation of any claims to its reinsurers for any portion of the Settlement Amount that may be covered by any reinsurance contracts including, without limitation, providing access to any information and documents that are not available in FFIC's files. CDOW further agrees that FFIC may retain copies of any confidential information or documents that CDOW has provided, or will provide, to FFIC.

4.5. Neither CDOW nor the Trust shall cooperate with or otherwise assist any person or entity who or which may attempt to impose liability upon FFIC by reason of, in connection with, or relating to any claims that involve, arise from and/or relate to the Policies. The Parties agree that they shall not take any position in any proceeding that is inconsistent with the rights and/or obligations assumed or imposed on them under this Agreement.

4.6.  If FFIC so requests, CDOW shall file court papers (which shall be prepared by FFIC) supporting the position that the release provided in this Agreement is effective to extinguish any and all obligations of FFIC that involve, arise from and/or relate to the Policies to the full extent set forth in this Agreement.  It is expressly understood, however, that nothing in this Agreement gives CDOW the right to file any pleading, motion, or other document in the name or on behalf of FFIC, and that CDOW is expressly prohibited from taking any action in the name or on behalf of FFIC, it being the intent of the Parties that any attorneys for CDOW shall not and do not represent FFIC.

4.7.  CDOW shall take all reasonable actions to minimize the possibility of any cross-claims or other actions against FFIC in connection with any Claims that involve, arise from and/or relate to the Policies by any other insurer of CDOW or by any surety furnishing any bond securing CDOW's obligations.  If CDOW settles any Claim asserted by any Person, CDOW agrees that any papers executed in settlement of any such Claim or any lawsuit relating to any such Claim shall recite that any release given also runs to FFIC.

4.8.  Any and all obligations, duties and responsibilities of the Parties under or relating to the Policies are hereby tolled and suspended until thirty (30) days after such time as this Agreement is either (i) terminated in accordance with section [14] of this Agreement or (ii) consummated upon the Effective Date.  The tolling and suspension shall survive any termination of this Agreement pursuant to section [14] of this Agreement and shall be fully effective

for all purposes notwithstanding any such termination of this Agreement or the

failure of the Bankruptcy Court to enter the Approval Order.

4.9.  Any time prior to the Effective Date, within seven (7)

business days after its receipt of written notice from CDOW that any Person has

commenced (or is continuing) litigation or otherwise has asserted or pursued a

Claim against FFIC arising out of or relating to the Policies, CDOW shall file a

motion or complaint in the Bankruptcy Court (on an emergency basis if

necessary to prevent imminent harm to FFIC), in form and substance reasonably

acceptable to FFIC (which acceptance shall not be unreasonably withheld),

seeking entry of a protective order (which may be a stipulated order on consent).

Any such protective order shall (a) enforce the automatic stay imposed by

section 362 of the Bankruptcy Code to stay, bar, or prohibit such Claim against

FFIC; and/or (b) restrain and/or enjoin such Person from commencing, asserting,

or continuing any such Claim against FFIC pursuant to section 105(a) of the

Bankruptcy Code.  If the Bankruptcy Court declines to enter such protective

order or, if it does enter such protective order, prior to the date it enters the

protective order (or at any other time when such protective order is not in full

force and effect) CDOW shall defend FFIC or, at the option of FFIC, shall credit

against the Settlement Amount the reasonable attorneys' fees and expenses

incurred by any of FFIC in defending against the Claim.

4.10.  CDOW and the Trust agree that its continuing duty to

cooperate with FFIC, is a material aspect of this Agreement and upon which

obligations FFIC is expressly relying as part of the consideration for entering

into this Agreement.  CDOW agrees to immediately discuss with FFIC any

strategy with respect to the resolution of Claims.

    5.  Conditions Precedent To Settlement.  FFIC's obligation to pay the Settlement

Amount is made expressly contingent upon satisfaction of the following conditions:

    5.1.  The Bankruptcy Court has been requested, by the

Approval Motion (the form and substance of which shall be subject to approval

by FFIC), and/or pursuant to CDOW's request for confirmation of the Settlement

Plan, to approve this fully executed Agreement, upon actual and adequate notice

by (first class mail, postage pre-paid) to:  (a) all creditors of CDOW and all

parties in interest in the Bankruptcy Case; provided, however, that notice to the

holders of Survivor Claims may be given to their counsel of record; (b) all

affiliates of CDOW; (c) all Non-Debtor Insureds; (d) the United States Trustee;

