**f.**     **Blackline of Granite State Insurance Company and The Insurance Company of the State of Pennsylvania**

## SETTLEMENT, RELEASE, COVENANT NOT TO EXECUTE AND POLICY BUY-
## BACK AGREEMENT

This Settlement, Release and Policy Buy-back Agreement ("Agreement") is made by, between and among the Catholic Diocese of Wilmington, Inc. a Delaware non-profit corporation (the "Diocese," as defined herein), the Diocese Releasing Parties (as defined herein), and Granite State Insurance Company and The Insurance Company of the State of Pennsylvania (collectively, the "Carriers"), each of their Affiliates, Agents and claim administrators, including Chartis Claims, Inc. (collectively referred to as "Chartis").

The Diocese, the Diocese Releasing Parties, the Carriers and Chartis shall be herein referred to collectively as the "Parties."

## RECITALS

WHEREAS, numerous individuals have asserted, or may in the future assert, claims or suits against the Diocese for injuries allegedly suffered due to sexual, physical and/or emotional abuse by priests or other personnel allegedly negligently hired, supervised or maintained by the Diocese ("Tort Claims," as defined herein); and

WHEREAS, the Diocese contends that the Carriers issued or allegedly issued certain policies of liability to or for the benefit of the Diocese (the "Policies," as defined herein); and

WHEREAS, on October 18, 2009 (the "Petition Date"), the Diocese filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (as defined herein) in the Bankruptcy Court (as defined herein), Case Number 09-13560 (the "Bankruptcy Case"); and

WHEREAS, in the Bankruptcy Case, numerous individuals filed proofs of claim against the Diocese in connection with their alleged Tort Claims; and

WHEREAS, the Diocese has maintained that its Policies are property of the Diocese's bankruptcy estate (the "Estate") under section 541 of the Bankruptcy Code (the "541 Claims"); and

WHEREAS, disputes exist between and among the Diocese, the Carriers and Chartis concerning the existence, nature and limits of coverage, if any, to be provided by the Carriers to the Diocese under the Policies for the Tort Claims (the "Coverage Dispute"); and

WHEREAS, disputes may also exist between the Carriers, Chartis and the Diocese concerning contribution, indemnity, subrogation, equitable subrogation, recoupment or similar claims relating to or arising out of the Tort Claims and the settlement thereof by the Diocese pursuant to a proposed plan of reorganization (the "Contribution Claims," as defined herein);

WHEREAS, the Parties, without any admission of liability or concession as to the validity of the positions or arguments advanced by each other, now wish to effect a full and final settlement, compromise, covenant not to execute, release and resolution of any and all disputes and disagreements by and among them with respect to the Tort Claims, the Policies, the 541 Claims, the Coverage Dispute and the Contribution Claims;

WHEREAS, the Parties, without any admission of liability or concession as to the validity of the positions or arguments advanced by each other, now to wish to effect: (i) a full and final settlement, compromise, covenant not to execute, mutual release and resolution of any and all disputes and disagreements by and between the Diocese, the Diocese Releasing Parties, the Carriers and Chartis to terminate and release any obligations the Carriers have or ever may have with respect to the Tort Claims, the Policies or the Bankruptcy Case; and (ii) the sale of the Policies to the Carriers and Chartis free and clear of all liens, claims, encumbrances and Interests (as defined herein); and

WHEREAS, through this Agreement, the Parties seek to provide each other with the broadest possible releases with respect to the Policies and ensure that neither the Diocese nor the Carriers nor Chartis have any further obligations with respect to the Policies; and

WHEREAS, as part of the settlement, compromise, release and resolution of the matters resolved herein, the Parties wish to effect a sale of the Policies back to the Carriers and Chartis pursuant to section 363 of the Bankruptcy Code, free and clear of all liens, claims, encumbrances and interests; and

WHEREAS, as part of the settlement, compromise, release and resolution of the matters herein, the Parties wish that the proceeds of the sale of the Policies be used to fund payment of Tort Claims under the Plan in exchange for a permanent injunction, enjoining and restraining all Entities from asserting any and all Channeled Claims (as defined herein) against the Carriers and/or Chartis; and

WHEREAS, this Agreement is the product of extensive negotiations and several days of mediation; and

WHEREAS, each Party has received the advice of counsel in the preparation, drafting and execution of this Agreement, which was negotiated at arm's length and in good faith;

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained herein, the sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, subject to the approval of the Bankruptcy Court, the Parties hereby agree as follows:

## I.    DEFINITIONS AND CONSTRUCTION

1.1    As used in this Agreement, the following terms shall have the meanings set forth below.  Terms not defined below shall have the meanings ascribed to them in the Bankruptcy Code.

(a)    "541 Claims" shall have the meaning ascribed to such term in the Recitals hereof.

(b)    "Affiliate" means any Entity that controls, is controlled by or is under common control with a Party (for Chartis, specifically including American International Group Inc.), or has ever had any other legal nexus to a Party hereto.  This includes, but is not limited to, all past, present and future parent corporations of a Party, subsidiaries, divisions, merged or acquired companies or operations and their respective predecessors, successors and assigns.

(c)    "Agent" means all past, present and future partners, agents, servants, employees, clergy, representatives, members, officers, executives, directors, shareholders, attorneys and their predecessors, successors, heirs, assigns, executors and administrators.

(d)    "Approval Order" means a Final Order in substantially the form attached hereto as Exhibit 1, with only such modifications as are mutually acceptable to the Carriers, Chartis, the Diocese and the Diocese Releasing Parties in each Party's respective sole discretion, that: (i) approves this Agreement and the sale of the Policies to the Carriers and Chartis free and clear of all Interests; (ii) authorizes the Parties to undertake the settlement and transactions contemplated by this Agreement; and (iii) is entered by the Bankruptcy Court under sections 363 and/or 105 of the Bankruptcy Code and Bankruptcy Rule 9019 and/or under such other provisions as the Bankruptcy Court may order, understanding that the Parties hereto intend the Approval Order to the Confirmation Order confirming the Diocese's "Settlement Plan", as defined herein..

(e)     "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended from time to time.

(f)     "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware and any other court in which the Bankruptcy Case may be pending or which has jurisdiction over the Bankruptcy Case.

(g)     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

(h)     "Bar Date" means April 15, 2010, the deadline set by the Bankruptcy Court for filing a proof of claim in the Bankruptcy Case.

(i)     "Bishop" means the Most Reverend Bishop of the Diocese and his predecessors, successors and assigns.

(j)     "Buyer" means the Carriers and Chartis.

