# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CATHOLIC DIOCESE OF WILMINGTON, INC., | ) | Case No. 09-13560 (CSS) |
| | ) | |
| | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

## OPINION[1]

| | |
|---|---|
| YOUNG CONAWAY STARGATT & TAYLOR, LLP | DRESCHER & ASSOICATES, P.A. |
| Robert S. Brady | Ronald J. Drescher |
| Anthony G. Flynn | Suite 107 |
| Mary F. Dugan | 4 Reservoir Circle |
| Patrick A. Jackson | Baltimore, MD 21208 |
| Rodney Square | |
| 1000 North King Street | Counsel for Kenneth Martin |
| Wilmington, DE 19801 | |
| | |
| Counsel to the Reorganized Debtor | |

Dated: July 16, 2014

Sontchi, J._____

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 9014 (c) and 7052.

**INTRODUCTION**

Before the Court is the Plan Administrator's First Omnibus (Substantive) Objection (the "Claims Objection")[2] to, *inter alia,* the Proof of Claim filed by Kenneth Martin ("Martin").[3]   The objection was made pursuant to Section 502(b) of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 3003 and 3007, and Local Rule 3007-1.

For the reasons that follow, the Claims Objection is nonjusticiable on the merits. However, since, under the Bankruptcy Rules, Mr. Martin's claim is deemed allowed unless and until the Claim Objection is granted, the Court will sustain the Claims Objection solely for the procedural purpose of removing any issues relating to Martin's claim from the purview of the Bankruptcy Court.

**JURISDICTION**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court has the judicial power to enter a final order.

---

[2] D.I. 1626, which was supplemented in D.I. 1779.

[3] Proof of Claim No. 1049. The Objection originally also addressed Proofs of Claims No. 1157 and 1564, filed by Charles Wiggins.  Wiggins filed a notice of withdrawal of his claims on June 12, 2014.  D.I. 2169.

## STATEMENT OF FACTS

### I.    Factual History

On October 18, 2009, the Catholic Diocese of Wilmington, Inc. (the "Debtor") commenced its reorganization by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code.[4]  Prior to the Debtor's bankruptcy, numerous lawsuits were commenced regarding the sexual abuse of minors by priests and employees within the Diocese and the broader Roman Catholic Church.[5]  The Debtor was named as a defendant in approximately 131 of these sexual abuse cases filed in the Delaware state courts, under the Delaware Child Victims Act.[6]  Within the bankruptcy case, the Debtor entered into a settlement with the abuse survivors.[7]  This settlement included both monetary and non-monetary provisions; some of the non-monetary provisions were included in various Court orders, including the Order this Court entered confirming the Debtor's "Settlement Plan."[8]  The Plan became effective on September 26, 2011.[9]

The Confirmation Order contained the following provisions, among others: (i) the Removed Priests, including Martin, shall be ineligible for benefits of any kind

---

[4] D.I. 1.  There is a distinction between the Catholic Diocese of Delaware (the "Diocese") and the Debtor. The Diocese is not a legal entity, but, rather an ecclesiastical entity under Canon Law.  It includes the Debtor, the Diocese's parishes and other entities that carry out the Diocese's ministry.  The Diocese and its members (parishes, etc.) are under the ecclesiastical authority of the Bishop of Wilmington.

[5] Declaration of the Reverend Monsignor J. Thomas Cini, D.I. 9, ¶ 56.

[6] *Id.* ¶ 67.

[7] *See* Conformed Second Amended Chapter 11 Plan of Reorganization, D.I. 1493.

[8] D.I. 1471 (the "Confirmation Order").

[9] Notice of Effective Date, D.I. 1628.

arising on or after the Petition Date;[10] and (ii) that the Debtor shall object to any and all claims asserted by the Removed Priests against the Debtor, regardless of whether such claims are asserted as pre-petition, post-petition or post-confirmation Claims.[11]

## II.    Factual and Procedural Background of the Claims Objection

In setting forth his case, Martin has filed documents under seal with the Court for the purposes of confidentiality.[12]  Consequently, the factual discussion to follow will be brief, and will avoid the unnecessary disclosure of any sealed factual evidence.