(e) all Persons that have filed a notice of appearance and demand for service of

papers in the Bankruptcy Case under Bankruptcy Rule 2002(i); (f) all Persons

asserting a Claim; (g) all committees appointed by the United States Trustee or

otherwise participating in the Bankruptcy Case; (h) all other insurers of CDOW;

and (i) all other Persons designated by the Bankruptcy Court as requiring notice

in order to be bound by an Approval Order.  CDOW shall use its best efforts to

ascertain the identity and addresses of aforesaid Persons entitled to notice

through a diligent review of its books and records.  CDOW and any claims agent

appointed in the Bankruptcy Case shall cooperate with FFIC by promptly

providing any information necessary to provide notice as required by section

[5.1] of this Agreement.  For the purposes of this Agreement, adequate notice

shall also include notice of the hearing on the Approval Motion by publication in the national edition of [national newspaper] and the [local newspaper] (and/or in any other publication as required by the Bankruptcy Court) in a manner as approved by the Bankruptcy Court as being adequate and sufficient; and a hearing on the Approval Motion shall have been held and concluded.

5.2.  An Approval Order shall have been entered by the Bankruptcy Court in its entirety and shall have become a final order in its entirety, and shall not have become subject to any other final order that restricts any of the Parties from performing their obligations hereunder.

5.3.  A Confirmation Order confirming the Settlement Plan shall have been entered by the Bankruptcy Court in its entirety and shall have become a final order in its entirety, and shall not have become subject to any other final order that restricts any of the Parties from performing their obligations hereunder or otherwise restricts the full implementation of the supplemental permanent injunction contained in the Settlement Plan and/or the consummation of the Settlement Plan, as the case may be.

5.4.  [RESERVED]The Confirmation Order shall:

A.  approve (i) this Agreement pursuant to Federal Rule of Bankruptcy Procedure 9019, and sections 363(b), (f) and (m) of the Bankruptcy Code; and (ii) the sale of the Policies to FFIC;

B.  authorize the Parties to undertake the settlement and the transactions contemplated by this Agreement;

C.  authorize the sale of the Policies to FFIC free and clear of any and all liens, claims or interests;

D.  The permanent Channeling Injunction as defined in and contained in the Settlement Plan, enjoining and restraining all entities who have held or asserted, hold or assert, or may in the future hold or assert a Claim from taking any action, directly or indirectly for the purposes of asserting, enforcing or attempting to assert or enforce any channeled Claim, including: (i) commencing or continuing in any manner, any action or any other proceeding of any kind with respect to any channeled claim or against FFIC; (ii) seeking the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against FFIC or the property of FFIC with respect to any channeled Claim; (iii) creating, perfecting or enforcing any encumbrance or lien of any kind against FFIC or the property of FFIC with respect to any channeled Claim; (iv) asserting any rights of setoff, subrogation or recoupment of any kind against any obligation due to FFIC with respect to any channeled Claim; and (v) taking any act, in any manner and in any place whatsoever, that does not conform to or comply with this Agreement.

E.  A provision stating that all injunctions or stays provided for in the Confirmation Order and in the Settlement Plan, the injunctive provisions of sections 524 and 1141 of the Bankruptcy Code, and all injunctions or stays protecting FFIC, are permanent and will remain in full force and effect following the effective date of the Settlement Plan.

In the event that the Confirmation Order does not include the approval and authorizations set forth in the above sub-paragraphs, this Agreement shall be void ab initio.

The Confirmation Order also shall contain the following factual findings and legal conclusions:

A.  the Agreement is fair and equitable and in the best interest of the estate and its creditors after consideration of (i) the probability of success in litigating the dispute, should it be litigated; (ii) the likely difficulties in collection; (iii) the probable complexity of any litigation of the dispute, the expense, inconvenience and delay necessarily attending such litigation, and the cost savings to CDOW of avoiding such litigation; and (iv) the paramount interest of creditors;

B.  FFIC is a good faith purchaser of the Policies and, as such, is entitled to all protections provided to good faith purchasers under section 363(m) of the Bankruptcy Code; and,

C.  the consideration exchanged by the Parties pursuant to this Agreement constitutes a fair and reasonable settlement of the Parties' disputes and of their respective rights and obligations relating to the Policies and satisfy, to the extent necessary, the provisions for approval of such settlements pursuant to Fed. R. Bankr. P. 9019;

D.  the releases contained in this Agreement and this policy buyback comply with the Bankruptcy Code; and

E.  notice of the sale free and clear of claims and interests was sufficient, and the requirements of Fed. R. Bankr. P. 6004(c) were satisfied, because notice

of the motion seeking approval of the Agreement and the motion itself were
served upon (i) all known claimants or counsel for claimants who filed a proof
of claim in the Bankruptcy case, who were scheduled by CDOW, or whose
claims are pending and tendered under the Policies, at the address provided
for notice in the proof of claim or the address listed for such claimant in
CDOW's schedules, or the address of such claimant last known to CDOW, as
applicable, (ii) all Persons who filed a notice of appearance in the Bankruptcy
Case, and (iii) all Persons known or alleged by CDOW to have provided
general liability insurance to CDOW.