(k)     "Buyer-Released Claims" shall have the meaning ascribed to such term in Section 5.3 hereof.

(l)     "Channeled Claims" means all Claims, including, without limitation, Tort Claims and Unknown Tort Claims, against the Diocese, the Diocese Releasing Parties and the Carriers and/or Chartis which shall be channeled, treated and administered pursuant to the provisions and protocols of this Agreement and the Plan (as defined herein).

(m)     "Claim" means any of the following:  (i) "Claim" as that term is defined in section 101(5) of the Bankruptcy Code; (ii) demand; or (iii) any claim, whether past, present or future, known or unknown, accrued or unaccrued, asserted or unasserted, foreseen or unforeseen, fixed or contingent, direct or indirect, and, whether in law, equity or otherwise including, without limitation, any claim: (i) arising out of, related to, or involving Tort Claims, Unknown Claims, Extra-Contractual Claims, and Contribution Related Claims; (ii) for any form of damages,

indemnity, defense obligations, insurance premiums (whether retrospectively rated or otherwise), deductibles, self-insured retentions, costs, expenses, contribution or subrogation; (iii) pursuant to or under a contract, other agreement, promise, representation or warranty; or (iv) pursuant to any direct action or statutory or regulatory right of action, assertion of right, complaint, cross-complaint, counterclaim, affirmative defense, writ, demand, inquiry, request, suit, lawsuit, liability, action, cause of action, administrative proceeding, governmental action, order, judgment, settlement, lien, loss, cost or expense.

(n)    "Committee" means the Official Committee of Unsecured Creditors of the Catholic Diocese of Wilmington, Inc., appointed by the United States Trustee on November 5, 2009 to represent the collective interests of Tort Claimants, as such Committee may be reconstituted from time to time.

(o)    "Conditions to Payment" shall have the meaning ascribed to such term in Section 3.1 hereof.

(p)    "Confirmation Order" means a Final Order entered in the Bankruptcy Case that is in a form reasonably acceptable to the Carriers and Chartis and that: (i) approves the Settlement Plan pursuant to section 1129 and any other applicable provision of the Bankruptcy Code; (ii) designates the Carriers and Chartis as Settling Insurers (as defined in the Plan); (iii) includes the Plan Provisions; and (iv) does not materially or adversely affect the interests of the Carriers and Chartis under this Agreement.

(q)    "Contribution Claims" means any Claim by any Entity, including, without limitation, any insurers of any of the Sellers or any of the Diocese Releasing Parties, based on contribution, indemnity, subrogation, equitable subrogation, recoupment, quantum meruit, rights

under "other insurance clauses," or any similar Claim or legal theory (including claims for attorneys' fees and costs) relating to or arising out of, directly or indirectly, the Policies.

(r)    "Diocese" means the Catholic Diocese of Wilmington, Inc., a Delaware nonprofit corporation, as well as all of its past, present and future Affiliates, associated corporations and Entities, employees, officers, directors, shareholders, principals, Agents, attorneys, representatives, predecessors, successors and assigns.

(s)    "Diocese Releasing Parties" means any Entity other than the Diocese that is or may claim to be insured under the Policies or any one of them, including the Diocese's Agents, the Bishop, all past, present, and future bishops of the Diocese and all parishes, churches, schools and other institutions within or affiliated with the Diocese, as it may have been constituted from time to time, at any time prior to the Effective Date (as defined herein) that are either: (i) located within the territorial limits of the Diocese; or (ii) directly or indirectly under or subject to the supervision or control of the Diocese, along with each of their past, present and future subsidiaries, Affiliates, associated corporations and Entities, employees, officers, directors, shareholders, principals, Agents, attorneys, representatives, predecessors, successors and assigns. The Diocese Releasing Parties shall include without limitation all entities ~~named on Schedule "A" attached hereto.~~executing this Agreement

(t)    "Effective Date" means the date on which all Conditions to Payment have been satisfied and the Settlement Payment is received by the Diocese.

(u)    "Enjoined Claim" means any Claim relating to the Policies including, without limitation, Contribution Claims against the Carriers and/or Chartis and any Claim by or on behalf of a Tort Claimant, whenever and wherever arising or asserted, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, including without limitation

all Claims by way of direct action, statutory or regulatory action or otherwise, Claims for exemplary or punitive damages for attorneys' fees and other expenses, or for any equitable remedy.

(v)     "Entity" means an individual, any corporation, including, without limitation, a corporation sole or non-profit corporation, partnership, association, limited liability company, proprietorship, joint venture, trust, executor, legal representative or any other entity or organization, as well as any federal, international, foreign, state or local governmental or quasi-governmental entity, body, or political subdivision or any agency or instrumentality thereof.

(w)     "Extra-Contractual Claim" means any Claim against the Carriers and/or Chartis, seeking any type of relief, including but not limited to compensatory, exemplary or punitive damages, or attorneys' fees, interest, costs or any other type of relief, on account of alleged bad faith, failure to provide insurance coverage under any Policy, failure or refusal to compromise and settle any Claim insured under any Policy, failure to act in good faith, violation of any covenant or duty of good faith and fair dealing; violation of any unfair claims practices act or similar statute, regulation or code, any type of alleged misconduct or any other act or omission of any type for which the claimant seeks relief other than coverage or benefits under an insurance policy.  Extra-Contractual Claims include, without limitation: (i) any Claim arising out of or relating to the Carriers' and/or Chartis' handling of any request for insurance coverage for any Claim, including any Tort Claim, Unknown Claim and Contribution Claim; and (ii) the conduct of the Parties with respect to the negotiation of this Agreement.

(x)     "Final Order" means an order, judgment or other decree (including any modification or amendment thereof) that remains in effect and has not been reversed, withdrawn, vacated or stayed, and as to which the time to appeal or seek review, rehearing or writ of

certiorari has expired and as to which no appeal or petition for review, reconsideration, rehearing or certiorari has been taken or, if such an appeal has been taken, (a) it has been resolved and no longer remains pending, or (b) an appeal has been timely taken but such order has not been stayed and the Parties have mutually agreed in writing that the order from which such appeal is taken should be deemed to be a Final Order within the meaning of this Agreement.

(y)     "Insured" means any and all Entities and their Agents who are or may claim to be an insured, named insured, person insured, additional insured or additional person insured, or otherwise claim to be entitled to any coverage or benefits under the Policies.

(z)     "Interests" includes, without limitation, all liens, Claims, encumbrances, interests, rights of refusal, security interests, pledges, judgments, demands, charges, defects, options, restrictions and other rights of any nature or kind, whether at law or in equity.