Martin's claim stems from his removal from ministerial duties after the late Bishop Michael A. Saltarelli released the names of numerous Diocesan priests who had admitted, corroborated, or otherwise substantiated allegations of abuse against minors.[13]  The claim asserts that he is entitled to pension and sustenance, based on a

---

[10] Paragraph 55 of the Confirmation Order, D.I. 1471, states, in part:

> 55.    Modification of Clergy Pension Plan.  The Debtor shall modify the Clergy Pension Plan to provide that . . . Kenneth J. Martin  . . . (the "Removed Priests") shall be ineligible for benefits of any kind arising on or after the Petition Date.  Such Modification is hereby approved pursuant to § 363(b) of the Bankruptcy Code, effective as of the Confirmation Date.

[11] *Id*. at ¶ 56 states:

> 56.    Objection to Certain Claims.  Within sixty (60) days after the Confirmation Date, the Debtor shall object to any and all Claims, in their entirety, of the Removed Priests asserted against the Debtor, regardless of whether such Claims are asserted as pre-petition, post-petition, or post-confirmation Claims (the "Removed Priest Claims").  The Plan shall be modified accordingly.

The Confirmation Order originally also contained an injunction against any payment to a removed priest from the assets of the Debtor and the Non-Debtor Catholic Entities.  This injunction, however, was excised from the Confirmation Order by the District Court on appeal.  *See* D.I. 2089.

[12] Martin filed a supplement to his proof of claim under seal.  *See* Transcript of Hearing Held 3/11/13, D.I. 2141, pp. 46-48, 58.

[13] *See* Declaration of the Reverend Monsignor J. Thomas Cini, D.I. 9, ¶ 65; Order Confirming the Second Amended Chapter 11 Plan of Reorganization, D.I. 1471, ¶ 55.

Canonical action between Martin and the Diocese before the Vatican.[14]  The Canonical action is to determine "the status of [Martin] as an active priest in the Diocese," which will also resolve Martin's "remuneration, recognition of rights, and . . . overall standing" within the Diocese.[15]  When the claim was filed, Martin's claim remained pending before the Vatican, but has since concluded.[16]

The Plan Administrator filed this Claims Objection[17] against all proofs of claim filed by the Removed Priests, including Martin's claim.[18]  Asserting that the Debtor was not liable with respect to any of the claims, the Plan Administrator requested that the claims be disallowed in their entirety.[19]  Martin filed a response to the Claims Objection,[20] which was further replied to by the Plan Administrator.[21]  An oral hearing and status conference regarding the Claims Objection occurred on March 11, 2013.[22]  At the conclusion of the hearing, the Court took the Claims Objection under advisement, but asked for Martin to file an amended claim, and for the parties to file sur-replies, if any.[23]  All further filings related to the Claims Objection were consequently made under seal.

---

[14] Proof of Claim No. 1049, D.I. 1714, Exh. 1.

[15] Response by Kenneth Martin, D.I. 1714, ¶ 3.

[16] Transcript of Hearing Held 3/11/13, D.I. 2141, pp. 47:10-14.

[17] D.I. 1626.

[18] *See id.*, Exh. A.

[19] *Id.*, ¶ 13.

[20] Response by Kenneth Martin, D.I. 1714.

[21] Combined Reply, D.I. 2119.

[22] *See* Transcript of Hearing, D.I. 2141.

[23] *Id.*, pp. 58-59.

## DISCUSSION

The filing of a proof of claim constitutes *prima facie* evidence of the validity of the claim.[24] Yet once an objecting party submits sufficient evidence to place the claimant's entitlement at issue, the burden of going forward with the evidence to sustain the claim shifts to the claimant or its assignee. These shifting burdens of proof are described by the Third Circuit as follows:

> The burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. § 502(a) rests on different parties at different times. Initially, the claimant must allege facts sufficient to support the claim. If averments in his filed claim meet this standard of sufficiency, it is "prima facie" valid. In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the prima facie validity of the filed claim. It is often said that the objector must produce evidence equal in force to the prima facie case. In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. The burden of persuasion is always on the claimant.[25]

Here, the Plan Administrator's position is that any award of relief to Martin, who was removed from ministry by the Bishop of the Diocese, would depend upon a ruling that the Bishop wrongly relieved him of his position.[26] Arguing that such a ruling

---

[24] *See* 11 U.S.C. § 502(a).