In the event that the above factual findings and legal conclusions are not entered
by the Bankruptcy Court, this Agreement shall be void ab initio.

6.  Reasonably Equivalent Value

The Parties acknowledge and agree that:  (i) this Agreement was bargained for
and entered into in good faith and as the result of arms-length negotiations; (ii) based on their
respective independent assessments, with the assistance and advice of counsel, of the probability
of success, the complexity, the delay in obtaining relief, and the expense of resolving their
disputes, the payment of the Settlement Amount pursuant to this Agreement constitute a fair and
reasonable settlement of CDOW's claims; (iii) the payments and other benefits received under
this Agreement by CDOW constitute reasonably equivalent value for the release, indemnity, and
other benefits received by FFIC under this Agreement; and (iv) this Agreement constitutes a full
and final resolution of all issues between the Parties.

7. 6. Indemnification.  It is expressly understood and agreed that the Settlement
Amount being paid by FFIC is intended to fully and finally satisfy and extinguish any and all

liability, possible payment obligations, costs or expenses that FFIC might otherwise incur, directly or indirectly, in any way related to, arising out of, or in connection with, the Claims and/or the Policies; and that the Settlement Amount is the total amount that FFIC will ever be obligated to pay to the CDOW or any other Person under, or in connection with, the Policies.

6.1.  [RESERVED].

6.2.  [RESERVED].

6.3.  [RESERVED]

6.3.1.  [RESERVED]; and

6.3.2.  [RESERVED].

6.4.  [RESERVED].

7.1.  In the event that any Person including, but not limited to, any holder of a Claim, any Non-Debtor Insured or any other insurer of CDOW, asserts any type of Claim or demand against FFIC with respect to the Policies relating to, arising from or in connection with, directly or indirectly, any Claim, then CDOW and/or the Trust, at their own expense, shall (up to the Settlement Amount) defend, indemnify, save and hold harmless FFIC from and against all such Claims (including, but not limited to, claims, counter-claims, cross-claims, actions, direct actions or claims for contribution, indemnity or subrogation) and from any and all costs, loss, expenses, judgment, settlement, liability, demand, right, assessment, debt, obligation, deficiency or other payment of any kind, including attorneys' fees, incurred in defending against any such Claims or demand or any related suit, action or proceeding.

7.2.  In any legal proceeding involving the assertion of any Claims against FFIC for which FFIC may seek indemnity from the CDOW and/or the Trust, FFIC shall have the absolute right to choose its own independent counsel to be retained to defend it, as it so chooses, in such legal proceeding, and FFIC shall have the absolute and exclusive right to determine any substantive litigation positions in any such legal proceedings including, without limitation, substantive litigation positions regarding coverage and the meaning, construction and interpretation of the Policies.  If FFIC so requests, CDOW and/or the Trust shall file court papers supporting the position that the Release is effective to extinguish any and all obligations of FFIC under the Policies to the full extent set forth in this Agreement.  It is expressly understood, however, that nothing in this Agreement gives CDOW and/or the Trust the right to file any pleading, motion or other document in the name or on behalf of FFIC and that CDOW and/or the Trust are expressly prohibited from taking any action in the name or on behalf of FFIC, it being the intent of all Parties that any attorneys for CDOW and/or the Trust shall not and do not represent FFIC.

7.3.  CDOW and the Trust's obligations to indemnify FFIC up to the Settlement Amount shall survive the Effective Date and the consummation of this Agreement and shall be a continuing obligation of any successor and/or assignee of either or all of them.

7.4.  If the Settlement Amount or its proceeds is transferred to any Person (other than as distribution by CDOW and/or the Trust and to holders of Claims allowed in the Bankruptcy Case by the Bankruptcy Court), it

shall be under and subject to FFIC's first priority lien and security interest; and any such Person shall expressly acknowledge FFIC's first priority lien and security interest and its continuing obligation to indemnify FFIC.