(aa)    "Perpetrator" means an Entity who committed or is alleged to have committed an act of Sexual Abuse upon a Tort Claimant.

(bb)    "Plan" means the "Settlement Plan" as set forth in the Second Amended Chapter 11 Plan of Reorganization of Catholic Diocese of Wilmington, Inc., as such Plan may be modified from time to time in accordance with the terms thereof; provided, however, that such modifications are consistent with the terms of this Agreement and do not materially and adversely affect the interests of the Carriers and/or Chartis under this Agreement.

(cc)    "Plan Provisions" shall have the meaning ascribed to such term in Section 6 hereof.

(dd)    "Policies" means all insurance policies, known or unknown, issued or allegedly issued by the Carriers under which the Diocese or Diocese Releasing Parties are or may claim to be an insured, named insured, person insured, Insured, additional person insured, or otherwise

entitled to any coverage or benefits under any such insurance policies, including, without limitation, the insurance policies and alleged insurance policies identified on Schedule BA to this Agreement. By referencing the "Policies," the Carriers and Chartis do not concede that the Diocese or anyone else has established the terms or existence of any such policies or entitlement to coverage under the Policies for any Claim, including any Tort Claim.

(ee)    "Reorganized Diocese" means the Diocese from and after the effective date of the Plan.

(ff)    "Sellers" means the Diocese and the Diocese Releasing Parties.

(gg)    "Seller-Released Claims" shall have the meaning ascribed to such term in Section 5.1 hereof.

(hh)    "Settlement Amount" means the payment to be made by the Carriers and Chartis pursuant to Section 2.1 of this Agreement.

(ii)    "Sexual Abuse" means any and all acts or omissions that in any way arise out of, are based upon or involve actual or alleged sexual conduct or misconduct, sexual abuse or molestation, indecent assault and/or battery, rape, lascivious behavior, undue familiarity, pedophilia, ephebophilia or sexually-related physical, psychological or emotional harm, or contacts or interactions of a sexual nature between a child and an adult, or a nonconsenting adult and another adult, by an Entity for which the Diocese is or was legally responsible, or which the Diocese failed to control, direct, train or supervise, or about whose acts and propensities the Diocese failed to warn, disclose or provide information. A child or nonconsenting adult is abused whether or not this activity involves explicit force, whether or not it involves genital or other physical contact, and whether or not there is physical, psychological or emotional harm to the child or nonconsenting adult.

(jj)    "Tort Claim" means any and all Claims, demands, suits, causes of action, proceedings or any other rights to monetary and/or other relief, for: (i) damages of any type, including but not limited to bodily injury, personal injury, emotional distress, wrongful death and/or loss of consortium; (ii) exemplary or punitive damages;    (iii) attorneys' fees and other expenses, fees or costs; and (iv) any equitable remedy, heretofore, now or hereafter asserted against any of the Parties.

(kk)    "Tort Claimant" means an Entity that asserts a Tort Claim, including any Unknown Claimants.

(ll)    "Unknown Claim" means any and all Tort Claims of any Unknown Claimants.

(mm)    "Unknown Claimant" means the holder of a Tort Claim who did not file a proof of claim by the Bar Date, including without limitation:

(i)    who has an extended statute of limitations period under the Delaware Code since he or she was under the age of 18 as of the Petition Date;

(ii)    had not, as of the Petition Date, discovered an injury and the causal relationship between the injury and Sexual Abuse pursuant to the Delaware Code or any repressed memory exception to the Delaware statute of limitations; or

(ii)    had a mental illness disability that tolled the statute of limitations pursuant to the Delaware Code .

1.2    The following rules of construction shall apply to this Agreement:

1.2.1.    Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein,"

"hereby" and derivative or similar words refer to this entire Agreement; (iv) the words "include," "includes" or "including" shall be deemed to be followed by the words "without limitation;" and (v) the word "or" shall be disjunctive but not exclusive;

  1.2.2. References to agreements and other documents shall be deemed to include all subsequent amendments and other modifications thereto;

  1.2.3. References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation;

  1.2.4. Capitalized terms not defined in this Agreement shall have the meaning ascribed to them by the Bankruptcy Code;

  1.2.5. The wording of this Agreement was reviewed by legal counsel for each of the Parties and each of them had sufficient opportunities to propose and negotiate changes prior to its execution. None of the Parties will be entitled to have any wording of this Agreement construed against the other based on any contention as to which of the Parties drafted the language in question or which Party is an insurer.

## II. **PAYMENT OF SETTLEMENT AMOUNTS**

  2.1 <u>Payment by the Carriers and Chartis</u>

  2.1.1. Subject to all of the terms of this Agreement, in full and final settlement of all responsibilities under and arising out of the Policies, and in consideration of the sale of the Policies to the Carriers and Chartis free and clear of all Interests of any Entity, and expressly subject to the fulfillment of all Conditions to Payment identified in Section 3 below, the Carriers and/or Chartis shall pay to   "Catholic Diocese of Wilmington, Inc., Debtor-in-Possession" the sum of Five Million Dollars ($5,000,000.00) (the "<u>Settlement Amount</u>")by check delivered by

mail to Young Conaway Stargatt & Taylor, counsel to the Diocese, within thirty (30) calendar days after all  Conditions to Payment described herein have been fulfilled but in no event earlier than September 12, 2011.

> 2.1.2.  The Parties expressly agree that the Settlement Amount is the total amount the Carriers and Chartis are obligated to pay on account of any and all Claims of any kind made under or relating to the Policies or with respect to the Extra-Contractual Claims, that under no circumstance will the Carriers or Chartis ever be obligated to make any additional payments to anyone in connection with the Policies, and that all indemnity amounts or limits of liability available or allegedly available under the Policies, including all per person, per occurrence and aggregate limits of liability, shall be deemed fully and properly exhausted. The Parties further agree that the Settlement Amount is the full purchase price of the Policies and that, upon payment of the Settlement Amount, the Carriers and Chartis shall be deemed to own the Policies free and clear of all Interests of any Entity, and there shall be no defense obligations under the Policies.

> 2.1.3.  Nothing in this Agreement precludes the Carriers and Chartis or the Sellers from allocating payments or the receipt of payments hereunder in such manner as the Carriers and Chartis or the Seller see fit.  Any such allocation by either the Carriers and Chartis or the Sellers shall not be binding on the other.

> 2.1.4.  Except as otherwise ordered by the Bankruptcy Court, the Sellers agree that they shall use any and all sums received hereunder solely toward payment for indemnity for Tort Claims or for contribution to a trust(s) established for the benefit of Tort Claimants under the Plan, subject to the terms and conditions of the Plan.