[25] *In re Allegheny Intern., Inc.,* 954 F.2d 167, 173–74 (3d Cir. 1992) (internal citations omitted).

[26] Plan Administrator's Combined Reply, D.I. 2119, p. 4.

would be inconsistent with the result reached in the Supreme Court's decision in *Hosanna-Tabor*[27], the Plan Administrator asserts that the claim presented here is barred by the ministerial exception.[28]

Even without *Hosanna-Tabor*, it is argued that Martin's claim is premised only on ecclesiastical rights, which is not contained within the Bankruptcy Code's definitions of a "claim" or "right to payment."[29]  The Plan Administrator maintains that it is not reasonable to infer that the phrase "right to payment" encompasses rights to payment that arise solely under ecclesiastical obligations.[30] Making such an inference would reflect an intention by Congress for the automatic stay to also enjoin any ecclesiastical proceedings adjudicating such rights, as well as an intention for such rights to payment to be dischargeable by a religious debtor in bankruptcy.[31]

In response, Martin maintains that while this Court does not have to determine his status as a priest or otherwise, a priest's right to payments, such as payments of salary and healthcare, are more akin to contractual employment rights than ecclesiastical rights.[32]  Martin also points out that the ministerial exception is to be utilized as an affirmative defense only, and, thus, must be established by the Debtor.[33]

---

[27] *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 132 S. Ct. 694 (2012).

[28] Plan Administrator's Combined Reply, D.I. 2119, p. 4.

[29] *Id.*, p. 5.

[30] *Id.*, p. 6.

[31] *Id.*

[32] Transcript of Hearing Held 3/11/13, D.I. 2141, pp. 43:15 – 44:2, 45:1-3.

[33] *Id.*, pp. 44 – 46.

## I.    The Ministerial Exception

The First Amendment provides, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."[34]  The Supreme Court has reviewed and ruled on a litany of cases regarding what is now deemed the "ministerial exception," which precludes the application of legislation to claims concerning the employment relationship between a religious institution and its ministers.

In *Watson v. Jones*,[35] the Supreme Court considered a dispute between antislavery and proslavery factions over who controlled the property of a church.  The general assembly of the church recognized the antislavery faction, and the Supreme Court declined to question that determination.  The Court explained that "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them."[36]

Thereafter, in *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*,[37] the Supreme Court set forth that the *Watson* opinion radiates:

---

[34] U.S. Const. amend. I.

[35] 80 U.S. 679 (1871).

[36] *Id.* at 727.  "[A]lthough [*Watson v. Jones*] contains a reference to the relations of church and state under our system of laws, [it] was decided without depending upon prohibition of state interference with the free exercise of religion.  It was decided in 1872, before judicial recognition of the coercive power of the Fourteenth Amendment to protect the limitations of the First Amendment against state action."  *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 115 (1952).

[37] 344 U.S. 94 (1952).

> . . . a spirit of freedom for religious organizations, an
> independence from secular control or manipulation, in short,
> power to decide for themselves, free from state interference,
> matters of church government as well as those of faith and
> doctrine.  Freedom to select the clergy, where no improper
> methods of choice are proven, we think, must now be said to
> have federal constitutional protection as a part of the free
> exercise of religion against state interference.[38]

In *Kedroff,* the Supreme Court considered the right to use a Russian Orthodox cathedral in New York City.[39]  The Russian Orthodox churches in North America had formerly split from the Supreme Church Authority in Moscow.  The North American churches claimed that the right to use the cathedral belonged to an archbishop elected by them, whereas the Supreme Church Authority claimed that it belonged instead to an archbishop appointed by the patriarch in Moscow.[40]  In the midst of the Cold War, the highest court in the State of New York ruled in favor of the North American churches, based on a state law declaring that every Russian Orthodox church was to recognize, and be subject to, the jurisdiction and authority of the governing bodies of the Russian churches in North America.[41]  The Supreme Court, however, held the state law unconstitutional, finding that the controversy over the right to use the cathedral was "strictly a matter of ecclesiastical government"; it was within "the power of the

---

[38] *Id.* at 116.