7.5.  6.5. [RESERVED], CDOW and/or the Trust may use such proceeds, from time to time, to make payments to holders of Claims allowed by Final Order of the Bankruptcy Court in accordance with the terms of any order of distribution entered in the Bankruptcy Case.

7.6.  6.6. In the event any Insurance Coverage Claim is brought by CDOW against any insurer other than FFIC and results in an adjudication on the merits, whether in court or in another tribunal with jurisdiction, that CDOW and/or the Trust would have been entitled to coverage from the FFIC under any of the Policies for any Claim released by this Agreement, and the recovery that CDOW and/or the Trust obtain against such insurer includes amounts allocable to any of the FFIC, CDOW and the Trust agree that they will not seek to obtain payments from such insurer or to enforce any related judgment to the extent such payments or judgment represent any FFIC's allocable share of any obligation owed to CDOW.  In the event that CDOW and/or the Trust obtain a judgment or binding arbitration award against any other insurer in connection with any Claim released pursuant to this Agreement, and that insurer thereafter obtains a judgment or binding arbitration award against any of FFIC on the ground that the judgment or binding arbitration award granted to CDOW against that other insurer included sums which are allocable to any of FFIC, CDOW and/or the Trust agree to reduce their judgment

or binding arbitration award against the other insurer to avoid such liability being imposed on FFIC. Such a reduction in CDOW's judgment or binding arbitration award will be accomplished by subtracting from the judgment or binding arbitration award against the other insurer the share of the judgment or binding arbitration award, if any, that is held to be allocable to the FFIC. To ensure that such a reduction is accomplished, FFIC shall be entitled to assert this right as a defense in any Claim against it for any such portion of the judgment or binding arbitration award, and shall be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect it from any liability for the judgment or binding arbitration award.

8. 7. Judgment Reduction. In any proceeding, suit or action involving one or more of the Parties, the Trust, or any insurer with respect to the Claims where any Person has asserted, asserts or could assert any contribution claim or similar claim against FFIC under, arising out of, related to, and/or in connection with the Policies with respect to insurance rights that are released under this Agreement, any judgment obtained by the Parties or the Trust against such other entity shall be automatically reduced by the amount, if any, of any judgment that entity obtains against FFIC, the purpose being to ensure that FFIC does not become obligated to pay more than the Settlement Amount. The Parties or the Trust, as the case may be, shall cooperate with FFIC in any litigation asserting contribution claims against FFIC with respect to any liability under, arising out of, related to, and/or in connection with any of the Policies, and shall support arguments made by FFIC that their obligations with respect to such claims have been fully released, satisfied and extinguished by the settlement and this Agreement. This reduction of judgment provision may be relied upon by FFIC as a defense in any such litigation.

In order to effectuate this judgment reduction clause in any action against another entity where FFIC is not a party, such Party or the Trust, as the case may be, shall either (1) obtain a finding from that court of what amount FFIC would be required to pay such other insurer under its contribution claim or other claim, before entry of judgment against such other entity, or (2) set aside the money in escrow paid from such other entity until such rights are adjudicated in a proceeding involving FFIC where this judgment reduction clause can be applied.

9. 8. Construction.  Nothing contained herein shall be construed to be an admission of any kind by any signatory hereto.  Specifically, and without limitation, nothing contained herein constitutes an admission by FFIC that CDOW was or is entitled to any insurance coverage from FFIC under the Policies in connection with any claims which have been or may be asserted against CDOW.

9.1. 8.1. This Agreement is the result of a compromise accord, is the product of arms-length negotiations, and is not intended to be, nor shall it be, construed as an insurance policy interpretation.  This Agreement is restricted and limited to the matters addressed herein, and shall not be used by either FFIC or CDOW in any court or dispute resolution proceeding to infer coverage or to create, prove or interpret claims under any insurance policy issued by FFIC.  Nothing contained herein, however, shall be deemed or construed to prohibit either FFIC or CDOW from introducing this Agreement into evidence for the purpose of enforcing the terms of this Agreement.

9.2. 8.2. The parties to this Agreement each represent and warrant that they have not and will not in any manner assign, transfer, convey or sell, or purport to assign, transfer, convey or sell to any entity or person any

cause of action, chose in action, or part thereof, arising out of or connected with the matters released herein, and that they are the only persons or entities entitled to recover for damages under such claims, causes of action, actions, and rights. The parties to this Agreement each also represent and warrant that no subrogation of any such causes of action, chose in action, or part thereof, has taken place. The parties to this Agreement each further represent and warrant that they will not in any way voluntarily assist any other person or entity in the establishment of any claim, cause of action, action or right against the other parties to this Agreement arising out of, resulting from or in any way relating to the handling by FFIC of CDOW claim for insurance coverage from FFIC.