## III.    CONDITIONS TO PAYMENT

3.1    The obligation to pay the Settlement Amount is expressly conditioned on, and payment need not be made unless and until the Diocese has obtained both the Approval Order and the Confirmation Order confirming the "Settlement Plan" which specifically contains the ~~Chaneling~~Channeling Injunction, until such orders become Final Orders; and until all "Conditions Precedent" contained in Section 15.1 of the Plan are met and satisfied.

3.1.1    Approval Order.  No later than ten (10) business days after the Effective Date, the Diocese shall file a motion (the "Approval Motion") requesting the Bankruptcy Court to enter the Approval Order and set a hearing date for the motion on the earliest available court date.  The Diocese shall use its reasonable best efforts to obtain entry of the Approval Order, which includes: (i) supporting entry of the Approval Order during all discussions with claimants, their attorneys and guardians *ad litem*;       (ii) filing a written response in the event any objections to the Approval Motion are filed with the Bankruptcy Court; and (iii) taking all reasonable steps to defend against any appeal, petition, motion or other challenge to the Bankruptcy Court's entry of the Approval Order.

3.1.2    The Diocese shall provide appropriate written notice of the Approval Motion to (i) all known claimants or counsel for claimants who have filed a proof of claim in the Bankruptcy Case, who were scheduled by the Diocese (whether or not scheduled as contingent, unliquidated and/or disputed), or whose claims are pending and were tendered under the Policies as of the commencement of the Bankruptcy Case, including all Tort Claimants and all holders of Contribution Claims, and any other known creditors or claimants, at the address provided for notice in the proof of claim filed by each such claimant or the address listed for such claimant in the Diocese's schedules, or the address of such claimant last known to the Sellers, as applicable,

(ii) all Entities who have filed a notice of appearance in the Bankruptcy Case, (iii) all Entities known or alleged by the Seller to have provided general liability insurance to the Sellers (as more specifically listed on Schedule ~~C~~B hereto),  (iv) counsel for the Committee and (v) all known Perpetrators, via service to their respective attorney of record in the Bankruptcy Case (if known), their registered agent for service of process in Delaware (if known), or at the address last known to the Diocese.  Notice of this Agreement shall also be published one time in *The News Journal* in a form and at a time agreed to by the Parties or as ordered by the Bankruptcy Court.

> 3.1.3   Confirmation Order.  In conjunction with the Plan, the Diocese shall use its reasonable best efforts to promptly obtain the Confirmation Order confirming the "Settlement Plan:", which shall include the Plan Provisions set forth in Section 6 hereof. ·Such best efforts include: (i) seeking a confirmation hearing on an appropriately timely basis; (ii) urging the Bankruptcy Court to overrule any objections and confirm the Plan; and (iii) taking all reasonable steps to defend against any appeal, petition, motion or other challenge to the Bankruptcy Court's entry of the Confirmation Order.

## IV.   SALE OF POLICIES

> 4.1   Sale and Buy-back of Policies Free and Clear of all Interests. On the Effective Date, this Agreement effects a sale and buy-back of the Policies from the Sellers, and the Carriers and Chartis buy back all of the Policies, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code and applicable law, free and clear of all Interests of all Entities; provided, however, that in the event that the Plan does not become effective, this Agreement shall be void ab initio.

4.2     Good Faith Purchase; Fair and Reasonable Settlement; Reasonable Equivalent Value; Compliance with Law.   The Parties acknowledge and agree that: (i) the Carriers and Chartis are good faith purchasers of the Policies within the meaning of section 363(m) of the Bankruptcy Code; (ii) the consideration exchanged by the Parties pursuant to this Agreement constitutes a fair and reasonable settlement of the Parties' disputes and of their respective rights and obligations relating to the Policies, and constitutes reasonably equivalent value; (iii) the releases contained in this Agreement and this policy buy-back comply with the Bankruptcy Code and applicable law; and (iv) this Agreement in no way voids, annuls or attempts to void or annul the Policies, which, with respect to each of the Sellers, have been fully performed.

## V.     **RELEASES**

5.1     Release of Buyer. Subject to the satisfaction of the Conditions to Payment, and upon the occurrence of the Effective Date, the Sellers hereby completely release and forever discharge (i) the Carriers and Chartis, (ii) all of the Carriers' and Chartis' respective Affiliates and Agents (including the law firms of McCurdy & Fuller LLP and Saul Ewing LLP and, more specifically, any attorney, partner, counsel, associate or employee of any type of said law firms), (iii) all of the Carriers' and Chartis' respective predecessors, successors and assigns and (iv) all other persons and Entities who acted, or may be deemed to have acted, on behalf of such parties listed in subsections (i) to (iii), from any and all Claims of any nature whatsoever, whether sounding in breach of contract, breach of any duty of good faith and fair dealing, breach of statutory duties, actual or constructive fraud, actual or constructive breach of fiduciary duty, or whether legal or equitable, known or unknown, accrued or unaccrued, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, fixed or contingent, of the Sellers that in any way are related to, connected with, based on or arise out of, directly or indirectly, the Tort

Claims, the Policies or the Bankruptcy Case, and which include the 541 Claims, the Contribution Claims and the Extra-Contractual Claims (collectively, the "Seller-Released Claims"). The Sellers further agree that if, contrary to the Parties' specific intent, any Seller-Released Claims are deemed to survive this Agreement, even though they are encompassed by the terms of the release set forth in this section, the Sellers hereby forever, expressly and irrevocably, waive entitlement to and agree not to assert any and all such Claims.

5.2   Release and Return of the Policies. Upon the occurrence of the Effective Date, the Sellers agree that the Carriers and Chartis will have bought back the Policies free and clear of all Interests and all rights, title and interests of the Sellers, any other party claiming by, through, on behalf of or under the Sellers, or any Entity claiming rights of any nature whatsoever under the Policies, are hereby completely released and forever discharged. On the Effective Date, the Sellers shall physically return the Policies to the Carriers and Chartis by sending to counsel for the Carriers and Chartis: (i) the original of any such Policy, if located; (ii) if no original can be located, a copy of such Policy, if a copy is found, and a certification that no original could be found, in which case the copy shall be treated for all purposes as if it were an original; or (iii) if no original or copy can be located, a certification to that effect, which shall have the same force and effect as if the original of that contract were returned to the Carriers and/or Chartis. In the event that after the Effective Date an original or copy of a Policy is discovered by the Sellers, such original or copy shall be promptly delivered to the Carriers and Chartis.