[39] *Id.* at 95.

[40] *Id.* at 96-97.

[41] *Saint Nicholas Cathedral of Russian Orthodox Church in N. Am. v. Kedroff,* 302 N.Y. 1 (1950), *rev'd sub nom., Kedroff. See* N.Y. Relig. Corp. Law § 107.

Supreme Church Authority of the Russian Orthodox Church to appoint the ruling hierarch of the archdiocese of North America."[42]

In *Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich,*[43] the Supreme Court also considered a dispute over control of the American-Canadian Diocese of the Serbian Orthodox Church, including its property and assets.[44]   The Church removed Dionisije Milivojevich as bishop of the American-Canadian Diocese due to his defiance of the church hierarchy.[45]   Following his removal, Milivojevich brought a civil action in state court challenging the Church's decision, and the highest court in the state of Illinois reinstated Milivojevich's position as a bishop on the grounds that the proceedings resulting in his removal were procedurally and substantively defective under the internal regulations of the church.[46]   The Supreme Court, however, reversed and held that:

> the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them.[47]

---

[42] *Kedroff,* 344 U.S. at 115.

[43] 426 U.S. 696 (1976).

[44] *Id.* at 698.

[45] *Id.* at 702-06.

[46] *Id.* at 706-08.   *See Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich,* 328 N.E.2d 268 (1975), *rev'd.*

[47] 426 U.S. at 724-25.

Most recently, the Supreme Court considered the freedom of religious organizations to select its own ministers within a suit involving alleged employment discrimination.[48]  In *Hosanna-Tabor*, Cheryl Perich, a Lutheran minister, was removed from ministry by her congregation after she refused to resign her post as a "called"[49] teacher at the congregation's school.  Prior to the dispute, Perich had taught a variety of secular subjects, such as math, language arts, social studies, science, gym, art, and music, but had also taught a religion class four days a week and led the students in prayer and devotional exercises each day.[50]  Additionally, Perich also attended a weekly school-wide chapel service, and led the chapel service herself about twice a year. Perich, however, became ill in June 2004 with what was eventually diagnosed as narcolepsy, and began the 2004–2005 school year on disability leave.[51]

On January 27, 2005, Perich notified the school principal that she would be able to report to work the following month, but was told that the school had already contracted with a lay teacher to fill Perich's position for the remainder of the school

---

[48] *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 132 S. Ct. 694 (2012).

[49] The Hosanna-Tabor Evangelical Lutheran Church and School is a member congregation of the Lutheran Church-Missouri Synod (the "Synod").  The Synod classifies teachers into two categories: "called" and "lay."  To be eligible to receive a call from a congregation, teachers must satisfy certain academic requirements.  One way of doing so is by taking courses in theological study, obtaining the endorsement of the local Synod district, and passing examination by a faculty committee.  *Id.* at 699.  At the Hosanna-Tabor Church, a call could be rescinded only for cause and by a supermajority vote of the congregation.  *Id.*  By contrast, "lay" or "contract" teachers are not required to be trained by the Synod. *Id.*  At the Hosanna-Tabor Church, lay teachers were appointed by the school board, without a vote of the congregation, to one-year renewable terms, but called and lay teachers performed the same duties.  *Id.* Lay teachers, however, were generally hired only when called teachers were unavailable.  *Id.*

[50] *Id.* at 700.

[51] *Id.*

11

year.[52]  During a meeting of the congregation, the school administrators had stated that Perich was unlikely to be physically capable of returning to work that school year or the next, and the congregation voted to offer Perich a "peaceful release" from her call, whereby the congregation would pay a portion of her health insurance premiums in exchange for her resignation as a called teacher.