9.3.  8.3.  This Agreement prevails over prior communications regarding the matters contained herein between the signatories hereto or their representatives.  This Agreement has been reviewed by counsel for the signatories hereto, and shall not be construed against any signatory, each signatory expressly waiving the doctrine of *contra proferentum*.

10.  9.  No Third Party Rights.  This Agreement is intended to confer rights and benefits only on the signatories hereto as described in this Agreement, and is not intended to confer any right or benefit upon any other person or entity.  This Agreement is an integrated Agreement and contains the entire Agreement regarding the matters herein between the signatories hereto, and no representations, warranties or promises have been made or relied on by any signatory hereto other than as set forth herein.  No person or entity other than the signatories hereto shall have any legally enforceable right under this Agreement.  All rights of action for any breach of this Agreement are hereby reserved to the signatories herein.

11.    10.  Representations, Warranties and Covenants.  Each of the Parties represents, warrants and covenants to the other that:

11.1.    10.1.  Each is a corporation duly organized and validly existing in good standing under the laws of one of the States of the United States; and has all requisite power and authority to execute and deliver this Agreement and any other documents necessary to consummate this Agreement and to perform their respective obligations hereunder and thereunder.  The individuals who have executed this Agreement on behalf of the Parties expressly represent and warrant that they are fully authorized to sign on behalf of such Parties for the purpose of duly binding such Parties to the terms of this Agreement subject only, in the case of CDOW, to approval of the Bankruptcy Court as contemplated herein.

11.2.    10.2.  The execution, delivery and performance of this Agreement and any other documents necessary to consummate this Agreement do not, and will not (i) require any approval by any court (other than the Bankruptcy Court and such other courts of the United States in the event of an appeal); (ii) require any action by or in respect of, notice to or filing with, any governmental entity, agency or FFIC; or (iii) contravene, or constitute a default under any contract or instrument to which any of them is a party or result in a violation of any provision of applicable law or regulation.

11.3.    10.3.  This Agreement constitutes a valid and binding agreement enforceable in accordance with its terms and, when executed and delivered in accordance with the terms of this Agreement and in the form of the

accompanying exhibits and any other documents necessary to consummate this Agreement, will constitute valid and binding instruments enforceable in accordance with their terms.

11.4.    10.4.  CDOW is the sole owner of all of the Policies and all of the rights, obligations, coverages, Claims, causes and/or choses in action which are intended to be affected by this Agreement; and no subrogation of any such Claims, causes and/or choses in action has taken place.  CDOW is not effected, permitted or attempted to effect any assignment of any of the Policies or any Claims as they relate to the Policies.  CDOW covenants that it will not in the future effect, permit or attempt to effect any assignment of any of the Policies or Claims as they relate to the Policies to any Person without the prior written consent of FFIC.

11.5.    10.5.  Until such time as the Approval Order becomes a Final Order and, if so, thereafter, CDOW shall not commence, or continue against FFIC any action, suit or proceeding of any nature whatsoever with respect to the matters, conduct, transactions, occurrences, facts or other circumstances alleged in, arising from, or related to any Claims and/or the Policies.

11.6.    10.6.  CDOW shall use its best efforts to provide actual notice of the Approval Motion to any and all known or potential holders of Claims which a diligent review of CDOW's books and records would reveal.  As of the date the Approval Order is entered, CDOW shall not have any knowledge or information that any Person holding a Claim that has not received actual

notice of the Approval Motion intends to proceed directly against FFIC to enforce such Claims in the Bankruptcy Case or otherwise.

11.7.  ~~10.7.~~ These representations, warranties and covenants are continuing and shall survive the Effective Date and the consummation of this Agreement.

11.8.  ~~10.8.~~ That they have read this Agreement and know the contents hereof, that the terms hereof are contractual and not by way of recital, and that they have signed this Agreement of their own free acts; and

11.9.  ~~10.9.~~ That in making this Agreement, they have obtained the advice of legal counsel.