5.3   Release of the Sellers. Upon the occurrence of the Effective Date, the Carriers and Chartis hereby completely release and forever discharge (i) the Sellers, (ii) all of the Sellers' employees, directors, officers, shareholders, agents, representatives and attorneys (including the law firm of Young Conaway Stargatt & Taylor, LLP and, more specifically, any attorney,

partner, counsel, associate, or employee of any type of said law firm), (iii) all of the Sellers' predecessors, successors and assigns and (iv) all other persons and entities who acted, or may be deemed to have acted, on behalf of such parties listed in subsections (i) to (iii), from any and all Claims, of any nature whatsoever, whether legal or equitable, known or unknown, past, present, or future, suspected or unsuspected, fixed or contingent, of the Carriers and/or Chartis, that in any way are related to, connected with, based on or arise out of, directly or indirectly, the Tort Claims, the Policies or the Bankruptcy Case (collectively, the "Buyer-Released Claims"). The Carriers and Chartis agree that if, contrary to the Parties' specific intent, any Buyer-Released Claims are deemed to survive this Agreement, even though they are encompassed by the terms of the release set forth in this section, the Carriers and Chartis hereby forever, expressly and irrevocably, waive entitlement to and agree not to assert any and all such Claims.

5.4    Nothing in these sections is intended to, nor shall be construed to, release, waive, relinquish or otherwise affect the Parties' rights and obligations under this Agreement.

5.5    Each of the Parties specifically acknowledges and agrees that it may hereafter discover facts in addition to or different from those which it now believes to be true with respect to the matters released herein, but agrees that it has taken such possibility into account in reaching this Agreement and that the releases shall be and remain in effect notwithstanding the discovery or existence of any such additional or different facts as to which the Parties expressly assume the risk.

## VI.   PLAN PROVISIONS

6.1    The Diocese shall include in the Plan and Confirmation Order the following provisions in a form reasonably acceptable to the Carriers and Chartis, which shall be referred to collectively herein as the "Plan Provisions:"

6.1.1    A complete release and discharge of all Tort Claims, including, without limitation, all Unknown Claims, Contribution Claims, 541 Claims and Extra-Contractual Claims, against any and all Entities and the Carriers and/or Chartis, and excluding only the Perpetrators;

6.1.2.    The permanent Channeling Injunction as defined in and contained in the Plan, enjoining and restraining all Entities who have held or asserted, hold or assert, or may in the future hold or assert a Channeled Claim or an Enjoined Claim from taking any action, directly or indirectly for the purposes of asserting, enforcing or attempting to assert or enforce any Channeled Claim or Enjoined Claim, including;    (i) commencing or continuing in any manner, any action or any other proceeding of any kind with respect to any Channeled Claim or Enjoined Claim against the Carriers and/or Chartis; (ii) seeking the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Carriers and Chartis or the property of the Carriers or Chartis with respect to any Channeled Claim or Enjoined Claim; (iii) creating, perfecting or enforcing any encumbrance or lien of any kind against the Carriers and/or Chartis or the property of the Carriers and/or Chartis with respect to any Channeled Claim or Enjoined Claim; (iv) asserting any rights of setoff, subrogation or recoupment of any kind against any obligation due to the Carriers and/or Chartis with respect to any Channeled Claim or Enjoined Claim; and (v) taking any act, in any manner and in any place whatsoever, that does not conform to or comply with this Agreement.

6.1.3    A provision stating that all injunctions or stays provided for in the Confirmation Order and in the Plan, the injunctive provisions of sections 524 and 1141 of the Bankruptcy Code, and all injunctions or stays protecting the Carriers and Chartis, are permanent and will remain in full force and effect following the effective date of the Plan; and

6.1.4    A provision releasing any and all avoidance actions or claims against the Carriers and Chartis arising under chapter 5 of the Bankruptcy Code with respect to this Agreement and the Claims released hereunder or any policies issued by Chartis.

## VII.    REPRESENTATIONS AND WARRANTIES OF THE PARTIES

7.1    Each of the Parties separately represents and warrants as follows:

7.1.1    To the extent it is a corporation, including, without limitation, a corporation sole or other legal Entity, it has the requisite power and authority to enter into this Agreement and to perform the obligations contemplated by this Agreement, subject only to approval of the Bankruptcy Court;

7.1.2    Subject to entry of the Approval Order and Confirmation Order as Final Orders, the execution, delivery and performance of the obligations contemplated by this Agreement have been approved by duly authorized representatives of each Party, and by all other necessary representatives of the Party;

7.1.3    Each Party has expressly authorized its undersigned representative to execute this Agreement on the Party's behalf as its duly authorized agent; and

7.1.4    This Agreement has been thoroughly negotiated and analyzed by each Party's counsel and has been executed and delivered in good faith, pursuant to arm's length negotiations and for good and valuable consideration.

7.2    The Sellers acknowledge, represent and warrant that they are the owners of the Policies and that they have not assigned or otherwise transferred or subrogated any interest in the Policies or any Claims that are the subject matter hereof.

## VIII.  ACTIONS INVOLVING THIRD PARTIES

8.1    For purposes of supporting the releases granted herein and the extinguishment of any and all rights under the Policies resulting from the sale and buy-back thereof contemplated by this Agreement, the Sellers hereby agree as follows with respect to any Claim against any of them:

8.1.1    They will not seek to obtain payment from any other insurance company of any amount that may be attributable or allocable to the Carriers and/or Chartis; and

8.1.2.    In the event that any insurer of the Sellers obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from the Carriers and/or Chartis as a result of a Contribution Claim against the Carriers and/or Chartis for the Carriers' or Chartis' alleged share or equitable share, or to enforce subrogation rights, if any, of the defense and/or indemnity obligation of the Carriers and Chartis for any Claims released pursuant to this Agreement, the Sellers shall voluntarily reduce the judgment or Claim against, or settlement with, such other insurer(s) to the extent necessary to eliminate such Contribution Claim against the Carriers and/or Chartis.  To ensure that such a reduction is accomplished, the Carriers and Chartis shall be entitled to assert this paragraph as a defense to any action against it for any such portion of the judgment or Claim and shall be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect the Carriers and Chartis from any liability for the judgment or Claim.

8.1.3    The Carriers and Chartis hereby agree that they shall not assert any Contribution Claim against any other insurer of the Sellers unless that other insurer first asserts a Contribution Claim against the Carriers and Chartis.  In such event, the Carriers and Chartis shall retain all of their rights, Claims, Contribution Claims and defenses against such other insurer.