Perich refused to resign, and reported to work on February 22, the first day she was medical cleared to do so.[53]  When asked to leave, Perich would not do so until she obtained written documentation that she had reported to work.  Later that afternoon, she was told by the school principal that she would likely be fired, to which Perich responded by stating that she had spoken to an attorney, and intended to assert her legal rights.  The congregation later voted to terminate and rescind Perich's calling on the grounds of her "insubordination and disruptive behavior" on February 22, as well as the damage she had done to her "working relationship" with the school by "threatening to take legal action."[54]

Perich filed a charge with the Equal Employment Opportunity Commission (the "EEOC"), alleging that she had been terminated in violation of the Americans with Disabilities Act ("ADA").[55]  The EEOC brought suit against the Hosanna-Tabor Church, alleging that she had been fired in retaliation for threatening to file an ADA lawsuit, and Perich intervened to add a cause of action under the state law counterpart to the

---

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.* at 701.

ADA.  The EEOC and Perich sought Perich's reinstatement to her former position, or front pay in lieu thereof, along with back pay, compensatory and punitive damages, attorney's fees, and injunctive relief.  The Hosanna-Tabor Church moved for summary judgment, arguing that under the "ministerial exception" to employment discrimination laws, the suit was barred by the First Amendment because the claims at issue concerned the employment relationship between a religious institution and one of its ministers.[56]  The District Court agreed with the church, and granted summary judgment.  On appeal, the Sixth Circuit vacated the District Court judgment, finding that the minister did not qualify as a "minister" for First Amendment purposes, because her duties as a teacher were identical to the duties of the church's lay teachers.[57]

The Supreme Court reversed, holding that both the Establishment Clause and the Free Exercise Clause barred the government "from interfering with the decision of a religious group to fire one of its ministers."[58]  As the opinion explained:

> The members of a religious group put their faith in the hands of their ministers.  Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision.  Such action interferes with the

---

[56] *Id.*

[57] *Id.*

[58] *Id.* at 702. The Supreme Court distinguished the present case from *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990), in which two members of the Native American Church were denied state unemployment benefits after it was determined that they had been fired from their jobs for ingesting peyote, a crime under Oregon law.  *Id.* at 706-07.  Despite that the peyote had been ingested for sacramental purposes, the Supreme Court stated that the denial of benefits did not violate the Free Exercise Clause, because the right of free exercise did not relieve an individual of the obligation to comply with a valid and neutral law of general applicability, and the case involved government regulation of only outward physical act by individuals.  *Hosanna-Tabor*, however, concerned government interference with an internal church decision which affected the "faith and mission of the church itself." *Id.* at 707.

internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs.   By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments.   According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.[59]

It was held that the award of any relief, such as frontpay, backpay, compensatory and punitive damages, or attorney's fees, would "operate as a penalty on the Church for terminating an unwanted minister," and was prohibited by the First Amendment.[60]

The Supreme Court went on to discuss that the purpose of the ministerial exception is "not to safeguard a church's decision to fire a minister only when it is made for a religious reason."[61]  Instead, the exception "ensures that the authority to select and control who will minister to the faithful – a matter 'strictly ecclesiastical' – is the church's alone."[62]

## II.    Application of the Ministerial Exception

The Plan Administrator has asserted that under *Hosanna-Tabor*, the Court is barred from granting Martin any relief on account of his removal from ministry.[63]  The Court finds the Plan Administrator's position persuasive.

---

[59] *Id.* at 706.

[60] *Id.* at 709 ("Such relief would depend on a determination that Hosanna-Tabor was wrong to have relieved Perich of her position, and it is precisely such a ruling that is barred by the ministerial exception.")

[61] *Id.*

[62] *Id.* (quoting *Kedroff*, 344 U.S. at 119) (internal citation omitted).

[63] Plan Administrator's Combined Reply, D.I. 2119, pp. 4-5.

*Hosanna-Tabor* has made it clear that the Establishment Clause and the Free Exercise Clause bar the government from interfering with the decision of a religious group to fire one of its ministers.[64]   In the same vein, the Court is unable to require a church to "accept or retain an unwanted minister, or punish . . . a church for failing to do so."[65]   Awarding any relief that would "operate as a penalty on the Church for terminating an unwanted minister" is equally prohibited by the First Amendment, seeing as the award of such relief would depend on a determination that the church was wrong to have relieved the minister in question. [66]

Here, when Bishop Saltarelli released the names of 18 Diocesan priests who had "admitted, corroborated, or otherwise substantiated allegations" of abuse against minors, all eight of the priests who were living at the time of the announcement were "removed from any ministerial duties."[67]   Mr. Martin was one of the eight removed priests.[68]  Much like how awarding Perich in *Hosanna-Tabor* with any relief (of frontpay, backpay, compensatory and punitive damages, or attorney's fees) would operate as a penalty on the church for terminating an unwanted minister,[69] awarding Martin with relief for his claim of pension and sustenance would likewise effectively create a penalty or punishment upon the Debtor for the removal of Martin from ministerial duties.  Mr.