12.  ~~11.~~ No Precedent.  This Agreement is intended to be and is a compromise of disputed claims among the Parties.  The Parties acknowledge and agree that all undertakings and agreements contained in this Agreement have been voluntarily agreed to solely for the purpose of finally compromising, settling and resolving all questions, disputes and issues between them relating to the Claims (including, without limitation, the existence of insurance coverage for CDOW under the Policies) or otherwise, without incurring expense, inconvenience and uncertainty of protracted litigation.  This Agreement and any proceeding taken pursuant hereto shall not in any event be construed as, interpreted as, or deemed to be evidence of an admission or concession by any of the Parties for any purpose, or deemed to constitute a waiver of any legal position or any defenses or other rights which any of the Parties might otherwise assert in any context.  Neither this Agreement nor any of its provisions nor any other documents related hereto, nor any negotiations, statements or testimony taken in connection herewith may be offered or received in evidence in, or used for any other purpose in connection with any suit,

action or legal proceeding which any of the Parties may now have or in the future have with any

other Person or entity, as an admission or concession of liability or wrongdoing or as any

admission or concession on the part of any of the Parties, except in connection with any action or

legal proceeding to enforce this Agreement, regarding the nature or existence of any rights,

duties or obligations under and/or in relation to any of the Policies or any other policies of

insurance alleged or otherwise, any interpretation of any insurance coverage under and/or in

relation to any of the Policies or any other policies of insurance alleged or otherwise, or as any

admission or concession whatsoever on the part of any of the Parties, except in connection with

any action or legal proceeding to enforce the terms of this Agreement.  By entering into this

Agreement, FFIC does not admit as a legal matter that it owes any duty or obligation to defend

or indemnify CDOW with respect to any Policies or any Claims.  This Agreement and its

provisions are not intended, nor shall they be cited, construed or represented in any litigation or

otherwise, to reflect the corporate position of FFIC as to the proper construction of any insurance

policies.  The Parties further acknowledge and agree that all undertakings and agreements

contained in this Agreement have been agreed to solely for the purpose of effectuating voluntary

settlements of the Claims, and shall not be deemed to constitute an admission or concession by

any of them for any purpose; nor shall such undertakings and agreements or this Agreement

itself be deemed to constitute a waiver of any legal position or any defenses existing or any other

agreements, or otherwise, which any of the Parties might otherwise assert in any context.  FFIC's

entry into this Agreement does not constitute an endorsement of any statement of position of any

kind as to any other aspect of the Cases.  FFIC reserves all rights to object to and/or oppose the

entry of any order, in the Cases that is inconsistent with any terms of this Agreement.  The

Parties further acknowledge and agree that nothing contained in this Agreement shall be

construed as a waiver, estoppel or invalidation of any position that the Parties may take in the future with respect to the existence of an insurance policy or policies, or coverage, claims or defenses related to any policies.  This Agreement creates no rights in any Person to any insurance policy and, in the event that this Agreement is terminated, except where specifically stated otherwise, it is agreed and understood that each of the Parties has reserved all of its claims, rights, defenses and positions.

13.  12.  Binding Effect.  This Agreement (which shall include the Exhibits attached hereto) shall inure to the benefit of and be binding upon the Parties and their respective parents, subsidiaries, affiliated companies, transferees, assigns, representatives, principals, agents, officers, directors, employees, predecessors, successors and assigns under the Bankruptcy Code and otherwise.  [RESERVED]Upon the Confirmation Order becoming a final order, this Agreement shall become immediately and automatically binding upon the Trust, and the Trust shall be deemed to be a Party to this Agreement without the need for further action.  Once the Effective Date has occurred, this Agreement, and the obligations of the Parties hereunder, shall survive the dismissal or conversion of the Bankruptcy Case, and shall be binding on any subsequent trustee appointed in the Bankruptcy Case under any chapter of the Bankruptcy Code.

14.  13.  Confidentiality.  The terms of this Agreement, as well as the discussions that led up to it, are strictly confidential, and shall not be disclosed to any Person not a Party to this Agreement, or not a director, employee, agent or representative of a Party with a need to know about this Agreement, except to (i) the United States Trustee; (ii) any reinsurers or reinsurance intermediaries of FFIC or any retrocessionaire of a reinsurer of FFIC; (iii) to outside auditors or accountants of the Parties, with appropriate assurances of confidentiality or (iv) under a written agreement of confidentiality or protective order: (a) to insurance regulators; (b) to the