The Sellers shall use their reasonable best efforts to obtain from all insurers with which they settle agreements similar to those contained in this section; provided, however, that the failure of the Sellers, despite their reasonable best efforts, to obtain such an agreement from any insurer with which they settle will not be a basis to terminate this Agreement or excuse the Carriers and/or Chartis from performing their obligations hereunder.

~~8.2    [RESERVED]~~

8.2    The Reorganized Diocese, on behalf of itself and the Diocese Releasing Parties, shall indemnify, defend and hold the Carriers and Chartis harmless from and against all Claims against the Carriers and/or Chartis arising out of or related to the Enjoined Claims. The obligation to defend shall include, without limitation, legal fees, litigation expenses and costs, and investigative expenses and costs, and shall extend to all aspects of the defense, including, without limitation, any challenge to the effect and validity of this Agreement. In defending the Carriers and /or Chartis, the Reorganized Diocese shall use (i) counsel acceptable to the Carriers and /or Chartis and (ii) legal positions approved by the Carriers and /or Chartis, but such acceptance and approval shall not be unreasonably withheld.

## IX.    MISCELLANEOUS

9.1    In the event that any proceedings are commenced to invalidate all or any part of this Agreement, the Parties agree to cooperate fully in opposing such proceedings.

9.2    Each Party agrees to take such steps and to execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Agreement and to preserve its validity and enforceability. In the event that any action or proceeding of any type whatsoever is commenced or prosecuted by any Entity not a Party hereto to invalidate, interpret or prevent the validation, enforcement or carrying out of all or any of the provisions of this

Agreement, the Parties mutually agree, represent, warrant and covenant to cooperate fully in opposing such action or proceeding.

9.3    The Diocese shall cooperate with the Carriers and Chartis and their respective representatives in connection with the Approval Order, the Confirmation Order and the Bankruptcy Case.   Such cooperation shall include, without limitation, consulting with the Carriers and Chartis at their request concerning the status of proceedings and providing the Carriers and Chartis with copies of requested pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court; provided, however, that nothing contained in this paragraph shall obligate the Diocese to provide to the Carriers and Chartis any information that is otherwise subject to attorney-client or work product privileges.

9.4    This Agreement along with the Plan, Confirmation Order and Approval Order, constitutes a single integrated written contract that expresses the entire agreement and understanding between the Parties.   Except as otherwise expressly provided, this Agreement supersedes all prior communications, settlements, and understandings between the Parties and their representatives regarding the matters addressed by this Agreement.   Except as explicitly set forth in this Agreement, there are no representations, warranties, promises, or inducements, whether oral, written, expressed or implied, that in any way affect or condition the validity of this Agreement or alter or supplement its terms.   Any statements, promises or inducements, whether made by any party or any agent of any party, that are not contained in this Agreement shall not be valid or binding.   Any changes to this Agreement must be made in writing and with the consent of all Parties.

9.5   No part of this agreement, its negotiation or performance may be used in any manner in any action, suit or proceeding by any Entity as evidence of the rights, duties or obligations of any of the Parties with respect to matters or Entities outside the scope of this Agreement.   All actions taken and statements made by the Parties or by their representatives relating to this Agreement or participation in this Agreement, including its development and implementation, shall be without prejudice or value as precedent, and shall not be used as a standard by which other matters may be judged.

9.6   This Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession by any Party of liability, culpability or wrongdoing. Settlement negotiations leading up to this Agreement and all related discussions and negotiations shall be deemed to fall within the protection afforded to compromises and offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions.   Any evidence of the terms of this Agreement or negotiations or discussions associated with this Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties or obligations of the Parties, except in: (i) a proceeding to obtain the Approval Order or the Confirmation Order; (ii) an action or proceeding to enforce the terms of this Agreement; or (iii) any possible action or proceeding between the Carriers and/or Chartis and any of their reinsurers. This Agreement shall not be used as evidence or in any other manner in any court or dispute resolution proceeding, to create, prove or interpret either the Carriers' and/or Chartis' obligations under the Policies to the Diocese or to any other Entity or any Claims of any Party against the Carriers and Chartis.

9.7   Neither this Agreement nor the rights and obligations set forth herein shall be assigned without the prior written consent of the other Parties.

9.8     Section titles and/or headings contained in this Agreement are included only for ease of reference and shall have no substantive effect.

9.9     All notices, demands or other communications to be provided pursuant to this Agreement shall be in writing and sent by facsimile or other electronic transmission or by Federal Express or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other person or address as any of them may designate in writing from time to time:

If to the CARRIERS:

175 Water Street, 18th Floor
New York, NY 10038

With a copy to:

Mary McCurdy, Esquire
McCURDY & FULLER LLP
4300 Bohannon Drive, Suite 240
Menlo Park, CA 94025

If to the Diocese:

~~Most Rev. W. Francis Malooly, D.D.~~
~~1925 Delaware Avenue~~
Rev. Msgr. J. Thomas Cini
Vicar General for Administration
Catholic Diocese of Wilmington
~~PO~~P.O. Box 2030
Wilmington, DE 19899-2030

With a copy to:

~~Robert S. Brady, Esq.~~
Anthony G. Flynn, Esquire
        Young Conaway Stargatt & Taylor, LLP
        The Brandywine Building
        1000 West ~~Street~~St., 17th Floor
P.O. Box 391
        Wilmington, DE ~~19801~~19899-0391
aflynn@ycst.com

If to the Committee:

Bruce Grohsgal, Esquire
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 16th Floor
Wilmington, DE 19899-8705

9.10    This Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by facsimile, which facsimile counterparts shall be deemed to be originals.

9.11    The Parties agree that nothing contained in this Agreement shall be deemed or construed to constitute:  (i) an admission by the Carriers and/or Chartis that the Diocese, the Diocese Releasing Parties or any Entity was or is entitled to any insurance coverage under the Policies or as to the validity of any positions that have been or could have been asserted by the Diocese; (ii) an admission by the Diocese as to the validity of any positions or defenses to coverage that have been or could have been asserted by the Carriers and/or Chartis or any Claims that have or could have been asserted by the Diocese against the Carriers and/or Chartis; and (iii) an admission by the Diocese or the Carriers and/or Chartis of any liability whatsoever with respect to any of the Tort Claims.

9.12    No waiver or indulgence of any breach or series of breaches of this Agreement shall be deemed or construed as a waiver of any breach of the same or any other provision hereof or affect the enforceability of any part or all of this Agreement, and no waiver shall be valid unless executed in writing by the waiving party.

9.13    By entering into this Agreement, none of the Parties has waived, or shall be deemed to have waived, any rights, obligations or positions it or they have asserted or may in the future assert in connection with any matter or person outside the scope of this Agreement.