---

[64] 132 S. Ct. at 702.

[65] *Id.* at 706.

[66] *Id.* at 709.

[67] Declaration of the Reverend Monsignor J. Thomas Cini, D.I. 9, ¶ 65.

[68] *See* Order Confirming the Second Amended Chapter 11 Plan of Reorganization, D.I. 1471, ¶ 55 (listing the eight removed priests).

[69] 132 S. Ct. at 709.

Martin emphasizes that his claim for pension and sustenance is premised upon an anticipated ruling in a Canonical action which will resolve his proper allotted remuneration and overall standing within the Diocese.[70]  Yet while the Debtor may be under a separate Canonical obligation to pay sustenance,[71] the Court is barred, by the ministerial exception, from forcing Martin's reinstatement into ministry, or awarding any form of relief that would come at the Debtor's expense on account of his removal.

The ministerial exception exists in order to ensure that "the authority to select and control who will minister to the faithful . . . is the church's alone."[72]  At the time of Bishop Saltarelli's announcement, the Diocese (through the Bishop) chose to remove eight priests from ministry, and that decision remains the Diocese's alone.  The granting of any claims for pensions, sustenance, or other forms of relief against the Debtor would create a determination that the Diocese was wrong to have relieved the ministers of their positions[73] – a decision that the Supreme Court has already declared "strictly ecclesiastical," and off-limits for the courts.[74]

---

[70] Response by Kenneth Martin, D.I. 1714, ¶ 3.

[71] *See* Letter Brief re: Canon Law, D.I. 1422, pp. 3-4 (describing sustenance and when it is to be paid, under Canon law).

Elsewhere, in an argument in favor of staying the proceeding or overruling the objection pending resolution of the dispute in the Vatican, Martin has argued that the rulings of a church tribunal are binding on civil courts, and civil courts should be able to enforce such rulings.  *See* Response by Kenneth Martin, D.I. 1714, pp. 2-3.  As a note, however, there have been no pleadings here which request the Court to enforce any rulings made by the Vatican regarding Canonical obligations to pay wages, sustenance, or other forms of relief.

[72] *Hosanna-Tabor,* 132 S. Ct. at 709 (*quoting Kedroff,* 344 U.S. at 119) (internal citation omitted).

[73] *Id.* ("[I]t is precisely such a ruling that is barred by the ministerial exception.")

[74] *Id.*

16

### III.    The Ministerial Exception as an Affirmative Defense

Mr. Martin has asserted that the ministerial exception only exists as an affirmative defense, and the burden stands on the Diocese to establish the defense.[75]

The Supreme Court has indeed stated that the ministerial exception operates "as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar."[76]   As described within *Hosanna-Tabor*: "That is because the issue presented by the exception is 'whether the allegations the plaintiff makes entitle him to relief,' not whether the court has 'power to hear [the] case.' District courts have power to consider . . . claims in cases of this sort, and to decide whether the claim can proceed or is instead barred by the ministerial exception."[77]   From this, it is uncertain, though unlikely, that the Supreme Court meant for the exception to join other defenses ordinarily raised under Rule 8(c)[78], or for it to be a defense that is ordinarily lost if not timely raised, which Martin's current argument seems to suggest.[79]   Rather, in accord with the usual burdens of proof operating in substantive claim objections, the Plan Administrator holds the burden of pleading such a defense sufficient to negate "the *prima facie* validity of the filed claim . . .

---

[75] Transcript of Hearing Held 3/11/13, D.I. 2141, p. 46:8-12.                                                   .

[76] *Hosanna-Tabor*, 132 S. Ct. at 709 n.4.