extent necessary to obtain the approval of the Bankruptcy Court and then only under seal; (c) in any action or proceeding to enforce this Agreement; (d) for the purpose of demonstrating or proving the exhaustion of any limits of liability contained in the Policies to any other insurer of any of the Parties that may be affected by any impairment of the Policies; and (e) as otherwise agreed to by the Parties in a written amendment to this Agreement. No such disclosures shall be made until the Person to receive such confidential documents or information is advised in writing of its protected and confidential nature. If any application or request of any kind for disclosure of this Agreement or its terms is received by any of the Parties, except with respect to (iv)(c) above, that Party shall give the other Parties immediate (and in any case not less than thirty (30) days) written notice upon receipt of such application or request setting forth all information sought to be disclosed, the identity of each Person to whom such information is sought to be disclosed, the confidentiality agreements governing any such proposed disclosure and the circumstances pursuant to which such proposed disclosure is to be made; and no disclosure shall be made before the Parties shall have a reasonable opportunity to challenge such proposed disclosure. Should a court order the disclosure of this Agreement or its terms to any Person, the Parties shall use their best efforts to maintain this Agreement and its terms under seal and/or protective order. This provision shall not prevent disclosure of the existence, as opposed to the terms, of this Agreement. All negotiations leading up to this Agreement, all communications generated pursuant to it, and the implementation of this Agreement will be deemed to fall within the protection afforded settlements, offers to compromise and compromises by Rule 408 of the Federal Rules of Evidence and analogous state law principles.

15. 14. Availability of Injunctive Relief. Each of the Parties expressly agree and acknowledge that irreparable injury may result to the other in the event of a breach by any of

them of this Agreement, and in the event of such a breach, or the threat thereof, the aggrieved

party shall be entitled, in addition to any other available remedies and without a showing of

actual damage, to temporary or permanent injunctive or other equitable relief to restrain any

and/or enjoin any actual, prospective or threatened violation of this Agreement.

16. 15. Termination. This Agreement shall terminate and be of no further force

and effect, and the Parties shall be released from all obligations hereunder (except for any

provisions hereof which shall survive such termination) if, at any time, any of the conditions

precedent as set forth in sections [5.1] through [5.5] of this Agreement cannot be satisfied.

16.1. 15.1. In the event of any termination of this Agreement,

each of the Parties shall be released from all obligations hereunder (except for

any provisions hereof that shall survive such termination), and each Party shall

be restored to its respective position existing immediately prior to the execution

of this Agreement, without prejudice.

16.2. 15.2. In the event of any termination of this

Agreement, the Parties acknowledge and agree that this Agreement and all

negotiations and proceedings connected herewith shall be without prejudice to

any of the rights or remedies of any of the Parties and no part of this Agreement

or any statement by any Party, any findings of fact or any conclusions of law

related thereto may be used in any manner by any Party in any action, suit or

proceeding as evidence of the respective rights, liabilities, duties, or obligations

of the Parties.

17. 16. Construction. This Agreement was negotiated at arm's length by parties

of equal bargaining power with each party participating in the joint drafting effort and each

receiving advice from competent legal counsel of their own choosing.  It is the intent of the

Parties that no part of this Agreement (as a result of any claimed ambiguity or otherwise) should

be construed for or against either of the Parties on account of the drafting or the identity of the

drafter.  In the event that any dispute, disagreement or controversy arises regarding this

Agreement, the Parties hereto shall be considered joint authors and no provision shall be

interpreted against FFIC because they are insurance companies.  This Agreement is not a

contract of insurance and the Parties agree that any special rules of interpretation or construction

of contracts of insurance, including, without limitation, the doctrine of *contra proferentem*, shall

not apply.  The Parties further acknowledge and agree that the obligations and Release are in

good faith and are reasonable in the context of the overall compromise settlement embodied in

this Agreement.

   18. ~~17.~~ Notice.  All notices or other communications which any Party desires or

is required to give shall be given in writing and shall be deemed to have been given if hand

delivered, sent by telecopier or mailed by depositing in the United States mail, prepaid to the

party at the address noted below or such other address as a party may designate in writing from

time to time:

   CDOW:

   Rev. Msgr. J. Thomas Cini
   Vicar General for Administration
   (Catholic Diocese of Wilmington~~, Inc. Contact~~)
   P.O. Box 2030
   Wilmington, DE 19899-2030

   With copies to:

   Anthony G. Flynn, Esq.
   Young Conaway Stargatt & Taylor LLP
   The Brandywine Building
   1000 West St., 17th Floor

P.O. Box 391
Wilmington, DE 19899-0391
aflynn@ycst.com

FFIC:

Director of Hazardous Waste
Fireman's Fund Insurance Companies
Historical Claims Department
777 San Marin Drive
Novato, CA 94998-3400

Allianz S.p.A.