9.14    All of the entities included in the definition of the Carriers and of Chartis are intended beneficiaries of this Agreement.  The Parties agree that, except as set forth in the prior sentence or otherwise set forth in this Agreement, there are no third-party beneficiaries of this Agreement.

9.15    This Agreement shall be regarded as confidential and shall not be disclosed to third parties, except that this Agreement may be disclosed (i) to the Bankruptcy Court insofar as necessary to fulfill a Party's obligations under this Agreement, the Bankruptcy Code and Bankruptcy Rules, as applicable, (ii) to any Party's auditors, regulators or reinsurers, (iii) to any Entity pursuant to court order, and (iv) by any Party, with the written consent of the other Party.  The Parties acknowledge and agree, notwithstanding the foregoing, that a copy of this Agreement will be attached to the Approval Motion and the material terms disclosed in any notice required to be given under this Agreement, the Bankruptcy Code or the Bankruptcy Rules in connection with seeking entry of the Approval Order.  The Parties agree not to disparage or induce or encourage others to disparage the other with respect to matters relating to this Agreement, the Policies and the Claims resolved herein.

9.16    Except as otherwise provided in this Agreement, each party shall be responsible for their own fees and costs incurred in conjunction with the Bankruptcy Case and this Agreement.

———— [RESERVED]

Catholic Diocese of Wilmington

By: _____ (SEAL)
   (Name)

Title: _____

Date: July ___, 2011

Cathedral of St. Peter Roman Catholic Church

By: _____ (SEAL)
   (Name), as its Trustee

Date: July ___, 2011

Christ Our King Roman Catholic Church

By: _____ (SEAL)
   (Name), as its Trustee


Date: July ___, 2011

Corpus Christi Roman Catholic Church

By: _____ (SEAL)
   (Name), as its Trustee


Date: July ___, 2011

Good Shepherd Roman Catholic Church

By: _____ (SEAL)
   (Name), as its Trustee


Date: July ___, 2011

Holy Child Roman Catholic Church

By: _____ (SEAL)
   (Name), as its Trustee


Date: July ___, 2011

Holy Cross Roman Catholic Church

By: _____ (SEAL)
   (Name), as its Trustee


Date: July ___, 2011

Holy Family Roman Catholic Church

By: _____ (SEAL)
   (Name), as its Trustee


Date: July ___, 2011

Holy Name of Jesus Roman Catholic Church

By: _____ (SEAL)
   (Name), as its Trustee


Date: July ___, 2011

Holy Rosary Roman Catholic Church

By: _____ (SEAL)
   (Name), as its Trustee


Date: July ___, 2011

Holy Spirit Roman Catholic Church

By: _____ (SEAL)
        (Name), as its Trustee


Date:  July _____, 2011


Immaculate Conception Roman Catholic Church
(Marydel)

By: _____ (SEAL)
        (Name), as its Trustee


Date:  July _____, 2011

Our Lady of Fatima Roman Catholic Church

By: _____ (SEAL)
        (Name), as its Trustee


Date:  July _____, 2011

Our Lady of Lourdes Roman Catholic Church

By: _____ (SEAL)
        (Name), as its Trustee


Date:  July _____, 2011

Parish of The Resurrection Roman Catholic
Church

By: _____ (SEAL)
        (Name), as its Trustee


Date:  July _____, 2011

Immaculate Conception Roman Catholic Church
(Elkton)

By: _____ (SEAL)
        (Name), as its Trustee


Date:  July _____, 2011


Immaculate Heart of Mary Roman Catholic
Church

By: _____ (SEAL)
        (Name), as its Trustee


Date:  July _____, 2011

Our Lady of Good Counsel Roman Catholic
Church

By: _____ (SEAL)
        (Name), as its Trustee


Date:  July _____, 2011

Our Mother of Sorrows Roman Catholic Church

By: _____ (SEAL)
        (Name), as its Trustee


Date:  July _____, 2011

Sacred Heart Roman Catholic Church

By: _____ (SEAL)
        (Name), as its Trustee


Date:  July _____, 2011

St. Andrew Roman Catholic Church

By: _____ (SEAL)
      (Name), as its Trustee


Date:  July ___, 2011

St. Ann Roman Catholic Church (Wilmington)

By: _____ (SEAL)
      (Name), as its Trustee


Date:  July ___, 2011

St. Benedict Roman Catholic Church

By: _____ (SEAL)
      (Name), as its Trustee


Date:  July ___, 2011

St. Christopher Roman Catholic Church

By: _____ (SEAL)
      (Name), as its Trustee


Date:  July ___, 2011

St. Elizabeth Roman Catholic Church

By: _____ (SEAL)
      (Name), as its Trustee


Date:  July ___, 2011

St. Francis de Sales Roman Catholic Church

By: _____ (SEAL)
      (Name), as its Trustee


Date:  July ___, 2011


St. Ann Roman Catholic Church (Bethany Beach)

By: _____ (SEAL)
      (Name), as its Trustee


Date:  July ___, 2011

St. Anthony of Padua Roman Catholic Church

By: _____ (SEAL)
      (Name), as its Trustee


Date:  July ___, 2011

St. Catherine of Siena Roman Catholic Church

By: _____ (SEAL)
      (Name), as its Trustee


Date:  July ___, 2011

St. Dennis Roman Catholic Church

By: _____ (SEAL)
      (Name), as its Trustee


Date:  July ___, 2011

St. Elizabeth Ann Seton Roman Catholic Church

By: _____ (SEAL)
      (Name), as its Trustee


Date:  July ___, 2011

St. Hedwig Roman Catholic Church

By: _____ (SEAL)
      (Name), as its Trustee


Date:  July ___, 2011

St. Helena Roman Catholic Church

By: _____ (SEAL)
      (Name), as its Trustee


Date: July ___, 2011

St. John the Apostle Roman Catholic Church

By: _____ (SEAL)
      (Name), as its Trustee


Date: July ___, 2011

St. John the Beloved Roman Catholic Church

By: _____ (SEAL)
      (Name), as its Trustee


Date: July ___, 2011

St. Joseph Roman Catholic Church (Wilmington)

By: _____ (SEAL)
      (Name), as its Trustee


Date: July ___, 2011

St. Jude the Apostle Roman Catholic Church

By: _____ (SEAL)
      (Name), as its Trustee


Date: July ___, 2011

St. John Neumann Roman Catholic Church

By: _____ (SEAL)
      (Name), as its Trustee


Date: July ___, 2011

St. John the Baptist - Holy Angels Roman Catholic Church

By: _____ (SEAL)
      (Name), as its Trustee


Date: July ___, 2011

St. Joseph Roman Catholic Church (Middletown)