[77] *Id.* (citations omitted).

[78] Fed. R. Civ. P. 8. (made applicable through Fed. R. Bankr. P. 7008, albeit only in adversary proceedings).

[79] It remains unclear whether, even as an affirmative defense, the Court is allowed to raise the question of the applicability of the ministerial defense *sua sponte*.  That question, however, does not need to be decided here.

the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency."[80]

Here, the Court accepts that the Plan Administrator has met its burden of pleading the application of the ministerial exception.   Not only does the Plan Administrator's first substantive objection to the claim point out the fact that the current dispute parallels one "involving church doctrine, Canon Law . . . and ministerial relationship,"[81] the argument that *Hosanna-Tabor* applies to the present case is further fleshed out in the Plan Administrator's Combined Reply.[82]   The Plan Administrator describes, at length, the *Hosanna-Tabor* case and stresses that when applied to the current facts, it mandates disallowance of Martin's claim for relief, as he was removed from ministry and filed claims for damages on the account of such removal.[83]   The Court is satisfied that the pleading of the ministerial exception undertaken by the Plan Administrator in both of these briefings have placed Martin on fair notice of the application of this affirmative defense.[84]   It is of note that the Court also gave Martin the

---

[80] *In re Allegheny Intern., Inc.,* 954 F.2d at 173–74.

[81] Plan Administrator's Claims Objection, D.I. 1626, Exh. A.  Although the ministerial exception is argued more as a jurisdictional bar than an affirmative defense within this particular brief, the Court is satisfied that it raised enough notice of the applicability of the ministerial exception and of the Plan Administrator's intention to raise such a defense.

[82] D.I. 2119, pp. 4-5.

[83] *Id.*

[84] Courts remain in disagreement as to whether the new pleading standards articulated by the Supreme Court in *Bell Atlantic Corp. v. Twombly* and *Iqbal v. Ashcroft* extends to the pleading of affirmative defenses. *See* 5 Fed. Prac. & Proc. Civ. § 1274 (3d ed.).  The District of Delaware, however, as well as other district courts within the Third Circuit, have found *Twombly* and *Iqbal* inapplicable to affirmative defenses.  *See Bayer CropScience AG v. Dow AgroSciences LLC,* No. 10-1045, 2011 WL 6934557 (D. Del. Dec. 30, 2011); *Tyco Fire Products LP v. Victaulic Co.,* 777 F. Supp. 2d 893, 900 (E.D. Pa. 2011).

opportunity to file an amended proof of claim after the oral hearing and status conference on the matter.

### IV.    Claims Premised on Ecclesiastical Rights

The Plan Administrator, pleading in the alternative, has asserted that notwithstanding the law in *Hosanna-Tabor,* Martin's claim arises under ecclesiastical law only, and do not fall under the definition of "right to payment" used within the Bankruptcy Code.  Yet, seeing as the applicability of the ministerial exception bars the award of any relief to Martin from the termination of his role as a minister, the Court need not address whether his claim is solely founded upon ecclesiastical rights, nor whether the Bankruptcy Code allows such claims to be recovered.

### <u>CONCLUSION</u>

As set forth above, pursuant to the recent Supreme Court decision in *Hosanna-Tabor*, the Court is unable to grant relief to Martin after his removal from active ministry.  The First Amendment prohibits the Court from interfering in ecclesiastical decisions and exercising control over who can act as ministers within a church.  Equally prohibited is the award of any relief to Martin in connection with his job as a minister, as the enforcement of any such award would operate as a penalty upon the Diocese for his removal from ministry.

The Bankruptcy Rules, however, put the Debtor and the Court in a strange procedural posture.  Under bankruptcy law, Martin's claim against the Debtor is

deemed allowed unless otherwise ordered by the Court.[85]  Thus, to abstain from ruling on the Claims Objection or to overrule the Claims Objection could have the legal effect of awarding Martin with a claim against the Debtor.  Thus, the Court will sustain the Claims Objection solely for the procedural purpose of removing (under the ministerial exception) any issues relating to Martin's claim from the purview of the Bankruptcy Court.

---

[85] See, generally, Fed. R. Bankr. P. 3001, 3003 and 3007.