Daniel Kane
Allianz S.p.A./RAS
Historical Claims Department
777 San Marin Drive
Novato, CA  94998-3400

With copies to:

Gary D. Centola, Esq.
Rivkin Radler LLP
926 RXR Plaza
Uniondale, New York  11556-0926

19.  18.  Severability.  Whenever possible, each provision of this Agreement will

be interpreted in such manner as to be effective and valid under applicable law, but if any

provision of this Agreement is held to be prohibited by or invalid under applicable law, such

provisions will be ineffective only to the extent of such prohibition or invalidity, without

invalidating the remainder of such provision or the remaining provisions of this Agreement,

which shall remain in effect and be interpreted so as best to reasonably effect the intent of the

Parties.  Notwithstanding the foregoing, the provisions in this Agreement regarding the entry of

the Approval Order as a final order (including a permanent injunction prohibiting the bringing of

Claims against FFIC), and the effectiveness of the Release [and the indemnification] of FFIC

shall not be severable from this Agreement.

20. ~~19.~~ Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the bankruptcy laws of the United States and the laws of the State of [Delaware] without giving effect to the rules and principles of conflict of laws under the laws of the State of [Delaware].

21. ~~20.~~ Dispute Resolution.  Should any dispute arise concerning the terms, meaning or implementation of this Agreement, the Parties shall use their best efforts to reach a prompt resolution of such dispute.  In the event that they are unable to do so, the Bankruptcy Court and, in the event of an appeal, any other courts of the United States, if necessary, shall have exclusive and continuing jurisdiction to resolve all disputes concerning the interpretation and enforcement of this Agreement and any other documents executed in conjunction with this Agreement.

22. ~~21.~~ Assignment.  No rights or obligations under this Agreement may be assigned to any entity without the express written consent by FFIC.  The identity of any present or future counter-parties to this Agreement is a material term of this Agreement upon which FFIC is expressly relying in undertaking the obligations in this Agreement, and any attempted assignment without FFIC's prior written consent shall constitute a material breach of this Agreement excusing all further performance by FFIC.

23. ~~22.~~ Counterparts.  The parties to this Agreement hereby agree that this Agreement may be executed in counterparts, and that all such counterparts shall constitute one instrument binding on the signatories in accordance therewith, notwithstanding that all signatories are not signatories to the original or the same counterpart.

24. ~~23.~~ No Waiver.  No waiver or indulgence of any breach or series of breaches of this Agreement shall be deemed or construed as a waiver of any other breach of the same or

any other provision hereof or affect the enforceability of any part or all of this Agreement, and no waiver shall be valid unless executed in writing by the waiving party.

25.  24. Headings.  The paragraph headings in this Agreement are inserted for convenience of reference only and are not part of the substance of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Settlement Agreement and Release under seal on the dates shown below:

CATHOLIC DIOCESE OF WILMINGTON, INC.

_____ (SEAL)

_____
WITNESS

Dated:_____

FIREMAN'S FUND INSURANCE COMPANY, ADRIATIC INSURANCE COMPANY, ALLIANZ S.p.A. and ALLIANZ

_____ (SEAL)

_____
WITNESS

Dated:_____

## EXHIBIT B

### Policies Allegedly Issued by Fireman's Fund Insurance Company, Adriatic Insurance Company, Allianz S.p.A. and Allianz

| Policy | Period |
|--------|--------|
| EL-1971 | 7/1/77-7/1/78 |
| EL-794361 | 3/9/80-3/9/81 |
| XLB 142-06-08 | 1/17/80-7/1/80 |
| XLX-168-65-15 | 7/1/84-7/1/85 |
| XLX-175-05-91 | 7/1/85-6/30-86 |

2473312 v2
2509070 v1

Document comparison by Workshare Professional on Thursday, July 28, 2011 1:27:16 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://WORKSITE01/YCST01/11203644/1 |
| Description | #11203644v1<YCST01> - Buyback - FFIC -- Redacted 6/24/11 |
| Document 2 ID | interwovenSite://WORKSITE01/YCST01/11244091/1 |
| Description | #11244091v1<YCST01> - CDOW - Fireman's Fund/Adriatic/Allianz Buy-Back Agreement |
| Rendering set | standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | Count |
|---|---|
| Insertions | 71 |
| Deletions | 73 |
| Moved from | 1 |
| Moved to | 1 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 146 |