By: _____ (SEAL)
      (Name), as its Trustee


Date: July ___, 2011

St. Joseph on the Brandywine Roman Catholic Church

By: _____ (SEAL)
      (Name), as its Trustee


Date: July ___, 2011

St. Luke Roman Catholic Church

By: _____ (SEAL)
      (Name), as its Trustee


Date: July ___, 2011

St. Margaret of Scotland Roman Catholic Church

By: _____ (SEAL)
　　　 (Name), as its Trustee


Date: July ___, 2011


St. Mary of the Immaculate Conception Roman
Catholic Church

By: _____ (SEAL)
　　　 (Name), as its Trustee


Date: July ___, 2011


St. Mary Refuge of Sinners Roman Catholic
Church

By: _____ (SEAL)
　　　 (Name), as its Trustee


Date: July ___, 2011


St. Matthew Roman Catholic Church

By: _____ (SEAL)
　　　 (Name), as its Trustee


Date: July ___, 2011


St. Patrick Roman Catholic Church

By: _____ (SEAL)
　　　 (Name), as its Trustee


Date: July ___, 2011


St. Mary of the Assumption Roman Catholic
Church

By: _____ (SEAL)
　　　 (Name), as its Trustee


Date: July ___, 2011


St. Mary Magdalen Roman Catholic Church

By: _____ (SEAL)
　　　 (Name), as its Trustee


Date: July ___, 2011


St. Mary Star of the Sea Roman Catholic Church

By: _____ (SEAL)
　　　 (Name), as its Trustee


Date: July ___, 2011


St. Michael the Archangel Roman Catholic
Church

By: _____ (SEAL)
　　　 (Name), as its Trustee


Date: July ___, 2011


St. Paul Roman Catholic Church (Delaware City)

By: _____ (SEAL)
　　　 (Name), as its Trustee


Date: July ___, 2011

| St. Paul Roman Catholic Church (Wilmington) | Ss. Peter and Paul Roman Catholic Church |
|---|---|
| By: _____ (SEAL)<br>_____ (Name), as its Trustee | By: _____ (SEAL)<br>_____ (Name), as its Trustee |
| Date: July ___, 2011 | Date: July ___, 2011 |
| St. Peter the Apostle Roman Catholic Church | St. Polycarp Roman Catholic Church |
| By: _____ (SEAL)<br>_____ (Name), as its Trustee | By: _____ (SEAL)<br>_____ (Name), as its Trustee |
| Date: July ___, 2011 | Date: July ___, 2011 |
| St. Thomas the Apostle Roman Catholic Church | DOW Schools, Inc. |
| By: _____ (SEAL)<br>_____ (Name), as its Trustee | By: _____ (SEAL)<br>_____ (Name), as its Trustee |
| Date: July ___, 2011 | Date: July ___, 2011 |
| Catholic Cemeteries, Inc. | Catholic Charities, Inc. |
| By: _____ (SEAL)<br>_____ (Name), as its Trustee | By: _____ (SEAL)<br>_____ (Name), as its Trustee |
| Date: July ___, 2011 | Date: July ___, 2011 |
| Siena Hall, Inc. | Seton Villa, Inc. |
| By: _____ (SEAL)<br>_____ (Name), as its Trustee | By: _____ (SEAL)<br>_____ (Name), as its Trustee |
| Date: July ___, 2011 | Date: July ___, 2011 |

Children's Home, Inc.

By: _____ (SEAL)
     (Name), as its Trustee


Date: July ___, 2011


Catholic Ministry to the Elderly, Inc.

By: _____ (SEAL)
     (Name), as its Trustee


Date: July ___, 2011

Catholic Diocese Foundation

By: _____ (SEAL)
     (Name), as its Trustee


Date: July ___, 2011

Catholic Youth Organization, Inc. d/b/a Catholic Youth Ministry

By: _____ (SEAL)
     (Name), as its Trustee


Date: July ___, 2011

Catholic Press of Wilmington, Inc.

By: _____ (SEAL)
     (Name), as its Trustee


Date: July ___, 2011


Signed: _____

     (name)

(For Underwriters)

SCHEDULE "B̲A̲"

# Chartis Insurance Policies

1)   Granite State Umbrella Policy No. 6485-0429
     (6/30/1985-6/30/1986)
     $10M/occurrence
     *Excess of $500k per occurrence/aggregate*

2)   ICSOP Umbrella Policy No. UML4186-4041
     (6/30/1986-6/30/1987)
     $5M/occurrence
     *Excess of $500k per occurrence/aggregate*

3)   ICSOP Excess Umbrella Policy No. 4486-9146
     (8/8/1986-6/30/1987)
     $2.5M/occurrence
     *Excess of $8M per occurrence/aggregate*

4)   ICSOP Umbrella Policy No. UML4187-4659
     (6/30/1987-7/1/1988)
     $5M/occurrence
     *Excess of $500k per occurrence/aggregate*

5)   ICSOP Umbrella Policy No. 4188-4934
     (7/1/1988-7/1/9189)
     $5M/occurrence
     *Excess of $500k per occurrence/aggregate*

6)   ICSOP Excess Umbrella Policy No. 4488-1278
     (8/4/1988-7/1/1989)
     $5M/occurrence
     *Excess of $10.5M per occurrence/aggregate*

7)   ICSOP Umbrella Policy No. 4189-5601
     (7/1/1989-7/1/1990)
     $5M/Occurrence
     *Excess of $500k per occurrence/aggregate*

SCHEDULE ~~C:  LIST OF INSURERS OF DIOCESE~~"B"

# List of Insurers of the Diocese

- Granite State Insurance Company
- The Insurance Company of the State of Pennsylvania
- First State Insurance Company
- Nutmeg Insurance Company
- Twin City Insurance Company
- Lloyd's, London
- National Casualty Company
- Scottsdale Insurance Company
- Fireman's Fund Insurance Company
- Adriatic Insurance Company
- Allianz S.p.A.
- Mission Insurance Company
- Transamerica Corporation
- The Hanover Insurance Group, Inc.
- Ullico

Document comparison by Workshare Professional on Thursday, July 28, 2011 1:23:31 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://WORKSITE01/YCST01/11209237/1 |
| Description | #11209237v1<YCST01> - Buyback - Chartis -- Redacted 6/24/11 |
| Document 2 ID | interwovenSite://WORKSITE01/YCST01/11244087/1 |
| Description | #11244087v1<YCST01> - CDOW - Chartis Buy-back Agreement |
| Rendering set | standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 256 |
| Deletions | 17 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 273 |